**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | |
|---|---|
| AMERICAN ALLIANCE FOR EQUAL RIGHTS, | |
| *Plaintiff,* | Case No. 1:25-cv-669 |
| and | |
| UNITED STATES OF AMERICA, | Judge Coleman |
| *Plaintiff-Intervenor,* | |
| v. | |
| STATE OF ILLINOIS; JB PRITZKER, in his official capacity as Governor of the State of Illinois; JAMES BENNETT, in his official capacity as Director of the Illinois Department of Human Rights; KWAME RAOUL, in his official capacity as Attorney General of the State of Illinois; and ALEXI GIANNOULIAS, in his official capacity as Secretary of State of the State of Illinois. | |
| *Defendants.* | |

**MOTION FOR A PRELIMINARY INJUNCTION
(<u>RELIEF REQUESTED BY JULY 1, 2025</u>)**

# TABLE OF CONTENTS

Introduction ......................................................................................................................... 1

Background ......................................................................................................................... 2

    I.   SB 2930 compels speech and encourages discrimination .................................... 2

    II.  SB 2930's demographic-disclosure requirements injure the Alliance's members. ........... 4

Argument ........................................................................................................................... 6

    I.   The Alliance is likely to succeed on the merits of its claims ............................... 7

        A.  SB 2930 likely violates the Fourteenth Amendment ............................. 7

        B.  SB 2930 likely violates the First Amendment ....................................... 9

    II.  SB 2930 will cause irreparable harm ............................................................. 12

    III. The balance of the harms and public interest favor a preliminary injunction. ................ 14

Conclusion ....................................................................................................................... 14

Certificate of Service ....................................................................................................... 15

## INTRODUCTION

Several States have tried to force businesses to recruit board members based on race, sex, and a host of other demographic traits. Some of those laws set explicit racial quotas. Others set sex-based quotas. And still others set "aspirational diversity objectives." *All. for Fair Bd. Recruitment v. SEC*, 125 F.4th 159, 166 (5th Cir. 2024) (en banc). All met the same fate: courts held that those regulations are "facially invalid" because they discriminate. *All. for Fair Bd. Recruitment v. Weber*, 2023 WL 3481146, at *2-3 (E.D. Cal. May 15); *Crest v. Padilla*, No. 19-STC-27561 at 5-23 (Cal. Sup. Ct. 2022).

Despite that string of losses for other States, Illinois passed SB 2930, which forces nonprofits to collect, aggregate, and advertise their demographic data to the public. Though SB 2930's language is different from the laws that courts have previously enjoined, its differences make it *more* heavy-handed, and its core aim remains the same: to "encourage nonprofits to reflect the diversity of the communities they support." Exhibit (Ex.) B at 1. "Diversity," according to Illinois' law, is defined not in terms of experience, knowledge, or viewpoint but in terms of "demographic[s]" alone. 805 ILCS §105/114.15(a)-(b).

That scheme violates the Constitution's ban on race discrimination. State-ordered discrimination is "antithetical to the Fourteenth Amendment." *Shaw v. Hunt*, 517 U.S. 899, 907 (1996). And SB 2930 can't end-run that rule by "encourag[ing]" private actors to discriminate on Illinois' behalf. *Norwood v. Harrison*, 413 U.S. 455, 465 (1973).

SB 2930 also offends the First Amendment. The Free Speech Clause protects not just "the right to speak freely" but also "the right to refrain from speaking at all." *Janus v. AFSCME*, 585 U.S. 878, 892 (2018). SB 2930 breaks that rule, conscripting nonprofits to talk about "controversial subjects" like race, sexual orientation, gender identity, and more. *Id*. at 913-14.

1

The Alliance will suffer irreparable harm if its members are forced to comply with SB 2930's requirements, both because the law punishes their refusal to discriminate and because the law compels their speech. Those members will be required to file the disclosures that trigger the law in November, and the side that loses this motion will likely take an expedited appeal. So to give this Court, the parties, and the Seventh Circuit sufficient time to consider these important issues, the Alliance respectfully asks this Court to preliminarily enjoin Defendants from implementing or enforcing SB 2930 **by July 1, 2025**.

## BACKGROUND

Illinois enacted SB 2930 on June 30, 2024. Ex.B at 1. The law requires nonprofits to publish the demographics of their boards, compelling speech and encouraging discrimination. It will irreparably harm the Alliance's members in late 2025, when these disclosures first become due.

## I.    SB 2930 compels speech and encourages discrimination.

After Illinois passed SB 2930, it became "the first" and only State that requires nonprofits to publicly disclose the demographics of their staff. Ex.A at 1. To implement that requirement, SB 2930 forces qualifying nonprofits to advertise "the aggregated demographic information of [their] directors and officers" on their "publicly available website." 805 ILCS §105/114.15(a). And when those nonprofits broadcast that data, they must include the "race, ethnicity, gender, disability status, veteran status, sexual orientation, and gender identity" of their "directors and officers." *Id*.

SB 2930 targets specific nonprofits. To fall within the law's ambit, a nonprofit must "repor[t] grants of $1,000,000 or more to other charitable organizations." *Id*. And if a nonprofit falls in that category, it must advertise its demographic data on its website within 30 days of filing its "annual AG990-IL Charitable Organization Annual Report." *Id*.

SB 2930 imposes two broad requirements. Charitable organizations must first ask their directors and officers several "demographic" questions, including who they are attracted to, how

they identify themselves, and what race they claim to be. *See id*. And once a nonprofit has that "demographic information," it must aggregate the data and advertise it on "the corporation's publicly available website for at least 3 years." *Id*.

When nonprofits publish that data, they must use Illinois' state-sanctioned "demographic classifications"—even if they find those categories inaccurate, offensive, or ahistorical. §105/114.15(b). Those classifications are "prepare[d] and publish[ed]" by Illinois' Department of Human Rights, which creates a "standardized list of demographic classifications" that every regulated nonprofit must use. *Id*. The Department does not have to use any scientific, historical, or ethnographic data to create them. Instead, SB 2930 directs the Department to "work with community partners" to create the classifications, which it can "update" at any time, for any reason. *Id*. As of today, those categories are "(i) White; (ii) Black or African American; (iii) American Indian or Alaska Native; (iv) Asian; (v) Native Hawaiian or Other Pacific Islander; (vi) Hispanic or Latino; or (vii) Middle Eastern or North African." 20 ILCS §50/1. The Supreme Court has called those same categories "arbitrary," "'incoherent,'" and "'irrational.'" *SFFA v. Harvard*, 600 U.S. 181, 216 (2023).

The main reason that SB 2930 compels speech is to promote discrimination. According to the law's main sponsor, SB 2930's "goal is to nudge foundations and big nonprofits to diversify their boards." Ex.A at 1. Other legislators echoed that claim, explaining that SB 2930 ensures that a "diverse range of communit[y] nonprofits [are] handled by a diverse range of people." Ex.B at 3. In fact, that type of discrimination was the law's central "aim." Ex.C at 6.

Governor Pritzker signed SB 2930 for the same reason. By "requir[ing] nonprofits to publicly report the aggregated demographic information about their boards," SB 2930 "encourage[s]

nonprofits to reflect the diversity of the communities they support." Ex.B at 1. And SB 2930 "encourage[s]" that behavior, the Governor observed, because it allows community leaders to "assess each nonprofit's" demographic statistics and "implement strategies" to change them. Ex.B at 2. The Governor then concluded: By encouraging nonprofits to hire with an eye towards race and other immutable characteristics, SB 2930 "will help ensure that nonprofit boards better reflect the populations they serve." Ex.D at 2.

The law's proponents understood SB 2930 the same way. The public can "assess the diversity of foundation boards," one proponent explained, because SB 2930 will force nonprofits to publicize their demographic data. Ex.C at 7. And if any boards aren't sufficiently "divers[e]," the public can pressure those nonprofits "to ensure that their leadership aligns with community demographics." Ex.C at 7. That pressure campaign wasn't lost on the public either, who recognized that SB 2930 was meant to "encourage nonprofits to reflect the diversity of the[ir] communities." Ex.E at 1; Ex.F at 2; *accord* Verif.-Compl. (Doc.1) ¶¶21 & * (cataloguing examples).

## II. SB 2930's demographic-disclosure requirements injure the Alliance's members.

The Alliance has members who will soon be harmed by SB 2930's demographic-disclosure requirements. Verif.-Compl. ¶¶22-24; Blum-Decl. ¶5. Those members include Members A and B. Blum-Decl. ¶¶5-6; A-Decl. ¶2; B-Decl. ¶2. Members A and B are directly regulated by SB 2930. Blum-Decl. ¶7; A-Decl. ¶4; B-Decl. ¶4; Verif.-Compl. ¶23. These nonprofits are charitable organizations that are incorporated for philanthropic and civic purposes. Blum-Decl. ¶7; A-Decl. ¶4; B-Decl. ¶4; Verif.-Compl. ¶23. Both are recognized 501(c)(3)s. Blum-Decl. ¶7; A-Decl. ¶4; B-Decl. ¶4; Verif.-Compl. ¶23. Both file AG990-IL Charitable Organization Annual Reports with the state attorney general. Blum-Decl. ¶7; A-Decl. ¶4; B-Decl. ¶4; Verif.-Compl. ¶23. And both contribute more than $1,000,000 in grants to other charitable organizations. Blum-Decl. ¶7; A-Decl. ¶4; B-Decl. ¶4; Verif.-Compl. ¶23.

Because SB 2930 regulates Members A and B, they have to follow the law's disclosure requirements starting this year. Blum-Decl. ¶¶5, 7; A-Decl. ¶¶4-5; B-Decl. ¶¶4-5; Verif.-Compl. ¶24. Members A and B will file their AG-990-IL report in November 2025. Blum-Decl. ¶¶7, 12; A-Decl. ¶5; B-Decl. ¶5; Verif.-Compl. ¶24. And once they file that report, they have "30 days" to publish their demographic information on their websites. 805 ILCS §105/114.15(a).

But Members A and B do not want to publish that information because it contradicts their sincerely held beliefs. A-Decl. ¶¶6-9; B-Decl. ¶¶6-9; Verif.-Compl. ¶¶25-27. Members A and B believe officers and directors should be selected based on their experience, skills, and organizational commitment—not race, sex, or any other immutable trait. A-Decl. ¶6; B-Decl. ¶6; Verif.-Compl. ¶¶25-27. And because of that belief, Members A and B don't consider race, sex, sexual orientation, or gender identity when filling board positions. A-Decl. ¶6; B-Decl. ¶6; Verif.-Compl. ¶¶25-27. They don't ask their staff if they fall within those demographic categories. A-Decl. ¶6; B-Decl. ¶6; Verif.-Compl. ¶¶25-27. And they don't classify their staff by those categories, because they think doing so would be immoral, unlawful, and unwise. A-Decl. ¶6; B-Decl. ¶6; Verif.-Compl. ¶¶25-27.

Yet SB 2930 compels Members A and B to speak in these ways. It requires Members A and B to talk with their officers and directors about sensitive demographic issues. A-Decl. ¶8; B-Decl. ¶8; Verif.-Compl. ¶26. It forces them to categorize their staff by race, gender identity, and a host of other categories. A-Decl. ¶8; B-Decl. ¶8; Verif.-Compl. ¶26. It compels them to advertise that information on their own websites. Blum-Decl. ¶¶11-12; A-Decl. ¶9; B-Decl. ¶9; Verif.-Compl. ¶27. And it requires them to publicize that information using the State's preferred "demographic classifications"—even though they think those classifications are inaccurate, ahistorical, and arbitrary. 805 ILCS §105/114.15(a)-(b).

SB 2930's publication requirements will also change the messages on Member A-B's web-sites. A-Decl. ¶9; B-Decl. ¶¶8-9. Both contain a carefully curated mix of content that Members A and B convey to the public. A-Decl. ¶9; B-Decl. ¶9. That content critiques principles that SB 2930 promotes, including the relevance of race and ethnicity and the need for sex-based classifications. A-Decl. ¶9; B-Decl. ¶9. By forcing these nonprofits to post sensitive demographic information on their own websites, their messages will be muddled—if not outright contradicted. A-Decl. ¶8; B-Decl. ¶¶8-9.

SB 2930 will also pressure Members A and B to discriminate. Blum-Decl. ¶¶8-10; A-Decl. ¶¶10-11; B-Decl. ¶¶10-11.  Once Members A and B are forced to advertise their demographic data, SB 2930's supporters can "assess" their "racial and ethnic statistics" and "pressure [them] to change the composition of [their] board[s]." A-Decl. ¶11 (quoting Ex.B at 2); B-Decl. ¶11. That pressure will be intense. Blum-Decl. ¶¶9-10; A-Decl. ¶11; B-Decl. ¶11. And outside groups will claim—without evidence beyond these misleading disclosures—that a nonprofit is insufficiently diverse, does not care about inclusivity, or is outright discriminating. Blum-Decl. ¶9; A-Decl. ¶11; B-Decl.¶11. Those accusations seriously harm a nonprofit's reputation, mission, and ability to get donations. A-Decl. ¶11; B-Decl. ¶11; *accord* Blum-Decl. ¶9. And they "exert significant pressure" on Members A and B to balance their boards racially and otherwise. A-Decl. ¶11; B-Decl. ¶11; Blum-Decl. ¶¶8-10.

## ARGUMENT

The Alliance is entitled to a preliminary injunction if it can prove four things: likely success, irreparable harm, the balance of harms, and the public interest. *Int'l Ass'n of Firefighters, Loc. 365 v. E. Chicago*, 56 F.4th 437, 446 (7th Cir. 2022). The Alliance proves all four here.

# I. The Alliance is likely to succeed on the merits of its claims.

SB 2930 encourages discrimination and compels speech. It likely violates the Fourteenth and First Amendments.

## A. SB 2930 likely violates the Fourteenth Amendment.

"The clear and central purpose of the Fourteenth Amendment was to eliminate *all* official state sources of invidious racial discrimination." *Harvard*, 600 U.S. at 206 (emphasis added). Consistent with that purpose, a State "may not induce, encourage or promote private persons to accomplish what it is constitutionally forbidden to accomplish." *Norwood*, 413 U.S. at 465. That rule applies with special force to the Fourteenth Amendment's "prohibition against racial discrimination." *Harvard*, 600 U.S. at 230. So a "law compelling persons to discriminate against other persons because of race is a palpable violation of the Fourteenth Amendment." *Monterey Mech. Co. v. Wilson*, 125 F.3d 702, 708 (9th Cir. 1997) (cleaned up).

A law that "encourages" or "induces an employer to hire with an eye toward … race" is presumptively unconstitutional. *W.H. Scott Const. Co., Inc. v. Jackson*, 199 F.3d 206, 215 (5th Cir. 1999). The "relevant question" for equal protection "is not whether a statute requires the use of [race-based] measures, but whether it authorizes or encourages them." *Id.*; *Wilson*, 125 F.3d at 711. So if a law lets someone "rely on racial classifications," then the Equal Protection Clause "requires the government to show that the [law] can survive strict scrutiny." *Midwest Fence Corp. v. U.S. DOT*, 840 F.3d 932, 941 (7th Cir. 2016); *Monterey Mech.*, 125 F.3d at 710-11. So too when a law "create[s] pressure to focus recruiting efforts" on "women" or racial "minorities." *MD/DC/DE Broad. Ass'n v. FCC*, 236 F.3d 13, 17-19 (D.C. Cir. 2001).

SB 2930 encourages discrimination. From its inception to its passage, SB 2930's supporters said the law's core aim was to "encourage nonprofits to reflect the diversity of the communities they support." Ex.B at 1. SB 2930's drafter touted that fact, boasting that SB 2930's "goal is to

nudge foundations and big nonprofits to diversify their boards." Ex.A at 1 (remarks of Sen. John-son). The Governor recognized that purpose and effect when he signed the law, explaining that SB 2930 "encourage[s] nonprofits to reflect the diversity of the communities they support." Ex.B at 1. So did SB 2930's proponents when they lobbied for the law's passage, observing that SB 2930 was designed "to recruit qualified individuals from diverse communities." Ex.F at 2.

By "diversity," SB 2930's sponsors mean the prioritization of certain demographics, like race, when selecting officers and directors. The prioritization of these demographics is clear from the text of the bill, which requires reporting only specific types of demographic information, in-cluding race, ethnicity, sexual orientation, and gender identity. 805 ILCS §105/114.15(a). And SB 2930 implements that discrimination through a simple, three-step process. First, the law forces nonprofits to advertise their demographic data, which lets "constituents," activist "groups," and local "leaders" see the racial and demographic breakdown of a nonprofit's board. Ex.A at 1. Those groups then "assess each nonprofit's" demographic data and pressure them "to recruit qualified individuals from diverse communities." Ex.B at 2. And that pressure will "nudge … nonprofits to diversify their boards," Ex.A at 1, by encouraging nonprofits to hire with an eye towards race so they can advertise better "demographic information" in the future, *see* 805 ILCS §105/114.15(a). Courts have recognized that similar disclosure rules "requir[e] or encourag[e]" businesses "to make discriminatory decisions" when selecting "board members." *Meland v. Weber*, 2 F.4th 838, 847 (9th Cir. 2021).

Because SB 2930 encourages discrimination, it is presumptively invalid and must satisfy strict scrutiny, *Harvard*, 600 U.S. at 206, which it fails. SB 2930 does not pursue either of the "two compelling interests that permit resort to race-based … action": It doesn't "remediat[e] specific, identified instances of past discrimination" or "avoi[d] imminent and serious risks to human safety

in prisons." *Id*. at 207. And the "diversity" interests that SB 2930's proponents have touted are not compelling. *Richmond v. J.A. Croson Co.*, 488 U.S. 469, 496-500 (1989); *accord Lutheran Church-Missouri Synod v. F.C.C.*, 141 F.3d 344, 354 (D.C. Cir. 1998) ("We do not think diversity can be elevated to the 'compelling' level.").

Even if Illinois' diversity interests were compelling, SB 2930 wouldn't be narrowly tailored. SB 2930 would be narrowly tailored only if it were *necessary* for achieving a compelling interest. *Harvard*, 600 U.S. at 207. But SB 2930 applies to nonprofits "without a predicate finding that [any] particular [nonprofit] discriminated in the past or reasonably could be expected to do so in the future." *MD/DC/DE*, 236 F.3d at 21. Such a "sweeping requirement is the antithesis of [a] rule narrowly tailored to meet a real problem." *Id*. And Illinois' "arbitrary" racial categories cannot help achieve any legitimate goal. *Harvard*, 600 U.S. at 216. SB 2930 thus likely violates the Equal Protection Clause. *Id*.

### B.    SB 2930 likely violates the First Amendment.

The Supreme Court has long held that "freedom of speech includes both the right to speak freely and the right to refrain from speaking at all." *Janus*, 585 U.S. at 892 (cleaned up); *see also Riley v. Nat'l Fed'n of the Blind of N.C.*, 487 U.S. 781, 796-97 (1988). Laws "compelling individuals to speak a particular message" necessarily "alter the content of their speech." *NIFLA v. Becerra*, 585 U.S. 755, 766 (2018) (cleaned up). These content-based regulations violate one of the First Amendment's "cardinal constitutional command[s]." *Janus*, 585 U.S. at 892-93. And that violation occurs whether the law involves either "compelled statements of opinion" or "compelled statements of 'fact.'" *Riley*, 487 U.S. at 797-98. "[E]ither form of compulsion," the Supreme Court has held, "burdens protected speech." *Id*.

SB 2930 compels speech. To comply, Members A and B must talk with their staff about controversial topics like race, sex, gender, and gender identity. 805 ILCS §105/114.15(a)-(b); A-

9

Decl. ¶8; B-Decl. ¶8. Then they must publicize that controversial information on their website, for the public, for several years—all while using Illinois' state-sanctioned definitions. 805 ILCS §105/114.15(b); A-Decl. ¶9; B-Decl. ¶9. By requiring nonprofits to publicize their demographic data, SB 2930 effectively requires them to "expres[s] support for a particular set of positions on controversial public issues." *Janus*, 585 U.S. at 892. And it requires them to "include other ideas" on their websites to accommodate—and ultimately promote—speech that they "would prefer not to include." *303 Creative LLC v. Elenis*, 600 U.S. 570, 586 (2023). In other words, SB 2930 forces nonprofits to speak the State's "own preferred messages." *Id.*; *Hurley v. Irish-Am. Gay, Lesbian & Bisexual Grp. of Bos.*, 515 U.S. 557, 572-73 (1995).

SB 2930 fails strict scrutiny. For starters, Illinois' interests are not compelling. Public transparency is not a compelling state interest. *See Int'l Dairy Food Ass'n v. Amestoy*, 92 F.3d 67, 73 (2d Cir. 1996) ("the public's 'right to know'" is not a substantial interest); *see also Riley*, 487 U.S. at 798-99 ("importance of informing donors" is not compelling). And "diversity" isn't a compelling interest either. *See Harvard*, 600 U.S. at 214-18; *Lutheran Church-Missouri Synod*, 141 F.3d at 354.

But even if Illinois' interests were compelling, SB 2930 wouldn't be narrowly tailored. *Riley*, 487 U.S. at 800. The State could, for example, undertake "a broader educational campaign" to promote its goals. *Ent. Software Ass'n v. Blagojevich*, 469 F.3d 641, 652 (7th Cir. 2006). Or it could require nonprofits to privately report their demographic statistics to the government, *Riley*, 487 U.S. at 800—a strategy Illinois has already adopted for some "private companies and boards." Ex.B at 2. And the State can "vigorously enforce its [antidiscrimination] laws" against any nonprofits that are violating them. *Riley*, 487 U.S. at 800. Because "more benign and narrowly tailored options are available," SB 2930 fails strict scrutiny. *Id.*

10

Illinois might claim that SB 2930 compels only commercial speech—which is subject to more relaxed constitutional scrutiny—but Illinois would be wrong. Commercial speech either "proposes a commercial transaction," "is an advertisement," "refers to a specific product," or is spoken with "an economic motivation." *Jordan v. Jewel Food Stores, Inc.*, 743 F.3d 509, 516-17 (7th Cir. 2014); *accord Bd. of Trs. of State Univ. of N.Y. v. Fox*, 492 U.S. 469, 482 (1989). SB 2930 doesn't regulate any of those things. It compels and alters nonprofits' *charitable* speech—a form of speech that, much like political speech, is highly "protected" and subject to strict scrutiny. *Riley*, 487 U.S. at 789.

Even if SB 2930 regulated commercial speech, it would still be subject to strict scrutiny. Strict scrutiny applies to commercial speech when the underlying speech does not involve "purely factual and uncontroversial information." *Zauderer v. Office of Disciplinary Counsel for Sup. Ct. of Ohio*, 471 U.S. 626, 651 (1985); *see also NIFLA*, 585 U.S. at 768. And SB 2930's disclosure requirements are neither factual nor uncontroversial.

Illinois' racial and ethnic classifications are "arbitrary," "irrational," and "incoherent"— not factual. *Harvard*, 600 U.S. at 216; *id.* at 291-294 (Gorsuch J., concurring). And its remaining classifications—like gender, gender identity, and sexual orientation—are just as "opinion-based." *Ent. Software Ass'n*, 469 F.3d at 652.

SB 2930's demographic categories are "highly controversial" too. *Id.* Even if they were accurate, many nonprofits would still "have an entirely different definition of [those] term[s]," *id.*—after all, "controversial subjects such as … sexual orientation and gender identity" are two of the most divisive issues in American politics, *Janus*, 585 U.S. at 913. So by conscripting Members A and B to publish demographic data using only Illinois' state-sanctioned classifications, SB 2930 forces those members to "communicat[e] a subjective and highly controversial message"—at a

11

minimum, that they agree with those definitions and believe those classifications are relevant. *Ent. Software Ass'n*, 469 F.3d at 652; *see* B-Decl. ¶9. That scheme requires nonprofits to "t[ake] sides in a heated political controversy," which is something the First Amendment does not permit. *See CTIA v. Berkeley*, 928 F.3d 832, 845 (9th Cir. 2019); *accord Harvard*, 600 U.S. at 216 (explaining that the use of these categories "further" racial "stereotypes").

SB 2930 would fail intermediate scrutiny too. When the Supreme Court addressed a similar disclosure law in *NIFLA*, the Court deemed it likely unconstitutional under "even intermediate scrutiny." 585 U.S. at 663, 773. And that law likely failed, the Court reasoned, because the State could achieve its goals through other means, like a "public-information campaign," "an advertising campaign," or something else that didn't "burde[n] a speaker with unwanted speech." *Id.* at 775. The same is true here: If Illinois' public "official[s]" want to promote diversity, they can advertise that message—but they can't "force [their] citizens" to promote that message for the State. *W.V. Bd. of Educ. v. Barnette*, 319 U.S. 624, 642 (1943).

## II.     SB 2930 will cause irreparable harm.

Without an injunction, the Alliance will be irreparably harmed in several ways: Member A and B's constitutional rights will be violated; their information will be publicly disclosed; and they won't be able to recoup any damages because the Eleventh Amendment would bar recovery.

**1.** Member A and B's constitutional injuries are irreparable. "[I]rreparable harm is presumed" for certain constitutional violations. *Ezell v. Chicago*, 651 F.3d 684, 699 (7th Cir. 2011). That presumption is "particularly true in First Amendment claims" because "the intangible nature of … those rights" is impossible to quantify—and thus remedy—with money damages. *Id.*; *accord Elrod v. Burns*, 427 U.S. 347, 373 (1976). So too for the Alliance's equal-protection claims, where the Supreme Court has repeatedly observed that the right to be free from illegal racial classifications is irreparable. *E.g.*, *Akina v. Hawaii,* 577 U.S. 1024 (2015) (use of race in voting); *Bd. of*

*Supervisors of LSU v. Wilson,* 340 U.S. 909 (1951) (use of race in university admission). Indeed, equal-protection violations are irreparable because "a monetary remedy" can't redress these intangible harms. *Free the Nipple-Fort Collins v. Ft. Collins*, 916 F.3d 792, 806 (10th Cir. 2019); *accord Brewer v. W. Irondequoit Cent. Sch. Dist.*, 212 F.3d 738, 744-45 (2d Cir. 2000); *Monterey Mech.*, 125 F.3d at 715; *St. Hilaire v. Comm'r of Ind. Bureau of Motor Vehicles*, 711 F. Supp. 3d 1028, 1055-56 (S.D. Ind. 2024) (collecting cases).

**2.** SB 2930 also will irreparably harm Members A and B through the act of disclosure. "The disclosure of private, confidential information is the quintessential type of irreparable harm." *Airbnb, Inc. v. City of N.Y.*, 373 F. Supp. 3d 467, 499 (S.D.N.Y. 2019) (cleaned up). There's "no way to recapture and remove" such data "from the knowledge of others" after Members A and B advertise it online. *Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Bishop*, 839 F. Supp. 68, 72 (D. Me. 1993). Nor will there be any way to scrub that data from the internet. A-Decl. ¶12; B-Decl. ¶12; Blum-Decl. ¶11. So once Members A and B comply with the law in December, their data will get scraped, screenshotted, and saved online—forever. A-Decl. ¶12; B-Decl. ¶12. And the Alliance's members "cannot … unring th[at] bell." *Maness v. Meyers*, 419 U.S. 449, 460 (1975).

**3.** Member A and B's injuries are also irreparable because they cannot recover their compliance costs from the State. *See* A-Decl. ¶13 (describing these costs); B-Decl. ¶13 (same). Nor can they recover the harm to their reputations, fundraising, and donations. A-Decl. ¶11; B-Decl. ¶11; Blum-Decl. ¶¶9-10; *see Life Spine, Inc. v. Aegis Spine, Inc.*, 8 F.4th 531, 546 (7th Cir. 2021) (reputational harm to a corporation is itself irreparable). The Eleventh Amendment bars any damages against these state defendants. *Ind. Fine Wine & Spirits v. Cook*, 459 F. Supp. 3d 1157, 1170 (S.D. Ind. 2020). And because these defendants have "immunity from compensatory damages in federal court," the Alliance "has no adequate remedy at law," meaning a preliminary injunction is

13

the only way to remedy its members' imminent injuries. *Id.*; *Milwaukee Cnty. Pavers Ass'n v. Fielder*, 707 F. Supp. 1016, 1033 (W.D. Wis. 1989).

### III. The balance of the harms and public interest favor a preliminary injunction.

The remaining equities also favor the Alliance. The "enforcement of an unconstitutional law is always contrary to the public interest." *Karem v. Trump,* 960 F.3d 656, 668 (D.C. Cir. 2020). And enjoining unconstitutional conduct always serves "the highest public interest." *United States v. Raines*, 362 U.S. 17, 27 (1960); *Joelner v. Vill. of Wash. Park*, 378 F.3d 613, 620 (7th Cir. 2004). That rule applies with special force in the equal-protection context, because "our Nation" must "rise above [the] racial classifications that are so inconsistent with our commitment to the equal dignity of all persons." *Peña-Rodriguez v. Colorado*, 580 U.S. 206, 221 (2017).

Pausing enforcement of SB 2930 will not meaningfully harm the State. Illinois' "interest in receiving this information immediately … poses no threat of irreparable harm." *John Doe Agency v. John Doe Corp.*, 488 U.S. 1306, 1309 (1989) (Marshall, J., in chambers). After all, Illinois has never compelled these disclosures before, so waiting a few more months could not irreparably harm the State now, after it's gone without this information for more than 200 years. *See Araneta v. United States*, 478 U.S. 1301, 1305 (1986) (Burger, C.J., in chambers) ("[T]he injury to the Government will likely be no more than the inconvenience of delay."); *accord Metro. Life Ins. Co. v. Usery*, 426 F. Supp. 150, 172 (D.D.C. 1976). And if Illinois wins at the end of this case, it will be able to compel these disclosures then. But if the Alliance loses at the preliminary-injunction stage but wins at the end, the Court won't be able to "unring the bell once the[ir] information has been released." *Maness*, 419 U.S. at 460 (cleaned up).

### CONCLUSION

For all these reasons, this Court should preliminarily enjoin Defendants from enforcing SB 2930 **by July 1, 2025.**

Dated: April 1, 2025

Respectfully submitted,

*/s/ Cameron T. Norris*
Thomas R. McCarthy*
Cameron T. Norris*
Matt Pociask**
R. Gabriel Anderson*
Marie E. Sayer***
CONSOVOY MCCARTHY PLLC
1600 Wilson Blvd., Ste. 700
Arlington, VA 22209
(703) 243-9423
tom@consovoymccarthy.com
cam@consovoymccarthy.com
matt@consovoymccarthy.com
gabe@consovoymccarthy.com
mari@consovoymccarthy.com

*Admitted *pro hac vice*
**Admitted to the Northern District of Illinois
****pro hac vice* forthcoming

*Counsel for Plaintiff*

### CERTIFICATE OF SERVICE

I hereby certify on April 1, 2025, a true and correct copy of this document and all related

attachments were served electronically by the Court's CM/ECF system to all counsel of record.

*/s/ Cameron T. Norris*
Counsel for Plaintiff

15

Alliance for Fair Board Recruitment v. Weber, Not Reported in Fed. Supp. (2023)

2023 WL 3481146

2023 WL 3481146
Only the Westlaw citation is currently available.
United States District Court, E.D. California.

ALLIANCE FOR FAIR BOARD
RECRUITMENT, Plaintiff,

v.

Shirley N. WEBER, in her official capacity as
Secretary of State of the State of California, Defendant.

No. 2:21-cv-01951-JAM-AC
|
Signed May 15, 2023

**Attorneys and Law Firms**

Andy Yang, Andy Yang, Attorney at Law, Sunnyvale, CA, for
Plaintiff.

**ORDER GRANTING PLAINTIFF'S
MOTION FOR SUMMARY JUDGMENT**

JOHN A. MENDEZ, SENIOR UNITED STATES DISTRICT
JUDGE

**\*1** Before the Court is the Alliance for Fair Board
Recruitment's ("Plaintiff") motion for summary judgment
against Shirley N. Weber ("Defendant"), in her official
capacity as California's Secretary of State. See Mot. for
Summary Judgment ("Mot"), ECF No. 88. Plaintiff alleges
that California Assembly Bill No. 979, which, in part,
requires publicly held corporations located in California
to have a minimum number of directors from designated
underrepresented racial, ethnic and LGBTQ backgrounds,
violates the Equal Protection Clause and 42 U.S.C. § 1981. Id.
at 9-10. Defendant opposes the motion, asserting that AB 979
satisfies strict scrutiny or, in the alternative, should have its
unconstitutional provisions severed from the rest of the bill.
See Opp'n, ECF No. 114. Plaintiff replied. See Reply, ECF
No. 122. For the reasons set forth below, this Court GRANTS
Plaintiff's motion. [1]

[1] This motion was determined to be suitable for
decision without oral argument. E.D. Cal. L.R.
230(g). The hearing was scheduled for April 25,
2023.

**I. FACTUAL ALLEGATIONS AND
PROCEDURAL BACKGROUND**

On September 30, 2020, AB 979 was passed into law, adding
California Corporations Code Sections 301.4 and 2115.6.
Compl., ECF No. 1, ¶ 38. Proponents of the bill claim that
it is intended to address corporate discrimination against
underrepresented communities. Opp'n at 1. The legislation
required public corporations headquartered in California to
have a minimum number of directors from select identities
that are underrepresented on corporate boards by December
31, 2022. Id. Specifically, the bill outlined underrepresented
groups as those who identify as "Black, African American,
Hispanic, Latino, Asian, Pacific Islander, Native American,
Native Hawaiian, or Alaska Native ... gay, lesbian, bisexual,
or transgender." Cal. Corp. Code § 301.4(e). The minimum
number of directors required by AB 979 depends on the size
of the corporation's board, ranging from a minimum of one
to three. Cal. Corp. Code § 301.4(b). Corporations that fail to
comply with the statute are subject to a $100,000 fine for an
initial violation and $300,000 for any subsequent violation.
Cal. Corp. Code § 301.4(d). The law contains no sunset
provision or expiration date.

Plaintiff, a non-profit membership organization composed
of individuals who do not self-identify into one of AB
979's underrepresented groups, filed suit against Defendant
on July 12, 2021. See Compl. With respect to AB 979,
Plaintiff alleged violations of (1) the Equal Protection Clause
of the Fourteenth Amendment, (2) 42 U.S.C. § 1981, and
(3) the Internal Affairs Doctrine. Id. At a hearing on
Defendant's motion to dismiss the complaint, the Court
dismissed Plaintiff's Internal Affairs Doctrine claim and
permitted the remaining claims against AB 979 to proceed.
Mot. Hearing, ECF No. 70. On March 30, 2022, Plaintiff filed
the operative motion for summary judgment, alleging that AB
979 constitutes an unconstitutional racial quota in violation
of the Equal Protection Clause and 42 U.S.C. § 1981. Mot.
at 9-10.

**II. OPINION**

A. Request for Judicial Notice
**\*2** Plaintiff asks the Court to take judicial notice of sixty-
three documents. See Req. for Judicial Notice ("RJN"), ECF
No. 115.

2023 WL 3481146

Under Federal Rule of Evidence 201, a district court may take judicial notice of a fact that is "not subject to reasonable dispute because it can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned." Fed. R. Evid. 201(b)(2). A court may therefore take judicial notice of court filings and other matters of public record. Reyn's Pasta Bella LLC v. Visa USA, Inc., 442 F.3d 741, 746 n.6 (9th Cir. 2006).

The Court grants Plaintiff's request for judicial notice for all requested documents pursuant to Rule 201.

### B. Legal Standard

Summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show that there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). The moving party bears the initial burden of demonstrating the absence of a genuine issue of material fact for trial. Anderson v. Liberty Lobby, Inc., 447 U.S. 242, 248–49 (1986). If the moving party meets its burden, the burden of production then shifts so that "the non-moving party must set forth, by affidavit or as otherwise provided in Rule 56, 'specific facts showing that there is a genuine issue for trial.' " T.W. Elec. Serv., Inc. v. Pacific Elec. Contractors Ass'n, 809 F.2d 626, 630 (9th Cir.1987). The Court must view the facts and draw inferences in the manner most favorable to the non-moving party. United States v. Diebold, Inc., 369 U.S. 654, 655 (1962).

### C. Analysis

#### 1. Claim One: Equal Protection Clause

##### a. Facial Challenge

Plaintiff contends that AB 979 must be invalidated because it is unconstitutional on its face. Mot. at 10-12. Plaintiff states that Defendant concedes that the bill imposes racial classifications and requires covered corporations to have a set minimum number of directors from a select racial and ethnic pool, which constitutes a race-based quota despite Defendant's semantic argument that it only sets a "flexible floor" for diversity. Id. at 10-11. Plaintiff argues that such quotas are *per se* unconstitutional according to established Supreme Court precedent. Id. at 11-12.

Defendant concedes that AB 979 constitutes a racial classification but argues that it is permissible because it is aimed at remedying past discrimination. Opp'n at 22. Defendant also claims that AB 979 does not create preferred racial and ethnic classes because no individual is insulated from competition with others and each candidate must still go through an individualized consideration process. Id. Furthermore, AB 979 expressly permits corporate boards to expand to accommodate as many candidates as they wish so no director or director candidate not included in one of the bill's preferred groups would be forced to lose their board position. Id.

The Court finds that Plaintiff's facial challenge to AB 979 must be affirmed. The Supreme Court defines a quota as "a program in which a certain fixed number or proportion of opportunities are 'reserved exclusively for certain minority groups.' " Grutter v. Bollinger, 539 U.S. 306, 335 (2003). The Supreme Court has rejected racial and ethnic quotas and has declared them "facially invalid." Regents of Univ. of California v. Bakke, 438 U.S. 265, 307 (1978). Depending on the size of the covered corporation, AB 979 requires corporate boards to have, at minimum, one or three board members who self-identify with select racial and ethnic groups. Despite Defendant's attempt to semantically cast this requirement as flexible, the Court finds that it is a racial quota as it requires a certain fixed number of board positions to be reserved exclusively for certain minority groups; in this case, those who identify as "Black, African American, Hispanic, Latino, Asian, Pacific Islander, Native American, Native Hawaiian, or Alaska Native." Cal. Corp. Code § 301.4(e). In the absence of a genuine issue of material fact, the Court finds that AB 979 is unconstitutional on its face and Plaintiff is entitled to summary judgment in its favor as a matter of law.

##### b. Strict Scrutiny

**\*3** The Court does not reach the parties' strict scrutiny arguments because the facial challenge to AB 979 is dispositive.

#### 2. Claim Two: 42 U.S.C. § 1981

The Supreme Court has stated that a violation of the Equal Protection Clause of the Fourteenth Amendment also constitutes a violation of § 1981. Gratz v. Bollinger, 539 U.S. 244, 276 n.23 (2003). In light of the Court's grant of summary

2023 WL 3481146

judgment in Plaintiff's favor on its Equal Protection challenge to AB 979, the Court, accordingly, finds that Plaintiff is entitled to summary judgment in its favor on this count as a matter of law.

### 3. Severability

Defendant asks the Court to sever AB 979 to exclude the particular groups whose inclusion violates the Equal Protection Clause. Opp'n at 24-25. Defendant argues that severing individual groups will not adversely affect the meaning of "underrepresented communities" or AB 979's basic operation. Id. at 25. Plaintiff responds that severance would be inappropriate in this case and notes that AB 979 does not include a severability clause. Reply at 14-15. The Court agrees.

When a state statute faces a constitutional challenge, the Court's severability analysis is guided by state law. Costco Wholesale Corp. v. Maleng, 522 F.3d 874, 886 (9th Cir. 2008). Under California law, severance is proper if (1) severance will not affect the wording or coherence of the remainder of the statute; (2) the remainder of the statute "is complete in itself," and (3) the legislature would have adopted the remainder of the statute "had it foreseen the partial invalidation of the statute." Cal. Redev. Ass'n v. Matosantos, 53 Cal. 4th 231, 270-71 (2011). The Court finds that removing AB 979's racial and ethnic classifications would adversely affect the coherence of the remaining provision regarding those who identify as gay, lesbian, bisexual, or transgender because the statute's language is almost exclusively cast in racial and ethnic terms and figures. Also, the Court finds that (1) the language of the statute, (2) Defendant's opposition brief, which argues that AB 979's main purpose is to remedy racial and ethnic discrimination, and (3) the lack of a severability clause collectively indicate that the legislature would not have adopted the remainder of AB 979 had it foreseen its partial invalidation. Therefore, the Court declines to sever AB 979.

### III. ORDER

For the reasons set forth above, this Court GRANTS Plaintiff's motion for summary judgment.

IT IS SO ORDERED.

**All Citations**

Not Reported in Fed. Supp., 2023 WL 3481146

---

**End of Document**

© 2025 Thomson Reuters. No claim to original U.S. Government Works.



**FILED**
Superior Court of California
County of Los Angeles

**MAY 13 2022**

Sherri R. Carter, Executive Officer/Clerk
By_____ Deputy
E. Garcia

SUPERIOR COURT OF THE STATE OF CALIFORNIA

FOR THE COUNTY OF LOS ANGELES

| | |
|---|---|
| ROBIN CREST, EARL DE VRIES, and JUDY DE VRIES,<br><br>          Plaintiffs,<br><br>vs.<br><br>ALEX PADILLA, in his official capacity as Secretary of State of the State of California.<br><br>          Defendant. | Case No. 19STCV27561<br><br>VERDICT |

This case presents two facial challenges to Senate Bill (S.B.) 826. The Plaintiffs allege that S.B. 826 violates Equal Protection under Article I, Section 7 (aka Equal Protection Clause) and violates Equal Protection under Article I, Section 31 (the prohibition on discrimination based on sex in public employment, education or contracting) of the California Constitution.

Both claims are brought under Code of Civil Procedure Section 526a which states, "An action to obtain a judgment, restraining and preventing any illegal expenditure of, waste of, or injury to, the estate, funds, or other property of a local agency, may be maintained against any officer thereof, or any agent, or other person, acting in its behalf, either by a resident therein, or by a corporation, who is assessed for and is liable to pay, or, within one year before the commencement of

- 1 -

the action, has paid, a tax that funds the defendant local agency, including, but not limited to, the following: (1) An income tax. (2) A sale and use tax or transaction and use tax initially paid by a consumer to a retailer. (3) A property tax, including a property tax paid by a tenant or lessee to a landlord of lessor pursuant to the terms of a written lease. (4) A business license tax." This section allows a taxpayer to enjoin an actual or threatened expenditure of taxpayer funds by a state official where the expenditure is illegal.

The above provision has been held to apply to both state and local officials for more than 50 years. (Serrano v. Priest (1971) 5 Cal. 3d 584, 619 n.38 ["[I]t has been held that state officers too may be sued under section 526a."]; Blair v. Pitchess (1971) 5 Cal. 3d 258, 268, ["[I]t has been held that taxpayers may sue state officials to enjoin such officials from illegally expending state funds."].), Stanson v. Mott (1976) 17 Cal.3d 206, 222-23; Vasquez v. State (2003) 105 Cal.App.4th 849, 854; Farley v. Cory (1978) 78 Cal.App.3d 583,589; Los Altos Property Owners Ass'n v. Hutcheson (1977) 69 Cal.App.3d 22, 26-30; Ahlgren v. Carr (1962) 209 Cal.App.3d 248, 254 ["[T]he great weight of authority supports the right of a taxpayer to bring an action to enjoin the alleged illegal expenditure of public moneys by a state official."].) In addition, Connerly v. State Personnel Bd. (2001) 92 Cal.App.4th 16, a taxpayer action brought against the state under Section 526, held that state officers may be sued.

The Court considered but was not persuaded by Defendant's argument that Serrano v. Priest (supra) was the result of a ruling "without any real analysis". The Defendant cited Rutgard v. City of Los Angeles (2020) 52 Cal App. 5th P. 815, 830, (among others).

The Court finds that **PLAINTIFFS ARE TAXPAYERS** and have standing for purpose of challenging a statutory scheme enacted by Legislature for application throughout the state. The Court finds that Plaintiff's Judy De Vries, Earl De Vries, and Robin Crest paid taxes to the State in the year prior to filing this lawsuit or were

1 | assessed and liable for such taxes.

2 |     The Court finds the Plaintiffs cause of action as a Taxpayer was Ripe. The

3 | Plaintiff's evidence is compelling. The Court relied on the following Plaintiff's

4 | testimony and all the admitted evidence to support this finding including: Exhibits

5 | 44, 45, and 47; Judy DeVries (Dec. 1), Pg. 62, line 25 through Pg. 70, line 1; Pg.

6 | 89, line 14 through Pg. 80, line 7 Earl De Vries (Dec. 1), Pg. 81, line 7 through Pg.

7 | 85, line 6. (Dec. 2), Pg. 5, line 28 through Pg. 6, line 14 Exhibit 46; Robin Crest

8 | (Dec. 1), Pg. 86, line 17 through Pg. 88, line 17. The Defendant argued that the

9 | claim is not ripe or justiciable because "the Government has not promulgated

10 | regulations implementing penalties and or there is no evidence to indicate future,

11 | threatened prosecution". Defense offered citations to Mahler v. Judicial Council of

12 | California (2021) 67 Cal. App. 5th, P. 111, Ohio Forestry Assn, Inc. v. Sierra Club

13 | (1998) 523 U.S. P. 726, 733-34. On this issue the Court finds for the Plaintiff.

14 |     The Court was most persuaded by Plaintiff's evidence including the following

15 | exhibits and testimony to show the **ILLEGALITY OF ACTIVITY** as challenged

16 | including; Exhibits 43, 213, 216, and 220; Senator Hannah-Beth Jackson (Jan. 27),

17 | Pg. 37, line 15 through Pg. 39, line23; Pg. 40, line 10 through Pg. 41, line 13; Pg.

18 | 60, line 21 through Pg. 62, line 16. Exhibits 2, 3, 8, and 9; Betsy Bogart (Dec. 2),

19 | Pg. 22, line 11 through Pg. 24, line 21; Pg. 52, line 25 through Pg. 53, line 15,

20 | Exhibits 4 and 5; Bogart (Dec. 2), Pg. 20, line 2 through Pg. 23, line 10; Pg. 25, line

21 | 22 through pg. 29, line 12, Exhibits 6 and 7; Bogart (Dec. 2), Pg. 29, line 20 through

22 | Pg. 32, line 24, Exhibits 10 and 11; Bogart (Dec. 2), Pg. 38, line 4 through Pg. 39,

23 | line 9, Bogart (Dec. 2), Pg. 8, line 27 through Pg. 1, line 19; Pg. 12, lines 3-15,

24 | Bogart (Dec. 2) Pg. 29, line 26 through Pg. 30, line 23; Pg. 33, lines 26 through Pg.

25 | 34, line 27, Bogart (Dec. 2), Pg. 88, lines 15 through Pg. 89, line 11, Bogart (Dec.

26 | 2), Pg. 2, lines 3-23, Bogart (Dec. 2), Pg. 40, line 2 through Pg. 41, line 17.

27 |     Defendant argued unpersuasively that the governmental conduct is legal and

28 | a "taxpayer suit will not lie where the challenged governmental conduct is legal".

1　Defendants cited to Coshow v. City of Escondido (2005) 132 Cal. App. 4 P. 687,

2　714-15, Humane Society of the United States v. State Board of Equalization (2007)

3　152 Cal App. 4th, 349, 355. Lyons v. Santa Barbara County Sheriff's Office (2014)

4　231 Cal. App. 4th p. 1499, 1503.

5　　　The Court notes that a claim under CCP§526a requires an **EXPENDITURE**

6　**OF PUBLIC FUNDS.** The use of taxpayer funds to implement or carry out an

7　allegedly unconstitutional law is illegal and satisfies the requirement. The

8　expenditure can be actual or even threatened, and the size of the expenditure is

9　immaterial. (Blair v. Pitchess, (1971) 5 Cal. 3d at 258; Wirin v. Parker, (1957) 48

10　Cal. 2d 890, 894.) Employees of a public entity implementing or carrying out an

11　allegedly unconstitutional law likely satisfies the requirement. (Blair v. Pitchess, 5

12　Cal. 3d at 258; Wirin v. Harrell, (1948) 85 Cal. App. 2d 497, 504-05; Citizens for

13　Uniform Laws v. County of Contra Costa, (1991) 233 Cal. App. 3d 1468, 1472-76.)

14　　　The Court finds Plaintiffs proved Defendant Secretary of State was an officer

15　of the State via Judicial Notice of that fact. Further, the Plaintiffs carried their burden

16　to prove an actual or threatened substantial expenditure of taxpayer funds or

17　taxpayer-financed resources by Defendant by promulgating regulations and

18　implementation of fines for enforcement of S.B. 826. -

19　　　The Court considered all Plaintiffs and Defendant testimony and admitted

20　evidence. The Court was not persuaded by Defendant's argument that the "Plaintiff

21　failed to show a threatened or actual illegal expenditure..." Defendants argued

22　vigorously that the implementation of and regulating the issue of monetary fines in

23　the challenged S.B. 826, was discretionary. Further, it was testified that the

24　Secretary had no plans to and has not taken any steps to issue the regulations

25　necessary to impose fines. Susan Lapsley offered testimony on 12-13-21 at p. 14,

26　line 12-26 that no regulations were planned. Lapsley is the Deputy Secretary of

27　State. She reviews, advises and makes recommendations on every regulatory

28　package and she was not aware of any efforts or discussions regarding

implementation of or imposing monetary fines for a violation of S.B. 826. On 12-2-21 Betsy Bogart, whose division implements S.B. 826, testified and averred she is similarly not aware of any plans to implement regulations or monetary fines. It was apparent to the court through defense testimony that the collection of information and analysis of S.B. 826, by the State of California, and its importance to the anticipated increase in tax revenues, once S.B. 826 was implemented, was purposeful and significant. Ongoing and or anticipated expenditures indicated implementation planning was occurring and in its beginning state. Fines to compel compliance was anticipated and expected by S.B. 826.

The Court then analyzed the **COUNT 1 VIOLATION OF EQUAL PROTECTION CLAUSE OF Cal. Const. art, I, § 7** "A person may not be... denied equal protection of the laws." (*Cal. Const., art I, § 7(a).)* Under California law, classifications based on gender have long been considered "suspect" for purposes of an equal protection analysis. *(Woods v. Horton (2008) 167 Cal. App. 4th 658, 674 (citing Sail'er Inn, Inc. v. Kirby (1971) 5 Cal.3d 17-20).)*

The first prerequisite to a meritorious claim under the equal protection clause is a showing that the state has adopted a classification that affects two or more "similarly situated" groups in an unequal manner. (Woods, 167 Cal.App.4th a 670.) The Court does not ask whether persons in the groups are similarly situated for all purposes, but only whether they are similarly situated for purposes of the laws in question such that some level of scrutiny is required to determine whether the distinction is justified. (Taking Offense v. State of California (2021) 66 Cal.App.5th 696, 724; Woods, supra, at 670.) In addition, a Court does not ask whether a group is" historically more likely to experience discrimination" than another group when determining whether the two groups are similarly situated. (Taking Offense, 66 Cal.App.5th at 725.)

When a statute makes express use of a suspect classification, a plaintiff challenging the statute meets their initial and ultimate burden simply by

1   pointing out the classification. (Woods, 167 Cal. App. 4th at 674.) The statute is
2   presumed to be unconstitutional, and the government bears the burden of
3   demonstrating otherwise. (D'Amico v. Board of Medical Examiners (1974) 11 Cal.
4   3d 1, 17; Woods, 167 Cal. App. 4th at 674; Connerly v. State Personnel Bd. (2001)
5   92 Cal. App. 4th 16, 36 & 43.)

6          The Court considered all Plaintiffs' and Defendants' evidence including:
7   Exhibit 236 (Section 2(b) of S.B. 826 which requires that, by December 31, 2021,
8   publicly held corporations in California have at least 1 female director if the number
9   of directors is 4 or fewer, at least 2 female directors if the number of directors is 5,
10  and at least 3 female directors if the number of directors is 6 or more.
11  The court found instructive the depositions and or testimony of: Sen. Hanna
12  Beth Jackson (Feb. 1), Pg. 65, line 28 through Pg. 66, line 13, (S.B. 826 requires a
13  specific number of female directors be added to corporate boards depending on
14  board size), Pg. 74, line 28 through Pg. 75, line 5, (corporations must now consider
15  women to comply with S.B. 826). Susanne Meline (Jan. 28), Pg. 111, lines 10-15
16  (Corporations must take gender into account to comply with S.B. 826); Alison
17  Konrad (Dec. 12), Pg. 103, line 28 through 104, line 28, (Defendant's expert admits
18  describing S.B. 826's gender-based classifications a quota) Exhibit 16/217, Pg. 4,
19  (Assembly Floor analysis reports, "the use of quota-like system, as proposed by this
20  bill, remedy past discrimination and differences in opportunity may be difficult to
21  defend.") Exhibit 17/219, Pg. 7, (Assembly Judiciary Committee analysis describes
22  S.B. 826 as "essentially a quota system for private corporate boards. Should this bill
23  be challenged, the State would confront a difficult challenge in showing a
24  compelling government interest in requiring a gender-based quota system for a
25  private corporation.")

26         In support of the Court finding, the Court considered all relevant admitted
27  evidence including: Meline, Jan. 28, Pg. 54, line 12 through Pg. 56, line 8 (board
28  selection process is the same for men and women); Betsy Berkhemer-Credaire,

Dec. 13, Pg. 43, lines 16-22 (describing board selection process generally, which does not differentiate between men and women), Dec. 10, Pg. 95, line 23 through Pg. 96 line 1 (same), Dec. 10, Pg. 81, lines 18-22 (being appointed to a board is a difficult process for men and women), Dec. 14, Pg. 67, lines 9-19 (men and women vie for the same, few open board seats each year); Schipani, Dec. 9, Pg. 3, line 7 through Pg. 7, line 9 (describing how boards come into existence and the general board selection process, which does not differentiate between men and women), Jan. 11, Pg. 112, lines 15-22 (both highly qualified men and women have not been selected and do not serve on boards)

      The Court finds Plaintiffs carried their burden to prove that men and women are similarly situated for purposes of S.B. 826's gender-based quota. As Plaintiffs have demonstrated that S.B. 826 is presumptively unconstitutional, the **BURDEN SHIFTS TO DEFENDANT** to prove that S.B. 826 satisfies strict scrutiny.

      To meet the **STRICT SCRUTINY TEST**, Defendant must show (1) a compelling state interest, (2) that S.B. 826 is necessary and (3) that S.B. 826 is narrowly tailored. The strict scrutiny standard applies even if a law is claimed to be remedial. (Connerly, 92 Cal.App.4th at 35, 37-38.)

      It is without question that the government must demonstrate a **(1) COMPELLING STATE INTEREST** and show that was in fact the Legislature's actual purpose, not a post hoc re-imagining of that purpose. (Connerly, 92 Cal.App.4th at 38-39.)

Defendant claimed three compelling state interests:

    (1) S.B. 826 was passed to eliminate and remedy discrimination in the director selection process for publicly held corporate boards in California.

    (2) S.B. 826 was passed to increase gender diversity on the boards of publicly held corporations to benefit the public and the state economy.

    (3) S.B. 826 was passed to increase gender diversity on publicly held corporations headquartered in California to benefit and protect California

taxpayers, public employees and retirees.

The law informs the Court that there is no compelling governmental interest in remedying societal discrimination. (Hiatt v. City of Berkeley (1982), 130 Cal.App.3d at 311-14.) There also is no compelling governmental interest in remedying generalized, non-specific allegations of discrimination. (Connerly, 92 Cal.App.4th at 38.)

The State must have a strong basis in evidence to conclude that remedial action is necessary before it embarks on a program to remedy discrimination, and the discrimination cannot merely be conceded. Generalized assertions of discrimination in a particular region or industry are insufficient to give rise to a compelling governmental interest, as are mere statistical anomalies, and the discrimination must be identified with specificity. (Ibid.) The state also must show purposeful or intentional, unlawful discrimination by the entity employing the suspect classification to assert a compelling governmental interest in remedying discrimination. (Hiatt, 130 Cal.App.3d at 311; Coral Constr. v. City of San Jose (2000) 24 Cal.4th 537, 568).

The use of a suspect classification to remedy purported discrimination has not been upheld absent judicial, legislative, or administrative findings of constitutional or statutory violations. (Hiatt, 130 Cal.App.3d at 311 [citing Bakke, 438 U.S. at 307 (Powell, J., concurring).]) "Without such findings of constitutional or statutory violations, it cannot be said that the government has any greater interest in helping one individual than in refraining from harming another." (Ibid. citing Bakke, 438 U.S. at 308-09.)

The State also must show that when using a suspect classification to redress specific discrimination the use of the classification is remedial. (Connerly, 92 Cal.App.4th at 38.) Connerly instructs that the remedy must be designed as nearly as possible to restore the victims of specific, purposeful, or intentional, unlawful

1    discrimination to the position they would have occupied in the absence of the

2    discrimination. (Id. At 39.) The lack of any effort to limit the remedial scheme to

3    those who suffered such discrimination is fatal to the scheme.

4         S.B. 826's goal was to achieve gender equity or parity; its goal was not to

5    boost California's economy, not to improve opportunities for women in the

6    workplace nor not to protect California's taxpayers, public employees, pensions and

7    retirees. In determining that fact, the Court was persuaded by the following

8    evidence: Exhibit 236 (text of S.B. 826 reference parity) Exhibit 351, Pg. 2, line 5

9    through Pg. 3, line 8 (Assembly Member Gonzalez Fletcher stating on the Assembly

10   Floor that the bill would "provide greater gender diversity" and "take a big step

11   towards closing this gender gap"); Jackson (Jan. 18), Pg. 78, lines 23-25 ("pretty

12   solidly clear that we were seeking gender parity"), Jackson (Feb. 1), Pg. 66, line 17

13   through Pg. 68, line 1 (S.B. 826 seeks to create gender equity within the board),

14   Jackson (Feb. 1), Pg. 124, lines 5-6 (:the goal of the legislation was to achieve

15   gender equality'), Jackson (Feb. 2), Pg. 18, line 14 through Pg. 19, line 12

16   (referencing achieving gender parity); Berkhemer-Credaire (Dec. 14), Pg. 74, lines

17   3-25 (goal is to reach parity).

18        A related goal of S.B. 826 was to get more women on boards; Jackson

19   (Jan. 18), Pg. 102, lines 21-28 (ultimate goal is "getting more women onto boards");

20   Pg. 37, lines 11-14 (proactive approach requiring more women on boards) Jackson,

21   (Feb. 1), Pg. 76, lines 7-12 ("This is a bill that addresses the need to add women on

22   boards"), Jackson (Feb. 15), Pg. 39, line 24 ("The issue is getting more women on

23   boards")

24        The Court considered all evidence but concluded a Compelling State Interest

25   is lacking. Specifically, the Court noted: Exhibit 236 (nothing in the text of S.B. 826

26   quantifies the expected boost to California's economy, the improvement in work

27   opportunities for women, or the protection of California taxpayers, public

28   employees, and retirees); Jay Chamberlain (Dec. 16), Pg. 82, lines 1-27 (there was

-9-

1  testimony that generally 10% of California's general fund revenues derive from all

2  corporate income tax proceeds, of which S.B. 826 corporations contribute an

3  unspecified portion of those proceeds); Chamberlain (Dec. 16), Pg. 84, lines 5-18

4  (California Department of Finance was not contacted during S.B. 826's legislative

5  process; the Department did not forecast a percentage increase expected in

6  general fund revenues because of S.B. 826; and the Department did not testify

7  before the legislature concerning S.B. 826), Chamberlain (Dec. 16), Pg. 83, line 21

8  through Pg. 84, line 4 (could not quantify how much a corporation's net income or

9  its profitability increases with female board members), Nzima (Dec. 15), Pg. 41, line

10  3 through Pg. 42, line 2 (S.B. 826 corporations only make up 5.7% of CalPERS's

11  portfolio), ($22.4 billion out of $392.5 billion)); Jackson (Feb. 1), Pg. 48, lines 21-26

12  ("there are so many items that can go into whether we pay more or less in taxes");

13  Jackson (Feb. 1), Pg. 63, lines 21-28 (did not know the percentage of California tax

14  revenue that derives from publicly held companies headquartered in the state and

15  does not believe that this information was provided to the legislature during S.B.

16  826's legislative process).

17      Defendant failed to sufficiently prove that S.B. 826's use of a gender-based

18  classification **(2) WAS NECESSARY** to boost California's economy, improve

19  opportunities for women in the workplace, and protect California taxpayers, public

20  employees, pensions, and retirees.

21      Neither Plaintiffs nor Defendant have identified any case in which boosting

22  the economy, improving work opportunities for women, protecting taxpayers, public

23  employees and retirees, or even improving corporate performance or corporate

24  governance, was found to be a Compelling Governmental Interest that justified the

25  use of a suspect classification.

26      The Court found the following evidence persuasive: Testimony of Jackson

27  (Feb. 1), Pg. 52, lines 26-27 ("There are always a number of ways to boost an

28  economy"), Jackson (Feb. 1), Pg. 53, lines 6-15 (witness acknowledged "a number

of different approaches" to protect taxpayers, shareholders, and retirees), Jackson (Feb. 1) Pg. 54, line 25 through Pg. 55, line 4; Chamberlain acknowledged that there were any number of ways to improve corporate profitability and boost the economy without using a gender-based classification, Chamberlain (Dec. 16), Pg. 86, line 25 through Pg. 87, line 4 (acknowledging alternative ways to improve corporate profitability).

Further, the studies cited in S.B. 826 failed to sufficiently show a causal connection between women on corporate boards and corporate governance and did not otherwise provide reliable conclusions, negating claims that S.B. 826's use of a gender-based classification is necessary to boost California's economy, improve opportunities for women in the workplace, or protect California taxpayers, public employees, pensions, and retirees.

The Court considered: Exhibit 236 (text of S.B. 826 citing studies), Exhibit 244, Pgs. 3,6, and 15 ("As with the previous study, a causal link was not established."); Jonathan Klick, Ph.D., J.D. (Jan. 13), Pg. 18, line 28 through Pg. 30, line 6, Pg. 84, line 20 through Pg. 85, line 17; Jackson (Feb. 1), Pg. 31, lines 9-18, Exhibit 245, Pgs. 4, 16, 18, and 21 ("While our statistical findings suggest that diversity does coincide with better corporate financial performance and higher stock market valuations, we acknowledge that we are not able to answer the causality question, and this is an important caveat to the observations below in the report."); Klick (Jan. 13), Pg. 30, line 8 through Pg. 40, line 16, Pg. 84, line 20 through Pg. 85, line 17, Exhibit 246, Pg. 4("Given limited data access and sources, we were unable to conduct regressions to determine causality. Furthermore, there are many additional variables that must be controlled for in a regression, which we were unable to collect for the entire sample."); Klick (Jan. 13), Pg. 40, line 18 through Pg. 48, line 11, Pg. 84, line 20 through Pg. 85, line 17; Jackson (Feb. 1), Pg. 32, line 17 through Pg. 33, line 3-5 through Pg. 34, line 1. Exhibit 47, Pgs. 6, 15, and 17 Klick (Jan. 13), Pg. 48, line 12 through Pg. 54, line10; Pg. 56, line 7 through Pg. 60, line

9, Pg. 84, line 20 through Pg. 85, line 17; see also, Jackson (Feb. 1) Pg. 34, line 2 through Pg. 36, line 3, Exhibit 248; Klick (Jan.13), Pg. 60, line 10 through Pg. 62, line 11, Pg. 84, line 20 through Pg. 85, line 17, Exhibit 249, Pg. 9 ("Some research has found that gender diverse boards may have a positive impact on a company's financial performance, but other research has not. These mixed results depend in part on difference in how financial performance was defined and what methodologies were used."); Klick (Jan. 13), Pg. 62, line 12 through Pg. 70, line 9, Pg. 84, line 20 through Pg. 85, line 17; see also Jackson (Feb. 1) Pg. 36, line 4 through Pg. 37, line 2, Exhibit 250; Klick (Jan. 13), Pg. 70, line 10 through Pg. 71, line 11, Pg. 73, lines 15-23, Pg. 84, line 20 through Pg. 85,line 17, Exhibit 227; Klick (Jan. 13), Pg. 71, line 12 through Pg. 73, line 14, Pg. 84, line 20 through Pg. 85, line 17, Exhibit 251; Klick (Jan. 13), Pg. 76, line 8 through Pg. 78, line 6, Page 79, line 26 through Pg. 82, line 23, Pg. 84, line 20 through Pg.85, line 17, Exhibit 252; Klick (Jan. 13), Pg. 78, line 12 through Pg. 79, line 25, Pg.84, line 20 through pg. 85, line 17, Exhibit 29, Pg. 4 ("While correlation does not prove causality, we have also found that a diversity of leadership styles can contribute to more effective decision making and that the leadership behaviors women typically display can have a positive impact on many dimensions of an organization's performance and health."); Klick (Jan. 13), Pg. 82, line 24 through Pg. 84, line 12, Pg. 84, line 20 through pg. 85, line 17; see also Jackson (Feb. 1) Pg. 38, lines 11-28.

Legislative analysis of S.B. 826 found that connections between women on corporate boards and improved corporate performance and corporate governance are inconclusive.

The court was persuaded by the following evidence: Exhibit 217, Pg. 3 ("[T]he Economist article, though not empirical suggests that quotas have not been successful in generating additional benefits beyond more diverse boards. Empirical research has been inconclusive in showing positive benefits related to company performance, corporate decision-making, or beneficial effects on the representation

1  of women in senior management."); Jackson (Jan. 27), Pg. 47, lines 18-28, Exhibit
2  218, Pg. 4, Exhibit 229, Pg. 29 ("The value of such data on business performance
3  has been questioned by many. The researchers themselves openly state that these
4  statistically significant correlations do not prove causality. Others have noted that
5  while there are many well-established benefits to gender-diverse boards, "the
6  overall impact…of diversity on corporate performance has yet to be established.'
7  Some are simply skeptical or unconvinced.'); Jackson (Jan. 27) Pg. 21, lines 2-25.

8       The Court noted from testimony that high quality academic studies that use
9  sophisticated econometric methodologies and the most current statistical analyses
10  were unavailable to the Legislature when it enacted S.B. 826. It was noted that
11  when the above methodologies and statistical information were utilized, they do not
12  support the existence of a causal relationship between women on boards and
13  improved corporate performance and corporate governance. The Court considered
14  all testimony and evidence, but was persuaded on this issue by the following
15  admitted evidence/testimony: Klick (Jan. 13), Pg. 85, lines 2-25, Pg. 91, line 23
16  through Pg. 92, line 3, Pg. 100, line 27 through Pg. 101, line 20, Pg. 102, line 11
17  through Pg. 103, line 18, Pg. 107, line 22 through Pg. 109, line 22, Pg. 127, line 23
18  through Pg. 130, line 24.

19       A Norwegian academic study for gender-based quota, which S.B. 826
20  specifically references, do not show positive outcomes for the Norwegian
21  businesses subject to the law and were ignored by the Legislatures and
22  Defendant's experts. The Court considered the testimony of Dr. Klick, (Jan. 13), Pg.
23  104, line 1 through Pg. 109, line 2, Pg. 109, line 26 through Pg. 111, line 10.

24       The studies relied on by Defendant's experts who did not employ persuasive
25  econometric methodologies and current statistical analyses mechanisms available.
26  The admitted evidence in this regard include: Exhibit 257; Klick (Jan. 13) Page 85,
27  line 26 through Pg. 89, line 24 Exhibit 259; Klick (Jan. 13), Page 89, line 25 through
28  Pg. 96, line 23, Exhibit 260; Klick (Jan. 13), Pg. 97, line 1 through 98, line 18, Pg.

99, line 11 through Pg. 100, line 10, Klick (Jan. 13), Pg. 100, line 15 through Pg. 101, line 16, Pg. 127, line 23 through Pg. 130, line 24, Klick (Jan. 12) Pg. 92, line 8 through Pg. 93, line 8 (panel data in and of itself is insufficient to make any causal inference); Klick (Jan. 13) Pg. 3, line 19 through Pg. 5, line 28 (panel data makes the assumption that unobservable variables are constant over time, and therefore cannot reliably demonstrate causality), Klick (Jan. 13), Pg. 101, line 21 through Pg. 104, line 15, Pg. 106, line 8 through Pg. 109, line 22, Pg. 127, line 23 through Pg. 130, line 24, Klick (Jan. 13), Pg. 109, lines 8 through 22, Pg. 119, line 28 through 120, line 25, Pg. 129, line 4 through Pg. 130, line 17

The Court finds that studies cited in S.B. 826 do not sufficiently address discrimination and or causality nor utilize the most sophisticated, econometric methodologies and current statistical analysis available and thus were in this Courts view, unreliable. The Court found persuasive the following: Konrad (Dec. 7), Pg. 132, line 18 through Pg. 135, line 8. Further the Court considered the admitted evidence including: Exhibit 257; Klick (Jan. 13) Page 85, line 26 through Pg. 89, line 24 Exhibit 259; Klick (Jan. 13), Page 89, line 25 through Pg. 96, line 23, Exhibit 260; Klick (Jan. 13), Pg. 97, line 1 through 98, line 18, Pg.99, line 11 through Pg. 100, line 10, Klick (Jan. 13), Pg. 100, line 15 through Pg.101, line 16, Pg. 127, line 23 through Pg. 130, line 24, Klick (Jan. 12) Pg. 92, line 8 through Pg. 93, line 8 (panel data in and of itself is insufficient to make any causal inference); Klick (Jan. 13) Pg. 3, line 19 through Pg. 5, line 28 (panel data makes the assumption that unobservable variables are constant over time, and therefore cannot reliably demonstrate causality), Klick (Jan. 13), Pg. 101, line 21 through Pg.104, line 15, Pg. 106, line 8 through Pg. 109, line 22, Pg. 127, line 23 through Pg.130, line 24, Klick (Jan. 13), Pg. 109, lines 8 through 22, Pg. 119, line 28 through 120, line 25, Pg. 129, line 4 through Pg. 130, line 17.

The Court found persuasive the following: Konrad (Dec. 7), Pg. 132, line 18 through Pg. 135, line 8 none of the studies cited in S.B. 826 identify specific

- 14 -

1  instances of discrimination in the board selection process, Jackson (Feb. 1), Pg. 45,

2  lines 15-24.

3         The Court found the evidence offered by defense tended to support gender

4  parity and proactively putting more women on boards demonstrated that the

5  Legislature's actual purpose was gender-balancing, not remedying discrimination.

6         The Court noted the following evidence: Exhibit 236 (noting in section 1(A) "it

7  will take 40 or 50 years to achieve gender parity, if something is not done

8  proactively." Also noting in section 1(F) "if measures are not taken to proactively

9  increase the number of women serving on corporate boards, studies have shown

10  that it will take decades, as many as 40 or 50 years, to achieve gender parity

11  amount directors"), Jackson (Jan. 18), Pg. 37, lines 11-14 Jackson (Jan. 18), Pg.

12  78, lines 23-25 ("pretty solidly clear that we were seeking gender parity"), Jackson

13  (Jan. 18), Pg. 79, lines 22-28 (S.B. 826 is a "proactive step []" to "achieve gender

14  parity"), Jackson (Jan. 18), Pg. 80, lines 25-28 ("the primary purpose of the bill is to

15  promote equitable and diverse gender representation on California's publicly traded

16  corporate boards headquartered in the state"), Jackson (Jan. 18), Pg. 88, lines

17  18-25 (without S.B. 826, "we'd be waiting another 40 or 50 years to get to gender

18  parity, and that taking proactive steps was necessary to achieve gender parity"),

19  Jackson (Jan. 18), Pg. 102, lines 21-28, Jackson (Jan. 18) Pg. 103, lines 12-23,

20  Jackson (Jan. 25), Pg. 101, lines 2-7, Jackson (Jan. 27), Pg. 11, line 10 through Pg.

21  14, line 27, (Jan. 27), Pg. 95, line 10 through Pg. 96, line 8, Jackson (Feb. 1), Pg.

22  76, lines 7-12, Jackson (Feb. 15), Pg. 39, line 24, Jackson (Feb. 1), Pg. 124, lines

23  5-20, Berkhemer-Credaire (Dec. 14), Pg. 74, lines 3-25 (indicating the hope is reach

24  parity" in 10 years).

25         The Court considered all evidence and specifically that S.B. 826's text does

26  not reference discrimination nor remedying discrimination. Of the evidence

27  presented, the Court was persuaded by the following: Exhibit 236 (text of S.B. 826

28  does not reference discrimination or remedying discrimination), Exhibit 205 (does

1   not reference discrimination or remedying discrimination), Exhibit 209 (does not

2   reference discrimination or remedying discrimination), Exhibit 351 (does not

3   reference discrimination or remedying decimation), Exhibit 212 (the

4   bill does not reference discrimination or remedying discrimination, The bill's author

5   was advised to add specific instances of past or present discrimination to try to

6   satisfy strict scrutiny); see also Jackson (Jan. 27), Pg. 33, line 1 through Pg. 35, line

7   7, Exhibit 215, does not reference discrimination or remedying discrimination,

8   Exhibit 216, does not reference discrimination or remedying discrimination, Exhibit

9   217 (analysis contains only one reference to remedying discrimination: "The use of

10   quota-like system, as proposed by this bill, to remedy past discrimination and

11   difference in opportunities may be difficult to defend."), Exhibit 218 (stated purpose

12   of the bill does not reference discrimination or remedying discrimination;), Exhibit

13   220, Exhibit 229. Pgs. 389 to 390 (providing background information for S.B. 826

14   does not reference discrimination in response to the question "What is the problem

15   or deficiency in current law which this bill seeks to remedy?"); see also Jackson

16   (Jan. 27) Pg. 23, line 23 through Pg. 25, line 3.

17         Further the Court notes that the law's focus on "critical mass" refutes

18   Defendant's claim that the actual purpose of the law is remedying discrimination

19   because having a "critical mass" of women on boards is unrelated to remedying any

20   injury that an actual victim of discrimination may have suffered. The court relied on

21   Exhibit 236, wherein section 1(g) noted that "studies have concluded that having

22   three women on the board, rather than just one or none, increases the effectiveness

23   of boards".

24         The Court noted Senator Hannah Beth Jackson's own summary of S.B 826

25   in her letter to Governor Brown, requesting his signature on S.B. 826 legislation,

26   described the legislations intent, "the issue of S.B. 826 seeks to address is classic

27   gender discrimination...that happens at the highest ranks of corporate America."

28   (Ex. 231). It was further expressed by Jackson and others how gender bias and

stereotypes are barriers to women becoming board members.

In support of women in the board room, the Defense offered the testimony of stereotypical virtues of women such as "consensus builders" and "less risky behavior in investments".

Such argument was also offered through a 2012 University of California, Berkeley Study which opined that companies with more women on their boards are more likely to create a" sustainable future", including implementing a strong governance structure with a high level of transparency. A 2012 Credit Suisse study offered that with women on the board business performance for key metrics would improve, including stock performance, carrying less debt and price to book value would benefit along with better net income growth (Ex 236-002: 244-006; 245. 247). The Governor on signing S.B. 826 furthered offered "we need greater equity". The Court is unpersuaded by this offer of stereotypes for a justification of S.B. 826.

Neither Plaintiffs nor Defendant have identified any case holding that the government has a compelling interest in remedying societal discrimination or even specific, private-sector discrimination that justified the use of a suspect classification.

There is no Compelling Governmental Interest in remedying discrimination in the board selection process because neither the Legislature nor Defendant could identify any specific, purposeful, intentional and unlawful discrimination to be remedied. Jackson (Feb. 1), Pg. 46, lines 2-4, Jackson (Feb. 1), Pg. 68, lines 7-13, Konrad (Dec. 7), Pg. 107, lines 8-16, Schipani (Dec. 9), Pg. 116, line 15 through Pg. 117, line 3; Cindy Schipani (Dec. 9), Pg. 40, line 17 through Pg. 41, line 17, Jones (Jan. 24), Pg. 107, lines 12-22, Meline (Jan. 28) Pg. 111, line 21 through Pg. 112, line 6.

As an alternative and or in addition to the "finding of a Compelling State Interest" the Defense argues that where it benefits or protects the public retirees

1    and the public pension, one could find a compelling state interest. McGlynn v. State

2    of California (2018) 21 Cal App. 5th 548, 564-65.  The court does not find this

3    argument persuasive nor sufficiently based on the law.

4         During trial the Court found that Defendant was unable to present specific

5    evidence of actual, unlawful discrimination against any specific woman by any

6    specific corporation subject to S.B. 826.

7         Discrimination experts, Konrad, and Schipani, could not identify specific

8    instance of specific woman being discriminated against by a specific corporation in

9    the corporation's board process. Legislature cited only statistics about the number

10   of women on corporate boards as compared to men, not any specific discrimination.

11   Court once again referred to Exhibit 326 (citing statistics in section 1(e) ).

12        Defendant offered after-the-fact supplementation to the Legislature's

13   statistics with claims of societal and structural discrimination and general social

14   phenomena of "like stereotyping", "affinity bias," "like picking like" and "gender

15   matching". These are not unique to nor associated with any particular, publicly held

16   corporations headquartered in California.

17        The Court refers directly to the following testimony: Jackson (Dec. 15), Pg.

18   99, lines 26-27, Jackson (Jan. 27), Pg. 64, line 22 through Pg. 65, line 9, Jackson

19   (Jan. 27), Pg. 98, line 10 through Pg. 99, line 3, Berkhemer-Credaire (Dec. 13), Pg.

20   70, lines 10-1, Berkhemer-Credaire (Dec. 13), Pg. 91, lines 10-17, Berkhermer-

21   Credaire (Dec. 14), Pg. 70, line 13-16, Jones (Jan. 4), Pg. 61, line 21 through Pg.

22   62, line 12, asserted that "like picking like" is not unique to corporate boards and is

23   "probably true across a variety of different categories and enterprises". Konrad

24   (Dec. 6), Pg. 49, line 21 through Pg. 50, line 17, Konrad (Dec. 7), Pg. 29, lines

25   19-28. Schipani (Dec. 8), Pg. 38, line 22 through 39, line 1 (testified essentially that

26   Literature tells us that people tend to prefer people like themselves. And with

27   respect to boards, there are studies that say that there is gender matching, so when

28   there is an open position on the board, it tends to be filled by a person of the same

gender as the person who has left.") see also Schipani (Dec. 8), Pg. 40, line 25 through Pg. 41, line 6, Schipani (Dec. 8), Pg. 43, line 10 through Pg. 44, line 3, Schipani (Dec. 8), Pg. 66, line 17 through Pg. 67, line 2, Schipani (Dec. 9), Pg. 41, line 21 through 44, line 12, where in, witness offered women, as well as men, critique women leaders more harshly, such that women leaders who speak too softly are perceived as "not being leaders" while women leaders who do give orders face "backlash".

The Court finds that Defendant's witnesses, including Jackson, Berkhemer-Credaire, and Grounds, attributed the differences in the numbers of men and women on corporate boards to reasons other than actual discrimination, including the lack of open board seats, women's networking issues, board propensity to select persons that they already know, and boards preference for choosing CEOs to fill open board positions. Supporting evidence for the courts' view is: Jackson (Dec. 15), Pg. 100, lines 4-7, Berkhemer-Credaire (Dec. 10), Pg. 114, line 22 through Pg. 115, line 5, Berkhemer-Credaire (Dec. 10), Pg. 108, lines 23-28, Berkhemer-Credaire (Dec.13), Pg. 84, line 25 through Pg. 85, line 18, Berkhemer-Credaire (Dec. 14), Pg 71, lines 15-17, Meline (Jan. 28), Pg. 38, line 26 through Pg. 39, line1.

It was argued that Corporations prefer directors with CEO experience, and CEO's have tended to be men. Jackson (Jan. 25), Pg. 35, line 19 through Pg. 36, line 6. Grounds (Jan. 11), Pg. 76, lines 14-26, Schipani (Dec. 8), Pg. 43, lines 1—17. Berkhemer-Credaire gave testimony on (Dec. 10), Pg. 80, lines 15-23, that women need to "network like men do, in order to seek and win a corporate board seat". Berkhemer-Credaire (Dec. 10), Pg. 82, lines 2-7, Berkhemer-Credaire (Dec. 10), Pg. 105, line 22 through Pg. 106, line 14, Jackson (Dec. 16), Pg. 44, lines 9-14, Berkhemer-Credaire (Dec. 10), Pg. 95, lines 13-20, Berkhemer-Credaire (Dec. 13), Pg. 70, lines 9-24 (in summary testimony offered that board members want to bring on CEOs and others they know but those individuals " tend to be Anglo men"); see

also id. At Pg. 91, lines 3-9, Berkhemer-Credaire (Dec. 13), Pg. 79, lines 18-24, Berkhemer-Credaire (Dec.14), Pg. 30, lines 16-26, Berkhemer-Credaire (Dec. 14), Pg. 71, line 23 through Pg. 72, line 11, Jones (Dec. 10), Pg. 42, lines 19-28, Jones (Jan. 24), Pg. 38, lines 8-14, offered that "boards tend to recruit and hire people onto their boards within the same social and economic circles as existing members." Meline (Jan. 28), Pg. 49, line 26 through Page 50, line 5, Meline (Jan 28), Pg. 81, lines 4-21, offered that boards rely on the traditional process of looking to their personal networks to fill board seats, commonly say they don't know any women, and do not utilize resources like registries. Konrad (Dec. 7), Pg. 54, line 26 through Page 55, line 5, Grounds (Dec. 17), Pg. 111, lines 22-27, noting that a primary barrier to women on boards is that "a lot of corporations do not look outside their own networks". Witness, Cindy Schipani further opined regarding networking on (Dec. 9), Pg. 5, lines 22-25, that in general, boards tend to select men based on who they think is available and who would be best for the company. Schipani (Dec.9), Pg. 15, line 17 through Pg. 16, line 6. Schipani (Dec. 9), Pg. 28, lines 11-28.

The Court noted that Defendant's experts and expert opinions on discrimination, were not before the Legislature when it enacted S.B. 826. The court relied upon and was persuaded (not exclusively) by the following: Konrad (Dec. 7), Pg. 103, lines 18-27, Konrad (Dec. 7) Pg. 5, line 28 through Pg. 7, line 3, Konrad (Dec. 7), Pg. 27, line 15 through Pg. 28, line 1.

The Court noted that there was an absence of testimony by the witness Konrad and others to show that publicly held corporations headquartered in California engage in purposeful and intentional, unlawful discrimination against women in their board selection processes, but only offered more generally that the "board selection process" in the United States, including in California, is "significantly affected by anti-female gender discrimination."); Konrad (Dec. 7), Pg. 28, lines 19-26. Konrad (Dec. 7), Pg. 109, lines 16-24; Pg. 111, lines 9-11 (The

witness did not distinguish between the terms "bias" and "discrimination" and used the terms interchangeably); Konrad (Dec. 7), Pg. 18, lines 15-23 also used the words discrimination and bias interchangeably Konrad (Dec. 7), Pg. 19, line 18 through Pg. 20, line 14 testified discrimination studies on which she for her opinion are "different" from panel studies relied on by Konrad (Dec. 7), Pg. 56, lines 7-12 testimony that no factor other than discrimination can explain the lack of women on corporate boards were contradicted by testimony of Berkhemer-Credaire, who testified that "lack of open seats" is the problem. Berkhemer-Credaire (Dec. 14) Pg. 71, lines 15-17.

The Court notes the witness Alison Konrad Ph.D. (Dec. 7), Pg. 112, lines 7-20 and Pg. 114, lines 15-27 based her opinion about discrimination in the board selection process on five studies, two of the five do not concern board selection itself but instead concern mentoring new board members (McDonald and Westphal); Konrad (Dec. 7), Pg. 21, lines 21 through Pg. 22, line 6, Pg. 118, line 10 through Pg. 119, line 19, Pg. 120, lines 2-21, Pg. 135, line 9 through Pg. 136, line 1.

The witness Schipani (Dec. 9), Pg. 40, line 17 through Pg. 31, line 17 testified clearly, offering her opinion regarding discrimination, which appears to arise from statistics about the numbers of women on boards and vague assertions about social phenomena, like gender-incongruent behaviors. The witness failed to specifically offer convincing testimony that publicly held corporations headquartered in California engaged in purposeful and intentional, unlawful discrimination against women in their board selection processes.

The singular study Schipani specifically identifies as having relied on for her opinion on discrimination is a 2020 article which was published in the MIT Sloan Management Review, well after S.B. 826's enactment. The Court relied on Exhibit 257; Klick (Jan. 13), Pg. 86, line 2 through Pg. 89, line 24. It is noted that Exhibit 257 is a version of research for non-specialists and is not an actual academic study; it provides basic descriptive statistics and findings from survey responses and there

1    was insufficient testimony regarding statistically significant reliable research.

2        The Court noted all parties agreed that confidentiality is a necessary feature

3    of the board selection process and is not evidence that remedial action is

4    necessary. Testimony by Berkhemer-Credaire supported this view (Dec. 10), Pg.

5    80, lines 25-26, Berkhemer-Credaire (Dec. 13), Pg. 50, lines 5-27, Berkhemer-

6    Credaire (Dec. 13), Pg. 29, lines 12-23.

7        The evidence shows a natural progression towards adding more women to

8    the boards of private sector corporation over time: Berkhemer-Credaire (Dec. 14),

9    Pg. 52, line 26 through Pg. 54, line 4; Exhibit 279, Pg. 6, Berkhemer-Credaire (Dec.

10    14), Pg. 78, line 6 through Pg. 81, line 6; Exhibit 48, Pg. 7 , Berkhemer-Credaire

11    (Dec. 14), Pg. 101, line 13 through Pg. 102, line 8, Exhibit 280, Pg. 6, Berkhemer-

12    Credaire (Dec. 14), Pg. 102, lines 10-22, Exhibit 48, Pg. 7.

13        The Defendant did not carry the burden to show that the legislation was **(3)**

14    **NARROWLY TAILORED.** Defendant failed to show the Legislature considered

15    gender-neutral alternatives to remedy specific purposeful or intentional, unlawful

16    discrimination against women by private-sector corporations in the selection of

17    board members or that gender-neutral alternatives were not available.

18        The Legislature did not consider amending existing anti-discrimination laws

19    or enacting a new anti-discrimination law focusing on the board selection process

20    before enacting S.B. 826: Jackson (Feb. 1), Pg. 68, line 23 through Pg. 71, line 3,

21    Jackson (Feb. 15), Pg. 67, line 21 through Pg. 71, line 14.

22        Defendant did not sufficiently prove that S.B. 826's use of a gender-based

23    classification was limited in scope and duration to that which is necessary to

24    remedy specific, unlawful discrimination against women in the selection of board

25    members.

26        Further, Defendant did not sufficiently prove that S.B. 826's use of a gender-

27    based classification was actually remedial. There is insufficient showing that S.B.

28    826 was designed as nearly as possible to restore the victims of specific, purposeful

1  or intentional, unlawful discrimination to the positions the victims would have
2  occupied in the absence of discrimination.

3       Exhibit 236, which is the text of S.B. 826, does not identify any purposeful or
4  intentional, unlawful discrimination it sought to remedy. The court further noted the
5  following testimony: Konrad (Dec. 7), Pg. 132, line 18 through Pg. 135, line 8,
6  wherein S.B. 826 does not identify specific instances of discrimination in the board
7  selection process. Jackson (Feb. 1), Pg. 45, line 15-19 Jackson (Feb. 1), Pg. 45,
8  line 20 through Pg. 46, line 9 (Legislature was not provided evidence of any specific
9  instances of discrimination in the board selection process), Jackson (Feb. 1), Pg.
10  66, line 17 through Pg. 68, line 1, averred that adding a woman board member
11  "doesn't necessarily cure" discrimination.

12       As to the claimed interest that S.B. 826 was passed to remedy
13  discrimination, defendant has not met its burden to show that this is necessary nor
14  narrowly tailored.  Therefore, for all the above stated reasons and analysis the
15  Court determines that S.B. 826 violates the Equal Protection Clause of the
16  California Constitution and is thus enjoined. [1]

17

18  Dated: 5 -13 - 22

19                                MAUREEN DUFFY-LEWIS

20                           JUDGE OF THE SUPERIOR COURT

21

22

23

24

25

26

27

28  _____

[1] As the Court has found that S.B. 826 is unconstitutional under the Article I, Section 7, it need not make any determination as to plaintiffs' second count under Article I, Section 31.

- 23 -