# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF ILLINOIS
# EASTERN DIVISION

| | |
|---|---|
| AMERICAN ALLIANCE FOR EQUAL RIGHTS, *Plaintiff*, and UNITED STATES OF AMERICA, *Plaintiff-Intervenor*, v. STATE OF ILLINOIS; JB PRITZKER, in his official capacity as Governor of the State of Illinois; JAMES BENNETT, in his official capacity as Director of the Illinois Department of Human Rights; KWAME RAOUL, in his official capacity as Attorney General of the State of Illinois; and ALEXI GIANNOULIAS, in his official capacity as Secretary of State of the State of Illinois, *Defendants*. | Case No. 1:25-cv-00669 Judge Coleman |

## DECLARATION OF OFFICER B

1. I am over the age of 18, of sound mind, and otherwise competent to sign this declaration.

2. I am a dues-paying member of the American Alliance for Equal Rights. So is my nonprofit, Member B.

3. I am the Chairman of Member B. I authorized the Alliance to bring this action on Member B's behalf, and Member B's board ratified that decision.

4. Member B is directly regulated by 805 ILCS §105/114.15. Member B is a charitable organization that is incorporated for philanthropic and civic purposes. Member B is recognized as a 501(c)(3) by the IRS. It contributes more than $1,000,000 in

1

grants to other charitable organizations. And it must file an AG990-IL Charitable Organization Annual Report with the Illinois Attorney General each year. It has filed that form in 2018, 2019, 2020, 2021, 2022, 2023, and 2024.

5. Without a preliminary injunction, Member B will have to comply with 805 ILCS §105/114.15's disclosure requirements in December 2025. Section 105/114.15(a) requires nonprofits to publish their demographic statistics within 30 days of filing their AG990-IL reports. Member B will file that report in November 2025, so it must publish its demographic data by December 2025.

6. Member B and its employees do not classify its officers, directors, or staff by race, ethnicity, sexual orientation, or gender identity. Member B and its employees do not ask its officers, directors, or staff if they fall in any of those categories. And Member B and its employees do not consider race, ethnicity, sexual orientation, or gender identity when filling Member B's board positions because they think those considerations would be unlawful and unwise.

7. Member B and its employees do not publicize the demographics of Member B's board members, directors, or staff. And none of the demographic information that §105/114.5 compels Member B to publish is currently on Member B's website.

8. 805 ILCS §105/114.5 will force Member B and its staff to talk with Member B's officers and directors about sensitive demographic issues. It will force Member B and its staff to categorize its officers and directors by the race, ethnicity, and other categories they report. And it risks offending or outing a board member or officer who feels obligated—as a fiduciary of the organization—to talk about his or her sexual orientation or gender identity. Member B, and many if not all its officers and directors, do not believe in "gender identity" and object to suggesting that someone can identify as a gender that's different from their biological sex.

9. 805 ILCS §105/114.5 will require Member B to publish controversial demographic information on its public-facing website. Member B's website focuses on bipartisanship and tries to target "a centrist audience." To that end, Member B's website tries to avoid "alienation" and "division." But Member B finds §105/114.5's concepts—like the relevance of a person's race, ethnicity, sex, or gender identity or a nonprofit's "representation" on these metrics—to be inherently alienating and divisive. So by requiring Member B to publish controversial demographic data on its website, §105/114.5 will change Member B's message and hinder its mission. Section 105/114.5 will also make users think that Member B endorses controversial concepts like racial consciousness, proportional representation, and gender identity—concepts that Member B thinks are incoherent, immoral, and wrong. Member B, its board, its staff, and I do not want to be forced to promote these messages.

10. 805 ILCS §105/114.5 pressures Member B to discriminate. Member B's staff and I feel that pressure; that public naming and shaming, after all, is the law's central "aim." *Government Affairs Roundup for 6.5.24*, Joliet Region (June 5, 2024), perma.cc/CM3Z-EMN8; *Lawmakers Target Nonprofit Boards*, Politico (June 4, 2024), bit.ly/4hVy90f; *Gov. Pritzker Signs LGBTQ+ Affirming Bills*, Gov. JB Pritzker (June 30, 2024), perma.cc/6SFJ-XVVZ.

11. Based on my experience in the nonprofit sector, I also know that §105/114.5's supporters will "assess" Member B's racial and ethnic statistics and try to pressure us to change the composition of our board. *Gov. Pritzker Signs LGBTQ+ Affirming Bills*. That information will be publicly visible and easily accessible on Member B's own website. And there are several private organizations that rank nonprofits based on the diversity of their boards. If a nonprofit's board isn't sufficiently "diverse," those organizations will claim—oftentimes, without evidence—that a nonprofit's recruiting is discriminatory or not sufficiently inclusive. Those claims would harm Member B's reputation, its mission, and its ability to get donations. All those harms exert significant

3

pressure on Member B, myself, and my staff—encouraging us to racially balance our boards so the public does not think we are discriminating. That pressure will only mount if Member B's officers and directors refuse to divulge their demographic information, leading outsiders to conclude that Member B's leadership must *not* be diverse.

12. Once §105/114.5 forces Member B to publish its demographic data, that information will stay online forever. The WayBack Machine (and other archival tools like it) has screenshotted Member B's website hundreds of times. This year alone, that application archived Member B's website roughly once a week.

13. If Member B has to comply with §105/114.5, Member B will incur direct expenses in the form of lost time and resources interviewing employees, collecting their information, and changing its website. Member B won't be able to recoup those expenses from the State or its officials.

14. I am signing this declaration under a pseudonym because I fear Illinois will retaliate against me and Member B for opposing 805 ILCS §105/114.5. I also fear that other organizations will be unwilling to partner with Member B, potential employees will be unwilling to work at Member B, and donations to Member B will decrease if my identity—or the identity of Member B—becomes public.

Executed April 1, 2025

_____
Officer B