**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | |
|---|---|
| AMERICAN ALLIANCE FOR EQUAL RIGHTS,<br>　　　　　　　　　　*Plaintiff*,<br>and<br><br>UNITED STATES OF AMERICA,<br>　　　　　　*Plaintiff-Intervenor*,<br>v.<br><br>STATE OF ILLINOIS; JB PRITZKER, in his official capacity as Governor of the State of Illinois; JAMES BENNETT, in his official capacity as Director of the Illinois Department of Human Rights; KWAME RAOUL, in his official capacity as Attorney General of the State of Illinois; and ALEXI GIANNOULIAS, in his official capacity as Secretary of State of the State of Illinois,<br>　　　　　　　　　　*Defendants*. | Case No. 1:25-cv-00669<br><br>Judge Coleman |

**CORRECTED DECLARATION OF OFFICER A**

1.　I am over the age of 18, of sound mind, and otherwise competent to sign this declaration.

2.　I am a dues-paying member of the American Alliance for Equal Rights. So is my nonprofit, Member A.

3.　I am the CEO of Member A. I authorized the Alliance to bring this action on Member A's behalf, and Member A's board ratified that decision.

4.　Member A is directly regulated by 805 ILCS §105/114.15. Member A is a charitable organization that is incorporated for philanthropic and civic purposes. Member A is recognized as a 501(c)(3) by the IRS. It contributes more than $1,000,000 in

1

grants to other charitable organizations. And it must file an AG990-IL Charitable Organization Annual Report with the Illinois Attorney General each year. It has filed that form in 2004, 2005, 2006, 2007, 2008, 2009, 2010, 2011, 2012, 2013, 2014, 2015, 2016, 2017, 2018, 2019, 2020, 2021, 2022, 2023, and 2024.

5. Without a preliminary injunction, Member A will have to comply with 805 ILCS §105/114.15's disclosure requirements in December 2025. Section 105/114.15(a) requires nonprofits to publish their demographic statistics "[w]ithin 30 days after filing [an] annual AG990-IL Charitable Organization Annual Report." Member A will file an AG990-IL Charitable Organization Annual Report in November 2025, so it must publish its demographic data by December 2025.

6. Member A and its employees do not classify its officers, directors, or staff by race, ethnicity, sexual orientation, or gender identity. Member A and its employees do not ask its officers, directors, or staff if they fall in any of those categories. And Member A and its employees do not consider race, ethnicity, sexual orientation, or gender identity when filling Member A's board positions because they think those considerations would be unlawful and unwise.

7. Member A and its employees do not publicize the demographics of Member A's board members, directors, or staff. And none of the demographic information that §105/114.5 will compel Member A to publish is currently on Member A's website.

8. 805 ILCS §105/114.5 will force Member A and its staff to talk with Member A's officers and directors about sensitive demographic issues. It will force Member A and its staff to categorize its officers and directors by the race, ethnicity, and other categories they report. And it risks offending or outing a board member or officer who feels obligated—as a fiduciary of the organization—to talk about his or her sexual orientation or gender identity.

9. 805 ILCS §105/114.5 will require Member A to publish controversial demographic information on its public-facing website. Member A's website features a wide

range of commentary, including articles that promote colorblindness and claim that demographic mandates like §105/114.5 offend America's founding principles. Section 105/114.5's mandates would change Member A's message. It would require Member A to publish controversial demographic data on its website, which will make users think that Member A endorses controversial concepts like race-based employment practices and proportional representation. Member A, its board, its staff, and I do not want to be forced to promote these messages.

10. 805 ILCS §105/114.5 pressures Member A to discriminate. Member A's staff and I feel that pressure, especially since the law's key sponsors—and even the Governor—said §105/114.5 is meant to "nudge foundations … to diversify their boards."[1]

11. Based on my experience in the nonprofit sector, I also know that §105/114.5's supporters will "assess" Member A's racial and ethnic statistics and try to pressure us to change the composition of our board.[2] That information will be publicly visible and easily accessible on Member A's own website. And there are several private organizations that rank nonprofits based on the diversity of their boards. If a nonprofit's board isn't sufficiently "diverse," those organizations will claim—oftentimes, without evidence—that a nonprofit's recruiting isn't "inclusive" and imply that the nonprofit is discriminating or is otherwise unworthy of support. Those claims would harm Member A's reputation, its mission, and its ability to get donations. All those harms exert significant pressure on Member A, myself, and my staff—encouraging us to racially balance our boards so the public does not think we are discriminating. That pressure will only

---

[1] *Lawmakers Target Nonprofit Boards*, Politico (June 4, 2024) bit.ly/4hVy90f; *Gov. Pritzker Signs LGBTQ+ Affirming Bills*, Gov. JB Pritzker (June 30, 2024), perma.cc/6SFJ-XVVZ; *Government Affairs Roundup for 6.5.24*, Joliet Region (June 5, 2024), perma.cc/CM3Z-EMN8.

[2] *Gov. Pritzker Signs LGBTQ+ Affirming Bills*, *supra*.

3

mount if Member A's officers and directors refuse to divulge their demographic information, leading outsiders to assume that Member A's leadership must *not* be diverse.

12. Once §105/114.5 forces Member A to publish its demographic data, that information will stay online forever. Indeed, just a single website—the "WayBack Machine"—has archived Member A's webpages over 75,000 times. And the WayBack Machine (and other archival tools like it) archive Member A's website almost every day.

13. If Member A must comply with §105/114.5, Member A will incur direct expenses every year in the form of lost time and resources interviewing employees, collecting their information, and changing its website. Member A won't be able to recoup those expenses from the State or its officials.

14. I am signing this declaration under a pseudonym because I fear Illinois will retaliate against me and Member A for opposing 805 ILCS §105/114.5. I also fear that other organizations will be unwilling to partner with Member A, potential employees will be unwilling to work at Member A, and donations to Member A will decrease if my identity—or the identity of Member A—becomes public.

15. When I signed my original declaration, I understood that I was swearing to the truth of its contents under penalty of perjury. I am submitting this corrected declaration because my original declaration unintentionally omitted that statement.

Per 28 U.S.C. §1746, I declare under penalty of perjury that the foregoing is true and correct.

Executed May 7, 2025

_____Officer A_____
Officer A