**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | |
|---|---|
| AMERICAN ALLIANCE FOR EQUAL RIGHTS, <br> *Plaintiff*, <br> and <br><br> UNITED STATES OF AMERICA, <br> *Plaintiff-Intervenor*, <br> v. <br><br> STATE OF ILLINOIS; JB PRITZKER, in his official capacity as Governor of the State of Illinois; JAMES BENNETT, in his official capacity as Director of the Illinois Department of Human Rights; KWAME RAOUL, in his official capacity as Attorney General of the State of Illinois; and ALEXI GIANNOULIAS, in his official capacity as Secretary of State of the State of Illinois. <br> *Defendants*. | Case No. 1:25-cv-669 <br><br> Judge Coleman |

**THE ALLIANCE'S RESPONSE IN OPPOSITION
TO DEFENDANTS' MOTION TO STRIKE**

When the Alliance filed its complaint in January 2025, it hoped to resolve its claims expeditiously on cross-motions for summary judgment, without needing to seek preliminary relief. But after Illinois took two extensions to even respond to the Alliance's complaint, it became clear that a preliminary injunction would be necessary to avoid the irreparable harm that its members face in November 2025. Illinois has since turned what should have been one motion into multiple motions with a confusing set of cross-referencing briefs and overlapping deadlines, wasting resources and threatening to delay a prompt ruling on the Alliance's time-sensitive request for a preliminary injunction.

As part of that back and forth, Illinois filed this motion to strike—a motion that is notorious for being the quintessential "time waste[r]." *Ajaj v. United States*, 2016 WL 11970231, at *1 (S.D.

1

Ill. July 5). Illinois' motion should be promptly denied. The Alliance has fixed the clerical error in its original declarations, so the motion is moot. And even if it were live, Illinois fails to justify the extreme remedy of striking documents.

## ARGUMENT

Illinois moves to strike "the declarations of 'Officer A' and 'Officer B.'" MTS (Doc.71) at 2. Aside from an undeveloped footnote, the sole argument in its motion is that those declarations do not comply with 28 U.S.C. §1746 because they "do not swear or affirm that the contents of the declarations are true and correct under penalty of perjury." *Id.* But that accidental omission has been corrected, making the motion moot. The omission would not be a reason to strike anyway, and Illinois' undeveloped argument about the declarants' anonymity is forfeited and wrong.

## I. Illinois' motion to strike is moot.

As explained in its notice of corrected declarations, the Alliance unintentionally omitted the penalty-of-perjury clauses from the declarations of Edward Blum, Officer A, and Officer B. Doc. 75. As soon as the Alliance learned of this clerical mistake, it submitted corrected declarations including the required language. Illinois did not confer with the Alliance before filing its motion to strike; if it had, the Alliance would have immediately fixed the issue and no motion would have been necessary. In all events, the correction means that Illinois' motion to strike the declarations "on the basis that they do not comply with the requirement under 28 U.S.C. §1746" is now "moot." *See BRC Rubber & Plastics, Inc. v. Continental Carbon Co.*, 876 F. Supp. 2d 1042, 1045 n.2 (N.D. Ind. 2012); *accord United States v. Gritz Bros. P'ship*, 155 F.R.D. 639, 644 (E.D. Wis. 1994) (denying motion to strike as moot where omission of required language was corrected and original declaration was timely filed). This Court should simply consider the corrected declarations, which Illinois has not moved to strike.

**II.     Illinois does not justify the extreme remedy of striking any document.**

Even if the motion were not moot, Illinois fails to justify the extraordinary remedy of strik-

ing. "Motions to strike 'are generally disfavored because they potentially only delay the proceed-

ings.'" *Siegel v. HSBC Holdings, PLC*, 283 F. Supp. 3d 722, 730 (N.D. Ill. 2017). They "disserve

the interest of judicial economy" and "com[e] at an unacceptable cost in judicial time." *Redwood

v. Dobson*, 476 F.3d 462, 471 (7th Cir. 2007). Striking is an "extreme measure" because courts

prefer to "ensur[e] that cases are decided on their merits." *Silva v. Swift*, 333 F.R.D. 245, 247 (N.D.

Fla. 2019) (collecting cases). For this reason, motions to strike "continue to be wasteful in all but

a few cases" and require "some showing of real prejudicial harm to the moving party." *Love v.

Gardison*, 2008 WL 1968732, at *1 (E.D. Wis. May 2).

Striking is inappropriate because Illinois suffered no prejudice. Illinois makes no argument

that it was prejudiced. Nor could it be. The same allegations appear in the verified amended com-

plaint, which was signed under penalty of perjury. Doc. 59; *accord* Doc. 1. And the declarations

were promptly corrected, with no material changes to the substantive testimony and with plenty

of time before the preliminary-injunction hearing. Doc. 75.

Nor would the accidental omission of the penalty-of-perjury clauses be a reason to strike.

"[A]t the preliminary injunction stage," "[e]videntiary rules" like 28 U.S.C. §1746 "are relaxed."

*Doe v. Elkhorn Area Sch. Dist.*, 743 F. Supp. 3d 1053, 1060 (E.D. Wis. 2024). The court "may

grant a preliminary injunction based on less formal procedures and on less extensive evidence than

a trial on the merits." *Dexia Credit Loc. v. Rogan*, 602 F.3d 879, 885 (7th Cir. 2010). Tellingly,

Illinois' only cases that struck or disregarded unsworn declarations involved summary-judgment

proceedings. *See* MTS at 2 & n.1; *cf. Hudson v. Preckwinkle*, 2015 WL 1541787, at *13, *23

(N.D. Ill. Mar. 31) (Illinois' case where, precisely because the case was at the preliminary-injunc-

tion stage, the court refused to strike the unsworn declarations). But unlike summary judgment, a

preliminary injunction need not "consist only of admissible evidence" because a preliminary-injunction proceeding "does not substitute for trial." *Cobell v. Norton*, 391 F.3d 251, 261 (D.C. Cir. 2004) (discussing 28 U.S.C. §1746). At most, Illinois' arguments would be reasons to give the Alliance's members' declarations less weight, not to strike them. But even that step would be inappropriate here given that the omission of the perjury clauses was an accident by the lawyers, not a reflection on the seriousness of the declarants or the truth of their statements, and it has now been corrected. *See* Doc. 75; *see* A-Corr.-Decl. ¶15, B-Corr.-Decl.¶15, Blum-Corr.-Decl. ¶16.

Nor is Illinois' argument about the anonymity of Officers A and B—raised only in a brief footnote—a reason to strike their declarations. MTS 2-3 n.2. By "failing to raise this issue other than by a passing reference in a footnote," Illinois has forfeited it. *United States v. White*, 879 F.2d 1509, 1513 (7th Cir. 1989); *see also Greer v. Advanced Equities, Inc.*, 683 F. Supp. 2d 761, 766 (N.D. Ill. 2010) ("arguments raised only in footnotes are forfeited"); *Thomas v. U.S. Dep't of Energy*, 719 F.2d 342, 344 n.3 (10th Cir. 1983) (deeming an objection to an unsworn declaration that was insufficiently argued to be "waived").

Even if it were preserved, Illinois' argument is wrong. As Illinois acknowledges, §1746 allows anonymous declarations so long as the declarant is a "readily identifiable person who can be subjected to the penalties for perjury." MTS 2 n.2 (citing *Doe v. Duerfahrd*, 2022 WL 17253080, at 4 n.2 (N.D. Ind. Nov. 28)). Here, Officers A and B can be identified by Blum and the Alliance's lawyers, either to the Court *in camera* or to the Court and Illinois under a protective order. In fact, the Alliance offered to provide the names of Officers A and B to Illinois under a protective order, but Illinois refused. *See* Ex.A. It would rather strike their declarations over a typographical error than learn their identities or challenge their credibility.

Anonymous declarations from an association's members are common and appropriate. The Alliance regularly uses them—and *wins* preliminary injunctions based on them. *See, e.g.*, *AAER v. Fearless Fund Mgmt.*, 103 F.4th 765 (11th Cir. 2024); *AAER v. Founders First CDC*, 2024 WL 3625684 (N.D. Tex. July 31). And courts regularly allow pseudonymous declarations like these. *See, e.g.*, *McGehee v. Neb. Dep't of Corr. Servs.*, 2019 WL 1227928, at *2 (D. Neb. Mar. 15) (allowing anonymous declaration of "President of Pharmacy N"), *vacated on other grounds*, 987 F.3d 785 (8th Cir. 2021). In fact, the Seventh Circuit has faulted an association for *not* filing anonymous "Doe affidavits" from its members in support of a preliminary injunction. *Speech First v. Killeen*, 968 F.3d 628, 643 (7th Cir. 2020), *accord id.* at 650 (Brennan, J., concurring) ("anonymous affidavits"). The Seventh Circuit would not have done so if that anonymous testimony were per se invalid.

## CONCLUSION

For all these reasons, this Court should deny Defendants' motion to strike.

Dated: May 14, 2025

Respectfully submitted,

*/s/ Cameron T. Norris*
Thomas R. McCarthy*
Cameron T. Norris*
Matt Pociask**
R. Gabriel Anderson*
Marie E. Sayer*
CONSOVOY MCCARTHY PLLC
1600 Wilson Blvd., Ste. 700
Arlington, VA 22209
(703) 243-9423
tom@consovoymccarthy.com
cam@consovoymccarthy.com
matt@consovoymccarthy.com
gabe@consovoymccarthy.com
mari@consovoymccarthy.com

*Admitted *pro hac vice*
**Admitted to the Northern District of Illinois

*Counsel for Plaintiff*

## CERTIFICATE OF SERVICE

On May 14, 2025, I e-filed this document with the Court, which automatically emailed everyone requiring notice.

*/s/ Cameron T. Norris*
Counsel for Plaintiff

Case: 1:25-cv-00669 Document #: 78 Filed: 05/14/25 Page 7 of 49 PageID #:521

AHMAD M. AJAJ, 40637-053, Plaintiff, v. UNITED STATES..., Not Reported in Fed....

2016 WL 11970231

2016 WL 11970231
Only the Westlaw citation is currently available.
United States District Court, S.D. Illinois.

AHMAD M. AJAJ, 40637-053, Plaintiff,

v.

UNITED STATES OF AMERICA, et al., Defendants.

Case Number: 3:14-cv-01245-SMY-PMF

|

Filed 07/15/2016

### ORDER

Philip M. Frazier United States Magistrate Judge

**\*1** Before the Court is the defendants' motion to strike. (Doc. 81). Plaintiff Ahmad Ajaj, an inmate in federal prison at ADX Florence, asserts in this case that the defendants subjected him to excessive force and unlawful conditions of confinement while he was housed at USP Marion. He also asserts that he was unlawfully transferred from USP Marion to ADX Florence. According to Ajaj, he has been subjected to the unlawful treatment because of his ethnicity (Arab) and religion (Islam). Ajaj proceeds on a large number of claims in this lawsuit, and so he was ordered to file a more definite statement in order to clarify the factual issues in this case. See Fed. R. Civ. P. 8(e).

The defendants now seek to strike portions of Ajaj's more definite statement. In paragraphs 43 through 61 of Ajaj's more definite statement he references the "Cowboy" gang that operated at ADX Florence. In the late 1990s the federal government conducted an investigation into allegations that correctional officers at ADX Florence were abusing inmates. See *US v. Lavee*, 439 F.3d 670, 678 (10th Cir. 2006). The investigation uncovered that a group of correctional officers (known as the "Cowboy" gang) had been physically assaulting inmates and then falsifying records in order to show that the officers' use of force was justified. *Id*. As a result, at least ten Bureau of Prisons employees were criminally charged. *Id*. Ajaj's more definite statement states that he was at ADX Florence when these events occurred and that one of the defendants in the instant case (Fozzard) was a member of the Cowboy Gang at that facility. Doc. 48, pp. 5-6, ¶¶ 43-50. Ajaj asserts that the Cowboy Gang targeted individuals on the basis of their religious beliefs and ethnic backgrounds, and that he was singled out for mistreatment.

Doc. 48, p. 5, ¶ 43. Ajaj also states that Fozzard was later transferred to USP Marion, and that Fozzard continued the mistreatment during their time together at USP Marion in 2011 and 2012. Doc. 48, p. 8, ¶¶ 62-63.

The defendants now seek to strike the portions of Ajaj's more definite statement that refer to the ADX Florence Cowboy Gang. The defendants argue that Ajaj's description of the Cowboy Gang is inaccurate, and that the Cowboy Gang did not target inmates on the basis of race or religion. The defendants also argue that the Cowboy Gang has not resurfaced at USP Marion and Ajaj's assertions stating otherwise are scandalous. Additionally, the defendants take issue with the fact that Ajaj appears to describe all of the defendants as bigoted, a characterization the defendants vehemently dispute.

Rule 12(f) of the Federal Rules of Civil Procedure states that "[t]he court may strike from a pleading an insufficient defense or any redundant, immaterial, impertinent, or scandalous matter." Motions to strike are not favored and they are often viewed as "time wasters." See 5C Charles Alan Wright & Arthur R. Miller, Federal Practice and Procedure § 1382 (3d ed.). Generally, motions to strike will be denied unless the movant can demonstrate that the offending materials "have no possible relation or logical connection to the subject matter of the controversy and may cause some form of significant prejudice to one or more of the parties to the action." *Id*.

**\*2** Ajaj's pleadings present very serious allegations regarding misconduct within the Bureau of Prisons and the defendants are entitled to dispute the veracity of those claims. However, the pleadings that the defendants seek to strike do relate to the merits of Ajaj's case. Whether Ajaj can support his claims with admissible evidence is another issue entirely, and one not properly addressed through a motion to strike. Additionally, District Courts are required to give *pro se* litigants a fair amount of leeway when filing complaints, see *Haines v. Kerner*, 92 S.Ct. 594, 596, 404 U.S. 519, 520 (1972) (*pro se* pleadings held to "less stringent standards than formal pleadings drafted by lawyers"), and *pro se* prisoner litigants with an abundance of free time sometimes push the boundaries of proper pleadings by digressing into tangentially related topics. Prisoner civil rights lawsuits also frequently touch on sensitive issues that would rightly be viewed as "scandalous" if presented in other contexts. With this in mind, the Court is not convinced that the defendants will be prejudiced by the material in question.

The defendants' motion to strike is DENIED.

IT IS SO ORDERED.

**All Citations**

Not Reported in Fed. Supp., 2016 WL 11970231

---

**End of Document**                    © 2025 Thomson Reuters. No claim to original U.S. Government Works.

---

2008 WL 1968732
Only the Westlaw citation is currently available.
United States District Court,
E.D. Wisconsin.

Deron LOVE, Plaintiff,

v.

David GARDISON, Meletha Kordus, Sgt.
Dulan, and Deputy Samflippo, Defendants.

No. 07-C-816.
|
May 2, 2008.

**Attorneys and Law Firms**

Deron Love, Milwaukee, WI, pro se.

Roy L. Williams, Milwaukee, WI, for Defendants.

**ORDER**

WILLIAM C. GRIESBACH, District Judge.

**\*1** Plaintiff Deron Love has filed a motion to strike the affirmative responses raised by the defendants in their answer to his complaint, pursuant to Federal Rule of Civil Procedure 12(f). For the following reasons, his motion will be denied.

As an initial matter, I note that courts in this circuit continue to frown upon motions to strike. As the Seventh Circuit recently reiterated:

> Motions to strike words, sentences, or sections out of briefs serve no purpose except to aggravate the opponent-and though that may have been the goal here, this goal is not one the judicial system will help any litigant achieve. Motions to strike disserve the interest of judicial economy. The aggravation comes at an unacceptable cost in judicial time.

Redwood v. Dobson, 476 F.3d 462, 471 (7th Cir.2007). Whether motions to strike are directed to portions of briefs or other filings, they continue to be wasteful in all but a few cases.

Federal Rule of Civil Procedure 12(f) provides that upon a motion made by a party within 20 days after a pleading is served upon him, the Court may order stricken from any pleading "any insufficient defense or any redundant, immaterial, impertinent, or scandalous matter."

> However, Rule 12(f) motions are not generally favored by the courts and are typically granted only if the challenged matter clearly has no bearing upon the subject matter of the litigation. In fact, a motion to strike a portion of a pleading is regarded as so drastic a remedy that one is seldom granted absent some showing of real prejudicial harm to the moving party. It is not a proper device for placing the actual merits of a party's pleadings in issue.

Armstrong v. Snyder, 103 F.R.D. 96, 100 (E.D.Wis.1984). Here, Love's motion disputes the merits of the affirmative defenses raised in the defendants' answer. As explained in Armstrong, this is not a basis on which the court will grant a motion to strike. Federal Rule of Civil Procedure 8(1) (A) requires that in responding to a pleading, a party must "state in short and plain terms its defenses to each claim asserted against it." Fed.R.Civ.P. 8(1)(A). The defendants' answer complies with this requirement.

**IT IS THEREFORE ORDERED** that the plaintiff's motion to strike is **DENIED.**

**All Citations**

Not Reported in F.Supp.2d, 2008 WL 1968732

---

    © 2025 Thomson Reuters. No claim to original U.S. Government Works.

**WESTLAW** © 2025 Thomson Reuters. No claim to original U.S. Government Works.

Hudson v. Preckwinkle, Not Reported in Fed. Supp. (2015)

2015 WL 1541787

2015 WL 1541787
Only the Westlaw citation is currently available.
United States District Court, N.D. Illinois, Eastern Division.

Tylon HUDSON, et al., Plaintiffs,

v.

Toni PRECKWINKLE, et al., Defendants.

13 C 8752
|
Signed March 31, 2015

**Attorneys and Law Firms**

Alan S. Mills, Alexa Van Brunt, Andrew Francis Merrick, David J. Bradford, Leah K. Williams, Nicole C. Berg, Jenner & Block LLP, David M. Shapiro, Laura A. Kleinman, Schiff Hardin, LLP, Locke E. Bowman, III, Sheila A. Bedi, Steve Weil, Chicago, IL, for Plaintiffs.

Lisa Marie Meador, Michael Jude Sorich, Thomas Edward Nowinski, James Matthias Lydon, Robert Thomas Shannon, Gretchen Harris Sperry, Virginia Brette Bensinger, Hinshaw & Culbertson, Dominick L Lanzito, Paul A. O'Grady, Peterson Johnson & Murray, Lisa Marie Meador, Michael Jude Sorich, Chicago, IL, for Defendants.

### MEMORANDUM OPINION AND ORDER

Virginia M. Kendall, District Judge

*1 Plaintiff Tylon Hudson and four other individuals who were or are housed in Divisions IX and X of the Cook County Jail (the "Jail") seek to represent a class of all current and future detainees in Divisions IX and X in arguing that the risk of violence and the conditions of confinement in those divisions violate the Constitution. Plaintiffs moved the Court to enter a preliminary injunction to put a stop to the alleged "deliberate indifference" of Cook County officials to the alleged "sadistic" behavior of guards and detainees. This case is the latest in a long string of court cases seeking to improve conditions at the Jail dating back to at least 1974. In response, Cook County Board President Toni Preckwinkle and Cook County have filed a motion to dismiss arguing that they cannot be held liable for the actions of those who have direct responsibility for operating the Jail. Named in their official capacities, Cook County Sheriff Tom Dart, Executive Director of the Cook County Department of Corrections Cara

Smith, Superintendent of Division X E. Greer, Superintendent of Division IX V. Thomas, as well as Officer Campbell, Sergeant Lewis, Officer Wilson, and Lieutenant Johnson, who were named individually, (the "Sheriff's Office Defendants") have separately moved to dismiss the Amended Complaint arguing that the injunctive relief sought already exists in the form of an agreed order in *United States v. Cook County* (10 C 2946) (the "Federal Agreed Order") and that the Amended Complaint fails to state a claim for damages.

For the reasons stated below, President Preckwinkle and Cook County's motion to dismiss (Dkt. No. 81) is denied. The Sheriff's Office Defendants' motion to dismiss (Dkt. No. 144) is granted in part and denied in part. The Amended Complaint is dismissed as to Lieutenant Lewis, but the remainder of the motion is denied. Also pending is Defendants' motion to strike Plaintiffs' submission related to the preliminary injunction hearing. (Dkt. No. 231). That motion is denied. Finally, Plaintiffs' motion for a preliminary injunction (Dkt. No. 36) is denied.

### BACKGROUND

*I. The Cook County Jail*

The Jail is one of the largest, if not the largest, single-site county detention facilities in the United States. Roughly 100,000 people are admitted to the Jail each year and the average total daily population is about 9,000. The oldest parts of the Jail date back to 1929. Division IX is a maximum security division designed to house roughly 1,000 male detainees. Division X is a maximum security division designed to hold roughly 800 male detainees. The Cook County Department of Corrections, a division of the Cook County Sheriff's Office, operates the Jail. The Cook County Board provides funding for the Jail.

*II. Cook County Jail Conditions Litigation*

The present case is the latest in a string of civil cases seeking to redress alleged unconstitutional conditions of confinement at the Cook County Jail. The saga began in 1974 with *Duran v. Elrod,* 74 C 2949. *Duran* was a class action that dealt specifically with overcrowding and insufficient staffing at the Jail. (Dkt. No. 144 Ex. A). [1] The class in *Duran* represented "all pre-trial detainees at Cook County Jail." The *Duran* class was represented by Robert Lehrer of the Law Offices of Robert E. Lehrer and Locke Bowman of the MacArthur Justice Center at Northwestern University. The case resulted

Case: 1:25-cv-00669 Document #: 78 Filed: 05/14/25 Page 11 of 49 PageID #:525

Hudson v. Preckwinkle, Not Reported in Fed. Supp. (2015)

2015 WL 1541787

in the "Duran Consent Decree," an agreement between the Sheriff, the County Board President, and the pretrial detainee class that required the jail be monitored by an outside third party which party would report regularly to a district court judge regarding efforts made on the part of the Defendants to correct the overcrowding situation. The Duran Consent Decree was handled by a number of federal judges, the last of which was this Court.

[1]     Exhibit A to Dkt. No. 144 is the notice provided by plaintiffs' counsel in *Duran* and *Harrington* to members of the classes in those cases regarding the proposed voluntarily dismissal of those cases.

**\*2** The next civil case seeking to improve conditions at the Jail was *Harrington v. DeVito,* 74 C 3290. The class in *Harrington* represented all pre-trial detainees at the Jail who were in need of mental health treatment. (*Id.*). The class claimed that the failure to provide adequate mental health services at the Jail constituted a Fourteenth Amendment violation. The *Harrington* case also resulted in an agreed order requiring the parties responsible for operating the Jail to follow mental illness screening and classification procedures and provide treatment to eligible detainees. The *Harrington* agreed order also required adequate security staffing for mental health treatment units.

While both Decrees were still operational and in effect, in 2008, the Department of Justice investigated the Jail and found that despite the *Duran* consent decree and *Harrington* agreed order, violence and overcrowding were still pervasive. (Am.Compl.¶¶ 5–7). In May 2010, the Department of Justice brought suit against Cook County as well as the defendants named in *Duran* and *Harrington* under the Civil Rights of Institutionalized Persons Act ("CRIPA"), 42 U.S.C. § 1997a. Captioned *United States v. Cook County,* 10 C 2946, the injunctive relief sought by the DOJ was significantly more expansive and fully encompassed the relief sought in both previous agreed orders and sought relief for a number of other alleged violations including violations regarding excessive force and training of correctional officers. For the first time, the new proposed relief sought to bring in experts in the field to monitor and improve the conditions at the Jail. These experts would be divided into four categories—facilities, operations, medical and mental health—and would have an over-arching monitor who would coordinate the experts' work. [2] In the words of the *Duran* and *Harrington* classes, the Federal Agreed Order in *United States v. Cook County* was "more comprehensive than the *Duran* consent

decree and the *Harrington* agreed order." (Dkt. No. 144 Ex. A p. 2). The new order, which this Court will refer to as the Federal Agreed Order, was assigned to this Court and resulted in quarterly in-chambers meetings and semi-annual reports by all of the expert monitors to the Court. These meetings addressed whatever needs were addressed by each expert report, whether it be pest control or correctional officer training, and included all of the parties and any other stakeholder within the facility who could add a solution to any of the problems addressed by the monitors. These meetings are intense and ongoing and the Federal Agreed Order and the regular reports and meetings are in effect today.

[2]     There are four independent monitors involved in the *Cook County* case: Dr. Esmaeil Porsa M.D. MPH is the monitor for medical provisions, Dr. Jeffrey Metzner is the monitor for mental health provisions, Harry Grenawitzke is the monitor for the physical plant and capital planning provisions, and Susan McCampbell is the monitor for the corrections provisions.

Specifically, the Federal Agreed Order identifies and regulates the Jail in eight areas: use of force and protection from harm; medical care; mental health care; sanitation; training; quality assurance/performance improvement; fire and life safety; and improved policies, procedures, and practices. The protection from harm section is further subdivided into use of force by staff, safety and supervision, security staffing, incidents and referrals, investigations, inmate disciplinary procedures, classification, inmate grievance procedure, access to information, and training and supervision. The Federal Agreed Order provided that it would remain in effect until Defendants maintained a rating of "Substantial Compliance" in each area, as determined by court appointed monitors and approved by the Court, for eighteen months.

**\*3** The Federal Agreed Order was entered into on May 26, 2010 and monitors reports have been filed 37 times since it was entered into, each series of reports is followed by a meeting with this Court to address any areas of concern—especially those which the reports show as either out of compliance or in need of improvement. The overarching monitor on the Federal Agreed Order is Susan McCampbell, an expert in the field of corrections and criminal justice system leadership with over forty years of experience in the field. The first report submitted by Monitor McCampbell on September 24, 2010 showed a total of 74 of 77 provisions in partial or noncompliance and only three

Case: 1:25-cv-00669 Document #: 78 Filed: 05/14/25 Page 12 of 49 PageID #:526

Hudson v. Preckwinkle, Not Reported in Fed. Supp. (2015)

2015 WL 1541787

provisions in substantial compliance. As of November 4, 2014, defendants were in substantial or sustained compliance with all provisions of the Federal Agreed Order related to protection from harm. (10 C 2946 Dkt. No. 262 p. 2). All of these reports are on the public docket of *United States v. Cook County*.

At the time that the Federal Agreed Order was entered into, the parties on both sides of the *Duran* and *Harrington* cases "agreed that Judge Kendall should vacate the consent decree in *Duran* and the agreed order in *Harrington*, and dismiss both cases." (Dkt. No. 144 Ex. A p. 11). Recognizing that "the 2010 Agreed Order and the 2011 Supplementary Orders had not only secured for the plaintiff classes [in *Duran* and *Harrington* ] all the relief that the *Duran* consent decree and the *Harrington* agreed order had afforded them, but also extended to them substantial additional relief and protection," (*Id.*) the parties relinquished their cases in favor of the new Federal Agreed Order which offered them a comprehensive and monitored form of relief. In truth, never before had the Jail had the scrutiny of this number of experts analyzing in such exacting detail every structure, procedure, and process at the Jail. Moreover, the parties agreed that "the 2010 Agreed Order and 2011 Supplementary Orders reasonably promised to secure the rights of the plaintiff classes under the Fourteenth Amendment to the United States Constitution." (*Id.*).

At the time of the entry of the Federal Agreed Order, members of the *Duran* and *Harrington* classes were given the opportunity to respond and object to the voluntarily dismissal of their cases. Sixty-six class members responded to the notice of proposed voluntary dismissal and sixteen objected. (74 C 2949 Dkt. No. 1137 p. 6). The "theme" of the bulk of the objections was that "existing conditions at the Jail [were] so poor and [gave] rise to and threat ensuch [*sic* ] injury to plaintiffs, violating their constitutional rights in the process, that dismissal of lawsuits that were brought precisely to correct poor conditions at the Jail, and to secure plaintiffs' constitutional rights, is unwarranted." (*Id.*). Of course, the dismissal of the previous lawsuits was not to abandon the issue of poor conditions, but rather to expand the expert intervention into the jail and to expand that intervention beyond any intervention previously contemplated. Although the handful of objectors filed their positions, it was clear to the class representatives that the new Federal Agreed Order would give their clients more relief than even their respective lawsuits had sought previously, and therefore, the class representatives advocated to the Court to approve the

voluntary dismissal. The dismissal to the class counsel was actually a moot point because the Federal Agreed Order fully encompassed the existing relief and yet was much broader than *Duran* and *Harrington* relief combined.

Ironically, because he was then incarcerated at the Jail, Plaintiff Hudson was a member of the *Duran* class and therefore entitled to respond or object to the dismissal. Hudson did respond; he did not, however, object. (*See* 74 C 2949 Dkt. No. 1137–1 p. 3). Further irony exists in that one of the class counsel in the *Duran* Consent Decree informed this Court on the record that the Federal Agreed Order "fairly promise[d] a substantial improvement in overall Jail conditions." (74 C 2949 Dkt. No. 1137 p. 10). That same attorney now represents the *Hudson* class arguing that the Federal Agreed Order is inadequate. Ultimately, the Court accepted the classes' argument that voluntary dismissal of *Duran* and *Harrington* would comport with Rule 23 of the Federal Rules of Civil Procedure and dismissed the cases in light of the new, more comprehensive relief that would be provided all members with the Federal Agreed Order covering all aspects of the Jail.

### *III. The Present Lawsuit*

**\*4** Hudson was a detainee at the Jail. On December 6, 2013, Hudson filed a pro se complaint alleging that correctional officers at the Jail coordinated an attack on him by another inmate and failed to intervene while he was being attacked in the Division X law library. (Dkt. No. 1). The Complaint also included a *Monell* claim. Hudson sought compensatory and punitive monetary damages to redress his injuries as well as attorneys' fees. (*Id.* p. 24). On December 27, 2014, Judge Shadur granted Hudson's application for leave to proceed in forma pauperis and recruited an attorney to represent him. (Dkt. No. 5).

The recruited attorney's tenure was short. On February 27, 2014, Locke Bowman and David Shapiro of the MacArthur Justice Center at Northwestern University filed appearances on behalf of Hudson and the recruited attorney withdrew. The new attorneys filed an Amended Complaint, adding four named plaintiffs and class claims, and immediately issued a press release. [3] (Dkt. No. 12). The Amended Complaint was filed "on behalf of all people who now or in the future will be housed in Divisions IX and X of the Cook County Jail" (*Id.* ¶ 31). The Amended Complaint sought injunctive relief on behalf of the class in the form of an order preventing "the Defendants, their agents, employees, and all persons under

Case: 1:25-cv-00669 Document #: 78 Filed: 05/14/25 Page 13 of 49 PageID #:527

Hudson v. Preckwinkle, Not Reported in Fed. Supp. (2015)

2015 WL 1541787

their control from subjecting Plaintiffs and the class they seek to represent from the unlawful policies, practices, and conduct described" in the Amended Complaint. (*Id.* p. 56). The Amended Complaint also sought money damages for Hudson alone. (*Id.* p. 57). The Amended Complaint acknowledges the Federal Agreed Order, but claims that "little has changed in the jail since the DOJ filed suit." (*Id.* ¶ 8).

3   *See* Press Release, Roderick and Solange MacArthur Justice Center, Civil Rights Class Action Suit Documents Culture of Brutality and Violence at Cook County Jail (Feb. 27, 2014) (http://www.law.northwestern.edu/ legalclinic/macarthur/projects/treatment/ documents/ CookCountyJailclassactionnewsreleaseFeb272014.pdf)

Plaintiffs quickly moved for the entry of a preliminary injunction.[4] (Dkt. No. 36). The Cook County Defendants —Cook County itself and President Preckwinkle—moved to dismiss the Amended Complaint as to them, arguing that Sheriff Dart was solely responsible for any constitutional violations at the Jail. (Dkt. No. 81). Sheriff Dart and the remaining defendants moved to dismiss arguing that the relief sought in the Amended Complaint overlaps with the Federal Agreed Order's injunctive relief and that the Amended Complaint also failed to state a claim for money damages under Rule 12(b)(6) of the Federal Rules of Civil Procedure. (Dkt. No. 144).

4   Plaintiffs also sought class certification. (Dkt. No. 14). The parties stipulated that Plaintiffs had timely moved for class certification and the motion was withdrawn without prejudice. (Dkt. No. 226). Whether the putative class should be certified has not been briefed and is not presently before the Court.

### *MOTIONS TO DISMISS*

#### *I. Background*

The Amended Complaint contains fifty-six pages of allegations of horrific treatment of detainees in Divisions IX and X of the Jail. The Amended Complaint contains five counts. Counts I, II, and III seek injunctive relief on behalf of the putative class and Counts IV and V seek monetary damages on behalf of Hudson individually. Counts I, II, and III seek injunctive relief against all defendants named

in their official capacity, specifically President Preckwinkle, Sheriff Tom Dart, Executive Director of the Cook County Department of Corrections Cara Smith, Superintendent of Division X E. Greer, and Superintendent of Division IX V. Thomas (collectively the "Official Capacity Defendants"). (Am.Compl.¶¶ 156–65).[5] Count IV seeks money damages from Officer Campbell individually for ordering other detainees to attack Hudson. (*Id.* ¶¶ 166–68). Count V seeks money damages from Lieutenant Johnson, Sergeant Lewis, and Officer Wilson for their failure to protect Hudson from the gang members under Officer Campbell's control. (*Id.* ¶¶ 169–71).

5   The County of Cook is named as a defendant in the case caption, but not any count of the Amended Complaint.

**\*5** Counts I and II allege pervasive violence at the Jail. According to the Amended Complaint, detainees routinely suffer serious injuries both by jail staff and other inmates. Plaintiffs also allege deficient grievance processes to redress injuries suffered in the Jail. The Amended Complaint alleges that the Official Capacity Defendants are aware of the danger and have adopted a custom of condoning correctional officers' failure to report uses of force to the proper authorities within the Jail, which both constitutes deliberate indifference to a substantial risk of serious harm and exacerbates that risk. Count I alleges that the Official Capacity Defendants acted with deliberate indifference to the serious risk that detainees would suffer substantial harm at the hands of correctional officers within the Jail. Similarly, Count II alleges that the Official Capacity Defendants acted with deliberate indifference to the serious risk of substantial harm that detainees would suffer substantial harm at the hands of other detainees.

Count III alleges that the conditions in the isolation and segregation units at the Jail constitute cruel and unusual punishment. The Amended Complaint alleges that holding detainees in solitary confinement "for 23 hours a day causes profound mental anguish and a documented risk of serious harm." (*Id.* ¶ 146).

Counts IV and V are specific to Hudson himself and are described in greater detail below.

#### *II. Legal Standard*

A complaint "must state a claim that is plausible on its face" to survive a Rule 12(b)(6) motion to dismiss. *Adams*

Hudson v. Preckwinkle, Not Reported in Fed. Supp. (2015)

Case: 1:25-cv-00669 Document #: 78 Filed: 05/14/25 Page 14 of 49 PageID #:528

2015 WL 1541787

*v. City of Indianapolis,* 742 F.3d 720, 728 (7th Cir.2014) (quoting *Bell Atl. Corp. v. Twombly,* 550 U.S. 544, 570 (2007)). "A claim has facial plausibility when the plaintiff pleads sufficient factual content that allows the court to draw the reasonable inference that the defendant is liable for the alleged misconduct." *Id.* (quoting *Aschroft v. Iqbal,* 556 U.S. 662, 678 (2009)). A plaintiff must allege that all elements of its claims are satisfied, but must supply more than bare legal conclusions in order to survive a Rule 12(b) (6) motion to dismiss. *Reynolds v. CB Sports Bar, Inc.,* 623 F.3d 1143, 1147 (7th Cir.2010). "[A]llegations in the form of legal conclusions are insufficient to survive a Rule 12(b)(6) motion." *McReynolds v. Merrill Lynch & Co.,* 694 F.3d 873, 885 (7th Cir.2012).

*III. Discussion*

As an initial matter, the Court treats Counts I, II, and III as suits against the Cook County Board and the Cook County Sheriff's Office because "[a]ctions against individual defendants in their official capacities are treated as suits brought against the government entity itself." *Walker v. Sheahan,* 526 F.3d 973, 977 (7th Cir.2008) (citing *Hafer v. Melo,* 502 U.S. 21, 25 (1991)). Thus, to the extent the suit is filed against Defendants Dart, Smith, Greer, and Thomas, it is really a suit against the office of the Cook County Sheriff, who has statutory responsibility for operating the Jail. *See* 55 ILCS 5–3–15003. To the extent the suit is filed against Defendant Preckwinkle, it is really a suit against the Cook County Board which has statutory responsibility for funding the jail. *See* 55 ILCS 5/3–15015.

A. Judicial Estoppel

The Sheriff Defendants first argue that Plaintiffs are judicially estopped from arguing that the Federal Agreed Order does not adequately protect Plaintiffs' constitutional rights because the *Duran* and *Harrington* classes argued that *Duran* and *Harrington* should be dismissed because the Federal Agreed Order provided sufficient relief to detainees at the Jail. Judicial estoppel is not lightly tossed around in the legal arena, yet there appears to be some justifiable legal irritation on the part of Defendants here in that both classes of plaintiffs actually *sought* the relief that is currently being given in the form of the Federal Agreed Order, and at least one of the attorneys who stood before the Court seeking to eliminate the earlier orders is now representing the class that says the Federal Agreed Order is ineffective. Defendants can't

help but feel whipsawed under the circumstances: one day you are with me; the next you are against me.

**\*6** "Judicial estoppel is an equitable concept that prevents parties from playing fast and loose with the courts by prevailing twice on opposing theories." *United States v. Hallahan,* 756 F.3d 962, 975 (7th Cir.2014) (internal quotation marks and citation omitted). Though there is no precise formula for judicial estoppel, there are at least three factors relevant to whether the doctrine should apply: "(1) whether the party's later position was 'clearly inconsistent' with its earlier position; (2) whether the party against whom estoppel is asserted in a later proceeding has succeeded in persuading the court in an earlier proceeding; and (3) whether the party 'seeking to assert an inconsistent position would derive an unfair advantage or impose an unfair detriment on the opposing party if not estopped.' " *In re Airadigm Comms., Inc.,* 616 F.3d 642, 661 (7th Cir.2010) (quoting *New Hampshire v. Maine,* 532 U.S. 742, 750–51 (2001)). The application of judicial estoppel is a matter of discretion. *In re Pansier,* 451 Fed.Appx. 593, 596–97 (7th Cir.2011).

Unfortunately for the Defendants, the doctrine is not applicable here because it cannot fairly be said that the party against whom estoppel would be asserted is the same party who took the purportedly inconsistent position in prior litigation. The putative class here comprises all individuals housed now or in the future in Divisions IX and X of the Jail. (Am.Compl.¶ 31). The *Duran* and *Harrington* classes represented individuals housed in the Jail during the pendency of those cases. Neither *Harrington* nor *Duran* purported to represent the interest of future detainees in perpetuity. [6] While there is some overlap among the identity of the classes—Hudson himself, for example, was a member of the *Duran* class – the bulk of the class that Plaintiffs seek to represent were not members of the *Duran* or *Harrington* classes. Though counsel in this case overlaps substantially with counsel in *Duran,* prohibiting the present class from presenting arguments that the present conditions in Divisions IX and X of the Jail are unconstitutional today because some members of the present class were members of the *Duran* or *Harrington* classes would not serve the interest of justice. The Court will not punish the class members for class counsel's caprice.

[6]      The current litigation, however, does. (*See* Am. Compl. p. 56) ("Plaintiffs respectfully pray that this Court ... enter an order certifying a class of all people who *are or will be housed* in

Case: 1:25-cv-00669 Document #: 78 Filed: 05/14/25 Page 15 of 49 PageID #:529

Hudson v. Preckwinkle, Not Reported in Fed. Supp. (2015)

2015 WL 1541787

Divisions IX and X of the Cook County Jail"). The Court struggles to square this fact with Plaintiffs' assertion that "[i]t would be inequitable for a statement made in 2011, on behalf of detainees no longer at the jail, to foreclose any further effort by Cook County Jail detainees to enforce their constitutional rights through injunctive litigation." (Dkt. No. 178 p. 9).

### B. Mootness

The Sheriff Defendants next argue that the portions of the Amended Complaint seeking injunctive relief should be dismissed on mootness grounds because the relief sought overlaps with injunctive relief already mandated under the Federal Agreed Order. (Dkt. No. 144 p. 13). A claim for injunctive relief may be moot when there is a "high degree of duplication" between the claim and existing injunctive relief. *See Madyun v. Thompson,* 657 F.2d 868, 872 (7th Cir.1981). This theory also does not fall entirely flat in that the previous judge who was assigned the matter also was concerned about that overlap. That judge sought to have the cases combined before this Court in order not to duplicate any of the relief that might have been given already in this matter and, of course, not to drain judicial resources. The standard is high, however, requiring nearly an "identity of content" between existing injunctive relief and the subsequent lawsuit. *Id.* Though the potential for substantial overlap in injunctive relief is obviously present here, the case is not moot. It is difficult to know exactly what sort of injunctive relief Plaintiffs are seeking since it evolved over time with each court hearing. Plaintiffs, however, established based on their written submissions that they seek injunctive relief that is not necessarily provided by the Federal Agreed Order. Plaintiffs presented various specific actions that they would like to be taken at the Jail to redress their alleged constitutional injury. Based on the parties' submissions and the representations made in open court, the Court determined that a hearing on the preliminary injunction was necessary because the relief did not overlap completely with the relief already being provided by the Federal Agreed Order. (Dkt. No. 248).

*7 The finding that the case is not moot, of course, does not necessarily suggest that any of the relief sought by Plaintiffs is appropriate in this case. That must be addressed on the merits after review of the evidence presented during the evidentiary hearing on the motion for preliminary injunction. At this point, the Court simply finds that Plaintiffs seek at least some injunctive relief not presently provided by the Federal Agreed

Order. The Court addresses the propriety of the injunctive relief below.

### C. PLRA

The Sheriff Defendants argue that the Prison Litigation Reform Act, specifically 18 U.S.C. § 3626, prohibits the Court from granting the relief sought in the Amended Complaint. The PLRA requires that any prospective relief be narrowly drawn, extend no further than necessary to remedy a constitutional violation, and be the least intrusive means necessary to achieve that goal. *See* 18 U.S.C. § 3626(a) (1)(A). Defendants' one paragraph argument on this point is conclusory and underdeveloped to the point of waiver. *See United States v. Wescott,* 576 F3d 347, 356 (7th Cir, 2009) (unsupported and undeveloped arguments are waived). While Defendants may be correct that granting all the relief sought by Plaintiffs would violate the PLRA, this conclusion supports crafting a pointed remedy if prospective relief is shown to be appropriate, not dismissing the case at the pleadings stage. The Court is aware of its obligations for crafting injunctive relief under the PLRA.

### D. Cook County Motion to Dismiss

Cook County and President Preckwinkle move to dismiss the Complaint as to them. They argue that they cannot be held liable for the conduct of the Sheriff's Office at the jail because Sheriff Dart is not an employee of the County and the operation of the jail is committed to his sole responsibility under Illinois law. Preckwinkle and Cook County Board are correct to the extent that they argue that no vicarious liability exists under § 1983, *see, e.g., O'Shell v. Cline,* 571 Fed.Appx. 487, 491 (7th Cir.2014), but they are incorrect that that conclusion warrants dismissal in this case. A governmental body can be held directly liable under § 1983 when there is a plausible "allegation that the official policy is responsible for the deprivation of rights." *Thomas v. Cook Cnty. Sheriff's Dep't,* 604 F.3d 293, 306 (7th Cir.2010) (quoting *Monell v. Dep't of Social Servs. of the City of New York,* 436 U.S. 658, 690 (1978)). The Board itself can indeed be held accountable for its own actions under § 1983.

The Amended Complaint states a claim for injunctive relief based on the Board's own conduct in underfunding the jail despite its knowledge of the substantial risk of serious harm that detainees experience at the Jail. As this Court is well

aware, a significant number of the issues regarding conditions at the Jail are related to the extremely old facility itself. Simply maintaining the old structure is costly and requires movement of pretrial detainees to other areas of the jail simply to keep the Jail at its most basic level of adequate functioning. Monitor McCampbell has frequently raised the significant impact of the decaying facility on operations and safety. All of the funding for that functioning and that old facility comes from the Cook County Board. The Amended Complaint alleges in Counts I, II, and III that the County policy or practice of providing inadequate funding for the jail were causally related to the harms suffered by inmates. Moreover, the Amended Complaint alleges that the County was well aware of the risk of harm in the Jail and maintained the allegedly inadequate level of funding. These allegations are sufficient to state a claim and survive the motion to dismiss. *See, e.g., Shoppell v. Schrader,* No. 08 C 284, 2009 WL 1886090 at *6 (N.D. Ind. June 30, 2009) ("critical question is whether Council's funding decisions were made with deliberate indifference to [prisoner's] rights"). Thus, Cook County's motion to dismiss is denied.

 **\*8** The Court also notes the practical reality of the Cook County Board's involvement with the Jail. The Board is responsible for providing adequate funding for the Jail under Illinois law. *See* 55 ILCS 5/3–15015 ("The County Board must appropriate and provide funds for the necessary ordinary and contingent cost incurred by the office of the Sheriff in the performance of its powers, duties and functions" which include operation of a jail). President Preckwinkle's predecessor signed on to the Federal Agreed Order on behalf of the Board. Indeed, the Board recently moved the Court to enter an order transferring responsibility for the execution of the emergency Prisoner Release Order in the Federal Agreed Order from the Sheriff to the Cook County Board. (10 C 2946 Dkt. No. 218). It strains credulity for the Board to distance itself from the Jail when it comes to shielding itself from liability here while at once seeking greater involvement with Jail operations under the Federal Agreed Order.

For those reasons, Preckwinkle and the Cook County Board's motion to dismiss is denied.

### E. Adequacy of Pleading as to Counts IV and V

Defendants Campbell, Johnson, Lewis, and Wilson move to dismiss Counts IV and V for failing to plead sufficient facts that state a plausible claim for money damages. (Dkt. No.

144 p. 15). As stated above, the Court takes the following allegations from the Complaint as true for the purposes of the motions to dismiss. *See Vinson v. Vermillion Cnty. Ill.,* 776 F.3d 924, 925 (7th Cir.2015). The Amended Complaint alleges that Officer Campbell and Lieutenant Johnson used their positions of authority to recruit other detainees to assault Hudson because Officer Campbell believed that Hudson had murdered a member of Campbell's family. (Am.Compl.¶¶ 120–31). The other detainees had openly threatened Hudson and prison officials were aware of the threats. (*Id.*). Even though Johnson arranged to move Hudson to protective custody in Division III as a result of the credible threats, Johnson and Campbell further conspired to move the threatening detainees to Hudson's new tier. (*Id.* ¶ 122). After two weeks in protective custody, then-Sergeant Lewis informed Hudson that he was required to move back to Division X because Division III did not have the ability to treat his epilepsy. (*Id.* ¶ 123).

After returning to Division X, Hudson spent a substantial amount of time in the law library preparing for his criminal case. Officer Wilson was the correctional officer assigned to the law library and was aware of the need to keep Hudson separate from the threatening detainees in the law library. (*Id.* ¶ 125). Eventually, the other detainee and Hudson were in the law library at the same time. Rather than enforcing a directive to keep the two separated, Officer Wilson, the correctional officer assigned to the law library, told Hudson simply to "be careful" when the other detainee was on his way to the law library. (*Id.* ¶ 128). While in the library, the other detainee punched Hudson and slashed him with a shank. (*Id.* ¶ 129).

Prison officials have a duty to protect detainees from violence at the hands of other detainees. *See Borello v. Allison,* 446 F.3d 742, 747 (7th Cir.2006); *see also Farmer v. Brennan,* 511 U.S. 825, 833 (1994). Correctional officers may not exhibit "deliberate indifference to a substantial risk of serious harm," including harm posed by other inmates. *Farmer,* 511 U.S. at 828. "The deliberate indifference requirement means that the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Olson v. Morgan,* 750 F.3d 708, 713 (7th Cir.2014) (quoting *Farmer,* 511 U.S. at 837) (internal quotation marks omitted). Once the correctional officer is subjectively aware of the risk, he or she may not simply disregard it. *See Kingsley v. Hendrickson,* 744 F.3d 443, 461 (7th Cir.2014).

2015 WL 1541787

The Amended Complaint alleges sufficient facts to state a plausible claim against Officers Wilson and Campbell as well as Sergeant Johnson. The Amended Complaint alleges that Campbell and Johnson conspired to create a substantial risk of harm in the form of a gang attack directed at Hudson. The Amended Complaint further states that Wilson received a directive to keep Hudson apart from the detainees who had been threatening him, plausibly suggesting that Wilson was subjectively aware of the risk of harm that Hudson faced. Moreover, Wilson's own words corroborate her knowledge of the threat against Hudson. Officer Wilson warned Hudson to be careful of the detainee about whom she had received a directive, but did nothing to ensure that the two remained separated in the law library according to the allegations. According to the Amended Complaint, Wilson, Campbell, and Johnson all knew of the specific threat that specific other detainees posed to Hudson and either did nothing to stop the harm or, worse, actually worked to ensure the threats would come to fruition. *See, e.g., Hoban v. Godinez,* 502 Fed.Appx. 574, 578 (7th Cir.2012) (complaint stated Eighth Amendment claim when prison officials had knowledge of specific threat but refused to take action to protect inmate). At this stage, the allegations are sufficient to survive a Rule 12(b)(6) motion to dismiss.

**\*9** The Amended Complaint does not allege sufficient facts to support a claim of deliberate indifference against Lewis. The only factual allegation involving then-Sergeant Lewis is that she oversaw Hudson's move from Division III protective custody to Division X. (Am.Compl.¶ 123). The Amended Complaint contains no allegations that lead to the inference that Lewis knew anything about the threat against Hudson, let alone that she subjectively believed that Hudson was in serious danger and was indifferent to the threat. *See Olson,* 750 F.3d at 713. The Amended Complaint would be insufficient as to Lewis even if Hudson had alleged that he had stated that he felt threatened in Division X because "prison guards are neither required nor expected to believe everything inmates tell them." *Id.* The Amended Complaint does not plead facts sufficient to find that Lewis had the subjective knowledge required for a deliberate indifference claim. Defendant Lewis is therefore dismissed.

### *PRELIMINARY INJUNCTION*

Shortly after filing an Amended Complaint, Plaintiffs moved the Court to enter a preliminary injunction "to protect the men housed in Divisions IX and X from the serious injuries that most certainly await them in the absence of court intervention." (Dkt. No. 36 p. 1). The Plaintiffs are not specific about the nature of the relief they request. Instead, they ask the Court to: (1) order Defendants to propose a remedial plan; (2) order Plaintiffs to respond to the proposed remedial plan; and (3) resolve any dispute among the parties as to the appropriate injunctive relief. (Am.Compl. p. 55). Plaintiffs seek injunctive relief only on Counts I and II of the Amended Complaint relating to Jail officials' deliberate indifference to the risk of physical harm at the Jail. Defendants oppose the entry of a preliminary injunction. For the reasons that follow, the Court denies Plaintiffs' motion for a preliminary injunction.

### *I. Hearing Testimony*

The Court held a nine-day evidentiary hearing over nearly two months on the preliminary injunction motion. During the hearing, the following witnesses testified: (1) Dr. Jeffrey Schwartz, an expert in the field of jail operations and security who testified on behalf of the Plaintiffs; (2) James Ford, a detainee at the Jail; (3) Markus Simmons, a detainee at the Jail; (4) Quinton Brown, a detainee at the Jail; (5) Curtis Curry, a detainee at the Jail; (6) Matthew Burke, Chief of Staff to the Executive Director of the Cook County Department of Corrections; (7) Margo Frasier, an expert in the field of jail operations who testified on behalf of the Defendants; and (8) Nancy Donahoe, General Counsel to the Cook County Sheriff. The Court also admitted into evidence designated portions of the deposition of Frank Arce, Commander of Operations in Division IX. Finally, Plaintiffs introduced 120 unsworn statements of detainees regarding conditions in the Jail.

### A. Expert Testimony

### 1. Dr. Schwartz

Dr. Jeffrey Schwartz testified on behalf of Plaintiffs as an expert witness [7] in the areas of jail operations and security. (Tr. 160). [8] Dr. Schwartz has a Ph.D. in Psychology and has worked in the field of corrections for over two decades as a consultant. Dr. Schwartz testified that his methodology involved reviewing documents, policies, procedures, use of force packages or investigations, inmate grievances, disciplinary records, and video. (Tr. 38). Dr. Schwartz also

Hudson v. Preckwinkle, Not Reported in Fed. Supp. (2015)

2015 WL 1541787

toured the Jail. (Tr. 53). Dr. Schwartz testified for two full days.

7   The Court denied Defendants *Daubert* motion to the extent it sought to prevent Dr. Schwartz from testifying as an expert in the fields of jail operations and security. The Court took the motion under advisement as to Dr. Schwartz's qualification to testify to various statistical conclusions in his expert report. (Dkt. No. 278). At that time, Plaintiffs represented to the Court that Dr. Schwartz would not testify to his statistical conclusions and he did not, in fact, testify in that area. Therefore, Defendants' oral *Daubert* motion is dismissed as moot to the extent it sought to bar Dr. Schwartz's statistical opinions.

8   Unless otherwise noted, Transcript references are to the preliminary injunction hearing that took place over eight days before the Court. The pages are numbered continuously across nine Volumes, each corresponding to a single day of testimony. Volume 1 is Dkt. No. 280; Volume 2 is Dkt. No. 281; Volume 3 is Dkt. No. 295; Volume 4 is Dkt. No. 299; Volume 5 is Dkt. No. 304; Volume 6 is Dkt. No. 308; Volume 7 is Dkt. No. 309; Volume 8 is Dkt. No. 314; and Volume 9 is Dkt. No. 315.

**\*10** It was Dr. Schwartz's professional opinion that the Jail was "among the worst" in the country with regard to violence. (Tr. 159). He opined that a culture of violence exists at the Jail and that detainees live in constant fear of violence at the hands of guards and detainees alike. In his opinion, there exists a code of silence among correctional officers that the higher-level officers at the Jail support.

In order to reach his conclusion, Dr. Schwartz relied heavily on detainee declarations and statements that were created and gathered by Plaintiffs' counsel, describing them as a major factor in reaching his conclusions as to the prevalence of officer misconduct at the Jail. (Tr. 43, 70). In spite of testifying that detainees lie at a greater rate than the general population, Dr. Schwartz relied heavily on the unsworn statements of the pretrial detainees.

Dr. Schwartz's conclusions were based upon his review of the thousands of pages of documents that he received from the lawyers and law students working with the Northwestern's MacArthur Justice Center who represent the Plaintiff class. Those lawyers and students would review incident reports and statements made by pretrial detainees and would then analyze those reports and statements and would provide that analysis to Dr. Schwartz for his professional review. Dr. Schwartz would supposedly then review the reports and interviews objectively and through his expert eye would reach a conclusion as to whether the incident was a constitutional violation based on his experience. Although this was the procedure he described, what became clear on cross-examination is that the majority of the conclusions he reached were the conclusions set forth by the students and lawyers working for the Plaintiffs. Numerous emails were presented to show that the alleged expert report was nothing more than a regurgitation—often verbatim—of the analysis and opinions of the MacArthur Justice Center lawyers. Dr. Schwartz's opinions and conclusions were "word for word" what the lawyers fed to him. Dr. Schwartz explained this by saying they were the ones who put pen to paper to put his conclusions into words. (Tr. 116–19). He testified that he reviewed what the MacArthur staff provided to him and was confident that it was consistent with the conclusions he would have reached anyway and that it would have been duplicative to rewrite what they had written, though he did use their drafts "word for word." (Tr. 94–95).

Dr. Schwartz did not testify as to the constitutional floor for conduct on the part of Jail officials, although he described the length of investigation at the jail as giving him "a concern" (Tr. 243) and concluded at times that conduct exhibited "a lack of professionalism." (Tr. 114; *see also* Tr. 115, 169, 265). Dr. Schwartz further testified on cross that incompetence of OPR investigators could have accounted for the delay in cases that were delayed. (Tr. 255). Dr. Schwartz also testified that he had a negative opinion of the Jail's policy of allowing detainees to self-select for protective custody. (Tr. 171). On cross, however, Dr. Schwartz testified that this practice was not unacceptable within the field of corrections nationally. He testified that protective custody at the Jail was "unusual." (Tr. 171). Finally, Dr. Schwartz admitted that episodes of excessive force will occur even in the best run jails. (Tr. 301)

**\*11** The Court assigns little weight to Dr. Schwartz's testimony due to its significant flaws in its methodology and analysis. First, Dr. Schwartz's heavy reliance on detainee declarations and statements that are not subjected to cross examination or even verified by oath reflects his desire to rely on evidence that has not been subjected to scrutiny or validated with risk of prosecution or other detriment to the affiant if it is false. *See, e.g., Walker v. Soo Line*

Case: 1:25-cv-00669 Document #: 78 Filed: 05/14/25 Page 19 of 49 PageID #:533

Hudson v. Preckwinkle, Not Reported in Fed. Supp. (2015)

2015 WL 1541787

*R.R. Co.,* 208 F.3d 581, 586 (7th Cir.2000) (reliance on unsworn, self-serving statements goes to weight of expert testimony); *see also Tate v. Riegert,* 390 Fed.Appx. 550, 552 (7th Cir.2010) ("unsworn letter was entitled to no weight as substantive evidence) (internal quotation and citation omitted). Second, Dr. Schwartz's reliance on the statements of the MacArthur Justice Center lawyers and students for the conclusions he reached within his expert report erodes the Court's confidence in his conclusions. An expert is expected to review evidence objectively and to apply his methodology to scrutinize it and conclude based on his expertise. Here, Dr. Schwartz completely abdicated his role as an objective and critical analyst when he accepted without scrutiny the conclusions given to him by Plaintiffs' lawyers. *See, e.g., Obrycka v. City of Chicago,* 792 F.Supp.2d 1013, 1026 (N.D.Ill.2011) (court "harbored serious concerns" about expert report influenced by counsel). Third, by failing to look at all sides of the incident, his conclusions fail to take into account all factors and circumstances involving the incidents he purported to analyze. Just as each pretrial detainee was entitled to have the incident reviewed from his perspective, so too were the defendants. An expert trained in jail operations should be comfortable looking at both sides of the incident and reaching a conclusion based on that analysis. *See, e.g., Richman v. Sheahan,* 415 F.Supp.2d 929, 944 (N.D.Ill.2006) (expert report relying on one version of events without having considered other versions would not be helpful to jury). Here, by failing to review the opposing version of events, his conclusions carry less weight. Finally, the Court questions whether Dr. Schwartz was truly aware of the standard to be applied to the matter. His testimony was replete with comments, such as the need to increase "professionalism" or that behavior was not "appropriate." The Court needs to determine whether there are ongoing constitutional violations, not whether Defendants are acting politely or professionally. The nature of Dr. Schwartz's criticisms was sufficiently vague as to be unhelpful to the Court's determination. *See Davis v. Duran,* 276 F.R.D. 227, 236 (N.D.Ill.2011) (vagueness of expert testimony negatively affects its weight); *see also Cage v. City of Chicago,* 979 F.Supp.2d 787, 827 (N.D.Ill.2013) (expert's bias goes to weight of testimony).

## 2. Margo Frasier

Margo Frasier testified as an expert on behalf of Defendants. Frasier has a law degree from Florida State University and an undergraduate degree from Sam Houston State University in criminology and corrections. (Tr. 768). She worked as a correctional officer while she was in college in Huntsville, Texas. (Tr. 768–69). Frasier also worked at the Travis County, Texas Sheriff's Department and wrote the use of force policy for the Travis County Jail. Frasier has led training on use of force in jail settings and jail management. In reaching her conclusions, Frasier reviewed in depth documents from two incidents involving the use of force. (Tr. 853). Frasier testified as an expert in the fields of jail operations and security. (Tr. 664).

Frasier concluded in her expert opinion that detainees in Divisions IX and X of the jail do not live under a constant risk of life-threatening violence. (Tr. 891). In reaching her conclusion, Frasier relied on use of force review documents, OPR documents, monitors' reports from *United States v. Cook County,* and detainee interviews. Frasier looked at the detainee declarations provided by Plaintiffs, reviewed them skeptically, and analyzed them as only one version of the offense while looking to all other facts provided to her. (Tr. 850). Frasier also toured the Jail. Frasier testified that there were fights between detainees at the Jail, something not uncommon in a jail setting, but that the violence was not pervasive. She also testified that correctional officers used force—sometimes inappropriately—at the Jail, but that it was not a situation where detainees live in fear of violence at the hands of the guards.

Frasier testified that Officer Gonzalez, who was shown on video in an altercation with Brian Garcia, should face discipline for his actions. (Tr. 909). The video shown to the Court of this incident depicted a clear and egregious example of excessive force committed by a correctional officer against a detainee. The video depicts Garcia on a telephone in what appears to be an empty day room and a correctional officer approaching him and without warning punching his face and dragging him away in a headlock. There is no dispute that the behavior is abhorrent. Frazier testified that the correctional officer should be disciplined for the incident. (Tr. 909).

Frasier reviewed the existing use of force policy at the Jail and found it to be adequate. (Tr. 918). She reached this conclusion by reviewing the policy itself and speaking with employees at the Jail and Sheriff's Department. Frasier testified that the detainees with whom she and Dr. Schwartz spoke were familiar with the grievance process and were aware that they could contact the Department of Justice if they had concerns about the use of force at the Jail. (Tr. 828). Although Frasier testified that vague language in use of

force reporting by guards is disfavored because it hampers the use of force review process, she commended the Jail for the implementation of a use of force review system as a check and balance on the use of force. Frasier testified that vague language in use of force reporting by guards is disfavored because it hampers the use of force review process.

### B. Detainee Testimony

#### 1. James Ford

**\*12** James Ford is a nineteen year-old former detainee at the Jail. Ford was housed at the Jail while his criminal charge of armed robbery was pending. At the time of the hearing, Ford had not been housed at the Jail for five months because he had transitioned into IDOC custody. Ford testified about two incidents of excessive force that he personally experienced. First, he testified that correctional officers hit him in the face and turned the camera away from the beating. (Tr. 424). Second, Ford testified that on March 20, 2014, he received another beating following a verbal altercation with Officer Couch. (Tr. 436–42). Ford claimed that Couch pushed him to the ground, knocked his legal papers out of his hands, put him in a headlock, and punched him. (Tr. 453). OPR was still investigating the incidents as a potential wrongful use of force at the time of the hearing. (Dkt. No. 317 p. 12; Dkt. No. 318 p. 17). There was no testimony that Defendants blocked his access to the grievance procedure, failed to investigate the claims, or failed to discipline officers if those officers were deemed to have violated his rights.

Ford testified that he believed detainee on detainee violence occurred at the Jail, but that he had never observed it. (Tr. 514). Ford testified that he occupied a corner cell in Division 9 and had a poor view of what went on outside his cell. (*Id.*). Ford testified that he is a member of the Vice Lords. On cross-examination, Defendants introduced a recorded phone call of Ford discussing plans to attack a correctional officer if he were given the opportunity, demonstrating his bias. Ford also testified that he faked a suicide attempt in order to manipulate his housing assignment. (Tr. 529–30).

#### 2. Markus Simmons

Video showed Markus Simmons being escorted into an elevator by multiple correctional officers after a gang fight in one of the Jail's dayrooms. The officer holding the camera does not enter the elevator. Dr. Schwartz testified that the term "elevator ride" is a term used in the Jail to describe a beating by correctional officers on elevators where there are no cameras. (Tr. 248–49). No other photographic or medical evidence documented any physical harm after the elevator ride depicted on video. Following the elevator ride, Simmons gave a taped statement to correctional officers in which he denied being subjected to excessive force and even denied that a fight between the gangs had occurred in the dayroom. (Tr. 573). Video of that statement confirmed that Simmons did not suffer any sever facial injuries. Although Simmons did not file a grievance following the elevator ride, he testified in Court that two officers punched him on the elevator. (Tr. 546). Simmons further testified that he had never filed a grievance related to correctional officer conduct or violence during his time at the Jail. (Tr. 559).

Simmons also testified regarding the fight that preceded the alleged "elevator ride." (Tr. 562). He testified that fifteen to seventeen members of the Gangster Disciples and Vice Lords were fighting in the day room while a handful of correctional officers watched from the protected "bubble." (Tr. 561).

The Court was able to view this incident on video. Simmons's account of the event exaggerated both the duration of time before correctional officers entered the day room and the force used against him. While he claimed to be thrown to the ground by officers, the video showed Simmons already to be on his knees and getting on the ground when officers placed him in handcuffs. Simmons testified that he had lied to investigators about the incident. (Tr. 573–74). Simmons lied to correctional officers about his gang affiliation in order to manipulate his housing assignment at the Jail. Simmons is a Gangster Disciple. (Tr. 561).

#### 3. Quinton Brown

Quinton Brown testified that he requested a transfer away from detainees who had threatened him and that the request was denied. (Tr. 594–99). Brown did not receive a response to his request. (Tr. 595). A month later, Brown testified that two detainees attacked him while officers looked on and took no action to protect him. (Tr. 595–96). He requested to be moved again while he was at Cermak being treated. (Tr. 597). The next day Brown returned from Cermak and again was attacked by the same detainees. (Tr. 597–98). Brown did not press charges against the detainees who attacked him and

Hudson v. Preckwinkle, Not Reported in Fed. Supp. (2015)

2015 WL 1541787

declined the Jail's offer to be transferred to protective custody. (Tr. 601). Although Brown testified that these incidents occurred, he never filed a grievance with the Defendants to apprise them of the alleged beatings.

**\*13** Brown also testified that he had never been a victim of violence at the hands of officers at the Jail, though he has been housed at the Jail on five separate occasions. (Tr. 616). He testified that he has filed one grievance at the Jail—a complaint having to do with his laundry. (*Id.*).

### 4. Curtis Curry

Curry testified that he has been in and out of the Jail for the past thirty years. During those thirty years, he testified that he was the victim of violence in the Jail one time. In that incident, a correctional officer slapped Curry's face which resulted in a perforated eardrum. (Tr. 636). Curry filed a grievance after the incident. (Tr. 637). Curry testified that he received a response to his grievance about a week after the incident and was interviewed around six months later. (Tr. 638–39). OPR investigated within five days of receiving Curry's grievance. (Tr. 68889). Curry and the officer who allegedly hit him have not been alone together since the date of the incident. (Tr. 690). The investigation remains open. Curry testified that he intended to file a civil lawsuit regarding that incident of violence and he hoped to purchase an Escalade with the proceeds. (Tr. 706).

### C. Detainee Declarations

Plaintiffs have presented a number of unsworn and unauthenticated letters describing the conditions at the jail and their experiences there. (Pl.Ex. 124). This Court may grant a preliminary injunction based on less formal procedures and less extensive evidence than a trial on the merits, *see Goodman v. Ill. Dept. Of Financial and Professional Regulation,* 430 F.3d 432, 439 (7th Cir.2005) (the court may rely on hearsay affidavits), yet the Court finds little reason to afford any significant weight to these unsworn and unauthenticated statements for a number of reasons. *See, e.g., Ill. League of Advocates for Developmentally Disabled, et al. v. Quinn,* No. 13 C 1300, 2013 WL 6355552, at \*4 (N.D. Ill.Dec. 5 2013) (admitting, but providing less weight to unsworn letters than to stipulated facts and sworn testimony at preliminary injunction hearing); *D.U. v. Rhodes,* 2015 WL 224932, at \*4 (E.D.Wis.2015) (unsworn statements and

unauthenticated documents insufficient to grant preliminary injunction). First, the majority, if not all, of the statements in this case were compiled *en masse* by MacArthur Center staff and volunteers visiting the jail to interview inmates and were neither sworn to, nor made under penalty of perjury. *See, e.g., London v. Guzman,* 26 F.Supp.3d 746, 753 (N.D.Ill.2014) (distinguishing between unsworn declaration dated and signed "under penalty of perjury" and unsigned affidavit not made under penalty of perjury); 28 U.S.C. § 1746 (same). There is no explanation in the record for why Plaintiffs' counsel would go through the trouble of obtaining the statements without the added step of having them sworn as being the truth. There are numerous reasons why a pretrial detainee might not swear to a statement including, but not limited to, his potential risk of being prosecuted for perjury if a statement is deemed to be a false statement presented to the Court. The benefit of a sworn statement is that the Court recognizes that the affiant is putting himself at risk in stating the facts that are contained within the statement. This Court will not guess at the Plaintiffs' reasoning for gathering this type of statement where they could have acquired sworn or authenticated statements made under penalty of perjury.

**\*14** This Court and the magistrate judge who worked diligently for months on the discovery management of this matter afforded Plaintiffs ample opportunity to obtain statements with greater indicia of reliability and they failed to do so. Plaintiffs' counsel repeatedly sought to have the preliminary injunction hearing held and repeatedly objected to any delay in presenting their evidence. Defendants, on the other hand, sought discovery extensions to respond to Plaintiffs' allegations. Not once did Plaintiffs' counsel seek a delay to obtain the statements under oath recognizing what little weight a biased and unsworn statement can have in a trial of facts. Even during the hearing, the Court offered the Plaintiffs an opportunity to obtain a portion of the affidavits under oath and it was not until after the close of evidence that they sought to take the Court up on its offer to strengthen their evidence. That request was too late. Because these statements lack any indicia of reliability, this Court grants them very little weight in its analysis. *See, e.g., Eyler v. Babcox,* 582 F.Supp. 981, 986 (N.D.Ill.1983) (unsworn representations cast considerable doubt upon plaintiff's probability of success).

### D. Cook County Employee Testimony

Case: 1:25-cv-00669 Document #: 78 Filed: 05/14/25 Page 22 of 49 PageID #:536

Hudson v. Preckwinkle, Not Reported in Fed. Supp. (2015)

2015 WL 1541787

### 1. Matthew Burke

Matthew Burke is the Chief of Staff to the Jail's Executive Director, a position he has held since May 2014. (Tr. 1139). Prior to that, he was an attorney at the Sheriff's Office. (Tr. 1169). Burke testified that he was not personally involved in the use of force review process and he does not independently review the work of those who are.

Burke testified to the process that led to the creation and implementation of the Jail's use of force policy. Court appointed Monitor Susan McCampbell from the *United States v. Cook County* case provided input on the policy. (Tr. 752; Tr. 1074). The Department of Justice reviewed the policy and did not object to its implementation. (*Id.*). The policy was implemented in the spring of 2011 and none of the parties who provided input on the policy have sought its modification since then. (Tr. 1078). The policy's implementation involved training for supervisors, administrators, and correctional officers. The Sheriff's Office paid substantial overtime to its employees to ensure that they were all trained quickly. Burke testified that Monitor McCampbell receives weekly reports on the use of force within the jail. She has not had any criticisms of Divisions IX or X since monitoring began and has documented those reports in her Monitor reports to the Court.

### 2. Nancy Donahoe

Nancy Donahoe is General Counsel of the Cook County Sheriff's Office. (Tr. 1380). Danahoe was involved with drafting the use of force policy and worked on a team that addressed, among other things, the backlog of Office of Professional Review ("OPR") investigations. (Tr. 1207). The OPR procedure is described in greater detail below. Donahoe provided Defendants' perspective with respect to the use of force incidents and investigations about which Dr. Schwartz and the detainees testified. In general, Donahoe testified that while she was aware of rank and file officers who violated the Jail's use of force review policy and who were not disciplined for doing so (Tr. 1394), Defendants' response in the vast majority of incidents was satisfactory. Donahoe's testimony is best described in conjunction with her review of various incidents involving the use of force, which are detailed below when relevant to the Court's findings of fact.

### 3. Frank Arce

Frank Arce is the Superintendent of Division IX. (7:24–8:1). [9] He also worked in Division X in around 2002. (9:18). Arce was not aware of the internal procedures or purpose of the Use of Force Review Unit. (12:24–14:5). Arce testified that fights occasionally occurred at the Jail and that he was essentially powerless to prevent detainees from fighting, though he could stop fights when they began. (123:8–13). Arce could not testify that kneeing an inmate in the face constituted a per se policy violation because the totality of the circumstances of an incident dictate the proper amount of force to use. (213:12–214:3). Arce testified that there was nothing inherently suspicious about multiple correctional officers who submit identical reports on the same incident (145: 22–146:2), though he would be concerned if two officers sat together and wrote a single report on an incident. (148:5–10). Arce testified that the incident involving detainee Robinson and a knee to the face was a close enough call that it justified referring the case to OPR. (218:20–24). In general, Arce testified that his job as superintendent was to refer cases to OPR when they were "questionable." (221:1–16).

[9]     Citations are to Arce's deposition which is Dkt. No. 227–51.

### II. Findings of Fact

A. Findings of Fact Related to OPR Referral Policy

**\*15** There is a "complex regime" in place at the Jail to report and investigate uses of force. (Dkt. No. 317 p. 8). Plaintiffs summarize the regime well:

Policy requires that an incident be referred to OPR when (1) 'there are documented or known injuries to a subject including but not limited to extensive or serious injuries; injuries involving fractures or head trauma; injuries of a suspicious nature (including black eyes, injuries to the mouth, injuries to the genitals, etc.)' and (2) 'when an inmate's injuries, as a result of a response to a resistance/use of force incident, cannot be treated within Cermak Health Services and requires transfer to an outside hospital.' (Tr. 1414). As set forth in the *Cook County* Agreed Order, each investigation referred to OPR must be timely, thorough, and include all supporting evidence.

Before an incident reaches OPR, policy establishes a review process that must occur each time an officer uses

Hudson v. Preckwinkle, Not Reported in Fed. Supp. (2015)

2015 WL 1541787

force. The immediate supervisor or the involved officer provides the first level of review. (Tr. 1223–23). According to Ms. Donahoe's testimony, the immediate supervisor is required to respond to the scene of the incident, ensure medical treatment for the detainee, review the paperwork submitted by the involved officer, and conduct interviews of the detainee and detainee witnesses. (*Id.*). The watch commander (generally a lieutenant, and mandated by jail policy to be an officer senior to the immediate supervisor) provides the second tier of review, and is required to make preliminary findings as to whether the officer's actions comply with the use of force policy and refer any potential excessive force cases to OPR. (Tr. 1383–84). The exempt member (either the superintendent or the commander of the division) reviews the watch commander's finding (Tr. 1242) and is also tasked with referring any excessive force cases to OPR. (Tr. 1383–84). The final level of review is provided by the department head (the executive director of the Cook County Department of Corrections or her designee), who reviews the preliminary findings of the immediate supervisor, watch commander, and exempt member. (Tr. 1243).

(Dkt. No. 317 p. 8–9) (citations to exhibits omitted). Plaintiffs argue, however, that these policies are widely disregarded in the jail. In support of that contention, Plaintiffs presented evidence of numerous use of force incidents and the investigations that followed.

### B. Findings of Fact Related to Use of Force Incidents and Investigations

Plaintiffs highlight twelve incidents in their post-hearing briefing as relevant to the Court's determination. (*See* Dkt. No. 317).

1) Plaintiffs presented evidence that Officer Jeffrey Ferrell kneed detainee Kevin Robinson in the head while he was handcuffed, restrained, and bent at the waist. (Tr. 1283). The incident was recorded on video. A grievance was filed by the inmate and an OPR investigation followed. After OPR concluded its investigation, it recommended Officer Ferrell for termination. (Tr. 1283). The investigation was delayed because other officers who witnessed the assault issued false reports and lied to OPR during the investigation. (Tr. 1390). Though officers failed to refer the case to OPR in conformity with policy, discipline of those officers was recommended after Robinson himself filed a complaint

register and triggered an OPR investigation. (Tr. 1396). Donahoe testified that those responsible for reporting the incident to OPR, including the watch commander, had violated protocol in this incident. (Tr. 1392). At the close of the investigation, these officers were all recommended for discipline. (*Id.*). After the internal investigation was completed and the officers were disciplined, the Sheriff's Office referred the case to the State's Attorney for possible criminal prosecution against the officer who committed the underlying violation. Robinson did not testify at the hearing.

**\*16** 2) Plaintiffs presented evidence that detainee Brian Garcia suffered injury at the hands of a correctional officer when he was punched and dragged from a telephone in a dayroom in May 2014. The watch commander on duty at the time of the incident did not refer the case to OPR immediately, though the exempt member did. (Tr. 237–38). Garcia was given 40 days in solitary confinement after the incident based on accusations from the correctional officer involved. Multiple levels of supervisor failed to refer the incident to OPR initially, despite Garcia's visible injuries. (Def. Ex. 388; Tr. 237–38). The investigation remained pending as of the close of discovery in 2014 and the officer was removed from detainee contact until the resolution of the investigation. Defendants represent that the incident remains open because it has been referred to the U.S. Attorney's Office and State's Attorney's office for possible criminal prosecution of the correctional officer. (Tr. 1579). Garcia did not testify at the hearing.

3) Plaintiffs presented evidence of injuries that Epigmenio Garcia suffered during an altercation with a correctional officer. Garcia suffered contusions on his back and shoulders, bruising on his forehead and right knee, and loss of consciousness. (Tr. 1306). Garcia was treated at Mt. Sinai Hospital for his injuries. (Tr. 1480). His case did not initially reach OPR despite the fact that he was treated at an outside hospital and the incident resulted in a lack of consciousness, both of which require referral to OPR under Jail policy. (Tr. 1418–19). Donahoe testified that this case should have been referred to OPR under Jail policy but was not. Nevertheless, Donahoe testified that in her judgment it did not need to be referred to OPR in practice because members of OPR, including Investigator Ellitch, had reached an internal conclusion as to what happened, though the procedure did not comply with official policy. No formal investigation was ever conducted. Garcia did not testify at the hearing.

Case: 1:25-cv-00669 Document #: 78 Filed: 05/14/25 Page 24 of 49 PageID #:538
Hudson v. Preckwinkle, Not Reported in Fed. Supp. (2015)
2015 WL 1541787

4) Detainee John Gentry suffered blunt trauma to his face during an altercation in 2012. (Tr. 1424). The supervisory review channel did not initiate an OPR investigation until Gentry himself submitted a complaint register and OPR's investigation began two years after the incident. (Tr. 1426). The incident was one of the many cases involved in the backlog of cases that existed after the implementation of the Federal Agreed Order. (Tr. 1422). The investigation did not include an interview with Officer Norise, the correctional officer accused of assaulting Gentry. OPR concluded that Gentry had initially pushed Norise and that Norise struck Gentry with a closed fist in order to gain compliance. (Tr. 1435). Norise provided a statement in the form of an incident report and a use of force report at the time of the incident. (Tr. 1430–31). Donahoe testified that OPR was able to assess the threat facing Norise by using those statements, though he should have been interviewed according to official policy. (Tr. 1431). No witnesses observed the altercation, though officers and three detainees were interviewed. (Tr. 1436). OPR investigated the matter and concluded that the allegations of excessive force were not sustained. In spite of the internal investigation, Officers on the OPR review chain who did not refer the incident to OPR were not disciplined.

5) Plaintiffs argue that detainee Yuron Robinson was subjected to a use of force by four to six officers in October 2012. The Court viewed footage of the incident in which officers entered a dayroom to put a stop to an ongoing fight. No officers completed a use of force report following the incident. (Tr. 1407). Robinson eventually filed a complaint register, which prompted an OPR investigation. (Tr. 1401). Detainee witnesses testified during OPR's investigation that they had seen correctional officers punch Robinson. (Tr. 1408). The OPR investigation did not find any indication of any force used against detainee Robinson. (Tr. 1403). The Court has no basis to find that OPR's assessment was incorrect. Robinson did not testify at the hearing.

 *17  6) Luis Serrano suffered a broken arm during a cell extraction, but no Jail employee referred the incident to OPR. (Tr. 1450). Serrano required treatment at Mt. Sinai Hospital, meaning that his case was required to be referred to OPR. (Tr. 1446). OPR investigated the case only when Serrano filed an excessive force lawsuit. (Tr. 1448). OPR did not find evidence of unreasonable force during the cell extraction. (Tr. 1449–50). Video of the incident exists, but the location of correctional officers in the frame obscures the view of the actual extraction. Serrano's civil case (13 C 5519) was settled before another judge in this District. The Court has no basis

to disagree with OPR's assessment. Serrano did not testify at the hearing.

7) Everette Robinson filed a grievance alleging that Officer Appleberry placed him in a headlock, punched, and kicked him. (Pl.Ex. 65). OPR interviewed Appleberry, but not until over a year after receiving the grievance. Appleberry denied using force and no video existed because the lieutenant on the tier had ordered cameras turned off due to nude detainees in the frame. (Tr. 1454). The lieutenant was not disciplined, but failing to video tape the incident was in violation of Jail policy. Appleberry was eventually found to have failed to report a use of force. Pl.Ex. 65. There is insufficient evidence in the record for the Court to make any finding with respect to this incident. Robinson did not testify at the hearing.

8) Omar Gunn filed a grievance alleging that correctional officers stood by while inmates fought and allowed him to suffer a stab wound in April 2014. (Tr. 1370–71). The grievance claimed that an officer stated that he was going to give the detainees five minutes to settle their differences before he intervened. (Tr. 285). The grievance did not state how many officers were in the protective bubble or how many inmates were fighting. Donahoe stated that it would not have been appropriate in this case for officers to use verbal control or other nonphysical interventions while waiting for more officers to arrive. OPR did not investigate the incident. There is insufficient evidence in the record for the Court to make any factual findings related to the underlying allegations. Gunn did not testify at the hearing.

9) Isaac Martinez was stabbed in the back by another detainee. (Pl.Ex. 89). Martinez had previously requested to be moved from the unit but the correctional officer denied the request. OPR is investigating the incident. (Tr. 1354). Martinez did not testify at the hearing.

10) James Ford was struck by correctional officers on two separate occasions. (Tr. 424; 436–42). At the time of hearing, OPR was still investigating the incident as a potential wrongful use of force. (Dkt. No. 317 p. 11). Regardless of the veracity of Ford's allegations, this Court finds on the record before it that Ford was allowed full access to the grievance procedure and was not denied investigation of his claims. The Court finds no evidence that the Jail failed to discipline the subject officers for a violation of Ford's rights.

11) Following a gang fight, Markus Simmons was escorted onto an elevator by a number of correctional officers, but the

Case: 1:25-cv-00669 Document #: 78 Filed: 05/14/25 Page 25 of 49 PageID #:539

Hudson v. Preckwinkle, Not Reported in Fed. Supp. (2015)

2015 WL 1541787

officer holding the camera did not enter the elevator. Video from immediately after the alleged elevator ride showed no signs of physical harm. The Court does not find Simmons credible because of the disparities between his reports to officers immediately following the incident and his testimony in court. Simmons exaggerated both the duration and the severity of the force used against him as evidence by the video of his condition immediately prior to and following the alleged attack. Simmons did not file a grievance following the alleged elevator ride. (Tr. 546). Simmons had never filed a grievance related violence during his time at the Jail. (Tr. 559).

**\*18** 12) Quinton Brown was attacked twice in March 2014 by other detainees. (Tr. 594–99). Brown received adequate medical treatment for his injuries at Cermak. (Tr. 597). Brown requested to be moved away from his attackers. The Jail offered to move Brown to protective custody, but he declined the offer. (Tr. 601). Brown did not file a grievance or press charges against his attackers. (Tr. 598–99).

*III. Legal Standard*

A party seeking a preliminary injunction "must establish that he is likely to succeed on the merits," *Adkins v. Nestle Purina PetCare Co.,* 779 F.3d 481 (7th Cir.2015) (quoting *Winter v. Natural Resources Defense Council,* 555 U.S. 7, 20 (2008)), that he or she "has no adequate remedy at law and will suffer irreparable harm if a preliminary injunction is denied." *Stuller, Inc. v. Steak N Shake Enters., Inc.,* 695 F.3d 676, 678 (7th Cir.2012). If the party seeking the injunction is able to establish the presence of these "threshold requirements, the district court must consider the irreparable harm that the nonmoving party will suffer if preliminary relief is granted, balancing such harm against the irreparable harm the moving party will suffer if relief is denied." *Id.* (quoting *Ty, Inc. v. Jones Grp., Inc.,* 237 F.3d 891, 895 (7th Cir.2001)). The Court must also consider the public interest, "assessing whether the balance of harms favors the moving party or whether the harm to the nonmoving party or the public is sufficiently weighty that the injunction should be denied." *Ezell v. City of Chicago,* 651 F.3d 684, 694 (7th Cir.2011) (citation omitted). The balance process "involves engaging in ... [a] sliding scale approach; the more likely the plaintiff will succeed on the merits, the less the balance of irreparable harms needs to favor the plaintiff's position." *Ty, Inc.,* 237 F.3d at 895. "The sliding scale approach is not mathematical in nature, rather 'it is more properly characterized as subjective and intuitive, one which permits district courts to weigh the competing considerations

and mold appropriate relief.' " *Id.* at 895–96 (quoting *Abbott Labs. v. Mead Johnson & Co.,* 971 F.2d 6, 12 (7th Cir.1992)).

The Prison Litigation Reform Act circumscribes the Court's authority to enter an injunction in the corrections context. *See Westefer v. Neal,* 682 F.3d 679, 683 (7th Cir.2012). Any remedial relief granted must be "narrowly drawn, extend no further than necessary to correct the harm the court finds requires preliminary relief, and be the least intrusive means necessary to correct that harm." 18 U.S.C. § 3626(a)(2). An "injunction requiring an affirmative act by the defendant" such as the one Plaintiffs here seeks, must be "cautiously viewed and sparingly issued." *Graham v. Med. Mut. of Ohio,* 130 F.3d 293, 295 (7th Cir.1997) (citations omitted).

*IV. Discussion*

A. Likelihood of Success on the Merits

A municipal defendant cannot be held liable under § 1983 solely because it employs a tortfeasor, or even a criminal. *Bd. of Cnty. Com'rs of Bryan Cnty., Okla. v. Brown,* 520 U.S. 397, 403 (1997). Plaintiffs must demonstrate the existence of a substantial risk of serious harm of which the municipality itself aware and to which it was deliberately indifferent. *See Farmer v. Brennan,* 511 U.S. 825, 828 (1994); *see also Canton v. Harris,* 489 U.S. 378, 388 (1989) (to support municipal liability, municipal actions must be taken with deliberate indifference to known or obvious consequences). "If the same problem has arisen many times and the municipality has acquiesced in the outcome, it is possible (though not necessary) to infer that there is a policy at work[.]" *Calhoun v. Ramsey,* 408 F.3d 375, 380 (7th Cir.2005). "[T]he word 'policy' generally implies a course of action consciously chosen from among various alternatives." *Calhoun,* 408 F.3d at 380 (quoting *City of Okla. v. Tuttle,* 471 U.S. 808, 823 (1985)) (alteration in original). Evidence of harm is not evidence of deliberate indifference. *Dale v. Poston,* 548 F.3d 563, 569–70 (7th Cir.2008). "The deliberate indifference test therefore has both objective and subjective prongs, the former requiring a grave risk and the latter requiring actual knowledge of that risk. A response can be reasonable even if it fails to aver the harm." *Dale,* 584 F.3d at 570; *see also Farmer,* 511 U.S. at 836.

**\*19** A plaintiff must also demonstrate that the municipality, through deliberate conduct, was the cause of the alleged injury. In deciding whether to impose municipal liability,

Case: 1:25-cv-00669 Document #: 78 Filed: 05/14/25 Page 26 of 49 PageID #:540

Hudson v. Preckwinkle, Not Reported in Fed. Supp. (2015)

2015 WL 1541787

the Court must decide "whether there is a direct causal link between a municipal policy or custom and the alleged constitutional deprivation." *Snyder v. King,* 745 F.3d 242, 247 (7th Cir.2014) (quoting *City of Canton,* 489 U.S. at 385). "A governmental body's policies must be the *moving* force behind the constitutional violation before [the Court] can impose liability under *Monell.*" *Thomas v. Cook Cnty. Sheriff's Dep't,* 604 F.3d 293, 306 (7th Cir.2009) (emphasis in original). The Court must proceed with caution when considering municipal liability under § 1983. "[R]igorous standards of culpability and causation must be applied to ensure that the municipality is not held liable solely for the actions of its employees." *Id.* (quoting *Bd. of the Cnty. Comm'rs of Bryan Cnty., Okla. v. Brown,* 520 U.S. 397, 405 (1997)).

There are therefore two elements for which Plaintiffs must establish a reasonable likelihood of success on the merits. First, plaintiffs must show that there is a substantial risk of serious harm at the Jail. Second, they must show that the municipality itself, that is, Sheriff Dart, has been deliberately indifferent to that risk. In support of the first, Plaintiffs have introduced episodic evidence of uses of force at the Jail. For purposes of the preliminary injunction, the Court assumes for the sake of argument that these episodes have established that a substantial risk of harm exists. [10] The record, however, is devoid of any evidence of a custom of deliberate indifference on the part of the municipal defendants.

[10]    By no means, however, does the Court mean to imply that the Plaintiffs have necessarily met their burden of establishing the existence of a substantial risk of serious harm; it is simply not necessary for the Court to reach that issue in order to deny the injunction. *See* Fed.R.Civ.P. 52(c); *see also Michigan v. U.S. Army Corps of Eng'rs,* 667 F.3d 765, 787 (7th Cir.2011) (findings made at preliminary injunction stage do not bind the district court as the case progresses). The episodic evidence of harm that Plaintiffs presented is fraught with serious deficiencies and suggests a misunderstanding of the realities of jail operations and the constitutional standards that apply to this case. Pl.Ex. 111, for example, is a video that shows a fight between detainees that is taking place in a sealed dayroom. Officers look on from inside the protective "bubble" before eventually entering the room, yelling "get on the ground" and subduing the scene. Plaintiffs characterize

the video as an example of correctional officers allowing detainees to fight without intervening. They present no evidence, however, of how many officers were immediately available to subdue the fight, the ratio of officers to detainees that represents a safe operation, or how many detainees were in the cellblock. The Court can see no fewer than twenty-five in the video. Plaintiffs argue that this is an example of correctional officers failing to deescalate the situation. Prison guards are "not required to take the unreasonable risk of attempting to break up a fight between ... inmates when the circumstances make it clear that such action would put [them] in significant jeopardy." *Guzman,* 495 F.3d at 858; *Peate v. McCann,* 294 F.3d 879, 883 (7th Cir.2002).

Plaintiffs have failed to demonstrate any likelihood of success on the merits because the record does not contain evidence that shows that Defendants have been deliberately indifferent to the risk of harm at the jail, let alone that that indifference was the "moving force" behind the proliferation of a culture of violence at the Jail. Instead, the testimony and evidence produced at the hearing show that the Defendants in the vast majority of cases that Plaintiff selected as demonstrating the worst practices committed by Defendants were reviewed by the internal procedures established to review violence either at the behest of either inmates or staff and those that were determined to have merit resulted in discipline in some form. Both experts testified that even the best run jails have incidents of violence. The issue for the Court is not whether Defendants have eradicated that violence entirely but whether they respond to it reasonably. It is unrealistic to expect that no incidents will occur but it is expected that when they do occur they will be handled in a constitutional manner. The evidence presented at hearing demonstrated that Defendants have worked diligently—and with marked success in many areas—at combatting the danger that exists at the Jail.

**\*20** Plaintiffs argue that Defendants have "failed—and continue to fail—to take reasonable actions to protect the men in their custody" even though they are aware of the threat of violence at the Jail. (Dkt. No. 317 p. 5). Plaintiffs argue that the Defendants' "failure to hold accountable officers who engage in excessive force and/or fail to protect detainees from violence" is the clearest evidence of that failure. (*Id.*). The evidence, however, is inconsistent with the notion that officers are not held accountable. There is a significant disconnect between Plaintiffs' arguments and the facts that were presented in court. Specifically, Plaintiffs

Case: 1:25-cv-00669 Document #: 78 Filed: 05/14/25 Page 27 of 49 PageID #:541

Hudson v. Preckwinkle, Not Reported in Fed. Supp. (2015)

2015 WL 1541787

introduced testimony and documentary evidence of nine use of force incidents at the Jail and four instances of guards allegedly failing to protect detainees. Four of those incidents, involving Markus Simmons, Epigmenio Garcia, Omar Gunn, and Quinton Brown were not investigated by OPR. In none of those cases did Jail staff members refer the cases. Neither Simmons nor Brown filed a grievance for the violence conduct. Three incidents, involving Kevin Robinson, Brian Garcia, and Everette Robinson resulted in staff discipline after the case was referred to OPR. Allegations in three incidents, involving John Gentry, Yuron Robinson, and Luis Serrano, were found to be unfounded after OPR investigated. Three investigations, involving Ford, Curry, and Martinez remain open. Even if the Court were to assume that Defendants intentionally ignored the four incidents that OPR did not investigate, it still would not constitute a pattern of deliberate indifference sufficient to warrant the entry of a preliminary injunction. *See Robles v. City of Fort Wayne,* 113 F.3d 732, 737 (7th Cir.1997) (evidence that one in five complaints was sustained foreclosed argument that city had a custom of investigating complaints so as to exonerate police officers).

Plaintiffs have simply failed to supply evidence to support their claims that the Defendants have engaged in a pattern and custom of failing to investigate cases of excessive force or have investigated them in such a way that officers are intentionally exonerated. On the contrary, Defendants provided evidence that shows they have worked diligently to eliminate violence in the jail and have opened the facility to frequent, regular review from four monitors who report the conditions and the incidents of potential violence directly to the Court. Counsel for the Plaintiffs agreed that he had "no doubt that Mr. Burke and Ms. Donahoe have worked conscientiously and have made improvements in policy, use of force review policy, and OPR policy." (Tr. 1563). Conscientious work is not deliberate indifference.

Plaintiffs introduced through testimony and documentary evidence and cited in their post-hearing briefs thirteen incidents at the Jail and argued that each one evinced the Defendants' failure to react reasonably. Of those incidents, OPR had completed investigations in six of them. Three of those investigations sustained charges against the officers. Officers were then disciplined and, in two cases, the incidents were referred to the Cook County State's Attorney's Office for criminal prosecution. (*E.g.* Tr. 1361). Half of the completed OPR investigations resulted in discipline. The subsequent discipline in itself "belies the existence" of a practice of failing to discipline officers or investigating in such a way that

officers were intentionally exonerated. *See Robles,* 113 F.3d at 737 (7th Cir.1997). The evidence, instead, demonstrates that Defendants were anything but deliberately indifferent to these incidents.

That OPR had not completed investigations in the other three incidents at the time discovery was exchanged likewise does not evince deliberate indifference on the part of the Defendants. The fact that the OPR investigations did not conclude in the manner that Plaintiffs believe that they should have does not mean that the Defendants are deliberately indifferent to a substantial risk of harm. The OPR system was completely overhauled in 2010 as part of the Federal Agreed Order, after the monitor identified a significant backlog of investigations. (Tr. 1267). Through the monitors, Defendants have worked diligently to reduce that backlog. Some of the cases have taken longer to investigate than contemplated in Jail guidelines because of the sheer volume of cases for which OPR was responsible. (Tr. 1270–71). Most importantly, at the time of the hearing in autumn of 2014, OPR was reviewing only 2014 incidents, the entire previous backlog having been cleared through the efforts of Defendants in the Federal Agreed Order.

Some cases have been referred for prosecution and even Plaintiffs' own expert conceded, referring cases to prosecutors adds significantly to the investigatory timeline. Regardless, the facts do not support that there are case delays due to indifference. A new procedure was put into place to ensure that cases move more quickly through the review process and it has taken time to work through the backlog of those cases. While again potentially not the ideal outcome, delayed investigations do not constitute a constitutional violation when the delay was reasonable. *Cf. Guzman v. Sheahan,* 495 F.3d 852, 857 (7th Cir.2007) ("The mere failure of the prison official to choose the best course of action does not amount to a constitutional violation.") (internal quotation and citation omitted). Even to the extent that Jail officials mishandled investigations—and they did in some cases by Ms. Donahoe's own testimony—a finding of deliberate indifference "requires more than a showing of negligent or even grossly negligent behavior." *Id.* Importantly, none of the evidence of mishandled investigations showed any knowledge or mistake on behalf of any named defendant or even an employee with the discretion to create policy at the Jail.

**\*21** The affirmative steps that Defendants have taken since the entry of the Federal Agreed Order cannot in any sense be

**Hudson v. Preckwinkle, Not Reported in Fed. Supp. (2015)**

2015 WL 1541787

characterized as deliberate indifference. Since the monitoring began under the Federal Agreed Order, Monitor McCampbell has visited the Jail and provided periodic reports on the Jail's compliance with the portions of the Federal Agreed Order related to protection from harm. As of her most recent report in November 2014, the Jail was in substantial or sustained compliance with all 77 paragraphs of the Federal Agreed Order related to protection from harm. McCampbell provided a chart documenting the Jail's progress since 2010:

| Report # | Sustained Compliance | Substantial Compliance | Partial Compliance | Non=Compliance | Not Applicable | Total |
|---|---|---|---|---|---|---|
| 1 | | 3 | 62 | 12 | 8 | 77 |
| 2 | | 1 | 63 | 5 | 8 | 77 |
| 3 | | 22 | 55 | 0 | 4 | 77 |
| 4 | | 39 | 34 | 0 | 4 | 77 |
| 5 | | 53 | 20 | 0 | 4 | 77 |
| 6 | 21 | 39 | 17 | 0 | 0 | 77 |
| 7 | 35 | 31 | 11 | 0 | 0 | 77 |
| 8 | 50 | 17 | 10 | 0 | 0 | 77 |
| 9 | 68 | 9 | 0 | 0 | 0 | 77 |

(10 C 2946 Dkt. No. 262 p. 4). Specific to the use of force review process at the Jail, McCampbell stated that "CCDOC has [a more] robust investigative process regarding uses of force than most likely any large or small jail in the United States, in my opinion and experience. Jails are coming to CCDOC to learn how to investigate and analyze uses of force, and develop strategies to minimize use of force." (*Id.*). Specifically, McCampbell noted that she had confidence in the Jail's employee discipline system, incident reporting system, inmate grievance process, referral process, early warning system, and data analysis. (*Id.* p. 7). In short, Defendants' progress has satisfied an independent monitor, the Department of Justice Civil Rights Division, and a federal judge, all of whom have devoted countless hours ensuring compliance at the Jail. "That is not deliberate indifference; it is almost the opposite. What more should they have done?" *Dale v. Poston,* 548 F.3d 563, 571 (7th Cir.2008). These accolades belie Plaintiffs argument that Defendants have "fail[ed] to take reasonable steps to protect detainees." (Dkt. No. 317 p. 6). The Jail is not a pleasant place to live, but "[t]he Constitution does not mandate comfortable prisons." *Farmer v. Brennan,* 511 U.S. 825, 832 (1994) (quoting *Rhodes v. Chapman,* 452 U.S. 337, 349 (1981)) (internal quotation marks omitted). As the Court is well aware, Defendants must work hard to ensure that the various categories within the Federal Agreed Order are addressed, but "[t]he mere failure of the prison official to choose the best course of action does not amount to a constitutional violation." *Guzman v. Sheahan,* 495 F.3d 852, 857 (7th Cir.2007). Defendants need not do more to comply with the Constitution.

### B. Lack of Adequate Remedy at Law

Plaintiffs have not shown the inadequacy of legal remedies available to them. The Federal Agreed Order, which overhauled the policies and practices of Cook County Jail in response to a Department of Justice investigation, represents effective relief for the established constitutional violation. *See Newman v. Alabama,* 683 F.2d 1312, 1319 (11th Cir.1982) (plaintiffs in prison overcrowding litigation had adequate legal remedy in existing consent decree). This is not a case where the Federal Agreed Order has grown stale and requires modification to renew its adequacy. On the contrary, the Federal Agreed Order addresses the precise subject matter raised in this lawsuit and which was entered and determined to be adequate by this Court and has been given the full weight

Hudson v. Preckwinkle, Not Reported in Fed. Supp. (2015)

2015 WL 1541787

and resources of this Court over recent years and months to ensure its enforcement and the Jail's compliance.

### C. Irreparable Harm

Plaintiffs are required to show that they would suffer irreparable harm during the pending lawsuit absent the preliminary injunction. *See Girl Scouts of Manitou Council, Inc. v. Girl Scouts of USA, Inc.,* 549 F.3d 1079, 1086 (7th Cir.2008). Though there is some analytical overlap, this element is distinct from the inquiry into whether Plaintiffs have demonstrated that they are likely to succeed on the merits. *See Michigan v. U.S. Army Corps of Eng'rs,* 667 F.3d 765, 787–88 (7th Cir.2011). Here, the inquiry is whether the Court has "the ability to correct [the purported harm] if it is created." *Id.* A generalized risk of harm from all inmates and guards without more specific evidentiary support is too speculative to warrant relief. *See Baird v. Hodge,* No. 14–1088 slip op. at 3 (7th Cir. March 27, 2015) (citing *U.S. Army Corps of Eng'rs,* 667 F.3d at 788 (7th Cir.2011)).

**\*22** The imprecise nature of the relief requested muddies the analysis of this prong substantially. Here, Plaintiffs do not seek a specific order remedying some deficient practice at the Jail. Instead, Plaintiffs essentially seek a seat at the bargaining table to craft a new consent decree or rework the existing Federal Agreed Order. (Am. Compl. p. 55; Tr. 1564). Because it is not clear what the negotiated relief would look like, the Court has no basis to find that a clear showing has been made that there will be immediate, irreparable harm if such negotiation is not ordered. Plaintiffs have not pointed to specific remedies that they feel will protect them from harm. To the contrary, Plaintiffs cite non-compliance with existing injunctive relief and official policy as the source of their purported constitutional injuries. (Tr. 1564). The Court agrees that compliance with the Federal Agreed Order is necessary and works diligently with the monitors in the *United States v. Cook County* case to enforce that compliance, but the Court cannot find on the record presently before it that irreparable harm will result without another order of Court to comply with an existing order. The Federal Agreed Order remains in effect and will protect Plaintiffs against irreparable harm in the immediate future.

### D. Balancing of Harms

Because the Court finds that the Plaintiffs have not demonstrated the presence of the threshold elements required for the entry of a preliminary injunction, the Court need not reach the balance of the harms. *See Ezell,* 651 F.3d at 694 (district court weighs balance of harms "[i]f the moving party meets ... threshold requirements"). Even so, the Court finds that the balance of harms would not warrant the entry of a preliminary injunction even if the threshold requirements were met.

The public and Defendants have a strong interest in the continued monitoring of the Jail by the four expert monitors in place in *United States v. Cook County* under the Federal Agreed Order without interference by individual detainees.[11] The Federal Agreed Order was the product of extensive negotiations between the Department of Justice, Cook County officials, and the parties to the *Duran* and *Harrington* litigation. A benefit of the relief, as the plaintiffs in *Duran* and *Harrington* recognized, was that a single set of comprehensive standards would govern operations at the Jail. The entry of an injunction in this case would undermine that goal. While Plaintiffs contend that it is their desire to coordinate injunctive relief between the two cases, the fact is that any injunction here would change the role and duties of the monitors in that case. Plaintiffs presented no evidence or argument of how the two injunctions could be coordinated in such a way as not to impose a severe financial burden on the Jail or practical burden on the monitors under the Federal Agreed Order.

[11]    The Court does not hold that *all* injunctive relief is foreclosed by the existence of the Federal Agreed Order. Neither CRIPA itself nor the Federal Agreed Order intended to prevent detainees from bringing individual suits when injunctive relief was in place separately. *E.g. United States v. Oregon,* 839 F.2d 635, 636–37 (9th Cir.1998) ("Both the language and the history of [CRIPA] show that Congress did not intend by its enactment to restrict in any way the authority of the district courts to adjudicate claims brought by or on behalf of institutionalized persons themselves."). Instead, the Court balances the public interest with the understanding that the Federal Agreed Order is in place and provides a comprehensive regulatory scheme for Jail operations.

The strong policy against entering injunctions in the prison context represents he strong public and institutional interest

2015 WL 1541787

in leaving the operation of jails to those who best know the field. *See Bell v. Wolfish,* 441 U.S. 520, 562 (1979) (warning courts against becoming "enmeshed in the minutiae of prison operations"); *see also* 18 U.S.C. § 3626(a)(2) (limiting range of injunctions that can be issued in jail cases). Prison conditions are important matters of public policy that prison officials are peculiarly situated to address. Judicial oversight of jails in the form of injunctive relief is "limited by the nature of our mission: that mission is to ensure that those facilities meet the requirements of the Constitution. Beyond what is proper to that end, we lack authority to interfere with the lawful discretion of state officials to manage jail facilities as they see fit." *Inmates of Suffolk County Jail v. Kearney,* 928 F.2d 33, 36 (2nd Cir.1991) (Campbell, J., concurring); *accord Williams v. Lane,* 851 F.2d 867, 871 (7th Cir.1988). Courts, therefore, approach the issuance of injunctive orders in the prison setting with caution and Plaintiffs have provided no public policy reason for departing from this usual course of caution. *See Farmer,* 511 U.S. at 846.

### CONCLUSION

**\*23** Because Plaintiffs' have failed to demonstrate any likelihood of success on the merits that Defendants have been deliberately indifferent to the risk of harm at the jail and the evidence presented at hearing demonstrates that Defendants have worked diligently—and with marked success in many areas—at combatting the danger that exists at the Jail, the motion for preliminary injunction (Dkt. No. 36) is denied. For the reasons stated herein, President Preckwinkle and Cook County's motion to dismiss (Dkt. No. 81) is denied. The Sheriff's Office Defendants' motion to dismiss (Dkt. No. 144) is granted in part and denied in part. The Amended Complaint is dismissed as to Lieutenant Lewis, but the remainder of the motion is denied. Defendants' motion to strike Plaintiffs' submission related to the preliminary injunction hearing (Dkt. No. 231) is denied.

**All Citations**

Not Reported in Fed. Supp., 2015 WL 1541787

---

**End of Document**

© 2025 Thomson Reuters. No claim to original U.S. Government Works.

Case: 1:25-cv-00669 Document #: 78 Filed: 05/14/25 Page 31 of 49 PageID #:545

Doe v. Duerfahrd, Not Reported in Fed. Supp. (2022)

2022 WL 17253080

2022 WL 17253080
Only the Westlaw citation is currently available.
United States District Court, N.D.
Indiana, Hammond Division.

Jane DOE, Plaintiff,
v.
Lance DUERFAHRD and
Purdue University, Defendants.

CAUSE NO.: 4:18-CV-72-JVB-JEM
|
Signed November 28, 2022

**Attorneys and Law Firms**

C. Anthony Ashford, Ashford Law Group PC, Valparaiso,
IN, Amishi P. Sanghvi, Sanghvi Law PC, Valparaiso, IN, for
Plaintiff.

Matthew S. Ryan, Cotsirilos Tighe Streicker Poulos
& Campbell Ltd., Chicago, IL, Emily Vermylen, U.S.
Department of Justice, Chicago, IL, for Defendant Lance
Duerfahrd.

William P. Kealey, Matthew M. Humble, Stuart & Branigin
LLP, Lafayette, IN, for Defendant Purdue University.

## OPINION AND ORDER

JOSEPH S. VAN BOKKELEN, JUDGE

**\*1** This matter is before the Court on Defendant The
Trustees of Purdue University's Motion for Judgment on the
Pleadings [DE 192] filed on May 3, 2022, and on Defendant
The Trustees of Purdue University's Motion for Summary
Judgment [DE 194] filed on May 23, 2022. No response to the
motion for judgment on the pleadings was filed. Plaintiff Jane
Doe filed a response to the motion for summary judgment on
June 30, 2022, and Defendant Purdue University ("Purdue")
filed a reply on July 22, 2022. Defendant Lance Duerfahrd
has not filed any document related to these motions.

Doe initiated this cause of action on September 20, 2018.
She filed an amended complaint on January 4, 2019. A
motion to dismiss Doe's fifth claim was granted on August
29, 2019. The remaining claims are (1) a Title IX violation,
brought against Purdue, (2) sexual assault, brought against
Duerfahrd, (3) sexual battery, brought against Duerfahrd, and

(4) intentional infliction of emotional distress, brought against
Duerfahrd. Only the Title IX claim against Purdue is at issue
in the present motions.

## MOTION FOR JUDGMENT ON THE PLEADINGS

In the motion for judgment on the pleadings, Purdue asks
the Court to dismiss any claim for emotional distress
damages that Doe is bringing against Purdue. In *Cummings
v. Premier Rehab Keller, P.L.L.C.*, 142 S.Ct. 1562 (2022), the
Supreme Court determined that emotional distress damages
are not recoverable under the Spending Clause statutes of the
Rehabilitation Act and the Affordable Care Act. *Id.* at 1569,
1576. Title IX is also a Spending Clause statute. *Id.* at 1569.
Purdue asserts that *Cummings* establishes that emotional
distress damages are not available under Title IX. Doe has not
responded. In light of Purdue's motion and with no argument
to the contrary provided, the Court finds that, as Title IX
is a Spending Clause statute, the reasoning applied to the
Rehabilitation Act and the Affordable Care Act in *Cummings*
applies equally to Title IX, and Doe's complaint therefore
fails to state a claim for emotional distress damages upon
which relief can be granted against Purdue. *See Doe v. Purdue
Univ.*, No. 2:17-CV-33, 2022 WL 32 79234, at \*13 (N.D.
Ind. Aug. 11, 2022) (dismissing, based on *Cummings*, claim
for emotional and psychological damages in a Title IX case).
Accordingly, the Court grants judgment on the pleadings in
Purdue's favor on the issue of emotional distress damages.

## MOTION FOR SUMMARY JUDGMENT

### A. Summary Judgment Standard

A motion for summary judgment must be granted "if
the pleadings, depositions, answers to interrogatories, and
admissions on file, together with the affidavits, if any, show
that there is no genuine issue as to any material fact and that
the moving party is entitled to a judgment as a matter of law."
Fed. R. Civ. P. 56(c). Rule 56(c) further requires the entry of
summary judgment, after adequate time for discovery, against
a party "who fails to make a showing sufficient to establish
the existence of an element essential to that party's case, and
on which that party will bear the burden of proof at trial."
*Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

Doe v. Duerfahrd, Not Reported in Fed. Supp. (2022)

2022 WL 17253080

**\*2** The party seeking summary judgment bears the initial responsibility of informing a court of the basis for its motion and identifying the evidence, if any, which it believes demonstrates the absence of a genuine issue of material fact. *Celotex,* 477 U.S. at 323. If the moving party supports its motion for summary judgment with affidavits or other materials, it thereby shifts to the non-moving party the burden of showing that an issue of material fact exists. *Keri v. Bd. of Trust. of Purdue Univ.,* 458 F.3d 620, 628 (7th Cir. 2006).

Rule 56(e) specifies that once a properly supported motion for summary judgment is made, "the adverse party's response, by affidavits or as otherwise provided in this rule, must set forth specific facts to establish that there is a genuine issue for trial." Fed. R. Civ. P. 56(e).

In viewing the facts presented on a motion for summary judgment, a court must construe all facts in a light most favorable to the non-moving party and draw all legitimate inferences and resolve all doubts in favor of that party. *Keri,* 458 F.3d at 628. A court's role is not to evaluate the weight of the evidence, to judge the credibility of witnesses, or to determine the truth of the matter, but instead to determine whether there is a genuine issue of triable fact. *Anderson v. Liberty Lobby,* 477 U.S. 242, 249-50 (1986).

## B. Material Facts [1]

[1]    Pursuant to Northern District of Indiana Local Rule 56-1(f), Purdue's request to strike portions of the record is embedded in its reply brief. To the extent objected-to portions of Doe's evidence are being used in deciding the summary judgment motion, the Court addresses Purdue's objections below in footnotes 2 and 3. Regarding objected- to statements or pieces of evidence that are not being used to decide this matter, the request to strike is denied as moot.

### *The Duerfahrd-Doe Incidents*

In the Fall of 2016, Duerfahrd was employed as an Associate Professor at Purdue University. (Purdue's Ex. A at 5, ECF No. 194-4). At that time, Doe was a 21-year-old international undergraduate student. *Id.* Among the classes in which Doe was enrolled that semester were one class taught by Duerfahrd

and one class that was taught by Duerfahrd's graduate student. (Jane Doe Dep. 62:9-63:19, ECF No. 194-6).

Doe testified that she met with Duerfahrd off campus on five separate occasions and that she was sexually assaulted by Duerfahrd on the fourth and fifth such occasions. *See id.* 47:11-14 & 48:24-49:5 (first occasion); 66:11-21 & 67:20-22 (second); 68:7-69:20 & 70:2-10 (third); 70:25-71:8 & 81:24-82:16 (fourth); & 157:11-22 (fifth). The fifth occasion occurred in Duerfahrd's office, and Duerfahrd ordered Doe to be there. (Jane Doe Decl. ¶ 46-47, ECF No. 202-1).

At various times, Duerfahrd screamed at Doe, threatened her, and told her to "shut up"; he "exploded with rage" when Doe asked why Duerfahrd was offering Doe wine in a "dark, deserted, unknown off campus location" *Id.* ¶¶ 21, 26-30. On one occasion, Duerfahrd told Doe that she wanted Duerfahrd to rape her. *Id.* ¶ 53. Once, when Doe told Duerfahrd that she was unwell, Duerfahrd responded by asking, "Did the doctor ask you to stop masturbating?" *Id.* ¶ 25.

After these interactions with Duerfahrd, Doe withdrew from classes, and Doe testified that she has been largely unable to resume her studies. *See* (Oliver Dep. 38:13-39:1, ECF No. 194-5) (withdrawal in Fall 2016); Jane Doe Dep. 192:15-195:19 & 289:22:-290:1, ECF No. 194-6 (discussing inability to resume studies).

**\*3** Doe reported Duerfahrd and filed a complaint with the U.S. Department of Education's office for Civil Rights and sent a copy to Purdue's Office of Institutional Equity. (Purdue's Ex. E., ECF No. 194-8). An investigation was initiated, and Duerfahrd resigned. (Purdue's Ex. A, ECF No. 194-4 (investigator's report); Purdue's Ex. O, ECF No. 194-18 (letter of resignation)). Doe does not allege Title IX violations regarding Purdue's post-complaint investigation of Doe's claims against Duerfahrd. (Purdue's Ex. P at 2, ECF No. 194-19).

Doe alleges that she has been harmed by Duerfahrd's actions and Purdue's failure to take action prior to Doe's report. She alleges that she has been diagnosed with Post Traumatic Stress Disorder, panic disorder, and agoraphobia due to Duerfahrd's assaults.

### *Purdue's Anti-Harassment Policies and Procedures*

According to Purdue's Anti-Harassment Policies, the term "Harassment" includes sexual harassment, and is defined as "Conduct towards another person or identifiable group of persons that has the purpose or effect of: Creating an intimidating or hostile educational environment, work environment or environment for participation in a University activity." (Rollock Dep. 69:17-70:1, ECF No. 202-4). Purdue's definition of sexual harassment includes

> Any unwelcome sexual advance, request for sexual favors or other written, verbal or physical conduct of a sexual nature when: ... Such conduct has the purpose or effect of unreasonably interfering with an individual's employment or academic performance or creating an intimidating, offensive or hostile environment for that individual's employment, education or participation in a University activity.

(Purdue's Ex. L at 30, ECF No. 194-15). The Purdue Anti-Harassment Policies also provided that:

> The University reserves the right to investigate circumstances that may involve Harassment in situations where no complaint, formal or informal, has been filed. In appropriate circumstances, sanctions in accordance with this policy will be implemented.

> To determine whether a particular act or course of conduct constitutes Harassment under this policy, the alleged behavior will be evaluated by considering the totality of the particular circumstances, including the nature, frequency, intensity, location, context and duration of the questioned behavior. Although repeated incidents generally create a stronger claim of Harassment, a serious incident, even if isolated, can be sufficient.

(Purdue's Ex. L at 23, ECF No. 194-15). Purdue's Procedures for Resolving Complaints of Discrimination and Harassment provided that:

> The University has an obligation to respond to information of which it becomes aware, whether received directly or indirectly. That is, the University's obligation may be triggered by a direct disclosure by those who have experienced potential discrimination or harassment or by gaining indirect knowledge of such information. For this reason, the University may initiate an investigation of circumstances that involve potential discrimination and/or harassment even where no complaint, formal or informal, has been filed. In those circumstances, the University may elect to investigate and, if warranted, impose disciplinary sanctions pursuant to these or other established University procedures.

(Purdue's Ex. L at 36, ECF No. 194-15).

During the 2015-16 academic year, the Policy included a couple of paragraphs that provided that sanctions for conduct that constitutes harassment, as defined by the policy, would be subject to enhancement when such conduct is motivated by bias based on a person's legally protected status as defined by federal and state law: e.g., race, gender, religion, color, age, national origin or ancestry, genetic information, or disability. (Rollock Dep. 53:11-20, ECF No. 202-4).

**\*4** Purdue's Title IX Coordinators are responsible for overseeing the investigation and resolution of all reports of sexual harassment involving students, staff, and faculty. (Purdue's Ex. L at 26, ECF No. 194-15). The Office of Institutional Equity (OIE) is the unit at Purdue that handles complaints of alleged sexual harassment, including by conducting formal investigations. (Wright Dep. 43:19-44:5, ECF No. 194-21). On the West Lafayette campus, the position of Title IX Coordinator is held by the Director of the Office of Institutional Equity. (Purdue's Ex. L at 12, ECF No. 194-15). All faculty members are mandatory reporters of all incidents of sexual harassment and must report such incidents directly to the Title IX Coordinator. *Id.* at 28.

The Director of OIE is the decisionmaker on the West Lafayette campus for complaints of alleged misconduct involving a faculty or staff member. (Wright Dep. 16:2-6, ECF No. 194-21). A report to West Lafayette campus OIE constitutes a report to a decisionmaker. (Rollock Dep.

Case: 1:25-cv-00669 Document #: 78 Filed: 05/14/25 Page 34 of 49 PageID #:548
Doe v. Duerfahrd, Not Reported in Fed. Supp. (2022)
2022 WL 17253080

84:21-85:25, ECF No. 194-16). A report must reach the Title IX Coordinator before the university knows of and can act on that report. *Id.* 83:3-84:4. A report can reach the Title IX Coordinator via a report made by a mandatory reporter. *Id.* 84:14-20.

### *Previous Reports Involving Duerfahrd*

#### Previous Report Involving R.P.

In March of 2011, Duerfahrd and a group of students met at a local bar. (R.P. Dep. 17:3-19, 32:16-19, ECF No. 194-22). Sometime thereafter, a subset of this group migrated to a second bar. *Id.* 19:7-14, 20:9 & 26:12-21. At this second location, graduate student R.P. and Duerfahrd danced with each other. *Id.* 29:15-30:3. Duerfahrd's "hand or arm grazed [R.P.'s] chest" while the two were dancing. *Id.* 29:15-19. After this March 2011 encounter, R.P. continued and completed the course that she was taking with Duerfahrd. *Id.* 33:5-7. R.P. testified that this interaction had no effect on the rest of her semester with Duerfahrd. *Id.* 33:24-34:8.

In the context of explaining that she did not feel comfortable taking another class with Duerfahrd, R.P. disclosed the March 2011 dance floor encounter to Professor Maren Linett in January 2012 and requested that Linett keep the report confidential. (Linett Dep. 12:3-13:20, ECF No. 194-23). Subsequently, Linett submitted an anonymous report of misconduct to Purdue's OIE. *Id.* 19:4-11. At this time, Monica Bloom was the Director of the OIE on the West Lafayette campus. (Peterson Dep. 21:21-22, ECF No. 194-20). Ms. Bloom talked to Nancy Peterson (who was Head of the English Department) and Linett. (Linett Dep. 111:11-20, ECF No. 194-23; Peterson Dep. 21:15-22:12, ECF No. 194-20).

No evidence has been identified to show that Purdue was able to or should have been able to substantiate unwanted touching of R.P. by Duerfahrd or to show that drinking and dancing with students in a social setting violates Purdue policy.

Bloom and Peterson spoke to Duerfahrd and advised that he needed to hold himself to a higher standard of conduct, even if university policy did not govern it. (Peterson Dep. 52:20-53:8, ECF No. 194-20; Duerfahrd Dep. 36:23-37:5 & 38:14-39:22, ECF No. 194-24).

#### Previous Report Involving K.H.

On February 8, 2016, while investigating an unrelated matter, OIE received a report that Duerfahrd may have been in a romantic or sexual relationship with student "K.H." (Purdue Ex. V at 1, ECF No. 194-25). On February 11, 2016, OIE followed up by interviewing K.H., who denied the existence of any such relationship. *Id.* at 2. No further evidence has been identified to show that such a relationship existed.

#### Previous Reports Regarding Classroom Behavior in 2015

Purdue student G.G. met with Purdue's Director of Graduate Studies, Director of the English Department, investigators, and the Director of OIE in the fall of 2015 to report what she perceived to be sexual harassment by Duerfahrd. (G.G. Decl. ¶ 5, ECF No. 202-8). [2] G.G. discussed the following matters with those individuals:

**\*5** A. In early fall of 2015, after Duerfahrd had the class watch a film that depicted sexual violence, Duerfahrd asked a female student about the film. The student reported that she was a survivor of sexual assault and was troubled by what she watched, and Duerfahrd responded to the female student that "If that offended you, then subconsciously you wanted to be one of the girls."

B. After that incident, G.G. stayed after class to discuss a film with Duerfahrd. In the film, there was a large flower sitting on a piano. Duerfahrd asked G.G. if she knew what was better than a flower on a piano, and when she responded that she did not, Duerfahrd replied, "Tulips on an organ." He then chuckled and stated, "Sorry, making a crude joke."

C. Duerfahrd showed a pornographic film to the class and read an autobiography by one of the actors. In the book, the male author writes about hitting a "Puerto Rican" so hard that he knocked her unconscious and a cut to her head that was bleeding. The author then wrote about tending to her wound and then engaging in intercourse with her while she was still unconscious. Duerfahrd asked G.G.'s opinion of the book, and she stated that she did not like the book because of the sexual abuse that was discussed. Duerfahrd belittled G.G. in class, telling her that he wanted to talk about the craft, not the content of the book.

Doe v. Duerfahrd, Not Reported in Fed. Supp. (2022)

2022 WL 17253080

D. After that incident, the class was given a midterm exam. One of the questions asked something similar to, "You are watching pornography and you are turned on by the acting and not the sex depicted, and you were going to masturbate, describe how that would be."

E. Duerfahrd made G.G. sit in the front of the class while he showed the class a pornographic film because Duerfahrd stated that he did not feel like G.G. was paying enough attention.

F. In one class, Duerfahrd continued to joke about how "pussies are hard to train."

**\*6** *Id.* ¶ 6.

2
    Purdue objects to the declaration and asks the Court to strike it on the basis that the "G.G." of the affidavit may not be the same "G.G." who complained about Duerfahrd. In Purdue's view, this means that the declaration fails to meet the personal knowledge requirement of Federal Rule of Evidence 602. This objection is overruled, and the Court will not strike the document.

    The declarant states that she made the reports at issue in the sworn declaration. As only one individual with initials G.G. has been identified as reporting Duerfahrd to Purdue, there is no reason to suspect any genuine confusion over G.G.'s identity, nor is there any reason to doubt the declarant's statement that she has personal knowledge of the matters addressed in the declaration. "Title 28 U.S.C. § 1746 (declarations) does not prohibit the use of nicknames, aliases, or pseudonyms." *Springer v. I.R.S.*, Nos. S97–0091, S–97–0092, & S–97–0093, 1997 WL 732526 (E.D. Cal. Sept. 12, 1997). A declarant should be "a readily identifiable person who can be subjected to the penalties for perjury." *Id.* The Court has no doubt that this is the case here.

    Purdue notes that it has used initials to identify students to comply with its obligations under the Family Educational Rights and Privacy Act (FERPA) and notes that, in contrast, Doe has no obligations to comply with FERPA. It would be of little benefit to G.G., however, if Purdue were to uphold its FERPA obligations only to have Purdue force Doe to disclose G.G.'s identity. *Cf. United States v. West*, No. 08 CR 669, 2010 WL 3951941,

at \*4 (N.D. Ill. 2010) ("Pseudonyms can be used when a witness's safety must be maintained"); *United States v. Pound*, No. CIV-07-427, 2010 WL 2803918, at \*1 (E.D. Okla. Feb. 2, 2010) (approving use of pseudonym by a declarant).

During the meetings with G.G., Purdue employees indicated that they were well-aware of Duerfahrd's harassment of female students, which was an "open secret." [3] *Id.* ¶ 8. G.G. wanted her name to remain confidential until she completed the class to prevent retaliation by Duerfahrd. *Id.* ¶ 7. OIE advised G.G. that they had sufficient information to move forward with action against Duerfahrd and that G.G. did not need to make a formal complaint using her name. *Id.* ¶ 9. G.G. was never advised that any action was taken against Duerfahrd regarding G.G.'s report, and OIE did not request anything further from G.G. after she completed Duerfahrd's class. *Id.* ¶ 10.

3
    Purdue asserts that the unnamed speaker's statements are hearsay. However, regardless of which of Purdue's employees identified previously as having met with G.G. made this statement, the Court concludes that the statements were on a matter within the scope of the employment relationship during the existence of the relationship. Thus, under Federal Rule of Evidence 801(d)(2)(D), the statements are not hearsay. The Court denies the request to strike this portion of G.G.'s declaration.

Graduate student C.G. met with Jake Amberger, an investigator with OIE, on November 13, 2015. (Purdue's Ex. A, ECF No. 194-4; Wright Dep. 44:14-17, 55:13-16). C.G. reported to Amberger that Duerfahrd asked C.G. to come after class, yelled at her, got close to her, and physically intimidated her by blocking her so she could not leave the room. (Wright Dep. 47:1-10). Duerfahrd told C.G. "You're fucking entitled" and left the room. *Id.* 47:5-10. C.G. further reported to Amberger that Duerfahrd had a midterm exam question regarding watching pornography and masturbating. *Id.* 47:13-22. C.G. withdrew from the class around September 20, 2015. (Wright Dep. 55:13-22, ECF No. 202-2).

On November 18, 2015, student K.D. submitted a written report identifying her concerns regarding Duerfahrd. (Wright Dep. 35:7-36:3, ECF No. 202-2). She met with Amberger and Associate Director of OIE Erin Oliver about those concerns. *Id.* 35:12-36:3. K.D. reported that Duerfahrd constantly made sexual or sexist comments in class that made the women in

Case: 1:25-cv-00669 Document #: 78 Filed: 05/14/25 Page 36 of 49 PageID #:550

Doe v. Duerfahrd, Not Reported in Fed. Supp. (2022)

2022 WL 17253080

his class incredibly uncomfortable. *Id.* 22:7-16. K.D. also provided OIE with a recording of a Duerfahrd class. *Id.* 29:10-24. Purdue agrees that K.D.'s report included conduct by Duerfahrd that would potentially violate Purdue's sexual harassment policy. *Id.* 28:25-29:6.

OIE did not receive formal complaints from K.D., G.G., and C.G., and OIE did not initiate an investigation on its own based upon their allegations despite having authority to do so. (Wright Dep. 37:12-17, 65:14-25, ECF No. 202-2). Instead, the OIE director reached out to Duerfahrd's department head to "explore and address the concerns that were raised." *Id.* 67:7-11.

The head of the English Department testified that she gave Duerfahrd expectations of how he was to behave in the future related to the use of inappropriate sexual terms in his class. (Ratcliffe Dep. 29:23-30:6, ECF No. 205-3). She explained that she thought there was a difference between critical engagement and making students feel uncomfortable in a way that created a hostile environment. *Id.* 30:15-19. The English Department head does not remember Duerfahrd being informed of any consequences he could face if he continued to use inappropriate sexual language in his class. *Id.* 29:23-30:1.

**\*7** It is "not uncommon" at Purdue, when a faculty member's concerning or unacceptable conduct does not rise to the level of a policy violation, for OIE to reach out to the department head and the faculty member, sometimes in conjunction with human resources, and to notify the faculty member of their concerns. (Wright Dep. 37:20-38:14, ECF No. 202-2).

Duerfahrd testified that he did not recall speaking to anyone from Purdue in 2015 regarding any student complaints against him. (Duerfahrd Dep. 49:20-23, ECF No. 202-5). He further stated that, prior to Jane Doe's complaint, no one at Purdue admonished him or cautioned him regarding his interactions with students, other than the R.P. dancing incident and an incident regarding a film Duerfahrd showed in class in 2009. *Id.* 48:19-49:11, 50:2-9.

Previous Report Involving A.S.

Student A.S. met with OIE in September 2016 and reported concerns regarding Duerfahrd. (Wright Dep. 100:8-11, ECF No. 205-5); *see also* (Rep. to Pl.'s Material Facts, ¶ 99, ECF No. 205-1). Amberger's notes from the meeting with A.S.

report that A.S. was asked to spit out her gum at Duerfahrd's office hours on September 14th. (Wright Dep. 87:3-22, ECF No. 202-2). The notes continue:

> Put out hand, spit in hand, and put in mouth.
>
> See how long been chewing, still flavored throughout, I think. Continued to talk about a film.
>
> As leaving, LD said get different flavor next time.
>
> ...
>
> Friday, September 16th, asked to come back to office hours after Wednesday meeting ...
>
> Told needed to get out of comfort zone and do things that make her uncomfortable

*Id.* 87:23-88:13. The notes record something about a machine, a strap that was put around A.S. and shook, which A.S. took off and stated she did not want to do anymore. *Id.* 88:14-19 (deponent unable to fully read handwritten notes). A.S. later reported to an individual named Parsons that Duerfahrd had A.S. try out an exercise machine, that A.S. got on for about a minute, felt uncomfortable, and got off. *Id.* 96:1-13.

There was no formal Purdue-initiated investigation following A.S.'s report. *See* (Rep. to Pl.'s Material Facts, ¶ 106, ECF No. 205-1). The department head and a Pam N. [4] spoke with Duerfahrd about unspecified matters, and the notes report that Duerfahrd "said he would never use 'c word' in class or other terms like that" and "he did say like to take students out of their comfort zone." (Purdue Ex. X, ECF No. 205-4; Wright Dep. 96:14-97:3, ECF No. 205-5 (identifying Ex. X)).

[4]     Purdue asserts, without objection from Doe, that this is Human Resources Director Pam Nesbitt.

### C. Analysis

Title IX of the Education Amendments of 1972 provides that "[n]o person ... shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance." 20 U.S.C. § 1681(a). Title IX contains an implied cause of action for private victims of discrimination. *Cannon v. Univ. of Chicago,* 441 U.S. 677, 704 (1979). As a Spending Clause statute, Title IX operates "much in the nature of a contract." *Davis v.*

Case: 1:25-cv-00669 Document #: 78 Filed: 05/14/25 Page 37 of 49 PageID #:551

Doe v. Duerfahrd, Not Reported in Fed. Supp. (2022)

2022 WL 17253080

*Monroe County Bd. of Educ.*, 526 U.S. 629, 640 (1999). "In the case of Title IX, the terms are clear: a school district [or university] accepting federal funds promises to not use those funds to discriminate on the basis of sex." *C.S. v. Madison Metro. Sch. Dist.*, 34 F.4th 536, 541 (7th Cir. 2022) (*en banc*) (citing *Gebser v. Lago Vista Indep. Sch. Dist.*, 524 U.S. 274, 286, 292 (1998)). The principles of constructive notice and respondeat superior do not apply; liability only attaches where the educational institution that has accepted federal funds was aware that it was breaking its contractual promise. *Id.*

**\*8** A plaintiff seeking to hold an institution liable under Title IX must prove two elements to succeed:

> *First*, "an official of the recipient entity with authority to take corrective action to end the discrimination" must have "*actual knowledge* of discrimination in the recipient's programs." *Second*, the official's "response [to that knowledge] must amount to deliberate indifference to discrimination" reflecting "an official decision by the recipient [entity] not to remedy the violation."

*Id.* (quoting *Gebser*, 524 U.S. at 290) (alterations and emphasis in original). The "actual knowledge" must be of completed or ongoing Title IX violations. *Id.* That is, there is no duty to take corrective action if no Title IX violation has occurred, even if past, non-violative behavior indicates a risk of a future Title IX violation. *Id.* at 541-42.

Once a violation has occurred, then the institution is obligated under Title IX "to act—both to remedy the existing misconduct and to prevent the further foreseeable risks from materializing." *Id.* at 542. The actions taken are not required to "be perfect or even successful." *Id.* at 543. "Owing to Title IX's roots in the Spending Clause, [an institution's] response will suffice to avoid institutional liability so long as it is not so unreasonable, under all the circumstances, as to constitute an 'official decision' to permit discrimination." *Id.* (citing *Gebser*, 524 U.S. at 290).

Doe agrees with Purdue that Purdue responded properly to Doe's complaint against Duerfahrd. However, she asserts that Purdue responded improperly to previous reports of sexual harassment by Duerfahrd. In this context, Doe must prove that Purdue knew of past discrimination by Duerfahrd and has shown itself to be unwilling to act to put an end to it. *See id.* at 544.

*1. Notice of Title IX Violations*

As a legal matter, Purdue had no duty to act "until it [had] actual knowledge of facts which, in the totality of the circumstances, indicate that sex-based discrimination [had] occurred or [was] occurring under its watch." *C.S.*, 34 F.4th at 544. Accordingly, the Court must determine if Purdue had the requisite knowledge.

*a. Fall 2015*

Doe asserts that Purdue had knowledge of multiple reports alleging Duerfahrd's sexual harassment of students and that Purdue did nothing to stop the harassment. Specifically, Doe identifies the reports by G.G., C.G., and K.D.

G.G. reported that Duerfahrd showed a film depicting sexual violence and then told a student who disclosed that she was sexual assault survivor "[i]f that offended you, then subconsciously you wanted to be one of the girls." Later, outside of class, Duerfahrd asked G.G. if she knew what was better than a flower on a piano and told her that it was "Tulips on an organ." Duerfahrd then apologized, saying he was "making a crude joke." On a midterm examination, Duerfahrd asked students to describe masturbating to pornography while being "turned on by the acting and not the sex depicted." (G.G. Decl. ¶ 6, ECF No. 202-8).

G.G. declares that she met with OIE staff, the English Department head, and the English Department's director of graduate studies. G.G. further declares that these Purdue employees "made clear that they were well-aware of Prof. Duerfahrd's harassment of female students, representing that it was an 'open secret.' " (G.G. Decl. ¶ 8, ECF No. 202-8).

**\*9** Another student, C.G., reported that Duerfahrd asked C.G. to come after class, yelled at her, got close to her, and physically intimidated her by blocking her so she could not leave the room. Duerfahrd told C.G. "You're fucking entitled" and left the room. (Wright Dep. 47:5-10). C.G. further reported to Amberger that Duerfahrd had a midterm exam question regarding watching pornography and masturbating. Ultimately, C.G. chose to withdraw from the class.

K.D., a third student, reported that Duerfahrd constantly made sexual or sexist comments in class that made the women in his class incredibly uncomfortable. K.D. also provided OIE with a recording of a Duerfahrd class. Purdue agrees that K.D.'s report included conduct by Duerfahrd that would potentially violate Purdue's sexual harassment policy.

Case: 1:25-cv-00669 Document #: 78 Filed: 05/14/25 Page 38 of 49 PageID #:552

Doe v. Duerfahrd, Not Reported in Fed. Supp. (2022)
2022 WL 17253080

Purdue dismisses G.G.'s, C.G.'s, and K.D.'s reports as student opinions on "course content, pedagogy, and alleged use of colorful language in the company of adults." (Rep. at 10, ECF No. 205).

When viewed in the light most favorable to Doe, however, the students reported behavior that extends beyond matters of academic freedom, curriculum choices, censorship, and off-color comments and enters the realm of harassment. There is evidence that Duerfahrd (1) told a sexual assault survivor that her discomfort watching a depiction of sexual violence meant that she wished to be subjected to sexual violence, (2) directed a crude, sexual joke to a female student outside of class, (3) on a midterm examination asked students to write descriptions of themselves masturbating, (4) yelled at and physically intimidated a female student outside of class, (5) "constantly" made sexual or sexist comments during class that made female students uncomfortable.

Additionally, Purdue agreed that the report by K.D. included conduct that potentially violated Purdue's sexual harassment policy, and Purdue employees made clear that they were "well-aware" of the "open secret" that was Duerfahrd's harassment of female students.

There is a genuine question of fact regarding whether Purdue had actual knowledge of past discrimination by Duerfahrd during the fall semester of 2015.

### b. Fall 2016

Doe also points to the 2016 report by A.S. that, when the evidence is viewed in the light most favorable to Doe, indicates that Duerfahrd told A.S. during office hours to spit her chewing gum into his hand, which Duerfahrd then placed in his own mouth and began chewing, commented on, and directed her to bring a different flavor "next time." He also had A.S. get on a shaking exercise machine that caused A.S. to feel uncomfortable. This shows a continuation of the pattern of Duerfahrd eschewing a professional manner of relating to female students outside of class and choosing a more intimate and familiar manner.

*2. Purdue's Response to the Reported Harassment*
Once the actual knowledge requirement is met, "Title IX requires [the educational entity] to 'take action to end the

harassment or to limit further harassment.' " *C.S.*, 34 F.4th at 547. However, under Title IX, Purdue "will not be held liable unless its response to harassment is clearly unreasonable in light of the circumstances." *Johnson v. Northeast Sch. Corp.*, 972 F.3d 905, 911-12 (7th Cir. 2020) (citations and quotation marks omitted). "The response does not have to be perfect or even successful ... so long as it is not so unreasonable, under all the circumstances, as to constitute an official decision to permit discrimination." *C.S.*, 34 F.4th at 543 (citing *Gebser*, 524 U.S. at 290).

### a. Fall 2015

**\*10**  OIE did not initiate an investigation based upon the reports made in the fall of 2015. Instead, the OIE director reached out to Duerfahrd's department head to "explore and address the concerns that were raised." (Wright Dep. 67:7-11, ECF No. 202-2). According to testimony given on behalf of Purdue, the English Department head gave Duerfahrd expectations of how he was to behave in the future related to the use of inappropriate sexual terms in his class. (Ratcliffe Dep. 29:23-30:6, ECF No. 205-3). She explained that she thought there was a difference between critical engagement and making students feel uncomfortable in a way that created a hostile environment. *Id.* 30:15-19. The English Department head does not remember Duerfahrd being informed of any consequences if he continued to use inappropriate sexual language in his class. *Id.* 29:23-30:1.

However, Duerfahrd testified that he did not recall speaking to anyone from Purdue in 2015 regarding any student complaints against him. (Duerfahrd Dep. 49:20-23, ECF No. 202-5). He further stated that, prior to Jane Doe's complaint, no one at Purdue admonished him or cautioned him regarding his interactions with students, other than the R.P. dancing incident and an incident regarding a film Duerfahrd showed in class in 2009. *Id.* 48:19-49:11, 50:2-9.

Given the conflicting evidence regarding how Purdue responded to the prior reports, there is a genuine issue of material fact, so Doe withstands summary judgment on the issue of whether Purdue was deliberately indifferent to discrimination.

### b. Fall 2016

Doe v. Duerfahrd, Not Reported in Fed. Supp. (2022)

2022 WL 17253080

There was no formal Purdue-initiated investigation following A.S.'s report in 2016. *See* (Rep. to Pl.'s Material Facts, ¶ 106, ECF No. 205-1). Notes recorded by Amberger regarding the situation state that the department head and Pam Nesbitt spoke with Duerfahrd about unspecified matters, and the notes report that Duerfahrd "said he would never use 'c word' in class or other terms like that" and "he did say like to take students out of their comfort zone." (Purdue Ex. X, ECF No. 205-4; Wright Dep. 96:14-97:3, ECF No. 205-5 (identifying Ex. X)).

However, once again there is a genuine issue of fact. Duerfahrd testified that, after the dancing incident with R.P., no one at Purdue admonished or cautioned him about his interactions with his students. Accordingly, questions of fact preclude a finding at this stage that Purdue's actions were not "clearly unreasonable."

### 3. Foreseeability of Risk to Jane Doe

Purdue's final argument is that any past misconduct by Duerfahrd was insufficient to alert Purdue to the possibility that Duerfahrd would become sexually involved with a student. In *Gebser*, as Purdue identifies, a single complaint that a teacher had used inappropriate comments during class was "plainly insufficient to alert the principal to the possibility that [the teacher] was involved in a sexual relationship with a student." 524 U.S. at 291.

*Gebser* is not directly on point here. Though Doe does allege that she was an unwilling recipient of Duerfahrd's sexual actions, there were more complaints against Duerfahrd than there were against the teacher in *Gebser*. Furthermore, Doe alleges milder forms of sexual harassment in addition to the sexual assaults. The Court cannot only consider whether the most egregious misconduct was foreseeable. Purdue can be liable under Title IX for lesser—but still violative—misconduct.

Doe has presented evidence that connects Duerfahrd's past behavior to instances of misconduct perpetrated against her. Similar to the midterm examination question—reported at least twice to Purdue—that asked students to describe their own masturbation, Duerfahrd asked Doe: "Did the doctor ask

you to stop masturbating?" (Doe Decl. ¶ 25, ECF No. 201-1). Duerfahrd told Doe that she wanted to be raped; Purdue knew that he had previously told a sexual violence survivor that discomfort with depictions of sexual violence meant that the survivor wished to have more sexual violence inflicted on her. Duerfahrd exhibited intimidating behavior in a private setting toward Doe as he had toward C.G. Duerfahrd used his office hours as an opportunity to misconduct himself with Doe, as he had with A.S. (chewing her gum and having A.S. get on an exercise machine that made her uncomfortable). The Court need not reach the closer question of whether Duerfahrd's sexual acts on Doe were foreseeable because, at the very least, a reasonable jury could find that his milder (but still harassing) behaviors were.

**\*11** In light of Duerfahrd's continuation of behaviors for which there is evidence that Purdue took no action to curb (despite there being an "open secret" that Duerfahrd harassed his female students) and the reality that "[p]ast misconduct may foreshadow even worse future misconduct," *C.S.*, 34 F.4th at 542, the Court finds that a reasonable juror could determine that Doe was subjected to sexual harassment in violation of Title IX because Purdue did not act to prevent the further foreseeable risks from materializing after having actual knowledge of Duerfahrd's prior misconduct. Purdue's motion for summary judgment fails.

## CONCLUSION

Based on the foregoing, the Court hereby **GRANTS** Defendant The Trustees of Purdue University's Motion for Judgment on the Pleadings [DE 192] and **DISMISSES** all claims for emotional damages brought by Plaintiff Jane Doe against Defendant Purdue University. The Court **DENIES** Defendant The Trustees of Purdue University's Motion for Summary Judgment [DE 194].

SO ORDERED on November 28, 2022.

## All Citations

Not Reported in Fed. Supp., 2022 WL 17253080

---

© 2025 Thomson Reuters. No claim to original U.S. Government Works.

2024 WL 3625684

2024 WL 3625684
Only the Westlaw citation is currently available.
United States District Court,
N.D. Texas, Fort Worth Division.

AMERICAN ALLIANCE FOR
EQUAL RIGHTS, Plaintiff,
v.
FOUNDERS FIRST COMMUNITY
DEVELOPMENT CORPORATION, Defendant.

Civil Action No. 4:24-cv-00327-O
|
Signed July 31, 2024

**Attorneys and Law Firms**

Steven Christopher Begakis, Cameron Thomas Norris, R. Gabriel Anderson, Thomas R. McCarthy, Pro Hac Vice, Consovoy McCarthy PLLC, Arlington, VA, Adam K. Mortara, Pro Hac Vice, Lawfair LLC, Nashville, TN, for Plaintiff.

Gregg Costa, Gibson, Dunn & Crutcher LLP, Houston, TX, Emily Claire Piepenburg, Gibson, Dunn & Crutcher LLP, Dallas, TX, Zakiyyah Salim-Williams, Pro Hac Vice, Zoe Klein, Pro Hac Vice, Gibson, Dunn & Crutcher LLP, Washington, DC, for Defendant.

<u>**MEMORANDUM OPINION AND ORDER**</u>

Reed O'Connor, UNITED STATES DISTRICT JUDGE

**\*1** Before the Court are Plaintiff's Motion for a Preliminary Injunction (ECF No. 3), Brief in Support (ECF No. 4), and Appendix (ECF No. 5), filed April 16, 2024; Defendant's Response and Objection (ECF No. 21), filed May 22, 2024; and Plaintiff's Reply (ECF No. 42) and Appendix (ECF No. 43), filed June 26, 2024. The Court also heard oral argument at the in-person hearing conducted on July 26, 2024. (ECF No. 47). Having considered the briefing and applicable law, the Court **GRANTS** Plaintiff's Motion for Injunction (ECF No. 3).

# I. BACKGROUND [1]

[1]    Unless otherwise indicated, the recitation of background facts are taken from Plaintiff's

Complaint (ECF No. 1), Plaintiff's Motion for Preliminary Injunction and Brief in Support (ECF Nos. 3, 4), and Plaintiff's Reply in Support of Motion for Preliminary Injunction (ECF No. 42).

Plaintiff American Alliance for Equal Rights ("the Alliance") sued Defendant Founders First Community Development Corporation ("Founders") pursuant to 42 U.S.C. § 1981, and seeks declaratory relief, injunctive relief, and nominal damages.

Founders is a nonprofit organization that provides entrepreneurship coaching and national and regional grants designed to accelerate small business growth. One of the regional grants is Founders' Texas Job Creators Grant ("Texas Grant"). The Texas Grant awards a total of $50,000 per annual grant cycle to ten Texas small businesses operating under a business-to-business or business-to-government model.

Founders sets strict eligibility requirements for those who want to apply. To participate in the contest, applicants must identify as one of the following: Latinx, Black, Asian, Women, LGBTQIA+, a Military Veteran, or someone located in a low to moderate income area. Eligible applicants must also satisfy three broad conditions: (i) they must own a for-profit service-based business in Texas; (ii) their business must have two to twenty employees and make $100,000 to $3,000,000 a year; and (iii) their business must be able to add at least one job that pays an average of $50,000 in yearly salary and benefits in the next 12 months. Once those eligibility requirements are met, Founders evaluates the applications based on eight merit-based criteria to score the applicants before ultimately selecting the grant recipients.

The Alliance has members who they allege are being harmed by Founders' racially discriminatory program, including Member A. Member A and his business are members of the Alliance. Member A is ready and able to immediately apply during the upcoming grant cycle but is unable to because he does not identify as one of Founders' preferred groups. Member A is a straight white civilian male who does not live in one of the specified economic areas. Other than not meeting the contest's demographic requirements, Member A otherwise satisfies all the other eligibility requirements.

# II. THRESHOLD ISSUE
As an initial matter, Defendant argues that Plaintiff does not have Article III standing because Member A was not

injured and because an anonymous person cannot support associational standing.[2] The Court disagrees.

[2]    Def.'s Resp. at 6, ECF No. 21.

**\*2**  The associational standing doctrine permits a traditional membership organization "to invoke the court's [injunctive or declaratory] remedial powers on behalf of its members." *Warth v. Seldin*, 422 U.S. 490, 515 (1975). To do so, the organization must satisfy the three-prong *Hunt* test by showing that "(a) its members would otherwise have standing to sue in their own right; (b) the interests it seeks to protect are germane to the organization's purpose; and (c) neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit." *Students for Fair Admissions, Inc. v. President & Fellows of Harv. Coll.*, 143 S. Ct. 2141, 2157 (2023) (quoting *Hunt v. Wash. State Apple Advert. Comm'n*, 432 U.S. 333, 343 (1977)).

Here, the Alliance satisfies the three-prong test. First, the Alliance seeks relief on behalf of Member A who has standing to sue. There is overwhelming evidence that Founders requires applicants to be "Latinx, Black, Asian, Women, LGBTQIA+, Military Veteran, or located in a low to Moderate Income area."[3] Thus, Member A has standing[4] because he is put "on unequal footing with other applicants based on race." *SFFA v. Univ. of Tex.*, 37 F.4th 1078, 1086 (5th Cir. 2022). Second, Founders does not challenge that this suit is germane to the Alliance's mission, so the second prong of associational standing is met.[5] Third, the Alliance's Section 1981 claim "[does] not require the participation of [its] individual members" because "the harm" is "their inability to compete on equal footing (and not their ultimate inability to obtain the grant)." *AAER v. Fearless Fund Mgmt.*, 2023 WL 6295121, at \*4 (N.D. Ga. Sept. 27), *aff'd on standing*, 103 F.4th 765, 771-75 (11th Cir. 2024). Finally, the Court determines "[t]he Alliance's identification of its affected members by ... pseudonyms ... poses no bar to its standing." *AAER v. Fearless Fund Mgmt.*, 103 F.4th 765, 773 (11th Cir. 2024).[6]

[3]    Pl.'s Reply in Supp. of Mot. for Prelim. Inj. at 2, ECF No. 42.

[4]    Defendant argues that a Section 1981 plaintiff must prove that his race was the "but for" cause of his injury. *See Comcast Corp. v. Nat'l Ass'n of Afr. Am.-Owned Media*, 589 U.S. 327, 329 (2020).

However, Plaintiff argues that their complaint is based on Member A's "inability to compete on equal footing." *Gratz v. Bollinger*, 539 U.S. 244, 262 (2003). Because race plays a role in the Texas Grant program, the Court agrees that Member A is injured by being put on unequal footing.

[5]    Pl.'s Reply in Supp. of Mot. for Prelim. Inj. at 2, ECF No. 42.

[6]    Order Den. Mot. Compel, ECF No. 45.

## III. LEGAL STANDARD

A preliminary injunction is an "extraordinary remedy" and will only be granted if the movant carries its burden on all four requirements. *Nichols v. Alcatel USA, Inc.*, 532 F.3d 364, 372 (5th Cir. 2008). "The purpose of a preliminary injunction is merely to preserve the relative positions of the parties until a trial on the merits[.]" *Univ. of Tex. v. Camenisch*, 451 U.S. 390, 395 (1981). A plaintiff must demonstrate (1) a substantial likelihood of prevailing on the merits; (2) a substantial threat of irreparable injury; (3) that the threatened injury outweighs any harm that will result to the non-movant if the injunction is granted; and (4) that the injunction will not disserve the public interest. *Robinson v. Ardoin*, 86 F.4th 574, 587 (5th Cir. 2023); *Air Prods. & Chems., Inc. v. Gen. Servs. Admin.*, No. 2:23-CV-147-Z, 2023 WL 7272115, at \*2 (N.D. Tex. Nov. 2, 2023). The movant must make a clear showing that the injunction is warranted, and the issuance of a preliminary injunction "is to be treated as the exception rather than the rule." *Miss. Power & Light Co. v. United Gas Pipe Line*, 760 F.2d 618, 621 (5th Cir. 1985).

**\*3**  The Fifth Circuit held that "[t]he party seeking [injunctive] relief must satisfy a cumulative burden of proving each of the four elements enumerated before a ... preliminary injunction can be granted." *Clark v. Prichard*, 812 F.2d 991, 993 (5th Cir. 1987) (citing *Miss. Power & Light Co.*, 760 F.2d at 621). That said, no factor has a "fixed quantitative value." *Mock v. Garland*, 75 F.4th 563, 587 (5th Cir. 2023). On the contrary, "a sliding scale is utilized, which takes into account the intensity of each in a given calculus." *Id.* In sum, "[t]he decision to grant or deny a preliminary injunction lies within the sound discretion of the trial court[.]" *White v. Carlucci*, 862 F.2d1209, 1211 (5th Cir. 1989).

## IV. ANALYSIS

**A. The Alliance is substantially likely to prevail on the merits by showing Founders violates Section 1981.**

Section 1981 guarantees "[a]ll persons ... the same right ... to make and enforce contracts," 42 U.S.C. § 1981(a), as such, it prohibits the "discrimination in the making or enforcement of contracts against, or in favor of, any race." *Gratz v. Bollinger*, 539 U.S. 244, 276 n.23 (2003). Section 1981 covers contracts between government, nongovernmental, and private parties, such as Founders, and "provid[es] a cause of action for public or private discrimination based on race." *Jett v. Dall. Indep. Sch. Dist.*, 798 F.2d 748, 762 (5th Cir. 1986); *accord Johnson v. Ry. Express Agency, Inc.*, 421 U.S. 454, 459-60 (1975). Section 1981 authorizes "both equitable and legal relief," including "damages." *Johnson*, 421 U.S. at 460.

At its core Section 1981 "guarantee[s] continuous equality between white and nonwhite citizens," *Jam v. Int'l Fin. Corp.*, 586 U.S. 199, 208 (2019). This is accomplished by protecting "the equal right of all persons ... to make and enforce contracts without respect to race." *Domino's Pizza, Inc. v. McDonald*, 546 U.S. 470, 474 (2006) (cleaned up). As the Fifth Circuit has held, "Section 1981 ... forbids racial discrimination in the making and enforcement of private contracts ... whether the aggrieved party is black or white." *Bobo v. ITT, Cont'l Baking Co.*, 662 F.2d 340, 342 (5th Cir. 1981). Founders' eligibility requirements violate these principles because its program is a contract that discriminates against applicants, including Member A, based on race.

Founders' program is a contract [7] under Section 1981, a fact not disputed by Founders. [8] Founders has made clear that applicants must belong to preferred demographic groups to apply. In numerous instances, Founders has repeatedly insisted that applicants *must* belong to one of its preferred demographic groups. On its website, Founders has historically listed six "Eligibility Requirements" for the program, the first of which is: "Founder identify as one of the following: Latinx, Black, Asian, Women, LGBTQIA +, Military Veteran, or located in a Low or Moderate Income area." [9] This eligibility requirement is corroborated by a FAQ page for the program that asks, "Can any company apply for this program?" [10] In response Founders answers, "*No*, the company *must* be diverse-led; meaning founders that are people of color, women, LGBTQ community, military veterans or [someone] located in a low or moderate income area." [11] This eligibility requirement was further emphasized

in press releases, quarterly reports, media interviews, and marketing materials. [12]

[7] "The term contract, as used in Section 1981, refers to a right in the promisee against the promisor, with a correlative special duty in the promisor to the promisee of rendering the performance promised." *Adams v. McDougal*, 695 F.2d 104, 108 (5th Cir. 1983) (cleaned up). Founders' contest fits that definition. The program offers contestants a grant in exchange for their time, intellectual property, and a promise to use the funds in a manner acceptable to Founders.

[8] Def.'s Resp. at 15-16, ECF No. 21.

[9] Pl.'s App. at 9, ECF No. 5; Pl.'s Supp. App. at 11, ECF No. 43-1 (same in February 2024); *id.* at 13 (same in April 2024); *id.* at 15 (same in May 2024).

[10] Pl.'s App. at 122, ECF No. 5.

[11] *Id.* (emphases added). Though the company changed other parts of its FAQs page after the Alliance sued, it left this answer unchanged. *See* Pl.'s Supp. App. at 279, ECF No. 44-4.

[12] Pl.'s App. at 22, ECF No. 5; Pl.'s Supp. App. at 19, 28, 42, 59, 73, 89, 110, 140, 155, 418-21, ECF Nos. 43-44.

**\*4** Despite this back drop, Founders argues that it "does not discriminate on the basis of race[,]" and thus, the contest does not treat races differently and therefore does not violate Section 1981. [13] In making this claim, Founders relies on a declaration from Founders' executive director, Shaylon Scott, and a declaration from Michael Farmer, the sole white male with no additional demographic category to be awarded a Texas Grant. [14]

[13] Def.'s Resp. at 14, ECF No. 21.

[14] Def.'s Resp. at Ex. A ¶ 13; Ex. B ¶ 11, ECF No. 21-1.

Countering the declarations of Ms. Scott and Mr. Farmer however is overwhelming evidence that Founders prefers applicants from its listed demographics as discussed above. Further, their claims are not supported by any policy, webpage, email, or other Founders document. [15] Worse still,

the Texas Grant's application requires disclosure of race and demands demographic information. [16] The application elicits answers to a host of demographic questions, and requires a "headshot of the founder," as well as a "video[.]" [17] Though Founders argues that collecting race data is acceptable when it's done for "legitimate reasons," Founders fails to identify a legitimate reason for doing so *before* winners are selected. [18]

[15] Draft Tr. of July 26, 2024 Hr'g at 27-28 (Answering "I am not aware" to the Court's question "Is there any document or web page or email from your client that supports your client's affidavit that says they do not consider race?").

[16] Pl.'s Reply in Supp. of Mot. for Prelim. Inj. at 18, ECF No. 42; Draft Tr. of July 26, 2024 Hr'g at 59 (describing attempts to not fill out race and hit next and being unable to proceed with the application).

[17] Pl.'s Supp. App. at 216, 229-30, ECF No. 44.

[18] Def.'s Resp. at 15 n.12, ECF No. 21; Draft Tr. of July 26, 2024 Hr'g at 34-35 (describing what trends Founders is tracking by requiring applicants to disclose race).

The Court finds that Founders' repeated and unequivocal statements that applicants *must* belong to one of its preferred demographic groups, far outweighs any probative value in Ms. Scott's singular post-lawsuit declaration that it does not, and Mr. Farmer's assessment of the program. This evidence demonstrates that, at best, Mr. Farmer's award is a fringe outlier that eluded Founders demographic eligibility requirements.

Nor does Founders' assertion that the webpage was unclear about race and that the program uses volunteers negate the evidence that it uses race in implementing the program. [19] First there is nothing unclear about the webpage. Founders emphatically proclaims applicants must be Latinx, Black, Asian, or otherwise meet one of the specified demographic categories. Even when Founders altered the webpage in an attempt to provide more clarity, it retained statements affirming applicants must be people of color, women, members of the LGBTQ community, military veterans or someone within a low or moderate income area. [20]

[19] Scott Decl. ¶¶ 17, 23, ECF No. 21-1.

[20] Pl.'s Supp. App. at 279, ECF No. 44; Draft Tr. of July 26, 2024 Hr'g at 73 (Founders asserting that the webpage has been revised recently). That evidence is not before the Court at this stage.

Finally, that Founders utilizes volunteer judges to evaluate the applications does not demonstrate race is not utilized because those judges are trained by Founders' executive director, the same person who has emphasized that the applicants must meet one of the preferred categories. [21] For the reasons stated above, the Court holds at this stage that Plaintiff is likely to succeed on the merits, and thus, has carried part of its burden for a preliminary injunction.

[21] Scott Decl. ¶ 17, ECF No. 21-1.

**B. The Alliance will suffer irreparable harm without injunctive relief.**

**\*5**  The Alliance has identified three irreparable harms: racial discrimination, lost opportunity to apply, and potential mootness. [22]  The Court agrees that Founders' discrimination is irreparably harming the Alliance and its members, including Member A, by subjecting them to "a discriminatory classification" that prevents Member A and other members "from competing on an equal footing." *Adarand Constructors, Inc. v. Peña*, 515 U.S. 200, 211 (1995) (cleaned up); *see also Parents Involved in Cmty. Sch. v. Seattle Sch. Dist. No. 1*, 551 U.S. 701, 719 (2007). Courts, including this one, have long held that "race and sex discrimination" are "irreparable" harms. *Greer's Ranch Café v. Guzman*, 540 F. Supp. 3d 638, 651(N.D. Tex. 2021) (O'Connor, J.); *accord Nuziard v. Minority Bus. Dev. Agency*, 2024 WL 965299, at *45 (N.D. Tex. Mar. 5, 2024) (Pittman, J.). In response, Founders renews its assertion that the Texas Grant program does not consider race and argues that the Alliance's argument for irreparable harm is therefore immaterial. [23] Again, the Court is not persuaded. [24] The overwhelming evidence shows that in the absence of the Court's intervening relief, the Plaintiff is substantially threatened with irreparable harm.

[22] Pl.'s Br. in Supp. of Mot. for Prelim. Inj. at 18, ECF No. 4.

[23] Def.'s Resp. at 17, ECF No. 21.

[24] Lost opportunity and mootness also justify irreparable harm.

**C. The remaining factors favor the Alliance.**

Finally, the balance of equities and public interest favors the Alliance. Absent injunctive relief, Member A risks forever losing his chance to compete in an application process that is race neutral—a right that the Supreme Court has described as "foundational," "fundamental," "transcendent," and "universal." *Harvard*, 600 U.S. at 201-06. While Founders contends that a preliminary injunction disserves the public interest because Texas Grants support small businesses,[25] the Court does not see how the public is served by a program with racially discriminatory practices.

[25]    Def.'s Resp. at 18, ECF No. 21.

**V. CONCLUSION**

Having considered the arguments, evidence, and applicable law, the Court concludes that the Plaintiff has met their burden of proving each of the four elements for preliminary injunctive relief. *See* Fed. R. Civ. P. 65(d). For the foregoing reasons, the Court **GRANTS** Plaintiff's Motion for Preliminary Injunction (ECF No. 3) and **ENJOINS** Defendant from closing the current application period for the Texas Job Creators Program, selecting grant recipients, or enforcing the contest's racial eligibility requirements until further Order from this Court or the Fifth Circuit Court of Appeals.

**SO ORDERED** on this **31st** day of **July, 2024**.

**All Citations**

Slip Copy, 2024 WL 3625684

---

**End of Document**

© 2025 Thomson Reuters. No claim to original U.S. Government Works.

McGehee v. Nebraska Department of Correctional Services, Not Reported in Fed....

2019 WL 1227928

2019 WL 1227928
Only the Westlaw citation is currently available.
United States District Court, D. Nebraska.

Jason MCGEHEE, Stacey Johnson, Bruce Ward,
Terrick Nooner, and Don Davis, Plaintiffs,

v.

NEBRASKA DEPARTMENT OF
CORRECTIONAL SERVICES, Defendant.

4:18CV3092
|
Signed 03/15/2019

**Attorneys and Law Firms**

Marnie A. Jensen, Quinn R. Eaton, Husch, Blackwell Law
Firm, Omaha, NE, for Plaintiffs.

David A. Lopez, Ryan S. Post, Attorney General's Office,
Lincoln, NE, for Defendant.

**MEMORANDUM AND ORDER**

Laurie Smith Camp, Senior United States District Judge

 **\*1** This matter is before the Court on the Plaintiff's Motion to
Compel, ECF No. 1, and the Supplemental Index of Evidence,
ECF No. 31, submitted by Defendant Nebraska Department
of Correctional Services ("NDCS") in opposition to the
Motion to Compel. For the reasons stated below, Plaintiffs'
subpoena requests will be modified under Fed. R. Civ. P. 45(d)
and the Motion to Compel will be granted, in part.

**BACKGROUND**

The factual and procedural background of this case is
detailed in the Court's Memorandum and Order dated January
17, 2019, ECF No. 27, which is incorporated herein by
reference. In response to the Court's prior Memorandum and
Order, NDCS submitted the Declaration of the President
of Pharmacy N (the "Declaration"), ECF No. 31-1. The
Declaration is nearly identical to the stricken Declaration
of Pharmacy N, ECF No. 14-2, except that it is made
by Pharmacy N's president who, as acknowledged in the
Declaration, could be held criminally responsible for making
false statements.

Plaintiffs submitted a Supplemental Index of Evidence, ECF
No. 28-1, containing communications between the parties
regarding the scope of Plaintiffs' request for production of
documents. Plaintiffs offered to narrow the scope of the
subpoena to the following:

> Information responsive to the following requests, with
> pharmacy identities and any other identifying information
> redacted:
>
> 1. Communications and documents exchanged between
> NDCS and Pharmacy N regarding Pharmacy N's
> decision to supply fentanyl to Nebraska for use in
> executions;
>
> 2. Communications and documents regarding how NDCS
> was able to identify Pharmacy N and convince Pharmacy
> N to supply fentanyl to Nebraska for use in executions;
> and
>
> 3. Communications and documents exchanged between
> NDCS and suppliers other than Pharmacy N, between
> January 1, 2017, and the present, regarding NDCS's
> attempts to convince other suppliers to supply fentanyl
> to Nebraska for use in executions.

Ex. 19 at 2-3, ECF No. 28-1. NDCS denied the request,
explaining that it wanted to ensure that the Court addressed
its Eleventh Amendment arguments. *Id.* at 2. In its sur-
reply, NDCS requested that the Court address its jurisdictional
challenge.

**DISCUSSION**

**I. Sufficiency of the Declaration**

In the Court's prior Memorandum and Order, the Court held
that the Declaration of Pharmacy N did not comply with
the federal unsworn declaration statute. The statute states
that where any matter is required to be "proved by the
sworn declaration, verification, certificate, statement, oath,
or affidavit, in writing of the person making the same,"
such matter may be supported by an unsworn declaration
if the declaration is "in writing of such person which is
subscribed by him, as true under penalty of perjury[.]" 28
U.S.C. § 1746. The Declaration of Pharmacy N was deficient
because it lacked "any record whatsoever of a witness's
identity or their signature, [and the] declarant cannot be held
to their statements under 'penalty of perjury.' " *See Doe v.*

Case: 1:25-cv-00669 Document #: 78 Filed: 05/14/25 Page 46 of 49 PageID #:560

McGehee v. Nebraska Department of Correctional Services, Not Reported in Fed....

2019 WL 1227928

*Los Angeles Unified Sch. Dist.*, No. 2:16-CV-305, 2017 WL 797152, at *9 (C.D. Cal. Feb. 27, 2017).

**\*2** The Declaration of the President of Pharmacy N satisfies § 1746 for purposes of this action. The Declaration is made by a readily identifiable person, the President of Pharmacy N, who, according to the Declaration, has executive authority over Pharmacy N and direct knowledge of its business decisions. *Id.* at 1. The Declaration acknowledges that the President of Pharmacy N could be held criminally responsible if any statements are false. *Id.* The Declaration explains that the President of Pharmacy N used a pseudonym because using the President's actual name would reveal the identity of Pharmacy N. *Id.* at 1-2. Based on these assertions, the Court is satisfied that the Declaration meets the requirements of § 1746. *See Springer v. I.R.S.*, No. S-97-0092 WBS GGH, 1997 WL 732526, at *5 (E.D. Cal. Sept. 12, 1997) (§ 1746 does not prohibit pseudonyms, "it merely requires by implication that the fact of such use is expressly stated in the declaration, and that the actual person can be identified.").

**II. Relevance of the Identity of Pharmacy N**

The Court previously held that if assertions in the Declaration of Pharmacy N were true, Pharmacy N's identity is not relevant to Plaintiffs' Eighth Amendment challenge to Arkansas's method of execution. The Eighth Circuit has held that information about a supplier of execution drugs would not "remain relevant once [the supplier] indisputably refuses to make [the drugs] available to anyone." *In re Missouri Dep't of Corr. (MDOC II)*, 839 F.3d 732, 736 (8th Cir. 2016). Accordingly, the pharmacy's identity in *MDOC II* had no relevance to the inmates' Eighth Amendment claim. *Id.*; see also *McGehee v. Tex. Dep't of Criminal Justice*, No. MC 18-MC-1546, 2018 WL 3996956, at *5 (S.D. Tex. June 1, 2018) ("On disclosure, information about Texas' supplier would cease to be relevant - Pharmacy X would no longer supply Texas with the drugs.").

The Declaration confirms that Pharmacy N fears that if its identity is disclosed or revealed, anti-death penalty advocates will harass and retaliate against Pharmacy N, causing physical and financial harm to its owners and employees. ECF No. 31-1 at 2. As with the suppliers in *McGehee v. Texas* and *MDOC II*, Pharmacy N agreed to supply chemicals to NDCS on the condition that Pharmacy N's identity be kept confidential. ECF No. 31-1 at 1. The Declaration states that since it supplied lethal injection chemicals to NDCS, Pharmacy N has made a business decision to decline any future sales of chemicals to any state, including Nebraska.

ECF No. 31-1 at 1. Because Pharmacy N will not provide chemicals to any state, and for the reasons stated in the Court's prior Memorandum and Order, Pharmacy N's identity has no relevance to Plaintiffs' Eighth Amendment claims. [1] Accordingly, to the extent Plaintiffs seek to compel disclosure of Pharmacy N's identity, the Motion to Compel is denied.

[1]    The Court acknowledges that the United States District Court for the Northern District of Florida disagrees with the holding of *MDOC II* and this Court. *See McGehee v. Florida Dep't of Corr.*, 4:2018-mc-00004, ECF No. 18 slip op. at 20-21 (N.D. Fla. Feb. 2, 2019). However, the holding in *MDOC II* is binding on this Court.

**III. Relevance of Redacted Material**

As noted in its prior order, in addition to the identity of Pharmacy N, Plaintiffs requested information in general regarding NDCS's attempts to obtain fentanyl, and communications or documents evidencing this process. Plaintiffs argue that even without Pharmacy N's identity, the Motion to Compel should be granted as to the remainder of the materials requested. Plaintiffs essentially ask this Court to modify their subpoena to permit redaction of any information regarding "pharmacy identities and other identifying information." Ex. 19 at 2-3, ECF No. 28-1. The Court first considers whether redacted information would be relevant to Plaintiffs' Eighth Amendment claim.

**\*3** The Western District of Missouri addressed this issue after concluding that Plaintiffs' requests should be modified to redact information about Missouri's pentobarbital supplier. *McGehee v. Mo. Dep't of Corr.*, 2:18-mc-04138, ECF No. 21 slip op. at 4, (W.D. Mo. Jan 15, 2019). The court held that even without information identifying Missouri's pentobarbital suppliers, documents responsive to Plaintiffs' requests were "relevant to Plaintiffs' Eighth Amendment challenge in the underlying litigation given that such information could shed light on whether Arkansas is simply 'unwilling' to use pentobarbital in its executions or whether it is truly infeasible for Arkansas to do so." *Id.* slip op. at 6 (citing *Johnson v. Precythe*, 901 F.3d 973, 979–80 (8th Cir. 2018) ). Accordingly, the court modified Plaintiffs' subpoena requests under Fed. R. Civ. P. 45(d). *Id.*

Similarly, even without information identifying Pharmacy N, some of Plaintiffs' modified requests are relevant to the underlying issue in Plaintiffs' Arkansas litigation. Plaintiffs voluntarily offered to narrow their requests

McGehee v. Nebraska Department of Correctional Services, Not Reported in Fed....

2019 WL 1227928

to communications and documents between NDCS and Pharmacy N leading up to Pharmacy N's decision to supply fentanyl. Ex. 19 at 2-3, ECF No. 28-1. Plaintiffs' modified requests permit redaction of Pharmacy N's identity. *See* Ex. 19 at 2-3, ECF No. 28-1. Because NDCS was ultimately successful in its requests to obtain fentanyl, the information sought may be relevant to whether it is truly infeasible for Arkansas to use fentanyl in its executions.

Although Plaintiffs' modified requests seek relevant information, the Court will not adopt the requests verbatim. In addition to the information described above, Plaintiffs' modified requests seek "communications and documents exchanged between NDCS and suppliers other than Pharmacy N, between January 1, 2017, and the present, regarding NDCS's attempts to convince other suppliers to supply fentanyl to Nebraska for use in executions." Ex. 19 at 2-3, ECF No. 28-1. Plaintiffs assert that this information is relevant because even though Nebraska was unsuccessful in obtaining supplies from other pharmacies, that "does not mean that Arkansas would be unsuccessful in doing so." Pl. Br. at 3, ECF No. 19. Plaintiffs do not demonstrate how NDCS's failed attempts to obtain drugs from other suppliers would be relevant to their underlying Eighth Amendment claim. Accordingly, the Court will modify Plaintiffs' subpoena requests under *Fed. R. Civ. P. 45(d)* as stated below.[2]

[2] As suggested in its prior Memorandum and Order, the Court's modified requests are modeled after the modifications made by the Western District of Missouri in *McGehee v. Mo. Dep't of Corr.*, 2:18-mc-04138, ECF No. 21 slip op. at 11-12 (W.D. Mo. Jan 15, 2019).

## IV. State Sovereign Immunity

Because some of Plaintiffs' requests are relevant to their underlying claim, the Court addresses NDCS's argument that sovereign immunity bars the subpoena. The Eleventh Amendment states that "[t]he Judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by Citizens of another State, or by Citizens or Subjects of any Foreign State." *U.S. Const. amend. XI.* Generally, "in the absence of consent a suit in which the State or one of its agencies or departments is named as the defendant is proscribed by the Eleventh Amendment." *Egerdahl v. Hibbing Cmty. Coll.*, 72 F.3d 615, 618–19 (8th Cir. 1995) (quoting *Pennhurst State Sch. & Hosp. v. Halderman*, 465

U.S. 89, 100 (1984) ). The Eleventh Amendment bars suit in federal court against states or state agencies "for any kind of relief, not merely monetary damages." *Monroe v. Ark. State Univ.*, 495 F.3d 591, 594 (8th Cir. 2007); *see also Ex parte Ayers*, 123 U.S. 443, 505 (1887) ("The very object and purpose of the Eleventh Amendment was to prevent the indignity of subjecting a state to the coercive process of judicial tribunals at the instance of private parties."). NDCS argues that a subpoena commanding a non-party to produce records is a "suit" for Article III purposes and therefore this action infringes on the State of Nebraska's autonomy.

### A. Subpoenas to Non-Party States

**\*4** The Eighth Circuit rejected an argument similar to NDCS's in *In re Missouri Dep't of Nat. Res. ("Missouri DNR")*, 105 F.3d 434, 436 (8th Cir. 1997). In *Missouri DNR*, the district court denied a state agency's motion to quash subpoenas duces tecum served on it by litigants in a case in which the state agency was not a party. *Id.* at 435. The agency sought a writ of mandamus directing the district court to vacate its order arguing, in part, that the subpoenas infringed upon Missouri's sovereign immunity. *Id.* at 435, 436. The Eighth Circuit denied the request, holding that "[g]overnmental units are subject to the same discovery rules as other persons and entities with contact with the federal courts." *Id.* at 436 (citing *United States v. Procter & Gamble*, 356 U.S. 677, 681 (1958) ). The court reasoned that the state agency failed to show "how production of these documents infringes on the State of Missouri's autonomy or threatens its treasury." *Id.*

The holding in *Missouri DNR* remains good law in the Eight Circuit and is binding in this case. NDCS nevertheless argues that the court in *Missouri DNR* "strongly suggested" that the Eleventh Amendment would bar a subpoena that "infringes on a State's autonomy or threatens its treasury." NDCS Br. at 10-11, ECF No. 16 (quoting *Missouri DNR*, 105 F.3d at 436). However, the holding in *Missouri DNR* does not support this position. While the Eighth Circuit recognized that the Missouri DNR failed to show that the subpoenas infringed on the State of Missouri's autonomy or pocketbook, the court stated that "[t]here is simply no authority for the position that the Eleventh Amendment shields government entities from discovery in federal court." *Missouri DNR*, 105 F.3d at 436.

Despite the Eighth Circuit's unqualified language, NDCS argues that the tea leaves of more recent precedent call into question the holding in *Missouri DNR*. NDCS relies on the Eighth Circuit's decision on tribal sovereign immunity in

Case: 1:25-cv-00669 Document #: 78 Filed: 05/14/25 Page 48 of 49 PageID #:562

McGehee v. Nebraska Department of Correctional Services, Not Reported in Fed....

2019 WL 1227928

*Alltel Commc'ns, LLC v. DeJordy*, 675 F.3d 1100, 1104 (8th Cir. 2012). In *Alltel*, the Ogallala Sioux Tribe moved to quash third-party subpoenas on the basis of tribal immunity. *Id.* at 1102. The district court denied the motion to quash, relying on the Eighth Circuit's decision in *Missouri DNR*. *Id.* at 1104. The Eighth Circuit held that the district court's reliance was misplaced because "[a]lthough Eleventh Amendment precedents are instructive, tribal immunity 'is not congruent with that which the Federal Government, or the States, enjoy.' " *Id.* (quoting *Three Affiliated Tribes of Fort Berthold Reservation v. Wold Eng'g*, 476 U.S. 877, 890 (1986) ). Accordingly, the court "declined to decide whether sovereign immunity provided states with protection against 'disruptive third-party subpoenas that would clearly be barred in a State's own courts.' " *In re: Mo. Dep't of Corr.*, 661 F. App'x 453, 456 (8th Cir.), *reh'g granted and opinion vacated* (Sept. 13, 2016), *on reh'g sub nom. In re Mo. Dep't of Corr.*, 839 F.3d 732 (8th Cir. 2016) (quoting *Alltel*, 675 F.3d at 1104–05).

The Court cannot read *Alltel* as overruling or questioning the court's holding in *Missouri DNR*. Other states' correctional departments subpoenaed by the Plaintiffs in this case have raised this argument and each court, citing to Eighth Circuit precedent, has refused to hold that sovereign immunity bars the subpoenas. *See McGehee v. Florida Dep't of Corr.*, 4:2018-mc-00004, ECF No. 18 slip op. at 1 (N.D. Fla. Feb. 2, 2019); *McGehee v. Missouri Dep't of Corr.*, 2:18-mc-04138, ECF No. 21 slip op. at 10, (W.D. Mo. Jan 15, 2019). The Court, following binding Eighth Circuit precedent, agrees with its sister courts that sovereign immunity does not categorically bar the subpoenas in this case.

### B. Infringement on State Autonomy

NDCS acknowledges that if its theory of sovereign immunity applies, NDCS must show that the subpoena "infringes on a State's autonomy or threatens its treasury." [3] *Missouri DNR*, 105 F.3d at 436. NDCS makes no argument that the subpoena threatens Nebraska's treasury but argues that the evidence conclusively shows "compliance with the subpoena would be disruptive to the autonomy of the State of Nebraska." ECF No. 4-2 at 1. NDCS asserts two main arguments for how the subpoena is disruptive. First, after "extraordinary difficulty" in identifying a supplier, Pharmacy N agreed to supply the drugs on the condition that its identity would remain secret. Frakes Aff. at 6, ECF No. 14-1; Declaration at 2, ECF No. 31-1. NDCS asserts that compliance with the subpoena would signal to possible future suppliers that Nebraska cannot legally keep their identities secret, thus jeopardizing NDCS's

ability to secure a stable supply of drugs to carry out future executions. Because the modified requests permit redaction of Pharmacy N's identity and any identifying information, these concerns are moot.

[3] As noted above, in denying a motion to quash third-party subpoenas, the court in *Missouri DNR* reasoned that the state agency failed to show "how production of these documents infringes on the State of Missouri's autonomy or threatens its treasury." 105 F.3d at 436. NDCS apparently interprets this language as a standard for when sovereign immunity would bar a subpoena rather than an explanation for why subpoenas do not implicate the Eleventh Amendment. The Court need not decide whether this language is a standard because even if it is, NDCS has not shown that the modified subpoena infringes on Nebraska's autonomy.

**\*5** Second, NDCS argues that the subpoena forces disclosure of "material reasonably calculated to lead to the identity of execution team members" in violation of Nebraska's execution team secrecy statute. Neb. Rev. Stat. § 83-967(2). Section 83-967(2) states:

> The identity of all members of the execution team, and any information reasonably calculated to lead to the identity of such members, shall be confidential and exempt from disclosure pursuant to sections 84-712 to 84-712.09 and shall not be subject to discovery or introduction as evidence in any civil proceeding unless extraordinary good cause is shown and a protective order is issued by a district court limiting dissemination of such information.

*Id.* Thus, identities of execution team members are exempt (1) from disclosure as public records requests (the "public records exemption") and (2) from discovery unless certain narrow circumstances apply (the "discovery exemption").

As noted in this Court's previous Memorandum and Order, the State of Nebraska raised the public records exemption

McGehee v. Nebraska Department of Correctional Services, Not Reported in Fed....

2019 WL 1227928

in currently pending State court proceedings. *State ex rel. Miller and ACLU v. Frakes*, No. CI-17-4283 (Lancaster Cnty. Dist. Ct.), *appeal docketed*, No. S-18-606 (Neb. July 19, 2018). In *State ex rel. Miller*, the trial court held records not identifying execution team members were not protected under § 83-967(2). *State ex rel. Miller and ACLU v. Frakes*, No. CI-17-4283, slip op. at 4 (Lancaster Cnty. Dist. Ct. June 18, 2018). The trial court reasoned that the "evidence is speculative at best that disclosure of these documents would be reasonably calculated to lead to such identification." *Id.* NDCS states that the *Miller* case when decided by the Nebraska Supreme Court, "will control on whether the State can viably argue that disclosure would violate Nebraska's execution team secrecy statute." NDCS Br. at 16, ECF No. 15. Although a decision in *Miller* may address whether supplier identities fall under the public records exemption, it will not address whether the information sought in this case would fall under the discovery exemption. Accordingly, the Court need not hold its ruling in abeyance pending the Nebraska Supreme Court's ruling.

NDCS has not shown that the information sought in the modified requests is protected under the discovery exemption of § 83-967(2). The modified subpoena requests allow redaction of Pharmacy N's identity as well as other identifying information and require that production be made subject to a protective order. No evidence in the record suggests the modified subpoena requests require disclosure of members of the execution team or any information reasonably calculated to lead to the identity of such members. Accordingly, even if the discovery exemption of § 83-967(2) is applicable, NDCS has not shown that the information sought is protected or that disclosure would infringe on state autonomy.

## CONCLUSION

The Declaration of the President of Pharmacy N demonstrates that the identity of Pharmacy N is not relevant to Plaintiffs' underlying Eighth Amendment claims. However, the subpoena requests, as modified under Fed. R. Civ. P. 45(d), seek other information that may be relevant to Plaintiffs' claims. Following Eighth Circuit precedent, the Eleventh Amendment does not categorically bar Plaintiffs' subpoena. Even under NDCS's theory of sovereign immunity, NDCS has not shown that the modified subpoena requests infringe on the autonomy of the State of Nebraska. Accordingly,

**\*6** IT IS ORDERED:

1. Plaintiff's Motion to Compel, ECF No. 1, is granted, in part;

2. On or before April 12, 2019, NDCS is ordered to produce information responsive to the following modified requests with Pharmacy N's identity and any other identifying information redacted:

   a. Communications and documents exchanged between NDCS and Pharmacy N regarding Pharmacy N's decision to supply fentanyl to Nebraska for use in executions;

   b. Documents regarding how NDCS was able to identify Pharmacy N and persuade Pharmacy N to supply fentanyl to Nebraska for use in executions; and

   c. Communications between NDCS and Pharmacy N regarding Pharmacy N's decision to supply fentanyl to Nebraska for use in executions; and

3. On or before March 29, 2019, the parties shall confer and agree to the terms of a protective order or shall agree on whether the protective order in the underlying litigation, ECF No. 4-11, will govern NDCS's responses.

## All Citations

Not Reported in Fed. Supp., 2019 WL 1227928

---

**End of Document**
© 2025 Thomson Reuters. No claim to original U.S. Government Works.