**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | |
|---|---|
| AMERICAN ALLIANCE FOR EQUAL RIGHTS, | |
| *Plaintiff,* | |
| and | Case No. 1:25-cv-669 |
| UNITED STATES OF AMERICA, | Judge Coleman |
| *Plaintiff-Intervenor*, | |
| v. | |
| STATE OF ILLINOIS; JB PRITZKER, in his official capacity as Governor of the State of Illinois; JAMES BENNETT, in his official capacity as Director of the Illinois Department of Human Rights; KWAME RAOUL, in his official capacity as Attorney General of the State of Illinois; and ALEXI GIANNOULIAS, in his official capacity as Secretary of State of the State of Illinois. | |
| *Defendants.* | |

**THE ALLIANCE'S REPLY IN SUPPORT OF ITS
MOTION FOR A PRELIMINARY INJUNCTION
(<u>RELIEF REQUESTED BY JULY 1, 2025</u>)**

**TABLE OF CONTENTS**

Introduction ........................................................................................................................... 1

Argument .............................................................................................................................. 1

   I.   The Alliance will likely succeed on the merits. ....................................................... 2

      A.   Illinois' "standing" arguments fail. .................................................................. 2

      B.   SB 2930 likely violates the Fourteenth Amendment. ..................................... 5

      C.   SB 2930 likely violates the First Amendment. ............................................... 7

   II.   The other preliminary-injunction factors favor the Alliance. ............................... 9

      A.   Irreparable Harm ............................................................................................. 9

      B.   Balance of harms and public interest ............................................................ 11

   III.   Illinois' objections to the injunction's scope fail. .............................................. 12

Conclusion ......................................................................................................................... 14

Certificate of Service ........................................................................................................ 15

**INTRODUCTION**

To hear Illinois tell it, SB 2930 does nothing for no reason. Illinois won't say the law serves a compelling state interest. PI-Opp. (Doc.73) 12 n.2, 15 n.5. Illinois denies that the law requires nonprofits to post their leaders' demographics, insisting that officers won't report that information. PI-Opp.8. And Illinois denies that nonprofits will feel any pressure to discriminate, insisting that the public won't do anything with the data. PI-Opp.6-7. Illinois not only makes these predictions, but makes them while submitting *zero* evidence of its own.

If Illinois were right about all this, then SB 2930 would fail even rational-basis scrutiny; but Illinois is not right. The law's text, motivation, and effect force large nonprofits to publish the race of their board members so that, if the data does not meet some desired balance, outsiders can pressure nonprofits to make race-based changes. Though Illinois is the first to do this to charities, Illinois is not the first to force the public disclosure of race. When Louisiana ordered ballots to disclose candidates' race, the Supreme Court had no trouble invalidating that attempt to "encourage" race-based decision-making. *Anderson v. Martin*, 375 U.S. 399, 402-04 (1964). Illinois should put down the tools of Jim Crow, no matter how much it thinks this use is benign. *SFFA v. Harvard*, 600 U.S. 181, 213-14 (2023). And Illinois certainly can't enlist private citizens to host its controversial worldview on their own websites.

SB 2930 directly regulates the Alliance's members, pressures them to discriminate, and compels their speech. It should be preliminarily enjoined by July 1.

**ARGUMENT**

If the test for a preliminary injunction is a "'sliding scale,'" PI-Opp.3, then the Alliance's motion is even stronger. Because its members are directly regulated by SB 2930, standing is obvious; and the merits are strong, given the poor track record of similar laws. Even if this Court had doubts, the non-merits factors overwhelmingly favor the Alliance, since the harms of disclosure

1

are imminent and irreversible while Illinois mostly *denies* any interest in immediately enforcing SB 2930. Its enforcement should be temporarily paused statewide, or at least for the Alliance and its members.

## I.    The Alliance will likely succeed on the merits.

### A.    Illinois' "standing" arguments fail.

Though Illinois challenges the Alliance's "standing," this Court can ignore those arguments. The United States—having invoked the Civil Rights Act's "unconditional right to intervene," *Carter v. Sch. Bd. of W. Feliciana Parish*, 569 F. Supp. 568, 571 (M.D. La. 1983)—is now a plaintiff with the same rights "as if it had instituted the action," 42 U.S.C. §2000h-2. The United States could "continue" this case even if the Alliance "disappear[ed]." *Pasadena City Bd. of Ed. v. Spangler*, 427 U.S. 424, 431 (1976). If the United States shows that SB 2930 likely violates equal protection, that showing is sufficient to preliminarily enjoin the entire law. AAER-MTD-Opp.II; *see infra* at III. The Alliance's standing would be irrelevant, since only one plaintiff needs standing to get that relief. *Ezell v. Chicago*, 651 F.3d 684, 696 n.7 (7th Cir. 2011).

Illinois does not meaningfully challenge the United States' standing. Even if the State had winning arguments about Members A and B, the United States represents *all* nonprofits that are covered by SB 2930. Those nonprofits are directly regulated by SB 2930, so their standing is "self-evident" on the face of the law. *Prop. Cas. Insurers Ass'n of Am. v. Todman*, 725 F. Supp. 3d 810, 825 (N.D. Ill. 2024). Illinois concedes as much, agreeing that its law requires nonprofits to do things they otherwise wouldn't. *E.g.*, PI-Opp.1 ("requires"); 7 ("requirements"); 17 ("need" to provide); 15 n.5 ("nothing" else requires). The only argument that Illinois makes against the United States' standing improperly argues the merits. PI-Opp.6-7; *see* AAER-MTD-Opp.I.B. So if the United States' equal-protection claim has likely merit, then SB 2930 should be preliminarily enjoined while ignoring Illinois' attacks on the Alliance's standing.

But even if the Alliance needed to show independent standing, it easily has. The question on a preliminary injunction is whether the Alliance will "'likely'" prove standing. *Murthy v. Missouri*, 603 U.S. 43, 58 (2024). Illinois says the Alliance likely won't. Other than conflating standing with the merits, *see* PI-Opp.6-8; AAER-MTD-Opp.I.B, Illinois makes two arguments. It says the Alliance must publicly identify its members' real names, rather than using pseudonyms. PI-Opp.5-6. And it says, after submitting *zero* evidence itself, that the Alliance's evidence is somehow insufficient. PI-Opp.4-6. Both arguments fail.

**1. *Pseudonymity***: Illinois claims that Article III bans associations from using pseudonyms "at the preliminary injunction stage." PI-Opp.5-6. But pseudonyms have nothing to do with Article III standing—at any stage. *See* AAER-MTD-Opp.I.C. Hence why, despite claiming the "weight of authority," PI-Opp.5, Illinois cannot cite a single case that rejected a preliminary injunction because the association used pseudonyms. On preliminary injunctions (and even at summary judgment), all cases to consider this argument have rejected it.[1] The argument is even weaker here, since the Alliance offered to give Illinois its members' real names under a protective order but Illinois refused. Doc.78-1 at 4-5; *see Chamber of Com.*, 691 F. Supp. 3d at 739. Illinois' refusal proves that its pseudonymity argument is not about helping defendants contest Article III standing, but about publicly unmasking members in the hopes of chilling litigation against the government. *See New York v. Dept. of Com.*, 351 F. Supp. 3d 502, 606 n.48 (S.D.N.Y.), *aff'd on standing*, 588 U.S. 752 (2019).

---

[1] *See AAER v. Fearless Fund*, 103 F.4th 765, 772-73 (11th Cir. 2024) (preliminary injunction); *AAER v. Founders First*, 2024 WL 3625684, at *2 (N.D. Tex. July 31) (same); *SFFA v. West Point*, 709 F. Supp. 3d 118, 131-32 (S.D.N.Y. 2024) (same); *PDE v. Olentangy*, 684 F. Supp. 3d 684, 696 n.2 (S.D. Ohio 2023) (same); *SFFA v. Naval Academy*, 707 F. Supp. 3d 486, 501 (D. Md. 2023) (same); *Advocs. for Highway & Auto Safety v. FMCSA*, 41 F.4th 586, 594 (D.C. Cir. 2022) (summary judgment); *Chamber of Com. v. CFPB*, 691 F. Supp. 3d 730, 738-39 (E.D. Tex. 2023) (same).

**2. *Evidence***: The Alliance's evidence of standing is more than sufficient to "'resis[t] a summary judgment motion.'" PI-Opp.6 (quoting *Speech First, Inc. v. Killeen*, 968 F.3d 628, 638 (7th Cir. 2020)). Illinois' attempt to strike the declarations of Officers A and B remains misguided. *See* MTS-Opp. (Doc.78) 2-5. Even without those declarations, the same facts appear in Blum's declaration (Doc.75-1) and verified complaint (Doc.59), which counts as a declaration at this stage, *IDS Life Ins. v. SunAmerica Life Ins.*, 136 F.3d 537, 542 (7th Cir. 1998) (same effect as "affidavits"); *El Bey v. Roop*, 530 F.3d 407, 414 (6th Cir. 2008) ("same weight [as] an affidavit"); *Tres Lotes LLC v. BNSF Ry. Co.,* 61 F. Supp. 3d 1213, 1220 (D.N.M. 2014) ("same effect" as an "affidavit or declaration"). Though Illinois says the president of an association cannot testify about its members' standing, that view has no support in logic or precedent. PI-Opp.4. Associations prove their members' standing through their officers' testimony all the time. *E.g.*, *Marszalek v. Kelly*, 2021 WL 2350913, at \*4 (N.D. Ill. June 9); *Luce v. Kelly*, 2022 WL 204373, at \*4-5 (N.D. Ill. Jan. 24). An association talking about its own members is not hearsay. Even if it were, hearsay is allowed at the preliminary-injunction stage, *SEC v. Cherif*, 933 F.2d 403, 412 n.8 (7th Cir. 1991), and the Alliance's president is speaking reliably based on personal knowledge, *see* Blum-Corr.-Decl. ¶¶6-12; Am.-Verif.-Compl. 23 ¶¶3-5.

Illinois' evidentiary objections regarding its merits-turned-standing arguments fare no better. Illinois questions the Alliance's evidence that its officers and directors will report, and so Members A-B must post, demographic data. PI-Opp.8. But the members testified to that fact based on their first-hand knowledge of their specific officers and directors. A-Corr.-Decl. ¶¶8-9; B-Corr.-Decl. ¶¶8-9; Am.-Verif.-Compl. ¶35. Illinois does not rebut this testimony with any evidence of its own. And both SB 2930 and its supporters agreed that individuals would report and nonprofits would post this data. AAER-PI-Mot.2-4; *see* Ex.A at 1; Ex.B at 1-2; Ex.C at 7; Ex.D at 2. Illinois'

4

"standing argument … ignores the very idea that it advances to justify adopting the [law] in the first place." *Owner-Operator Indep. Drivers Ass'n v. FMCSA*, 656 F.3d 580, 586 (7th Cir. 2011). Illinois also questions the Alliance's evidence that nonprofits will be pressured to discriminate. PI-Opp.6-7. But the Alliance submitted specific evidence on this point, relying on its declarants' experience and knowledge of the nonprofit world and citing specific examples and threats. AAER-PI-Mot.3-5; *see* Blum-Corr.-Decl. ¶¶8-11; A-Corr.-Decl. ¶¶10-11; B-Corr.-Decl. ¶¶10-11. Illinois again fails to rebut that evidence with any evidence of its own. And Illinois again ignores the contrary predictions of SB 2930 and its supporters. *E.g.*, Am.-Verif.-Compl. ¶¶19-21 & *.

**B.    SB 2930 likely violates the Fourteenth Amendment.**

Illinois does not try to satisfy strict scrutiny, PI-Opp.12 n.2, so the only question is whether SB 2930 likely triggers that standard. Contra Illinois, PI-Opp.9-11, "the relevant question is not whether [the] statute *requires*" the use of race. *W.H. Scott Const. Co. v. Jackson*, 199 F.3d 206, 215 (5th Cir. 1999) (emphasis added). States also violate equal protection when they "'induce,'" "'promote,'" or "'encourage'" discrimination by others. *Norwood v. Harrison*, 413 U.S. 455, 465 (1973); *Anderson*, 375 U.S. at 404; *Poindexter v. La. Fin. Assistance Comm'n*, 275 F. Supp. 833, 855 (E.D. La. 1967) (citing *Reitman v. Mulkey*, 387 U.S. 369, 376 (1967)), *aff'd*, 389 U.S. 571 (1968). A law requiring ballots to disclose candidates' race does not *require* anyone to vote based on race, for example, but it's illegal because it "promotes" that behavior. *Anderson*, 375 U.S. at 402-04. Under the Fourteenth Amendment "that which cannot be done by express statutory [command] cannot be done by indirection." *Id.* at 404. That anticircumvention principle applies equally when the discrimination takes the form of using race as a factor to benefit minorities. *Harvard*, 600 U.S. at 230-31.

Illinois does not contest that it would be unconstitutional for it to encourage nonprofits to consider race as a factor when choosing officers or directors, PI-Opp.9; MTD 12, yet that is what

SB 2930 likely does. As explained, SB 2930 requires nonprofits to publish racial data so that, if some demographic is insufficiently represented, the nonprofit will feel pressure from donors, watchdogs, the public, and even the State to correct the balance. *See* PI-Br.2-4; Blum-Corr.-Decl. ¶¶8-11; A-Corr.-Decl. ¶¶11-12; B-Corr.-Decl. ¶¶11-12. And those corrections will either be based on race or impermissibly motivated by race. *Ricci v. DeStefano*, 557 U.S. 557, 579-80 (2009); *MD/DC/DE Broad. Ass'n v. FCC*, 236 F.3d 13, 20-21 (D.C. Cir. 2001). The law's supporters trumpeted that effect. PI-Br.3-4; Am.-Verif.-Compl. ¶¶19-21. Illinois concedes that effect, stressing that the disclosure will let "donors" who are concerned with a nonprofit's "lack" of "diversity" withhold "donations." PI-Opp.15 n.5; *see also* MTD 1. The whole reason why a law would require the public disclosure of race is to "indicat[e]" that race is "important" and to "influence" citizens and nonprofits to act on it. *Anderson*, 375 U.S. at 402. A law that requires entities to report the race of job applicants, for example, violates equal protection when the government threatens to investigate entities whose numbers are too low. *MD/DC/DE*, 236 F.3d at 19. That unconstitutional "pressure" does not become constitutional when it comes in the form of donors threatening a nonprofit's funding or constituents considering a candidate's race. *Anderson*, 375 U.S. at 402.

Discrimination is also SB 2930's intent. Contra Illinois, SB 2930 is not "facially race neutral." PI-Opp.9. By requiring the collection and disclosure of "race," 805 ILCS §105/114.15(a), "[r]ace is the factor upon which the statute operates," *Anderson*, 375 U.S. at 404. That facial non-neutrality is the only discriminatory intent needed to trigger strict scrutiny. *Mitchell v. Washington*, 818 F.3d 436, 445-46 (9th Cir. 2016). But even if SB 2930 were facially race neutral, its purpose was still race-based. As explained, the law's supporters, sponsors, and signatories passed the law to help make boards achieve a certain racial balance. *Jackson*, 199 F.3d at 216; *see* AAER-PI-

Mot.3-4. And SB 2930's text "'underscores the purely racial character and purpose' of the statute.'" *Anderson*, 375 U.S. at 403.

That discriminatory purpose is enough to invalidate SB 2930 on its face. Though Illinois says the law must also have discriminatory effects, PI-Opp.1, that requirement does not apply when the law encourages discrimination. "'Where the conscious purpose of the State action is to foster discrimination, the mere fact of such action requires constitutional sanctions.'" *Poindexter*, 275 F. Supp. at 854-55. In encouragement cases, the unconstitutional action "lies not in the resulting injury but in the placing of the power of the State behind a racial classification that induces racial prejudice." *Anderson*, 375 U.S. at 402. Even if effects were required, the question in this pre-enforcement case would be whether those effects "will" "likely" occur. *State v. Dep't of Com.*, 315 F. Supp. 3d 766, 807 (S.D.N.Y. 2018). They will, as the Alliance explained with evidence and Illinois never rebuts with counterevidence. AAER-PI-Mot.7-8; Am.-Verif.-Compl. ¶¶21, 34; A-Corr.-Decl. ¶11; B-Corr.-Decl. ¶11. Those effects can be reliably predicted from the government's encouragement itself. *See Lutheran Church-Missouri Synod v. FCC*, 141 F.3d 344, 354 (D.C. Cir. 1998) (explaining that even aspirational racial "goals" by the government "can and surely will result in individuals being granted a preference because of their race").

### C.    SB 2930 likely violates the First Amendment.

By refusing to "address" strict scrutiny, PI-Opp. 15 n.5, Illinois necessarily fails that test at this stage. *See Ashcroft v. ACLU*, 542 U.S. 656, 666 (2004). So the only questions are whether SB 2930 compels speech and, if so, whether strict scrutiny applies. Both answers are likely yes. And Illinois likely fails even the *Zauderer* test that it invokes.

**1.** SB 2930 compels speech by forcing nonprofits to solicit, publish, and maintain information on their websites. *See* AAER-PI-Mot.9-12. As explained, Illinois' speculative argument

that regulated charities can post nothing because their directors will decline to disclose anything is wrong both legally and factually. *See supra* I.A; AAER-MTD-Opp.I.B.

**2.** SB 2930's compulsion triggers strict scrutiny, not the test "set forth in *Zauderer*." PI-Opp.14. *Zauderer* applies only to "'commercial'" speech. *NIFLA v. Treto*, 2025 WL 1017677, at *9 (N.D. Ill. Apr. 4); *Hurley v. Irish Am. GLB of Boston*, 515 U.S. 557, 573 (1995). Commercial speech "'does no more than propose a commercial transaction.'" *Harris v. Quinn*, 573 U.S. 616, 648 (2014). But SB 2930 governs "charitable organizations" that are, by definition, not seeking profit. 805 ILCS §105/114.15(a); *see* AAER-PI-Mot.2-3. SB 2930 requires them to post this data on their websites at all times—with no connection to a commercial transaction or the nature of the nonprofit's goods or services. 805 ILCS §105/114.15(a); *see NIFLA v. Becerra*, 585 U.S. 755, 768-69 (2018); *Recht v. Morrisey*, 32 F.4th 398, 416-17 (4th Cir. 2022). And while nonprofits solicit donations, PI-Opp.14 n.4, SB 2930 requires no connection to solicitations either, *NIFLA*, 585 U.S. at 768-69. Even if it did, "the Supreme Court [has] unambiguously held that charitable speech, including charitable solicitations, is not commercial speech." *Nat'l Coal. of Prayer, Inc. v. Carter*, 455 F.3d 783, 792 (7th Cir. 2006) (Williams, J., concurring) (collecting cases); *accord Gresham v. Peterson*, 225 F.3d 899, 904 (7th Cir. 2000) (same). Illinois' inability to sensibly distinguish these precedents proves the point. *See* PI-Opp. 14 n.4.

Even if SB 2930 compelled commercial speech, *Zauderer* would not apply because this speech is not "factual" and is highly "controversial." AAER-PI-Mot.9-12. Per courts, these categories are themselves "controversial." *E.g.*, *Janus v. AFSCME*, 585 U.S. 878, 913-14 (2018) ("sexual orientation" and "gender identity"); *Harvard*, 600 U.S. at 216-17 (race and ethnicity); *AFBR v. SEC*, 125 F.4th 159, 165, 181 (5th Cir. 2024) (en banc) ("gender," "race," and "LGBTQ+" status). The Census agrees on race. *See Measuring Race and Ethnicity*, U.S. Census Br. (archived

May 15, 2025), perma.cc/PQT2-76TZ. Also controversial are the broader messages that Illinois wants nonprofits to endorse—like the notion that the organization cares about its directors' immutable demographics, or that a nonprofit's board should approximate some ideal demographic mix. For nonprofits like Members A and B, SB 2930's viewpoints are "fundamentally at odds" with their own. *Nat'l Ass'n of Wheat Growers v. Bonta*, 85 F.4th 1263, 1277-78 (9th Cir. 2023); *PG&E Co. v. Pub. Util. Comm'n of Cal.*, 475 U.S. 1, 16 n.12 (1986). Illinois seems to appreciate this problem when it notes that concerned nonprofits might need to add "additional information or context" explaining this data on their websites. PI-Opp.15 n.5.[2]

**3.** SB 2930 also violates *Zauderer*. Contra Illinois, *Zauderer* isn't rational basis. PI-Opp.12. "[U]nder *Zauderer*," the State "has the burden to prove" that its disclosure law is "neither unjustified nor unduly burdensome." *NIFLA*, 585 U.S. at 776. Illinois proves neither. It has no interest in "disclosure," PI-Opp. 15 & n.5, since race and other demographics have no legitimate bearing on being an officer or director. *Anderson*, 375 U.S. at 403. And forcing nonprofits to publish this information on their own websites is unduly burdensome. If Illinois wants to work like "the United States Census," PI-Opp.13, then *it* should survey officers and directors and post their demographics on *its* website. *NIFLA*, 585 U.S. at 775.

## II.   The other preliminary-injunction factors favor the Alliance.

### A.   Irreparable Harm

Without a preliminary injunction, the Alliance will suffer intangible constitutional harms, irreversible disclosure harms, and unrecoverable business harms. AAER-PI-Mot.12-13. Illinois

---

[2] The Alliance did not "waiv[e]" any objection to SB 2930's non-racial categories. PI-Opp.13 n.3. It presented specific evidence on them. B-Corr.-Decl. ¶¶6-8; A-Corr.-Decl. ¶¶6-8; Am.-Verif.-Compl. ¶¶25-26, 29-30, 54. And it made specific arguments about them, including that the non-racial "classifications—like gender, gender identity, and sexual orientation"—are "highly controversial," "not factual," and "opinion-based." PI-Br.11, 1, 5, 9. The Alliance came nowhere close to waiver. *Santana-Diaz v. Metro. Life Ins.*, 816 F.3d 172, 178 n.7 (1st Cir. 2016).

responds to the constitutional harms by repeating its incorrect merits arguments, and it largely ignores the other harms. And all these harms are imminent because they will occur on and shortly before the members' publication deadline in December 2025. AAER-PI-Mot.5, 13.

**1. *Constitutional Harms***: Illinois does not deny that likely violations of the First and Fourteenth Amendments are irreparable. AAER-PI-Mot.12-13. Though it repeats its arguments for why SB 2930 does not compel speech or encourage discrimination, PI-Opp.16-18, those arguments remain likely wrong, *supra* I.B-C, and do not remove the threat of irreparable harm, *Hatchett v. Barland*, 816 F. Supp. 2d 583, 607-08 (E.D. Wis. 2011).

**2. *Disclosure Harms***: Illinois largely ignores the irreparable harm of disclosure. It never denies that divulging confidential information is "irreparable," since "secrecy" is lost "forever." *Huawei Techs. Co. v. Motorola, Inc.*, 2011 WL 612722, at *10 (N.D. Ill. Feb. 22) (Coleman, J.); *PepsiCo, Inc. v. Redmond*, 1996 WL 3965, at *30 (N.D. Ill. Jan. 2); *see* AAER-PI-Mot.13-14. Though Illinois speculates that no publication might occur because all officers and directors might decline to produce any demographic information, PI-Opp.17-18, it misreads the statute, never refutes the Alliance's member-specific evidence, and ignores the contrary predictions of SB 2930 and its supporters. AAER-PI-Mot.3-4; AAER-MTD-Opp.4-5; *supra* I.A. Only the State's argument—which would require more than a dozen directors and officers to simultaneously withhold all demographic data—presents a "tenuous chain of hypothetical events." PI-Opp.6, 16-18.

**3. *Business Harms***: Illinois does not deny that the Alliance's members will incur "compliance costs." PI-Opp.18 n.6. It concedes that, under the law, nonprofits "need" to survey their officers and directors. PI-Opp.17. And these nonprofits must spend time and money publishing and maintaining the data on their websites. AAER-PI-Mot.13-14. Even if these nonprofits published no data or partial data, they would still suffer reputational and monetary harms when donors and

others assume they are *not* diverse. AAER-PI-Mot.13-14. Illinois' only response—in a lone conclusory footnote—is the Seventh Circuit's decision in *AHA v. Harris*. PI-Opp.18 n.6. But there the costs were "already" incurred, were "unduly speculative," or could be "remedied" later. 625 F.2d 1328, 1331 (7th Cir. 1980). Here the costs will not occur before the hearing, are uncontested and will continually recur, and concededly cannot be recouped due to Illinois' sovereign immunity. AAER-PI-Mot.13-14; *see Louisiana v. Biden*, 55 F.4th 1017, 1034 n.51 (5th Cir. 2022) (distinguishing *AHA*). Courts in this circuit recognize such costs as irreparable, regardless of their extent or peculiarity. *E.g.*, *Ill. Bankers Ass'n v. Raoul*, 760 F. Supp. 3d 636, 664 (N.D. Ill. 2024); *Staffing Servs. Ass'n of Ill. v. Flanagan*, 720 F. Supp. 3d 627, 641 (N.D. Ill. 2024) (collecting in-circuit cases).

**B.    Balance of harms and public interest**

On the other side of the equitable ledger, Illinois has nothing. It doesn't deny that the equities "always" favor enjoining laws that are likely unconstitutional. *Chicago v. Sessions*, 321 F. Supp. 3d 855, 879 (N.D. Ill. 2018), *aff'd*, 961 F.3d 882 (7th Cir. 2020); *see* AAER-PI-Mot.14. And Illinois declines to even argue that SB 2930 serves a compelling state interest. *See* PI-Opp.12 n.2, 15 n.5. Though Illinois says an injunction would decrease "transparency," PI-Opp.18, that interest is negligible. Neither Illinois nor any other State has *ever* required the public disclosure of this information, *AFP v. Bonta*, 594 U.S. 595, 614 (2021), and the public will not be harmed by waiting a little longer while this case is litigated, AAER-PI-Mot.14. If the Alliance is likely right on the merits, then Illinois' transparency interest is invalid. The public has no "legitimate" interest in learning demographic data that has "no relevance" to someone's "qualifications" for being an officer or director. *Anderson*, 375 U.S. at 403.

11

### III.    Illinois' objections to the injunction's scope fail.

Illinois makes three technical objections to the scope of relief. It says an injunction should not cover its secretary of state. PI-Opp.19. It says an injunction would be "premature" before the State creates a standardized list of demographic categories. PI-Opp.20. And it says, "[w]ith regard to the First Amendment," an injunction should be limited to the Alliance's members but can't be due to their "anonymity." PI-Opp.19-20. These cursory arguments fail.

**1.** Illinois' attempt to exempt its secretary of state from the preliminary injunction is wrong and irrelevant. Wrong because the secretary enforces the statute and is thus a proper defendant under *Ex parte Young*. AAER-MTD-Opp.II. And irrelevant because an injunction for the United States would cover the whole "State of Illinois," including its secretary. U.S.-Am.-Compl. (Doc.74) ¶6, prayer.

**2.** A preliminary injunction is needed now. Though the State "has not yet issued its list of demographic categories," PI-Opp.20, Illinois does not claim that the statute is *inoperative* until that list issues. The statute "t[ook] effect January 1, 2025." Ill. Pub. Act 103-0635, §99. Though it contemplates a "standardized list," it doesn't make nonprofits' disclosure obligation contingent on that list; that obligation is triggered by the "filing" of the nonprofit's "annual AG990-IL." 805 ILCS §105/114.15(a)-(b). If a nonprofit files before the list is done, then it must report based on ordinary understandings of these categories—or, at least for race, Illinois' default definitions, *see* 20 ILCS §50/5 ("White," "Black," "American Indian," "Asian," "Hispanic," "Middle Eastern," etc.). As the Alliance explained and Illinois never denies, any realistic definition of these terms still pressures nonprofits to discriminate and compels their speech on controversial topics. AAER-PI-Mot.3, 5-6. Member B, for example, objects to the very existence of "gender identity," espe-cially as a category distinct from "gender." 805 ILCS §105/114.15(a); *see* B-Corr.-Decl. ¶8; Am.-Verif.-Compl. ¶29.

Even if the statute were inoperative without the standardized list, that fact would not make a preliminary injunction less appropriate. Illinois never suggests that the list won't be finalized by July 1 (when many nonprofits end their fiscal year and thus file their AG990-IL, *see* U.S.-PI-Mot. (Doc.50) 3) or by November (when the Alliance's members will file their AG990-IL). So nonprofits still need a preliminary injunction to prevent imminent, irreparable harms before this case could reach final judgment. *See BP Chems. Ltd. v. Formosa Chem. & Fibre Corp.*, 229 F.3d 254, 263-64 (3d Cir. 2000). And if the statute were truly not in force now, then Illinois has even less reason to object to a preliminary injunction freezing the status quo while the parties litigate. *Air Evac EMS v. Dodrill*, 548 F. Supp. 3d 580, 595 (S.D.W. Va. 2021).

**3.** Though Illinois objects to a "universal" injunction, it does so only "[w]ith regard to the [Alliance's] First Amendment claim." PI-Opp.19-20, 15-16. Illinois does not deny that, if the law likely violates equal protection, then its enforcement should be frozen statewide. A party-specific injunction for the United States would necessarily cover all nonprofits. *Cf. Spangler v. United States*, 415 F.3d 1242, 1244-45 (9th Cir. 1969). And the Alliance's equal-protection claim makes the statute facially unconstitutional, *City of Richmond v. J.A. Croson Co.*, 488 U.S. 469, 483, 511 (1989), meaning it should not be enforced against anyone, *e.g.*, *Towbin v. Antonacci*, 885 F. Supp. 2d 1274, 1281, 1296 (S.D. Fla. 2012). That freeze should disempower the whole law, since Illinois does not argue that its coverage of "race" and "ethnicity" are severable. *See Garcia v. L.A.*, 11 F.4th 1113, 1124 (9th Cir. 2021). Under Illinois law, "the entire statute" must fall "[i]f the legislature would not have passed [it] with the invalid portion eliminated." *People v. Warren*, 173 Ill. 2d 348, 372 (1996). And here, "race" and "ethnicity" are listed first, 805 ILCS §105/114.15(a), and were the legislature's primary focus, AAER-PI-Mot.7-9. They cannot be textually excised

given the statute's broad coverage of "demographic information," which explains why the law contains no severability clause. 805 ILCS §105/114.15.

Even if the Alliance were likely to prevail only under the First Amendment, this Court could preliminarily enjoin the law's enforcement in full. Though the statute is certainly unconstitutional "as applied" to the Alliance's members, PI-Opp.16, it is likely unconstitutional on its face too. *Every* application compels publication, and thus speech. *Bonta*, 594 U.S. at 615. (A nonprofit that voluntarily publishes this data—if any exist, *but cf.* PI-Opp.15 n.5—would not count for purposes of judging the statute's facial constitutionality, *L.A. v. Patel*, 576 U.S. 409, 419 (2015).) And "every" time the law compels that speech, it flunks heightened scrutiny. *Bonta*, 594 U.S. at 618; *see supra* I.B; AAER-PI-Mot.10-12. The law is at least unconstitutional in a "'substantial number of its applications'"—especially for race, ethnicity, gender, and gender identity—which is sufficient for facial invalidity under overbreadth. *Bonta*, 594 U.S. at 615, 618.

At a minimum, this Court should enter a preliminary injunction for the Alliance. Under associational standing, injunctive relief runs to the association, which then "'inure[s] to the benefit of [its] members.'" *UAW v. Brock*, 477 U.S. 274, 288 (1986). Illinois says it would be "impossible" to know who those members are. PI-Opp.16, 20. That argument is contrived, since Illinois rejected the Alliance's offer to tell it who Members A-B are. Doc.78-1. The Alliance remains willing to confidentially tell Illinois and this Court, either under a protective order or *in camera*. But even that step isn't necessary: Illinois would not violate a preliminary injunction for the Alliance unless it tried to enforce the statute against a nonprofit, that nonprofit revealed it was a member, and Illinois continued enforcing. *Chamber*, 691 F. Supp. 3d at 745. This Court could spell that out in the injunction. *E.g.*, *Franciscan All. v. Becerra*, 2021 WL 6774686, at *1 (N.D. Tex. Oct. 1).

## CONCLUSION

For all these reasons, this Court should preliminarily enjoin Defendants **by July 1, 2025**.

Dated: May 15, 2025                    Respectfully submitted,

                                       /s/ Cameron T. Norris
                                       Thomas R. McCarthy*
                                       Cameron T. Norris*
                                       Matt Pociask**
                                       R. Gabriel Anderson*
                                       Marie E. Sayer***
                                       CONSOVOY MCCARTHY PLLC
                                       1600 Wilson Blvd., Ste. 700
                                       Arlington, VA 22209
                                       (703) 243-9423
                                       tom@consovoymccarthy.com
                                       cam@consovoymccarthy.com
                                       matt@consovoymccarthy.com
                                       gabe@consovoymccarthy.com
                                       mari@consovoymccarthy.com

                                       *Admitted *pro hac vice*
                                       **Admitted to the Northern District of Illinois
                                       ****pro hac vice* forthcoming

                                       *Counsel for Plaintiff*

## CERTIFICATE OF SERVICE

I hereby certify on May 15, 2025, a true and correct copy of this document and all related

attachments were served electronically by the Court's CM/ECF system to all counsel of record.

                                       /s/ Cameron T. Norris
                                       Counsel for Plaintiff

15

Marszalek v. Kelly, Not Reported in Fed. Supp. (2021)

2021 WL 2350913

2021 WL 2350913
Only the Westlaw citation is currently available.
United States District Court, N.D. Illinois, Eastern Division.

John M. MARSZALEK, et al., Plaintiffs,

v.

Brendan F. KELLY, in his official capacity as Director
of the Illinois State Police; and Jarod Ingebrigtsen,
in his official capacity as Bureau Chief of the Illinois
State Police Firearms Services Bureau, Defendants.

Case No. 20-cv-04270
|
Signed 06/09/2021

**Attorneys and Law Firms**

Gregory Abbott Bedell, Chicago, IL, Jacob Huebert, Martha
Astor, Pro Hac Vice, Goldwater Institute, Phoenix, AZ, David
G. Sigale, Law Firm of David G. Sigale, P.C., Wheaton,
IL, for Plaintiffs Illinois State Rifle Association, Second
Amendment Foundation, Inc.

David G. Sigale, Law Firm of David G. Sigale, P.C., Wheaton,
IL, for Plaintiff John M. Marszalek.

Mary Alice Johnston, Illinois Attorney General, Chicago, IL,
for Defendant Brendan F. Kelly.

**MEMORANDUM OPINION AND ORDER**

MARY M. ROWLAND, United States District Judge

**\*1** The individual and organizational plaintiffs bring
this action against officials of the Illinois State Police
(ISP) alleging violations of their Second and Fourteenth
Amendment rights. The claims arise from the ISP's delays in
granting to applicants Firearm Owners Identification (FOID)
cards necessary to legally possess a firearm in Illinois. The
plaintiffs John Marszalek, the Illinois State Rifle Association
(ISRA), and the Second Amendment Foundation (SAF) have
moved for a preliminary injunction against the defendants
directing them to immediately issue FOID cards to Marszalek
and affected members of ISRA and the SAF. For the reasons
state below, the plaintiffs' Motion [47] is denied.

**STANDARD**

"A preliminary injunction is an extraordinary remedy."
*Whitaker v. Kenosha Unified Sch. Dist. No. 1 Bd. of Educ.,*
858 F.3d 1034, 1044 (7th Cir. 2017). *See also Orr v. Shicker,*
953 F.3d 490, 501 (7th Cir. 2020) ("a preliminary injunction is
an exercise of a very far-reaching power, never to be indulged
[ ] except in a case clearly demanding it.") (cleaned up).

The party seeking a preliminary injunction must make an
initial threshold showing that: (1) it has some likelihood of
succeeding on the merits; (2) it will suffer irreparable harm
if the injunction is not granted; and (3) there is no adequate
remedy at law. *Girl Scouts of Manitou Council, Inc. v. Girl
Scouts of the U.S.A., Inc.,* 549 F.3d 1079 (7th Cir. 2008). *See
also Illinois Republican Party v. Pritzker,* 973 F.3d 760, 763
(7th Cir. 2020). Demonstrating a likelihood of success is "a
significant burden," though "at such a preliminary stage, the
applicant need not show that it definitely will win the case."
*Id.* (noting that the "better than negligible" standard has been
retired). "A 'strong' showing thus does not mean proof by a
preponderance ... [b]ut it normally includes a demonstration
of how the applicant proposes to prove the key elements of its
case." *Id.* If the moving party fails to demonstrate "any one
of the[ ] three threshold requirements, [the court] must deny
the injunction." *Girl Scouts of Manitou,* 549 F.3d at 1086.

If the moving party makes the initial showing, the court
then balances the irreparable harm that the moving party
would endure without a preliminary injunction against any
irreparable harm the nonmoving party would suffer if the
court were to grant the requested relief. *Id.* "This Circuit
employs a sliding scale approach for this balancing: if a
plaintiff is more likely to win, the balance of harms can weigh
less heavily in its favor, but the less likely a plaintiff is to win
the more that balance would need to weigh in its favor." *GEFT
Outdoors, LLC v. City of Westfield,* 922 F.3d 357, 364 (7th Cir.
2019), cert. denied sub nom. 140 S. Ct. 268, 205 L. Ed. 2d 137
(2019) (internal citations and quotations omitted). Finally, the
court considers "whether the preliminary injunction is in the
public interest, which entails taking into account any effects
on non-parties." *Courthouse News Serv. v. Brown,* 908 F.3d
1063, 1068 (7th Cir. 2018). "Ultimately, the moving party
bears the burden of showing that a preliminary injunction is
warranted." *Id.*

Case: 1:25-cv-00669 Document #: 79 Filed: 05/15/25 Page 19 of 90 PageID #:587

Marszalek v. Kelly, Not Reported in Fed. Supp. (2021)
2021 WL 2350913

## BACKGROUND

**\*2** The facts herein are taken from the plaintiffs' Second Amended Complaint (Dkt. 40), their Motion for Preliminary Injunction (Dkt. 48), their Reply (Dkt. 73), and the defendants' Response (Dkt. 67). In support of the Motion, the plaintiffs submitted declarations from John Marszalek (Dkt. 48-1); Richard Pearson, the Executive Director of ISRA (Dkt. 48-2, Dkt. 73-1); Julianne Versnel, the Director of Operations of the SAF (Dkt. 48-3); Alexey Alekseev (Dkt. 73-2); Andrew Schamaun (Dkt.73-2); Benjamin Kirkland (Dkt. 73-2); and Pamela DiCarlantonio (Dkt. 73-2), along with a supporting exhibit. The defendants submitted a declaration from Gregory Hacker, the acting commander of the ISP's Firearms Services Bureau (Dkt. 67-1), and a supporting exhibit. [1]

[1]    "Affidavits are ordinarily inadmissible at trials but they are fully admissible in summary proceedings, including preliminary-injunction proceedings." *Ty, Inc.*, 132 F.3d at 1171.

Marszalek is a resident of Carol Stream, Illinois. Dkt. 40, Am. Compl. ¶ 12. ISRA is a non-profit organization incorporated in Illinois. *Id.* at ¶ 15. ISRA has 26,000 members in the state, and its purposes include "securing the constitutional right to privately own and possess firearms within Illinois, through education, outreach, and litigation." *Id.* The SAF is a non-profit organization incorporated in Washington with over 650,000 members and supporters. *Id.* at ¶ 19. Its purposes include "education, research, publishing, and legal action focusing on the constitutional right privately to own and possess firearms." *Id.* Kelly and Ingebrigtsen are officials with the ISP responsible for managing programs related to firearms. *Id.* at ¶¶ 24-25.

Illinois law requires that individuals obtain a FOID card before they may legally possess a firearm or ammunition. *Id.* at ¶¶ 27-28. The ISP is responsible for reviewing FOID applications and issuing FOID cards. *Id.* Illinois law requires that the ISP approve or deny applications within 30 days of receiving them. *Id.* at ¶ 29. The ISP is required to grant a card unless the applicant is disqualified by a factor listed in the relevant statute. *Id.* at ¶ 19.

Despite the statutory requirement, the ISP often takes longer than 30 days to review applications and issue FOID cards. *Id.* at ¶ 19. As of October 2020, it took 116 days on average to process an application. Dkt. 48, Mot. at 7. The ISP says

that applications can be delayed for several reasons, such as gathering information from out-of-state law enforcement agencies. Dkt. 67, Resp. at 11. In 2020, the ISP processed an average of 15,891 applications a month. *Id.* The backlog has been exacerbated by the Covid-19 pandemic and summer protests, with the ISP seeing a surge in applications at the same time that remote work hampered the training of new analysts. *Id.* at 11-12.

On May 4, 2020, Marszalek applied for an FOID card. The application was approved on December 3, 2020 and mailed on January 2, 2021, after the instant Motion was filed. Dkt. 67-1, Hacker Decl. ¶ 3. ISRA and SAF, however, state that other members of their organizations for cards and have been waiting for more than 30 days. Pearson identifies a 55-year-old man and a 76-year-old who are both members of ISRA who have been waiting since June 2020. Dkt. 48-2, Pearson Decl. ¶¶ 7-8. In a later declaration, Pearson affirms that the 55-year-old is still waiting for his FOID card. Dkt. 73-1, Pearson Decl. ¶ 3. Versnel identifies a 55-year-old man as an SAF member who has also been waiting since last June. Dkt. 48-3, Versnel Decl. ¶ 6. In their Reply, the plaintiffs provide declarations from four other ISRA members stating that they qualify for FOID cards and have had applications pending for more than 30 days. *See* Dkt. 73-2. Finally, ISRA operates a firing range in Bonfield, Illinois. Dkt. 40, Am. Compl. ¶ 16. In order to gain access to the range, ISRA members must purchase a range membership for $600 from the organization and have a valid FOID card. *Id.* at ¶ 55.

**\*3** On July 20, 2020, the present lawsuit was filed. Subsequently, however, many of the individual plaintiffs' claims were rendered moot because they received their FOID cards. On December 15, 2020, Marszalek and the organizational plaintiffs filed this Motion for Preliminary Injunction. They seek a preliminary injunction directing the defendants to immediately issue FOID cards to Marszalek and all affected members of ISRA and the SAF. [2]

[2]    It is unclear how many FOID cards the plaintiffs are requesting be issued. At a hearing, the plaintiffs' counsel did not know what percentage of ISRA and SAF members currently have FOID cards, and the Motion does not identify how many affected members there are.

## ANALYSIS

Marszalek v. Kelly, Not Reported in Fed. Supp. (2021)

2021 WL 2350913

As stated, in order to obtain a preliminary injunction, the plaintiffs must establish that they have a likelihood of success on the merits; will suffer irreparable harm if an injunction is not granted; and lack an adequate remedy at law. *Girl Scouts of Manitou Council, Inc. v. Girl Scouts of the U.S.A.*, Inc., 549 F.3d 1079 (7th Cir. 2008). If that hurdle is cleared, the court must balance the harms that would be imposed by granting or denying the injunction. *Id.* In this case, the plaintiffs' Motion fails at the first step. The defendants present two different arguments as to why the plaintiffs are unlikely to succeed on the merits—first, that the plaintiffs lack standing and second, that their substantive claims will fail.

### A. The Organizational Plaintiffs Have Standing

The defendants first argue that the plaintiffs are unlikely to succeed on the merits because their claims are moot or they lack standing. According to an uncontested declaration supplied by the defendants, Marszalek received his FOID card subsequent to the filing of the present motion. Dkt. 67-1, Hacker Decl. ¶ 3. As a result, his claim for injunctive relief is now moot. *See Brown v. Bartholomew Consol.*, 442 F.3d 588, 596 (7th Cir. 2006). Without Marszalek, only ISRA and the SAF remain to litigate this case.

The defendants assert that ISRA and SAF lack standing to bring this action. In order to establish Article III standing a plaintiff must show that she has suffered an "injury in fact;" that there is a causal connection between the injury and the defendant's actions; and that the injury is likely to be redressed by a favorable decision. *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560–61 (1992). A mere "abstract interest" in a particular topic is not enough to grant standing. *Muro v. Target Corp.*, 580 F.3d 485, 491 (7th Cir. 2009).

Along with their own standing, organizations may also assert standing on behalf of their members. An organization may exercise such associational standing when: "(1) its members would otherwise have standing to sue in their own right, (2) the interests it seeks to protect are germane to the organization's purpose, and (3) neither the claims asserted, nor the relief requested, requires the participation of individual members in the lawsuit." *Disability Rts. Wisconsin, Inc. v. Walworth Cty. Bd. of Supervisors*, 522 F.3d 796, 801 (7th Cir. 2008). The plaintiffs insist that ISRA has standing in itself and that ISRA and SAF have standing on behalf of their members.

*The Organizational Plaintiffs Lack Standing in Themselves*

In support of ISRA's standing, the plaintiffs rely on the shooting rang that ISRA operates in Bonfield, Illinois. It is available to ISRA members who pay an additional $600 annual fee. To use the range, however, the member must have an FOID card. So, the plaintiffs assert, ISRA is harmed by the long delays in FOID card processing because it denies them revenue they otherwise would receive. Importantly, however, they do not claim that any delayed member would actually purchase a range membership.

**\*4** In order to show an injury, a plaintiff must assert "some nonnegligible, nontheoretical, probability of harm." *MainStreet Org. of Realtors v. Calumet City*, Ill., 505 F.3d 742, 744 (7th Cir. 2007). A harm that is probabilistic, for example a proposed ordinance that may increase or decrease property values, can provide standing. *See id.* But the harm claimed here is not an identified harm that has some percentage of likelihood to arise from a particular action. Instead, it is speculation that more ISRA members with FOID cards may translate into more range revenue. The mere theoretical possibility that someone would purchase a range pass is not enough to confer standing. This is reinforced by the fact that, as the defendants point out, the shooting range is located in a town of about four hundred people around fifty miles from Cook County.

The plaintiffs correctly state that loss of revenue can be a cognizable injury. *See Craig v. Boren*, 429 U.S. 190 (1976) (holding that a beer vendor prohibited from selling to young men had standing to sue for discrimination). But in *Craig*, there was no question as to whether the plaintiff had potential customers. Here, the plaintiffs have conspicuously failed to plead that any of the appealing ISRA members would shell out the $600 in additional member dues in order to access the ISRA shooting range. As a result, the organization does not have standing on its own behalf.

*ISRA and the SAF Have Associational Standing*

In order to establish associational standing, the organization must have members who "would otherwise have standing to sue in their own right." *Disability Rts. Wisconsin*, 522 F.3d at 801. Only one qualifying member is needed to satisfy this requirement, and he need not be named. *Id.* at 802. Still, the plaintiff must make "specific allegations establishing that at least one identified member had suffered or would suffer harm." *Summers v. Earth Island Inst.*, 555 U.S. 488, 498 (2009). In *Summers*, the Supreme Court held that the organizational plaintiff lacked standing to challenge an agency regulation affecting logging. In support of its

Case: 1:25-cv-00669 Document #: 79 Filed: 05/15/25 Page 21 of 90 PageID #:589
Marszalek v. Kelly, Not Reported in Fed. Supp. (2021)

2021 WL 2350913

standing, the organization had submitted a declaration by a member who hoped to one day visit a specific national forest, who said that his enjoyment of the trip would be marred by planned logging there. *Id.* at 495-96. The Court found this individual did not have an injury in fact because the "vague desire" to visit a place was not sufficiently imminent. *Id.* at 496. Because the individual had not suffered an injury in fact, the organization to which he belonged did not have standing to sue on his behalf.

In the present case, by contrast, ISRA and the SAF have alleged that at least one member of both organizations is currently awaiting an FOID card after having applied over 30 days ago. There is no question of imminence—the applicant is currently suffering the harm about which the organizations complain. He clearly would have standing to sue on his own, and so he can bestow associational standing on ISRA and the SAF.

The defendants argue that the Court should not accept "the organizations' self-descriptions of their membership." *Id.* at 499. Instead, the Court has "an independent obligation to assure that standing exists." *Id.* But in those passages, the *Summers* majority was objecting to the dissent accepting as true allegations of harm made in the complaint but unsupported by declarations. *See id.* at 506-07 (Breyer, J., dissenting). In this case, the organizations' descriptions of their membership are supported by declarations from their officers. *See* Dkt. 48-2, Pearson Decl. ¶¶ 7-8; Dkt. 48-3, Versnel Decl. ¶ 6. The Court has no reason to doubt the truthfulness of these declarations. The defendants insist that the plaintiffs must "identify members who have suffered the requisite harm." *Id.* at 499. But it is not clear how a more specific identification could be accomplished at this stage without explicitly naming the affected member, a step that associational standing does not require. *See Disability Rts. Wisconsin, Inc. v. Walworth Cty. Bd. of Supervisors*, 522 F.3d 796, 803 (7th Cir. 2008).

 **\*5** The defendants also argue that the organizational plaintiffs lack standing because it is possible that the underlying members' claims have been mooted, as occurred with the named plaintiffs. Dkt. 67, Def. Resp. at 3. In their Reply, ISRA reaffirmed that one of the previously mentioned members was still waiting for an FOID card. The plaintiffs also supplied the declarations of several other ISRA members whose FOID applications remain in limbo, suggesting that ISRA has a number of members through which it can claim standing. None of the declarations in the

Reply mentioned the SAF, but the plaintiffs have not informed the Court of any change since the original declarations were filed. Of course, "mootness doctrine requires re-evaluating the standing requirements throughout litigation." *Milwaukee Police Ass'n v. Bd. of Fire & Police Comm'rs of City of Milwaukee*, 708 F.3d 921, 929 (7th Cir. 2013). It is possible that all the affected members of the organizational plaintiffs will obtain FOID cards during this litigation, denying ISRA and SAF standing. But the Court will not make that conclusion preemptively.

ISRA and the SAF also satisfy the final two elements of associational standing. Both organizations describe their purpose as furthering the "the constitutional right to privately own and possess firearms." Dkt. 40, Am. Compl. ¶¶ 15; 19. Ensuring their members are able to legally exercise that right in a timely fashion is clearly an interest "germane to the organization's purpose." *Disability Rts. Wisconsin, Inc. v. Walworth Cty. Bd. of Supervisors*, 522 F.3d 796, 801 (7th Cir. 2008).

Furthermore, it is clear that the participation of individual members is not required in this lawsuit. Supreme Court precedent holds that individual participation "is not normally necessary when an association seeks prospective or injunctive relief for its members." *United Food & Com. Workers Union Loc. 751 v. Brown Grp., Inc.*, 517 U.S. 544, 546 (1996). In cases where government practice, as opposed to policy, is at issue, the participation of some individual members may be necessary to establish the governmental practice. *See Retired Chicago Police Ass'n v. City of Chicago*, 7 F.3d 584, 601 (7th Cir. 1993). But the Supreme Court has not limited "representational standing to cases in which it would not be necessary to take any evidence from individual members of an association." *Id.* at 602. Instead, the requirement limits standing when "it is necessary to establish 'individualized proof' for litigants not before the court," as when bringing a claim for damages. *Id.*

In this case, the organizational plaintiffs do not seek damages on behalf of the plaintiffs. And while individual participation will be required to establish the plaintiff's allegations of the ISP's practice, it will not be necessary to establish individualized facts for every affected member of the organizational plaintiffs. The defendants cite to cases that find a presumption against granting third-party standing, but third-party standing is a legally distinct concept from associational standing, where the organization represents the interests of its members. *Compare Uptown Tent City Organizers v. City*

Case: 1:25-cv-00669 Document #: 79 Filed: 05/15/25 Page 22 of 90 PageID #:590
Marszalek v. Kelly, Not Reported in Fed. Supp. (2021)
2021 WL 2350913

*of Chicago Dep't of Admin. Hearings*, No. 17 C 4518, 2018 WL 2709431, at \*7 (N.D. Ill. June 5, 2018) (analyzing a plaintiff's third-party standing argument); *with id.* at \*\*6-7 (analyzing a plaintiff's legally distinct associational standing argument). Accordingly, ISRA and the SAF satisfy all the requirements for associational standing. In order to determine their likelihood of success, we must turn to the underlying merits of the case.

### B. The Plaintiffs Have Not Demonstrated a Likelihood of Success on the Merits of Their Second Amendment Claim

ISRA and the SAF allege violations of their members Second and Fourteenth Amendment rights. In determining whether to grant a preliminary injunction, the Court must determine whether these claims are likely to succeed on the merits. *Girl Scouts of Manitou Council, Inc. v. Girl Scouts of the U.S.A., Inc.*, 549 F.3d 1079 (7th Cir. 2008).

**\*6** Following the Supreme Court's recognition of an individual right to possess firearms in *District of Columbia v. Heller*, 554 U.S. 570 (2008), the Seventh Circuit articulated a two-step process to evaluate Second Amendment claims. *Ezell v. City of Chicago*, 651 F.3d 684, 701 (7th Cir. 2011). The first, "threshold inquiry" asks whether "the restricted activity [is] protected by the Second Amendment in the first place." *Id.* If it is, the Court must then consider "the strength of the government's justification for restricting or regulating the exercise of Second Amendment rights." *Id.* at 703. To establish a likelihood of success, the plaintiffs must show the ISP's delays in granting FOID cards implicate and unduly burden the constitutional right.

*The ISP's FOID Process Implicates the Second Amendment*
Determining the scope of the Second Amendment "requires a textual and historical inquiry" into its meaning at the time it became applicable against the states through the ratification of the Fourteenth Amendment. *Ezell*, 651 F.3d at 701-02. The Supreme Court has recognized that laws prohibiting certain limited classes of people from possessing firearms, such as felons and the mentally ill, likely do not implicate the Second Amendment. *Heller*, 554 U.S. at 626. The Fifth Circuit conducted a thorough review of the historical record and identified deep historical precedents for "a variety of gun safety regulations," including those that kept "track of who in the community had guns" and that "targeted particular groups for public safety reasons" in *Nat'l Rifle Ass'n of Am., Inc. v. Bureau of Alcohol, Tobacco, Firearms, & Explosives*, 700

F.3d 185, 200 (5th Cir. 2012). The defendants provide further citations to historical state laws requiring background checks and permits before obtaining a permit. *See* 1911 N.Y. Laws 195, at 442 § 1984; 1918 Mont. Laws 2, at 6 § 3; *see also* David B. Kopel, *Background Checks for Firearms Sales and Loans: Law, History, and Policy*, 53 Harv. J. on Legis. 303, 343 (2016) (describing these and other early-20[th] century regulations).

The gathered historical evidence is clear that prohibiting some classes of people from obtaining firearms does not implicate the Second Amendment. The evidence further suggests that some form of permit requirement is consistent with a historically-informed understanding of the Second Amendment. But the plaintiffs here are not challenging the permitting process set up by the Illinois legislature. Instead, they claim the ISP's processing of applications consistently and significantly exceeds the deadline set by the legislature. "The system is broken," plaintiffs lament. The relevant question, then, is whether the Second Amendment is implicated by a state agency's noncompliance with state law aimed at preventing unauthorized persons from possessing firearms, when that results in widespread delays in the ability of authorized people to possess firearms.

Neither side offers historical evidence directly responsive to the question, but the clear implication of *Heller* is that such state action must implicate the Second Amendment. In *Heller*, the Supreme Court found that the Second Amendment protected the use of firearms for the "core lawful purpose of self-defense." 554 U.S. at 630. If the ISP spent three decades vigorously reviewing *every* FOID application, that would effectively prevent Illinois residents from exercising that core right of the Second Amendment. If a state practice could effectively deny all residents from keeping a firearm in their home for self-defense, that practice must implicate the Second Amendment. *See Pena v. Lindley*, 898 F.3d 969, 1010–11 (9th Cir. 2018) (Bybee, J. concurring in part and dissenting in part) (stating that a regulation that would effectively ban the commercial sale of guns cannot fall outside the scope of the Second Amendment).

**\*7** Of course, the delays at issue in this case are on the order of months, not decades. But if the Second Amendment is not implicated by such delays, then Illinois residents would have no constitutional redress if the application processing time did in fact lengthen to years. Clearly, at some point, agency dithering would violate the Second Amendment. Fixing that point would be difficult, but the Court need only

Case: 1:25-cv-00669 Document #: 79 Filed: 05/15/25 Page 23 of 90 PageID #:591

Marszalek v. Kelly, Not Reported in Fed. Supp. (2021)

2021 WL 2350913

decide whether the ISP's current practice likely constitutes a violation. To make that determination, we must continue to *Ezell*'s second step. *See Ezell v. City of Chicago*, 651 F.3d 684, 701 (7th Cir. 2011).

*The ISP Delays Likely Do Not Violate the Second Amendment*

If a given practice is found to implicate the Second Amendment, the Court must then consider "the strength of the government's justification for restricting or regulating the exercise of Second Amendment rights." *Id.* at 703. This process requires "the court to evaluate the regulatory means the government has chosen and the public-benefits end it seeks to achieve," with the stringency of the review depending on "how close the law comes to the core of the Second Amendment right and the severity of the law's burden on the right." *Id.* In order to evaluate the constitutionality of the ISP's FOID card processing, the Court must first determine the appropriate level of scrutiny to apply.

Although *Heller* established that rational basis review was insufficient, the Supreme Court has not clearly articulated a level of scrutiny framework for the Second Amendment. *United States v. Meza-Rodriguez*, 798 F.3d 664, 672 (7th Cir. 2015). Instead, the circuit courts have been left to navigate through the " 'levels of scrutiny' quagmire." *United States v. Skoien*, 614 F.3d 638, 642 (7th Cir. 2010). Drawing on Seventh Circuit case law, the litigants have proposed two competing levels of scrutiny in this case. The plaintiffs have argued that the ISP should be subjected to the "not quite 'strict scrutiny' " articulated in *Ezell*, which required an "extremely strong public-interest justification and a close fit between the government's means and its end." 651 F.3d at 708. In *Ezell*, the Seventh Circuit was evaluating a Chicago ordinance that prohibited the construction of firing ranges in the City but also required range training in order to obtain a gun permit. *Id.* at 691. The ordinance was subjected to higher review because it applied to "law-abiding, responsible citizens" and, by prohibiting Chicago residents from training in their city, it severely restricted the right to train, an essential corollary of the Second Amendment's core right to possess a gun for self-defense. *Id.* at 708. A similarly strict standard was employed in *Moore v. Madigan*, which held unconstitutional an Illinois law that prohibited almost all people from carrying a ready-to-use firearm outside of the home. 702 F.3d 933, 934 (7th Cir. 2012). Again, the law was reviewed strictly because it applied to "the entire law-abiding adult population" and it infringed what the court recognized in that case as a core right to armed self-defense outside of the home. *Id.* at 940.

The defendants, on the other hand, argue that a standard "akin to intermediate scrutiny," which would require them to prove that the "challenged statute is substantially related to an important governmental objective," is more appropriate. *Kanter v. Barr*, 919 F.3d 437, 442 (7th Cir. 2019). This less stringent but still "strong" standard has been employed by the Seventh Circuit when evaluating federal law prohibiting the possession of firearms by certain categories of people, including unauthorized aliens and nonviolent felons. *United States v. Meza-Rodriguez*, 798 F.3d 664, 672 (7th Cir. 2015); *Kanter v. Barr*, 919 F.3d 437 (7th Cir. 2019).

**\*8** Neither of these sets of cases are precisely analogous to the present situation. For one thing, the plaintiffs in this case are not challenging a law or regulation, but the ISP's implementation of a law. ISP's processing speed is affected by a variety of practical factors that do not, in themselves, have a Second Amendment valiance, most notably the slowdown in processing and new hire training caused by the pandemic. *See* Dkt. 67-1, Hacker Decl. ¶¶ 28-35; *see also Roman Cath. Diocese of Brooklyn v. Cuomo*, 141 S. Ct. 63, 74, 208 L. Ed. 2d 206 (2020) (Kavanaugh, J., concurring) (admonishing federal courts to "afford substantial deference to state and local authorities about how best to balance competing policy considerations during the pandemic").

Also, unlike in *Ezell* and *Moore*, the FOID card delays do not represent a categorical prohibition on certain forms of core Second Amendment activity. Instead, the delay is exactly that, a delay. And while the waiting periods described in the declarations, up to a year, are no doubt frustrating, they do not amount to a de facto ban on possessing firearms. *See* Dkt. 73-2, Alekseev Decl.; Dkt.73-2, Schamaun Decl.; Dkt. 73-2, Kirkland Decl.; Dkt. 73-2, DiCarlantonio Decl.

The instant case also differs from *Kanter* and *Meza-Rodriguez* because the burden affects all new applicants, not only those that belong to limited, particularly risky, categories. The delays affect the "the entire law-abiding adult population" of applicants. *Moore v. Madigan*, 702 F.3d 933, 934 (7th Cir. 2012). Of course, the FOID review process must apply to every applicant because it is the way the Illinois legislature has chosen to separate dangerous would-be-gun-owners from the larger "law-abiding" body of applicants. Its ultimate goal, preventing high-risk classes of people from obtaining firearms, likely does not implicate the Second Amendment. *See Ezell v. City of Chicago*, 651 F.3d 684, 702 (7th Cir. 2011). The delays are a byproduct of this constitutionally

Case: 1:25-cv-00669 Document #: 79 Filed: 05/15/25 Page 24 of 90 PageID #:592

Marszalek v. Kelly, Not Reported in Fed. Supp. (2021)

2021 WL 2350913

legitimate purpose. They are thus distinct from *Moore*, where the law at issue was intended to prevent almost all people from exercising a core right. *See* 702 F.3d at 934.

Without a comparable case, we must reason by imperfect analogy. In order to determine the appropriate level of scrutiny, the Court looks to "how close the law comes to the core of the Second Amendment right and the severity of the law's burden on the right." *Ezell*, 651 F.3d at 703. Here, the burden is significantly less than that of *Ezell* and *Moore*. Instead of broadly and permanently restricting a core Second Amendment right, the ISP's process temporarily postpones its exercise as to each individual proper gun owner. The burden of this delay on exercising a right is probably more fairly equated with a select prohibition, like those in *Kanter* and *Meza-Rodriguez*. Two other factors also counsel an intermediate review: that the delay is the byproduct of a purpose that that does not burden the Second Amendment, (i.e., preventing prohibited persons from possessing guns); and that it is taking place in the context of an international public health emergency to which state agencies have had to rapidly adjust with limited resources.

The plaintiffs argue that even a temporary delay in granting FOID cards constitutes a "severe" burden requiring stricter scrutiny. In support of this claim, the plaintiffs cite First Amendment case law. Courts have recognized that that even temporary delays in exercising one's speech rights can, in certain contexts, impose a severe burden because "[w]here spontaneity is part of the message, dissemination delayed is dissemination denied." *N.A.A.C.P., W. Region v. City of Richmond*, 743 F.2d 1346, 1356 (9th Cir. 1984). The Second Amendment, they argue, is similarly burdened when an individual urgently desires a gun for self-defense and is forced to wait before buying one. *See* John O. McGinnis, *Gun Rights Delayed Can Be Gun Rights Denied*, 304 U. Ill. L.J. Online 302, 317 (2020) (expanding on this analogy).

 **\*9** The plaintiffs provide no citations to Second Amendment cases adopting the principle that even temporary delays to exercising the right necessarily constitute a severe burden. Of course, there are examples of other important constitutional rights, such as the right to a speedy trial, where considerably longer delays are constitutionally acceptable. *See Barker v. Wingo*, 407 U.S. 514, 92 S. Ct. 2182, 33 L. Ed. 2d 101 (1972) (holding that a five-year delay between arrest and trial was constitutional). The Seventh Circuit has suggested that the Second Amendment exists somewhere along this "spectrum," but has yet to resolve where it falls. *Rhein v. Coffman*, 825

F.3d 823, 827 (7th Cir. 2016). The long historical precedent of states requiring background checks and permits to purchase firearms, meanwhile, pushes against the view that delays constitute a *per se* severe burden. *See* David B. Kopel, *Background Checks for Firearms Sales and Loans: Law, History, and Policy*, 53 Harv. J. on Legis. 303, 343 (2016) (describing early-20 th century permitting requirements).

Given that no court appears to have adopted the plaintiff's proposed approach, the Court focuses on *Ezell*'s standard for determining the appropriate level of scrutiny. 651 F.3d at 703. As discussed above, the Seventh Circuit cases suggest an intermediate review is appropriate here. As a result, the Court will employ the standard "akin to intermediate scrutiny" described in *Kanter*, asking whether the challenged practice "is substantially related to an important governmental objective."

The parties agree that the FOID process serves an important government interest—preventing unqualified people from obtaining firearms. *See United States v. Meza-Rodriguez*, 798 F.3d 664, 673 (7th Cir. 2015) ("[T]he government has a strong interest in preventing people who already have disrespected the law (including, in addition to aliens unlawfully in the country, felons, fugitives, and those convicted of misdemeanor crimes of domestic violence from possessing guns.")). From there, the analysis is straightforward. The defendants' declarations describe a thorough review process that checks to make sure an applicant is legally permitted to possess a firearm. Dkt. 67-1, Hacker Decl. ¶¶ 4-15. Besides for some vague statements in their Reply, the plaintiffs have not alleged that the ISP does not actually follow its described procedure or that it intentionally delays applications. A process that reviews all relevant databases to ensure that an applicant is qualified to possess a firearm is clearly "substantially related" to the government's interest in preventing unqualified people from possessing firearms.

The plaintiffs argue that with more funding or alternative procedures, the ISP could process the applications within 30 days. That may well be the case. But so long as it is substantially related to an important government interest, current practice is not rendered unconstitutional by the possibility of a better (and more expensive) approach. The plaintiffs also argue that the delays must be unconstitutional because only Massachusetts and Illinois require permits before one may purchase any firearm. But, of course, a statute's constitutionality is not dependent on its widespread adoption. In *Moore*, the fact that only Illinois had a statute of

2021 WL 2350913

the type at issue was used to support the conclusion that there was not a close fit between the statute and the government interest. *Moore v. Madigan*, 702 F.3d 933, 940 (7th Cir. 2012). However, as we have discussed, *Moore* involved a higher standard of scrutiny than is appropriate for this case.

Finally, the defendants say that the plaintiffs have not shown that the FOID process actually advances public safety. While some dangerous individuals are prevented from obtaining guns which might have been used for violent crime, law-abiding individuals also have to wait longer before they have a gun to defend themselves, perhaps making crime more likely. But the government's interest in limiting the gun-possession to qualified individuals cannot be reduced to a single variable. For example, in *Meza-Rodriguez*, the Seventh Circuit recognized an important government interest in preventing unauthorized immigrants from obtaining firearms because they "are able purposefully to evade detection by law enforcement," even if they are no more likely to commit violent crime. 798 F.3d at 673. The government also likely has an interest in preventing people convicted of domestic violence crimes from obtaining a firearm, even if the firearm is never used to commit a violent crime, because of the added power it may give an abuser over the members of their household. Given the varied and interconnected safety values the FOID process promotes, there is a clear connection between it and the government interest.

 *10 The FOID process is substantially related to an important government interest. Although the delays are a burden on the Second Amendment rights of the applicants, they are not so severe as to render the process unconstitutional. Thus, it is unlikely that the plaintiffs will succeed on the merits of their Second Amendment claim.

### C. The Plaintiffs Have Not Demonstrated a Likelihood of Success on the Merits of Their Fourteenth Amendment Claim

Along with their Second Amendment claim, the plaintiffs assert that the ISP's delays in granting FOID cards violate their right to procedural due process under the Fourteenth Amendment. To establish a due process violation, "the plaintiffs must establish that there is '(1) a cognizable property interest; (2) a deprivation of that property interest; and (3) a denial of due process.' " *Hudson v. City of Chicago*, 374 F.3d 554, 559 (7th Cir. 2004) (quoting *Buttitta v. City of Chicago*, 9 F.3d 1198, 1201 (7th Cir. 1993)). The defendants do not contest the first two elements. Instead, they focus on

whether the ISP procedure and delays amount to a denial of due process.

Due process is a "flexible" concept that varies based on the demands of a given situation. *Id.* (quoting *Mathews v. Eldridge*, 424 U.S. 319, 334 (1976)). In determining a process's constitutionality, the Court balances three factors: "[f]irst, the private interest that will be affected by the official action; second, the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safe-guards; and finally, the Government's interest." *Id.* at 559-560 (quoting *Gilbert v. Homar*, 520 U.S. 924, 931–32 (1997)).

In this case, both the government and the plaintiffs have important interests at stake. The ISP has a duty to prevent ineligible individuals from obtaining firearms, and the plaintiffs have a constitutionally protected right to keep firearms for self-defense. Unusually, there does not appear to be a risk of erroneous deprivation in this case. The plaintiffs have not alleged that they have been wrongly denied an FOID card. Instead, the problem is the length of time it takes for a card to be issued. It thus seems unlikely that additional procedures would be useful. In fact, the plaintiffs seek a functional elimination of process—requiring ISP to issue FOID cards to all applicants who belong to the organizational plaintiffs and applied more than 30 days ago. In practice, the plaintiffs do not appear to have an issue with the procedures of the FOID process, but with their pace.

Perhaps aware of the poor fit between their claim and its structure, the plaintiffs largely ignore the due process balancing framework. Instead, they argue that, when the state requires a license to exercise a constitutional right, due process requires that it be issued or denied within a "specified brief period." *Freedman v. State of Md.*, 380 U.S. 51, 59 (1965); *see also Staub v. City of Baxley*, 355 U.S. 313, 322 (1958) (also cited by the plaintiffs). But the cases cited by the plaintiffs deal with prior restraints on speech, a First Amendment issue. In *Freedman*, the Supreme Court held that a Maryland film censorship statute was unconstitutional because, in part, it required the submission of films to a censorship board that had no time limit on its review. *Freedman*, 380 U.S. at 54-55. The Court reasoned that, because only a judicial decision may impose a final restraint on speech, an agency review must be time-limited so as to prevent an end-run around the judiciary. *Id.* at 58.

2021 WL 2350913

**\*11** The plaintiffs assume, without argument, that the "specified brief period" of review requirement is secured by due process and is applicable to interests other than those protected by the First Amendment. In actuality, the opinion is clear that this is a requirement imposed by the First Amendment, and the Court has been unable to find a Seventh Circuit or Supreme Court case that has invoked this principle in a non-First Amendment case. The Court sees no reason to extend *Freedman* to the Second Amendment. The judiciary is not ultimately responsible for determining who may possess a firearm, and so the same end-running concerns do not apply. The balance of interests, meanwhile, suggest that the FOID process is adequate from a due process perspective. Thus, the plaintiffs are unlikely to succeed on this claim as well.

Although they have standing, the organizational plaintiffs have failed to demonstrate that they are likely to succeed on the merits. As a result, they cannot satisfy the threshold requirements and the Court must deny their Motion for a Preliminary Injunction. *Girl Scouts of Manitou Council, Inc. v. Girl Scouts of the U.S.A., Inc.*, 549 F.3d 1079, 1086 (7th Cir. 2008).

## CONCLUSION

For the stated reasons, the plaintiffs' motion for preliminary injunction [47] is denied.

**All Citations**

Not Reported in Fed. Supp., 2021 WL 2350913

---

**End of Document**                                                                          © 2025 Thomson Reuters. No claim to original U.S. Government Works.

Case: 1:25-cv-00669 Document #: 79 Filed: 05/15/25 Page 27 of 90 PageID #:595

Luce v. Kelly, Not Reported in Fed. Supp. (2022)

2022 WL 204373

2022 WL 204373
Only the Westlaw citation is currently available.
United States District Court, N.D. Illinois, Eastern Division.

Nicholas LUCE, et al., Plaintiffs,

v.

Brendan KELLY, et al., Defendants.

Case No. 21-cv-1250
|
Signed 01/24/2022

**Attorneys and Law Firms**

David G. Sigale, Law Firm of David G. Sigale, P.C., Wheaton, IL, Gregory Abbott Bedell, Chicago, IL, for Plaintiffs.

Amanda Leigh Kozar, Mary Alice Johnston, Office of the Illinois Attorney General, Chicago, IL, for Defendants.

**MEMORANDUM OPINION AND ORDER**

MARY M. ROWLAND, United States District Judge

**\*1** This case arises from the dissatisfaction of Illinois citizens and Second Amendment non-profit organizations with the State of Illinois' speed of adjudicating applications for private citizens to carry concealed weapons. Plaintiffs Nicholas Luce, Joseph Stacho, David Rice, Jerry Robinson, the Illinois State Rifle Association, and the Second Amendment Foundation, Inc. claim that the State of Illinois has violated their Second and Fourteenth Amendment rights by failing to issue their concealed weapon licenses within statutorily-set time periods and sue for injunctive, declaratory, and monetary relief. Defendants Brendan F. Kelly, the Director of the Illinois State Police, and Jacob Ingebrigsten, the Bureau Chief of the Firearm Services Bureau, move to dismiss Plaintiffs' claims under Federal Rules of Civil Procedure 12(b)(1) and 12(b)(6). [11]. For the reasons explained below, this Court grants in part and denies in part their motion.

**I. Background**

This Court accepts as true the following allegations from the complaint. Crescent Plaza Hotel Owner, L.P. v. Zurich Am. Ins. Co., 20 F.4th 303, 307 (7th Cir. 2021).

Plaintiffs Nicholas Luce, Joseph Stacho, David Rice, and Jerry Robinson are all individuals living in Illinois. [1] ¶¶ 11–14. They are joined in this lawsuit by Plaintiff Illinois State Rifle Association (ISRA), a non-profit organization, whose organizational purposes include "securing the constitutional right to privately own and possess firearms within Illinois, through education, outreach, and litigation," id. ¶ 16, and by Plaintiff Second Amendment Foundation, Inc. (SAF), another non-profit focused upon the "constitutional right privately to own and possess firearms," id. ¶ 19.

Defendant Brendan F. Kelly serves as the Director of the Illinois State Police (ISP), the state agency charged with administering the determination of applications for individual licenses to carry concealed firearms in Illinois. Id. ¶¶ 21–22. The other Defendant, Jacob Ingebrigsten, acts as the Bureau Chief of the Firearm Services Bureau (FSB), a division of ISP. Id. ¶ 26. Plaintiffs sue Kelly and Ingebrigsten in their official capacities. Id. ¶¶ 25, 27.

In Illinois, an individual must obtain a concealed carry license (CCL) to carry a concealed functional firearm in public for self-defense. Id. ¶ 28; see White v. Ill. State Police, 15 F.4th 801, 804 (7th Cir. 2021) ("Illinois's Firearm Concealed Carry Act creates a scheme for licensing individuals to carry concealed firearms in public."). Under Illinois law, the ISP must approve a CCL application when an applicant meets the statutory criteria—namely, he must be twenty-one or older, trained to handle firearms, eligible to possess a firearm under state and federal law, not subject to any pending proceedings that could disqualify him from possessing a firearm, and free of certain types of substance abuse treatment and criminal convictions within the past five years. [1] ¶ 31; see also White, 15 F.4th at 804 (citing 430 Ill. Comp. Stat. §§ 66/10(a), 66/25). The law also requires the ISP to approve or deny a CCL application within either ninety days (if the applicant submits fingerprints with the application) or within one hundred twenty days (if the application does not include fingerprints). [1] ¶ 3; see 420 Ill. Comp. Stat. §§ 66/10(e), 66/30(b)(8).

**\*2** The individual Plaintiffs claim that they meet all statutory criteria for obtaining a CCL, but that Defendants failed to issue them CCLs within ninety or one hundred twenty days of receiving their applications; as of the date they filed their complaint, Plaintiffs still had not received their licenses. [1] ¶¶ 39, 48. Two of the individual Plaintiffs—Luce and Stacho—additionally paid an $80.00 fee and submitted fingerprints to expedite their applications. Id. ¶¶ 35–36. Plaintiffs claim that the ISP commonly fails to approve CCL applications

within ninety or one hundred twenty days, as required under the law. *Id.* ¶ 3.

On March 5, 2021, Plaintiffs brought claims under 42 U.S.C. § 1983 for violations of their Second and Fourteenth Amendment rights (Counts I and II). In their complaint, Plaintiffs requested a declaratory judgment stating that Defendants violated their constitutional rights; prospective injunctive relief ordering Defendants to issue CCLs to the individual Plaintiffs and other organizational members with overdue applications; and damages to Luce and Stacho for expending $80.00 each to expedite their applications. [1] (request for relief).

After the filing of the complaint in March 2021, all of the named individual Plaintiffs received their CCLs. [12-1] ¶¶ 3–6. The organizational Plaintiffs, however, insist that other of their members continue to await overdue adjudications of their CCL applications. Richard Pearson, the Executive Director of ISRA, submitted a declaration attesting that he knows the following members sitting on overdue applications: a forty-five year-old Cook County resident who applied in February 2021; a forty-seven year-old Kane County resident who applied in March 2021 with fingerprints; a sixty year-old Boone County resident who applied in early June 2020; and a thirty-nine year-old Vermilion County resident who applies in February 2021 with fingerprints. [15-1] ¶¶ 1–2, 7–10. The Director of Operations for SAF, Julianne Versnel, also submitted a declaration. [15-2] ¶¶ 1–2. Versnel asserts that she knows of a forty-five year-old Cook County resident and SAF member who applied for a CCL in February 2021 but has yet to receive an adjudication. *Id.* ¶ 6.

Defendants have moved to dismiss the complaint under Federal Rules of Civil Procedure 12(b)(2) and 12(b)(6), arguing that the individual Plaintiffs' requests for injunctive and declaratory relief are moot, the Eleventh Amendment bars Luce and Stacho's request for money damages, and the organizational Plaintiffs lack Article III standing. [11].

## II. Legal Standard

A motion to dismiss tests the sufficiency of a claim, not the merits of the case. *Gunn v. Cont'l Cas. Co.*, 968 F.3d 802, 806 (7th Cir. 2020).

To survive a motion to dismiss under Rule 12(b)(6), the claim "must provide enough factual information to state a claim to relief that is plausible on its face and raise a right to relief above the speculative level." *Haywood v. Massage Envy*

*Franchising, LLC*, 887 F.3d 329, 333 (7th Cir. 2018) (quoting *Camasta v. Jos. A. Bank Clothiers, Inc.*, 761 F.3d 732, 736 (7th Cir. 2014)); *see also* Fed. R. Civ. P. 8(a)(2) (requiring a complaint to contain a "short and plain statement of the claim showing that the pleader is entitled to relief"). A court deciding a Rule 12(b)(6) motion accepts the well-pleaded factual allegations as true and draws all permissible inferences in the pleading party's favor. *Degroot v. Client Servs., Inc.*, 977 F.3d 656, 659 (7th Cir. 2020). Dismissal for failure to state a claim is proper "when the allegations in a complaint, however true, could not raise a claim of entitlement to relief." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 558 (2007).

**\*3** Rule 12(b)(1), like Rule 12(b)(6), requires this Court to construe Plaintiffs' complaint in the light most favorable to Plaintiffs, accept as true all well-pleaded facts, and draw reasonable inferences in their favor. *Silha v. ACT, Inc.*, 807 F.3d 169, 173 (7th Cir. 2015); *Long v. Shorebank Dev. Corp.*, 182 F.3d 548, 554 (7th Cir. 1999). Courts evaluating Rule 12(b)(1) motions may look beyond the complaint to consider whatever evidence has been submitted on the issue to determine whether subject matter jurisdiction exists. *Silha*, 807 F.3d at 173 (noting that a court "may look beyond the pleadings and view any evidence submitted" when reviewing a challenge that there is in fact no subject matter jurisdiction, even if the pleadings are formally sufficient).

## III. Analysis

Defendants have moved to dismiss the individual Plaintiffs and organizational Plaintiffs on different grounds, so this Court's analysis proceeds separately as to the two groups.

## A. The Individual Plaintiffs' Claims

Starting with the individual Plaintiffs, there remains little dispute among the parties that the individual Plaintiffs' claims fail to survive this motion to dismiss.

First, the parties do not seriously dispute that the individual Plaintiffs' requests for declaratory and injunctive relief became moot when the ISP issued them CCLs. *See* [15] at 4; [20] at 2. Article III of the Constitution limits federal judicial jurisdiction to the adjudication of live "cases" and "controversies." *Cook County v. Wolf*, 962 F.3d 208, 218 (7th Cir. 2020) (quoting U.S. Const. art. III, § 2, cl. 1), *cert. dismissed sub nom. Mayorkas v. Cook County*, 141 S. Ct. 1292 (2021). A court loses jurisdiction when a party's claim

Case: 1:25-cv-00669 Document #: 79 Filed: 05/15/25 Page 29 of 90 PageID #:597

Luce v. Kelly, Not Reported in Fed. Supp. (2022)

2022 WL 204373

becomes moot, or in other words, when it "is impossible for a court to grant any effectual relief whatever to the prevailing party." *E.F.L. v. Prim*, 986 F.3d 959, 962 (7th Cir. 2021) (quoting *Trinity 83 Dev., LLC v. ColFin Midwest Funding, LLC*, 917 F.3d 599, 601–02 (7th Cir. 2019)). Because Defendants have granted Plaintiffs their CCLs, it is impossible for this Court to grant "any effectual" prospective injunctive or declaratory relief. *See id.* at 963 (holding that the plaintiff's habeas petition is moot "because it seeks to enjoin DHS from executing her removal order while her VAWA petition is pending, but that petition has now been approved"); *see also Swanigan v. City of Chicago*, 881 F.3d 577, 583 & n.2 (7th Cir. 2018) (noting that claims for injunctive and declaratory relief require "ongoing or impending harm") (citing *Feit v. Ward*, 886 F.2d 848, 857 (7th Cir. 1989)); *see also, e.g., Sawyer v. Vivint, Inc.*, No. 14 C 8959, 2015 WL 3420615, at *3 (N.D. Ill. May 28, 2015) (concluding that plaintiffs could not seek "declaratory and injunctive relief" for past " 'exposure to illegal conduct' ") (quoting *O'Shea v. Littleton*, 414 U.S. 488, 495–96 (1974)).

The individual Plaintiffs also concede the dismissal of their request for money damages. [15] at 4. The Eleventh Amendment states that the "Judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by Citizens of another State." U.S. Const. amend. XI. Practically, the Eleventh Amendment forecloses suits against states and their officials for money damages. *Will v. Mich. Dep't of State Police*, 491 U.S. 58, 69–71 (1989); *Nunez v. Ind. Dep't of Child Servs.*, 817 F.3d 1042, 1044 (7th Cir. 2016); *see also, e.g., Pearson v. Pritzker*, No. 20-CV-02888, 2021 WL 1121086, at *4 (N.D. Ill. Mar. 24, 2021) (holding that the Eleventh Amendment barred a claim for money damages against Governor Pritzker in his official capacity).

**\*4** In short, the individual Plaintiffs' requests for injunctive and declaratory relief are moot because this Court can no longer afford them any effectual relief, and the Eleventh Amendment bars their claim for money damages. Accordingly, this Court dismisses the individual Plaintiffs from this suit.

### B. Associational Standing

With the individual Plaintiffs' claims out of the way, the slightly more contentious question becomes whether ISRA and SAF possess Article III standing to maintain this lawsuit.

To establish a justiciable case or controversy under Article III, the party invoking federal jurisdiction must possess standing to sue. *Cook County*, 962 F.3d at 218. Standing requires (1) an injury in fact (2) caused by the defendants' conduct and (3) redressable by a favorable decision. *Woodring v. Jackson County*, 986 F.3d 979, 984 (7th Cir. 2021). Generally, organizations like ISRA and SAF "may have standing to sue either on their own behalf or on behalf of their members." *White*, 15 F.4th at 807.

Here, neither ISRA nor SAF possesses standing to sue on its own behalf because they do not allege injuries to themselves or request any relief. *Id.*; *see also Milwaukee Police Ass'n v. Bd. of Fire & Police Comm'rs of City of Milwaukee*, 708 F.3d 921, 927 (7th Cir. 2013) (holding that alleging injuries to an organization's members remain insufficient to establish standing on an organization's own behalf); *see* [15] at 4–9 (asserting only associational standing). Rather, they assert associational standing which "allows an organization to sue on behalf of its members 'even without a showing of injury to the association itself.' " *Prairie Rivers Network v Dynegy Midwest Generation, LLC*, 2 F.4th 1002, 1008 (7th Cir. 2021) (quoting *United Food & Commercial Workers Union Local 751 v. Brown Grp., Inc.*, 517 U.S. 544, 552 (1996)). To establish associational standing, ISRA and SAF must demonstrate that: (1) at least one of its members possesses standing to sue in his or her own right; (2) the interests it seeks to protect are germane to the organization's purpose; and (3) "neither the claim asserted nor the relief requested requires the participation of individual members." *Id.* (quoting *Hunt v. Wash. State Apple Advert. Comm'n*, 432 U.S. 333, 343 (1977)); *see Shakman v. Clerk of Cook Cty.*, 994 F.3d 832, 840 (7th Cir. 2021).

With those elements in mind, this Court evaluates whether ISRA *or* SAF has sufficiently established associational standing. *See Ezell v. City of Chicago*, 651 F.3d 684, 696 (7th Cir. 2011) ("Where at least one plaintiff has standing, jurisdiction is secure and the court will adjudicate the case whether the additional plaintiffs have standing or not.").

### 1. Standing of At Least One Member

The parties dispute whether ISRA or SAF has established the standing of at least one of its members. As discussed above, the four named Plaintiffs—Nicholas Luce, Joseph Stacho, David Rice, and Jerry Robinson—do not possess any live

Case: 1:25-cv-00669 Document #: 79 Filed: 05/15/25 Page 30 of 90 PageID #:598

**Luce v. Kelly, Not Reported in Fed. Supp. (2022)**

2022 WL 204373

claims: their receipt of CCL cards mooted their requests for injunctive and declaratory relief, and they concede the Eleventh Amendment forecloses their damages request. *See Swanigan*, 881 F.3d at 583 & n.2; [15] at 4.

Even without those individuals, ISRA and SAF maintains that they still possess associational standing because other members of their organizations have standing to sue. [15] at 5. To that end, both organizations have produced declarations describing—without naming—members who await overdue adjudications of their CCL licenses. [15-1]; [15-2]. The declarations identify, by age and county of residence, members of their organizations who currently await their CCL licenses which are overdue for adjudication. *Id.*

**\*5** Defendants argue that Plaintiffs' failure to name and more specifically identify these members render their standing assertions too vague to survive a motion to dismiss. [20] at 4–5. True, "standing for at least one individual members remains an essential component of associational standing." *Prairie Rivers Network*, 2 F.4th at 1011; *see also White*, 15 F.4th at 807 (concluding that ISRA failed to establish associational standing because it neither identified any members nor explained how one affected member possesses standing). To date, however, the Seventh Circuit has not required organizations to name individual members who possess standing. Indeed, the court of appeals has "noted that the requirement for an individual member to have standing 'still allows for the member on whose behalf the suit is filed to remain unnamed by the organization.' " *Prairie Rivers Network*, 2 F.4th at 1011 (quoting *Disability Rts. Wis., Inc. v. Walworth Cty. Bd. of Supervisors*, 522 F.3d 796, 802 (7th Cir. 2008)). Accordingly, this Court concludes that the organizations' identification of members, by age and county of residence, suffices at the pleadings stage to establish member standing. *See Marszalek v. Kelly*, No. 20-CV-04270, 2021 WL 2350913, at \*4 (N.D. Ill. June 9, 2021); *Thomas v. Kelly*, No. 20-CV-0734, 2021 WL 2350931, at \*7 (N.D. Ill. June 9, 2021).

### 2. Germane to Organizational Interests

The parties also dispute whether ISRA and SAF have established, for pleading purposes, that the interests they seek to protect relate to the organizations' purposes. [20] at 5. This court concludes that they have. ISRA and SAF both claim that their organizational purposes include securing "the constitutional right to privately own and possess firearms." [1] ¶¶ 16, 19. Defendants argue that the organizational purposes do not specifically align with the relief they seek here; according to Defendants, Plaintiffs should have more granularly alleged that their purpose "is [to] limit what background checks can be required to carry a concealed firearm or that background checks should not be required to carry a concealed firearm." [20] at 5.

This Court sees no reason to require such granular pleading. Plaintiffs' stated organizational purposes—securing private citizens' constitutional rights to possess firearms—sufficiently overlaps with the rights they seek to vindicate in this suit: timely adjudications of the rights of their members to carry concealed firearms. [20] at 5. Surely, the interest in protecting the right to possess firearms encompasses the right to carry concealed firearms. Plaintiffs have therefore sufficiently established that the interests they seek to protect in this lawsuit are germane to their organizational interests. *Speech First, Inc. v. Killeen*, 968 F.3d 628, 638 (7th Cir. 2020), *as amended on denial of reh'g and reh'g en banc* (Sept. 4, 2020).

### 3. No Required Participation of Members

Finally, Defendants do not dispute that this litigation requires participation of individual members. ISRA and SAF request injunctive and declaratory relief based upon constitutional violations, and neither the claims nor requests for relief require proof of individual damages or participation of their members. *See Shakman v. Clerk of Cook Cty.*, 994 F.3d 832, 841 (7th Cir. 2021); *see also Retired Chicago Police Ass'n v. City of Chicago*, 7 F.3d 584, 603 (7th Cir. 1993) ("Declaratory, injunctive, or other prospective relief will usually inure to the benefit of the members actually injured and thus individualized proof of damages is often unnecessary."). Plaintiffs have sufficiently demonstrated that the third prong to associational standing exists.

In sum, ISRA and SAF have established the three prongs necessary to demonstrate associational standing at the pleadings stage. This Court therefore denies Defendants' motion to the extent based upon dismissal of these Plaintiffs for lack of standing.

### IV. Conclusion

**\*6** For the reasons explained above, this Court grants in part and denies in part Defendants' motion to dismiss [11].

2022 WL 204373

The individual Plaintiffs—Luce, Stacho, Rice, and Robinson—are hereby dismissed; their requests for injunctive and declaratory relief are moot and the Eleventh Amendment bars their request for money damages. The organizational Plaintiffs—ISRA and SAF—remain in this suit, as they have established Article III standing at the pleadings stage.

Defendants are directed to answer the complaint by February 11, 2022.

**All Citations**

Not Reported in Fed. Supp., 2022 WL 204373

---

**End of Document**                    © 2025 Thomson Reuters. No claim to original U.S. Government Works.

2025 WL 1017677
Only the Westlaw citation is currently available.
United States District Court,
N.D. Illinois, Western Division.

NATIONAL INSTITUTE OF FAMILY
AND LIFE ADVOCATES, et al., Plaintiffs,

v.

Mario TRETO Jr., Defendant.

Ronald Schroeder, et al., Plaintiffs,

v.

Mario Treto Jr., Defendant.

No. 16 CV 50310, No. 17 CV 4663
|
Signed April 4, 2025

**Synopsis**
**Background:** Anti-abortion religious organization, its pregnancy centers, and health care provider brought actions alleging that Illinois Health Care Right of Conscience Act (HCRCA) provisions requiring health care providers to inform patients of legal treatment options and risks and benefits of treatment options in timely manner, and to refer or transfer patients or to provide written information about other health care providers who they reasonably believed might offer service that they could not provide because of conscience-based objection violated their First Amendment rights. After actions were consolidated, bench trial was held.

**Holdings:** The District Court, Iain D. Johnston, J., held that:

provision requiring providers to "inform" patients about risks and benefits associated with their treatment options regulated speech;

provision was content-based regulation;

lower level of scrutiny applied to laws requiring professionals to disclose factual, noncontroversial information in their commercial speech did not apply;

provision did not qualify as regulation of professional conduct that incidentally burdened speech;

provision violated plaintiffs' First Amendment free speech rights;

provision requiring health care providers to provide written information about other health care providers did not implicate protected First Amendment activities;

provision was neutral law of general applicability subject to rational basis review under Free Exercise Clause; and

provision did not violate plaintiffs' First Amendment free exercise rights.

Ordered accordingly.

**Procedural Posture(s):** Judgment.

**West Codenotes**

**Held Unconstitutional**
745 Ill. Comp. Stat. Ann. 70/6.1(1)

**Attorneys and Law Firms**

John W. Mauck, Mauck & Baker LLC, Chicago, IL, Julia Catherine Payne, Kevin Hayden Theriot, Alliance Defending Freedom, Scottsdale, AZ, Noel W. Sterett, Alliance Defending Freedom, Lansdowne, VA, for Plaintiff National Institute of Family and Life Advocates in No. 16 CV 50310.

John W. Mauck, Mauck & Baker LLC, Chicago, IL, Julia Catherine Payne, Alliance Defending Freedom, Scottsdale, AZ, Noel W. Sterett, Alliance Defending Freedom, Lansdowne, VA, for Plaintiffs Tri-County Crisis Pregnancy Center, The Life Center, Inc., Mosaic Pregnancy & Health Centers in No. 16 CV 50310.

Kathryn Hunt Muse, Illinois Department of Healthcare and Family Services Office of General Counsel, Chicago, IL, Karyn L. Bass Ehler, Elizabeth A.F. Morris, Hannah Yeon Mee Jurowicz, Christopher Graham Wells, John Thomas Hazinski, Sarah Jeanne Gallo, Office of the Attorney General, Chicago, IL, for Defendant Mario Treto, Jr. in Nos. 16 CV 50310, 17 CV 4663.

Patrick T. Gillen, Pro Hac Vice, Naples, FL, Peter Christopher Breen, Thomas Gerald Olp, Thomas More Society, Chicago, IL, for Plaintiffs Ronald L. Schroeder, 1st Way Pregnancy Support Services, Pregnancy Aid South Suburbs in No. 17 CV 4663.

Rebecca Kim Glenberg, Emily Werth, Mason B. Strand, Roger Baldwin Foundation of ACLU, Inc., Chicago, IL, Ameri Rose Klafeta, Oak Park, IL, for Amicus American College of Obstetricians and Gynecologists in Nos. 17 CV 4663, 16 CV 50310.

Rebecca Kim Glenberg, Roger Baldwin Foundation of ACLU, Inc., Chicago, IL, Ameri Rose Klafeta, Oak Park, IL, for Amici Illinois Academy of Family Physicians, Dr. Julie Chor, Dr. AuTumn Davidson, Dr. Sabrina Holmquist, Dr. Scott Moses, Dr. Maura Quinlan, Dr. Elizabeth Salisbury-Afshar, Dr. Debra Stulberg, Dr. Tabatha Wells, Dr. Santina Wheat in No. 17 CV 4663, 16 CV 50310.

Leah Rachel Bruno, Jacqueline A, Giannini, JoAnne Caceres, Dentons U.S. LLP, Chicago, IL, for Amicus Physicians for Reproductive Health in No. 17 CV 4663.

Giannini Jacqueline A, JoAnne Caceres, Leah Rachel Bruno, Dentons U.S. LLP, Chicago, IL, for Amicus Physicians for Reproductive Health in No. 16 CV 50310.

Steven Henry Aden, Pro Hac Vice, Alliance Defending Freedom, Washington, DC, for Amicus American Association of Prolife Obstetricians and Gynecologists et al. in No. 16 CV 50310.

Edward Lawrence White, American Center For Law & Justice, Ann Arbor, MI, Geoffrey R. Surtees, American Center for Law & Justice, New Hope, KY, for Amicus American Center for Law and Justice in No. 16 CV 50310.

**MEMORANDUM OF DECISION**

Iain D. Johnston, United States District Judge

**\*1** This Memorandum of Decision contains the Court's findings of fact and conclusions of law under Rule 52(a). The Court will separately enter Rule 58 judgment orders in each case.[1] The Court concludes that Public Act 99-690 Section 6.1(1), in exchange for a liability shield, compels speech, requiring a discussion about the risks and benefits of childbirth and abortion. That compelled discussion violates the First Amendment. Section 6.1(1) isn't a doctrinally qualifying informed consent statute, and the compelled speech isn't "incidental" to conduct. However, unlike Section 6.1(1), Section 6.1(3) doesn't compel speech. Instead, Section 6.1(3) merely regulates professional conduct, instructing clinicians, upon request, to either refer or transfer a patient to another physician, or at least provide her with a list of potential providers. These types of conduct regulations don't implicate the First Amendment's Speech clause. And because Section 6.1(3) returns conscientious objectors to their earlier, generally applicable liability exposure, it doesn't violate the Free Exercise Clause either. So, the Court finds Section 6.1(3) constitutional. Constitutionally, to obtain the liability shield, the State can't require medical professionals to discuss with patients what the State believes are the benefits of abortions; however, if patients request abortions, at a minimum, the State can require medical professionals to provide information of other medical professionals whom they reasonably believe might perform abortions.

[1]     The Court thanks counsel for all the Parties for their work in these cases. Without doubt, the subject matter of this litigation can result in intemperate language and behavior. But throughout the Court's involvement with this case, counsel have been courteous and professional among themselves and with the Court. What's more, the Court appreciates the quality of the presentations and filings by all counsel. Thank you. X

**INTRODUCTION**

Before launching into the legal analysis, the Court is compelled underscore the narrow legal and factual issues in this case.

First, as described in more detail later, the legislative evidence presented to the Illinois General Assembly in support of Public Act 99-690[2] was underwhelming. Nevertheless, in its wisdom, the State of Illinois sought to address a perceived problem, which it has every right to do in support of the public's health, safety, and welfare. It is not this Court's role to judge the wisdom of a public act. Instead, the Court's limited function is to determine whether Public Act 99-690 is constitutional, in whole or in part.

[2]     A note on citations: As discussed shortly, Public Act 99-690 amended the Health Care Right of Conscience Act ("HCRCA"). Public Act 99-690 encompasses Section 6.1(1) and 6.1(3). When the Court refers to the amendment generally, it uses "Public Act 99-690." It otherwise identifies the particular section (e.g. 6.1(1) or 6.1(3)) at issue. Citations to the Illinois Code (ILCS) refer to the HCRCA.

**\*2** Second, a preliminary injunction enjoining enforcement of Public Act 99-690 has been in place for nearly a decade. Despite the General Assembly's determinations and the State's assertions that—absent Public Act 99-690—the health of women was in grave peril, no evidence has been presented to this Court that supports that concern. Dkt. 48 at 26–27. Despite extensive summary judgment briefing and a three-day bench trial, no evidence was presented showing that a single woman's health was compromised because Public Act 99-690 was enjoined.

Third, the lack of this evidence should not be surprising. Public Act 99-690 amended the HCRCA to limit its use as an affirmative defense in civil and criminal proceedings. This factual scenario is highly unusual and rarely (if ever) occurs. Indeed, the Parties cited no instances in which this aspect of the HCRCA has been litigated, and the Court was unable to find a single reported case involving this aspect of the HCRCA.

Fourth, the lack of evidence of women's health being imperiled but for Public Act 99-690 is unsurprising because the HCRCA provides no protections for health care professionals who fail to treat emergencies. 745 ILCS 70/6 ("Nothing in this Act shall be construed so as to relieve a physician or other health care personnel from obligations under the law of providing emergency medical care."); 745 ILCS 70/9 ("Nothing in this Act shall be construed so as to relieve a physician, health care personnel, or a health care facility from obligations under the law of providing emergency medical care."). Health care professionals who fail to treat pregnant women in a medical emergency find no quarter in the HCRCA, regardless of the amendments contained in Public Act 99-690.

None of the foregoing should be interpreted as minimizing the constitutional issues at stake in this litigation, the role of the State to address perceived concerns about public health, safety, and welfare, or a woman's access to medical care. Instead, the Court notes that its decision is cabined to the statutory scheme at issue and the HCRCA and its subsequent amendments.

## I. BACKGROUND

A. *Parties*
This case involves two sets of plaintiffs: the National Institute of Family and Life Advocates ("NIFLA") Plaintiffs and the Schroeder Plaintiffs. NIFLA is a religious organization comprised of member pregnancy centers from across the country. NIFLA dkt. 275-2. ¶ 1.[3] The NIFLA Plaintiffs also include three individual Illinois pregnancy centers. *Id.* The Schroeder Plaintiffs include Dr. Ronald Schroeder, the volunteer medical director at Options-Now/Thrive Metro-East, as well as two other pregnancy centers. Schroeder dkt. 236-1 ¶ 1.[4]

[3]     The Court cites 16-cv-50310 as "NIFLA" and 17-cv-04663 as "Schroeder."

[4]     For this decision's purposes, the two sets of Plaintiffs and the Pregnancy Centers' work are essentially identical. So, unless otherwise noted, the Court simply refers to them as "Plaintiffs," and assumes they're all engaged in the same activities.

Defendant is the Director of the Illinois Department of Financial and Professional Regulation. The action is brought against that individual in the individual's official capacity. The current Director—and therefore, Defendant—is Mario Treto Jr. Rather than call out the latest person to hold this office, the Court will simply refer to the Defendant as "the State." The Court is mindful that some adherents of the Eleventh Amendment might be shocked at this approach. But they'll get over it. It's just a label for purposes of this decision.

B. *The Health Care Right of Conscience Act (HCRCA)*
**\*3** As the Court previously mentioned, Public Act 99-690 purports to amend the HCRCA. Since its enactment in 1977, the HCRCA has addressed many issues, including prohibiting discrimination and providing a right of action if discrimination occurs. Relevant to this action, the HCRCA provides an affirmative defense against civil and criminal liability. 745 ILCS 70/4, 70/9. Section 4 of the HCRCA contains one of the affirmative defenses:

> No physician or health care personnel shall be civilly or criminally liable to any person, estate, public or private entity or public official by reason of his or her refusal to perform, assist, counsel, suggest, recommend, refer or participate in any way in any particular form of health care service which is contrary to the conscience of such

physician or health care personnel. 745 ILCS 70/4.

Section 9 of the HCRCA contains the other provision providing a defense:

> No person, association, or corporation, which owns, operates, supervises, or manages a health care facility shall be civilly or criminally liable to any person, estate, or public or private entity by reason of refusal of the health care facility to permit or provide any particular form of health care service which violates the facility's conscience as documented in its ethical guidelines, mission statement, constitution, bylaws, articles of incorporation, regulations, or other governing documents. 745 ILCS 70/9.

In 2016, the General Assembly held hearings regarding the HCRCA because of concerns raised by Illinois residents regarding their health care treatment.

C. *Legislative History of Amendments to the HCRCA*
Relating to the issues raised in this case, the legislative support for Public Act 99-690 was sparce. Only two examples have been identified. First, there appear to be two letters from an anesthesiologist who refused to provide his services when abortions were performed. Second, there was heartbreaking testimony from a witness about her treatment during a pregnancy that was not viable. But nothing in the challenged provisions (what would become Section 6.1(1) and Section 6.1(3)) would have remedied any of problems highlighted by these two examples, because Public Act 99-690 neither requires conscientious objectors to personally perform abortion services nor excuses them from facilitating emergency treatment.

**\*4** Following these hearings, by way of Public Act 99-690, Illinois amended the HCRCA in several ways. First, Illinois added a provision identifying the public policy for the HCRCA and presumably the amendments to the HCRCA.

According to the amendments, "[i]t is also the public policy of the State of Illinois to ensure that patients receive timely access to information and medically appropriate care." Second, the amendments added the definition of "undue delay," which "means unreasonable delay that causes impairment of the patient's health." Third, the amendments added to the list of duties of medical "practices and care" not relieved by the immunity provided by the HCRCA, specifically identifying the duty to inform patients of "legal treatment options" and "benefits of treatment options." Fourth, the amendments to the HCRCA made two significant additions—one entitled "access to care and information protocols" and the other entitled "permissible acts related to access to care and information protocols." Access to care and information protocols are the important parts.

The amendments adding the protocols provision to Section 6.1 are the crux of this litigation. Section 6.1 requires all health care facilities to adopt protocols that allegedly would ensure that conscience-based objections did not impair patients' health. Critically, the affirmative defenses contained in Section 4 and Section 9 of the HCRCA "only apply if conscience-based refusals occur in accordance with these protocols." The consequence being that for physicians, health care personnel, and persons, associations, or corporations that own, operate, supervise, or manage a health care facility to receive the benefits of the affirmative defense, they are forced to comply with the requirements of Public Act 99-690, which require physicians to "inform," "give[ ] information" to, "refer," or "transfer" patients when they are unable to act or provide information to a patient because of a "conscience-based objection."

To obtain the immunity protections, the protocols minimally need to address the requirements of Section 6.1(1) and Section 6.1(3). The Plaintiffs challenge both provisions. Under Section 6.1(1), health care facilities, physicians, and health care personnel are mandated to inform a patient of, among other things, "legal treatment options, and the risks and benefits of the treatment options in a timely manner." Under Section 6.1(3), if requested by a patient or a patient's representative, health care facilities, physicians, and health care personnel must take one of three actions: (a) refer the patient, (b) transfer the patient, or (c) provide written information about other health care providers who they reasonably believe may offer the service that the facility, physician, or personnel can't provide because of a conscience-

based objection. Note a critical difference between Section 6.1(1) and Section 6.1(3): the former mandates speech regardless of anything else; whereas, the latter requires actions when prompted by a patient.

The amendment regarding "permissible acts" allows a health care facility to require physicians and health care personnel working at the facility to comply with the protocols. In full, this amendment states, "[n]othing in this Act shall be construed to prevent a health care facility from requiring that physicians or health care personnel working in the facility comply with access to care and information protocols that comply with the provisions of this Act." 745 ILCS 70/6.2.

Fifth, as to liability, the HCRCA's amendments added that a health care facility is not relieved from providing emergency medical care under the HCRCA. Stated differently, the HCRCA—which is an immunity statute—explicitly doesn't provide any immunity when physicians, health care personnel, or health care facilities fail to meet their legal obligations to provide emergency medical care. 745 ILCS 70/9.

### D. *Procedural History of the Litigation*
This litigation started in 2016, when the NIFLA Plaintiffs filed an action in this Court. The Schroeder Plaintiffs then filed an action in the Eastern Division of the Northern District of Illinois, which was consolidated with the NIFLA action in this Court. On July 19, 2017, then-Judge Fredrick Kapala entered a preliminary injunction, enjoining the State from enforcing Public Act 99-690.

**\*5** On December 15, 2017, based on an unopposed motion, the Court stayed both actions pending the Supreme Court's ruling in *Nat'l Inst. of Fam. & Life Advocs. v. Becerra*, 585 U.S. 755, 138 S.Ct. 2361, 201 L.Ed.2d 835 (2018). Following the Supreme Court's decision, the Plaintiffs asserted that the decision supported their position and the preliminary injunction. The State asserted that *Becerra* "provided some guidance" but was not "dispositive."

After then-Judge Kapala took inactive status, the actions were assigned to then-Chief Judge Rebecca Pallmeyer. The Plaintiffs moved for summary judgment, seeking permanent injunctive relief. They contended that Public Act 99-690 violated their rights to free speech and to free exercise of religion under the First Amendment. On September 3, 2020, Judge Pallmeyer denied the summary judgment motions, concluding that "genuine disputes of material facts

remain[ed]." Dkt. 176. In doing so, Judge Pallmeyer found "that expert discovery about the standard of care [was] necessary before the court [could]" resolve the litigation. Dkt. 176 at 36.

Following Judge Pallmeyer's ruling on summary judgment, three events occurred. First, the undersigned was confirmed by the United States Senate and received a commission, resulting in these actions being transferred. Second, the Parties engaged in expert discovery per Judge Pallmeyer's order. Third, following expert discovery, the Court held a three-day bench trial.

## II. FACTUAL FINDINGS

### A. *Pregnancy Centers' Work*
Pregnancy Centers ("Pregnancy Centers") are pro-life clinics that will not perform or refer for an abortion. NIFLA dkt. 282-1 ¶ 23. The Pregnancy Centers generally offer free ultrasounds, pregnancy testing, STI testing and treatment. *See* NIFLA dkt. 275-2 ¶¶ 2–15. At least one Pregnancy Center offers "abortion pill reversals." *Id.* ¶ 5. The Pregnancy Centers also provide material assistance to pregnant women and engage in "pregnancy options" and "post-abortion" counseling. *Id.* That counseling includes discussion about the risks of abortion, but it doesn't include a benefits discussion, because the Pregnancy Centers don't believe any benefits exist. *Id.*; NIFLA dkt. 282-1 ¶¶ 31–32. They further believe that counseling about abortion benefits would encourage the procedure. *Id.* ¶ 33. The Pregnancy Centers "rely on the visuals of the ultrasound itself and the health care provider's diagnoses to try to convince pregnant patients to carry to term and not have an abortion." *Id.* ¶ 20. The Parties dispute the extent to which the Pregnancy Centers engage in "medical conduct."

### B. *Standard of Care and Informed Consent*
On summary judgment, Judge Pallmeyer applied intermediate scrutiny and identified an unresolved factual question: whether Public Act 99-690 "burden[ed] more speech than necessary" and whether secular doctors, upon request, generally transferred, referred, or provided alternative resources. NIFLA dkt. 176 at 23. The State said Public Act 99-690 wasn't overly burdensome because the "standard of care" already required all doctors to discuss a treatment option's benefits and risks. *Id.* at 24. So, the State argued, Public Act 99-690 merely imposed that same standard on the Plaintiffs. *Id.* The Plaintiffs disagreed, claiming that

the "standard of care" didn't universally require these types of discussions. *Id.* So, the Plaintiffs contended Public Act 99-690 was underinclusive, applying only to conscientious objectors. *Id.* Judge Pallmeyer ordered a trial to determine what the "standard of care" required.

**\*6** As discussed later, the Court analyzes the legal issues differently, in a way that turns less on the "standard of care" question. Regardless, a three-day bench trial demonstrated only that, in the abstract, there's no single administrable definition of the standard of care. During that trial, the Parties also discussed "informed consent." Those two issues —standard of care and informed consent—intertwine with one another. However, for later analytical purposes, the Court discusses them separately. All Parties relied on credible and persuasive opinion witnesses. And all Parties agree that any medical organizations pronouncements are only nonmandatory guidelines. NIFLA dkt. 275-2 ¶ 34.

### Standard of Care

The trial testimony was, by and large, consistent with the Parties' briefing: The State argued that Public Act 99-690 simply repeats the professional standards that already bind all health care professionals, while the Plaintiffs argued that the pre-existing standard of care doesn't require a so-called benefits discussion. NIFLA dkt. 275 at 22; dkt. 271 at 4–8. According to all Parties' retained experts, medical standards of care turn on individualized assessments of a patient's needs, including a woman's medical history, mental health, spirituality, stated goals and expectations, reaction to her pregnancy, the providers' own abilities and expertise, and other factual inquiries. *See e.g.*, Trial Tr. 600:5–13; 629:13–630:21; Trial Tr. 61:6–62:25; *compare* Trial Tr. 431:21–432:9 (Dr. Fernandes encouraging physicians to balance a patient's wishes against other factors) *with id.* at 587:1–25 (Dr. Burcher suggesting patient autonomy is the preeminent principle in modern bioethics). This testimony is unsurprising. Under Illinois law, standard of care depends on the specific factual circumstances presented to the health care professional. *Edelin v. Westlake Comm. Hosp.*, 157 Ill.App.3d 857, 109 Ill.Dec. 890, 510 N.E.2d 958, 962 (1987). Indeed, Illinois juries are instructed to this effect. Illinois Pattern Jury Instructions, Civil, No. 105.00 (2020). This highly fact-specific inquiry is incompatible with requiring a doctor to discuss so-called benefits with *every* patient—largely because the State never presented evidence that every pregnant woman

needs the "thorough[ ]" discussion that the State tries to impose. NIFLA dkt. 275-1 ¶¶ 90–110.

The State argued that professional organizations create ethical standards of care that encourage health care professionals to provide neutral options counseling and requested abortion referrals. NIFLA dkt. 275 at 5–6. But those standards aren't binding. Trial Tr. 316:8–10; NIFLA dkt. 275-1 ¶¶ 75–78, 106–09. [5] In an amicus brief before the Court, the American College of Obstetrics and Gynecology ("ACOG") cites its own Code of Professional Ethics, stating that obstetrician-gynecologists must discuss the "risks, benefits, possible complications, and anticipated results" of terminating a pregnancy, and the American Medical Association ("AMA") statement that health care providers "should" present accurate information about "the burdens, risks, and expected benefits of all options." NIFLA dkt. 279 at 3. As the experts testified at trial, ACOG and AMA standards for discussing abortion make no sense when a patient is thrilled to learn of her pregnancy and no reasonable concerns exist for the patient to continue with the pregnancy. Trial Tr. 168:8–13, 629:18–630:2. And, not surprisingly, given the contentious nature of elective abortion, other professional groups have conflicting opinions. *See* Trial Tr. 473:15–475:23. So, all the evidence shows is that the standard of care doesn't require a binding, uniform benefits discussion.

[5]    Like the Pirate's Code, trial testimony established that these standards are more what you'd call "guidelines" than actual rules. https://www.youtube.com/watch?v=WJVBvvS57j0.

### Informed Consent

**\*7** The Court's best efforts to define "informed consent" were similarly futile. The Parties disagree on the medical definition of "informed consent." According to the Plaintiffs, a doctor's ethical obligations to a specific patient "arise out of the nature of the doctor–patient relationship ... specifically what has that patient come to the physician for and what is the physician offering to the patient." NIFLA dkt. 271-1 ¶ 28. Accordingly, "[i]nformed consent is the responsibility of the physician who will provide the treatment for which consent is sought, not the referring physician or any other physician." *Id.* ¶ 29. So, according to the Plaintiffs, "a physician need not discuss the risks and benefits of treatments like abortion that they do not personally provide." *Id.* ¶ 30.

The State takes a different view. According to the State, "[i]nformed consent is not limited to seeking authorization for an imminent medical procedure." NIFLA dkt. 275-1 ¶ 107. Instead, informed consent can "apply to counseling both about a specific medical intervention by a health care provider or more broadly about different relevant medical options available to a patient, because both involve choosing a treatment option or a plan of care." *Id.* ¶ 108. So, "[h]ealth care personnel are obligated to advise patients of risks and benefits of relevant procedures and treatment options, even if those treatments are not available at that particular medical facility." *Id.* ¶ 109. According to the State, proper medical care then requires "medical options counseling," in which providers "present[ ] patients with medically appropriate treatment options for their condition and the risks and benefits of those options." *Id.* ¶ 96. Again, this view makes no sense if the patient is thrilled to learn of the pregnancy and no reasonable medical concerns exist for the patient to continue the pregnancy.

As with the standard of care issue, the witnesses drew their definitions from competing ethical and moral principles. For example, the State says the "*central approach* to biomedical ethics is the 'principalist theory,' " which emphasizes "autonomy, beneficence, nonmaleficence, and justice." *Id.* ¶ 66. But the Plaintiffs stress that some medical professionals—and organizations—adhere to other ethical regimes that balance values differently. *Schroeder* dkt. 236-1 ¶¶ 61–78. So, the Court can't define, in the abstract, a binding, universal definition of "informed consent."

## III. CONCLUSIONS OF LAW

The Court now addresses the legal questions. It first considers whether either Section 6.1(1) or Section 6.1(3) violates the First Amendment's Free Speech Clause.[6] If warranted, the Court also considers whether either Section violates the Free Exercise Clause. In making these assessments, this Court recognizes that "[w]here fairly possibl[e], [it] should construe a statute to avoid a danger of unconstitutionality." *Zbaraz v. Madigan*, 572 F.3d 370, 383 (7th Cir. 2009) (citations omitted); *see Rescue Army v. Mun. Ct.*, 331 U.S. 549, 568–74, 67 S.Ct. 1409, 91 L.Ed. 1666 (1947). Further, in addressing the constitutionality of a state statute, a federal court may not formulate a rule of constitutional law broader than is required by the precise facts to which is to be applied. *United States v. Raines*, 362 U.S. 17, 21, 80 S.Ct. 519, 4 L.Ed.2d 524 (1960). And, if a federal court is required to grant injunctive relief, the relief should be no more burdensome than necessary. *Califano*

*v. Yamasaki*, 442 U.S. 682, 702, 99 S.Ct. 2545, 61 L.Ed.2d 176 (1979). Injunctive relief must be tailored to the scope of the violation and the specific harm established. *DraftKings Inc. v. Hermalyn*, 118 F. 4th 416, 423 (1st Cir. 2024); *e360 Insight v. Spamhaus Project*, 500 F.3d 594, 604 (7th Cir. 2007).

6    The Court only addresses Sections 6.1(1) and (3), because the others aren't contested. *See* NIFLA dkt. 275 at 9. Section 6.1(2) is not mentioned. *Id.*

## Unconstitutional Conditions

**\*8** The Plaintiffs argue that Public Act 99-690 imposes unconstitutional conditions on the receipt of a public benefit. Importantly, a state cannot condition the receipt of a public benefit—such as a liability shield—on a citizen surrendering their constitutional rights. *See Elrod v. Burns*, 427 U.S. 347, 361, 96 S.Ct. 2673, 49 L.Ed.2d 547 (1976) (plurality opinion); *Libertarian Party of Ind. v. Packard*, 741 F.2d 981, 988 (7th Cir. 1984) ("What a government cannot compel, it should not be able to coerce."). So, the unconstitutional conditions doctrine is a theory of First Amendment liability, not a claim in itself. As discussed more in the Free Exercise section, Public Act 99-690 offers a benefit, namely a liability shield. In making that offer, however, the State can't demand a constitutional violation. So, the threshold question is whether each Section violates the constitution.

## First Amendment Free Speech Claim

The First Amendment, applicable to the states through the Fourteenth, prohibits laws "abridging the freedom of speech." U.S. Const. amend. I; *Becerra*, 585 U.S. at 766, 138 S.Ct. 2361. In any challenge to government action that allegedly violates the First Amendment, the first step is to determine whether a particular state-action provision regulates speech (implicating the First Amendment) or conduct (not entitled to First Amendment protections).[7] Next, if the state action regulates speech based on its content, the court applies strict scrutiny, unless a doctrinal exception pulls the state action to a lesser tier of scrutiny. The First Amendment protects both the "right to speak freely and the right to refrain from speaking at all." *Wooley v. Maynard*, 430 U.S. 705, 714, 97 S.Ct. 1428, 51 L.Ed.2d 752 (1977). The Court analyzes Sections 6.1(1) and 6.1(3) in turn.

7    Just as Everlast explained in *What It's Like, see* https://genius.com/Everlast-what-its-like-lyrics, where a court starts its analysis—by

concluding that the state action regulates speech or regulates conduct—is essentially dispositive. *See Dana's R.R. v. A.G.*, 807 F.3d 1235, 1242 (11th Cir. 2015) (describing speech conduct determination as being determinative).

A. *Section 6.1(1)*

The Supreme Court's precedents have "long drawn a line" between speech and conduct. *Becerra*, 585 U.S. at 769, 138 S.Ct. 2361 (collecting cases). Although, in some circumstances, that line might be "difficult" to draw, *id.*, Section 6.1(1) falls on the speech side. The provision demands that health care providers "*inform*" patients about the risks and benefits associated with their treatment options. § 1 (emphasis added). And the State imagines a "thorough discuss[ion]" between the health care provider and the patient. NIFLA dkt. 275-1 ¶¶ 90–110 (terming the discussion "counseling"). [8] So, Section 6.1(1) regulates speech, implicating the First Amendment.

[8] The Court discusses below whether counseling can be considered "conduct."

Next, the Court considers whether Section 6.1(1) is content-based or content-neutral. Content-based state actions "target speech based on its communicative content." *Reed v. Town of Gilbert*, 576 U.S. 155, 163, 135 S.Ct. 2218, 192 L.Ed.2d 236 (2015). A statute alters the content of a speaker's speech by compelling individuals to speak a particular message or share particular pieces of information. *Becerra*, 585 U.S. at 755, 138 S.Ct. 2361 (2018).

Section 6.1(1) is a content-based regulation because it governs a health care provider's discussion on pregnancy and abortion. The state action is especially suspect because it's also view-point discriminatory. *Nat'l Inst. of Fam. & Life Advocs. v. Raoul*, 685 F. Supp. 3d 688, 704 (N.D. Ill. 2023) (citing *Rosenberger v. Rector and Visitors of University of Virginia*, 515 U.S. 819, 115 S.Ct. 2510, 132 L.Ed.2d 700 (1995)) ("When the government targets not subject matter, but particular views taken by speakers on a subject, the violation of the First Amendment is all the more blatant."). The Plaintiffs contend that abortion confers no medical benefits. NIFLA dkt. 271-1 ¶ 18; Schroeder dkt. 236-1 ¶ 41. It is important to note that the Plaintiffs' definition of abortion basically only encompasses elective abortions (which seems to mean all abortions where there's a viable fetus). Schroeder dkt. 236-1 ¶ 38. For example, the Plaintiffs don't argue that terminating an ectopic pregnancy is an "abortion" as

they define the term. *See* Trial Tr. 52:20–53:4. This view is consistent—albeit perhaps for different reasons—with the fact that even the medical profession doesn't consider terminating an ectopic pregnancy to be an "abortion." *See Procedural Abortion*, UptoDate.com (Feb. 2025) ("[W]hen a trained health care provider does a procedure to remove the pregnancy *from [a] uterus*.") (emphasis added). This limited definition of abortion is at least somewhat consistent with the Act, which doesn't provide immunity when health care professionals fail to act in an emergency. 745 ILCS 70/9.

**\*9** The State disagrees with the Plaintiffs, believing that an abortion (however it is defined) is beneficial in certain circumstances. Whether the State or the Plaintiffs are correct, however, doesn't factor into this constitutional analysis. In demanding that health care professionals discuss the benefits (and thereby concede to the State's view), the State makes the providers "instruments" in delivering a particular message. *DeBoer v. Village of Oak Park*, 267 F.3d 558, 572 (7th Cir. 2001) (quoting *Wooley v. Maynard*, 430 U.S. 705, 715, 97 S.Ct. 1428, 51 L.Ed.2d 752 (1977)).

Ordinarily, the First Amendment bars a state from commanding this type of speech, unless it survives strict scrutiny. This level of scrutiny requires the state to identify a compelling interest and narrowly tailored means to achieve it. The State says it's entitled to deferential treatment in this case because Section 6.1(1) targets professional conduct and only incidentally implicates speech. The Plaintiffs disagree, arguing that Section 6.1(1) unconstitutionally compels speech. To determine whether Section 6.1(1) receives deferential treatment, the Court considers two First Amendment doctrines: (a) the *Zauderer* commercial speech and (b) the "speech incidental to conduct" exceptions.

a) *Zauderer* Commercial Speech

In limited, narrow circumstances, the government has leeway to regulate speech relating to professional activities. *Zauderer v. Off. of Disciplinary Couns. of Sup. Ct. of Ohio*, 471 U.S. 626, 105 S.Ct. 2265, 85 L.Ed.2d 652 (1985); *Hurley v. Irish-American Gay, Lesbian & Bisexual Grp. of Boston, Inc.*, 515 U.S. 557, 573, 115 S.Ct. 2338, 132 L.Ed.2d 487 (1995). The *Zauderer* exception applies only to "purely factual and uncontroversial information" in commercial advertising. *Becerra*, 585 U.S. at 768–69, 138 S.Ct. 2361; *Hurley*, 515 U.S. at 573, 115 S.Ct. 2338.

*Zauderer*'s narrow scope doesn't apply to this case for three reasons. First, none of the speech in this case is "commercial" speech. Generally, "[c]ommercial speech is speech that proposes a commercial transaction." *Jordan v. Jewel Food Stores, Inc.*, 743 F.3d 509, 517 (7th Cir. 2014) (citing *Bd. of Trs. of State Univ. of N.Y. v. Fox*, 492 U.S. 469, 475, 109 S.Ct. 3028, 106 L.Ed.2d 388 (1989)); *see also Commerce*, BLACK'S LAW DICTIONARY (12th ed. 2024) (defining commerce as the "exchange"—not the free provision—of "goods and services"); *In re Primus*, 436 U.S. 412, 437–38 n. 32, 98 S.Ct. 1893, 56 L.Ed.2d 417 (1978) (finding an attorney engaged in noncommercial speech by advertising free services intended to advance "beliefs and ideas," as opposed to financial gain).

In this case, there's no economic transaction: None of the Pregnancy Centers charge for their services, so there's no financial exchange. *See NIFLA v. Raoul*, 685 F. Supp. 3d 688, 705 (N.D. Ill. 2023) (This Court made the same conclusion involving largely the same facts, because "there [was] no economic motivation for the speech."). Moreover, "abortion [is] anything but an 'uncontroversial' topic." *Becerra*, 585 U.S. at 769, 138 S.Ct. 2361. Ordinary life experiences support that conclusion: Try talking about abortion in public amongst strangers and see what reaction it spawns. Third, as discussed more below, the information Public Act 99-690 requires "in no way relates to the services" that the Plaintiffs provide. *See Becerra*, 585 U.S. at 769, 138 S.Ct. 2361. In *Becerra*, the Supreme Court held that the compelled disclosures (information about abortion) weren't "commercial speech," in part because the pregnancy centers didn't provide abortions. That's the same in this case. The Plaintiffs don't provide abortions, so the State can't rely on the *Zauderer* exception to compel speech about the procedure. So, the commercial speech exception won't shield the disclosures from heightened review.

b) Speech Incidental to Conduct

**\*10** The First Amendment also permits a state to regulate conduct, even when doing so incidentally burdens speech. Whether the regulation remains "incidental" depends on how to read (and reconcile) *Planned Parenthood v. Casey*, 505 U.S. 833, 112 S.Ct. 2791, 120 L.Ed.2d 674 (1992) (*overruled on other grounds by Dobbs v. Jackson Women's Health Org.*, 597 U.S. 215, 142 S.Ct. 2228, 213 L.Ed.2d 545 (2022)). The Parties excise favorable sentences from one case while nearly ignoring the other. *See e.g.*, NIFLA Plaintiffs'

Table of Authorities, dkt. 275 at 3 (citing *Becerra* "*passim*" and *Casey* once); the State's Table of Authorities, dkt. 271 at 3, (citing *Casey* "*passim*" and *Becerra* twice). The Court also must examine whether and to what extent the Seventh Circuit's decision in *Doe v. Rokita* affects the interpretation of those two cases. 54 F. 4th 518 (7th Cir. 2022). The Court is duty bound to harmonize all three cases. *United States v. Hansen*, 929 F.3d 1238, 1254 (10th Cir. 2019) ("[W]e must endeavor to interpret our cases in a manner that permits them to coexist harmoniously with overarching and controlling Supreme Court precedent and with each other."); *Kimberly-Clark Corp. v. Fort Howard Paper Co.*, 772 F.2d 860 – 63 (Fed. Cir. 1985) ("Thus, statements in opinions of this court must be read harmoniously with prior precedent, not in isolation.").

In *Casey*, abortion-provider plaintiffs challenged Pennsylvania's law requiring them to provide patients with certain information before performing an abortion. 505 U.S. at 880, 112 S.Ct. 2791. Specifically, the law required the physician to discuss the "nature of the procedure, the health risks of the abortion and of childbirth, and the probable gestational age of the unborn child." *Id.* at 881, 112 S.Ct. 2791. Further, the law required the physician to note the availability of state-published materials on child-support assistance, adoption agencies, and other abortion alternatives. *Id.*

The *Casey* plurality didn't evaluate the Pennsylvania law under heightened review. *Id.* Instead, the plurality termed the mandated disclosures an "informed consent requirement." *Id.* It suggested that a state doesn't violate the First Amendment when it requires a doctor to provide "truthful, nonmisleading information about the nature of [a] procedure." *Id.* at 882, 112 S.Ct. 2791. Though such requirements implicated the doctor's right not to speak, they did so "only as part of the practice of medicine, subject to reasonable licensing and regulation by the State." *Id.*

The State is correct that *Casey*'s language gives it some constitutional leeway to enact Section 6.1(1). But the *Casey* decision doesn't stand in isolation. Both the Supreme Court and the Seventh Circuit had more to say.

In *Becerra*, the Supreme Court considered a California statute that required certain pro-life pregnancy centers to display a state-drafted notice regarding abortion availability. *Becerra*, 585 U.S. at 763, 138 S.Ct. 2361. The notice had to be "posted

in the waiting room, printed and distributed to all clients, or provided digitally at check-in." *Id.*

Rejecting a so-called "professional speech" First Amendment exception, the Supreme Court held that "speech is not unprotected merely because it is uttered by professionals." " *Id.* at 766, 138 S.Ct. 2361. Citing *Casey*, the Court acknowledged that "States may regulate professional conduct, even though that conduct incidentally involves speech." *Id.* at 769, 138 S.Ct. 2361. In doing so, *Becerra* immediately categorized the action at issue in *Casey* as more akin to conduct, rather than speech. Moving forward, the Supreme Court then held *Casey*'s lower standard didn't apply to the California statute. Instead, according to the *Becerra* Court, the law "regulate[d] speech as speech." *Id.* at 770, 138 S.Ct. 2361. The *Becerra* Court reasoned that the Pennsylvania statute in *Casey* was an "informed consent" law; whereas, the California statute was "neither an informed consent requirement nor any other regulation of professional conduct." *Id.*

Although it didn't overrule *Casey, Becerra*'s dicta revealed the Court's dim view of compelled speech, even when it occurs in a medical context. "Doctors help patients make deeply personal decisions, and their candor is crucial," the Court said. *Id.* at 771, 138 S.Ct. 2361 (citations omitted). And "[t]hroughout history, 'governments have 'manipulated the content of doctor-patient discourse' to increase state power and suppress minorities." *Id.* (citations omitted). "Doctors and nurses might disagree about the ethics of assisted suicide or the benefits of medical marijuana ... [but] the people lose when government is the one deciding which ideas should prevail." *Id.* at 772, 138 S.Ct. 2361.

\*\*\*

**\*11** The Court detours here to discuss "informed consent," for purposes of *Becerra*'s "speech incidental to conduct." *Becerra, Casey, Rokita*, and other abortion-related cases refer to informed consent. And, as the Parties recognize, this loaded term of art does a decisive amount of work: If a disclosure fits within an "informed consent" statute, *Becerra* deemed it "incidental to professional conduct," and thereby immune from heightened review. Indeed, post-*Becerra*, if a disclosure *isn't* an informed consent statute, few avenues permit deferential review. *But see Rokita infra.* Yet, there's apparently "no[ ] legal authority reciting the contours of 'informed consent.' " *E.M.W. Women's Surgical Ctr., P.S.C.*

*v. Beshear*, 920 F. 3d 421, 448 (6th Cir. 2019) (Donald, J., dissenting).

The Parties in this case offer conflicting definitions of informed consent. A three-day trial devolved into disagreements about the competing ethical principles underpinning medical practice and which values should be prioritized over others. *See* Trial Tr. 426–35; 603–10. To the extent the American Medical Association or similar groups adopt a definition, the record demonstrates those are nonbinding guidelines. NIFLA dkt. 275-2 ¶ 34. So, under these circumstances, the Court has two options: examine legal precedent and derive a definition from that caselaw or choose between competing experts and trade associations on an issue fraught with scientific, moral, and philosophical controversy. Some judges take the latter approach, looking to the normative medical definition promulgated by groups like AMA and ACOG. *See E.M.W.*, 920 F. 3d at 454–55 (6th Cir. 2019) (Donald, J., dissenting); *Camnitz*, 774 F.3d at 251–53. A court would then conclude that whatever falls within the medical groups' informed consent definition automatically meets *Becerra*'s "speech incidental to conduct."

But there are significant problems with that approach, an approach this Court refuses to take. First, that process ultimately nullifies *Becerra*: "Speech isn't unprotected," the *Becerra* Court held, "merely because it's uttered by professionals." Yet if the State or professional groups could tuck the compelled speech under an "informed consent" labeled shield, then they could routinely evade scrutiny. *See Becerra*, at 755, 138 S.Ct. 2361 ("[S]tate labels cannot be dispositive of [the] degree of First Amendment Protection." (cleaned up)). Further, that approach forces the Court to decide what's constitutional based on the normative, conventional perspectives. That conflicts with the First Amendment's entire purpose, aiming to protect "*unpopular* ideas [and] information." *See Becerra*, 585 U.S. at 773, 138 S.Ct. 2361 (emphasis added).

More importantly, doctors and lawyers are talking past each other. *Becerra* didn't say "informed consent" status alone is a get-out-of-First-Amendment-free card. Instead, *Becerra* held that such provisions are acceptable *because they're incidental to professional conduct.* Indeed, the Supreme Court pointed to the specific informed consent provision at issue in *Casey*. 585 U.S. at 769–70, 138 S.Ct. 2361. So, the Court must determine whether the medical definition of informed consent remains incidental to conduct. If the scope of the medical community's definition captures protected speech

—i.e. amounts to more than an incidental burden—then it violates the First Amendment. A court can't abdicate its responsibility to determine constitutional protections to trade associations.

Ultimately, when medical experts disagree as to what constitutes "informed consent," the Court can't pick a side. It's not only unqualified do so, but, more importantly, *Becerra* doesn't care about the abstract definition. Instead, the Court examines abortion-related cases to discern some of the contours of informed consent. When "informed consent" meets *those* qualifications, it necessarily satisfies *Becerra*'s "incidental to professional conduct." The Court finds that "informed consent" is incidental to conduct when it meets the following four minimum requirements.

**\*12** First, informed consent necessarily requires a "medical procedure." The *Becerra* statute wasn't an informed consent provision, because it wasn't "tied to a procedure at all," instead applying to "all interactions between a covered facility and its clients, regardless of whether a medical procedure is ever sought, offered or performed." *Becerra*, 585 U.S. at 756, 138 S.Ct. 2361; *see also Rokita*, 54 F. 4th at 520 (noting that states may require "informed consent to risky procedures"). That's also consistent with the term "incidental to conduct." If there's not an identifiable procedure—i.e. no conduct—then the informed consent can't latch on to anything.

Second, as the term suggests, an informed consent provision must "afford the patient the ability to make an informed, intelligent decision regarding medical treatment he is to receive," including "the general nature of the contemplated procedure, the risks involved, the prospects of success, the prognosis if the procedure is not performed and alternative medical treatment." *Roberts v. Patel*, 620 F. Supp. 323, 325 (N.D. Ill. 1985). *Canterbury v. Spence*, 464 F.2d 772, 781 (D.C. Cir. 1972) (physicians generally must "warn the patient of any risks to his well-being which the contemplated therapy may involve").

So, by definition, a disclosure only qualifies as an informed consent provision if it occurs *before* a patient undergoes a medical procedure. *See Patel*, 620 F. Supp. at 325 ("The doctrine of informed consent requires that *prior to* administering medical treatment ....") (emphasis added); *Becerra*, 585 U.S. at 769, 138 S.Ct. 2361 (noting that *Casey* required "informed consent *before* they could perform an abortion.") (emphasis added); *Karlin v. Foust*, 188 F.3d 446, 454 (7th Cir. 1999) (discussing informed consent before a

procedure); *Stuart v. Camnitz*, 774 F.3d 238, 252 (4th Cir. 2014) ("The informed consent process typically involves a conversation between the patient ... and the physician ... before the procedure begins."). Both legal and medical dictionaries agree on this fundamental principle of informed consent. *Informed Consent*, BLACK'S LAW DICTIONARY (12th ed. 2024) ("A person's agreement to allow something to happen, made with full knowledge of the risks involved and the alternatives."); *Informed Consent*, STEDMAN'S MED. DICTIONARY ("Voluntary agreement given by a person ... for participation in a ... treatment regime ... after being informed of the purpose, methods, procedures, benefits, and risks.").

Third, to be incidental to conduct, the informed consent provision must substantively relate to the impending medical procedure. In other words, a state can't throw whatever it wants into a compelled disclosure and label it informed consent. Before surgery, the State can't require a doctor to tell her patient that ketchup should never be put on a hotdog. Courts have interpreted that requirement broadly, allowing discussions of such things as adoption and parental support, *Casey*, 505 U.S. at 881, 112 S.Ct. 2791, and descriptive ultrasounds, *E.M.W.*, 920 F. 3d 421, 424 (6th Cir. 2019); *but see Camnitz*, 774 F.3d at 252 (holding such ultrasounds don't fit within informed consent). But in all those scenarios, the disclosures aimed to articulate the factual "risks involved, the prospects of success, the prognosis if the procedure is not performed and alternative medical treatment." *Patel*, 620 F. Supp. 323, 325 (N.D. Ill. 1985). The relational requirement essentially tracks the "truthful, non-misleading and relevant" standard articulated in *E.M.W.*, 920 F.3d at 424.[9]

[9]
The State argues that "truthful, non-misleading, and relevant" standard should govern compelled disclosures, like Section 6.1(1). But the State skips a step. The *E.M.W.* court had already concluded that the statute at issue was an informed consent provision. *See* 920 F.3d at 424 ("Even though an *abortion-informed-consent* law compels a doctor's disclosure of certain information, it should be upheld so long as the disclosures is truthful, non-misleading, and relevant to an abortion.") (emphasis added); *id.* at 429 ("[S]uch incidental regulation includes mandated informed-consent requirements, provided that the disclosures are truthful, non-misleading, and relevant."). Moreover, the Court shares some of the *E.M.W.* dissent's concern that *Casey* may have used that

language in an undue burden analysis, not a First Amendment one. *Id.* at 449.

**\*13** Fourth, doctrinally, an informed consent provision is incidental to conduct only when it regulates the health care provider performing the identified medical procedure. *See Casey*, 505 U.S. at 881–82, 112 S.Ct. 2791 (explaining how the statute applied to the doctor performing the abortion); *A Woman's Choice-East Side Women's Clinic v. Newman*, 305 F.3d 684, 684–85 (7th Cir. 2002) (discussing what the Court called an "informed consent" statute that regulated the "*physician who is to perform* the abortion") (emphasis added); *E.M.W.*, 920 F.3d at 424 (discussing what the court termed an informed consent provision that "direct[ed] a doctor, prior to performing an abortion"); *Tex. Med. Providers Performing Abortion Servs. v. Lakey*, 667 F.3d 570 (5th Cir. 2012) (same); *Planned Parenthood Minnesota, North Dakota, South Dakota v. Rounds*, 530 F.3d 724 (8th Cir. 2008) (same). All of those cases are doctrinally consistent with the goal of informed consent that a physician can't operate on a person without the patient's permission. *See Becerra*, at 770, 138 S.Ct. 2361 (citing *Schloendorff v. Soc'y of N.Y. Hosp.*, 211 N.Y. 125, 105 N.E. 92, 93 (1914)) (Cardozo, J.) ("[A] surgeon who performs an operation without his patient's consent commits an assault."). That rationale only carries weight when the operating physician obtains the patient's consent for *that* impending procedure.

The State calls this an "invent[ed]" rule that imposes "a novel limitation" on the State's power. NIFLA dkt. 275 at 15. It's true that neither *Casey* nor those other cases said in exact words that a disclosure is only an informed consent provision when it's regulating the procedure-providing doctor. But those were the factual circumstances. And cases must be read and their holdings interpreted in the factual context presented to the court making the decision. *See Pampered Chef v. Alexanian*, 804 F. Supp. 2d 765, 782 (N.D. Ill. 2011); *MB Fin. Bank, N.A. v. Walker*, 741 F. Supp. 2d 912, 919 (N.D. Ill. 2010). Indeed, the Supreme Court found *Becerra's* counterfactual (i.e. a state compelling speech from someone not necessarily performing the medical procedure) unconstitutional. What's more, the State has things backwards. The State cites no case that construes "informed consent" in this type of expansive manner, one that applies "informed consent" to health care providers who never offer the underlying-yet-to-occur procedure. Instead, the *State* breaks doctrinal ground by pioneering a novel definition without authority. In doing so, the State—not the Plaintiffs—are the inventors.

The State notes that *Casey* required the operating physicians to inform women about "subjects far beyond the health care they offered," including paternal child support and adoption. NIFLA dkt. 275 at 12. So, the State asserts, the physician need not provide the triggering medical procedure. *Id.* But the State confuses the necessary and sufficient conditions. If a doctor performs a medical procedure, then a state may require an informed consent disclosure. The doctor must perform a medical procedure for the state to constitutionally compel that disclosure. However, the doctor doesn't need to also perform the procedures (if any) contained within those disclosures. For example, a state may compel a surgeon to inform a patient that surgery will consequentially require physical therapy, even though the surgeon doesn't offer physical therapy.

The State proposes a broader definition of informed consent. It contends that "[i]nformed consent is not limited to seeking authorization for an imminent medical procedure." NIFLA dkt. 275-1 ¶¶ 107–08. Instead, "[h]ealth care personnel are obligated to advise patients of risks and benefits of relevant procedures and treatment options, even if those treatments are not available at that particular medical facility." NIFLA dkt. 275-1 ¶¶107–08. The State derives that definition from the AMA's Code of Ethics and other professional bodies. *See* NIFLA dkt. 275-1 ¶¶ 75–78, 106–09. The State admits those ethical guidelines are "not binding professional or legal standards, but they provide a normative set of guidelines within the medical profession that health care professional consult to inform their practice." *Id.* [10] The State cites no case in which courts stretch informed consent to apply to doctors who don't perform the impending procedure. The Plaintiffs and their experts disagree with the State, offering a definition similar to the Court's definition. *See* NIFLA dkt. 271 at 3 ("To qualify as an informed consent requirement, a law must be tied to a medical procedure that the regulated parties perform.").

[10]
To be clear, the Court doesn't doubt that "informed consent" also prizes "patient autonomy" and "self-determination." *Camnitz*, 774 F.3d at 251; *see also Canterbury v. Spence*, 464 F.2d 772, 787 (D.C. Cir. 1972) (emphasizing "patients right to self-decision" and determination). But the doctrine still requires certain other predicates to be satisfied for the term to qualify as "speech incidental to conduct." *Camnitz* found that an ultrasound-description requirement fell outside informed consent—essentially because it demanded *too*

*much* information—but the necessary elements discussed above still existed.

**\*14** The State's definition falls outside *Becerra*'s scope. *Becerra* carved out room for informed consent provisions as incidental to conduct. But that's because they were nearly contemporaneous with and in furtherance of the underlying procedure. "Incidental to conduct" is incompatible with a definition of informed consent that would require doctors to discuss hypothetical medical procedures they won't perform.

So, to summarize: Doctrinally, a statute qualifies as an informed consent provision—and therefore incidental to conduct—when it requires a health care professional, before she performs a medical procedure, to discuss the nature or consequences of the impending medical procedure.

\*\*\*

In medical cases, informed consent occupies most of the "speech incidental to professional conduct" universe. *See Becerra*, 585 U.S. at 768, 138 S.Ct. 2361 (citing only two examples: the informed consent statute in *Casey* and legal advertising regulations). But *Becerra* leaves some room for non-informed consent qualifying statutes that are nonetheless incidental to professional conduct. *See id.* at 770 (noting that the California statute was "not an informed consent requirement *or any other regulation of professional conduct*."). *Rokita* provides such an example.

In *Rokita*, Indiana regulated the disposal of fetal remains. Specifically, the state required abortion providers (but not women who kept the remains) to dispose of the remains by either burial or cremation. 54 F. 4th 518, 519 (2022). The disposal requirements didn't apply to women who kept the remains themselves. *Id.* The provider could explain those options after the procedure, and the information didn't aim to inform her consent to a procedure; nor did *Rokita* call the statute an informed consent provision. Two doctors sued, arguing that the First Amendment barred Indiana from requiring them to ask the women to select an option: burial or cremation. *Id.* at 520.

In a brief decision, the Seventh Circuit held Indiana's law constitutional. On the one hand (and as the State highlights), the *Rokita* Court stressed that "states may require medical providers to give truthful notices," including disclosures that enable "informed consent to risky procedures." *Id.* Characterizing *Becerra, Rokita* explained that although a "state may not enforce requirements disconnected from

medical care," [11] the state could still demand that "medical professionals alert patients to laws that affect medical choices." *Id.* at 521. That precise language gives states some latitude to demand certain speech, so long as that speech related to "medical choices" or falls within "medical care." But, as the Seventh Circuit has reminded district courts, that sentence must be read in context, including in the context of the facts of the case. *Livingston v. Trustguard Ins.*, 558 Fed. Appx. 681, 683 (7th Cir. 2014) *citing United States v. Costello*, 666 F.3d 1040, 1044 (7th Cir. 2012). [12] The Seventh Circuit's reminder is critical because, as the Plaintiffs emphasize, later language in *Rokita* limits its scope. Characterizing *Becerra*'s characterization of *Casey, Rokita* held that "a state may require medical professionals to provide information that facilitates patients' choices directly linked to procedures that have been or may be performed." *Rokita*, 54 F.4th at 521.

---

[11]   This is the "ketchup on the hot dog" example the Court used previously.

[12]   For example, although *Rokita* used the phrase "risky procedures," no risky procedures were implicated under the challenged statute or facts of the case.

**\*15** Reading *Casey, Becerra*, and *Rokita* together, the Court derives the following rule: States may regulate the practice of medicine, but to the extent the regulation implicates speech, to be constitutional, that speech must be "incidental to professional conduct." *Becerra*, 585 U.S. at 768, 138 S.Ct. 2361. In the medical context, qualifying informed consent provisions will occupy most of the "speech incidental to professional conduct" universe. But *Rokita* makes clear that there's still room for some other speech-implicating conduct regulations, so long as the speech remains incidental to the underlying conduct.

*Application to Section 6.1(1)*

With that background, the Court now assesses Section 6.1(1). It first considers whether the mandated disclosures are "informed consent" provisions, as earlier defined. It then weighs whether the provisions are otherwise "incidental to conduct."

As discussed above, to secure a liability shield, Section 6.1(1) compels certain speech; namely a discussion about a

patient's "condition, prognosis, legal treatment options, and risks and benefits of the treatment options." NIFLA dkt. 275-1 ¶ 100 (imagining a "thorough[ ] discuss[ion]" between the provider and the patient; *id.* ¶¶ 90–110 (terming the discussion "counseling"). As discussed, the mandated disclosures don't qualify as commercial speech. So, the Court subjects it to heightened scrutiny, unless the speech is only incidental to conduct.

*Informed Consent Analysis*

If the disclosures fall under the definition of informed consent, then the *Becerra, Casey,* and *Rokita* decisions teach that the disclosures are necessarily incidental to conduct and therefore don't trigger strict scrutiny. Recall that a state action doctrinally qualifies as an informed consent provision when it requires a health care professional, before she performs a medical procedure, to discuss the nature or consequences of the impending medical procedure. Under Section 6.1(1):

> "The health care facility, physician, or health care personnel shall inform a patient of the patient's condition, prognosis, legal treatment options, and risks and benefits of the treatment options in a timely manner, consistent with current standards of medical practice or care."

The Pregnancy Centers engage in some medical-like conduct. They discuss medical histories, maternal health, abortion, and childbirth. In some cases, they administer STI and/or pregnancy tests as well as abortion pill reversals. And the Pregnancy Centers also perform transvaginal and abdominal ultrasounds. None of the Pregnancy Centers themselves perform abortions.

Although the cases on informed consent don't define a "medical procedure," under these facts, the Court is able to identify only two procedures from the list of medical conduct that could possibly anchor an informed consent provision: (i) sonogram/pregnancy test, and (ii) "medical options counseling." The Court considers whether either are qualifying "medical procedures," and, if so, whether the disclosures meet the other qualifications for informed consent.

(i) *Ultrasound*

The Pregnancy Centers perform abdominal and transvaginal ultrasounds and conduct pregnancy tests. [13] In doing so, a woman is "assigned a medical professional," and brought to an ultrasound exam room. Tr. 361:12–22. The Court finds these exams to be "medical procedures." And because it's a qualifying medical procedure, the State has leeway to require informed consent for these procedures.

[13]    The Court identifies the ultrasound (as opposed to the urine test) as the underlying procedure, because its more invasive nature permits a broader set of disclosures, which in turn maximizes the likelihood that the disclosures are constitutional.

**\*16** As applied to the Pregnancy Centers, the disclosure's timing doesn't fit the informed consent definition. Section 6.1(1) kicks-in *after* the ultrasound procedure. *See* Section 6.1(1) (the provider must inform the patient of her "condition, prognosis, legal treatment options, and risks and benefits of the treatment options."). [14] These types of discussions could only occur following a pregnancy determination. But after the ultrasound the woman is either "free to go," Trial Tr. 97:13–16, or otherwise discusses her pregnancy options with a nurse or patient advocate. Trial Tr. 155:17–21. At that point, the Pregnancy Centers don't perform an impending medical procedure, so there's nothing that requires the patient's informed consent.

[14]    The Plaintiffs contend that the ultrasound doesn't qualify as a medical "diagnosis." But the Court construes it as a diagnostic procedure for these purposes. It blinks reality to assert that an ultrasound performed at a crisis pregnancy center is not performed to obtain images for medical diagnostic purposes. *Diagnostic ultrasound,* STEDMAN'S MEDICAL DICTIONARY (28th ed. 2006).

And it's not just a timing issue. There's a relationship disconnect. A prototypical informed consent provision would pertain to the impending procedure's (here an ultrasound) nature, risks, and benefits. To that end, the medical professional might need to inform a woman about the ultrasound's benefits. For example, the medical professional might need to inform the patient that the ultrasound provides an image of the fetus; that it can determine a fetus' age and condition; or that it can identify risky health conditions. And the health care professional might also be compelled to disclose that an ultrasound requires abdominal or vaginal contact; that less invasive procedures, like a urine test, can accomplish some of the same goals; or that an image of a fetus will appear on screen or that the woman may hear certain

sounds. That type of information might inform the woman's decision as to whether to undergo the ultrasound procedure.

But the compelled disclosures required by Section 6.1(1) (i.e. the risks and benefits of abortion and childbirth) both occur after the ultrasound and substantively don't relate to that procedure. So, they don't fit within the doctrinal understanding of informed consent statutes.

### (ii) *Medical Options Counseling*

The Court next considers whether the Pregnancy Centers' "medical options counseling" could qualify as a medical procedure that could anchor incidental disclosures. The State groups much of the Pregnancy Centers' activities together, terming them "medical options counseling." And the Plaintiffs admit they engage in this type of counseling. Dkt. 282-1 at 16. The Court understands that to essentially mean a discussion regarding pregnancy status (pregnant or not pregnant) and a woman's associated options (if pregnant, then childbirth or abortion). If all of that counseling itself is a "medical procedure," then the State could regulate that conversation under the theory that the discussion is actually conduct. Put simply, the speech itself is treatment, which would be conduct. Under that kind of reading, the Court wouldn't even need to consider whether particular speech was "incidental" or to a procedure, because the procedure necessarily encompasses the speech. Stated differently, according to the State, "medical options counseling" is conduct, not speech.

There's support for this type of reading. (In the near future, the Supreme Court might have something to say about this type of reading.) In *Tingley v. Ferguson*, the Ninth Circuit considered whether conversion therapy [15] constituted conduct or speech. 47 F.4th 1055 (9th Cir. 2022). The therapist-plaintiff alleged that Washington's ban on the practice violated his free speech rights. But citing its pre-*Becerra* decision in *Pickup v. Brown*, 740 F. 3d 1208 (2014) the Ninth Circuit held that the therapy constituted conduct and therefore didn't implicate the First Amendment's free speech clause. 740 F.3d at 1221. The *Tingley* court reasoned that the therapy wasn't any less of a medical treatment "merely because [the treatment is] implemented through speech rather than conduct." *See also Chiles v. Salazar*, 116 F. 4th 1178, 1203–09 (10th Cir. 2024) (*cert. granted*, No. 24-539, ––– U.S. ––––, ––– S.Ct. ––––, ––– L.Ed.2d ––––, 2025 WL 746313, 2025 U.S. LEXIS 1025 (Mar. 10, 2025)) (upholding a district court's preliminary

injunction finding talk therapy a "medical treatment," and therefore "conduct.").

[15] "Within the field of psychology, conversion therapy is also known as 'reparative therapy' or 'sexual orientation and gender identity change efforts.' " 47 F.4th at 1064. Conversion therapy employs counseling and psychotherapy.

**\*17** But not all circuit courts are on board. The Eleventh Circuit, in *Otto v. City of Boca Raton, Florida*, held that conversion therapy constituted speech. 981 F.3d 854 (11th Cir. 2020). States couldn't regulate the *Otto* court held, by relabeling it "conduct." *Id.* at 861. The court recognized that it wasn't "entirely wrong" to characterize speech-based therapy as a "course of conduct." But the *Otto* court stressed that what the enacting governments called a "medical procedure" actually "consist[ed]—entirely—of words." *Id.* at 865. So, the Eleventh Circuit concluded that the First Amendment applied to therapy regulations.

The State says *Otto* doesn't apply. In its view, *Otto* didn't involve a "physician disclosure law of the kind at issue in *Casey* and *Rokita*, which require[d] providers to disclose certain information in connection with the provision of healthcare services." NIFLA dkt. 275 at 23. According to the State, "*Casey* and *Rokita* make clear that giving patients full information to make medical decisions is part of the 'practice of medicine, subject to reasonable licensing and regulation by the state.' " *Id.* (citing *Casey*, 505 U.S. at 884, 112 S.Ct. 2791). As explained above, the Court disagrees with the State's reading, because it largely ignores *Becerra* and sidesteps important language in *Rokita*. The State must either establish that it's solely regulating conduct (without implicating any speech) or otherwise demonstrate that the speech is incidental. Though *Otto*'s holding doesn't help the State demonstrate that therapy is fully conduct, *Tingley*'s and *Salazar*'s could.

But beyond its appearance in a string cite, the State didn't rely on either case. Absent further briefing, the Court isn't willing to say categorically whether all counseling/ therapy constitutes speech or conduct. The Court only concludes that the State hasn't persuaded the Court to adopt *Tingley/Salazar*'s reasoning over *Otto*'s. So, the Court can't find that the Pregnancy Centers' "medical options counseling" qualifies as a "medical procedure" for purposes of the *Casey/Becerra/Rokita* doctrine. And because it's

not a "procedure," it doesn't trigger an informed consent analysis. [16]

[16]    The Court applies strict scrutiny, because Section 6.1(1) is content-based, and not incidental to any recognized medical procedure. What's more, Section 6.1(1) isn't entitled to *Zauderer* deference. So, the Court doesn't see a doctrinal avenue to apply something like intermediate scrutiny. However, the Court notes that Section 6.1(1) would fail intermediate scrutiny on fit, for the reasons discussed below.

*Non-Informed Consent Analysis*

Concluding that Section 6.1(1) isn't an informed consent provision, the Court considers whether it's nevertheless incidental to some conduct. *Rokita* underscored that a state action need not qualify as an informed consent provision to be "incidental." So, for example, unlike an informed consent statute, compelled speech could follow a procedure or not need to be provided by the rendering physician at all. If the state is regulating a specific course of conduct, it has leeway to implicate directly related speech.

However, stretching *Rokita* too far ultimately reverts to a *Casey*-only world, one in which the state may regulate the amorphous "practice of medicine." *Becerra* limited the universe in which *Casey* applied, barring disclosures even when they appeared in the pregnancy center's waiting room. It's true that the disclosure doesn't have to qualify as an informed consent statute, but there isn't much space between constitutional informed consent provisions and *Becerra*'s unconstitutional compelled materials. The Court finds that Section 6.1(1) doesn't squeeze through that narrow path.

**\*18** *Rokita* involved a statute regulating the disposal of fetal remains. To that end, after an abortion, a woman could choose to take possession of the fetus or the provider could dispose of it consistent with the statute. *Rokita*, 54 F.4th at 519. So, the provider necessarily had to determine which route the woman wanted to take. This was a binary decision. No discussion was required, let alone the thorough discussion the State contends Public Act 99-690 mandates. What's more, the provider had to speak by asking this question. It didn't otherwise compel any discussion, such as the provider informing the woman of the risks and benefits of each option. *Id.* There was a proximate relationship, both temporally and substantively, between the disclosures

in *Rokita* and the medical conduct. [17] Contrastingly, Section 6.1(1) demands a wide-ranging, hypothetical conversation unrelated to any procedure or other medical conduct. Indeed, Section 6.1(1) requires a wide-ranging conversation that might be completely divorced from the reality of the situation; for example, the thrilled patient who is not reasonably likely to encounter medical difficulties because of the pregnancy. What's more, that compelled speech isn't necessary to further future conduct. Any link under those circumstances is far too attenuated to satisfy *Becerra* or *Rokita*. Finding Section 6.1(1) not incidental to conduct, the Court must apply strict scrutiny.

[17]    Similarly, as discussed below, Section 6.1(3) tethers any cognizable speech to specific conduct.

*Strict Scrutiny Analysis*

When a government restricts or requires speech based on content or viewpoint, the government action must survive strict scrutiny analysis. *Reed, 576 U.S. at 171, 135 S.Ct. 2218.* Under this standard, the government must prove that the restrictions or required speech not only furthers a compelling interest but also that they do so in a narrowly tailored way to achieve that goal. *Id.* Restrictions that are underinclusive or overinclusive are not narrowly tailored. Indeed, to be narrowly tailored, the action must eliminate "no more than the exact source of the 'evil' it seeks to remedy." *Frisby v. Schultz, 487 U.S. 474, 485, 108 S.Ct. 2495, 101 L.Ed.2d 420 (1988).*

The State argues that it has a compelling interest in ensuring that conscience-based objections don't impair patients' health. *See* 745 ILCS § 70/6.1. To that end, the State asserts, it must demand that patients "receive accurate, timely information about their treatment options necessary to make autonomous medical choices, as well as reliable information about other providers who offer the care they have chosen." NIFLA dkt. 275 at 21. The Plaintiffs argue that's not a compelling interest because there's no evidence patients lack any information. NIFLA dkt. 282 at 13.

"[T]here can be no doubt," the Supreme Court has said, that "the government 'has an interest in protecting the integrity and ethics of the medical profession.' " *Gonzales v. Carhart, 550 U.S. 124, 157, 127 S.Ct. 1610, 167 L.Ed.2d 480 (2007)* (quoting *Wash. v. Glucksberg, 521 U.S. 702, 731, 117 S.Ct. 2258, 138 L.Ed.2d 772 (1997)*) (citing *Barsky v. Bd. of Regents of Univ. of N.Y., 347 U.S. 442, 451, 74 S.Ct. 650, 98 L.Ed. 829 (1954)* (noting that a state has "a legitimate concern for maintaining high standards of professional conduct")). The Court will assume, without deciding, that the State has a

2025 WL 1017677

compelling government interest, despite the State's failure to affirmatively produce evidence at trial on this requirement.

But Section 6.1(1) fails strict scrutiny because it's fatally overbroad. Section 6.1(1) requires compliance consistent with the "standard of care." Perhaps it's possible—after the fact—to discern the standard of care in a particular interaction. Those after-the-fact determinations occur continually in civil trials across Illinois. But testimony established that, prospectively, it's essentially indefinable. Indeed, the State admitted that "full explanation of all treatment options and the risks and benefits isn't required by the standard of care in every situation." Trial Tr. 661:17–20. Even assuming that, in some non-medically necessary cases, the "standard of care" would require a benefits discussion, the Pregnancy Centers have little guidance on what those situations look like. So, in every situation they'll either risk potential liability or utter compelled speech without furthering *any* interest. Under strict scrutiny, the State carries the burden of establishing the provision is narrowly tailored; it falls far short in this case. [18] So, Section 6.1(3) unconstitutionally compels speech, and therefore the State can't demand such speech in exchange for a liability shield.

[18]  Because the Court finds that Section 6.1(1) compels speech even when it furthers no interest, the Court doesn't assess the Plaintiffs' argument that it's also underinclusive because it applies to those with conscience objections.

B. *Section 6.1(3)*

**\*19** The Plaintiffs also challenge Section 6.1(3) on First Amendment Free Speech grounds. This Section requires covered providers to transfer, refer, or tender, upon request, a list of medical providers that they reasonably believe will provide abortion services. The Court ultimately concludes that Section 6.1(3) doesn't implicate speech, so it doesn't violate the Free Speech Clause, either facially or as applied to the Plaintiffs. Section 6.1(3) provides:

If requested by the patient or the legal representative of the patient, the health care facility, physician, or health care personnel shall: (i) refer the patient to, or (ii) transfer the patient to, or; (iii) provide in writing information to the patient about other health care

providers who they reasonably believe may offer the health care service the health care facility, physician, or health personnel refuses to permit, perform, or participate in because of a conscience-based objection.

Whereas Section 6.1(1) requires health care professionals to *say* something to obtain immunity from civil or criminal liability, Section 6.1(3) explains what covered people and entities must *do* to earn immunity after the triggering event occurs: refer, transfer, or provide written information. As discussed more below, those three options are all conduct; none of them cognizably implicate speech.

Nor do the Pregnancy Centers engage in inherently expressive activities. The Court understands that the Plaintiffs run these Pregnancy Centers for the very sake of communicating pro-life messages. But conduct doesn't become expressive merely because the person engaged therein intended to express an idea. *United States v. O'Brien*, 391 U.S. 367, 376, 88 S.Ct. 1673, 20 L.Ed.2d 672 (1968). Juxtapose the line of cases extending First Amendment protections to inherently expressive conduct—such as dancing, flag burning, or web-design—with a doctor referring a patient to physical therapy. Stripped of its controversy, the difference is easy to see. Actions like transfers, referrals, or listing potential alternatives aren't inherently creative processes.

Further, the State grants conscientious objectors three different avenues to immunity. In lieu of referring the patient, a health care provider may "transfer the patient" to another facility or provide information about "other health care providers who they *reasonably believe may* offer" the unavailable service. § 6.1(3)(iii) (emphasis added). Most obviously, the option to transfer a patient doesn't implicate speech. [19]

[19]  The Court gives slightly more attention to the referral option because that's what the Parties emphasized. However, Section 6.1(3) provides *three options*, and all three are conduct.

When viewed through the lens of common sense, the Court has no trouble concluding that Section 6.1(3) doesn't implicate protected First Amendment activities. But, in reaching this holding, the Court also relies on trial testimony, persuasive precedent, analogies, common usage of the

terms, and legal and medical dictionaries. The Court first acknowledges the uncontested fact that the State intended for Section 6.1(3) to facilitate the provision of medical services. This provision narrowly applies when a patient expressly asks a medical provider for information regarding potential abortion providers. Stated differently, Section 6.1(3) contains an explicit and mandatory trigger that is directly linked to the action. And even then, the provider need only comply if it intends to use the HCRCA as an affirmative defense.

**\*20** From this narrow and purposeful drafting, the Court deduces that Section 6.1(3) doesn't target speech. And dictionary definitions compel the same conclusion. For example, the National Cancer Institute defines "referral" as an act. *Referral*, *Nat. cancer. Inst.* ("In medicine, the act of sending from one health care provider to another ...."). Black's Law Dictionary defines the term similarly as "[t]he act ... of *sending or directing* to another for information, service, consideration, or decision." *Referral*, Black's Law Dictionary (12th ed. 2024) (emphasis added).

What's more, courts around the country have expressly stated that medical providers engage in pure conduct when writing prescriptions. 360 *Virtual Drone Servs. LLC v. Ritter*, 102 F.4th 263, 274 (4th Cir. 2024); *Kory v. Bonta*, No. 24-cv-00001, 2024 WL 1742037, \*4, 2024 U.S. Dist. LEXIS 73845, \*11. As with prescriptions, the "key component" of a medical referral is the provision of treatment. *Kory*, 2024 WL 1742037, \*5, 2024 U.S. Dist. LEXIS 73845, \*11 (quoting *Nat'l Ass'n for the Advancement of Psychoanalysis v. Cal. Bd. of Psych.*, 228 F.3d 1043, 1046 (9th Cir. 2000)). Prescriptions and referrals are both standard responsibilities among health care providers. They serve clinical—not expressive—goals. Again, contrast the goals of doctors with the goals of dancers. As this analogy shows, referrals aren't protected First Amendment activities.

There's also a trump card for this analysis. The Court finds clear guidance in the Seventh Circuit's decision in *K.C. v. Individual Members of Med. Licensing Bd. of Indiana*, 121 F.4th 604, 629 (7th Cir. 2024). At the heart of *K.C.* were several First Amendment challenges to SEA 480: an Indiana statute banning health care professionals from providing, discussing, or referring minor patients for gender conversion therapy. Indiana and Illinois' referral provisions are two halves of the same whole; one state *restricts* medical referrals for controversial procedures, whereas another state *requires* them. The Seventh Circuit ultimately resolved the First Amendment issues in *K.C.* on other grounds. But,

importantly, it reversed the lower court's holding that SEA 480 burdens speech "on its face or in its practical operation." *Id.* (citing *Sorrell v. IMS Health Inc.*, 564 U.S. 552, 567, 131 S.Ct. 2653, 180 L.Ed.2d 544 (2011)). To the contrary, the Seventh Circuit suggested that restrictions on referrals are valid regulations of professional conduct. *Id.*

As the *K.C.* court explained, "SEA 480's secondary liability provision burdens speech incidentally because it targets conduct: facilitating the provision of gender transition procedures." *Id.* This logic applies with full force to statutes targeting referrals for any other medical procedure. "After all, in the law, what is sauce for the goose is normally sauce for the gander." *Heffernan v. City of Paterson*, 578 U.S. 266, 273, 136 S.Ct. 1412, 194 L.Ed.2d 508 (2016). The First Amendment certainly doesn't discriminate between topics of protected speech. *Otto*, 981 F.3d at 871 (11th Cir. 2020). So, if SEA 480's heavy restrictions on referrals for controversial medical treatment stand, so can their mirror image. *See id.*

*K.C.* and the additional cited authorities compel the Court's conclusion that medical referrals—and so certainly potential resource lists or transfers—are pure conduct, subject to reasonable state regulation. The Plaintiffs disagree. In their view, Public Act 99-690 is subject to strict scrutiny in its entirety because the practice of medicine necessarily implicates speech. Though it's true a few words are often necessary to carry out a course of conduct, words don't automatically turn the conduct into speech. *Giboney v. Empire Storage & Ice Co.*, 336 U.S. 490, 502, 69 S.Ct. 684, 93 L.Ed. 834 (1949). Consider, for example, the hypothetical in *Schneiderman*, where, by adopting economic regulations, a state incidentally regulates merchants' speech:

**\*21** [A New York statute preventing credit card surcharges] is not like a typical price regulation. Such a regulation—for example, a law requiring all New York delis to charge $10 for their sandwiches—would simply regulate the amount that a store could collect. In other words, it would regulate the sandwich seller's conduct. To be sure, in order to actually collect that money, a store would likely have to put "$10" on its menus or have its employees tell customers that price. Those written or oral communications would be speech, and the law—by determining the amount charged—would indirectly dictate the content of that speech. But the law's effect on speech would be only incidental to its primary effect on conduct, and "it has never been deemed an abridgment of freedom of speech or press to make a course of conduct illegal merely because the conduct was in part initiated, evidenced, or

carried out by means of language, either spoken, written, or printed." *Expressions Hair Design v. Schneiderman*, 581 U.S. 37, 47, 137 S.Ct. 1144, 197 L.Ed.2d 442 (2017) (quoting *Giboney v. Empire Storage & Ice Co.*, 336 U.S. 490, 502, 69 S.Ct. 684, 93 L.Ed. 834 (1949)).

Similarly, minimum wage laws don't implicate speech just because they require a supervisor to write a certain number on the check. [20] In these hypotheticals, as in this case, speech is a means to an end. Each regulation holds conduct at its core; limitations on employee speech are only a necessary means of enforcing compliance with the central regulatory scheme. In short, it's not enough to show that Public Act 99-690 implicates the First Amendment broadly. Given the option of severability, the Plaintiffs must show that this section, standing alone, abridges the covered health care providers' rights not to speak. They haven't done so. Section 6.1(3) is a wholesale regulation of professional conduct with no cognizable downstream effects on speech.

[20]    Contrastingly, minimum wage laws would implicate the First Amendment if they compelled the supervisor to discuss the benefits and downsides of paying certain salaries. That's the difference between Sections 6.1(1) and Section 6.1(3).

Even if the Court took the Plaintiffs at their word that Section 6.1(3) incidentally restricts some cognizable amount of speech, this Section would still be constitutional. As explained at length already, *Becerra, Rokita*, and its progeny allow states to regulate speech incidental to professional conduct, even beyond drafting informed consent disclosures. [21] *Otto*, 981 F.3d at 865; *360 Virtual Drone Servs. LLC*, 102 F.4th at 273. In this case, the necessary speech— either writing a list or drafting a referral—bears a direct nexus to the underlying conduct that's necessarily effectuated by speaking or writing.

[21]    No doubt, Section 6.1(3) isn't an informed consent requirement. Medical referrals only take place after an ultrasound or options counseling (that is, once the patient has confirmed that she is pregnant and decided what to do about it), and a referral isn't directly linked to either qualifying "procedure." The Court's analysis here essentially duplicates the discussion of Section 6.1(1) as an informed-consent requirement.

Ironically, though, the impact on speech is also incidental. The State's only goal in regulating things like referrals is to facilitate patients' access to their preferred medical treatment. The State doesn't intend to control the flow of discussion between doctors and patients—nor could it, for that matter. [22] Nothing in the HCRCA restricts the Plaintiffs' rights to express their own opinions, especially now that the Court finds Section 6.1(1) unconstitutional.

[22]    Contrastingly, the benefits discussion in Section 6.1(1) wholly regulates the exchange of information between providers and patients. In that scenario, the State takes the drivers' seat in deciding which ideas should factor into a woman's decision to have an abortion. In this one, the State exercises its police powers to facilitate a woman's choice only after she's decided for herself.

**\*22** The Court understands the Plaintiffs' position that, while complying with Section 6.1(3), they are required to effectively endorse a course of conduct they find morally abhorrent. That's more of a Free Exercise issue, discussed below. But, in any event, if the Plaintiffs are unhappy with this legislation, "the remedy to be applied is more speech." *United States v. Alvarez*, 567 U.S. 709, 727–28, 132 S.Ct. 2537, 183 L.Ed.2d 574 (2012) (quoting Justice Brandeis' concurrence in *Whitney v. California*, 274 U.S. 357, 377, 47 S.Ct. 641, 71 L.Ed. 1095 (1927)). When meeting the requirements of Section 6.1(3), covered providers may rearticulate their stance on abortion or explain that their conduct is required by the State. Many will. Section 6.1(3) establishes a floor, not a ceiling, of information that must be provided to patients. So, Section 6.1(3) doesn't offend the Plaintiffs' rights not to speak; it's simply a valid exercise of the State's police powers to improve citizens' access to health care by regulating professional conduct. Consequently, the State may require such conduct in exchange for the HCRCA's liability shield.

### Free Exercise Claim

Because the Court found Section 6.1(3) constitutional on Free Speech grounds, it now considers the Plaintiffs' contention that this Section violates the Free Exercise Clause. The Court recognizes that the peculiar circumstances presented by the facts, the HCRCA, and Public Act 99-690 put it in uncharted waters. As explained earlier, *supra* Part I(C), Public Act 99-690 arises in a unique statutory scheme; it works alongside the HCRCA to "respect and protect the right of conscience" for all heath care providers. 745 ILCS 70/2. The initial version of the HCRCA (now, almost fifty years old) protects

conscientious objectors from all liability resulting from their "refus[al] to act contrary to their conscience." *Id.* [23] But after collecting evidence—albeit minimal—that the HCRCA was *too strong* of a shield, in 2015, the General Assembly amended the HCRCA via Public Act 99-690. This statutory context guides the following discussion of the Plaintiffs' Free Exercise claims.

[23] Note, this part of the HCRCA has remained unchanged since its enactment. *See* P.A. 80-616 § 2; P.A. 90-246 § 5.

The Free Exercise Clause of the First Amendment, as applied to the states through the Fourteenth, provides that "Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof ...." U.S. Const. amend. I. Again, the Plaintiffs argue that Section 6.1(3) imposes unconstitutional conditions on their receipt of a public benefit. The Parties agree that the Plaintiffs have a sincere religious practice in refraining from facilitating abortions. NIFLA dkt. 275-2 at 4–5. The trial testimony confirmed this agreement beyond doubt. To end the analysis here, however, "would be to make the professed doctrines of religious belief superior to the law of the land, and in effect to permit every citizen to become a law unto himself." *Reynolds v. United States*, 98 U.S. 145, 167, 25 L.Ed. 244 (1878).

The Court has "never held that an individual's religious beliefs excuse him from compliance with an otherwise valid law prohibiting conduct that the State is free to regulate." *Emp. Div., Dep't of Hum. Res. of Oregon v. Smith*, 494 U.S. 872, 879, 110 S.Ct. 1595, 108 L.Ed.2d 876 (1990). Instead, courts determine the appropriate level of scrutiny by asking if a challenged regulation "targets religious conduct for distinctive treatment or advances legitimate governmental interests only against conduct with a religious motivation ...." *Church of Lukumi Babalu Aye, Inc. v. City of Hialeah.*, 508 U.S. 520, 531, 113 S.Ct. 2217, 124 L.Ed.2d 472 (1993). Laws that "single out" religious conduct for discriminatory treatment are subject to strict scrutiny. *Espinoza v. Montana Dep't of Revenue*, 591 U.S. 464, 483, 140 S.Ct. 2246, 207 L.Ed.2d 679 (2020) (quoting *Trinity Lutheran Church of Columbia, Inc. v. Comer*, 582 U.S. 449, 479, 137 S.Ct. 2012, 198 L.Ed.2d 551 (2017)) (Kagan, J., dissenting) (cleaned up). A "neutral law of general applicability," on the other hand, triggers rationality review, "even if [it has] the incidental effect of burdening a particular religious practice." *Lukumi*, 508 U.S. at 531, 113 S.Ct. 2217.

**\*23** To avoid burying the lede, the State correctly argues that Public Act 99-690 is a neutral law of general applicability. These "interrelated" requirements forbid the government from selectively imposing burdens only on conduct motivated by religious belief—partly by asking whether "the object of the law is to infringe upon or restrict practices because of their religious motivation." *Id.* at 531, 533, 113 S.Ct. 2217; *Listecki v. Off. Comm. of Unsecured Creditors*, 780 F.3d 731, 743 (7th Cir. 2015). Public Act 99-690 does no such thing.

Ordinarily, "[t]he minimum requirement of neutrality is that a law not discriminate on its face. A law lacks facial neutrality if it refers to a religious practice without a secular meaning discernable from the language or context." *Lukumi*, 508 U.S. 520, 546, 113 S.Ct. 2217, 124 L.Ed.2d 472 (1993). But, for the reasons already given, Section 6.1(3) doesn't fit neatly into the Free Exercise doctrine. Unlike the "historical instances of religious persecution and intolerance that gave concern to those who drafted the Free Exercise Clause," *Bowen v. Roy*, 476 U.S. 693, 703, 106 S.Ct. 2147, 90 L.Ed.2d 735 (1986), Public Act 99-690 and the HCRCA expand conscientious objectors' rights to the free exercise of religion by immunizing them from liability. This context is important. *See In re Sinclair*, 870 F.2d 1340, 1342 (7th Cir. 1989). "Considering the Act in isolation, as Plaintiffs insist the [C]ourt should, would mean that religious exemptions are a one-way ratchet: once extended, they could never be narrowed or abolished without violating the Free Exercise Clause because religious accommodations are, by their very nature, neither neutral nor generally applicable." NIFLA dkt. 176 at 35.

The Court wholeheartedly agrees with Judge Pallmeyer's discussion "about what law is the proper subject of analysis." *Id.* at 34. As she explained, the proper question is whether Public Act 99-690 *and* the HCRCA subject conscientious objectors to "unequal treatment" by imposing additional burdens on conscientious objectors over secular providers. *Lukumi*, 508 U.S. at 542, 113 S.Ct. 2217 (quoting *Hobbie v. Unemployment Appeals Comm'n of Fla.*, 480 U.S. 136, 148, 107 S.Ct. 1046, 94 L.Ed.2d 190 (1987) (Stevens, J., concurring)). Judge Pallmeyer hoped that the statewide "standard of care" may be dispositive; if Public Act 99-690 doesn't impose additional burdens on conscientious objectors, she reasoned, the Amendments must be neutral and generally applicable. NIFLA dkt. 176 at 20. As noted earlier, however, trial testimony made it impossible to prospectively and abstractly establish the standard of care for all providers in all circumstances. [24] *Supra* Part II(B). And, again, that

conclusion is unsurprising given that standard of care determinations are specific to the circumstances presented to the health care professional. *See Edelin,* 157 Ill.App.3d 857, 109 Ill.Dec. 890, 510 N.E.2d at 962.

24    Importantly, the Court doesn't decide whether the standards of care do or don't match Section 6.1(3)'s provisions. It's possible that a conscientious objector might fail to comply with Section 6.1(3) and still satisfy the standard of care. As explained more later, the Court only concludes that the Plaintiffs can be called to court to make such a showing, as could anyone else.

So, this Court takes a different route, starting with a hypothetical from before the HCRCA: Two providers—one a conscientious objector and the other secular—both fail to provide a woman with requested information about abortion providers. The conscientious objector refuses because of his sincerely held beliefs. The secular provider doesn't provide the requested information because he's too busy. Both patients sue. Before the HCRCA, both suits could've gone forward, requiring the plaintiff in both cases to show that the health care providers fell below the standard of care.[25] After the HCRCA's enactment, the conscientious objector—but not the secular provider—is wholly protected, regardless of whether the provider's actions fell below the standard of care.

25    As Judge Pallmeyer explained, there's no indication that the pre-HCRCA liability regime wasn't neutral and generally applicable. Put differently, absent the HCRCA, it's not necessarily unconstitutional to sue a doctor who didn't meet the standard of care because of her conscientious objection. In any event, the Amendments don't ban any other affirmative defenses.

**\*24** Along comes Public Act 99-690—partially restoring the pre-HCRCA universe. Now, as before, all health care providers are amenable to suit for failure to refer, transfer, or provide written information about potential abortion providers. Relative to each other, the secular provider isn't in any *better* position than before the HCRCA and the conscientious objector isn't any worse for the wear.

As this hypothetical shows, the latest Amendments to the HCRCA don't impose additional burdens on conscientious objectors because of their beliefs.[26] It's true that conscientious objectors can no longer rely on the HCRCA's

once-expansive immunity. But as discussed previously, conscientious objectors were never constitutionally entitled to those benefits. NIFLA dkt. 176 at 35. The General Assembly was formerly inclined to offer an optional shield and now it isn't. It's not the Court's place to second-guess the wisdom of that decision. *Grand Trunk W. Ry. Co. v. Indus. Comm'n,* 291 Ill. 167, 172, 125 N.E. 748 (1919).

26    For the mathematically inclined lawyer (if one exists): 0 [what the two providers had pre-HCRCA] + 1 [what the conscientious objector had after the HCRCA] − 1 [what the provider has after P.A. 99-690] = 0. So, the two are once again on equal footing. (In fact, that oversimplifies it because the conscientious objector, unlike the secular provider, earns absolute immunity after complying with Section 6.1(3)).

In a further attempt to bind the General Assembly to its own generosity, the Plaintiffs suggest that the State passed Public Act 99-690 at least partially "because of" its adverse effect on religious activities. *Personnel Administrator of Mass. v. Feeney,* 442 U.S. 256, 279, n. 24, 99 S.Ct. 2282, 60 L.Ed.2d 870 (1979). They don't support that argument with any evidence of legislative malintent. *Compare Lukumi,* 508 U.S. at 540, 113 S.Ct. 2217 (challenged city ordinances were designed to prevent religious activities because city councilmembers viewed the religion as "a sin, 'foolishness,' 'an abomination to the Lord,' and the worship of 'demons' ") *with* S.B 1564, 99th Gen. Assemb. 2d Sess. (Ill. 2015) (Public Act 99-690 is designed to ensure that the HCRCA doesn't frustrate women's access to health care). Even if Public Act 99-690 has discriminatory effects in operation, "[a]dverse impact will not always lead to a finding of impermissible targeting." *Lukumi,* 508 U.S. at 535, 113 S.Ct. 2217.[27] "The law's text and history ... suggest instead that the legislature adopted the changes due to legitimate concerns about patient access to healthcare and not out of a desire to stifle religiously-motivated conduct." NIFLA dkt. 176 at 38. So, under the circumstances, Public Act 99-690 is neutral and generally applicable.

27    Likewise, the Plaintiffs didn't produce any evidence that Section 6.1(3) "prohibits religious conduct while permitting secular conduct that undermines the government's asserted interests in a similar way." *Fulton v. City of Philadelphia, Pennsylvania,* 593 U.S. 522, 534, 141 S.Ct. 1868, 210 L.Ed.2d 137 (2021). Depending on the

standard of care, health care providers may be liable if they unreasonably delay a woman's access to abortion by failing to transfer, refer, or provide her with written information *for any reason.*

Finally, the Plaintiffs urge the Court to apply heightened scrutiny on a "hybrid rights" theory. NIFLA dkt. 282 at 9–10. "In *Smith*, the Supreme Court noted that, in cases implicating the Free Exercise Clause in conjunction with other constitutional protections, such as freedom of speech ... the First Amendment" may require courts to apply strict scrutiny even to neutral, generally applicable laws. *C.L. for Urb. Believers v. City of Chicago*, 342 F.3d 752, 764 (7th Cir. 2003) (citing *Smith*, 494 U.S. at 881–82, 110 S.Ct. 1595). Though a plaintiff doesn't need to *succeed* on another First Amendment claim, he "does not allege a hybrid rights claim entitled to strict scrutiny analysis merely by combining a free exercise claim with an utterly meritless claim of the violation of another alleged fundamental right." *Id.* at 765 (quoting *Miller v. Reed*, 176 F.3d 1202, 1207–08 (9th Cir. 1999)).

**\*25** The doctrine rests on a teetering foundation. As Judge Pallmeyer noted, it "originates in [*Smith's*] dictum." NIFLA dkt. 176 at 36. And it's "hard" to "justif[y] the curious [hybrid rights] doctrine," some circuits essentially abandoning it entirely. *Fulton*, 593 U.S. at 599, 604, 141 S.Ct. 1868 (2021) (Alito, J., concurring); *see also Henderson v. Kennedy,* 253 F.3d 12, 19 (D.C. Cir. 2001) ("For this argument to prevail, one would have to conclude that although the regulation does not violate the Free Exercise Clause, and although they have no viable First Amendment claim against the regulation, the combination of two untenable claims equals a tenable one. But in law as in mathematics zero plus zero equals zero." (citations omitted.)). "Telling[ly]," the Supreme Court "has never once accepted a 'hybrid rights' claim in the more than three decades since [*Smith*]." *Fulton*, 593 U.S. at 600, 141 S.Ct. 1868. The Seventh Circuit similarly rejected hybrid rights theories in the two cases that considered them. *See Ill. Bible Coll. Assoc. v. Anderson*, 870 F.3d 631, 641 (7th Cir. 2017); *Civil Liberties*, 342 F.3d at 764–65; *see also Maum Meditation House of Truth v. Lake County, Ill.*, 55 F.Supp.3d 1081, 1088 (N.D. Ill. 2014) (rejecting application); *Mahwikizi v. Ctr. for Control & Prevention*, 573 F. Supp. 3d 1245, 1253 (N.D. Ill. 2021) (same).

In any event, the Seventh Circuit seems to follow the Ninth in requiring, at minimum, a summary judgment level showing on the non-Free Exercise claim. *See C.L for Urb. Believers*, 342 F.3d at 765 (rejecting a hybrid rights theory because

it "f[oun]d [the other claims] individually lacking the merit necessary to withstand summary judgment"). As to Section 6.1(3), the Plaintiffs' weak Free Speech claims fall short of the summary judgment standard, because the provisions only regulate conduct. The Court found a Free Speech violation in Section 6.1(1), but it severed the sections and assessed the two individually. It won't now resew them with a tenuous doctrinal thread. So, the Court doesn't believe the hybrid rights doctrine compels it to apply strict scrutiny to Section 6.1(3).

*Rational Basis Analysis*

Having reached the end of a long front walk, *see Steel Co. v. Citizens for a Better Env't.*, 523 U.S. 83, 102, 118 S.Ct. 1003, 140 L.Ed.2d 210 (1998), the Court finds that Section 6.1(3) triggers (and withstands) rational-basis review. Under this test, a court "need only find a reasonably conceivable state of facts that could provide a rational basis for the classification." *Ind. Petroleum Marketers & Convenience Store Ass'n v. Cook,* 808 F.3d 318, 322 (7th Cir. 2015); *Lukaszczyk v. Cook Cnty.,* 47 F.4th 587, 602–03 (7th Cir. 2022) (collecting cases). This isn't an onerous test. The law comes to court bearing a strong presumption of validity, and the challengers must negate every conceivable basis which might support it. *Ind. Petroleum Marketers & Convenience Store Ass'n.*, 808 F.3d at 322.

Conceivably, the State has a legitimate interest in facilitating abortions provided by health care professionals to reduce the number of "self-managed abortions" or "self-induced abortions," which are inherently dangerous. Requiring the Plaintiffs to provide the requested information is a rational means of meeting that goal. So, Section 6.1(3) doesn't offend the Free Exercise Clause of the First Amendment.

**CONCLUSION**

Based on these findings of fact and conclusions of law, the Court holds that Section 6.1(1) violates the First Amendment's Free Speech Clause, but that Section 6.1(3) is constitutional. So, the Court grants Plaintiff's request for declaratory and permanent injunctive relief as to Section 6.1(1), finding this provision of Public Act 99-690 is unconstitutional and cannot be enforced. It denies the Plaintiffs' Motion as to Section 6.1(3).

**All Citations**

--- F.Supp.3d ----, 2025 WL 1017677

National Institute of Family and Life Advocates v. Treto, --- F.Supp.3d ---- (2025)

2025 WL 1017677

**End of Document**

© 2025 Thomson Reuters. No claim to original U.S. Government Works.

2011 WL 612722
Only the Westlaw citation is currently available.
United States District Court,
N.D. Illinois,
Eastern Division.

HUAWEI TECHNOLOGIES CO., LTD., Plaintiff,

v.

MOTOROLA, INC., Motorola Solutions, Inc., Motorola
Mobility Holdings, Inc., Nokia Siemens Networks US,
LLC and Nokia Siemens Networks B.V., Defendants.

Civil Action No. 11–cv–497.
|
Feb. 22, 2011.

**Attorneys and Law Firms**

Dale A. Rice, L.J. Chris Martiniak, Nathan E. Shafroth,
Samuel F. Ernst, Covington & Burling LLP, San Francisco,
CA, David M. Airan, H. Michael Hartmann, Leydig, Voit
& Mayer, Ltd., Chicago, IL, Robert T. Haslam, Stanley
Young, Covington & Burling LLP, Redwood Shores, CA, for
Plaintiff.

Thomas James Frederick, Dana E. Schaffner, Maureen L.
Rurka, Raymond C. Perkins, Winston & Strawn LLP, Daniel
J. Wolman, Thomas Lee Holt, Thomas Gerard Pasternak,
Steptoe & Johnson LLP, Robert Mark Halligan, Nixon
Peabody LLP, Chicago, IL, Paul Lall, Stewart A. Baker,
William G. Pecau, Steptoe & Johnson L.L.P., Washington,
DC, for Defendants.

**MEMORANDUM OPINION AND ORDER**

SHARON JOHNSON COLEMAN, District Judge.

**\*1** This matter is before the Court on motion by
Huawei Technologies Co., Ltd. ("Huawei") for a preliminary
injunction against Defendants Motorola Solutions, Inc. [1]
("Motorola"), Nokia Siemens Networks US, LLC and Nokia
Siemens Networks B.V. to maintain the *status quo* pending
arbitration and prevent Motorola from disclosing Huawei
confidential information and trade secrets to the Nokia
Defendants (collectively "NSN") and to prevent NSN from
using the same. (Dkt. No. 9.) The parties filed extensive
briefs on the matter and the Court conducted an evidentiary
hearing beginning on February 11, 2011 and continuing on

February 14, 2011. For the reasons that follow, the Court
grants Huawei's request for a preliminary injunction in part
and denies the request in part.

[1] As of January 4, 2011, Motorola, Inc. was spun off
into two publicly traded companies: (1) Motorola
Solutions, Inc. and Motorola Mobility Holdings,
Inc. Motorola, Inc. no longer exists. Huawei
voluntarily dismissed Motorola Mobility Holdings,
Inc. without prejudice on February 10, 2011. (Dkt.
No. 96.)

**BACKGROUND**

**I. The Parties**

Huawei is a Chinese corporation and leading provider
of next generation telecommunications network solutions
for operators around the world. Motorola is a Delaware
corporation and global provider of wireless and broadband
communications. NSN is a joint venture formed from
business units of Nokia Corporation of Finland and Siemens
AG of Germany. Nokia Siemens Networks U.S. LLC is a
Delaware corporation and Nokia Siemens Networks B.V. is a
Dutch corporation. NSN sells mobile infrastructure hardware
and service agreements to carrier companies and is a direct
competitor to Huawei.

**II. The Huawei and Motorola Agreements**

Beginning in June 2000, Huawei and Motorola entered
into a series of agreements under which Huawei
would develop, design, and implement new optimized
technologies for cellular communications networks and
then sell those technologies and other Huawei products
to Motorola. Motorola would then resell the technologies
and products under the Motorola brand. The technologies
Huawei developed and provided to Motorola under
the various agreements include: Global Systems for
Mobile ("GSM") communications products, Radio Network
Controller ("RNC") products, and Universal Mobile
Telecommunications Systems ("UMTS") products. Motorola
purchased approximately $878 million in equipment from
Huawei from 2000 through the present.

To ensure that Motorola could service its customers
and repair and maintain the Huawei equipment, the
agreements between the companies contemplated that
Huawei provide Motorola with highly confidential
information. The agreements required Motorola to protect

Huawei's confidential information and prohibited Motorola from disclosing Huawei's confidential information to third parties. The two agreements that are most relevant to the instant matter are the Restated Cooperation Agreement ("RCA") and the Joint Research and Development Center Agreement ("JRDC"). Both agreements remain in force today and impose ongoing protections on Motorola's use of Huawei's confidential information. Under the RCA, Motorola and Huawei agreed that the party receiving confidential information acknowledges that this information may contain trade secrets and proprietary information and that the unauthorized disclosure of this information may cause irreparable harm to the disclosing party. Dispute resolution provisions in the RCA and JRDC provide that all disputes arising under the agreements must be resolved through arbitration before a Tribunal of the International Chamber of Commerce in Geneva, Switzerland.

### III. The Motorola/NSN Transaction

**\*2** In the fall of 2009, investment bankers working on Motorola's behalf contacted Huawei and other parties to explore whether they would be interested in purchasing Motorola's wireless networks infrastructure business and its assets. Through this business, Motorola provides equipment and services to wireless network carriers such as Verizon and AT & T. Huawei submitted an initial non-binding bid in December 2009 and a revised bid in April 2010. Motorola ultimately decided to sell its wireless networks business to NSN and the Motorola/NSN transaction was announced on July 19, 2010. With the exception of the Ministry of Commerce of the People's Republic of China ("MOFCOM"), the Motorola/NSN transaction had been approved by the necessary government antitrust authorities. The transaction is expected to close following MOFCOM's approval. Under the contemplated transaction, NSN will acquire Motorola's GSM and UMTS networks, including all of the equipment and connections that comprise these networks as well as Motorola's business in servicing and maintaining these networks. NSN will also acquire all of the network equipment that Huawei has provided Motorola pursuant to the RCA, JRDC, and other agreements between Huawei and Motorola.

### IV. Motorola Seeks Huawei's Consent To Assign The Agreements To NSN

By letter September 13, 2010 Michael Annes, Corporate Vice President of Business Development and Ventures for Motorola, informed Huawei of the Motorola/NSN transaction and requested Huawei consent to Motorola's assignment

to NSN of 13 Motorola–Huawei agreements. (Annes Decl. Ex. E.) Huawei declined to consent to the assignment and demanded Motorola identify effective measures to protect the confidential information Huawei shared with Motorola pursuant to the agreements. (*Id.* at Ex. F.) On October 13, 2010, Motorola and NSN jointly responded with measures both organizations agreed to undertake to "prohibit the dissemination of Huawei Confidential Information ("Huawei CI") while still properly supporting Motorola's infrastructure customers using Huawei-manufactured Products." (*Id.* at Ex. G.) The identified measures placed Motorola personnel into separate categories depending upon whether they had access to Huawei confidential information relating to currently available or future Huawei products and described the access to Huawei confidential information that would be permitted once the transaction closed and the personnel became NSN employees. Post-closing, former Motorola employees with access to future Huawei product features, offerings, and specifications would be required to review their files and destroy any materials related to these future products. The former Motorola employees with access to commercially available Huawei products would be "firewalled" within NSN so that they would be the only NSN employees with access to Huawei confidential information.

On October 26, 2010, Huawei sent a response to Motorola and NSN reiterating that Huawei would not consent to the assignment of the agreements and explaining that the proposed measures were not sufficient to protect the confidentiality of Huawei's confidential information. (*Id.* at Ex. H.) Motorola and Huawei's discussions on protection of the Huawei confidential information continued into November and December 2010. (Annes Decl. Exs. I & J.) On January 8, 2011, Huawei sent separate letters to Motorola and NSN restating its position and specifying the steps Huawei believed necessary to protect its confidential information and to avoid trade secret misappropriation and breach of the Motorola–Huawei agreements. (*Id.* at K; Dianyao Decl. Ex. 10.) The steps included Motorola's agreement that it would not facilitate NSN's hiring of Motorola employees who have had access to Huawei confidential information, not grant any NSN personnel access to any Huawei confidential information, and require all Motorola employees who have had access to Huawei confidential information to sign nondisclosure agreements with Huawei. (*Id.*) Motorola responded by letter dated January 10, 2011 indicating that neither it nor NSN had any intention of breaching any agreement with Huawei or misappropriating any of its trade secrets through the sale of Motorola's network infrastructure

business to NSN. (Annes Decl. at Ex. L.) Motorola also stated that it was willing to discuss "all commercially reasonable steps to protect Huawei's trade secrets" in addition to the firewall solution Motorola previously recommended. (*Id.*) At Motorola's suggestion, the parties met in Hong Kong later that week on January 14, 2011 but were unable to reach agreement on the measures that would provide adequate protection for the Huawei confidential information. (Dianyao Decl. ¶ 38.)

**\*3** The dispute resolution provision in the JRDC and the RCA provide that any disputes relating to the agreements follow a formal dispute resolution procedure. (Dianyao Decl., Ex. 1 at ¶ 31.2.) The procedures call for a 60 day waiting period after a meeting of top executives of Huawei and Motorola before a request for an arbitration can be filed. (*Id.*) Four days after the Hong Kong meeting, Huawei proposed to Motorola that the parties waive the 60 day waiting period and submit their dispute regarding the protection of Huawei's confidential information to arbitration. (*Id.* at Ex. 12.) Motorola did not agree to accelerate the arbitration process and the instant litigation followed.

### PROCEDURAL HISTORY

#### A. Commencement of Litigation and Motion for Temporary Restraining Order

On the morning of January 24, 2011, Huawei filed the instant action asserting claims of breach of contract, actual or threatened misappropriation of trade secrets, and copyright infringement against Motorola and claims of actual or threatened misappropriation of trade secrets and contributory copyright infringement against NSN. (Dkt. No. 1) That same morning, Huawei filed motions for a temporary restraining order and a preliminary injunction against Motorola and NSN. (Dkt.Nos.9, 14.) That afternoon, the Court held a hearing on Huawei's motion for a temporary restraining order ("TRO"). Huawei requested an order requiring Motorola to provide Huawei and the Court with at least five business days' notice in advance of the closing of the Motorola/NSN transaction. Huawei argued that Motorola and NSN intended to close the transaction immediately after receiving MOFCOM approval. Huawei contended that if it were not granted injunctive relief, that Huawei's confidential information would be transferred to NSN before the arbitration tribunal had an opportunity to consider Huawei and Motorola's dispute thereby rendering the arbitration a meaningless exercise. Huawei argued that it needed the notice so that it could take steps to seek further relief if necessary. In asking the Court to deny the TRO,

Motorola argued that it could not provide the Court with the five days' notice Huawei was seeking because Motorola did not know when MOFCOM would approve the deal or when the transaction would close. The Court issued a TRO ordering Motorola not to provide any Huawei confidential information to NSN. (Dkt. No. 20.) Further, the Court ordered Motorola to provide the Court and Huawei with immediate written notice of any action taken by MOFCOM. [2]

[2]    The Court later modified the TRO on 1/27/2011 and again on 2/4/2011at the request of the parties. (Dkt.Nos.42, 100.)

#### B. Motion for Preliminary Injunction

The parties submitted extensive briefing on Huawei's motion for a preliminary injunction. Huawei initially sought a preliminary injunction to preserve the *status quo* by ordering Motorola to "modify its transaction with NSN to prevent the transfer of Motorola's GSM and UMTS business to NSN until such time as an arbitral tribunal has determined whether further interim relief is necessary." Huawei also sought injunctive relief against NSN to "prevent NSN from obtaining Huawei's trade secrets and copyrighted material in a manner for which Motorola may disclaim responsibility— for instance, by hiring Motorola employees in possession of Huawei's confidential information into service and support positions where they will necessarily need to make use of this information." (Dkt. No. 9–1 p. 3.) Huawei filed numerous declarations under seal in support of its motion which detailed the various categories of Huawei confidential information and trade secrets designated with "Internal Use" or "Highly Confidential" legends that it shared with Motorola and sought to protect, the investment Huawei made in developing this confidential information, the harm Huawei would suffer in the marketplace should this information be made available to a competitor, and the unfair competitive advantage NSN would gain should Motorola transfer this confidential information to NSN. (Xiren, Guangfeng, Wei, Hao, Yuqiao, Jianhui, Kai, Xiaocheng, and Yuan Decls.) The declarations establish that Huawei's technology and trade secrets are deeply embedded in Motorola's GSM and UMTS telecommunications networks. Huawei also provided declarations of Huawei employees and an industry expert attesting to the fact that NSN could not service, support, and maintain Motorola's wireless infrastructure business without using Huawei's confidential information. (Dianyao, Wei, and Crowe Decls.) Finally, Huawei produced a declaration explaining that Huawei's confidential information would be used at NSN if the Motorola employees who have been

Huawei Technologies Co., Ltd. v. Motorola, Inc., Not Reported in F.Supp.2d (2011)

2011 WL 612722

involved with Motorola-branded GSM and UMTS systems containing Huawei products are permitted to move to NSN and continue in their present roles. (Dianyao Decl. ¶ 32.) Huawei argues that this evidence demonstrates that Huawei has a high likelihood of succeeding on the merits on its claim that former Motorola employees who possess Huawei trade secrets would inevitably rely on Huawei trade secrets while employed by NSN in contravention of the law.

**\*4** In its reply brief, Huawei proposed alternative injunctive relief including: (1) an order that would temporarily bar the transfer of Huawei's confidential information and Motorola's UMTS business unit and select portions of Motorola's GSM network supplied by Huawei; (2) an order barring the transfer to NSN of Huawei's confidential information and all customer contracts for customers that have Huawei equipment pending arbitration; and (3) an injunction that continues the relief that is currently in place by virtue of the TRO. (Dkt. No. 87 p. 26.)

### C. Evidentiary Hearing

#### 1. Opening Arguments

The Court heard opening arguments on behalf of all of the parties followed by the testimony of witnesses called by Motorola and Huawei. Huawei argued that the record contained undisputed evidence that Huawei shared confidential information with Motorola and that the need for an injunction to protect this information was clear given Motorola's letter of January 10, 2011 proposing that Motorola grant NSN employees access to Huawei confidential information. Huawei argued that the evidence showing that NSN could not provide customers with the same level of support as Motorola without access to Huawei's confidential information stood unchallenged. Huawei then conceded that the relief it originally sought to prohibit the transfer of the UMTS business or NSN's hiring of Motorola employing was not without consequences. Huawei proposed injunctive relief that instead included a monitoring and audit system to ensure that Motorola did not transfer any Huawei confidential information to NSN, an exit interview and new hire process to make personnel aware of the prohibition on taking or receiving Huawei confidential information, and the use of a third party vendor to ensure that any Huawei confidential information stored in electronic format was wiped clean such that the information could not be recovered or retrieved. (2/11/2011 Hr'g Tr. 19:16–24:17.)

Motorola argued that while Huawei now appeared to "sound reasonable" in its latest request for injunctive relief, that

there was no injunctive relief that was good for Motorola or justified. (*Id.* at 27:19–23.) Motorola claimed that Huawei could not meet its burden to show it was entitled to a preliminary injunction and that any such order would allow NSN to make a claim that Motorola failed to use its best efforts to assign the contracts thereby providing NSN with a basis to walk away from the pending transaction. (*Id.* at 29:17–22.) Motorola contended that Huawei did not care about its confidential information, which it had already divulged, and that its true intent was to use its confidential information as a "poison pill" to kill the Motorola/NSN transaction. (*Id.* at 32:5–15, 43:7–12.) Motorola cited the lawsuit it filed against Huawei and others as a reason why Huawei wanted to sabotage the Motorola/NSN transaction. [3] (*Id.* at 32:9–15.) Counsel argued that Motorola had already suffered harm due to the uncertainty surrounding the transaction that was originally scheduled to close on January 1, 2011 and that Motorola would suffer further harm if the transaction does not close by April 30, 2011. (*Id.* at 43:13–22, 45:7–16.)

[3]    The lawsuit Motorola referenced is *Motorola, Inc. v. Lemko, Corp.,* No. 08–cv–05427, pending before Judge Kennelly.

**\*5** NSN argued that Huawei was not entitled to a preliminary injunction because Huawei could not show that it had been harmed or that any harm was imminent. (*Id.* at 54:3–7.) NSN claimed that it had no Huawei confidential information and that all that Huawei was left with was a threat that NSN would obtain Huawei's confidential information. (*Id.* at 54:11–12.) NSN further claimed that it did not want to improperly obtain Huawei confidential information nor did NSN want Motorola to violate any of its agreements with Huawei. (*Id.* at 54:13–14, 55:7–11.) NSN stated, however, that it did want the Huawei information necessary for NSN to repair, service, connect, and maintain the Huawei equipment that NSN intends to acquire from Motorola. (*Id.* at 54:12–20.) Counsel for NSN alleged that any injunction that restricts NSN's ability to repair, service, or maintain the Huawei products "kills the deal" between Motorola and NSN. (*Id.* at 59:21–60:3.)

#### 2. Testimony of Michael Annes

Michael Annes ("Annes"), Corporate Vice President of Business Development and Ventures testified that he is responsible for leading all mergers, acquisitions, and divestures and that he led the negotiations related to the sale of Motorola's wireless infrastructure business. (*Id.* at 82:18–24.) Annes also led Motorola's discussions with

Huawei Technologies Co., Ltd. v. Motorola, Inc., Not Reported in F.Supp.2d (2011)

2011 WL 612722

Huawei to obtain its consent to assign the Motorola–Huawei agreements to NSN. (*Id.* at 84:22–24.) Annes testified that the firewall that Motorola proposed in its January 10, 2011 letter to Huawei would actually allow certain Motorola employees who transfer to NSN to continue to have access to Huawei confidential information. (*Id.* at 97:25–98:23.) Annes explained that the reason Motorola proposed allowing NSN employees to use Huawei confidential information was to ensure NSN provided the proper support to Motorola customers using Huawei manufactured products. (*Id.* at 100:12–17.) Annes testified that Motorola's agreements with Huawei entitle Motorola to provide Huawei confidential information to certain third parties. (*Id.* at 96:3–11.)

Annes testified that there is no requirement in the Master Acquisition Agreement ("MAA") between Motorola and NSN that requires Motorola to transfer Huawei confidential information to NSN. (*Id.* at 90:19–22.) Under the MAA, if Motorola is unable to obtain consent to assignment, then Motorola will not make the assignment. (*Id.* at 90:25–91:5.) Annes admitted that he did not know whether Motorola would decide to give Huawei confidential information to NSN if the Court does not issue an injunction. (*Id.* at 111:24–112:5.) Annes stated that such a decision would be made by Motorola's law division. (*Id.*)

Annes also testified that he believed any delay in the closing of the Motorola/NSN transaction pending the completion of arbitration would "kill the deal." (*Id.* at 93:15–94:4.) Annes admitted that Huawei proposed that the parties accelerate the arbitration process. (*Id.* at 94:15–95:6.) Annes explained that Motorola declined to do so because Motorola was afraid that the arbitration would distract them. (*Id.*)

### 3. Testimony of Scott Morrison

**\*6** Scott Morrison ("Morrison"), Senior Director and General Manager of Motorola's GSM and UMTS research and development engineering teams testified about the COMPASS system Motorola uses to protect third party confidential information. (*Id.* at 126:20–127:8.) Morrison stated that it was his belief that many of the servers and applications that Motorola uses today will remain at Motorola and be accessible by former Motorola employees who transfer to NSN. (*Id.* at 135:15–19.)

Morrison also testified about the increased attrition rate that the engineering team began to experience in December 2010 due to the uncertainty employees were experiencing because of the delay in closing the Motorola/NSN transaction. (*Id.* at

131:18–133:10.) Morrison admitted that he could not see how the increased attrition rate had anything to do with the lawsuit Huawei filed against Motorola and NSN. (*Id.*)

### 4. Testimony of Bruce Brda

Bruce Brda ("Brda"), Senior Vice President and General Manager of Motorola's wireless networks business testified that NSN made job offers to all 7,000 Motorola employees in the networks business. (*Id.* at 157:4–9.) Brda stated that NSN is also buying Motorola's buildings and other assets including computers and furniture. (*Id.* at 159:2–14, 162:3–7.)

Brda testified about the uncertainties that Motorola and any company faces when they announce the sale of a business. (*Id.* at 162:15–24) He stated that these uncertainties will continue until MOFCOM approves the deal. (*Id.*) Brda stated Huawei had nothing to do with the uncertainties that caused Motorola to lose business in China and Vietnam. (*Id.* at 162:8–17.)

Brda testified that the agreement with NSN could close without Motorola providing any Huawei confidential information to NSN. (*Id.* at 164:10–21.) Brda admitted that an injunction prohibiting the transfer of Huawei confidential information would not cause Motorola to breach its agreement with NSN. (*Id.* at 164:22–165:6.) Brda stated that he believed NSN would have no basis to back out of the deal if Motorola did not provide NSN with Huawei confidential information. (*Id.* at 165:8–13.)

### 5. Testimony of Tim Danks

Tim Danks ("Danks") testified that he is responsible for customer support and for Huawei's technical support centers. (*Id.* at 174:1–12.) Danks testified about the difference between the type of service and support provided by a vendor of telecom equipment and the operation and maintenance that a customer performs on its telecom equipment. (*Id.* at 174:23–175:10.) Danks described the various resources that a vendor uses to support its equipment including signaling protocols between equipment, internal documentation, and other confidential information. (*Id.* at 175:13–16.) Danks testified that vendor support cannot be provided without the use of confidential information that is not provided to customers. (*Id.* at 175:19.) Danks testified that vendor level confidential information would be made available to an OEM like Motorola. (*Id.* at 176:13–15.)

### 6. Testimony of David Crowe

**\*7** The Court heard testimony from David Crowe ("Crowe"), who Huawei presented as an expert witness in the area of telecommunication network systems. (*Id.* at 192:1–16.) Crowe testified that he reviewed Huawei's ABIS interface, which is the link between cellular transmission towers ("base stations") and the processor ("base station controllers") that allows them to work as a unit by allocating calls and resources between them. (*Id.* at 192:5–9.) Crowe opined that the ABIS interface used in Motorola's network was proprietary to Huawei. (*Id.* at 192:5–9.) Crowe testified that without knowledge of Huawei's proprietary ABIS interface, one could not properly service a Huawei 2G GSM network with UMTS capability containing hundreds of base station towers controlled by a base station controller. (*Id.* at 194:23–195:7.) Crowe testified that in the event that a Huawei base station controller failed, that someone with access to Huawei's proprietary ABIS interface could modify another manufacturer's base station controller to operate in the network and save the expense of replacing hundreds of base station towers. (*Id.* at 194:23–196:8.) Crowe opined that vendor level customer support cannot be provided without access to the confidential information of the manufacturer. (*Id.* at 196:13–197:18.)

### G. Kristian Kuhn Declaration

The night before the evidentiary hearing, Motorola filed the declaration of Kristian Kuhn ("Kuhn"), Head of Managed Services for NSN. In the declaration, Kuhn stated that NSN had received Huawei confidential information pursuant to a managed services agreement between NSN and Nextel. Nextel purchased all of the equipment for its 3G telecommunications network from Huawei. Under the NSN–Nextel agreement, Nextel outsourced the maintenance of this equipment to NSN. At the hearing, Motorola claimed that the Nextel–NSN agreement proved that NSN already had Huawei confidential information and thus Huawei could not be irreparably harmed should Motorola provide NSN this same information.

Since the Kuhn declaration was filed after the close of briefing on the instant motion and neither Motorola nor NSN called Kuhn as a witness, the Court granted Huawei leave to file a response to this declaration. Huawei first noted that the Kuhn declaration was not supported with copies of any of the confidential documents Kuhn claimed were in NSN's possession. Huawei argued that the confidential information Kuhn referred to was information that Huawei provides to customers pursuant to a non-disclosure agreement to assist them in operating and maintaining the Huawei equipment

they purchase. Huawei claimed customer level information is different from the confidential technical information related to the design and development of Huawei products that Huawei provided Motorola. As an example, Huawei described the training it provides Motorola to allow it to sell and service the Huawei equipment as a vendor as distinct from the standard training Huawei provides its customers to assist them in operating and maintaining Huawei equipment. Huawei also noted that the Kuhn declaration did not state that NSN had received Huawei's proprietary ABIS interface or many of the other categories of confidential information that Huawei seeks to protect. Huawei supported its response with the declaration of Wu Haibin ("Haibin"), a Technical Product Manager at Huawei who is responsible for working with Nextel and NSN. Haibin attached several documents as exhibits to his declaration which disputed much of the Kuhn declaration. Haibin also included a copy of the customer training materials Huawei provided Nextel and NSN.

### FACTUAL FINDINGS

**\*8** 1. Huawei has provided Motorola with Huawei confidential information to enable Motorola to provide vendor level support, service, and maintenance to Motorola's customers with Huawei equipment.

2. NSN will need the Huawei confidential information to provide the newly acquired Motorola customers with the same level of vendor support, service, and maintenance that Motorola provided.

3. As recently as January 10, 2011, Motorola proposed providing its former employees who transfer to NSN with access to Huawei confidential information.

4. NSN does not currently have any vendor level Huawei confidential information.

5. NSN has customer level Huawei confidential information that Huawei provides to its customers under non-disclosure agreements.

6. Huawei and NSN are direct competitors in the wireless networks infrastructure business.

7. NSN will gain an unfair competitive advantage if it obtains Huawei's vendor level confidential information without Huawei's consent.

8. As part of the Motorola/NSN transaction, NSN intends to acquire Motorola's wireless assets including Motorola's buildings, computers, and equipment.

9. NSN intends to employ former Motorola personnel to service, support, and maintain the Huawei equipment that NSN will acquire pursuant to the Motorola/NSN transaction.

10. Many of the Motorola employees involved with Huawei equipment will perform the same job responsibilities once they become NSN employees including providing support, service, and maintenance to customers with Huawei equipment with some employees even working in the same location.

11. The Motorola/NSN transaction has been delayed pending approval by MOFCOM.

12. Motorola has experienced a higher than average attrition rate in its wireless networks business which began prior to the commencement of this litigation.

13. If NSN obtains vendor level Huawei confidential information from Motorola before a Swiss arbitral panel has the opportunity to determine Motorola and Huawei's rights and obligations, the *status quo* will be altered leaving Huawei with inadequate relief.

## LEGAL STANDARDS AND CONCLUSIONS

A preliminary injunction is an extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is entitled to such relief. *Winter v. Nat'l Res. Def. Council,* 555 U.S. 7, 129 S.Ct. 365, 376, 172 L.Ed.2d 249 (2008). To determine whether a situation warrants such a remedy, plaintiffs must show: (1) that they are likely to succeed on the merits; (2) that they are likely to suffer irreparable harm without the injunction; (3) that the harm they would suffer is greater than the harm that the preliminary injunction would inflict on the defendants; and (4) that the injunction is in the public interest. *Judge v. Quinn,* 612 F.3d 527, 546 (7th Cir.2010). These considerations are interdependent such that "the greater the likelihood of success on the merits, the less net harm the injunction must prevent in order for preliminary relief to be warranted." *Id.* Taking into account all these considerations, the Court must exercise its discretion to arrive at a decision based on a subjective evaluation of the import

of the various factors and a personal, intuitive sense about the nature of the case. *Girl Scouts of Manitou Council v. Girl Scouts of the United States of America, Inc.,* 549 F.3d 1079, 1085 (7th Cir.2008).

### A. Threatened Misappropriation of Trade Secret Claim

**\*9** A party seeking a preliminary injunction in a threatened misappropriations of trade secrets case must prove both the existence of a trade secret and a threatened misappropriation *PepsiCo, Inc. v. Redmond,* 54 F.3d 1262, 1268 (7th Cir.1995) ("PepsiCo I"). A plaintiff may prove a claim of threatened misappropriation of trade secrets by demonstrating that new employment will inevitably lead employees to rely upon trade secrets gained during their previous employment. *PepsiCo I,* 54 F.3d at 1269. To determine whether a threatened misappropriation is actionable under the inevitable disclosure doctrine, the Court examines: (1) the level of competition between the owner of the trade secrets and the new employer; (2) whether the employees' position with the new employer is comparable to the position with the former employer; and (3) the actions the new employer has taken to prevent the new employees from using or disclosing the trade secrets. *PepsiCo, Inc. v. Redmond,* 1996 WL 3965, at \*20 (N.D.Ill.1996) ("PepsiCo II"). Contractual prohibitions against disclosure of trade secrets are routinely rejected as insufficient to prevent inevitable disclosure or use. *Id.* at \*21 (collecting cases).

Huawei has taken reasonable steps to maintain the secrecy of its confidential information including its ABIS interface specification, product and technical specifications, technology roadmaps, design and interface documentation, LTE statement of compliance and test case, original and design requirements, and configuration tools. These reasonable steps include marking any printed documents containing this information with the legend "Internal Use" or "Highly Confidential" and providing this information only under a non-disclosure agreement. Huawei derives economic value from this information not being generally known to its competitors who can benefit economically from the disclosure of this information. Huawei's confidential information constitutes a trade secret under the Illinois Trade Secrets Act, 765 ILCS 1065/1 *et seq.* (West 2011).

As recently as January 10, 2011, Motorola proposed allowing its former employees who transfer to NSN to have access to Huawei confidential information stored at Motorola. While Motorola concedes that the Huawei–Motorola agreements

prohibit Motorola from disclosing Huawei confidential information without Huawei's consent, Motorola maintains that it has the right to disclose Huawei's confidential information to certain third parties. Motorola's proposal and it insistence that it can disclose Huawei trade secrets under certain circumstances, threaten to make Huawei confidential information available to Huawei's direct competitor NSN.

Similarly, NSN's intent to employ former Motorola personnel with access to Huawei confidential information to support, service, and maintain customers with Huawei equipment will inevitably cause these employees to use Huawei confidential information. While employees may use generalized skills and knowledge acquired during their previous employment, they cannot use particularized plans or processes disclosed to them by their previous employer which are unknown to others in the industry and which give the owner of such information an advantage over its competitors. *PepsiCo I,* 54 F.3d at 1269; *AMP, Inc. v. Fleischhacker,* 823 F.2d 1199, 1202 (7th Cir.1987).

**\*10** In light of the above factors, the Court concludes that Huawei has a strong likelihood of succeeding on its threatened misappropriations of trade secrets claim against Motorola and NSN.

### B. Irreparable Harm

A party is irreparably harmed where the damages the party suffers are difficult to calculate or where the remedy comes too late to save the plaintiff's business. *Gateway E. Ry. Co. v. Terminal R.R. Ass'n of St. Louis,* 35 F.3d 1134, 1140 (7th Cir.1994). Where trade secrets are involved, the threat is significant that the harm experienced by a misappropriation will be irreparable. *IDS Fin'l Servs. v. Smithson,* 843 F.Supp. 415, 418 (N.D.Ill.1994). Since competitive position in an industry defies calculation, courts lack a reasonably precise method of calculating the pecuniary damage a corporation faces for its loss of competitive position sustained by the disclosure of its trade secrets and confidential information. *PepsiCo II,* 1996 WL 3965, at \*30.

The Court concludes that Huawei is likely to suffer irreparable harm if, without Huawei's consent and prior to arbitration, Motorola provides NSN with Huawei confidential information or if former Motorola employees use Huawei confidential information after transfering to NSN. In either case, NSN would gain an unfair competitive advantage at Huawei's expense.

### C. Balance of Hardships

There is a risk that NSN will walk away from the Motorola/NSN transaction if the Court enters an order that prevents Motorola from using its best efforts to effectuate the assignment of the Motorola–Huawei agreements. Neither Motorola nor NSN has presented any evidence that the injunctive relief proposed by Huawei will provide NSN with a basis to walk away from the pending transaction. Furthermore, the Motorola/NSN transaction may not close for other reasons including a lack of approval by MOFCOM. The evidence establishes that Motorola may suffer harm if the transaction does not close by April 30, 2011 but this same evidence fails to establish a causal connection between the transaction's success or failure and an injunction protecting Huawei's confidential information. The harms Motorola alleges it will suffer are attributable to causes other than the instant lawsuit. The increased attrition rate and the loss of market share that Motorola has experienced predate the filing of this action and stem from the uncertainty caused by the delay in closing the Motorola/NSN transaction. Neither Motorola nor NSN argue that Huawei is in any way responsible for this delay.

The Court finds that the balance of hardships weighs in Huawei's favor as the harm that it will suffer if Motorola and NSN are not enjoined is concrete and the causes are identifiable whereas the risk that the pending transaction will not close is speculative and the causes for such cannot yet be known.

### D. Public Interest

The public interest is well-served by enforcing valid agreements and protecting trade secrets. Trade secrets law serves to protect "standards of commercial morality" and encourage invention and innovation while maintaining the public interest in having free and open competition in the manufacture and sale of unpatented goods. *PepsiCo I,* 54 F.3d at 1268. The Court finds that the public interest favors granting an injunction to ensure that Huawei's trade secrets are protected and that its bargained-for right to meaningful arbitration is maintained.

### ORDER

**\*11** Huawei has demonstrated that it has a reasonable likelihood of success on the merits of its threatened misappropriation of trade secrets claim against Motorola

Case: 1:25-cv-00669 Document #: 79 Filed: 05/15/25 Page 63 of 90 PageID #:631

and NSN relating to NSN's plan to acquire Motorola's networks business and hire former Motorola employees with knowledge of Huawei's trade secrets. Huawei has established that it will suffer irreparable competitive harm if its trade secrets are disclosed to NSN or are inevitably relied upon by former Motorola employees who transfer to NSN. The balance of hardships lies in its favor, and the public interest will be furthered by affording meaningful protection to Huawei's confidential information.

**NOW, THEREFORE, BASED ON THE FOREGOING, IT IS HEREBY ORDERED THAT** effective immediately:

1. For purposes of this Order, "Huawei Confidential Information" includes information or documents provided to Motorola by Huawei that have not been publicly disclosed by Huawei and that constitute or relate to:

- Huawei's ABIS interface design specifications, other design specifications, proprietary software and code for Huawei's wireless and core network technologies and products, and any work derived thereof;

- Huawei Offering Requirements ("OR"), Design Requirements ("DR"), Scenario Designs ("SD"), Service Scenario Analyses ("SSA"), "AR," and similar Huawei technical documents that contain detailed information about the design, features, functionality and operation of Huawei products;

- Configuration Manuals, Configuration Specifications, Configuration Tools and other confidential configuration and pricing information and tools for Huawei products and system configurations;

- Huawei's future market strategy and future products to the extent that Huawei has not made that information public (for example, product roadmaps that address future product plans);

- Performance, operation, interoperability and standards compliance of Huawei's products (for example, testing reports and analyses, test cases, statements of compliance, feature lists and analyses, training information and materials);

- Vendor service support and the resources, tools and systems used to provide those services (for example, pre-caution notices, problem reports and solutions made available to Motorola on Huawei's iCare system and Global Customer Request Management

System, maintenance service documentation, tools and resources); and

- Confidential information or trade secrets as defined by the Huawei–Motorola Agreements.

2. Huawei Confidential Information for purposes of this Order as it pertains to NSN shall not include information that NSN receives pursuant to a managed services agreement with a Huawei customer, provided that use of such information comports with the applicable agreements, including any non-disclosure agreement and any use restrictions relating to such information.

3. Defendant Motorola and its subsidiaries, affiliates, officers, directors, agents,

**\*12** employees, servants, licensors, successors, assigns, and all those acting in concert with them, are hereby enjoined from:

- Disclosing Huawei Confidential Information to NSN, directly or indirectly, by any means;

- Inducing, encouraging, or providing material aid to others to disclose or use Huawei's Confidential Information;

- Granting NSN personnel access to Huawei Confidential Information or trade secrets; and

- Transferring any records or assets to NSN, including but not limited to hard copy records, servers, databases, web-based or internet resources, mobile phones or other handheld devices used for business purposes, personal computers, hard drives, computer hardware, computer memory, electronic or digital media, software, code of any type, and any equipment, prototypes, samples or parts, that contain, reference or disclose any Huawei Confidential Information.

4. Defendant NSN and its subsidiaries, affiliates, officers, directors, agents, employees, servants, licensors, successors, assigns, and all those acting in concert with them, are hereby enjoined from:

- Using Huawei Confidential Information disclosed to it by Motorola either directly or indirectly, for any purpose;

- Inducing, encouraging, or providing material aid to Motorola and its subsidiaries, affiliates, officers, directors, agents, employees, servants, licensors,

successors, assigns, and all those acting in concert with them to disclose Huawei's Confidential Information to NSN;

• Granting NSN personnel access to Huawei Confidential Information or trade secrets that Huawei has made available to Motorola; and

• Acquiring any records or assets of Motorola, including but not limited to hard copy records, servers, databases, web-based or internet resources, mobile phones or other handheld devices used for business purposes, personal computers, hard drives, computer hardware, computer memory, electronic or digital media, software, code of any type, and any equipment, prototypes, samples or parts, that contain, reference or disclose any Huawei Confidential Information.

5. Defendants Motorola, NSN and their subsidiaries, affiliates, officers, directors, agents, employees, servants, licensors, successors, assigns, and all those acting in concert with them, are further ordered to comply with the following requirements to ensure that Motorola does not transfer and NSN does not acquire or use any Huawei Confidential Information.

• Motorola and NSN shall take all necessary steps to ensure that Motorola does not transfer and NSN does not acquire any Huawei Confidential Information as part of NSN's acquisition of any records or assets of Motorola, including but not limited to hard copy records, servers, databases, web-based or internet resources, mobile phones or other handheld devices used for business purposes, personal computers, hard drives, computer hardware, computer memory, electronic or digital media, software, code of any type, and any equipment, prototypes, samples or parts.

**\*13** • Before any Motorola records or assets that could contain Huawei Confidential Information are transferred from Motorola to NSN, Motorola and NSN shall retain a qualified third party vendor to inspect those records and assets to ensure that all Huawei Confidential Information has been removed and can no longer be recovered by any means.

• NSN shall maintain auditable records of all service it performs on Motorolabranded systems that include Huawei products. The records shall include the name of the customer, the location of the system or equipment being serviced, the problem reported, the resolution of the problem, the resources used to resolve the problem, and the name(s) of the NSN personnel who perform the servicing.

• NSN shall assign an employee in the United States who is familiar with this Order to be responsible for performing periodic audits on the service call records. Huawei shall have a right to audit the NSN service records on a monthly basis during the time period that this injunction is in effect, but only with regard to records that relate to servicing of Huawei hardware and software products. In the event that it is not possible to segregate records relating to Huawei products, a qualified third party shall be retained to review the records, segregate records relating to Huawei products and provide Huawei with access to those segregated records.

• All Motorola employees who have had access to Huawei Confidential Information and who accept employment at NSN will be provided with notice of this Order and will be specifically informed, and will sign an undertaking, that (1) they cannot retain any Huawei Confidential Information when they move to NSN; (2) they cannot disclose any Huawei Confidential to any other employee or representative of NSN; and (3) they cannot use Huawei Confidential Information for any purpose once they have commenced employment at NSN

6. With respect to Motorola, this injunction is to remain in effect until Huawei returns to this Court with enforceable interim relief from the arbitral tribunal or the arbitral tribunal denies Huawei's request for interim relief or until further order of this Court;

7. With respect to NSN, this injunction is to remain in effect until further order of the Court.

8. Huawei is ordered to post a security bond in the amount of $500,000 with the Clerk of the Court to pay the administrative costs and third party vendor fees associated with the auditing and monitoring system included in this injunction should it be determined that Motorola and NSN were wrongfully enjoined.

9. This Court's Temporary Restraining Order of January 24, 2011 as modified on January 27, 2011 and February 10, 2011 is hereby vacated.

**IT IS SO ORDERED.**

**Huawei Technologies Co., Ltd. v. Motorola, Inc., Not Reported in F.Supp.2d (2011)**

2011 WL 612722

**All Citations**

Not Reported in F.Supp.2d, 2011 WL 612722

---

**End of Document**

© 2025 Thomson Reuters. No claim to original U.S. Government Works.

PepsiCo, Inc. v. Redmond, Not Reported in F.Supp. (1996)

1996 WL 3965

1996 WL 3965
Only the Westlaw citation is currently available.
United States District Court, N.D. Illinois.

PEPSICO, INC., Plaintiff,

v.

William E. REDMOND, Jr., et al., Defendants.

No. 94 C 6838.
|
Jan. 2, 1996.

*PERMANENT INJUNCTION AND FINAL JUDGMENT*

LINDBERG, District Judge.

**\*1** This case coming on for trial, and all parties having elected to rest without offering further evidence; the Court having issued its preliminary injunction order and opinion (the "Preliminary Injunction") on January 26, 1995, *nunc pro tunc* as of December 15, 1994 based on the evidence adduced in the course of the preliminary injunction hearing theretofore conducted by the Court; and the United States Court of the Appeals for the Seventh Circuit having affirmed the Preliminary Injunction in its opinion issued on May 11, 1995 (*PepsiCo, Inc. v. William E. Redmond, Jr. and The Quaker Oats Company*, 54 F.3d 1262 (7th Cir. 1995) (hereinafter, "*PepsiCo*")), including paragraphs numbered 1 and 2 of the Preliminary Injunction "... preventing [Redmond] forever from disclosing PCNA trade secrets and confidential information" (54 F.3d at 1272); the remaining injunctive paragraphs of the Preliminary Injunction, numbered 3 to 8, having expired by their terms; and the Court therefore finding the same facts and reaching the same conclusions of law as it made in the Preliminary Injunction, a copy of which is attached hereto as Exhibit A and is incorporated herein as if fully set forth in this order;

IT THEREFORE IS ORDERED, ADJUDGED AND DECREED:

A. That a permanent injunction is hereby issued in favor of plaintiff PepsiCo and against defendants Redmond and Quaker, enjoining:

  1. Defendant Redmond and any of his agents, servants, employees, attorneys, and all others in active concert or participation with him, from using or disclosing any trade secrets or confidential information of PepsiCo acquired by Redmond in the course of, or arising out of his employment by PepsiCo, including, without limitation, information relating to PepsiCo's strategic and annual operating plans, PepsiCo's pricing of beverage products, PepsiCo's selling and delivery system (including its Customer Representative compensation formula), and any information relating to PepsiCo's customer proposals to national accounts;

  2. Defendant Quaker and its officers, directors, agents, servants, employees, attorneys, and all others in active concert or participation with it, from seeking or acquiring any trade secrets or confidential information of PepsiCo acquired by Redmond in the course of or arising out of his employment by PepsiCo, including, without limitation, information relating to PepsiCo's strategic and annual operating plans, PepsiCo's pricing of beverage products, PepsiCo's selling and delivery system (including its Customer Representative compensation formula), and any information relating to PepsiCo's customer proposals to national accounts.

EXHIBIT A

MEMORANDUM AND ORDER

The court has reviewed both parties' proposed findings of fact and conclusions of law. Plaintiff's submission accurately portrays both the facts and the law applicable to this case. The court is therefore adopting as its own the proposed findings of fact with modification where appropriate and conclusions of law submitted by plaintiff, with the addition of a conclusion of law and modification of the relief granted to better reflect the appropriate balance between plaintiff's and defendants' rights required in this case. [1]

**\*2** Certain of the evidence presented by plaintiff contains trade secrets or confidential information. That material was protected from disclosure in this proceeding by an Agreed Protective Order. Indeed, the Illinois Trade Secrets Act expressly provides that: "In an action under this Act, the court shall preserve the secrecy of an alleged trade secret by reasonable means, which may include ... holding in-camera hearings [and] sealing the records of the action ...." 765 ILCS 1065/6. Accordingly, the court will only indirectly refer to the secret material so as to maintain its secrecy.

Case: 1:25-cv-00669 Document #: 79 Filed: 05/15/25 Page 67 of 90 PageID #:635

**PepsiCo, Inc. v. Redmond, Not Reported in F.Supp. (1996)**

1996 WL 3965

Since the preceding paragraph does not affect in any way the meaning or purport of the court's Order of December 15, 1994, this Order is entered *nunc pro tunc.*

FINDINGS OF FACT

I. Subject Matter Jurisdiction
Plaintiff, PepsiCo, Inc. ("PepsiCo"), is a North Carolina corporation with its principal place of business in the state of New York. PepsiCo is a citizen of North Carolina and of New York. Pepsi-Cola North America ("PCNA") is an unincorporated division of PepsiCo through which PepsiCo transacts business.

Defendant, William E. Redmond, Jr. ("Redmond"), at the time of filing of this lawsuit, was a citizen of the state of California. Defendant, The Quaker Oats Company ("Quaker"), is a New Jersey corporation with its principal place of business in Illinois. Quaker is a citizen of New Jersey and of Illinois. Gatorade North America is an unincorporated division of Quaker through which Quaker transacts business.

The matter in controversy among the parties exceeds $50,000, exclusive of interest and costs.

II. The Parties
PepsiCo is a major food and beverage company. PCNA markets carbonated soft drinks, sports drinks, prepackaged tea and fruit drinks, waters, and many other beverages excluding alcohol- and dairy-based drinks. Among PCNA's competitors is Quaker, with its Gatorade and, prospectively, Snapple businesses.

PCNA is divided into eleven business units each having responsibility for a geographic region of the U.S. and Canada. Each of those units is run by a General Manager. Other business units exist for PepsiCo's franchise-owned bottlers and for national accounts.

Quaker is a world-wide grocery products and beverage company. Its sports drink, Gatorade, was Quaker's principal beverage product, and one of its most profitable products as of November 2, 1994. On that date, Quaker announced that it was acquiring Snapple Beverage Corp. ("Snapple"), through an Agreement and Plan of Merger and a Tender Offer for shares of common stock of Snapple.

PCNA launched its "All Sport" isotonic drink on a national basis in March and April, 1994. Prior to that time, All Sport had been available only in a few test markets. All Sport's main competitor is Quaker's Gatorade, which has a dominant market share. Quaker's market share in the isotonic beverage category is approximately ten times that of PCNA.

**\*3** In recent years, PepsiCo has entered into joint ventures with Thomas J. Lipton Company to produce ready-to-drink tea products, and with Ocean Spray Cranberries, Inc. to market certain fruit drinks. In the "new age" category, including ready-to-drink teas and fruit drinks, PCNA's share is approximately 1/2 that of Snapple.

William E. Redmond, Jr. was employed by PepsiCo in its PCNA division for approximately ten years prior to his resignation on November 10, 1994. In June, 1993, he was promoted to the position of General Manager of the Northern California Business Unit. In July 1994, Redmond was promoted to the position of General Manager of the newly-created business unit covering all of California and became responsible for the profit and loss of a business having annual revenues of more than 1/2 billion dollars-- about 20 percent of the PCNA's profit for the entire U.S. Redmond's position was a very senior level within PepsiCo's organization.

Like other PepsiCo management employees, as a condition of Redmond's employment with PepsiCo, and at the outset of that employment, Redmond signed a Confidentiality Agreement with PepsiCo. The Confidentiality Agreement provides in part that

> [Redmond] will not disclose at any time, to anyone other than officers or employees of [PepsiCo] or make use of, confidential information relating to the business of [PepsiCo] ... obtained while in the employ of [PepsiCo], which shall not be generally known or available to the public or recognized as standard practices ....

Redmond admits that he is bound by the terms of the Confidentiality Agreement.

1996 WL 3965

### III. Redmond Is Recruited By Quaker And Uzzi

Quaker's initial contact with Redmond, for the purpose of recruiting him for employment at Quaker, was through Donald Uzzi ("Uzzi"). Uzzi himself had been a PCNA employee for seven years, until March, 1994, when he resigned to become President of Gatorade. Uzzi received a written offer of employment from Quaker dated December 1, 1993, which offer recited that Quaker understood that Uzzi wanted to delay acceptance of an offer from Quaker and his departure from PepsiCo for approximately two months. Uzzi claims not to know or remember how Quaker came to have such an understanding. At the time of Uzzi's departure, any PepsiCo confidential information that he had in his possession was less critical, as a consequence of the timing of his departure, than the information that is now in Redmond's possession.

Around the beginning of 1994, Uzzi accepted a promotion by PCNA from the position of General Manager of the Mid-Atlantic Business Unit of PCNA to Senior Vice President and Chief Customer Officer of PCNA, without advising anyone at PCNA that he had already received an offer of employment from Quaker, with whom he was then in serious discussions regarding a position. Uzzi held the position of Senior Vice President and Chief Customer Officer for a very short time during which he was engaged "purely" in transition to the position.

 **\*4** Uzzi accepted the position as the President of Gatorade in January or February, 1994 and resigned from PepsiCo some time in March, 1994.

At the time of Uzzi's departure from PepsiCo, Brenda Barnes (PCNA's Chief Operating Officer) advised all of the business unit General Managers, including Redmond, that they needed to be careful in talking with Uzzi because he now was working for a competitor. Barnes asked Redmond to talk with her if he ever were to consider leaving PepsiCo, and Redmond assured Barnes that he had no intention of leaving PepsiCo.

Uzzi, acting on behalf of Quaker, bought dinner for Redmond in May, 1994, in San Francisco. During dinner, Uzzi raised the question of Redmond coming to work for Gatorade. Shortly after Uzzi's dinner with Redmond in San Francisco, Uzzi gave Redmond's name to Barbara Pickens, an executive recruiter, who started calling Redmond approximately once a week for the next several months. In August, 1994, Redmond met at Quaker headquarters in Chicago with William D. Smithburg, Quaker's Chairman and Chief Executive Officer, Philip A.

Marineau, Quaker's President and Chief Operating Officer, James F. Doyle, Quaker's Senior Vice President and President of Gatorade Worldwide, as well as with Uzzi. On October 20, 1994, Quaker offered Redmond the position of Vice President - On Premise Sales for Gatorade. Redmond did not accept that offer, but rather, continued to negotiate for more money.

When, in July, 1994, Redmond was promoted by his boss, Barnes, to the position of Business Unit General Manager of all of California, he did not tell anyone at PepsiCo that he was then being actively recruited by a competitor, Quaker.

Quaker had interviewed three candidates for the position of Vice President - On Premise Sales. All three, including Redmond, were employed by PCNA. The court finds that it is not unreasonable to infer that Quaker's interest in exclusively PCNA employees resulted from an interest that went beyond PCNA employees' general business experience.

On November 8, 1994 at a breakfast meeting, Uzzi, on behalf of Quaker, delivered to Redmond a written offer for the position of Vice President-Field Operations for Gatorade. Redmond accepted that offer unequivocally, unconditionally and without qualification, in the course of the breakfast meeting.

### IV. Redmond's Resignation

After accepting a position with Quaker at breakfast on November 8, 1994, Redmond called PCNA and spoke with William Bensyl, the Senior Vice President of Human Resources for PCNA.

In the course of that call, Redmond told Bensyl that he had an offer from Quaker and gave Bensyl the financial details of the offer. Redmond:

> (a) falsely told Bensyl that he had *not* accepted the offer
>
> (b) told Bensyl that his job would be Chief Operating Officer of the combined Gatorade and Snapple company; and
>
> (c) asked Bensyl if he should carry out his plans to make calls upon certain PCNA customers without telling Bensyl of his previous acceptance of the Quaker job.

 **\*5** Not knowing that Redmond had already accepted the Quaker position, Bensyl told Redmond to make the customer visits. Redmond did so.

1996 WL 3965

On November 9, 1994, Redmond falsely told Craig Weatherup ("Weatherup"), the President and Chief Executive Officer of PCNA, that he had not accepted the Quaker offer, and that he was uncertain whether he would accept or reject that offer.

On November 10, 1994, Redmond went to PCNA headquarters in Somers, New York for a previously scheduled meeting with his immediate superior, Barnes. Barnes' primary responsibility as PCNA's Chief Operating Officer is to run the field operations for the Pepsi Cola business in the U.S. and in Canada that produce, sell and distribute beverages in those countries.

Redmond met in the morning with Barnes and told her, again falsely, that he was considering, but had not yet decided to accept the Quaker offer. In speaking with Barnes, Redmond also sought to determine if a more senior position such as Barnes' job might be available for him.

In the three days immediately preceding his resignation, Redmond told at least six PCNA employees, including Weatherup, Barnes and Bensyl, that the job he had been offered by Quaker was Chief Operating Officer of Gatorade.

V. Redmond's Position at Quaker

A. As It Was Known Before This Litigation

Whatever Redmond's duties may be in his new position at Quaker, it is conceded by defendants that he "could be faced with a decision that could be influenced by certain confidential information that [he] obtained while employed at Pepsico." Redmond himself concedes that he possesses confidential information of PCNA that he would not feel free to disclose to Quaker.

Although the written offer from Quaker that Redmond accepted on November 8, 1994 denominated his new job as "Vice President, Field Operations," Redmond did not, in his own mind, distinguish that job from the job of "Chief Operating Officer." Redmond purports to describe his new job in his declaration, but he testified that he is unclear on his job and can only speculate on what it will be. In other testimony, Redmond describes his new job as managing the entire sales effort of Gatorade at the field level, possibly including strategic planning.

B. As Defendants Have Described It In This Litigation

Uzzi says that Redmond's job will be to execute marketing, promotion and sales plans in the marketplace. That job will include consulting with regional directors about their spending of discretionary marketing funds. Uzzi agrees that Quaker will be going to market differently with Gatorade and Snapple after the two distribution systems are integrated than before.

In his declaration Redmond asserts that his primary task for the next few months will be to execute an existing "business plan" to integrate the Gatorade and Snapple distribution systems. That "business plan" however, consists only of a formal contract among a single Snapple distributor, Select Beverages, Inc., Snapple and Stokely Van Camp, and/or a two-page "contract terms summary" that sets forth the changes in the renegotiated Select agreement.

*6 Regardless of what Quaker says constitutes the business plan, in fact Redmond himself has no knowledge of any such business plan. Although Redmond swears that his new boss-- Uzzi--told him of this plan, Uzzi himself knows of no one who transmitted such hearsay to Redmond.

Uzzi has publicly stated that the plan for integrating the Gatorade and Snapple distribution systems is something that will happen in the future. In so doing, Uzzi is consistent with another Quaker executive, Mr. Robb, who also has told the public that the integration plan for the two distribution systems has yet to be designed. The integration aspect of Redmond's job is neither mentioned nor even hinted at in personnel files, executive search files, or any other piece of paper relating to Redmond's job in the possession of Quaker, Redmond or Uzzi other than the declarations fashioned by Quaker after this case was filed.

If Redmond were to take on the task of integrating Quaker's and Snapple's distribution systems, he could not reasonably expect to force distributors to accept a renegotiated distributor agreement in the form of the business plan that is the Select agreement because:

(a) The Select agreement was negotiated not at arm's length, but rather with a distributor (Select) that is controlled by Thomas H. Lee & Co., one of the major selling shareholders of Snapple

(b) A group of Snapple distributors has openly expressed concern about the "plan" represented by the Select

Case: 1:25-cv-00669 Document #: 79 Filed: 05/15/25 Page 70 of 90 PageID #:638

PepsiCo, Inc. v. Redmond, Not Reported in F.Supp. (1996)

1996 WL 3965

distributor agreement, particularly about "changes caused by competition"

(c) The distribution plan itself, as distinguished from the integration plan, contemplates taking away from existing Snapple distributors certain Snapple packages that they have heretofore distributed.

Quaker has no plan whatever for renegotiating the Snapple distributor agreements if Snapple distributors do not accept the terms sought by Snapple. Thus, while Quaker claims to have a plan or "vision" for the integrated distribution system after all Snapple distributor agreements have been renegotiated, Quaker has no plan to achieve the renegotiation with 350 distributors.

If Redmond were to take on the integration task, he could be "influenced by certain confidential information [he] obtained while employed at PepsiCo," as he contemplates in his declaration, because:

(a) The integration plan itself requires renegotiation of actual merchandising co-operative programs, advertising co-operative programs and pricing increase formulae, distribution targets and equipment placement programs;

(b) Quaker makes available to distributors marketing funds that are discretionary at the regional level to be used to meet in-market competitive responses "on a regional meeting competitive basis" by regional directors who report to Redmond, and who consult with Redmond on decisions regarding the use of such funds; and

(c) The current Quaker/Gatorade distribution system has very little experience with store-door delivery systems such as the Snapple system. Redmond, on the other hand, has PepsiCo confidential information regarding its contemplated and tested new selling and delivery system, that PCNA recently has developed with Redmond's involvement.

**\*7** Uzzi has testified that Redmond has never seen the Snapple strategic marketing plan that he is supposed to execute. Quaker has not yet embraced this plan, because Uzzi has only skimmed it and disagrees strongly with certain premises of it. Additionally, Uzzi cannot confirm that this plan was created prior to Redmond's employment by Quaker, as he swore in his declaration Likewise, there is no Snapple 1995 National Sales and Marketing Plan, which will include an

allocation of Snapple's resources, its 1995 marketing tactics, its budget allocation for promotions, and its product mix, among other things.

Redmond's use of PepsiCo's confidential information and trade secrets in his new job does not depend upon its title. He will use that information because he is a senior executive with Gatorade who will have responsibility for packaging, pricing, costs, margins, distribution systems, products, channels, and marketing, and therefore will necessarily suffer the influence of PepsiCo's trade secrets.

The court finds that Defendants' credibility regarding Redmond's duties at Quaker has been undermined by:

(a) Redmond's false statements to three PCNA executives regarding his acceptance of the Quaker offer;

(b) Redmond's unconditional acceptance of the offer from Uzzi when he apparently intended to negotiate for a higher position with his present employer;

(c) Redmond's sworn declaration describing a business plan of which he knew nothing and his false testimony that he got that information from Uzzi;

(d) The widely varying descriptions of Redmond's job title and duties, starting with his assertion to six PCNA employees that Quaker hired him to be the Chief Operating Officer of Gatorade; and

(e) Redmond's admission in his declaration and Uzzi's denial in the hearing that Redmond's job performance could be influenced by confidential PepsiCo information.

## VI. PepsiCo's Trade Secrets

A. Strategic Plan and Marketing Initiatives
PCNA uses a planning process for its business that begins with a Strategic Plan for a three-year time frame, and is revisited annually. The Strategic Plan identifies the areas of the beverage business in which PCNA plans to compete, product strategies, operational strategies relating to manufacturing, selling and distribution, marketing strategies, and financial goals and strategies. The strategic planning process is confidential, because its purpose is to create a competitive advantage by anticipating competitor's moves in the marketplace and preempting those moves.

PCNA's Strategic Plan is developed by Weatherup and his staff. Because the General Managers of PCNA's business units are involved in the process of developing and directing PCNA's plans, the General Managers understand the nature of the information presented to them and treat the information in those plans as confidential. Although the General Managers are responsible for individual geographic regions, their interest in the strategic plans is not limited to their own region. PepsiCo primarily goes to market on a national basis.

**\*8** PCNA's Strategic Plan was presented to senior PCNA managers, including Redmond, at a meeting at the Sagamore hotel in upstate New York in July, 1994. Those managers are responsible for the formulation of the plans, as well as for the execution of the Strategic Plan. At that meeting, Weatherup and others presented specific information regarding products, package sizes, financial targets, key operational changes, and timing, among other things. Weatherup and others explained at this meeting that the information being presented was confidential.

Among other times and places where the General Managers, including Redmond, were involved in and exposed to PCNA's strategic planning processes was the July, 1994 meeting. At that meeting, PCNA presented its confidential strategic marketing information to the General Managers, including, for example, marketing plans relating to the sales of Lipton Original and Lipton Brisk ready-to-drink teas. PCNA's marketing plans, as presented at Sagamore, are not publicly known. If they became known to a competitor, they could be used by that competitor to create a product or plan designed to challenge PCNA's marketing strategy.

Also presented at the Sagamore meeting was, for example, another strategic initiative related to PCNA's juice drinks, and specifically to new flavors being introduced by PCNA in 1995 and the expansion of flavors in specified package sizes. Knowledge of such confidential information would enable a competitor to block the success of PCNA's planned product introductions.

Still another example of the strategic initiatives presented at the Sagamore meeting related to PCNA's All Sport. That initiative related to the size of the All Sport package and was designed to shift the focus of All Sport's marketing.

PCNA's Strategic Plan has economic value as a result of its not being generally known in the beverage business. That is because the Strategic Plan shows PCNA's direction, which

competitors could use to try to preempt or block PCNA's moves and thereby reap economic benefits. If a competitor obtained PCNA's confidential strategic plans, that competitor would know where PCNA was and was not going to place its competitive and financial resources, what accounts PCNA did and did not plan to focus upon, what size packages PCNA was and was not planning to use, and what PCNA's new innovations are. That information represents the difference between winning (by taking sales and customers away from competitors, and by being profitable) and losing in the marketplace.

B. Annual Operating Plan

PCNA's strategic plan is focused for a single calendar year in an Annual Operating Plan ("AOP"), in a process beginning in June. That AOP is a nationwide plan developed by reviewing proposals with the field operations, including the business managers of each of the geographic business units. Once finalized, the AOP is delivered to the geographic business units for implementation within each specific region. Business Unit General Managers use their own judgment to implement the national plan on a regional level.

**\*9** As a result of the confluence of several events, calendar year 1995 will be a pivotal year for PCNA's success or failure in the non-carbonated soft drink categories that are new areas for PCNA: isotonic beverages, teas and juices. 1995 will be the first full year in which PCNA and the Coca-Cola Company will have products that compete with Quaker's Gatorade product that has for so long dominated the isotonic beverage market.

1995 also is pivotal because the combined Gatorade and Snapple businesses form a greater competitive threat than those entities standing alone. The combined entity will be able to present a more powerful sales effort across sales channels. PepsiCo has formed a task force to address the competitive effects of the combined Gatorade/Snapple entity.

Competition in the tea market also will be remarkably fierce in 1995. A partnership between Coke and Nestea already has been disbanded in that market as a result of the fierce competition. Fierce competition for the sale of juice products is also anticipated in 1995.

PCNA concludes its AOP at the national level in mid- to late summer. That AOP becomes the guideline for all of PCNA's field operations in the U.S. and Canada to execute all the activities that PepsiCo participates in during the calendar

Case: 1:25-cv-00669 Document #: 79 Filed: 05/15/25 Page 72 of 90 PageID #:640

PepsiCo, Inc. v. Redmond, Not Reported in F.Supp. (1996)

1996 WL 3965

year 1995. Although the specific implementation of the AOP varies among the regional business units, the AOP provides the direction for that implementation. The AOP includes PCNA's financial goals and expectations, marketing plans for each product and package size, promotional event calendars, growth expectations, and operational changes. These plans represent the "strategic bets" that PCNA makes about its business, that will allow PCNA to win or lose in the market.

PCNA's AOP is developed by many people at PCNA over many months. The development group is the same as that for PCNA's strategic plan (including Redmond), and also includes brand managers, PCNA's new product Vice President, joint venture managers and others whose input is necessary to the plan.

PCNA's 1995 AOP was distributed to Barnes' direct reports-- the Business Unit General Managers, and senior personnel working at PepsiCo's headquarters in Somers, NY. Barnes has discussed the AOP with Redmond over the last several weeks as Redmond (along with other Business Unit General Managers) prepared the action plan for his business unit for 1995. Redmond knows of every initiative contained in the AOP.

The AOP bears a legend that reads "Private and Confidential-Do Not Reproduce," and generally is understood by PCNA managers to contain confidential information. Different information contained within the AOP is competitively sensitive for different periods of time, some of it through December, 1995.

PCNA's competitors could not develop the information contained in PCNA's AOP even if they looked at historical market data. If the information contained in the AOP were to be placed in the hands of one of PCNA's competitors, competitors could take steps to preempt or destroy PCNA's competitive moves.

 *10  Among the major PCNA initiatives outlined in the AOP are confidential advertising, campaigns, marketing strategies, including a determination of the timing for specific activities, and packaging tactics. The plans are not generally known and have been kept confidential by PCNA.

Included in the AOP is confidential information about a new piece of merchandising equipment. Although that piece of equipment has been introduced to the public, PCNA's plans with respect to that equipment--targets for placement, capital

expenditures, and the like--are not known to the public. PCNA's AOP also includes an initiative to place other cold merchandising equipment into stores, detailing the type of equipment that PCNA will purchase, and the number of pieces of equipment. Pepsi is in competition with other beverage vendors to place such equipment into stores.

PCNA's plans to expand its business in certain markets that are new to PCNA, using a specific PCNA product, are not publicly known. PCNA's AOP includes details of funding available to PCNA's distributors to spend on an initiative behind PCNA's Lipton Brisk tea product, and other plans (including timing) relating to that product. PCNA's AOP also includes information regarding new product flavors and packages that is not publicly known and that is competitively sensitive.

Although trade press reports may contain information regarding new flavors, that information frequently is incorrect. Readers of the press reports would be unable to discern which of the information contained within such reports is accurate, and which is inaccurate. Gatorade's president, Uzzi, testified that he did not believe everything that he read in Brand News, Brand Marketing and other trade publications, and that those publications are not always accurate. Thus, the fact that some of the new flavors and packaging plans identified in PCNA's AOP are mentioned in the press does not preclude trade secret status for PCNA's plans regarding those flavors, because the press statements could not be relied upon by competitors in formulating their own business plans.

### D. Pricing Architecture

"Pricing Architecture" is a key component of PCNA's AOP, relating to how PCNA prices its products in the marketplace. Pricing Architecture goes to great length and detail to determine and establish what prices PCNA will be charging for its products, including All Sport, Lipton and Ocean Spray products, to deliver certain retail prices in the market, on a nationwide basis. Documents reflecting PCNA's Pricing Architecture are labeled as "Private and Confidential."

Pricing Architecture includes PCNA's national pricing approach, specific price points, directions for Customer Development Agreements ("CDAs"), objectives for All Sport, Lipton teas, Ocean Spray juices and lemonade, and PCNA's new (and still under test) water product, Aquafina, by trade channel, package size and other characteristics of PCNA's products and customers. The pricing alternatives

identified in the Pricing Architecture were selected by PCNA from many alternatives. PCNA's Pricing Architecture is not publicly known and is confidential. Because the beverage market is extremely price sensitive, if competitors had access to PCNA's confidential information, they could use that information to calculate their own price points to beat PCNA in the marketplace.

 **\*11**  Pricing Architecture also includes information on the guidance that PCNA gives to its sales personnel entering into CDAs with retailers. CDAs are agreements between PCNA and retailers by which the retailer agrees to engage in certain merchandising activities for PCNA products in exchange for the payment of money by PCNA for a one calendar year period. PCNA's CDA information for 1995 is confidential, is not publicly available, and includes using the CDA approach for new products (which has not been a common practice for the types of products that PCNA sells). PCNA's Pricing Architecture includes CDA goals for specific products in specific channels. Redmond was responsible for developing specific CDAs for California and for working on CDAs for national accounts that are headquartered in California.

At the time of Redmond's departure on November 10, 1994, PCNA was negotiating CDAs with its customers. One CDA in process at the time of Redmond's departure was a contract with K-Mart, which included specific recommendations regarding merchandising equipment. That information is not publicly known, but competitors could use that information to outbid PCNA in order to obtain a merchandising advantage with the retailer. Similar information was in process regarding a CDA with PCNA's customer, "7-11," and Redmond had access to that information shortly before he left PCNA to work for Quaker.

PCNA developed its Pricing Architecture with the work of five full time staff members and consultant resources over an eighteen-month period. Redmond was a member of PCNA's steering committee for Pricing Architecture, which met with the headquarters group to review work in progress on Pricing Architecture and to give the headquarters group guidance as they developed the Pricing Architecture plan. Redmond concedes that he participated in one Pricing Architecture steering committee meeting; the steering committee also engaged in conference and other telephone calls to provide input.

Pricing Architecture was presented to PCNA's general managers, including Redmond, in an August 23-24 meeting.

The Pricing Architecture document was delivered only to those PCNA personnel having a need to know the contents of the document in order to carry out their jobs: the vice presidents of customer development and financial officers of each of the PCNA business units. At a later date, copies of the Pricing Architecture document would have been provided to the market unit managers who report directly to the business unit general managers. Those persons were involved in the development of Pricing Architecture. Pricing Architecture was not distributed in its entirety to PCNA's franchise bottlers. The information that was received by the bottlers, however, was reasonably expected by PCNA to be kept in confidence by them as a result of their own business and legal incentives to retain that information in confidence, and because PCNA senior employees tell the bottlers to keep the information confidential.

 **\*12**  PCNA's Pricing Architecture has major economic value precisely because it is not generally known. That is because there is no variable that has a greater effect on profitability than pricing. Indeed, there is nothing more important that will influence the success of a business unit, such as the California business unit of which Redmond was in charge, in terms of achieving profit goals than pricing. PCNA's competitors could use PCNA's confidential Pricing Architecture information to preempt PCNA's pricing moves, undercut PCNA's prices, and planning to fight competition from PCNA. PCNA's Pricing Architecture retains its competitive sensitivity through the end of 1995.

The mere fact that a product is priced in the market at a specific dollar amount does not mean that PCNA's 1995 Pricing Architecture is publicly known. Because of the complexity of pricing, which varies by geography, retailer, channel, and time, pricing across the country, PCNA's Pricing Architecture could not be developed with any degree of accuracy by a competitor looking at public data. The best that a competitor could do with public data is speculate as to PCNA's approach to pricing. PCNA's Pricing Architecture deals with ranges of prices, and not the specific prices that PCNA charges to individual customers. Likewise, PCNA's customers do not obtain the entire pricing plan outlined in Pricing Architecture when they receive information specific to them from PCNA.

Business Unit General Managers (including Redmond) worked on Pricing Architecture, and planned to implement within each regional business unit's market. PCNA's Pricing Architecture must be and could be remembered by

PepsiCo, Inc. v. Redmond, Not Reported in F.Supp. (1996)

1996 WL 3965

management employees such as Barnes and by business unit general managers such as Redmond.

Indeed, Redmond was responsible for implementing the guidelines of Pricing Architecture within the California business unit that he ran until November 10, 1994, to assess price points for the markets within that business unit, to prepare proposals for customers, and to forecast profits. Redmond was required to report to Barnes how he was going to use Pricing Architecture to develop specific plans for California, how he was going to approach customers, and what he was going to achieve with those customers.

Examples of PCNA's Pricing Architecture are found in its pricing approach and objectives to All Sport, Lipton Original and Brisk tea and Ocean Spray products in various channels. That information is competitively sensitive until December, 1995, because competitors do not know what PCNA is going to do with its prices until after PCNA has priced its products in the marketplace. Even then, competitors would be required to assemble prices from different geographic markets and channels, over the entire year, to obtain the information contained in PCNA's Pricing Architecture. The specifics of PCNA's approach to the marketplace is not generally known. A competitor of PCNA could use this information to block PCNA's efforts in the marketplace by locking up retailer shelf space sooner, by obtaining it for a lower price than PCNA, or by any of several other competitive methods. Redmond was made aware of all of this information.

 *13  Pricing Architecture also includes specific targets for All Sport relating to shelf space, which a competitor could use to try to block PCNA's plans by itself obtaining more shelf space in retailers' stores. Likewise, Pricing Architecture includes a new PCNA pricing structure for All Sport. Redmond is attuned to PCNA's pricing strategies against Gatorade.

The manner in which competitive information, of the type included in Pricing Architecture, is used can be shown by what PCNA has done with information that it obtained from the marketplace relating to Quaker's Gatorade product. Parts of PCNA's plans to take All Sport to market are contained in an October 5, 1994 memorandum.

### E. Selling and Delivery System

In PCNA's system, products are manufactured and then sold to stores by delivering the product directly from the manufacturing plant to the store shelves for the retailer.

Because there are many alternate ways to perform that function, PCNA has, in the last two years, studied those approaches to find the most cost-effective approach to meet its customers' needs. Providing such service will give PCNA an advantage with its retailers as the retailers make decisions regarding shelf space and merchandising activity.

PCNA has initiated a pilot market test of a new and unique beverage selling and delivery system in Laguna, California. The elements of that system are indicated in the record. PCNA's knowledge, gained through the pilot test, is known only by the team studying it. That team included a group of PCNA employees at its headquarters, the management team in Laguna, California, along with Redmond and his operations staff.

Whether, and if so, when PCNA will begin implementing its now tested selling and delivery system nationwide is not publicly known. Quaker considers its ''vision'' of a new distribution system to be very confidential information. PCNA considers its new system to be no less so. CNA developed its new selling and delivery system with the assistance of a consultant, spending more than a million dollars over the past two years.

### V. Redmond Knows PepsiCo's Confidential Information and Trade Secrets.

As noted above, Redmond participated in the development of PCNA's trade secrets, and received documents and attended presentations relating to those trade secrets. Redmond has acknowledged his possession of PCNA's confidential information, and illustrated his knowledge of PCNA's confidential information by preparing a chart relating to Pricing Architecture during his testimony, and by providing details regarding PCNA's plans during his testimony.

In mid-September, 1994, Weatherup spent a day with Redmond in California reviewing Redmond's California AOP as well as the company's national direction. The AOP is the core of Redmond's job: he "lives and breathes this every single day of every single week." Redmond has not denied having such knowledge, or put on any evidence to suggest that he does not have such knowledge; in fact, Redmond demonstrated to Weatherup that he could articulate PCNA's strategic plan and Annual Operating plan in 20-30 key respects during Weatherup's visit with Redmond in September, 1994.

VI. Redmond's And Quaker's Use Of PCNA's Confidential Information And Trade Secrets Will Irreparably Harm PCNA.

**\*14** The specific effects of the use of certain of PCNA's trade secrets and confidential information is set forth above. If Redmond's knowledge of PCNA's plans were placed into the hands of a competitor like Quaker, the effects on PCNA would be "catastrophic."

VII. Redmond And Quaker Will Suffer Little Harm From The Entry Of An Injunction.

Uzzi had not begun to think about hiring anyone for the positions that Redmond now holds at any time prior to October 20, 1994. By October 21, 1994 there had not been any discussions at Quaker about any potential candidates to lead the effort to integrate the distribution systems. Redmond's name had not been raised in connection with that job at that time. Quaker and Uzzi did not interview anyone for Redmond's position. If Redmond had not accepted that position, Uzzi would have been required to solicit someone else for the position. Uzzi acknowledges that he would have carried more of the burden of putting the system together himself, had Redmond not accepted. Thus, the court may infer that any injunction precluding Redmond from participating in such efforts will cause little burden to Quaker that Quaker had not already contemplated before Redmond accepted his job, and would have suffered if Redmond had not, in fact, accepted. Uzzi was not surprised that Redmond negotiated with Pepsi following his acceptance of Quaker's job offer, and contemplated the possibility of Redmond's not accepting the job. Uzzi would have hired someone else in that circumstance, and can do so now.

Quaker is still in the process of defining Redmond's role and responsibilities, and does not expect to have his responsibilities defined until later in December, or early next year. Redmond and Uzzi have themselves agreed not to talk about Redmond's job until the end of the proceedings in this matter or were advised by someone not to do so. This tempers Quaker's claim that an injunction would be "devastating" to Quaker.

*CONCLUSIONS OF LAW*

This court has subject matter jurisdiction to hear this dispute based upon the diversity of citizenship between plaintiff and defendants and the amount in controversy exceeding fifty thousand dollars. 28 U.S.C. § 1332(a) (1994).

I. PRELIMINARY INJUNCTION STANDARDS IN THE SEVENTH CIRCUIT

In determining whether a preliminary injunction should be granted in favor of PepsiCo, this court must consider four factors:

(1) whether PepsiCo has some likelihood of succeeding on the merits of any of its claims at trial;

(2) whether PepsiCo will have an adequate remedy at law or will be irreparably harmed if the injunction does not issue;

(3) whether the threatened injury to PepsiCo outweighs the threatened harm the injunction may inflict on the defendants; and

(4) whether the granting of the preliminary injunction will disserve the public interest.

*Gateway Eastern Ry. Co. v. Terminal R.R. Ass'n. of St. Louis,* 35 F.3d 1134, 1137 (7th Cir. 1994); *Duct-O-Wire Co. v. U.S. Crane, Inc.,* 31 F.3d 506, 509 (7th Cir. 1994); *Erickson v. Trinity Theatre, Inc.,* 13 F.3d 1061, 1067, (7th Cir. 1994); *Abbott Labs. v. Mead Johnson & Co.,* 971 F.2d 6, 11-12 (7th Cir. 1992); *Roland v. Air Line Employees Ass'n. Int'l,* 753 F.2d 1385, 1392 (7th Cir. 1985). The court concludes that PepsiCo has met its burden with respect to these factors demonstrating that injunctive relief is warranted.

**\*15** Under the Seventh Circuit's "sliding scale" approach, "the more likely it is the plaintiff will succeed on the merits, the less the balance of irreparable harms need weigh towards its side; the less likely it is the plaintiff will succeed, the more the balance need weigh towards its side." *Abbott Labs.,* 971 F.2d at 12; *Gateway Eastern Ry. Co.,* 35 F.3d at 1137; *Duct-O-Wire,* 31 F.3d at 509. In *Abbott Labs.,* the court further clarified its analysis: "While we have at times framed the sliding scale approach in mathematical terms, it is more properly characterized as subjective and intuitive, one which permits district courts to 'weigh the competing considerations and mold appropriate relief.'" *Abbott Labs.,* 971 F.2d at 12 (citation omitted) In this case, both the likelihood of success on the merits and the balance of harms that might be suffered if no injunction were to issue weigh heavily in PepsiCo's favor.

**PepsiCo, Inc. v. Redmond, Not Reported in F.Supp. (1996)**

1996 WL 3965

## II. PEPSICO IS LIKELY TO SUCCEED ON THE MERITS OF ITS CLAIMS.

It is frequently true in trade secret cases that "[m]isappropriation and misuse can rarely be proved by convincing direct evidence. In most cases, plaintiffs [like PepsiCo] must construct a web of perhaps ambiguous circumstantial evidence from which the trier of fact may draw inferences which convince him that it is more probable than not that what plaintiffs allege happened did in fact take place. Against this often delicate construct of circumstantial evidence there frequently must be balanced defendants and defendants' witnesses who directly deny everything." *Si Handling Sys., Inc. v. Heisley,* 753 F.2d 1244, 1261 (3d Cir. 1985) (quoting *Greenberg v. Croydon Plastics Co.,* 378 F. Supp. 806, 814 (E.D. Pa. 1974), *vacated,* 184 U.S.P.Q. 27 (E.D. Pa. 1974) (vacating earlier order and substituting more definite injunctive relief)).

### A. PepsiCo is Likely to Prevail on its Illinois Trade Secret Act Claim.

To safeguard intellectual property and confidential business information, Illinois has adopted a version of the Uniform Trade Secrets Act. 765 ILCS 1065/1 *et seq.* (1994) (the Illinois Trade Secrets Act, hereinafter "the ITSA"); 14 Uniform L. Ann. 437 *et seq.* (Master ed. 1990). The ITSA was intended to codify existing Illinois common law relating to trade secrets, and to eliminate any inconsistencies within that body of law. *See Napoli v. Sears, Roebuck & Co.,* 835 F. Supp. 1053, 1058 (N.D. Ill. 1993) (Aspen, J.); *Elmer Miller, Inc. v. Landis,* 253 Ill. App. 3d 129, 133, 625 N.E.2d 338, 341 (1st Dist. 1993); *Gillis Assoc. Indus., Inc. v. Cari-All, Inc.,* 206 Ill. App. 3d 184, 189, 564 N.E.2d 881, 884 (1st Dist. 1990); Jager, *Trade Secrets Law* § IL.01 (the ITSA corrects some "recent aberrations in the Illinois case law [and resolves] some confusion that existed in the case law"). Although there are very few Illinois cases construing the provisions of the ITSA applicable here, it is appropriate for this court to look to the application of statutory trade secret act claims in other jurisdictions. *Le Gout v. Decker,* 146 Ill. 2d 389, 397, 586 N.E.2d 1257, 1260-61 (1992) ("To further the goal of uniformity in [uniform] laws, courts generally 'defer to decisions of other states and will construe the statute in accordance with the construction given to the same statute in other jurisdictions.'") (citation omitted); *Urban v. Lohman,* 227 Ill. App. 3d 772, 776, 592 N.E.2d 292, 295 (1st Dist. 1992) ("In construing an Illinois statute, decisions of other states construing similar laws are entitled to respect and consideration") (citation omitted).

### 1. PepsiCo's Confidential Information Constitutes Protectible Trade Secrets.

**\*16** The ITSA defines a "Trade Secret" as:

information, including but not limited to, technical or non-technical data, a formula, pattern, compilation, program, device, method, technique, drawing, process, financial data, or list of actual or potential customers or suppliers, that:

(1) is sufficiently secret to derive economic value, actual or potential, from not being generally known to other persons who can obtain economic value from its disclosure or use; and

(2) is the subject of efforts that are reasonable under the circumstances to maintain its secrecy or confidentiality.

765 ILCS 1065/2(d) (1993). PepsiCo's confidential business information constitutes protectible trade secrets within the ITSA's definition, because they are data, processes, methods, plans and strategies (including pricing, marketing, strategic and related business information) that derive economic value from not being generally known within the beverage industry.

Further, in this case, defendant Redmond admitted that the PCNA business information at issue is confidential, that he views confidential business information and trade secrets as one and the same, and that he is not free to disclose PepsiCo's confidential information. These admissions alone establish the fact of PepsiCo's trade secrets, for trade secret status may be found when the defendant admits that the information constitutes a trade secret. *Churchill Communications Corp. v. Demyanovich,* 668 F. Supp. 207, 213 (S.D.N.Y. 1987) (admission by a former employee concerning the confidential nature of certain information was relevant in determining whether that information was entitled to trade secret status).

PepsiCo's efforts to maintain the secrecy of its trade secret and confidential information were reasonable and more than required under the ITSA. PepsiCo provided confidential and trade secret information to those employees with an actual need to know it; it regularly marked information "private and confidential;" it required all of its personnel with access to this information to execute agreements with PepsiCo whereby they agreed not to use or disclose PepsiCo's confidential information; the bottlers with whom some of this information

Case: 1:25-cv-00669 Document #: 79 Filed: 05/15/25 Page 77 of 90 PageID #:645

**PepsiCo, Inc. v. Redmond, Not Reported in F.Supp. (1996)**

1996 WL 3965

was shared knew the secret and sensitive nature of the material and had strong business and legal incentives to maintain the secrecy of the information; at meetings where strategic and other business plans were discussed, PCNA executives emphasized to the attendees that the information they were to receive at the meeting was confidential. These steps were more than the "reasonable efforts" required by the ITSA.

The case law illustrates the sufficiency of PCNA's effort to safeguard its confidential information. For example, in *Televation Telecommunication Sys., Inc. v. Saindon,* 169 Ill. App. 3d 8, 15-17, 522 N.E.2d 1359, 1364-66 (2d Dist. 1988), *appeal denied,* 122 Ill. 2d 595, 530 N.E.2d 266 (1988), the court held that the plaintiff took reasonable steps to ensure the secrecy of its proprietary drawings though the drawings were kept in an unlocked file cabinet, portions of those drawings were freely distributed to lower level employees who were not bound by confidentiality agreements and drawings were given to non-employee third parties. The court reasoned that the plaintiff's policy of disclosing complete drawings to employees only on a need-to-know basis, after orally informing its employees that the drawings were confidential and stamping the drawings proprietary, were reasonable measures to protect the information under the circumstances. *See also Service Ctrs. of Chicago, Inc. v. Minogue,* 180 Ill App. 3d 447, 454, 535 N.E.2d 1132, 1136 (1st Dist. 1989) (disclosure to those who have a need to know the content of the trade secret is adequate protection under the ITSA); *Surgidev Corp. v. Eye Technology, Inc.,* 828 F.2d 452, 455 (8th Cir. 1987) (applying Minnesota and California versions of the Uniform Trade Secrets Act, and holding that employee nondisclosure agreements were sufficient protection of secrecy).

**\*17** Likewise, that a limited amount of PepsiCo's trade secrets and confidential information was distributed to PCNA's franchise-owned bottlers (FOBOs) does not mean that PepsiCo has used less than reasonable efforts to maintain the secrecy of such information. FOBOs have the same incentives as PepsiCo to keep that information confidential, and PepsiCo reasonably could expect them to do so. *See Kewanee Oil Co. v. Bicron Corp.,* 416 U.S. 470, 475 (1974) ("This necessary element of secrecy is not lost, however, if the holder of the trade secret reveals the trade secrets to another in confidence, and under an implied obligation not to use or disclose it."). PepsiCo's witnesses also correctly observe that disclosure of confidential information to competitors and others by FOBOs can in certain circumstances run afoul of the law. *See, e.g., U.S. v. U.S. Gypsum Corp.,* 438 U.S. 422,

433 n.16 (1978) (exchanges of current price information by competitors represents the "greatest potential for generating anticompetitive effects" and consistently have been held to violate the Sherman Act).

### 2. Redmond's Use And Inevitable Disclosure Of PepsiCo's Trade Secrets Constitute Actionable Misappropriate Under The ITSA.

"Misappropriation" is defined under the ITSA in pertinent part as:

(1) acquisition of a trade secret of a person by another person who knows or has reason to know that the trade secret was acquired by improper means; or

(2) disclosure or use of a trade secret of a person without express or implied consent by another person who:

(A) used improper means to acquire knowledge of the trade secret; or

(B) at the time of disclosure or use, knew or had reason to know that knowledge of the trade secret was:

(I) derived from or through a person who utilized improper means to acquire it;

(II) acquired under circumstances giving rise to a duty to maintain its secrecy or limit its use; or

(III) derived from or through a person who owed a duty to the person seeking relief to maintain its secrecy or limit its use.

765 ILCS 1065/2(b) (1993). Both actual and threatened misappropriation also may by enjoined under the ITSA. 765 ILCS 1065/3(a) (1993); *George S. May Int'l Co. v. International Profit Assoc.,* 256 Ill. App. 3d 779, 788, 628 N.E.2d 647, 653 (1st Dist. 1993), *appeal denied,* 156 Ill. 2d 557, 638 N.E.2d 1115 (1994).

"Improper Means" under the ITSA:

> includes theft, bribery, misrepresentation, breach or inducement of a breach of a confidential relationship or other duty to maintain secrecy or limit use, or

Case: 1:25-cv-00669 Document #: 79 Filed: 05/15/25 Page 78 of 90 PageID #:646

PepsiCo, Inc. v. Redmond, Not Reported in F.Supp. (1996)

1996 WL 3965

espionage through electronic or other means.

765 ILCS 1065/2(a) (1993).

In this case, Redmond's performance of his job at Quaker results in actual misappropriation because he will use PepsiCo's trade secrets and other confidences in order to perform his duties. Thus, under the ITSA, Redmond has misappropriated PepsiCo's trade secrets by "use of a trade secret of [PepsiCo] without express or implied consent" and because Redmond "used improper means [[[by breaching his duty to maintain the confidentiality of PepsiCo's trade secrets and other confidential information] to acquire knowledge of the trade secret." Quaker has misappropriated PepsiCo's trade secrets by placing Redmond into a job in which it "knew or had reason to know that knowledge of the [[[PepsiCo] trade secret was derived from or through a person who utilized improper means to acquire it; [and that the trade secrets were] acquired under circumstances giving rise to a duty to maintain its secrecy or limit its use; [[[and that the trade secrets were] derived from or through a person who owed a duty to the person seeking relief to maintain its secrecy or limit its use." 765 ILCS 1065/2(b)(1), (2)(A)(I), (II) and (III) (1993).

**\*18** Further, Redmond and Quaker have "threatened misappropriation" of PepsiCo's trade secrets within the meaning of the ITSA. Threatened misappropriation can occur when an employee who knows of his employer's trade secrets is hired by a competitor to perform a job with similar duties. In such circumstances, the inevitable disclosure or use of the trade secrets by the employee in his new job constitutes misappropriation or threatened misappropriation under the Uniform Trade Secrets Act and under the common law. *See, e.g., IBM Corp. v. Seagate Technology, Inc.,* 1991 U.S. Dist. LEXIS 20406, at \*7-12 (D. Minn. 1991), *remanded for more specific statement of relief, 962 F.2d 12 (8th Cir. 1992)* ("*IBM*") (court issued an injunction under the Minnesota Trade Secrets Act (the relevant provisions of which are identical to the ITSA) barring a former employee from working for a competitor in a new job with the same responsibilities because the new job would inevitably lead to the disclosure or use of trade secrets); *American Totalisator Co. v. Autotote Ltd.,* 1983 WL 21374, at \*5 (Del. Ch. 1983) (court noted that Delaware's adoption of the Uniform Trade Secrets Act authorized an injunction against threatened misappropriation where it was impossible for an employee not to use his former employer's trade secrets in his job

with the plaintiff's competitor); *Emery Indus., Inc. v. Cottier,* 202 U.S.P.Q. 829, 834 (S.D. Ohio 1978) ("There can be no doubt of the present threat of disclosure in any case in which the transfer of employment is to a head-to-head competitor and the responsibilities in the employment are comparable."); *FMC Corp. v. Varco Int'l, Inc.,* 677 F.2d 500, 504-05 (5th Cir. 1982) (court enjoined an employee from working in a new job that posed "an inherent *threat* of disclosure or use of [plaintiff's] trade secrets" because the new job had duties identical to those at his former employer); *Den-Tal-Ez, Inc. v. Siemens Capital Corp.,* 566 A.2d 1214, 1232-33 (Pa. Super. Ct. 1989) (noting that the trial court may have overstated the situation when it said that trade secret disclosure would be "inevitable," but that there was still ample evidence showing at least a substantial threat of disclosure); *Air Prods & Chems., Inc. v. Johnson,* 442 A.2d 1114, 1122-25 (Pa. Super. Ct. 1982) (finding the inevitability of trade secret disclosure to a new employer to be a sufficient threat to enjoin the employee from holding certain positions where disclosure was likely to occur); *Weed Eater, Inc. v. Dowling,* 562 S.W.2d 898, 902 (Tex. Civ. App. 1978) (finding inevitable disclosure notwithstanding former employee's good faith, and enjoining employee from working for competitor in any capacity in which trade secrets of previous employer were likely to be used); *Allis-Chalmers Mfg. Co. v. Continental Aviation & Eng'g Corp.,* 255 F. Supp. 645, 654 (E.D. Mich. 1966) (enjoining former employee from engaging in the same line of work for a competitor because the nature and type of work created "an inference that there is an inevitable and immediate danger of disclosure" of former employer's trade secrets); *Fountain v. Hudson Cush-N-Foam Corp.,* 122 So.2d 232, 234 (Fla. Dist. Ct. App. 1960) (enjoining former employee from working for a competitor because employee's "knowledge of the trade secrets would be so entwined with his employment as to render ineffective an injunction directed only toward a prevention of disclosure.").

**\*19** The only court to consider whether "inevitable disclosure" constitutes a threatened misappropriation under the ITSA concluded that it does. *Teradyne, Inc. v. Clear Communications Corp.,* 707 F. Supp. 353, 355 (N.D. Ill. 1989) (Zagel, J.). In that case, the court considered the adequacy of allegations sufficient to state a claim under the ITSA and observed that "[a]n employer seeking injunctive protection for his trade secrets prior to their disclosure generally alleges either that the ex-employee actually intends to divulge the secrets or that he will inevitably do so, whether consciously or not, because of the type of work in which he will be involved, or that there is a substantial probability of

PepsiCo, Inc. v. Redmond, Not Reported in F.Supp. (1996)

1996 WL 3965

disclosure." *Id.* at 356 (quoting *Standard Brands v. Zumpe,* 264 F. Supp. 254, 269 (E.D. La. 1967)). In *Teradyne* the claim failed only because there were no allegations of inevitable disclosure. *Teradyne,* 707 F. Supp at 356-57. PepsiCo's complaint here makes such allegations.

Inevitable disclosure is not a concept limited to the law of trade secrets and misappropriation. Thus, for example, the courts have recognized that "it is very difficult for the human mind to compartmentalize and selectively suppress information once learned, no matter how well intentioned the effort may be to do so." *FTC v. Exxon Corp.,* 636 F.2d 1336, 1350 (D.C. Cir. 1980); *see also Sullivan Marketing, Inc. v. Valassis Comm., Inc.,* 1994 WL 177795 at *3 (S.D.N.Y. 1994). Those cases recognize that, once a person has knowledge of a competitors business information, when they are called upon to act on behalf of his own company, his ability to compartmentalize the knowledge of his competitor's been is "nigh impossible." *Sullivan,* 1994 WL at *3. The court cannot find that any less is true of Redmond's ability (or inability) to compartmentalize his knowledge of PepsiCo's trade secrets and confidential information and to refrain from using that information in his job at Quaker.

Defendants' reliance upon *AMP Inc. v. Fleischhacker,* 823 F.2d 1199 (7th Cir. 1987), is misplaced. *Fleischhacker* was decided before the ITSA was enacted, and the ITSA provides expressly for injunctive relief upon a showing of threatened misappropriation. 765 ILCS 1065/3(a). The court in *Fleischhacker* also indicated that injunctive relief would have been warranted if the plaintiff had shown that any of its protectible trade secrets were misappropriated or "at risk of misappropriation." *Fleischhacker,* 823 F.2d at 1207. Thus, unlike the plaintiff in *Fleischhacker,* who could not prove that it had specific trade secrets, or that those trade secrets (if possessed) would have been of value to the defendant's new employer, PepsiCo here has shown that it has protectible trade secrets and confidences, that Redmond was integrally involved in their development and implementation, and that Quaker will obtain a great and unfair advantage as a result of Redmond's possession and use of PepsiCo's trade secrets and confidences.

**\*20** In order to determine whether disclosure of trade secrets in such circumstances is inevitable, this court examines (i) the level of competition between the former employer and the new employer; (ii) whether the employee's position with the new employer is comparable to the position he held with the former employer; and (iii) the actions the new employer has

taken to prevent the former employee from using or disclosing trade secrets of the former employer. *IBM,* 1991 U.S. Dist. LEXIS 20406, at *7 (citing *Surgidev Corp. v. Eye Technology, Inc.,* 648 F. Supp. 661, 695 (D. Minn. 1986), *aff'd,* 828 F.2d 452 (8th Cir. 1987)). In this case, there is no dispute that PepsiCo and Quaker are direct competitors in the fiercely competitive soft drink business.

The court also concludes that PepsiCo has shown that Redmond's new position is sufficiently comparable to his former position at PepsiCo to make disclosure of PepsiCo's trade secrets and confidential information inevitable at his new position. Redmond himself characterized his new position at Quaker as Chief Operating Officer of Gatorade. The duties of his new position as Vice President-Field Operations for Gatorade North America will overlap the duties he had while at PepsiCo, and thereby will result in his use or disclosure of PepsiCo's confidential information. *See, e.g., National Starch & Chem. Corp. v. Parker Chem. Corp.,* 530 A.2d 31, 32-33 (N.J. Super. Ct. App. Div. 1987) (former employee enjoined from any employment responsibilities related to his previous employment, despite the fact that 95 percent of his work for the defendant consisted of non-related responsibilities; court found that the circumstances gave "rise to an inference that a substantial threat of disclosure exists" even though only 5 percent of his current employment was related to his previous work). The testimony of Redmond and Uzzi (in their respective declarations, Uzzi's deposition and testimony of each at the preliminary injunction hearing) establish that the scope of Redmond's job responsibilities at Quaker will be both broad and pertain to the same areas for which Redmond possesses PepsiCo's confidential information, namely sales, distribution, marketing, pricing, customer agreements and promotions. According to both Redmond and Uzzi, Redmond will manage the integration of the distribution systems of Gatorade and Snapple. Redmond also will be responsible for "executing sales and marketing plans, pricing strategies, including Customer Merchandising Agreements, and other types of promotional programs." Redmond's testimony reveals that he will be managing from the top Gatorade's entire North American sales operation at the field level. Although Quaker claims that Redmond will only take charge of previously developed plans and strategies, an executive of his level will implement, improve, and modify existing systems, and Uzzi concedes that Redmond's job will empower him to direct the spending of discretionary marketing funds. Therefore, regardless of whether Redmond is responsible for developing pricing strategies, his knowledge of PepsiCo's

**PepsiCo, Inc. v. Redmond, Not Reported in F.Supp. (1996)**

1996 WL 3965

trade secrets will either intentionally or inadvertently be used in improving and implementing Quaker's existing sales and distribution systems. Redmond's position with Quaker presents a substantial threat of disclosure.

 **\*21** Defendants contend that no risk of disclosure exists because Redmond has signed a contract with Quaker that requires him not to disclose PepsiCo's confidential information while at Quaker, and not to induce Quaker to use PepsiCo's information. The court concludes that this Quaker contract is not adequate to protect PepsiCo's information. First, the Quaker contract does not bar Redmond himself from using PepsiCo's information for Quaker's benefit. Further, such contracts and admonitions do not supplant the trade secrets laws and are routinely rejected as insufficient to prevent inevitable disclosure or use. *IBM,* 1991 U.S. Dist. LEXIS 20406, at \*10 (noting that injunction was appropriate where new employer was unable to explain any specific plan to ensure that employee would not disclose former employer's trade secrets); *FMC Corp.,* 677 F.2d at 504-05 (finding that a confidentiality agreement and good faith were insufficient to prevent the use or disclosure of a former employer's trade secrets, the court enjoined employee from disclosing former employer's trade secrets and enjoined new employer from placing employee in position that posed inherent threat of use or disclosure of trade secrets); *Autotote,* 1983 WL 21374, at \*5 (noting that promise to not use trade secrets is not possible without an injunction). Moreover, Quaker's effort to preclude such misappropriation--its own confidentiality agreement with Redmond-- noticeably fails to prohibit Redmond's use of PepsiCo's information even as it express prohibits him from using Quaker's confidences. PepsiCo therefore is entitled to injunctive relief under the ITSA. 765 ILCS 1065/3(a) (1993).

PepsiCo has shown that it is likely to prevail on all elements of its claim under the ITSA. Moreover, any shortage in PepsiCo's proof arises from the shifting facts describing Redmond's job that have been provided to PepsiCo and to the court. In such circumstances, it is only fair to shift the burden to defendants, to prove that Redmond will not use or disclose PepsiCo's confidential information. That is because knowledge as to the scope of Redmond's new job duties and Quaker's job plans for Redmond is peculiarly and exclusively within the control of the defendants. It is a "familiar principle" that

> "when the true facts relating to [a] disputed issue lie peculiarly within the knowledge of" one party, the burden of proof may properly be assigned to that party "in the interest of fairness."

*ITSI TV Prods., Inc. v. Agricultural Assocs.,* 3 F.3d 1289, 1292 (9th Cir. 1993) (quoting *United States v. Hayes,* 369 F.2d 671, 676 (9th Cir. 1966)). This principle has been recognized by the United States Supreme Court, the Seventh Circuit, other federal courts, and Illinois courts. As the United States Supreme Court has noted,

> [T]he ordinary rule, based on considerations of fairness, does not place the burden upon a litigant of establishing facts peculiarly within the knowledge of his adversary.

 **\*22** *Campbell v. United States,* 365 U.S. 85, 96 (1961); *see also United States v. N.Y., N.H. & Hartford R.R. Co.,* 355 U.S. 253, 256 n.5, 78 S. Ct. 212, 214-15 n.5 (1957) (same); *Old Ben Coal Corp. v. Interior Bd. of Mine Operations Appeals,* 523 F.2d 25, 36 (7th Cir. 1975) (citing 9 Wigmore, Evidence § 2486 (3d ed.)); *Erving Paper Mills v. Hudson-Sharp Mach. Co.,* 332 F.2d 674, 678 (7th Cir.) (en banc) (also citing Wigmore), *cert. denied,* 379 U.S. 946 (1964); *Wohl v. Yelen,* 22 Ill. App. 2d 455, 459, 161 N.E.2d 339, 341 (1st Dist. 1959) (recognizing "that if the evidence with respect to an issue is within the control of an adverse party, it is he who has the burden of proof ..."); *Snyder v. Ambrose,* 639 N.E.2d 639, 640-41, 1994 Ill. App. LEXIS 1210, \*6-7 (2d Dist., Aug. 30, 1994); *Southwest Fed. S. & L. Ass'n v. Cosmopolitan Nat'l Bank,* 23 Ill. App. 2d 174, 180-81, 161 N.E.2d 697, 701 (1st Dist. 1959).

In light of PepsiCo's showing of the considerable similarities between Redmond's former and present jobs, it is only through such proof by defendants that the court could be assured that PepsiCo's trade secrets would not inevitably be disclosed or used by Redmond. Defendants completely control the evidence as to what duties Redmond will be assigned. Defendants have failed to prove that Redmond's former position is not comparable to his new position, and that it will not involve the use of PepsiCo's confidential information.

 B. PepsiCo Is Also Likely To Prevail On Its Trade Secrets Misappropriation Claim Under Illinois Common Law.

PepsiCo is likely to prevail on its claim of trade secret misappropriation under the common law. In order to succeed

Case: 1:25-cv-00669 Document #: 79 Filed: 05/15/25 Page 81 of 90 PageID #:649

**PepsiCo, Inc. v. Redmond, Not Reported in F.Supp. (1996)**

1996 WL 3965

on the merits of a trade secret claim, PepsiCo must demonstrate that (1) it possessed legally cognizable trade secrets, (2) defendants misappropriated those trade secrets in breach of an agreement, confidence, duty, or as a result of discovery by improper means, and (3) the information will be used in the defendants' business. *See Cohn and RLC Enter., Inc. v. Taco Bell Corp.,* No. 92 C 5852, 1994 WL 13769 at *10 (N.D. Ill., Jan. 14, 1994)* (Nordberg, J.); *Syntex Ophthalmics, Inc. v. Novicky,* 745 F.2d 1423, 1433 (Fed. Cir. 1984), *vacated and remanded on other grounds,* 470 U.S. 1047 (1985)* (applying Illinois law) (citing *Schulenburg v. Signatrol, Inc.,* 50 Ill. App. 2d 402, 200 N.E.2d 615 (1964), *aff'd in part and rev'd in part,* 33 Ill. 2d 379, 212 N.E.2d 865 (1965), *cert. denied,* 383 U.S. 959 (1966)).

Under the common law, a trade secret includes "a plan or process, tool, mechanism, compound, or informational data utilized by a person in his business operations and known only to him and such limited other persons to whom it may be necessary to confide it." *ILG Indus., Inc. v. Scott,* 49 Ill. 2d 88, 92, 273 N.E.2d 393, 395 (1971); *Schulenburg,* 33 Ill. 2d at 385, 212 N.E.2d at 868; *Victor Chem. Works v. Iliff,* 299 Ill. 532, 545-46, 132 N.E. 806, 811 (1921); *Television Telecommunication Sys., Inc. v. Saindon,* 169 Ill. App. 3d 8, 13, 522 N.E.2d 1359, 1363 (2d Dist. 1988); *Junkunc v. S.J. Advanced Technology & Mfg. Corp.,* 149 Ill. App. 3d 114, 118-19, 498 N.E.2d 1179, 1183 (1st Dist. 1986).

**\*23** To determine whether a trade secret is entitled to the protection of the common law, the court is required to examine six factors: (1) the extent to which the information is known outside PepsiCo's business; (2) the extent to which it is known by employees and other individuals involved in PepsiCo's business; (3) the extent of measures taken to guard the secrecy of the information; (4) the value of the information to PepsiCo and its competitors; (5) the amount of effort or money expended by PepsiCo in developing the information; and (6) the ease or difficulty with which the information could properly be duplicated or acquired by others. *ILG,* 49 Ill. 2d at 93, 273 N.E.2d at 396 (1971); *Tie Systems, Inc. v. Telcom Midwest, Inc.,* 203 Ill. App. 3d 142, 148, 560 N.E.2d 1080, 1085 (1st Dist. 1990); *Service Ctrs.,* 180 Ill. App. 3d at 453, 535 N.E.2d at 1136; *Junkunc,* 149 Ill. App. 3d at 118-19, 498 N.E.2d at 1183; *Television,* 169 Ill. App. 3d at 13, 522 N.E.2d at 1363; *American Wheel & Eng'g Co. v. Dana Molded Prods., Inc.,* 132 Ill. App. 3d 205, 209, 476 N.E.2d 1291, 1294 (1st Dist. 1985).

PepsiCo seeks injunctive relief for the period of time that the confidentiality of the business information to which Redmond was exposed remains valuable. PepsiCo has established that, during this period of time, the information for which it seeks protection from this court is protectible as a trade secret because it is not known outside of the PepsiCo business family, which includes only select PepsiCo managers and executives, and PepsiCo's business partners (for example, its franchise operators), on a need-to-know basis. Further, PepsiCo has established that it has taken extensive protective measures to guard the information's secrecy, including confidentiality agreements and frequent indications, orally and in writing, that the information is confidential. PepsiCo's information was developed at great expense and effort by PepsiCo, is of great value to PepsiCo while it is secret, and would be valuable to its competitors if it is revealed to them before the information becomes known in the marketplace in the next several months. And, while Defendants have claimed that discrete elements of this information already are known, the court concludes that the breadth of information and the plans of PepsiCo could not be duplicated by others from publicly available sources during the time period that is critical to the value of the information.

The court concludes that the business information for which PepsiCo seeks this court's protection constitutes protectible trade secrets under Illinois common law because, by not being known to others, they give PepsiCo a significant competitive advantage over other firms in the beverage industry. *Novicky,* 745 F.2d at 1434 (applying Illinois law); *Syntex Ophthalmics, Inc. v. Tsuetaki,* 701 F.2d 677, 684 (7th Cir. 1983) (applying Illinois law). This court concludes that PepsiCo's strategic and annual operating plans for 1995, pricing architecture, new selling and delivery plans (including its new customer representative compensation system) and customer proposal information are protectible trade secrets. *See, e.g., Elmer Miller,* 253 Ill. App. 3d at 133-35, 625 N.E.2d at 342-43 (customer list containing sales and marketing information was a protectible trade secret); *Lyle R. Jager Agency, Inc. v. Steward,* 253 Ill. App. 3d 631, 639-41, 625 N.E.2d 397, 402 (3d Dist. 1993) (customer files containing information relating to pricing were protectible trade secrets); *Brostron v. Warmann,* 190 Ill. App. 3d 87, 90, 546 N.E.2d 3, 5 (3d Dist. 1989) (gross profit information was a protectible trade secret); *Brunswick Corp. v. Jones,* 784 F.2d 271 (7th Cir. 1986) (finding that access to confidential marketing strategies, financial performance and projections, gave a competitor the unfair advantage to cut the time and costs required to develop a new product, preempt the plaintiff's

Case: 1:25-cv-00669 Document #: 79 Filed: 05/15/25 Page 82 of 90 PageID #:650

**PepsiCo, Inc. v. Redmond, Not Reported in F.Supp. (1996)**

1996 WL 3965

new products before they reached the market, and enabled the competitor to determine how aggressively to price its products); *American Totalisator Co. v. Autotote Ltd.,* 1983 WL 21374 at *4 (Del. Ch. 1983) (finding plaintiff's bidding information constituted a trade secret because it "necessarily encompasses a philosophy for future operation and, as such, possesses some proprietary value to Amtote and a devastating advantage if it becomes available to its competitors....To know the plan would affect the bidding which would determine profit and loss which would affect everything about this Plaintiff doing business"); *National Starch and Chem. Corp. v. Parker Chem. Corp.,* 530 A.2d 31, 32 (N.J. Super. 1987) (information relating to marketing and sales strategies, manufacturing processes, pricing, research and development, and specialized product specification was protectible as trade secrets); *Metallurgical Indus., Inc. v. Fourtek, Inc.,* 790 F.2d 1195, 1201 (5th Cir. 1986).

**\*24** PepsiCo acted prudently and reasonably to keep its confidential information secret. *See Lincoln Towers Ins. Agency v. Farrell,* 99 Ill. App. 3d 353, 358, 425 N.E.2d 1034, 1037 (1st Dist. 1981). PepsiCo protected its confidentiality interests by requiring its employees to sign confidentiality and non-disclosure agreements, and to promise not to divulge confidential or proprietary information relating to PepsiCo's trade secrets to others during and after employment. *Novicky,* 591 F. Supp. 28, 37 (N.D. Ill. 1983) (Decker, J.), *aff'd,* 745 F.2d 1423 (Fed. Cir. 1984); *Televation,* 169 Ill. App. 3d at 15-17, 522 N.E.2d at 1364-66 (disclosure of complete documents on a need-to-know basis was sufficient to ensure the secrecy of proprietary documents and to maintain trade secret status); *Affiliated Hosp. Prods., Inc. v. Baldwin,* 57 Ill. App. 3d 800, 802, 806, 373 N.E.2d 1000, 1002, 1005 (1st Dist. 1978) (disclosure of information to employees under agreement not to disclose or use information constituted sufficient protection to qualify the information as trade secrets at common law); *Greenberg v. Croydon Plastics Co.,* 378 F. Supp. 806, 812 (E.D. Pa. 1974) ("The secrecy in which a purported trade secret is shrouded need not be absolute but reasonable precautions under the circumstances must be taken to prevent disclosure to unauthorized parties"); *Q-CO Indus., Inc. v. Hoffman,* 625 F. Supp. 608, 617 (S.D.N.Y. 1985) ("absolute secrecy is not required"); *Tie Systems,* 203 Ill. App. 3d at 148, 560 N.E.2d at 1085 (absence of precautions restricting access to the information did not establish that the information was not confidential).

The court concludes, based upon the law and the evidence presented at the hearing, that PepsiCo is entitled to legal protection for its trade secrets in the business information described above. The underlying principle at work here is simple: "A business which may invest substantial time, money and manpower to develop secret advantages over its competitors, must be afforded protection against the wrongful appropriation of confidential information by a prior employee, who was in a position of confidence and trust." *ILG Indus.,* 49 Ill. 2d at 93, 273 N.E.2d at 396. The defendants are not entitled to use for their own benefit information developed by PepsiCo over substantial time and at great cost. The court concludes that PepsiCo is entitled to preliminary injunctive relief on its trade secrets claim under the Illinois common law.

C. PepsiCo Is Likely To Prevail On Its Breach Of Confidentiality Agreement Claim Against Defendant Redmond.

Defendant Redmond entered a confidentiality agreement with PepsiCo which provided, in pertinent part, as follows:

> I will not disclose at any time, to any one other than officers or employees of the Company [PepsiCo] or make use of, confidential information relating to the business of the Company, manufacturing methods, processes, techniques, products, research or customers lists obtained while in the employ of the Company, which shall not be generally known or available to the public or recognized as standard practices, and on leaving the employ of the Company will not take without the consent of the Company, any drawing, blueprint, or other reproduction, customers list or confidential data.

**\*25** Actions for breach of confidentiality agreements are properly made under the common law of Illinois. The ITSA provides that "contractual remedies, whether or not based upon misappropriation of a trade secret" are not affected by the ITSA. 765 ILCS 1065/8(b)(1).

PepsiCo's confidentiality agreement with Redmond is valid and enforceable. Redmond entered the agreement prior to his employment with PepsiCo, and the agreement was supported

Case: 1:25-cv-00669 Document #: 79 Filed: 05/15/25 Page 83 of 90 PageID #:651

PepsiCo, Inc. v. Redmond, Not Reported in F.Supp. (1996)

1996 WL 3965

by adequate consideration. *See, e.g., Corroon & Black of Illinois, Inc. v. Magner,* 145 Ill. App. 3d 151, 163, 494 N.E.2d 785, 791 (1st Dist. 1986) (continued employment for a substantial period of time is adequate consideration for an employment contract). The parties have both cited to Illinois law in memorandum submitted to the court. The court is convinced that no different result would be reached under New York law, however, because similar agreements have been held valid and enforceable under New York law. *See, e.g., Integrated Cash Management Servs., Inc. v. Digital Transactions, Inc.,* 920 F.2d 171, 172, 173 (2d Cir. 1990) (finding valid and enforceable a confidentiality agreement where employees simply agreed "not to disclose or use any confidential or proprietary information of [the employer] upon leaving the company's employ."); *Anacomp., Inc. v. Shell Knob Servs. Inc.,* 1994 WL 9681 at *4, 12 (S.D.N.Y. 1994) (confidentiality agreement that prohibited disclosure or use of the employer's private and proprietary business information, trade secrets and other confidential data" held valid and enforceable).

Redmond admitted that he was not free to disclose PepsiCo's confidential information. Redmond's counsel also admitted during closing argument that the Confidentiality Agreement was valid and bound Redmond "to protect the confidential information of the Pepsi Cola Company that he was made privy to while employed by Pepsi Cola." "[S]tatements made by an attorney in closing argument may be the basis from which a trial court finds a judicial admission." *Lowe v. Kang,* 167 Ill. App. 3d 772, 777, 521 N.E.2d 1245, 1248 (2d Dist. 1988); *accord Williams v. Cahill,* 258 Ill. App. 3d 822, 826, 629 N.E.2d 1175, 1179 (3d Dist. 1994). "Judicial admissions are formal acts of a party or his attorney in court, dispensing with proof of a fact claimed to be true, and are used a substitute for legal evidence at trial." *Lowe,* 167 Ill. App. 3d at 776, 521 N.E.2d at 1248; *accord Dremco, Inc. v. Hartz Constr. Co.,* 261 Ill. App. 3d 531, 535-36, 633 N.E.2d 884, 888 (1st Dist. 1994). Redmond's counsel affirmatively admitted during his closing argument that Redmond entered into a valid and enforceable Confidentiality Agreement with PepsiCo:

> The Pepsi Cola agreement I think is absolutely clear that Mr. Redmond is contractually bound to protect the confidential information of the Pepsi Cola Company that he was made privy to while employed by Pepsi Cola.

Thus, this judicial admission binds Redmond and dictates a conclusion that Redmond's confidentiality agreement with PepsiCo is valid and enforceable.

**\*26** The fact that the confidentiality agreement here has no time limitation does not invalidate the agreement. Rather, the ITSA explicitly provides that "a contractual or other duty to maintain secrecy or limit use of a trade secret shall not be deemed to be void or unenforceable solely for lack of durational or geographic limitation on the duty." 765 ILCS 1065/8(b)(1).

Prior to the enactment of the ITSA, a few cases held that confidentiality agreements would not be enforced unless they contained reasonable temporal or geographic limitations. *E.g., Cincinnati Tool Steel Co. v. Breed,* 136 Ill. App. 3d 267, 482 N.E.2d 170 (2d Dist. 1985). Section 8(b)(1) of the ITSA superseded and overruled those holdings to the extent they required durational or geographic limits on contractual duties to maintain secrecy or limit the use of trade secrets. *Abbott Interfast Corp. v. Harkabus,* 250 Ill. App. 3d 13, 22, 619 N.E.2d 1337, 1344 (2d Dist. 1993) (contractual prohibition against trade secret disclosure not invalid because it did not contain time limitation; citing Section 8(b)(1) of ITSA); *see also* Jager at § IL.01[1], p. IL-3; § IL.07, p. IL-19-20.

It is true that, at the termination of employment, an employee is free to take with him "general skills and knowledge acquired during his tenure with his former employer." That employee may not, however, take with him "confidential, particularized plans or processes developed by his employer and disclosed to [[[the employee] while the employer-employee relationship existed, which are unknown to others in the industry and which give the employer an advantage over his competitors." *AMP, Inc. v. Fleischhacker,* 823 F.2d 1199, 1202 (7th Cir. 1987); *accord Schulenburg,* 33 Ill. 2d at 387, 212 N.E.2d at 869.

Redmond expressly and contractually agreed to protect PepsiCo's confidential business information and to utilize PepsiCo's trade secrets exclusively for the benefit of PepsiCo. The confidentiality agreement is evidence that Redmond was informed from the outset that he would not be permitted to use PepsiCo's confidences except in PepsiCo's business.

Redmond's performance of his new job with Quaker, PepsiCo's direct competitor in the soft drink market, will require him to use and to disclose PepsiCo's confidential business information in violation of the confidentiality

**PepsiCo, Inc. v. Redmond, Not Reported in F.Supp. (1996)**

1996 WL 3965

agreement. The court further concludes that Redmond has thereby breached his contractual non-disclosure obligations to PepsiCo as to valuable confidential business information in which PepsiCo has a protectible business interests. *See, e.g., Lawter Int'l., Inc. v. Carroll,* 116 Ill. App. 3d 717, 720-23, 451 N.E.2d 1338, 1346-48 (1st Dist. 1983).

The court concludes that a preliminary injunction should issue here against Redmond to protect PepsiCo from any breach of the Confidentiality Agreement and further disclosure or use of its confidential business information. Illinois courts routinely hold confidential customer information, confidential pricing procedures, and other confidential methods, formulas, procedures and equipment capabilities learned and used in the course of confidential employer-employee relationships as protectible. *See, e.g., Gorman Publ. Co. v. Stillman,* 516 F. Supp. 98, 105 (N.D. Ill. 1980) (Decker, J.) (protectible information found in plaintiff's finances, staffing problems, salary structure, public relations problems, customer lists and distribution methods); *Crocan,* 385 F. Supp. at 253 ("knowledge of what constitutes the best way to manufacture, package, distribute and sell a product may in itself constitute a trade secret of confidential information"); *Millard Maint. Svc. Co. v. Bernard,* 207 Ill. App. 3d 736, 746, 566 N.E.2d 379, 385 (1st Dist. 1990) (pricing formula and customer information protected); *Torrence v. Hewitt Assoc.,* 143 Ill. App. 3d 520, 526, 493 N.E.2d 74, 77-78 (1st Dist. 1986) (protectible confidential information found in financial data, future business plans, client lists and confidential reports); *Tower Oil & Technology Co. v. Buckley,* 99 Ill. App. 3d 637, 643, 425 N.E.2d 1060, 1066 (1st Dist. 1981) (particular customer needs, product applications, suppliers were confidential and valuable information); *Donald McElroy, Inc. v. Delaney,* 72 Ill. App. 3d 285, 292-93, 389 N.E.2d 1300, 1306-07 (1st Dist. 1979) (confidential supplier sources and requirements, company procedures, equipment capabilities and other confidential company data); *Wessel Co. v. Busa,* 28 Ill. App. 3d 686, 692, 329 N.E.2d 414, 419 (1st Dist. 1975) (sensitive customer information, confidential pricing procedures and the years of accumulated data upon which it was based); *Smithereen Co. v. Renfrew,* 325 Ill. App. 229, 242-43, 59 N.E.2d 545, 550 (confidential methods, processes and formulae used in plaintiff's business); *see also* Restatement of Torts § 759, cmt. b ("Examples of [such] information ... include ... the state of one's accounts, the amount of his bid for a contract, his sources of supply, his plans for expansion or retrenchment, and the like. There are no limitations as to the type of information included except that it relate to [secret or

confidential] matters in the business."); Restatement (Second) Agency § 395, cmt. b (the rule against nondisclosure of a former employee's confidential information "applies not only to those communications which are stated to be confidential, but also to information which the agent should know his principal would not care to have revealed to others or used in competition with him. It applies to unique business methods of the employer, trade secrets, lists of names, and all other matters which are peculiarly known in the employer's business.")

**\*27** The justification for enjoining Redmond from further disclosing PepsiCo's confidential information was stated eloquently by Justice Holmes in *E. I. DuPont de Nemours Powder Co. v. Masland,* 244 U.S. 100, 102 (1917):

> Whether the plaintiffs have any valuable secret or not the defendant knows the facts, whatever they are, through a special confidence that he accepted. The property may be denied, but the confidence cannot be. Therefore the starting point for the present matter is not property or due process of law, but that the defendant stood in confidential relations with the plaintiffs, or one of them. These have given place to hostility, and the first thing to be made sure of is that the defendant shall not fraudulently abuse the trust reposed in him. It is the usual incident of confidential relations. If there is any disadvantage in the fact that he knew the plaintiffs' secrets, he must take the burden with the good.

D. PepsiCo Is Not Estopped From Obtaining Injunctive Relief.

The court concludes that the fact that PepsiCo did not enter a covenant not to compete with Redmond does not estop PepsiCo from obtaining injunctive relief against the disclosure of its trade secrets and confidential information. Illinois law is well-settled that where an employer seeks to enjoin a former employee from using the employer's trade secrets, as in this case, a covenant not to compete is not required:

Case: 1:25-cv-00669 Document #: 79 Filed: 05/15/25 Page 85 of 90 PageID #:653

PepsiCo, Inc. v. Redmond, Not Reported in F.Supp. (1996)

1996 WL 3965

Under Illinois law, an employer has a legitimate business interest in insuring trade secrets not be disclosed for the benefit of third parties or for the employee's use after his employment. (citations omitted). This is true even when there is no noncompetition contract between the parties.

*Pivot Point Int'l, Inc. v. Charlene Prods., Inc.,* 1994 U.S. Dist. LEXIS 8993, at *25 (N.D. Ill., July 1, 1994) (Nordberg, J.); *see also Televation Telecommunication Sys., Inc. v. Saindon,* 169 Ill. App. 3d 8, 12, 522 N.E.2d 1359, 1362 (2d Dist. 1988). [2]

The court further concludes that Redmond owed PepsiCo common law duties of confidentiality. "The duty to protect an employer's trade secret exists apart from a contract embodying the obligation." *Crocan Corp. v. Sheller--Globe Corp.,* 385 F. Supp. 251, 253 (N.D. Ill. 1974) (Bauer, J.); *see also Televation,* 169 Ill. App. 3d at 12, 522 N.E.2d at 1362 ("An employer has a recognized business interest in protecting trade secrets disclosed in confidence to the employee during the course of his employment even where ... there is no enforceable restrictive covenant between the parties.") (citations omitted). For this reason as well, it was not necessary for PepsiCo to enter a non-compete agreement with Redmond to bind him to his non-disclosure obligations.

Further, Defendants have failed to cite any authority, or set forth the applicable legal standard, for estoppel. The Illinois Supreme Court has identified six elements necessary for equitable estoppel, including the basic elements of (1) a representation made by the party against whom the estoppel is alleged, and (2) the good faith and reasonable reliance on this representation by the party seeking the benefit of the estoppel. *Vaughn v. Speaker,* 126 Ill. 2d 150, 161-63, 533 N.E.2d 885, 890 (1988). Defendants failed to assert or establish any of the necessary elements of estoppel; thus, the court rejects their argument that PepsiCo is estopped from obtaining injunctive relief.

III. PEPSICO WILL BE IRREPARABLY HARMED IF THE PRELIMINARY INJUNCTION DOES NOT ISSUE, AND THAT INJURY FAR OUTWEIGHS ANY HARM THE INJUNCTION MAY CAUSE THE DEFENDANTS.

**\*28** The court concludes that the threatened injury to PepsiCo far outweighs any harm the injunction may cause defendants, and PepsiCo will be irreparably harmed if the injunction sought by PepsiCo is not issued.

A. Because The ITSA Provides For Injunctive Relief, No Showing Of Lack Of Adequate Remedy At Law Or Irreparable Injury Is Required.

Under Illinois law, "where a statute expressly authorizes injunctive relief to enforce the provisions of the statute, the general rules of equity requiring a showing of a lack of an adequate remedy at law and irreparable injury need not be shown." *People v. Fiorini,* 143 Ill. 2d 318, 574 N.E.2d 612, 623 (1991) (other citations omitted). This general principle has been recognized widely by federal and state courts alike. *See, e.g., Illinois Bell Telephone Co. v. Illinois Commerce Commission,* 740 F.2d 566, 571 (7th Cir. 1984) ("where the plaintiff seeks [a preliminary] injunction to prevent the violation of a ... statute that specifically provides for injunctive relief, it need not show irreparable harm"); *Trailer Train Co. v. State Bd. of Equalization,* 697 F.2d 860, 869 (9th Cir.) ("The standard requirements for equitable relief need not be satisfied when [a preliminary] injunction is sought to prevent the violation of a ... statute which specifically provides for injunctive relief") (other citations omitted), *cert. denied,* 464 U.S. 846 (1983); *Environmental Defense Fund, Inc. v. Lamphier,* 714 F.2d 331, 338 (4th Cir. 1983) ("[w]here a statute authorizes injunctive relief for its enforcement, plaintiffs need not plead and prove irreparable injury") (other citations omitted); *Virginia Beach S.P.C.A., Inc. v. South Hampton Roads Veterinary Ass'n,* 229 Va. 349, 329 S.E.2d 10, 13 (1985) ("When a statute empowers a court to grant injunctive relief, the party seeking an injunction is not required to establish the traditional prerequisites, *i.e.,* irreparable harm and lack of an adequate remedy at law, before the injunction can issue, [and a]ll that is required is proof that the statute or regulation has been violated") (citation omitted).

Although no Illinois case has yet been decided under the Illinois Trade Secrets Act squarely addressing this specific issue, federal and state courts in other states adopting the Uniform Trade Secrets Act (like Illinois) have repeatedly invoked this principle in dispensing with the irreparable harm requirement for injunctive relief where a violation of the trade secret statute has been demonstrated. *See, e.g., Capital Tool and Mfg. Co. v. Maschinenfabrik Herkules,* 837 F.2d 171, 172

Case: 1:25-cv-00669 Document #: 79 Filed: 05/15/25 Page 86 of 90 PageID #:654

PepsiCo, Inc. v. Redmond, Not Reported in F.Supp. (1996)

1996 WL 3965

(4th Cir. 1988) (where a statutory violation is demonstrated, "a complainant need not allege or prove irreparable harm when it invokes a statute that authorizes in injunctive relief"); *National League Rsch. Group v. Lathan,* 1993 WL 169789 (W.D.Va. 1993) ("A complainant need not prove irreparable harm when invoking a statute [like the Virginia--and Illinois--Trade Secrets Act] that authorizes injunctive relief, but must only prove that the defendant violated the statute"); *Boeing Co. v. Sierracin Corp.,* 108 Wash. 2d 38, 738 P.2d 665, 681 (1987) (no finding of irreparable harm required under Uniform Trade Secrets Act, as adopted by Washington, in order for injunctive relief properly to issue).

**\*29** Accordingly, the Illinois Trade Secrets Act expressly authorizes injunctive relief to enforce its provisions (765 ILCS 1065/8), and PepsiCo has demonstrated a violation of the Illinois Trade Secrets Act. Injunctive relief is appropriate in the instant case without any additional findings of irreparable harm or lack of an adequate remedy at law.

B. PepsiCo Has Amply Demonstrated Irreparable Injury.
In cases such as this, involving threats to trade secrets and confidential information, courts readily presume irreparable injury from a showing that the protectible interest at stake is imperilled by a defendant's conduct. *See, e.g., AMP,* 823 F.2d at 1206 (trade secrets and confidential information); *Refractory Technology, Inc. v. Koski,* No. 90 C 4350, 1990 WL 119560, at *3 (N.D. Ill., Aug. 13, 1990) (Duff, J.) (dissemination of trade secrets would cause plaintiff immediate, irreparable harm); *ISC-Bunker Ramo Corp. v. Altech, Inc.,* 765 F. Supp. 1310, 1334-35, 1339 (N.D. Ill. 1990) (Marovich, J.) (irreparable harm adequately demonstrated because defendant had misappropriated plaintiff's trade secret and was likely to continue doing so; "irreparable injury is presumed to occur when an ex-employee breaches a confidentiality agreement ...."); *CPG Products Corp. v. Mego Corp.,* 214 U.S.P.Q. 206, 214 (S.D. Ohio 1981) (threat of disclosure, destruction or dilution of plaintiff's trade secrets constitutes irreparable injury justifying injunctive relief.); *Donald McElroy, Inc. v. Delany,* 72 Ill. App. 3d 285, 294-95, 389 N.E.2d 1300, 1308 (1st Dist. 1979) ("Once a protectible interest has been established, injury to plaintiff will presumably follow if that interest is not protected"; threat of irreparable harm sufficient where former employee violated the terms of a non-disclosure agreement); *Lawter Int'l,* 116 Ill. App. 3d at 731, 451 N.E.2d at 1348 (where former employee signed a non-disclosure agreement and was about to use plaintiff's confidential information against

the plaintiff, irreparable injury was shown and preliminary injunction was properly granted). An injury is "irreparable" in these cases because it cannot be remedied through the payment of money damages and, indeed, it is often difficult (if not impossible) to calculate the true extent of the loss. *See, e.g., Vogel v. American Soc. of Appraisers,* 744 F.2d 598, 599 (7th Cir. 1984) ("irreparable harm ... means ... plaintiff is unlikely to be made whole by an award of damages or other relief at the end of the trial"); *Cross Wood Products, Inc. v. Suter,* 97 Ill. App. 3d 282, 286, 422 N.E.2d 953, 957 (1st Dist. 1981) (holding that loss of competitive position was not readily subject to measurement by any certain pecuniary standard and this no legal remedy would be adequate to compensate for that loss); *Prentice Medical Corp. v. Todd,* 145 Ill. App. 3d 692, 701, 495 N.E.2d 1044, 1051 (1st Dist. 1986) (finding that irreparable injury denotes transgressions of a continuous nature resulting in a loss of competition position).

**\*30** The disclosure of even a single trade secret is sufficient to cause irreparable harm. *Union Carbide Corp. v. UGI Corp.,* 731 F.2d 1186, 1191-92 (5th Cir. 1984) ("It is not the number of trade secrets taken that determines whether the threat of irreparable harm exists. The fact that a trade secret may be disclosed is enough.") (citation omitted). Moreover, just as it is impossible to unring a bell, once disclosed, trade secrets and confidential information lose their secrecy forever and, "[s]ince the confidentiality of this information can never be regained, the [threatened] injuries would indeed be irreparable." *Metropolitan Life Ins. Co. v. Usery,* 426 F. Supp. 150, 172 (D.D.C. 1976); *see also FMC Corp. v. Taiwan Tainan Giant Indus. Co.,* 730 F.2d 61, 63 (2d Cir. 1984) ("A trade secret once lost is, of course, lost forever").

Here, PepsiCo faces the certain prospect of irreparable harm unless Redmond and Quaker are enjoined. Quaker's access to, and use of, PepsiCo's competitive information in Redmond's possession will result in injury to PepsiCo. That injury is irreparable because there is no way to measure what impact on PepsiCo's sales the defendant's misappropriation will have. It will be difficult, if not impossible, for PepsiCo to prove that it would have made certain sales of its products had the misappropriation not occurred; and its difficulty will be exacerbated by the fact that its All Sport, Lipton and Ocean Spray brands are products attempting to establish themselves against the market leaders in the isotonic, ready-to-drink tea and fruit drink market niches. PepsiCo also stands to lose its ability to develop market recognition and goodwill that result from an active presence in the marketplace. That loss, too,

Case: 1:25-cv-00669 Document #: 79 Filed: 05/15/25 Page 87 of 90 PageID #:655

PepsiCo, Inc. v. Redmond, Not Reported in F.Supp. (1996)

1996 WL 3965

is irreparable, because PepsiCo cannot place a value on the market share that it is now trying to develop by using its trade secrets to establish a market presence. Because competitive position in an industry defies calculation, the court concludes that it would have no way of calculating a reasonably precise level of pecuniary damage to PepsiCo for its loss of potential competitive position sustained by the disclosure of its trade secrets and confidential information.

Consequently, the court concludes that where trade secrets and confidential information are at issue, as they are here, irreparable harm flows necessarily from the actual or threatened loss of the important protectible business interests at stake. Therefore, a preliminary injunction is the only remedy adequate to curtail the irreparable harm that would otherwise inevitably follow. *See, e.g., Taiwan Tainan,* 730 F.2d at 63-64; *Franke v. Wiltschek,* 209 F.2d 493, 498 (2d Cir. 1953); *Penetone Corp. v. Palchem, Inc.,* 627 F. Supp. 997, 1005-07 (N.D. Ohio 1985). As Judge Posner stated in *American Hosp. Supply,* a "district judge asked to decide whether to grant or deny a preliminary injunction must choose the course of action that will minimize the costs of being mistaken." 780 F.2d at 593. Given the choice between either requiring defendants to compete fairly and legitimately by not using PepsiCo's information, even if that means denying Redmond particular head-to-head competitive employment for a period of a few months, or requiring PepsiCo to suffer the inestimable consequences of losing its secret business information to its principal competitor who is the dominant player in the field, the court concludes that the only course of action that would minimize the costs of being mistaken consists of granting PepsiCo's request for a preliminary injunction.

 **\*31** Under the standards for granting a preliminary injunction, "the degree of likelihood of prevailing on the merits that the plaintiff must demonstrate decreases the more heavily the balance of harms weighs in its favor." *E.g., Brunswick,* 784 F.2d at 275. Consequently, "[i]f the harm to the plaintiff from denial of the preliminary injunction would be very great and the harm to the defendant from granting it very small, then the injunction should be granted even if the defendant has a better chance of prevailing on the merits than the plaintiff, provided the plaintiff's chances are better than negligible...." *Omega Satellite Prods. v. Indianapolis,* 694 F.2d 119, 123 (7th Cir. 1982); *see also Brunswick,* 784 F.2d at 275; *IDS Financial Services, Inc. v. Smithson,* 843 F. Supp. 415, 419 (N.D. Ill. 1994) (Norgle, J.); *Samuel Bingham Co. v. Maron,* 651 F. Supp. 102, 106 (N.D. Ill. 1986) (Moran,

J.). Moreover, a successful showing of a likelihood of success on the merits alone is strong evidence an injunction should issue. *Adams v. Attorney Registration & Disciplinary Com'n,* 801 F.2d 968, 971 (7th Cir. 1986). Where the plaintiff is likely to win on the merits and is also likely to sustain greater injury if the injunction is denied than the defendants are likely to sustain if it is granted, "the case for the injunction is made," and no other possibilities need even be considered. *American Civil Liberties Union v. City of St. Charles,* 794 F.2d 265, 269 (7th Cir.) (citing *American Hosp. Supply,* 780 F.2d at 598, *cert. denied,* 107 S. Ct. 458 (1986)). The court concludes that such is the case at bar: PepsiCo is likely to prevail on its trade secret and confidentiality agreement claims, and PepsiCo is likely to sustain greater injury if the injunction is not granted than defendants would if the injunction were granted because the potential harm to defendants is slight. A preliminary injunction should be entered in PepsiCo's favor.

IV. GRANTING A PRELIMINARY INJUNCTION TO PEPSICO WILL NOT DISSERVE THE PUBLIC INTEREST.

Rather than disserving the public interest, the court concludes that granting PepsiCo a preliminary injunction will further the public interest in a number of ways. A variety of public interests and policies impact on any case involving trade secrets and confidentiality agreements. These interests include:

(a) The maintenance of standards of commercial ethics and the encouragement of invention are the broadly stated policies behind trade secret law. "The necessity of good faith and honest, fair dealing, is the very life and spirit of the commercial world....[e]ven though a discovery may not be patentable, that does "not destroy the value of the discovery to one who makes its or advantage to the competitor who by unfair means, or as the beneficiary of a broken faith, obtains the desired knowledge without himself paying the price In labor, money, or machines expended by the discoverer....[T]rade secret protection [is important] to the subsidization of research and development and to increased economic efficiency within large companies through the dispersion of responsibilities for creative developments." *Kewanee Oil Co. v. Bicron Corp.,* 416 U.S. 470, 481-82 (1974) (citations omitted).

 **\*32** (b) "[R]estrictions upon an employee's disclosure of information which was developed as a result of the employer's initiative and investment, and which

was entrusted to the employee in confidence, are necessary to the maintenance of decent standards of morality in the business community. Unless protection is given against unauthorized disclosure of confidential business information by employees, employee-employer relationships will be demoralized; employers will be compelled to limit communication among employees with a consequent loss in efficiency; and business espionage, deceit, and fraud among employers will be encouraged. *Winston Research Corp. v. Minnesota Mining and Mfg. Co.,* 350 F.2d 134, 138 (9th Cir. 1965).

Illinois courts have found it imperative "to recognize a protectible business interest where a trade secret exists and ... a breach of confidentiality by an employee has occurred in the course of his employment." *Burt Dickens,* 144 Ill. App. 3d at 879, 494 N.E.2d at 819 (1st Dist. 1986). Moreover, "the court should protect the employer's investment of time, money and manpower in developing secret advantages from misappropriation by former employees who occupied a position of trust." *Television,* 169 Ill. App. 3d at 12, 522 N.E.2d at 1362; *see also Service Ctrs.,* 180 Ill. App. 3d at 452, 535 N.E.2d at 1135.

The integrity of these and other important policies is at stake in the present litigation. If a preliminary injunction is not granted in favor of PepsiCo, the public interests in fair competition, business innovation and economic efficiency will suffer. The court concludes that granting PepsiCo a preliminary injunction will serve to further these vital public interests.

Alternatively, the court would find that plaintiff would be entitled to a preliminary injunction even if the court were to find that defendant Redmond's position with defendant Quaker would not result in the inevitable use of plaintiff's secrets. For plaintiff's secrets to be secure with defendant Redmond in his new position with defendant Quaker would require the utmost sensitivity and good faith on defendant Redmond's part in treating with plaintiff's secrets. A violation by defendant Redmond's using plaintiff's secrets in making decisions for defendant Quaker could be extremely difficult to detect. Defendant Redmond's lack of forthrightness on some occasions, and out and out lies on others, in the period between the time he accepted the position with defendant Quaker and when he informed plaintiff that he had accepted that position leads the court to conclude that defendant Redmond could not be trusted to act with the necessary sensitivity and good faith under circumstances in which the only practical verification that he was not using plaintiff's

secrets would be defendant Redmond's word to that effect. This constitutes a threatened use of plaintiff's secrets, and would be sufficient of itself to warrant the preliminary injunction being entered.

**\*33** ORDERED: The motion of defendants, William E. Redmond, Jr., and the Quaker Oats Company, to supplement the record is granted.

The request of plaintiff, PepsiCo, Inc., for a preliminary injunction is granted on the following terms:

IT THEREFORE IS ORDERED, ADJUDGED AND DECREED that a preliminary injunction is hereby issued in favor of plaintiff PepsiCo and against defendants Redmond and Quaker, enjoining:

1. Defendant Redmond and any of his agents, servants, employees, attorneys, and all others in active concert or participation with him from using or disclosing any trade secrets or confidential information of PepsiCo acquired by Redmond in the course of, or arising out of his employment by PepsiCo, including, without limitation, information relating to PepsiCo's strategic and annual operating plans, PepsiCo's pricing of beverage products, PepsiCo's selling and delivery system (including its Customer Representative compensation formula), and any information relating to PepsiCo's customer proposals to national accounts;

2. Defendant Quaker and its officers, directors, agents, servants, employees, attorneys, and all others in active concert or participation with it, from seeking or acquiring any trade secrets or confidential information of PepsiCo acquired by Redmond in the course of or arising out of his employment by PepsiCo, including, without limitation, information relating to PepsiCo's strategic and annual operating plans, PepsiCo's pricing of beverage products, PepsiCo's selling and delivery system (including its Customer Representative compensation formula), and any information relating to PepsiCo's customer proposals to national accounts;

3. Redmond from assuming or performing any duties for Quaker relating in any way to the pricing of beverages through the end of May 1995;

4. Quaker from permitting Redmond to assume or perform any of the duties described in paragraph 3;

5. Redmond from assuming or performing any duties for Quaker relating to the development or implementation of any marketing or sales programs for the sale of beverages through May, 1995;

6. Quaker from permitting Redmond to assume or perform any of the duties described in paragraph 5;

7. Redmond from assuming or performing any duties for Quaker relating to the system for delivering or distributing beverages through May, 1995; and

8. Quaker from permitting Redmond to assume or perform any of the duties described in paragraph 7.

[1]    In addition, defendants have moved to supplement the record. Defendants' motion to supplement the record after proofs were closed, on the basis of newly discovered evidence, is granted. However, the substance of the Wall Street Journal article of December 2, 1994, having been considered by the court, does not affect the court's ruling on the request for a preliminary injunction for essentially the reasons stated in plaintiff's memorandum in opposition to the motion to supplement the record. The article is hearsay with respect to the truth of its contents, including whether the FOBOs do or do not maintain the confidentiality of information received from plaintiff. The non-hearsay purpose of the article is a very limited one; to the extent that purportedly secret information of plaintiff's actually appears in the article, it may not in fact be confidential or trade secrets. Because there is very little in the way of accurate information about plaintiff's purported secrets in the article, the additional evidence does not affect this court's ruling on the request for a preliminary injunction.

[2]    In their Memorandum in Opposition to PepsiCo's Motion for a Temporary Restraining Order, Defendants cited *Fleming Sales Co. v. Bailey,* 611 F. Supp. 507 (N.D. Ill. 1985) (Shadur, J.), and *Colson Co. v. Wittel,* 210 Ill. App. 3d 1030, 569 N.E.2d 1082 (4th Dist. 1991) to support its proposition that PepsiCo is estopped from obtaining injunctive relief against Redmond and Quaker because they did not enter into a covenant not to compete with Redmond; both cases are inapposite. The courts in both cases cited by the defendants found that the information possessed by the former employees were *not* trade secrets; therefore, that information could not be protected absent some sort of protective agreement. *See Fleming,* 611 F. Supp. at 511-16; *Colson,* 210 Ill App. 3d at 1040, 589 N.E.2d at 1087-88. The PepsiCo information Redmond possesses, however, constitutes a trade secret (*see supra,* Conclusions, *supra*), and is therefore protected regardless of whether the parties entered into a covenant not to compete. Moreover, the cases cited by the defendants concern employer/ employee relationships where the parties did not execute *either* a covenant not to compete *or* a nondisclosure agreement. *Fleming,* 611 F. Supp. at 509; *Colson,* 210 Ill. App. 3d at 1037, 569 N.E.2d at 1086. In contrast, as discussed above, Redmond entered into a valid, enforceable confidentiality agreement with PepsiCo that covers both trade secrets and confidential information. (PX3) Redmond's attorney has even conceded in his closing arguments that the agreement restricts Redmond from disclosing PepsiCo's confidential information.

**All Citations**

Not Reported in F.Supp., 1996 WL 3965

---

**End of Document**    © 2025 Thomson Reuters. No claim to original U.S. Government Works.

Franciscan Alliance, Inc. v. Becerra, Not Reported in Fed. Supp. (2021)

2021 WL 6774686

2021 WL 6774686
Only the Westlaw citation is currently available.
United States District Court, N.D.
Texas, Wichita Falls Division.

FRANCISCAN ALLIANCE, INC., et al., Plaintiffs,

v.

Xavier BECERRA, Secretary of the United
States Department of Health and Human
Services; and United States Department of
Health and Human Services, Defendants.

Civil Action No. 7:16-cv-00108-O
|
Signed 10/01/2021

## Attorneys and Law Firms

Luke Goodrich, Joseph C. Davis, Mark Leonard Rienzi, Stephanie Hall Barclay, The Becket Fund for Religious Liberty, Washington, DC, for Plaintiffs Franciscan Alliance, Inc., Christian Medical and Dental Society, Specialty Physicians of Illinois, LLC.

David Jonathan Hacker, First Liberty Institute, Plano, TX, William Thomas Thompson, Office of the Attorney General, Austin, TX, for Plaintiffs State of Texas, State of Nebraska, Commonwealth of Kentucky, by and through Governor Matthew G. Bevin, State of Kansas, State of Louisiana, State of Arizona, State of Mississippi.

Bradley Philip Humphreys, Rhett Martin, Alexander Haas, Bailey Wilson Heaps, United States Department of Justice, Washington, DC, for Defendant.

## ORDER

Reed O'Connor, UNITED STATES DISTRICT JUDGE

**\*1** Before the Court are Defendants' Motion to Amend/Correct Memorandum Opinion and Order, (ECF No. 208),

filed September 13, 2021; Plaintiffs' Response (ECF No. 209) filed September 24, 2021; and Defendants' Reply (ECF No. 210), filed September 28, 2021. The Court notes, as pointed out in Plaintiffs' Response (ECF No. 209), the contradictions between Defendants' previous arguments in this litigation, claiming enforcement of Section 1557 "is purely speculative" (ECF. No. 202, 18), and Defendants' current argument, claiming it has a "statutory obligation[ ]" to "enforce Section 1557" (ECF No. 208, 4). Regardless, the Motion being unopposed, the Court finds it should be **GRANTED**. The following language is hereby added to the Conclusion of the Court's August 16, 2021 Memorandum Opinion and Order (ECF No. 206):

> HHS does not violate this order by taking any of the above-described actions against Plaintiffs, their current or future members, or those acting in concert or participation with them, including their respective health plans and any insurers or third-party administrators in connection with such health plans, if the agency officials directly responsible for taking these actions are unaware that an entity is a member of one of the Plaintiffs or has a relevant relationship to one of the Plaintiffs/Plaintiff-members.

> However, if HHS, unaware that an entity is a member of one of the Plaintiffs or has the relevant relationship to one of the Plaintiffs/Plaintiff-members, takes any of the above-described actions, the member and the relevant Plaintiff may promptly notify a directly responsible agency official of the fact of the member's membership or the entity's relevant relationship to the member and its protection under this order. Once such official receives such notice from the member and verification of the same by the relevant Plaintiff, the agency shall promptly comply with this order with respect to such member or related entity.

**SO ORDERED** on this **1st day of October, 2021**.

## All Citations

Not Reported in Fed. Supp., 2021 WL 6774686

**End of Document** © 2025 Thomson Reuters. No claim to original U.S. Government Works.