**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | |
|---|---|
| AMERICAN ALLIANCE FOR EQUAL RIGHTS, | |
| *Plaintiff,* | |
| and | Case No. 1:25-cv-669 |
| UNITED STATES OF AMERICA, | Judge Coleman |
| *Plaintiff-Intervenor*, | |
|     v. | |
| STATE OF ILLINOIS; JB PRITZKER, in his official capacity as Governor of the State of Illinois; JAMES BENNETT, in his official capacity as Director of the Illinois Department of Human Rights; KWAME RAOUL, in his official capacity as Attorney General of the State of Illinois; and ALEXI GIANNOULIAS, in his official capacity as Secretary of State of the State of Illinois. | |
| *Defendants.* | |

**THE ALLIANCE'S OPPOSITION TO DEFENDANTS'
MOTION TO DISMISS ITS AMENDED COMPLAINT**

## TABLE OF CONTENTS

Introduction ............................................................................................................................ 1

Argument ............................................................................................................................... 2

    I.   The amended complaint should not be dismissed for lack of standing. ............................ 2

        A.   Illinois ignores that the Alliance's members are directly regulated by SB 2930 and thus injured by the burdens of compliance. .......................................................................... 3

        B.   Illinois' "injury" arguments conflate standing with the merits. ................................... 5

        C.   Pseudonymity is not a bar to standing. .......................................................................... 6

    II.   Illinois' secretary of state is a proper defendant. ............................................................ 10

    III.  The amended complaint should not be dismissed for failure to state a claim. ................ 12

Conclusion ............................................................................................................................. 12

Certificate of Service ............................................................................................................. 13

## INTRODUCTION

The Alliance is not sure why Illinois has insisted on quickly filing a motion to dismiss, repeating the same arguments in its preliminary-injunction opposition but in a procedural posture that's wholly *harder* for the State. *Food & Water Watch, Inc. v. Vilsack*, 808 F.3d 905, 912-13 (D.C. Cir. 2015). If Illinois was hoping that this Court—after denying a preliminary injunction—would use the same reasoning to dismiss the whole case, then Illinois is inviting error. Preliminary injunctions turn on the evidence presented so far (not the legal sufficiency in the complaint) and ask only who will likely win (not who does win now). *Id.* at 913; *Lackey v. Stinnie*, 145 S.Ct. 659, 667 (2025). So the district court errs if it dismisses a case solely because the plaintiff didn't show enough to get a preliminary injunction. *FWW*, 808 F.3d at 912-13. And if Illinois was hoping to delay a decision on the preliminary injunction by increasing the amount of paperwork, this Court should not let that happen. *See, e.g.*, *PDE v. Olentangy*, 2023 WL 4727053, at *1 (S.D. Ohio July 12) (deferring a decision on the motion to dismiss until after it decided the preliminary-injunction motion); *Speech First, Inc. v. Whitten*, 2024 WL 3964864, at *1 (S.D. Ind. Aug. 28) (resolving the preliminary-injunction motion and staying briefing on the motion to dismiss). To help prevent any delay, the Alliance is filing this opposition almost two weeks early. *See* Doc.76.

Whatever Illinois' reasons, and under any legal standard, the State's arguments are unpersuasive. They aren't enough to defeat the Alliance's motion for a preliminary injunction. *See* AAER-PI-Mot. (Doc.44); AAER-PI-Reply. So they certainly aren't enough to dismiss its complaint, where all facts must be taken as true, no outside evidence can be considered (Illinois submits none anyway), and allegations can be made generally. This Court should first rule on the Alliance's motion for a preliminary injunction, and then either stay this case or deny Illinois' motion to dismiss.

## ARGUMENT

Illinois does not submit any outside evidence, so its motion to dismiss under Rule 12(b)(1) is a "facial" challenge to the Alliance's Article III standing. *Abreu v. Harold's Chicken Shack #60, LLC*, 2019 WL 1382902, at *2 (N.D. Ind. Mar. 27); *Apex Digital, Inc. v. Sears, Roebuck & Co.*, 572 F.3d 440, 443 (7th Cir. 2009). When resolving a facial challenge, this Court must stick to the four corners of the complaint, accept its factual allegations as true, construe everything in the Alliance's favor, and assume any general allegations contain all necessary specifics. *Apex*, 572 F.3d at 443-44; *John v. Whole Foods Mkt. Grp., Inc.*, 858 F.3d 732, 737 (2d Cir. 2017). After all that, the question is whether the Alliance "plausibly" alleged Article III standing. *Harden v. Mead Johnson & Co., LLC*, 2024 WL 2882214, at *3 (N.D. Ill. June 7). Those same rules—and that same plausibility standard—governs Illinois' merits arguments under Rule 12(b)(6). *Firestone Fin. Corp. v. Meyer*, 796 F.3d 822, 826-27 (7th Cir. 2015).

This Court should not dismiss the Alliance's amended complaint. Illinois' "standing" arguments ignore that SB 2930 directly regulates the Alliance's members, giving them standing to raise any constitutional claim against that law. And *no* case holds that an association must not only identify a specific member with standing in its complaint, but also divulge that member's real name. The secretary of state is a proper defendant under *Ex parte Young*. And Illinois' merits arguments are just weaker versions of its preliminary-injunction arguments, given the lower standard for plaintiffs at the pleading stage.

## I.    The amended complaint should not be dismissed for lack of standing.

Under the test for associational standing, the Alliance must show three things: its members have standing, the case is germane to its purpose, and the litigation doesn't require individual-member participation. *Shakman v. Clerk of Cook Cnty.*, 994 F.3d 832, 840 (7th Cir. 2021). Illinois doesn't dispute the last two requirements, which are easily met. *E.g.*, *AAER v. Fearless Fund*, 103

F.4th 765, 771 (11th Cir. 2024). Though it claims to challenge the first, it doesn't grapple with the most obvious reason why the law injures the Alliance's members: It directly regulates them. Illinois' other arguments about other "injuries" conflate standing with the merits. And its arguments about the anonymity of the Alliance's members conflate standing with still more inapplicable doctrines.

### A. Illinois ignores that the Alliance's members are directly regulated by SB 2930 and thus injured by the burdens of compliance.

When a law directly regulates a plaintiff, there's usually "little question" that the plaintiff has standing. *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 561-62 (1992). Regulated entities must spend time and money on "compliance measures," *Virginia v. Am. Booksellers Ass'n.*, 484 U.S. 383, 392 (1988)—a pocketbook injury that is "paradigmatically concrete," *see Big Shoulders Cap. LLC v. San Luis & Rio Grande R.R.*, 13 F.4th 560, 568 (7th Cir. 2021). These and other "regulatory burden[s]" are enough to "satisf[y] the injury in fact requirement" of Article III. *Contender Farms v. USDA*, 779 F.3d 258, 266 (5th Cir. 2015); *Lutheran Church-Missouri Synod v. FCC*, 141 F.3d 344, 349-50 (D.C. Cir. 1998). Hence why "the requirements of associational standing" are "easily met" when a rule directly regulates a member. *Owner-Operator Indep. Drivers Ass'n v. FMCSA*, 656 F.3d 580, 585-86 (7th Cir. 2011); *see also Brown v. Kemp*, 86 F.4th 745, 761-62 (7th Cir. 2023).

So too here. SB 2930 directly regulates Members A and B, who satisfy all the statutory criteria for being covered entities. Am.-Compl. ¶¶23-24. The statute requires each member to do things it otherwise wouldn't, like "collec[t] the aggregated demographic information of its directors and officers," "post" the data "on its publicly available website," and maintain it "for at least 3 years." 805 ILCS §105/114.15(a), (c); *see* Am.-Compl. ¶¶25-30. And those obligations will cost each member time and money. Am.-Compl. ¶36. Illinois does not contest any of these allegations,

which must be taken as true anyway. *Carman v. Yellen*, 112 F.4th 386, 410 (6th Cir. 2024). And both direct regulation and compelled disclosure are sufficient under Article III and let the Alliance raise all its constitutional challenges to SB 2930. *Id.* at 407-08; *AFBR v. SEC*, 125 F.4th 159, 168 (5th Cir. 2024) (en banc).[1]

Though Illinois says the law doesn't require nonprofits to post anything if their officers and directors refuse to report anything, MTD (Doc.69) 8-10, that argument cannot defeat standing. Illinois concedes that nonprofits must at least *ask* their officers and directors for this information, MTD 9—an increased regulatory burden that alone supports standing. Am.-Compl. (Doc.59) ¶¶25-30, 54. And while SB 2930 says officers and directors can "decline to disclose," the statute nowhere excuses nonprofits from their duty to "post" their aggregate data on their websites; if everyone declined to disclose anything, the nonprofit still "shall post" that information (by, for example, reporting that 100% of its officers and directors are "prefer not to say" for each category). 805 ILCS §105/114.15(c), (a). If Illinois disagrees, it submitted no declaration or any other evidence proving a different interpretation. *Ind. Right to Life Victory Fund v. Morales*, 112 F.4th 466, 470 (7th Cir. 2024). And no state official could defeat standing by adding words to the statute that aren't there. *See FCC v. Fox Television Stations, Inc.,* 567 U.S. 239, 255 (2012).

But even under the crabbed reading in the briefs of Illinois' lawyers, the Alliance's members must publish this data on their websites. Under that reading, a nonprofit would be excused from its posting obligation only if every officer, every year, refused to disclose any data for every

---

[1] Contra Illinois, being forced to collect and publish data that you otherwise wouldn't is still an injury, even if the data is your "*own*." MTD 9; *see Carman*, 112 F.4th at 410-11. But in case it matters, the data here is not the nonprofit's; it concerns officers and directors *as* "*individual*[*s*]." 805 ILCS §105/114.15(c) (emphasis added). Under Illinois' logic, the State could make nonprofits collect and publish data on whether their directors have had an abortion, since that information about the board is just the nonprofit's "*own* data." MTD 8-9.

demographic category. Yet the Alliance alleged that its officers and directors would disclose data, Am.-Compl. ¶35, which must be accepted as true at this stage. *Carman*, 112 F.4th at 410. And Illinois obviously thinks that officers and directors will disclose, else the law could not promote "transparency," give "notice" or "informatio[n]," or serve any rational purpose. PI-Opp. (Doc.73) 15 & n.5, 18; *see* Am.-Compl. ¶¶19-21. Illinois' "standing argument" thus "ignores the very idea that it advances to justify adopting the [law] in the first place." *Owner-Operator*, 656 F.3d at 586.

## B. Illinois' "injury" arguments conflate standing with the merits.

After ignoring the direct regulatory burdens that the law imposes on the Alliance's members, Illinois says the members have no "First Amendment" or "equal protection" injury because SB 2930 does not compel speech or encourage discrimination. MTD 8-12. Those arguments are irrelevant because, while compelled speech and pressure to discriminate are additional injuries, the law's regulatory burdens alone give the Alliance standing to bring all its claims. *Carman*, 112 F.4th at 409-10.

More fundamentally, Illinois' arguments improperly conflate standing with the merits. When assessing standing, this Court must "assume" that the Alliance is right on the merits. *Parker v. D.C.*, 478 F.3d 370, 377 (D.C. Cir. 2007), *aff'd*, 554 U.S. 570 (2008); *Warth v. Seldin*, 422 U.S. 490, 501-02 (1975). It must ask whether SB 2930, assuming that the law illegally compels speech and encourages discrimination, injures the Alliance's members. *N. Cypress Med. Ctr. Op. Co. v. Cigna Healthcare*, 781 F.3d 182, 191 (5th Cir. 2015); *Kyles v. J.K. Guardian Sec. Servs.*, 222 F.3d 289, 300 (7th Cir. 2000). By making the Alliance prove that SB 2930 compels speech or encourages discrimination before it has standing, Illinois gets "the analysis backward"; it would require every court that rejects a constitutional claim to conclude, paradoxically, that it lacked jurisdiction to rule on that claim in the first place. *Ind. Right to Life Victory Fund v. Morales*, 112 F.4th 466, 470 (7th Cir. 2024). Standing doesn't work that way. *Bell v. Hood*, 327 U.S. 678, 682 (1946).

In all events, Illinois' arguments are wrong because the Alliance is right on the merits. *See infra* III; AAER-PI-Reply I.B-C; AAER-PI-Mot. I.A-B. Contra Illinois, the Alliance never conceded that Illinois could require nonprofits to collect the same information and disclose it confidentially to the State alone. MTD 8. It said the existence of that option made SB 2930 not "narrowly tailored." AAER-PI-Mot. I.B. Even if Illinois adopted that alternative and defended its constitutionality, "each governmental demand for disclosure" causes harm; and SB 2930's demand for *public* disclosure on the nonprofit's *own* website compels speech more directly and for different purposes. *AFP v. Bonta*, 594 U.S. 595, 618 (2021). And contra Illinois, the possibility "that some donors might not mind—or might even prefer—the disclosure" of this data by Members A and B does not eliminate the harm to them or their rights. *Id*. at 616; *cf.* PI-Opp.7.

### C.     Pseudonymity is not a bar to standing.

Illinois next claims that the Alliance's amended complaint must be dismissed for lack of standing because it refers to its members with pseudonyms. MTD 4-7. Illinois is not the first defendant to try this creative theory. But Illinois does not reveal that, in the last three years alone, the argument was rejected at least nine times. *E.g.*, *Fearless Fund*, 103 F.4th at 772-73; *Advocs. for Highway & Auto Safety v. FMCSA*, 41 F.4th 586, 594 (D.C. Cir. 2022); *Do No Harm v. NAEMT*, 2025 WL 973614, at *3 (S.D. Miss. Mar. 31); *Do No Harm v. Lee*, 2024 WL 3730623, at *3 (M.D. Tenn. Aug. 8); *SFFA v. West Point*, 709 F. Supp 3d 118, 131 (S.D.N.Y. 2024); *Chamber of Com. v. CFPB*, 691 F. Supp. 3d 730, 738-39 (E.D. Tex. 2023); *PDE v. Olentangy*, 684 F. Supp. 3d 684, 696 n.2 (S.D. Ohio 2023); *SFFA v. Naval Academy*, 707 F. Supp. 3d 486, 501 (D. Md. 2023). When two district courts accepted it, they were both reversed on appeal. *See Speech First, Inc. v. Shrum*, 92 F.4th 947, 949-53 (10th Cir. 2024); *Do No Harm v. Pfizer Inc.*, 126 F.4th 109, 113-14 (2d Cir. 2025).

To make this argument, Illinois combines associational-standing cases that don't involve anonymity with anonymity cases that don't involve associational-standing. The Alliance did not violate either line of precedent. Illinois cannot conflate them to create a nonexistent rule that somehow deprives associations of Article III standing if they refer to their members with pseudonyms.

**1.** Illinois first cites *Summers*, which held that associations must "make specific allegations establishing that at least one identified member had suffered or would suffer harm." *Summers v. Earth Island Inst.*, 555 U.S. 488, 498 (2009). The Alliance followed that rule here. It didn't refer to its membership generally. *Id*. at 497-500. And it didn't speculate that there was "a statistical probability" that it had a member with standing. *Id*. at 497. It identified two specific members, named "Member A" and "Member B," and explained why they currently have standing to challenge SB 2930. Am-Comp. ¶¶22-24.

When *Summers* said that an association must identify a specific member with standing, it didn't mean that the association must divulge that member's *real* name. That argument "significantly overreads" *Summers*. *Naval Academy*, 707 F. Supp. 3d at 501. *Summers* couldn't have banned pseudonyms because the associations there didn't even use pseudonyms. *Fearless Fund*, 103 F.4th at 773. And a specific person with standing can be identified and named with a pseudonym, just as easily as a legal name. *Schrum*, 92 F.4th at 952; *accord Goldman v. Highland Park*, 2024 WL 98429, at *4-5 (N.D. Ill. Jan. 9) (distinguishing cases like *Prairie Rivers* where the association referred to its members "'only as a collective'" from cases where the association identified standing members with specificity).

Even *Summers*' actual rule—that associations must identify a specific member with standing—does not apply at the pleading stage. In *Disability Rights Wisconsin v. Walworth County Board of Supervisors*, the Seventh Circuit held that Article III "allows for the member on whose

behalf the suit is filed to remain unnamed by the organization" in its complaint. 522 F.3d 796, 802 (7th Cir. 2008). *Summers* could not have abrogated this circuit precedent, since *Summers* was decided at final judgment after trial rather than the pleading stage. 555 U.S. at 492, 500; *Bldg. & Const. Trades Council of Buffalo, New York & Vicinity v. Downtown Dev., Inc.*, 448 F.3d 138, 144-45 (2d Cir. 2006). Though the Seventh Circuit has since given reasons why associations should identify specific members in their complaints, *Prairie Rivers Network v. Dynegy Midwest Generation*, 2 F.4th 1002, 1010-11 (7th Cir. 2021), courts in this circuit continue to treat *Disability Rights Wisconsin* as the binding circuit precedent.[2] In fact, *no* circuit applies *Summers* at the pleading stage. *E.g.*, *Nat'l Council of La Raza v. Cegavske*, 800 F.3d 1032, 1041 (9th Cir. 2015); *Building & Constr. Trades Council of Buffalo v. Downtown Develop., Inc.*, 448 F.3d 138, 145 (2d Cir. 2006); *Hancock Cnty Bd. of Sup'rs v. Ruhr*, 487 F. App'x 189, 198 (5th Cir. 2012); *Am. Coll. of Emergency Physicians v. Blue Cross & Blue Shield of Ga.*, 833 F. App'x 235, 240 n.8 (11th Cir. 2020). Applying it here would be especially odd, since the Alliance's complaint fully complies with *Summers*' actual holding by identifying two specific members who currently have standing.

**2.** Recognizing that none of its cases about *Summers* or standing involve pseudonyms, Illinois sprinkles in cases where *named plaintiffs* were not allowed to use pseudonyms. MTD 6-7. While these cases involve pseudonyms, they do not involve associations or Article III standing. They apply Rule 10(a), which courts read to ban plaintiffs from referring to themselves with pseudonyms without first getting permission from the court. Illinois does not suggest that the Alliance violated Rule 10(a). That rule governs "the parties." Fed. R. Civ. P. 10(a). The only party plaintiff

---

[2] *E.g.*, *Indiana Prot. & Advoc. Servs. Comm'n v. Comm'r, Indiana Dep't of Correction*, 642 F. Supp. 2d 872, 879-80 (S.D. Ind. 2009); *accord Students & Parents for Priv. v. Sch. Directors of Twp. High Sch. Dist. 211*, 377 F. Supp. 3d 891, 897 (N.D. Ill. 2019) (same); *Quad Cities Waterkeeper v. Ballegeer*, 84 F. Supp. 3d 848, 861 (C.D. Ill. 2015) (same); *Second Amend. Found., Inc. v. Walker*, 2019 WL 13162728, at *6 (C.D. Ill. Apr. 1) (same).

here is the Alliance, which is not using a pseudonym; standing members are not parties under Rule 10(a). *Fearless Fund*, 103 F.4th at 773 n.2; *Olentangy*, 684 F. Supp. 3d at 695 n.2. Though the members' right to be anonymous is sometimes litigated in discovery or motions to (un)seal, their status as nonparties means they usually *can* remain anonymous to the public. *E.g.*, *SFFA v. Harvard*, 2023 WL 3126414, at *6 n.4 (D. Mass. Apr. 27) (denying motion to unseal). Their identities are usually given only to the defendant and the Court, and only later once a protective order is entered and discovery has begun. *AAER v. Founders First*, 2024 WL 3364034, at *1 (N.D. Tex. July 10); *S.C. NAACP v. Alexander*, 2022 WL 453533, at *3 (D.S.C. Feb. 14).

But as should already be clear, none of this has anything to do with standing. Rule 10(a) and motions to seal concern the public's First Amendment right to "access" court documents, not Article III. *Doe v. Chicago,* 360 F.3d 667, 669 (7th Cir. 2004). And courts *allow* pseudonyms under that right-of-access doctrine in many "circumstances," MTD 6, meaning any ban on their use cannot be a matter of Article III jurisdiction, *see Santos-Zacaria v. Garland*, 598 U.S. 411, 423 (2023). Indeed, "the use, vel non, of pseudonyms" is "immaterial to the case or controversy inquiry." *B.R. v. F.C.S.B.*, 17 F.4th 485, 495 (4th Cir. 2021). A member's legal name "'adds no essential information'" relevant to "'standing.'" *Highway Safety*, 41 F.4th at 594; *accord New York v. United States Dep't of Com.*, 351 F. Supp. 3d 502, 606 n.48 (S.D.N.Y.), *aff'd on standing*, 588 U.S. 752, 767-68 (2019). Tellingly, Illinois never explains what standing argument it did not make—but might have made—if it only knew Member A-B's legal names. The answer is none, since the Alliance offered to disclose their real names to Illinois under a protective order and the State refused. Doc.78-1 at 4-5. While Illinois wants to expose their identities to the whole world, *see id.*, that desire is not rooted in Article III.

9

## II. Illinois' secretary of state is a proper defendant.

Under *Ex parte Young*, private parties can sue "individual state officials for prospective relief to enjoin ongoing violations of federal law." *MCI Telecomm'ns Corp. v. Illinois Bell Tel. Co.*, 222 F.3d 323, 337 (7th Cir. 2000) (collecting cases). A plaintiff properly invokes that doctrine when the defendant has "'some connection with the enforcement'" of the allegedly unconstitutional law. *Ent. Software Ass'n v. Blagojevich*, 469 F.3d 641, 645 (7th Cir. 2006) (quoting *Ex parte Young*, 209 U.S. 123, 157 (1908)). "Any official with enforcement power—even if shared with others—satisfies the 'some connection' standard." *Eason v. Pritzker*, 2020 WL 6781794, at *8 (N.D. Ill. Nov. 18).

Contra Illinois, its secretary of state is a proper defendant under *Ex parte Young*. MTD 14-15. More than "some connection," the secretary is empowered to "promulgate … rules and regulations" to enforce SB 2930. 805 ILCS §105/101.55; Am.-Compl. ¶11. He can issue interrogatories to see if covered nonprofits "ha[ve] complied." 805 ILCS §105/101.35; Am.-Compl. ¶11. And if the responses "disclose a violation," then the secretary must "certify" those interrogatories to the attorney general, who can bring various enforcement "action[s]." 805 ILCS §105/101.35. The secretary thus satisfies the "'some connection'" requirement of *Ex parte Young*. *E.g.*, *Sweeney v. Madigan*, 359 F. Supp. 3d 585, 592 (N.D. Ill. 2019) (Coleman, J.) (defendant had authority "tangential" to the entity empowered to enforce); *Int'l Ass'n of Machinists Dist. 10 v. Wisconsin*, 194 F. Supp. 3d 856, 863 (W.D. Wis. 2016) (defendant could do "indirect enforcement," instruct "investigators," and say "how a statute must be interpreted and applied"); *Culinary Workers Union, Loc. 226 v. Del Papa*, 200 F.3d 614, 619 (9th Cir. 1999) (defendant could investigate and make referrals); *Nat'l Conf. of Pers. Managers, Inc. v. Brown*, 2015 WL 4873541, at *3-4 (C.D. Cal. Aug. 13, 2015) (defendant could investigate and adopt rules and regulations), *aff'd*, 690 F. App'x 461 (9th Cir. 2017).

Illinois ignores *Ex parte Young*, instead couching its argument in terms of Article III standing. MTD 14-15. But Illinois' argument "misunderstands" *Ex parte Young*. *Deida v. Milwaukee*, 192 F. Supp. 2d 899, 915 (E.D. Wis. 2002). In a case like this one, the plaintiff's injuries are caused by the statute, regardless "whether the defendant has actually threatened the plaintiff with enforcement." *Id.* And those harms are redressable by an order barring a defendant with some connection to the statute's enforcement from exercising that power. *Id.* at 915-16. Here, an injunction against the secretary would bar him from promulgating rules to enforce SB 2930, issuing interrogatories to nonprofits, or referring nonprofits to the attorney general. Though his power is "concurrent" with other officials, *Ent. Software Ass'n*, 469 F.3d at 645, a "'partial remedy'" against his powers satisfies Article III, *Uzuegbunam v. Preczewski*, 592 U.S. 279, 291 (2021); *see, e.g.*, *Ass'n of Machinists*, 194 F. Supp. 3d at 863-64. Illinois nowhere suggests that, if this Court ruled that SB 2930 is unconstitutional and entered relief against the Secretary alone, then other state officials would keep enforcing the statute.

In all events, the Alliance is willing to accommodate Illinois by dismissing Secretary Giannoulias—voluntarily and without prejudice—if two conditions are met. Illinois should stipulate that, if the Alliance obtains relief against the remaining defendants, it will be treated as relief against the State itself. And Illinois should stipulate that, should the parties seek discovery, any requests to Secretary Giannoulias will be treated as though they were made to a party. Litigants often agree to drop defendants in exchange for these stipulations. *E.g.*, *SFFA v. UNC*, Doc.29, No. 1:14-cv-954 (M.D.N.C. Mar. 20, 2015); *Speech First, Inc. v. Fenves*, Doc. 13, No. 1:18-cv-1078 (W.D. Tex. Dec. 28, 2018). But to date, Illinois has not agreed. It is not entitled to use a motion to dismiss to excuse a defendant with power to enforce the law from participating in this case or being bound by the Court's relief.

**III.    The amended complaint should not be dismissed for failure to state a claim.**

In addition to Rule 12(b)(1), Illinois invokes Rule 12(b)(6). It does not argue that the Alliance failed to state a claim under the First Amendment. Though it challenges the Alliance's equal-protection claim because SB 2930 doesn't require "decision-making based on race," MTD 12, that argument fails. *See* AAER-PI-Mot. I.A.; AAER-PI-Reply I.B. SB 2930 encourages and pressures race-based decision-making, which is sufficient. AAER-PI-Mot. I.A.; AAER-PI-Reply I.B. And a law encourages discrimination whenever it pressures someone to discriminate. AAER-PI-Mot. I.A.; AAER-PI-Reply I.B. SB 2930 does just that, AAER-PI-Mot. I.A.; AAER-PI-Reply I.B.— and the Alliance certainly plausibly *alleged* that in its complaint.

## CONCLUSION

For these reasons, this Court should deny Defendants' motion to dismiss.

12

Dated: May 15, 2025

Respectfully submitted,

*/s/ Cameron T. Norris*
Thomas R. McCarthy*
Cameron T. Norris*
Matt Pociask**
R. Gabriel Anderson*
Marie E. Sayer*
CONSOVOY MCCARTHY PLLC
1600 Wilson Blvd., Ste. 700
Arlington, VA 22209
(703) 243-9423
tom@consovoymccarthy.com
cam@consovoymccarthy.com
matt@consovoymccarthy.com
gabe@consovoymccarthy.com
mari@consovoymccarthy.com

*Admitted *pro hac vice*
**Admitted to the Northern District of Illinois

*Counsel for Plaintiff*

## CERTIFICATE OF SERVICE

I hereby certify on May 15, 2025, a true and correct copy of this document and all related

attachments were served electronically by the Court's CM/ECF system to all counsel of record.

*/s/ Cameron T. Norris*
Counsel for Plaintiff

13

Parents Defending Education v. Olentangy Local School..., Not Reported in Fed....

2023 WL 4727053

2023 WL 4727053
Only the Westlaw citation is currently available.
United States District Court, S.D. Ohio, Eastern Division.

PARENTS DEFENDING EDUCATION, Plaintiff,

v.

OLENTANGY LOCAL SCHOOL DISTRICT
BOARD OF EDUCATION, et al., Defendants.

Case No. 2:23-cv-01595
|
Signed July 12, 2023

**Attorneys and Law Firms**

Emmett E. Robinson, Robinson Law Firm LLC, Cleveland, OH, James F. Hasson, Pro Hac Vice, Arlington, OH, John Michael Connolly, Pro Hac Vice, Taylor A.R. Meehan, Pro Hac Vice, Thomas Samuel Vaseliou, Pro Hac Vice, Consovoy McCarthy PLLC, Arlington, VA, for Plaintiff.

Bartholomew T. Freeze, Myrl H. Shoemaker, III, Freund, Freeze & Arnold, Columbus, OH, Jessica K. Philemond, Mitchell L. Stith, Sandra R. McIntosh, Scott Scriven LLP, Columbus, OH, for Defendant Olentangy Local School District Board of Education.

Bartholomew T. Freeze, Myrl H. Shoemaker, III, Freund, Freeze & Arnold, Columbus, OH, for Defendants Mark T. Raiff, Peter Stern, Randy Wright, Kevin Daberkow, Brandon Lester, Kevin O'Brien, Libby Wallick, Lakesha Wyse.

## **ORDER**

ALGENON L. MARBLEY, CHIEF UNITED STATES DISTRICT JUDGE

**\*1** This matter is before the Court on Defendants' Motion to Dismiss and to Continue (ECF No. 16). In the motion, Defendants argue that this matter should be dismissed for lack of standing, and ask that the preliminary injunction hearing, presently scheduled for July 24, 2023, at 10:00 a.m., be continued pending a decision on the standing issue. The parties have provided expedited briefing on this topic, at the request of this Court.

It is, of course, well-established that "[s]ubject matter jurisdiction is always a threshold determination," *Am.*

*Telecom Co., LLC v. Republic of Lebanon*, 501 F.3d 534, 537 (6th Cir. 2007) (citing *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 101 (1998)), and thus that federal courts cannot hear cases over which they lack jurisdiction. But the plethora of cases that Defendants cite, which simply reiterate this fundamental tenet of Article III, do not support their contention that this Court must withhold its consideration of Plaintiff's Motion for Preliminary Injunction (ECF No. 7) until it arrives at a final opinion on the standing question; in fact, they are silent on that question. (*See generally* Defs.' Reply Br. at 2–4, ECF No. 22) (collecting cases).

To the contrary, this Court need not wait. As the Sixth Circuit has explained, when a party seeks a preliminary injunction on the basis of a potential constitutional violation, "the merits on which plaintiff must show a likelihood of success encompass not only substantive theories but also establishment of jurisdiction and standing." *Waskul v. Washtenaw Cnty. Cmty. Mental Health*, 900 F.3d 250, 256 n.4 (6th Cir. 2018) (cleaned up) (first quoting *Obama v. Klayman*, 800 F.3d 559, 565 (D.C. Cir. 2015); then quoting *Food & Water Watch, Inc. v. Vilsack*, 808 F.3d 905, 913 (D.C. Cir. 2015)). In other words, a plaintiff need not establish standing in full before seeking (or being granted) a preliminary injunction; she need only make a showing that there is a substantial likelihood she will be able to do so.

Before this Court reaches a full merits decision, of course, it must first "satisfy itself that subject matter jurisdiction exists." *De Angelis v. Nat'l Ent. Grp.*, No. 2:17-cv-00924, 2018 WL 11316612, at \*2 (S.D. Ohio July 25, 2018). But at this preliminary stage, with a request for emergency relief pending, this Court need only make a preliminary determination on jurisdiction—*i.e.*, deciding whether Plaintiff has a substantial likelihood of establishing standing—while deferring final resolution of the issue. Accordingly, the request to continue the preliminary injunction hearing is **DENIED**. This Order addresses only the portion of Defendants' motion that asks for a continuance and provides no opinion as to the concurrently filed motion to dismiss.

**IT IS SO ORDERED.**

## **All Citations**

Not Reported in Fed. Supp., 2023 WL 4727053

---

**End of Document**                                  © 2025 Thomson Reuters. No claim to original U.S. Government Works.

2024 WL 3964864
Only the Westlaw citation is currently available.
United States District Court, S.D.
Indiana, Indianapolis Division.

SPEECH FIRST, INC., Plaintiff,

v.

Pamela WHITTEN, Lamar Hylton, Kathy Adams
Riester, Cedric Harris, Jason Spratt, Heather
Brake, Katherine Betts, Quinn Buckner, Cindy
Lucchese, Cathy Langham, Jeremy A. Morris,
J. Timothy Morris, Kyle S. Seibert, Donna B.
Spears, Isaac Torres, Vivian Winston, Defendants.

No. 1:24-cv-00898-JPH-MG
|
Signed August 28, 2024

**Attorneys and Law Firms**

Cameron Thomas Norris, Thomas Samuel Vaseliou,
Consovoy McCarthy PLLC, Arlington, VA, Zachary S.
Kester, Charitable Allies, Inc., Indianapolis, IN, for Plaintiff.

Dylan Pittman, John R. Maley, Barnes & Thornburg, LLP,
Indianapolis, IN, for Defendants.

### ORDER DENYING MOTION FOR
### PRELIMINARY INJUNCTION

James Patrick Hanlon, United States District Judge

**\*1** Speech First, an organization that seeks to protect free
speech rights on college campuses, brought this case against
Indiana University officials alleging that IU's "bias incident"
policy violates the First and Fourteenth Amendments. Dkt. 1.
Although Speech First has filed a motion for a preliminary
injunction preventing Defendants from enforcing IU's policy,
dkt. 9, the parties agree that *Speech First, Inc. v. Killeen*, 968
F.3d 628 (7th Cir. 2020), requires the Court to deny Speech

First's motion. Dkt. 10 at 5–6; dkt. 30 at 6–7, 23; dkt. 31
at 2 (Speech First acknowledging that "it must lose under
*Killeen*").

For the reasons below, the motion for preliminary injunction
is **DENIED** under *Killeen* and this case is **STAYED** pending
Speech First's anticipated appeal. Dkt. [9].

### I.

### Facts & Background

The parties have filed affidavits and other documentary
evidence, the relevant parts of which are uncontested. *See* dkt.
1 (verified complaint); dkt. 9; dkt. 25. Neither party requested
an evidentiary hearing, *see* dkt. 21, so these facts are based on
that designated evidence.

#### A. Indiana University's Bias Response & Education
#### Initiative

Indiana University is an institution of higher education that
"encourages the free and civil exchange of ideas." Dkt. 9-12
at 5. In order to "foster[ ] campus communities where all
are welcomed, valued, respected, and belong," IU has created
Bias Response & Education, an initiative that includes a bias
incident process. *Id.* at 4. Through this process, IU invites
reports of "bias incidents," which include "any conduct,
speech, or expression, motivated in whole or in part by bias
or prejudice meant to intimidate, demean, mock, degrade,
marginalize, or threaten individuals or groups based on that
individual or group's actual or perceived identities." *Id.* at 2.
IU has encouraged reports on several of its websites, *see id.*;
dkt. 9-23; dkt. 9-26, and on social media, *see* dkt. 9-22.

IU's Bias Response & Education website explains that it
"privately reviews all submitted bias incident reports" and
responds to them:

**The university's response
includes:**

• Conversation(s) centered
around the incident and impacted
person(s)

**Possible outcomes include:**

• 1-on-1 ongoing support

| | |
|---|---|
| • Refer reporter to appropriate campus offices that can effectively respond | • Engage person(s) impacting others |
| • Refer impacted to support resources | • Engage leaders to address systemic issues |
| • Incident assessment, response plan | • Mediation and facilitated dialogue |
| • Ongoing support and check-ins | |

Dkt. 9-12 at 2–3. The website goes on to explain what Bias Response & Education does and does not do:

| **What We Do:** | **What We Don't Do:** |
|---|---|
| • Conversation(s) centered around the incident and impacted person(s) | • Take disciplinary action |
| • Refer to support services or offices who can appropriately respond | • Conduct formal investigations |
| • Log all reported incidents and track for trends | • Impinge on free speech rights<https://freespeech.iu.edu/> and academic freedom |
| • Notify campus leaders of ongoing bias incidents and trends | |
| • Educate and consult the campus community about bias | |
| • Inform the campus community about our work through informational meetings and annual reports | |

The form for reporting incidents of bias adds that the "primary goal is to provide support to the individual or community impacted," though reports are also "evaluated to determine if further investigation is required for potential violations of university policy and/or criminal law." Dkt. 9-14 at 2.

Any student engagement with Bias Response & Education is "entirely voluntary." Dkts. 25-1 at 3; 25-2 at 3. If a student—whether reporting or alleged to have engaged in reported behavior—"does not want to meet or otherwise engage with Bias Response & Education, the student does not have to, and will not be penalized or sanctioned as a result of that decision." Dkts. 25-1 at 3; 25-2 at 3. Reported students may receive an email asking to schedule a voluntary meeting. Dkts. 25-1 at 10; 25-2 at 10. Many students— "the majority" at the Indianapolis campus and "numerous" at the Bloomington campus—either do not respond or decline a meeting. Dkts. 25-1 at 10; 25-2 at 10. If a student agrees to meet, "Bias Response & Education does not ask or require students to change what they do or say" and "leaves no doubt that [students] are not being charged with any Code violation, nor are the students 'in trouble.' " Dkts. 25-1 at 10; 25-2 at 10.

**\*2** Regardless of the situation, "Bias Response & Education never makes a 'finding' that a bias-motivated incident has occurred, nor does it have any disciplinary function whatsoever." Dkts. 25-1 at 3; 25-2 at 3. Bias-incident reports are kept in "an internal Bias Response & Education

database" and data from them are aggregated—without names or personal identifiers—to track, for example, the volume, categories, and locations of reports. Dkts. 25-1 at 9, 11; 25-2 at 9, 11. Those reports are "kept secure and private" and "are not recorded in students' academic or disciplinary records." Dkts 25-1 at 10–11; 25-2 at 10–11. In short, "Bias Response & Education has no power to sanction, punish, or otherwise discipline any student for any reason." Dkts. 25-1 at 3; 25-2 at 3.

### B. Speech First and its IU Student Members

Speech First "is a nationwide membership organization of students, alumni, and other concerned citizens" that "seeks to protect the rights of students and others at colleges and universities." Dkt. 1 at 3. Some of its members attend Indiana University, including anonymous students A, B, C, D, and E. *Id.*

Students A, B, C, D, and E are all "politically conservative and hold views that are unpopular, controversial, and in the minority on campus." Dkts. 9-3 at 1; 9-4 at 1; 9-5 at 1; 9-6 at 1; 9-7 at 1. They each "want to speak directly to [their] classmates" and "want to talk frequently and repeatedly" about issues such as gender identity, immigration, affirmative action, and the Israel– Palestine conflict. Dkts. 9-3 at 1–3; 9-4 at 1–2; 9-5 at 1–2; 9-6 at 1–3; 9-7 at 1–3. IU's "bias incidents policy, however, makes [them] reluctant to openly express [their] opinions or have these conversations in the broader University community." Dkts. 9-3 at 3; 9-4 at 3; 9-5 at 3; 9-6 at 3; 9-7 at 3. They therefore "do not fully express" themselves because "others will likely report [them] to University officials for committing a 'bias incident.'" Dkts. 9-3 at 3; 9-4 at 3; 9-5 at 3; 9-6 at 3; 9-7 at 3. Each student is "afraid that the Bias Response Team will keep a record on me, share the allegations with campus leaders and others within the university, call me in for meetings, or refer the allegations to the Office of Student Conduct." Dkts. 9-3 at 3; 9-4 at 3; 9-5 at 3; 9-6 at 3; 9-7 at 3.

Speech First brings a facial challenge against IU's "bias incident" policy, alleging that it should be enjoined in its entirety under the First and Fourteenth Amendments. Dkt. 1. It has filed a motion for a preliminary injunction under Federal Rule of Civil Procedure 65, requesting that the Court "enjoin Defendants from enforcing [IU's bias-incident] policies during this litigation." Dkt. 9. Speech First concedes, however, that the Seventh Circuit's opinion in *Killeen*—which addressed a facial challenge to the University of Illinois's bias-response policies—is "binding" and "requires this Court

to deny Speech First's motion for a preliminary injunction." Dkt. 10 at 5; dkt. 31 at 1 ("Speech First agrees that its preliminary-injunction motion must be denied" and "asks this Court to rule promptly so it can appeal.").

### II.

### Preliminary Injunction Standard

Injunctive relief under Federal Rule of Civil Procedure 65 is "an exercise of very far-reaching power, never to be indulged in except in a case clearly demanding it." *Cassell v. Snyders*, 990 F.3d 539, 544 (7th Cir. 2021). To obtain such extraordinary relief, the party seeking the preliminary injunction carries the burden of persuasion by a clear showing. *See id.*; *Mazurek v. Armstrong*, 520 U.S. 968, 972 (1997).

Determining whether a plaintiff "is entitled to a preliminary injunction involves a multi-step inquiry." *Int'l Ass'n of Fire Fighters, Local 365 v. City of E. Chicago*, 56 F.4th 437, 446 (7th Cir. 2022). "As a threshold matter, a party seeking a preliminary injunction must demonstrate (1) some likelihood of succeeding on the merits, and (2) that it has no adequate remedy at law and will suffer irreparable harm if preliminary relief is denied." *Id.* "If these threshold factors are met, the court proceeds to a balancing phase, where it must then consider: (3) the irreparable harm the non-moving party will suffer if preliminary relief is granted, balancing that harm against the irreparable harm to the moving party if relief is denied; and (4) the public interest, meaning the consequences of granting or denying the injunction to non-parties." *Cassell*, 990 F.3d at 545. This "involves a 'sliding scale' approach: the more likely the plaintiff is to win on the merits, the less the balance of harms needs to weigh in his favor, and vice versa." *Mays v. Dart*, 974 F.3d 810, 818 (7th Cir. 2020). "In the final analysis, the district court equitably weighs these factors together, seeking at all times to minimize the costs of being mistaken." *Cassell*, 990 F.3d at 545.

### III.

### Analysis

**\*3** "To invoke federal jurisdiction, [a plaintiff] must have standing, which is a short-hand term for the right to seek

judicial relief for an alleged injury." *Simic v. City of Chicago,* 851 F.3d 734, 738 (7th Cir. 2017). "A plaintiff bears the burden of showing that she has standing for each form of relief sought," including "injunctive relief." *Id.* "A district court ... can address a motion for a preliminary injunction without making a conclusive decision about whether it has subject-matter jurisdiction." *Id.* But "issues of subject matter jurisdiction are always on the table in federal courts," including in preliminary-injunction proceedings. *Id.* Accordingly, if a plaintiff lacks standing to seek injunctive relief, a motion for preliminary injunction should be denied on that basis. *Id.* at 738–39; *Killeen,* 968 F.3d at 638–39, 647.

In *Killeen,* Speech First brought a facial challenge against bias-response policies at the University of Illinois at Urbana–Champaign, arguing that they "impermissibly chill[ed] the speech of student members of its organization." 968 F.3d at 632. Those policies were implemented by a Bias Assessment and Response Team ("BART"), which "collect[ed] and respond[ed] to reports of bias-motivated incidents that occur within the University of Illinois at Urbana– Champaign community." *Id.* BART was housed in the same office that enforced the student code and had a law-enforcement liaison from the University Police Department. *Id.* at 633. It could not, however, "require students to change their behavior and [did] not have authority to issue sanctions." *Id.* And while BART published an "annual report of incidents with all personally identifiable information removed," interactions with students were kept private and did "not appear on students' academic or disciplinary records." *Id.*

The Seventh Circuit affirmed the district court's denial of Speech First's motion for a preliminary injunction, holding that Speech First lacked standing to seek a preliminary injunction. *Id.* at 647. The Seventh Circuit explained that the University of Illinois had "not investigated or punished any of the students who are members of Speech First pursuant to any of the challenged University policies." *Id.* at 639. Nor had Speech First "demonstrated that these policies pose[d] a credible threat of enforcement to any student or whether any student has faced an objectively reasonable chilling effect on his or her speech." *Id.* That was because Speech First (1) did not contest that its members could not be disciplined under the student code for expressing the views they wished to express; (2) did not identify the statements its student–members wished to make; (3) designated no evidence that any student fears consequences from interacting (or deciding not to interact) with BART, and has therefore self-censored; (4) did not contest that BART lacked disciplinary authority; and

(5) did not contradict that BART's "interactions with students are private." *Id.* at 639–42.

Here, the parties agree that the Court must deny Speech First's motion because under *Killeen,* Speech First lacks standing to seek a preliminary injunction. Dkt. 10 at 5–6; dkt. 30 at 6–7, 23; dkt. 31 at 2 (Speech First acknowledging that "it must lose under *Killeen*").

Considering Speech First's concessions and the factual record established by the parties' filings, *Killeen* cannot be meaningfully distinguished. Speech First's student–members at IU have identified the general topics they'd like to speak about and expressed fear "that the Bias Response Team will keep a record on me, share the allegations with campus leaders and others within the university, call me in for meetings, or refer the allegations to the Office of Student Conduct." Dkts. 9-3; 9-4; 9-5; 9-6; 9-7. But Speech First concedes that these affidavits are not enough for standing because, under *Killeen,* Bias Response & Education at IU is "materially similar" to the University of Illinois's policy and therefore does "not chill speech." Dkt. 31 at 4–5.

**\*4** Indeed, Speech First admits that Bias Response & Education lacks disciplinary authority and that "[b]ias-motivated speech alone is not a Student Code violation" at IU. *Id.* at 4. It further admits that "students are not punished" for declining to meet with Bias Response & Education. *Id.* And it admits that interactions with Bias Response & Education are anonymized and "not recorded in academic or disciplinary records." *Id.* Speech First also does not contest that many students either decline or do not respond to Bias Response & Education's meeting invitations. *Id.* at 3.

Speech First therefore has not shown that it has standing to seek preliminary injunctive relief under *Killeen. See id.* at 647 ("Speech First ... failed to demonstrate that any of its members face a credible threat of any enforcement on the basis of their speech or that ... responses to reports of bias-motivated incidents have an objective chilling effect."); *Simic,* 851 F.3d at 738–39. This Court is bound to follow *Killeen,* and therefore must deny Speech First's motion for preliminary injunction. [1] *See Reiser v. Residential Funding Corp.,* 380 F.3d 1027, 1029 (7th Cir. 2004).

[1]    The Court's analysis of the facts in this order speak only to whether Speech First "has met its burden to demonstrate that any of its members experience an actual, concrete, and particularized injury as a

result of [IU]'s policies for the purpose of standing to pursue a preliminary injunction." *Killeen*, 968 F.3d at 643–44.

### IV.

### Conclusion

Under binding Seventh Circuit precedent, Speech First lacks standing to seek preliminary injunctive relief, so its motion for preliminary injunction is **DENIED**. Dkt. [9]; *see Killeen*, 968 F.3d at 638–39, 647.

This case, including briefing on IU's motion to dismiss, dkt. 24, is **STAYED** pending resolution of Speech First's

anticipated appeal. Dkt. 31 at 1 ("Speech First asks this Court to rule promptly so it can appeal to a court that has the power to overrule *Killeen*."); *see Killeen*, 968 F.3d at 655 n.7 (concurrence in part noting that "the defendants' obligation to answer or otherwise respond to the complaint" had been stayed during the preliminary-injunction appeal); *Simic*, 851 F.3d at 740. Any party may file a motion to lift the stay for good cause.

**SO ORDERED.**

**All Citations**

Slip Copy, 2024 WL 3964864

---

© 2025 Thomson Reuters. No claim to original U.S. Government Works.

Abreu v. Harold's Chicken Shack #60, LLC, Not Reported in Fed. Supp. (2019)

2019 WL 1382902

2019 WL 1382902
Only the Westlaw citation is currently available.
United States District Court, N.D.
Indiana, Hammond Division.

Santiago ABREU, Plaintiff,
v.
HAROLD'S CHICKEN SHACK #60, LLC, Defendant.

Case No. 2:16-CV-243-JD
|
Signed 03/27/2019

**Attorneys and Law Firms**

George T. Blackmore, Blackmore Law PLC, Southfield, MI, for Plaintiff.

Dennis Pearson, Merrillville, IN, for Defendant.

**OPINION AND ORDER**

JON E. DEGUILIO, Judge

*1 Plaintiff Santiago Abreu ("Abreu") claims that Defendant Harold's Chicken Shack #60, LLC ("Harold's"), is violating Title III of the Americans With Disabilities Act (the "ADA"). *See* 42 U.S.C. § 12181 *et seq.* Because Abreu's Complaint failed to establish his standing to pursue his claim for prospective relief against Harold's, the Court afforded him an opportunity to substantiate the allegations of his Complaint. Thus, Abreu filed an Amended Complaint [DE 27], to which Harold's has moved to dismiss for lack of standing [DE 28]. In response, Abreu unconventionally filed its own verified motion [DE 29]—that is, one for summary judgment, but it is unaccompanied by any evidence. For the reasons stated below, the Court denies both motions.

**I. FACTUAL BACKGROUND**

Because no admissible evidence has been produced in support of the motions, the Court sets forth the facts asserted in the Amended Complaint [DE 27]. The allegations establish that Harold's is a public restaurant located at 6690 Broadway in Merrillville, Indiana. Abreu is a resident of Palm Beach County, Florida, who visited Harold's on March 24, 2016, as a customer. However, Abreu was unable to fully and

safely access Harold's pathway to the entrance, check-out counter, and men's restroom due to architectural barriers that prevented use of his wheelchair (which is needed on account of Abreu's suffering from multiple sclerosis and paraparesis). Abreu indicates that he will return to the Merrillville area next Summer, as he does twice every year, in order to seek treatment for his disability and to visit friends. Abreu alleges that he would return to Harold's if it ceased its discriminatory conduct and modified the facility in order to accommodate individuals with physical disabilities. Thus, Abreu asks the Court to declare that Harold's is in violation of the ADA and related accessibility guidelines, to require Harold's to comply with the ADA, and to award the fees, costs, and expenses associated with the litigation.

Rather than file an Answer to the Amended Complaint, Harold's moved to dismiss the Amended Complaint arguing that Abreu lacks standing to bring the ADA claim.

**II. STANDARD OF REVIEW**

Rule 12(b)(1) authorizes dismissal of claims over which the Court lacks subject matter jurisdiction. In analyzing a motion to dismiss, the Court must accept as true all well-pled factual allegations and must draw all reasonable inferences in favor of the plaintiff. *Long v. Shorebank Dev. Corp.*, 182 F.3d 548, 554 (7th Cir. 1999). The burden of establishing proper federal subject matter jurisdiction rests on the party asserting it, which in this case is Abreu. *Muscarello v. Ogle Cnty. Bd. of Comm'rs*, 610 F.3d 416, 425 (7th Cir. 2010).

Although Abreu argues that the motion to dismiss ought to be converted into a motion for summary judgment, *see*, Fed. R. Civ. P. 12(d), the Court declines the request. First, generally speaking, a "district court may properly look beyond the jurisdictional allegations of the complaint and view whatever evidence has been submitted on the issue to determine whether in fact subject matter jurisdiction exists." *Long v. Shorebank Dev. Corp.*, 182 F.3d 548, 554 (7th Cir. 1999). Second, with respect to this case, no evidence was submitted for the Court's consideration.

*2 If, at some point, Harold's intends to lodge a factual challenge rather than a facial challenge to jurisdiction, then it will need to submit *evidence* (not just threadbare allegations) calling Abreu's standing into question. *See Apex Digital, Inc. v. Sears, Roebuck & Co.*, 572 F.3d 440, 443-46 (7th Cir. 2009) (internal citation omitted). At that point, "[t]he

Abreu v. Harold's Chicken Shack #60, LLC, Not Reported in Fed. Supp. (2019)

2019 WL 1382902

presumption of correctness that ... [is] accord[ed] to a complaint's allegations fall[ ] away," and Abreu would then have the burden of coming forward with competent proof that standing exists. *See id.* (citation omitted).

## III. DISCUSSION

Title III of the ADA prohibits discrimination on the basis of disability in places of public accommodation by the owner, lessee, or operator of such a place. 42 U.S.C. § 12182(a). "The core meaning of this provision, plainly enough, is that the owner or operator of a store, hotel, restaurant, ... or other facility (whether in physical space or in electronic space ...) that is open to the public cannot exclude disabled persons from entering the facility and, once in, from using the facility in the same way that the nondisabled do." *Doe v. Mut. of Omaha Ins. Co.*, 179 F.3d 557, 559 (7th Cir. 1999) (internal citation omitted). Although the ADA "generously confer[s] the right to be free from disability-based discrimination, Congress [cannot] abrogate the Art. III minima: A plaintiff must always have suffered 'a distinct and palpable injury to himself,' that is likely to be redressed if the requested relief is granted." *Ortiz v. Westchester Med. Ctr. Health Care Corp.*, No. 15 CIV. 5432 (NSR), 2016 WL 6901314, at *5 (S.D.N.Y. Nov. 18, 2016) (internal citations and citations omitted). Thus, in order to establish standing, a plaintiff must show: "(1) injury in fact, which must be concrete and particularized, and actual and imminent; (2) a causal connection between the injury and the defendant's conduct; and (3) redressability." *Scherr v. Marriott Int'l, Inc.*, 703 F.3d 1069, 1073 (7th Cir. 2013) (quoting *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992) ).

The second and third elements of *Lujan* are not at issue here, [1] and the only question is whether Abreu is presently suffering a sufficiently "concrete and particularized" and "actual or imminent" injury to satisfy the Court's "injury in fact" requirement. *See Scherr*, 703 F.3d at 1074. Because Abreu seeks injunctive relief, and to establish injury in fact when seeking prospective injunctive relief, Abreu must allege a "real and immediate" threat of future violations of his rights (in this case, his rights under the ADA). *Id.* (citing *City of Los Angeles v. Lyons*, 461 U.S. 95, 102 (1983) ); *see Hummel v. St. Joseph Cty. Bd. of Comm'rs*, 817 F.3d 1010, 1016 (7th Cir. 2016). The threat of future injury can be shown by an intent to return to or use the public accommodation, *Scherr*, 703 F.3d at 1074, but it can also be shown by establishing that the plaintiff is reasonably deterred from the accommodation because of

the discrimination. *See Access Living of Metro. Chicago v. Uber Techs., Inc.*, 351 F. Supp. 3d 1141, 1149 (N.D. Ill. 2018) (citing *Chapman v. Pier 1 Imports (U.S.) Inc.*, 631 F.3d 939, 949 (9th Cir. 2011) (en banc); *Scherr v. Marriot Int'l, Inc.*, 833 F.Supp.2d 945, 951 (N.D. Ill. 2011), *aff'd*, 703 F.3d 1069 (7th Cir. 2013) ).

[1]    The uncontested allegations of the Amended Complaint establish that Abreu visited Harold's on March 24, 2016, as a customer that required use of a wheelchair. At that time, Abreu was unable to safely access Harold's uneven and overly steep pathway to the entrance, unable to use the excessively high check-out counter, and unable to fully utilize the men's restroom facilities due to architectural barriers. Therefore, it is clear that Abreu's assertions, taken as true, establish that he suffered a past injury. And, per Abreu, there is no indication that the owner or operator of Harold's has attempted to remedy these alleged barriers.

**\*3** While it is true that Abreu resides in the Southern Region of the United States, which is a significant distance from Merrillville, Indiana, Abreu claims that he has traveled to the Merrillville area twice each year for purposes of seeking medical treatment for his disability and visiting friends. He also alleges that he "will return" next July for these same reasons. Per Abreu, during these regularly scheduled annual trips to the Merrillville area, were it not for Harold's failing to reasonably accommodate the physically disabled (as he personally experienced), then Abreu would return to Harold's.

Given these factual contentions, the Court finds that at this stage of the proceedings, Abreu faces a "real and immediate" threat that he will be subjected to a violation of his rights sufficient to confer standing. *See Hummel*, 817 F.3d at 1019–20 (7th Cir. 2016) (the possibility of future injury need not be certain, but there must be at least a substantial risk that such harm will occur) (citing *American Bottom Conservancy v. United States Army Corps of Engineers*, 650 F.3d 652, 658 (7th Cir. 2011) (holding that certainty is not required; but probable harm is enough); *Bauer v. Shepard*, 620 F.3d 704, 708 (7th Cir. 2010) (stating that "probability of future injury counts as 'injury' for the purpose of standing") ). Abreu's future plans (as stated at the time the Amended Complaint was filed) are much more specific than the vague and speculative "some day" intentions that troubled the Supreme Court in *Lujan*. *See Lujan*, 504 U.S. at 564 (holding that " 'some day' intentions—without any description of concrete plans, or indeed even any specification of when the some day will be

2019 WL 1382902

—do not support a finding of the "actual or imminent" injury that our cases require."). Moreover, Abreu's upcoming plans to return every year to the same area for medical treatment and to visit friends (as he has in the past) are sufficient to support a plausible inference that Abreu would like to return to Harold's, but for its continued structural barriers for the wheelchair bound. *See id.* Given Abreu's past history of and future plans to travel to the Merrillville area, along with his affirmative desire to frequent Harold's but for the alleged violations, Abreu has standing to pursue his claim for injunctive relief against Harold's.

One last matter must be resolved—that is, Abreu's motion for summary judgment. Despite the fact that judicial records reveal that Abreu is a plaintiff in just over two hundred state and federal cases (pending in Arizona, Colorado, Florida, Illinois, Indiana, Michigan, and New York), with his attorney of record representing him in at least twenty of those cases, the plaintiff's motion for summary judgment fails to comply with the federal rules. Specifically, no admissible evidence was provided in support of the motion for summary judgment in accordance with Federal Rule of Civil Procedure 56(c)(1). While the motion itself is verified, it only states unhelpful legal conclusions [DE 29]. At the summary judgment stage, the plaintiff can no longer rest on mere allegations, but must set forth by affidavit or other evidence specific facts. *See Midwest Fence Corp. v. United States Dep't of Transportation*, 840 F.3d 932, 939 (7th Cir. 2016). Nor will the Court permit the parties to rely on prior judicial opinions or mooted pleadings as a form of evidence (as Abreu did) to support or oppose summary judgment. *See Hummel*, 817 F.3d at 1017 (citing Rule 56(c)(1)(A) ). Finally, because the

motion for summary judgment was simultaneously filed as a response to Harold's motion to dismiss, it appears Harold's only replied to the issue of standing, rather than taking the opportunity to address the merits of any ADA violation. Rather than risk a dispositive ruling based on a misstep of counsel, compliance with the rules will ensure that the Court can resolve any motion for summary judgment on the merits. *See, e.g., Schmidt v. Eagle Waste & Recycling, Inc.*, 599 F.3d 626, 630 (7th Cir. 2010).

**\*4** These procedural problems have helped take this case long past the discovery stage and its needed disposition (by way of a properly filed dispositive motion or trial). Accordingly, Harold's has until April 10, 2019, to file an Amended Answer to the Amended Complaint, and the parties have until May 6, 2019, to file any motions for summary judgment, with any responses due by June 3, 2019, and any replies to be filed by July 17, 2019.

## IV. CONCLUSION

For the reasons set forth above, the Court DENIES the motion to dismiss [DE 28] and the motion for summary judgment [DE 29].

SO ORDERED.

## All Citations

Not Reported in Fed. Supp., 2019 WL 1382902

---

**End of Document**

© 2025 Thomson Reuters. No claim to original U.S. Government Works.

2024 WL 2882214
Only the Westlaw citation is currently available.
United States District Court, N.D. Illinois, Eastern Division.

Dion HARDEN, individually and on
behalf of M.H., a minor, et al., Plaintiffs,

v.

MEAD JOHNSON & COMPANY, LLC, Defendant.

No. 24 CV 108
|
Signed June 7, 2024

**Attorneys and Law Firms**

Jeffrey Daniel Blake, Matthew C. De Re, Sharon Harris, Thomas A. Zimmerman, Jr., Zimmerman Law Offices, P.C., Chicago, IL, for Plaintiffs.

James William Mizgala, Connor Joseph Doughty, Tucker Ellis LLP, Chicago, IL, Jennifer Lynn Mesko, Ethan William Weber, Tucker Ellis LLP, Cleveland, OH, for Defendant.

**MEMORANDUM OPINION AND ORDER**

Lindsay C. Jenkins, United States District Judge

**\*1** Defendant Mead Johnson & Company, LLC ("Mead Johnson")[1] manufactures infant formula, including Enfamil-brand Nutramigen Powder. [Dkt. 1 ¶¶ 1–2.] On December 30, 2023, Mead Johnson recalled Nutramigen products sold in the United States because of possible contamination with *Chronobacter sakazakii*, a harmful bacterium. [*Id.* ¶¶ 6–7.] Dion Harden and Jessica Tan filed this putative class action, which Mead Johnson moves to dismiss on several grounds; it also moves to strike the class allegations. [Dkt. 20.] As explained below, the motion to dismiss is denied as to subject-matter jurisdiction but otherwise granted, and the motion to strike is denied.[2]

[1]   Mead Johnson's only member is Mead Johnson Nutrition Company, a corporation. [Dkt. 1 ¶¶ 13–14.] Plaintiffs properly allege jurisdiction under 28 U.S.C. § 1332(d) [*id.* ¶ 15], and Mead Johnson does not challenge the subject-matter jurisdiction on the basis of diversity of citizenship, so the Court does not refer to the parent company in this order.

[2]   Because the Court dismisses the Complaint, it declines to consider appointing interim class counsel at this time, so it denies Plaintiffs' motion [Dkt. 18] without prejudice.

**I. Background**

Mead Johnson & Company, LLC is a leading producer of infant formula. [Dkt. 1 ¶ 2.] It manufactures and sells Enfamil-brand infant formula products including Nutramigen. [*Id.* ¶¶ 2–3, 18.] On August 30, 2023, the Food and Drug Administration sent Mead Johnson a "Warning Letter" explaining that the FDA had inspected its manufacturing facilities in Zeeland, Michigan[3] and Wanamingo, Minnesota and found evidence of "significant violations" of federal regulations. [*Id.* ¶¶ 23–25.] The Zeeland inspection occurred between February 7 and 23, 2023, and the Wanamingo inspection between November 28, 2022 and January 9, 2023. [*Id.* ¶ 24.]

[3]   The Complaint erroneously states that Zeeland is in Connecticut. [Dkt. 1 ¶ 24; *cf. id.* at 45, 52–53 (correctly identifying the Zeeland as in Michigan).]

The Warning Letter stated that different Enfamil products manufactured at both facilities tested positive for *Chronobacter sakazakii* ("*C. sakazakii*"), a bacterium that can cause various illnesses and symptoms, including meningitis. [*Id.* ¶¶ 6, 26; *see id.* at 46–48.] The FDA found that Defendant "did not establish a system of process controls ... designed to ensure that infant formula does not become adulterated" and "did not ensure that equipment and utensils used ... were of appropriate design and their cleaning and maintenance." [*Id.* ¶ 27.] In a separate incident, the Israeli Ministry of Health found that Nutramigen Powder manufactured at the Zeeland facility tested positive for *C. sakazakii.* [*Id.* ¶ 28.]

On December 30, 2023, Mead Johnson recalled Nutramigen Powder products manufactured in June 2023 and largely distributed between June and August 2023. [*Id.* ¶ 19.] These products had a "use by" date of January 1, 2025. [*Id.*][4] The next day, the FDA announced the recall, stating that the recall was "due to a possibility of contamination with Chronobacter sakazakii in product sampled outside the U.S." [*Id.* ¶¶ 20–21.]

[4]   Elsewhere, the Complaint states that the use by date was January 1, 2024. [Dkt. 1 ¶ 1.] January 1, 2025 is the correct date. [*See id.* at 39.]

**\*2** Dion Harden, from Illinois, bought Nutramigen Powder in and after June 2023 for his infant daughter, M.H., and Jessica Tan, from Connecticut, bought Nutramigen Powder in September 2023 for her infant son, L.L. [*See id.* ¶¶ 11–12, 29–32.] Each child became ill after consuming the Nutramigen Powder. Plaintiffs allege that Tan's son was hospitalized and diagnosed with meningitis; they allege only that Harden's son "became ill." [*Id.* ¶¶ 31–32.] Believing that Nutramigen caused their children's illnesses, Harden and Tan filed this lawsuit against Mead Johnson, seeking relief for themselves, their children, and several classes on various legal theories. They ask the Court to appoint their attorneys as interim class counsel. [Dkt. 18.] Mead Johnson moves to dismiss the Complaint on jurisdictional and merits grounds. [Dkt. 20.]

## II. Legal Standards

Mead Johnson moves to dismiss under Federal Rule of Civil Procedure 12(b)(1), 12(b)(2), and 12(b)(6). A motion to dismiss pursuant to Rule 12(b)(1) challenges the Court's subject-matter jurisdiction, while a motion to dismiss under Rule 12(b)(6) tests the legal sufficiency of the plaintiff's claims. In both cases, the Court takes well-pleaded factual allegations as true and draws reasonable inferences in favor of the plaintiff, *Choice v. Kohn L. Firm, S.C.*, 77 F.4th 636, 638 (7th Cir. 2023); *Reardon v. Danley*, 74 F.4th 825, 826–27 (7th Cir. 2023), but it need not accept statements of law or conclusory factual allegations as true, *Bilek v. Fed. Ins. Co.*, 8 F.4th 581, 586 (7th Cir. 2021). To survive dismissal, "a complaint must state a claim to relief that is plausible on its face." *Page v. Alliant Credit Union*, 52 F.4th 340, 346 (7th Cir. 2022) (cleaned up). This standard requires plaintiffs to provide "just enough details about the subject matter of the case to present a story that holds together," or "to nudge their claims across the line from conceivable to plausible." *Russell v. Zimmer, Inc.*, 82 F.4th 564, 570–71 (7th Cir. 2023) (cleaned up).

A different standard applies to a Rule 12(b)(2) motion to dismiss for lack of personal jurisdiction. *See Curry v. Revolution Lab'ys, LLC*, 949 F.3d 385, 392 (7th Cir. 2020). The Court takes the well-pleaded factual allegations as true and draws all reasonable inferences in the plaintiff's favor, but if the defendant submits "affidavits or other evidence in opposition to the exercise of jurisdiction, the plaintiff must go beyond the pleadings and submit affirmative evidence supporting the exercise of jurisdiction." *Purdue Rsch. Found. v. Sanofi Synthelabo, S.A.*, 338 F.3d 773, 782–83 (7th Cir. 2003). Where the Court does not hold an evidentiary hearing, the plaintiff need only make a prima facie showing of personal

jurisdiction, *uBID, Inc. v. GoDaddy Grp., Inc.*, 623 F.3d 421, 424 (7th Cir. 2010), but this is an evidentiary burden, not a pleading standard. If the plaintiff fails to offer evidence of his own, the presumption flips and the Court "will accept as true any facts in the defendants' affidavits that do not conflict with" evidence introduced by the plaintiff. *Curry*, 949 F.3d at 393; *see also Swanson v. City of Hammond*, 411 F. App'x 913, 915 (7th Cir. 2011) (nonprecedential) (accepting "allegations relating to personal jurisdiction as true except where the defendants refute them through undisputed affidavits" (citations omitted)).

Under Rule 12(f), on motion or on its own, the Court may "strike from a pleading ... any redundant, immaterial, impertinent, or scandalous matter," and Rule 23(c)(1)(A) permits the Court to "deny class certification even before the plaintiff files a motion requesting certification." *Kasalo v. Harris & Harris, Ltd.*, 656 F.3d 557, 563 (7th Cir. 2011). Thus, the Court may strike "facially and inherently deficient" class allegations, but it is seldom appropriate to do so at the pleading stage. *See Robinson v. Lake Ventures LLC*, 2023 WL 5720873, at \*9 (N.D. Ill. Sept. 5, 2023).

## III. Jurisdiction

### A. Subject-Matter Jurisdiction

**\*3** The Court begins, as it must, with Mead Johnson's challenge to the Court's subject-matter jurisdiction. *Sherwood v. Marchiori*, 76 F.4th 688, 693 (7th Cir. 2023). Mead Johnson moves to dismiss under Rule 12(b)(1), arguing that Plaintiffs lack Article III standing. [Dkt. 21 at 7.] At the pleading stage, a plaintiff must plausibly allege all three elements of standing: "(1) an injury in fact that is (2) fairly traceable to the challenged action of the defendant and (3) is likely, not merely speculative, that the injury will be redressed by a favorable decision." *In re Recalled Abbott Infant Formula Prods. Liab. Litig.*, 97 F.4th 525, 528–29 (7th Cir. 2024) (citation omitted). Mead Johnson pursues a facial standing challenge, arguing that Plaintiffs have not plausibly alleged that their personal injuries are fairly traceable to it. *See id.* at 528 ("A facial challenge attacks standing on the pleadings, arguing that the plaintiff lacks standing even if the well-pleaded allegations in the complaint are taken as true." (quotation omitted)). The Court disagrees.[5]

[5]     Mead Johnson also argues that Plaintiffs fail to plausibly allege a concrete economic injury in fact. [Dkt. 21 at 10–12.] Plaintiffs have plausibly alleged

2024 WL 2882214

that their children's personal injuries are fairly traceable to Mead Johnson, so the Court does not reach this issue.

Plaintiffs' theory of standing as to their children's injuries is straightforward. Harden and Tan purchased Nutramigen for their infant children, who consumed it and became ill. [Dkt. 1 ¶¶ 29, 31–32.] Mead Johnson recalled Nutramigen products based on positive test results for *C. sakazakii*. [*Id.* ¶¶ 19–20, 24–28.] Plaintiffs allege that the Nutramigen Powder they purchased was contaminated with *C. sakazakii*. [*Id.* ¶ 30.] These allegations suffice to establish standing at the pleading stage. *Cf.* *Morrison v. YTB Int'l, Inc.*, 649 F.3d 533, 536 (7th Cir. 2011) ("Plaintiffs allege that they are victims of a pyramid scheme that saddled them with financial loss, which YTB caused. The judiciary can redress that injury by ordering YTB to pay money to the victims. Nothing more is required for standing.").

Mead Johnson's contrary view is unpersuasive. It correctly notes that an attenuated chain of causation is insufficient for standing, but the factually distinct cases it cites do not support the conclusion that Plaintiffs lack standing here. [Dkt. 21 at 8–10.] In *Johnson v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, the injury was not traceable to the defendant, but rather a state court judge's order which the defendant was compelled to follow. 719 F.3d 601, 606–07 (7th Cir. 2011). In *Clapper v. Amnesty International USA*, any future injury the respondents might have been at risk of was not fairly traceable to the statute whose constitutionality the respondents were challenging because the "chain of contingencies" necessary for an injury to occur "show[ed] that respondents cannot satisfy the requirement that any injury in fact must be fairly traceable to [the statute]." 568 U.S. 398, 410–11 (2013). Here, however, Plaintiffs' theory of standing does not depend on third-party conduct or a chain of contingencies. Plaintiffs allege that Mead Johnson's product was contaminated, their children consumed it, and the children became ill as a result. The injury, illness from allegedly tainted baby formula, is fairly traceable to Mead Johnson's conduct, the allegedly negligent production of baby formula.

Mead Johnson argues that Plaintiffs' allegations do not make it plausible that the Nutramigen they bought was, in fact, contaminated or that it caused their children's illnesses. Mead Johnson emphasizes that "the domestic recall involved the 'possibility of contamination' "; that none of the recalled Nutramigen that was tested came back positive for *Chronobacter* or *C. sakazakii*; and that Plaintiffs do not allege that the Nutramigen they bought was subject to the recall. [Dkt. 21 at 8–9 (citations omitted).] "They presume that because *different* products at *different* times were contaminated, there is a causal basis for their claims." [*Id.* at 9 (citations omitted).]

**\*4** These arguments go to the merits, not standing. True, to prevail, Plaintiffs will have to prove that Mead Johnson caused any injury they suffered, and to survive a motion to dismiss, they must allege facts making their entitlement to relief plausible. *Page*, 52 F.4th at 346. But traceability requires plausible allegations only of a causal connection, not proximate cause. *Pit Row, Inc. v. Costco Wholesale Corp.*, 101 F.4th 493, 502 (7th Cir. 2024). Mead Johnson argues that Plaintiffs' allegations fall short on this front, and the Court addresses those arguments below, but "[t]hat a plaintiff's claim under his preferred legal theory fails has nothing to do with subject-matter jurisdiction unless the claim is so feeble as to be essentially fictitious." *Morrison*, 649 F.3d at 536 (cleaned up). At the minimum, Mead Johnson agrees that Plaintiffs allege that some Nutramigen was contaminated with *C. sakazakii* and that their children became ill after consuming Nutramigen. Those allegations establish that Plaintiffs' claims are not essentially fictitious. Mead Johnson's motion to dismiss for lack of subject matter jurisdiction is therefore denied. [6]

[6]   Two further points. First, Mead Johnson does not argue that if the personal injuries confer standing, the Court should nevertheless narrow the scope of the claims because only the children suffered those injuries [*see* Dkt. 21 at 8–10], so the Court has not considered doing so. Second, Mead Johnson's motion does not discuss Plaintiffs' standing with respect to injunctive and declaratory relief, but often, when the alleged problem with a defendant's product comes to light, a plaintiff will lack standing to seek prospective relief because it is not likely that the plaintiff will be injured in the same way again. *See, e.g.*, *Camasta v. Jos. A. Bank Clothiers, Inc.*, 761 F.3d 732, 740–41 (7th Cir. 2014). The Court has an independent obligation to ensure that subject-matter jurisdiction is secure, *see, e.g.*, *Webb v. FINRA, Inc.*, 889 F.3d 853, 856 (7th Cir. 2018), but because it dismisses the Complaint without prejudice, it does not address these unbriefed standing issues now, but they may arise in the future.

**B. Personal Jurisdiction**

The Court now turns to the motion to dismiss Tan's claims under Rule 12(b)(2) for lack of personal jurisdiction. [Dkt. 21 at 12–14.]

## 1. Governing Law

"A federal court sitting in diversity must rely on the law of personal jurisdiction that governs the courts of general jurisdiction in the state where the court is sitting," here Illinois. *Hyatt Int'l Corp. v. Coco*, 302 F.3d 707, 713 (7th Cir. 2002); Fed. R. Civ. P. 4(k)(1)(A). The Illinois long-arm statute "permits its courts to exercise jurisdiction on any basis permitted by the Illinois and United States Constitutions." *Hyatt*, 302 F.3d at 714 (citation omitted); 735 ILCS 5/2-209(c). Because "[no] party urges that the Illinois due process analysis differs," the Court "only consider[s] the requirements of federal due process." *NBA Props., Inc. v. HANWJH*, 46 F.4th 614, 620 n.15 (7th Cir. 2022) (cleaned up). [*See* Dkt. 21 at 13 (agreeing with this point).]

Fourteenth Amendment's Due Process Clause "protects an individual's liberty interest in not being subject to the binding judgments of a forum with which he has established no meaningful contacts, ties, or relations." *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 471–72 (1985) (cleaned up). The Clause permits courts to exercise jurisdiction over an out-of-state defendant only if it has "sufficient minimum contacts with [the forum State] such that the maintenance of the suit does not offend traditional notions of fair play and substantial justice." *Tamburo v. Dworkin*, 601 F.3d 693, 700–01 (7th Cir. 2010) (cleaned up). Personal jurisdiction may be general or specific. *See Daimler AG v. Bauman*, 571 U.S. 117, 126–27 (2014).

General jurisdiction exists "only when a defendant is 'essentially at home' in [a] State"; it "extends to any and all claims brought against a defendant." *Ford Motor Co. v. Mont. Eighth Jud. Dist. Ct.*, 592 U.S. 351, 358 (2021) (cleaned up). A state may exercise general jurisdiction over a corporation if the corporation is incorporated or has its principal place of business there, *id.* at 358–59, and in an "exceptional case," a different state might also be able to exercise general jurisdiction, *see Daimler*, 571 U.S. at 139 n.19. However, "exceptional circumstances are incredibly difficult to establish," *Pace v. Cirrus Design Corp.*, 93 F.4th 879, 898 (5th Cir. 2024) (cleaned up); and no Supreme Court or Seventh Circuit case has identified any such circumstances. Mead Johnson states that "limited liability companies are

treated like corporations" for purposes of general jurisdiction [Dkt. 21 at 12 (citation omitted)], but "[t]he Supreme Court has yet to address specifically how to evaluate whether an entity other than a corporation is subject to general jurisdiction." 4 Fed. Prac. & Proc. Civ. § 1067.5 (4th ed. June 2024 update) (footnote omitted). But Plaintiffs do not suggest another standard [*see* Dkt. 33 at 10–12], and Mead Johnson's view has some support, [7] so the Court will apply the same test it would for a corporation.

[7]     *See, e.g.*, *Frank v. P N K (Lake Charles) L.L.C.*, 947 F.3d 331, 337 n.10 (5th Cir. 2020) (noting that the Fifth Circuit has applied this test to limited liability companies); Richard D. Freer, *Some Specific Concerns with the New General Jurisdiction*, 15 Nev. L.J. 1161, 1163 n.20 (2015) (noting that the defendant in *Daimler* was a limited liability company, despite the opinion articulating the test as applied to corporations); Susan Gilles & Angela Upchurch, *Finding a "Home" for Unincorporated Entities Post-*Daimler AG v. Bauman, 20 Nev. L.J. 693, 720–25, 728–29 (2020) (arguing for a corporation-like test for limited liability companies).

**\*5** Specific jurisdiction "covers defendants less intimately connected with a State [than general jurisdiction], but only as to a narrower class of claims." *Ford*, 592 U.S. at 359. To establish specific personal jurisdiction over a defendant, the plaintiff must show that "(1) the defendant has purposefully directed his activities at the forum state or purposefully availed himself of the privilege of conducting business in the state; (2) the alleged injury arises out of or relates to the defendant's forum-related activities; and (3) [the] exercise of personal jurisdiction ... comport[s] with traditional notions of fair play and substantial justice." *Rogers v. City of Hobart*, 996 F.3d 812, 819 (7th Cir. 2020) (citation omitted).

## 2. Application

Mead Johnson argues that the Court has no personal jurisdiction over Tan's claims against it. Mead Johnson is organized under Delaware law, and while it was formerly headquartered in Illinois, it submits a declaration attesting that in 2018 it moved its headquarters from Illinois to Indiana. [Dkt. 21 at 13; *see* Dkt. 21-1 ¶¶ 3–4.] Therefore, Mead Johnson argues that it is subject to general jurisdiction only in Delaware and Indiana [Dkt. 21 at 12–13] and that specific

2024 WL 2882214

personal jurisdiction over Tan's claims does not exist because those claims do not arise out of or relate to Mead Johnson's Illinois-based activities. [*Id.* at 13–14 ("Tan says *nothing* that connects her, her claimed injury, or her claims to Illinois.").]

Plaintiffs agree that Mead Johnson moved its headquarters to Indiana, but they argue that "general personal jurisdiction over Mead Johnson may still exist if Defendant still has continuous and systematic contacts with Illinois." [*Id.* at 12.] And they note that the Complaint alleges that Harden's claims arise out of or relate to Mead Johnson's contacts with Illinois. [*Id.* at 12–14.] Plaintiffs therefore ask the Court to permit jurisdictional discovery before ruling on the Rule 12(b)(2) motion, to determine whether Mead Johnson is subject to general jurisdiction in Illinois and whether Tan's claims arise out of or relate to Mead Johnson's Illinois contacts. [*Id.* at 12–14.]

The Court disagrees that jurisdictional discovery is warranted. The Seventh Circuit cautions that "[a] plaintiff must be able to establish a colorable or prima facie showing of personal jurisdiction before discovery should be permitted." *In re Sheehan*, 48 F.4th 513, 526 (7th Cir. 2022) (cleaned up). To make out a prima facie case of personal jurisdiction, a plaintiff must plausibly allege or offer evidence of the grounds for jurisdiction and, if the defendant submits evidence contradicting the allegations, the plaintiff must come forward with evidence. *See Curry*, 949 F.3d at 393; *Purdue*, 338 F.3d at 782–83. [Dkt. 34 at 3–4.] Plaintiffs fail to provide allegations or evidence sufficient to establish a prima facie showing of personal jurisdiction.

On general jurisdiction, the Complaint alleges that Mead Johnson "has its headquarters in Chicago, Illinois" [Dkt. 1 ¶ 13], which would supports finding general personal jurisdiction. *Ford*, 592 U.S. at 359; *see Hertz Corp. v. Friend*, 559 U.S. 77, 92–93 (2010) (holding that a corporation's principal place of business is typically its where its headquarters is located). But Mead Johnson provided a sworn declaration stating that its headquarters is in Indiana. [Dkt. 21-1 ¶ 4.] Thus, the Court takes the declaration as true, not the contrary allegation in the Complaint, *see Curry*, 949 F.3d at 393, and Plaintiffs do not offer any evidence of their own on this point. [*Cf.* Dkt. 33 at 11–12.] Nor do Plaintiffs allege or offer evidence that Mead Johnson has such systemic and continuous contacts with Illinois that this is the exceptional case where a defendant is subject to general jurisdiction in a state where it is not organized and does not have its principal place of business. [*See id.*; Dkt. 34 at 3–

4 ("Plaintiffs offer nothing about Mead Johnson's corporate activities or scale of operations in Illinois.").] *Pace*, 93 F.4th at 898 (noting the difficulty of meeting the exceptional case standard). With no allegations of systemic and continuous contacts and no evidence to rebut the declaration that Mead Johnson's headquarters are in Indiana, Plaintiffs have failed to make a prima facie showing that Mead Johnson is subject to general jurisdiction in Illinois. *See Curry*, 949 F.3d at 393; *Purdue*, 338 F.3d at 782–83.

**\*6** On specific jurisdiction, Mead Johnson offers no evidence that Tan's injuries do not arise out of or relate to its Illinois-related activities, so to make out a prima facie case of personal jurisdiction, Plaintiffs need only allege the basis for jurisdiction. *See Curry*, 949 F.3d at 393; *Purdue*, 338 F.3d at 782–83. The allegations they point to, however, are unrelated to Tan. [Dkt. 33 at 13; *see* Dkt. 1 ¶ 11 (Harden is an Illinois resident), ¶ 17 (Mead Johnson "conducts business in" and "has sold, marketed, and/or distributed contaminated Nutramigen Powder products" in Illinois), ¶ 180 (Harden purchased Nutramigen Powder products in Illinois).] While these allegations satisfy the first prong of the test for specific personal jurisdiction—purposeful availment by the defendant —they do not support an inference that Tan's "alleged injury arises out of or relates to [Mead Johnson's] forum-related activities." *Rogers*, 996 F.3d at 819 (citation omitted). Mead Johnson's ties to Illinois generally or to customers based in Illinois do not help Tan establish a prima facie showing of specific jurisdiction. *See Bristol-Myers Squibb Co. v. Sup. Ct. of Cal.*, 582 U.S. 255, 264–65 (2017) ("The State Supreme Court found that specific jurisdiction was present without identifying any adequate link between the State and the nonresidents' claims .... [But t]he mere fact that other plaintiffs were prescribed, obtained, and ingested Plavix in California ... does not allow the State to assert specific jurisdiction over the nonresidents' claims.").

District courts cannot permit jurisdictional discovery unless a plaintiff makes a prima facie showing that there is personal jurisdiction over the defendant. *Sheehan*, 48 F.4th at 526. Plaintiffs have failed to make that showing as to Tan's claims against Mead Johnson, so the Court declines to permit jurisdictional discovery and grants the Rule 12(b)(2) motion to dismiss Tan's claims for lack of personal jurisdiction.

### IV. Failure to State a Claim
The Court now turns to Mead Johnson's arguments for dismissal for failure to state a claim under Rule 12(b)(6). Because the Court dismisses Tan's claims for lack of personal

jurisdiction, this section applies only to Harden's claims. Mead Johnson makes two arguments: (1) the Complaint fails to plausibly allege that Nutramigen caused the injuries to Harden or his daughter, and (2) Harden's breach of warranty claim fails because he did not give Mead Johnson pre-suit notice. [Dkt. 21 at 15–17.]

### A. Causation

Mead Johnson argues that Harden's allegations do not support a plausible inference that contaminated Nutramigen caused his daughter's illness. [Dkt. 21 at 15–16.] The Court agrees that gaps in the Complaint's allegations mean that Harden has not currently stated a plausible claim.

Mead Johnson asserts that "[t]he entire crux" of Harden's theory rests on "two tenuous assumptions," what it characterizes as a *post hoc, ergo propter hoc*-style argument. [Dkt. 21 at 15; Dkt. 34 at 1.] Those assumptions are that "because of FDA inspections in late 2022 and early 2023 that found *other* Enfamil products (not Nutramigen) were contaminated with *C. sakazakii*, Nutramigen produced months later must have also been contaminated" and that "Nutramigen testing positive for *C. sakazakii* abroad means domestic Nutramigen also was contaminated. Plaintiffs then surmise their Nutramigen must have been contaminated too." [Dkt. 21 at 15.]

Mead Johnson argues that these assumptions do not support an inference that the Nutramigen Harden purchased was tainted. As to the FDA inspections, it notes that the inspections occurred months before the Nutramigen was manufactured and found *C. sakazakii* in products other than Nutramigen. [*Id.*] As to the positive tests from Israel, Mead Johnson notes that its recall notice stated that the Nutramigen went through "extensive testing ... and tested negative for" *C. sakazakii*. [*Id.*; *see* Dkt. 1 at 39.] Further, the Complaint does not contain allegations about Nutramigen in the United States being contaminated. [Dkt. 21 at 15.] Mead Johnson contends that these allegations are insufficient to survive a motion to dismiss. [*Id.* at 15–16.] *See Russell*, 82 F.4th at 570–71 (noting that a complaint's allegations must cross the line between conceivable and plausible).

The Court disagrees to an extent. In ruling on a motion to dismiss, the Court must "read[ ] the allegations sensibly and as a whole," *Engel v. Buchan*, 710 F.3d 698, 710 (7th Cir. 2013), and draw inferences in favor of the plaintiff, *Reardon*, 74 F.4th at 826–27. Mead Johnson is correct that the FDA tests that detected contaminated infant formula powder occurred

months before the Nutramigen at issue here was produced, but the Warning Letter, issued in late August 2023, found Mead Johnson's efforts to remedy the conditions in its factories inadequate.[8] Based on these findings by the FDA, it is reasonable to infer that the conditions that led to the positive tests for *C. sakazakii* in late 2022 and early 2023 continued into the summer of 2023, when Mead Johson produced the allegedly contaminated Nutramigen. The positive tests for *C. sakazakii* in Nutramigen manufactured at the Zeeland facility and exported to Israel supports the inference that the conditions that caused contamination of other Enfamil products also affected Nutramigen.

[8]    For example, the FDA stated about Zeeland: "[Y]our firm did not perform genetic characterization (e.g., WGS) of the product isolate and recent environmental isolates from your facility; therefore, it is not clear how you determined that *C. sakazakii* and activities within your own facility could not be responsible for the contamination event. Moreover, you did not provide adequate data to demonstrate that this approach (a product flush) is sufficient to mitigate microbiological contamination from your system." [Dkt. 1 at 46.]

**\*7** Mead Johnson's statements that the recalled Nutramigen tested negative for *C. sakazakii* to "extensive testing"; that Mead Johnson "believed that much, if not all, of the products recalled ... ha[d already] been consumed"; and that there had been "no reports of illnesses or adverse events to date" [Dkt. 1 at 39] are not dispositive. [*Contra* Dkt. 21 at 15.] Because the Court construes the Complaint in Harden's favor, *Reardon*, 74 F.4th at 826–27, it cannot take Mead Johnson's statements as gospel. The statements in the recall notice may not have been complete or correct, and as the Court has explained, other allegations support an inference that the contamination detected in other products also affected the recalled Nutramigen.

Although the Complaint pleads many of the facts necessary to state a plausible claim, there are gaps. It would be irrelevant that Nutramigen tested positive in Israel if the Nutramigen that Harden bought was also manufactured in Zeeland during the relevant time period. But the Complaint does not contain that allegation. [*Compare* Dkt. 1 ¶ 28 ("On information and belief, the Nutramigen Powder products [that tested positive for *C. sakazakii* in Israel] were manufactured at [Mead Johnson's] Zeeland facility."), *with id.* ¶¶ 29–30 (alleging

2024 WL 2882214

that Plaintiffs purchased tainted Nutramigen, but not that it came from Zeeland).] Nor does the Complaint allege that the Nutramigen Harden bought contained a January 1, 2025 use by date. [*Id.* ¶¶ 29–30.]

Another gap concerns Harden's daughter's illness. The Complaint alleges that Tan's son contracted meningitis, a disease linked to *C. sakazakii* [*id.* ¶¶ 6, 32], but it merely alleges that Harden's daughter "became ill" after consuming Nutramigen. [*Id.* ¶ 31.] The Court agrees that this vague allegation "does not plausibly connect *C. sakazakii* contamination to [Harden's child's] injuries." [Dkt. 21 at 16 ("No allegation suggests a chain of causation—no timeline, no details about the injury, not even a simple claim that the Nutramigen caused the illness.").] The Court has explained that the facts alleged make it plausible that there was *C. sakazakii* contamination Mead Johnson's facilities, but it is also necessary to plausibly allege that the injury suffered was caused by *C. sakazakii*. The Complaint does not currently do that, but it may be possible to fill this gap in an amended complaint. [9]

[9]  Plaintiffs barely attempt to show that Harden's daughter's injury is indicative of *C. sakazakii* exposure, as they focus more on Tan's son's meningitis diagnosis. [*See* Dkt. 33 at 15–16 ("The fact that both children consumed the product and then became ill, and L.L. developed meningitis which can be caused by Cronobacter bacteria, demonstrates a plausible connection between the product and their injuries.").] The Court does not consider whether the allegations in the Complaint would be sufficient as to Tan, as the Court lacks personal jurisdiction over her claims against Mead Johnson. The allegations about her are stronger, but some of Mead Johnson's arguments, such as the lack of a "timeline" and "details about the injury," may also apply to Tan's claims. [*See* Dkt. 21 at 16.]

At an abstract level, the Court agrees with Harden that the Complaint's basic theory is viable, but the gaps the Court has identified fail to move the claims across the line between conceivable and plausible. *Russell*, 82 F.4th at 570–71. The Court will therefore dismiss the Complaint on causation grounds.

### B. Pre-Suit Notice

Mead Johnson also argues that Harden's failure to give Mead Johnson pre-suit notice defeats his breach of warranty claim.

[Dkt. 21 at 16–17.] Harden responds that his claim falls into two exceptions to the pre-suit notice requirement: first, Mead Johnson was already on notice of the defect because it issued the recall and, second, Harden is exempt from the pre-suit notice requirement because he alleges personal injury. [Dkt. 33 at 16–17.] *See Connick v. Suzuki Motor Co., Ltd.*, 675 N.E.2d 584, 589–91 (Ill. 1996). Mead Johnson counters that the first exception only applies when the defendant has notice of the buyer's claim, not general defects with the product, and the Complaint does not allege such notice. [Dkt. 34 at 7–8.] *See Connick*, 675 N.E.2d at 590 ("[E]ven if a manufacturer is aware of problems with a particular product line, the notice requirement ... is satisfied only where the manufacturer is somehow apprised of the trouble with the particular product purchased by a particular buyer." (citations omitted)). As to the second exception, Mead Johnson argues that Harden does not allege that he suffered any injury, and he fails to allege that his daughter's injury was caused by contaminated Nutramigen. [Dkt. 34 at 8.]

**\*8**  The Court agrees with Mead Johnson on both grounds, with one caveat. It is correct that Illinois law requires notice of the actual buyer's claim to excuse a lack of pre-suit notice, which the Complaint does not allege. Mead Johnson is also correct that the Complaint does not allege personal injury to Harden himself. And because the Complaint fails to plausibly connect M.H.'s illness to Nutramigen, the Court agrees with Mead Johnson that the warranty claim on behalf of M.H. fails. Harden's breach of warranty claim, on behalf of himself and his daughter, will be dismissed at this time. The caveat is that if Harden can fix the deficiencies regarding causation, the warranty claim to M.H. will be able to proceed.

*   *   *

For the foregoing reasons, the motion to dismiss for failure to state a claim is granted in full. Because Harden may be able to replead some or all of the claims and the norm is to provide at least one opportunity to amend, *Zimmerman v. Bornick*, 25 F.4th 491, 494 (7th Cir. 2022), the dismissal is without prejudice.

### V. Motion to Strike

Finally, the Court considers Mead Johnson's motion to strike class allegations. It argues that the three proposed classes lack Article III standing and that differences in class members' injuries and differences in applicable state law mean that common questions will not predominate over individual questions, precluding certification under Rule 23(b)(3). [Dkt.

21 at 18–24.] Since the Court has granted the motion to dismiss, it declines to take a firm position as to the class allegations in the initial Complaint. Mead Johnson raises serious arguments that call into question whether the classes will ultimately be certified, and the Court encourages Plaintiffs to take these arguments into account for any amendment to the Complaint. The Court's preliminary view is that these challenges would be more appropriately addressed at the class certification stage, not on a motion to strike.

On standing, the Court has explained that the allegations that children became ill after consuming contaminated Nutramigen meets the injury in fact requirement. Setting the issue of economic injury aside, if class members or their children suffered physical illness, they have standing. The current would-be class representatives each have children who they allege were physically injured by Nutramigen, so they have standing to pursue their claims on behalf of the classes. The Seventh Circuit has cautioned that "a class should not be certified if it is apparent that it contains a great many persons who have suffered no injury at the hands of the defendant," *Kohen v. Pac. Inv. Mgmt. Co. LLC*, 571 F.3d 672, 677 (7th Cir. 2009) (citations omitted); [Dkt. 21 at 18–19], but since there is no Article III problem that applies across the board, the class can later be narrowed, if needed, based on evidence adduced in discovery. *Cf. Eddlemon v. Bradley Univ.*, 65 F.4th 335, 338–39 (7th Cir. 2023) (noting that class certification decisions must be made based on evidence, no allegations).

Regarding Mead Johnson's points about individualized injuries and differences in governing law, these problems may preclude classwide resolution on all aspects of every claim, but this too appears to be a question better taken up later. When it is not possible to resolve an entire claim on a classwide basis, Rule 23(c)(4) may enable litigating discrete issues as a class, with individual proceedings to follow. *See Bennett v. Dart*, 53 F.4th 419, 420 (7th Cir. 2022) (per curiam); *Butler v. Sears, Roebuck & Co.*, 727 F.3d 796, 800 (7th Cir. 2013). Relatedly, once they know more about who is in the class and which states' law applies to their claims, Plaintiffs can decide how best to proceed. States with similar legal requirements might be able to be grouped together in subclasses, and class members in some states or with some types of claims might need to proceed on an individual basis.

**\*9** Plaintiffs' class allegations do not appear to be so facially deficient that striking them at this early stage is warranted. *See Robinson*, 2023 WL 5720873, at *9. At minimum, the Court is likely to permit at least some class discovery before shutting the door on class certification permanently. The Court emphasizes, however, that its views on these issues are preliminary. If Mead Johnson wishes to renew its motion to strike in the event that Plaintiffs file an amended complaint, it may do so.

## VI. Conclusion

For the foregoing reasons, Mead Johnson's motion to dismiss for lack of subject-matter jurisdiction is denied; its motion to dismiss Tan's claims for lack of personal jurisdiction is granted; and its motion to dismiss for failure to state a claim is granted as to Harden's claims, which are dismissed without prejudice, and denied as moot as to Tan's claims. Mead Johnson's motion to strike class allegations is denied without prejudice, as is Plaintiffs' motion to appoint interim class counsel.

Because the Court's holding that Mead Johnson is not subject to general jurisdiction in Illinois may impact whether Plaintiffs wish to proceed in this forum, [10] the Court will not set an amendment deadline at this time. Instead, by separate order it will provide the parties a date by which to submit a joint status report proposing next steps.

[10]    *See, e.g.*, Andrew D. Brandt & D. Theodore Rave, *Aggregation on Defendants' Terms: Bristol-Myers Squibb and the Federalization of Mass-Tort Litigation*, 59 B.C. L. Rev. 1251, 1287 (2018) ("[I]n federal court, as in state court, if plaintiffs want to bring a multistate class action, most of the time they will likely have to do so in a forum that has general jurisdiction over the defendant ....").

### All Citations

Slip Copy, 2024 WL 2882214

---

**End of Document**    © 2025 Thomson Reuters. No claim to original U.S. Government Works.

2025 WL 973614
Only the Westlaw citation is currently available.
United States District Court, S.D.
Mississippi, Northern Division,
Northern Division.

DO NO HARM, Plaintiff,
v.
NATIONAL ASSOCIATION OF EMERGENCY
MEDICAL TECHNICIANS, Defendant.

Cause No. 3:24-CV-11-CWR-LGI
|
Signed March 31, 2025

**Attorneys and Law Firms**

C'Zar David Bernstein, Pro Hac Vice, Cameron T. Norris, Pro Hac Vice, Frank H. Chang, Pro Hac Vice, Thomas R. McCarthy, Pro Hac Vice, Consovoy McCarthy, PLLC, Arlington, VA, Emily S. Nobile, Emily S. Nobile, Attorney, Gulfport, MS, for Plaintiff.

Richard Jarrad Garner, Mary Clark Joyner, Adams and Reese, LLP, Ridgeland, MS, for Defendant.

## ORDER

Carlton W. Reeves, UNITED STATES DISTRICT JUDGE

**\*1** Before the Court is National Association of Emergency Medical Technicians' ("NAEMT's") motion to dismiss the amended complaint. Docket No. 23. For the reasons that follow, the motion is due to be denied.

**I. Factual and Procedural History**
Plaintiff Do No Harm "is a nationwide membership organization consisting of healthcare professionals, students, patients, and policymakers who want to protect healthcare from radical, divisive, and discriminatory ideologies." Docket No. 20 at 2. It advocates against the "woke takeover" of healthcare and disavows *all* efforts to promote diversity, equity, and inclusion within the profession. *See The Woke Establishment Reacts to Do No Harm*, DO NO HARM (May 9, 2022), https://donoharmmedicine.org/2022/05/09/the-woke-establishment-reacts-to-do-no-harm (emphasis added).

Defendant NAEMT, meanwhile, "is a national association of emergency medical responders, such as paramedics, emergency medical technicians, and other medical professionals who provide urgent medical care." Docket No. 20 at 3. It is open to current and former members of the profession, along with students interested in pursuing a career in emergency medical services. It has established several scholarships to help students cover the expenses associated with their respective program. *See Scholarships*, NAEMT, https://www.naemt.org/resources/scholarships (last visited Mar. 25, 2025).

At some point, NAEMT recognized what it perceived to be a gap—that the EMS profession failed to reflect the communities its professionals were called to serve. In other words, NAEMT realized that the profession was more white than America. So, it chose to use *one* of its scholarships to attempt to rectify this issue. Put into perspective, no more than four of the nearly 17,000 students expected to enroll in EMS related courses would receive this scholarship. *See* Matthew Ball et al., *Paramedic Educational Program Attrition Accounts for Significant Loss of Potential EMS Workforce*, J. AM. COLL. EMERGENCY PHYSICIANS (Apr. 6, 2023), https://www.jacepopen.com/article/S2688-1152(24)00094-8/fulltext.

Since 2021, this program has awarded up to four scholarships of $1,250 each, which recipients may use towards tuition, fees, and books. This scholarship is awarded based on a recipient's "commitment to entering the EMS profession, financial need, service to the community, and ability to serve as a positive ambassador for the EMS profession." Docket No. 20 at 3 (cleaned up). The scholarship's guidelines do not list race as a factor; however, the selection process states that NAEMT "will" award the scholarship to students of color. *See* Docket No. 1-1. Upon being awarded the scholarship, recipients must:

- Begin the educational program in the term for which the award is granted;

- Fully complete the EMS program for which the scholarship is awarded;

- Maintain passing grades and remain in good standing throughout the course of study;

- Seek certification by testing upon completion of their EMS educational program and;

**\*2** • Provide follow up information and respond to NAEMT requests pertaining to their education and career.

Docket No. 20 at 4 (cleaned up). If a recipient withdraws or discontinues their program for reasons within their control, they must return any scholarship funds received.

In this case, Do No Harm challenges NAEMT's diversity scholarship. In its amended complaint, filed on March 4, 2024, it alleges that (1) NAEMT operates "a race-based 'diversity' scholarship that awards money only to 'students of color,' " (2) the scholarship program "flatly" excludes white students, and (3) the program violates 42 U.S.C. § 1981. *Id.* at 1, 6.

Do No Harm specifically seeks to vindicate the rights of a member whom it identifies as "Member A," a student it claims "is being harmed by NAEMT's racially discriminatory scholarship." *Id.* at 7. It says Member A is a white woman who satisfies the nonracial scholarship criteria and would apply for the scholarship, but for her racial background.

NAEMT has now moved to dismiss the amended complaint. The parties' respective positions are discussed below.

## II. Legal Standard

A defendant may move to dismiss a complaint for "failure to state a claim upon which relief can be granted." Fed. R. Civ. P. 12(b)(6). To survive a motion to dismiss, a complaint "must contain a short and plain statement of the claim showing that the pleader is entitled to relief." Ashcroft v. Iqbal, 556 U.S. 662, 677-78 (2009) (cleaned up). Additionally, the plaintiff's claims must be plausible on their face, which means there is "factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* at 678 (cleaned up). The Court must accept the plaintiff's factual allegations as true and make reasonable inferences in the plaintiff's favor. Johnson v. Harris Cnty., 83 F.4th 941, 945 (5th Cir. 2023) (quotation marks omitted). It need not, however, accept "threadbare recitals of the elements of a cause of action; conclusory statements; and naked assertions devoid of further factual enhancement." *Id.*

## III. Discussion

NAEMT first contends that Do No Harm lacks standing to pursue this action. It argues that Do No Harm cannot prove

an "injury in fact" without providing Member A's real name. NAEMT then argues that its diversity scholarship program—which is one of the many scholarships it offers—is lawful. Each argument is addressed below.

### A. Standing

"Standing to sue," the Supreme Court has explained, "is a doctrine rooted in the traditional understanding of a case or controversy." Spokeo, Inc. v. Robins, 578 U.S. 330, 338 (2016). It "ensure[s] that federal courts do not exceed their authority as it has been traditionally understood." *Id.* Furthermore, it "limits the category of litigants empowered to maintain a lawsuit in federal court to seek redress for a legal wrong." *Id.*

The "irreducible constitutional minimum" of standing requires that the plaintiff allege: (1) a direct, cognizable, injury in fact that is (2) fairly traceable to the defendant's conduct and is (3) likely to be redressed by a favorable decision from the court. Lujan v. Defenders of Wildlife, 504 U.S. 555, 560-61 (1992). An injury in fact is an "invasion of a legally protected interest which is (a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical." *Id.* (cleaned up).

**\*3** An organization may have standing to litigate a case "solely as the representative of its members." Students for Fair Admission v. President and Fellows of Harvard Coll., 600 U.S. 181, 199 (2023). An organizational plaintiff has standing when: "(a) its members would otherwise have standing to sue in their own right; (b) the interests it seeks to protect are germane to the organization's purpose; and (c) neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit." *Id.* (quoting Hunt v. Wash. State Apple Advert. Comm'n, 432 U.S. 333, 343 (1977)).

### 1. Injury in Fact

NAEMT argues that Do No Harm cannot pursue this case because it has not identified—by name—at least one member with standing. It relies on Summers v. Earth Island Institute, 555 U.S. 488 (2009), for that proposition. Do No Harm responds that *Summers* is inapplicable at the pleading stage and, in the alternative, *Summers* does not require that a member be identified by name.

### a. *Summers* does not require Do No Harm to name Member A.

In *Summers*, an environmental case, the organizational plaintiffs pointed to Jim Bensman as an individual member who suffered an injury in fact. *Id.* at 495. NAEMT posits that the inclusion of Mr. Bensman's name reflects the requirement that an individual's name be pleaded. Respectfully, NAEMT is mistaken.

*Summers* tells us that an organizational plaintiff must "make specific allegations establishing that at least one identified member had suffered or would suffer harm." *Id.* at 498 (citing *Lujan*, 405 U.S. at 563). That showing failed because Mr. Bensman's allegations were either based on past injures or were speculation that he could be harmed by an unspecified future action. *Id.* at 495-96.

*Summers* is concerned with whether an individual member's injuries are concrete and particularized, not whether an individual member's name is pleaded or otherwise discernable. *Id.* at 496. It does not definitively answer the more precise question raised today: whether an organizational plaintiff must identify its affected member *by name.*

Courts interpreting *Summers* have found that an organizational plaintiff need not identify a member by name. *E.g., Am. All. for Equal Rts. v. Fearless Fund Mgmt., LLC*, 103 F.4th 765, 773 (11th Cir. 2024); *Do No Harm v. Pfizer, Inc.*, 126 F.4th 109 (2d Cir. 2025).

The Fifth Circuit has interpreted *Summers* even more liberally. In *National Infusion Center Association v. Becerra*, 116 F.4th 488, 497 n.5 (5th Cir. 2024), the court reasoned that an organizational plaintiff can have standing by simply alleging the member's existence; "[a]lleging that a specific member exists does not require naming that member."

Given this precedent, Do No Harm is not required to identify by name its member who has suffered the alleged harm, because its claims rest on alleged harm to a specific member. It has satisfied its burden at this stage by building its case around Member A.

### b. Do No Harm has plausibly alleged that Member A's injury is concrete and particularized.

NAEMT then argues that Member A has not shown a concrete and particularized injury. It finds Member A's argument —that she *would* compile and submit an application if it removed the racial criteria—too speculative to proceed and observes that she has not been prevented from applying to the program. NAEMT relies, in part, on *Carney v. Adams*, 592 U.S. 53 (2020), for its argument that speculative injuries cannot sustain Do No Harm's burden at the pleading stage.

**\*4** Do No Harm sees it differently. In its view, NAEMT misreads *Carney*. It believes that Member A has adequately shown that her race limits her ability to apply for the scholarship.

It is well-established that a plaintiff's alleged injury must be "(a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical." *Lujan*, 504 U.S. at 560. Future injuries can provide the basis for standing only if they are "certainly impending." *Id.* at 565 n.2.

In these situations, proposed plaintiffs may establish standing by showing they are "able and ready" to apply for the scholarship if the alleged discriminatory criterion is lifted. *Carney*, 592 U.S. at 60; *see also Gratz v. Bollinger*, 539 U.S. 244, 262 (2003). The "able and ready" requirement is concerned with whether a prospective plaintiff has "come forward with some supporting facts indicating a likelihood that she will actually take the proscribed action." *Fearless Fund*, 103 F.4th at 772.

The Supreme Court examined this requirement in *Carney*. There, the plaintiff challenged a state law that required him to declare a party affiliation before running for certain judgeships. 592 U.S. at 60. Evidence presented during the summary judgment phase revealed that the plaintiff had neither applied for any vacant position for which he was eligible, nor had he cited any vacancies he would apply for in the near future. *Id.* at 60-63. There had been at least 14 open positions that he was eligible for but had not applied for. Yet he maintained that the party affiliation requirement infringed on his ability to apply, and therefore constituted an injury in fact.

The Court held that the plaintiff failed to establish standing. Its decision relied, in part, on three essentially-factual considerations: (1) the plaintiff had not applied for any position or taken efforts to determine likely openings, (2) the context of the case showed a generalized grievance, not an actual desire to become a judge, and (3) the plaintiff had

merely stated his intent to apply for a position if the allegedly unlawful requirement was lifted. *See id.* at 64.

Turning back to this case, after accepting the facts as true, as the Court must at this stage, Member A has shown that she is "able and ready" to apply for NAEMT's diversity scholarship. Unlike the plaintiff in *Carney* who could not point to a specific judgeship he sought to fill, Member A has named the specific scholarship for which she intends to apply. Crediting her assertions, she has not expressed a passing desire to apply for scholarships but remains committed to applying for NAEMT's diversity scholarship if the allegedly unlawful criterion is lifted.

This case is still in its infancy. Further proceedings may reveal that Member A's assertions are, indeed, closer to the *Carney* plaintiff's "generalized grievances." Member A states that her father has "set aside money" for her education that she simply cannot access because they are "estranged." Docket No. 8-1 at 2. But while she maintains that she has "demonstrated financial need," she has not expressed an interest in NAEMT's scholarships that do not consider race. *Id.* Those matters, though, are better left for discovery.

**\*5** The standard of the day requires the Court to draw reasonable factual inferences in favor of the plaintiff. Because Do No Harm has plausibly alleged that she is able and ready to apply for the diversity scholarship, it has established standing at this stage of the case. [1]

[1]     NAEMT also argues that Do No Harm lacks standing under *Domino's Pizza, Inc. v. McDonald*, 546 U.S. 470, 476 (2000), which precludes organizations from litigating current or future contracts they are not parties to. Docket No. 24 at 10. This Court is unaware of other courts interpreting *Domino's* in such a way and declines to do so here. It notes only that NAEMT's reading clashes with the Supreme Court's precedent on organizational standing.

### B. The Merits

Section 1981 guarantees all persons within the United States "the same right ... to make and enforce contracts, to sue, be parties, give evidence, and to the full and equal benefit of all laws and proceedings for the security of persons and property as is enjoyed by white citizens." 42 U.S.C. § 1981(a).

In passing the statute, "Congress established a rule for newly freed slaves by giving them the 'same right' to make and enforce contracts and to buy and sell property 'as is enjoyed by white citizens.' " *Jam v. Int'l Fin. Corp.*, 586 U.S. 199, 208 (2019) (cleaned up). This financial protection was crucial to the resolution and yes, reconstruction of society after the Civil War, as it reflected Congress's desire to "grant the Freedmen basic economic rights—to make and enforce contacts, to sue and be sued, and to purchase and lease property." Barry Sullivan, *Historical Reconstruction, Reconstruction History, and the Proper Scope of Section 1981*, 98 YALE L.J. 541, 550 (1989). The statute's reach extends beyond government contracts; it also "forbids racial discrimination in the making and enforcement of private contracts." *Bobo v. ITT, Cont'l Banking Co.*, 662 F.2d 340, 342 (5th Cir. 1981); *see Runyon v. McCrary*, 427 U.S. 160, 168 (1976).

"To succeed on a § 1981 claim, a plaintiff must establish '(1) that she is a member of a racial minority; (2) that the defendant had intent to discriminate on the basis of race; and (3) that the discrimination concerned one or more of the activities enumerated in the statute.' " *Arguello v. Conoco, Inc.*, 330 F.3d 355, 358 (5th Cir. 2003) (quoting *Morris v. Dillard Dep't Stores, Inc.*, 277 F.3d 743, 751 (5th Cir. 2001)).

NAEMT raises two grounds for dismissal on the merits. It first urges that because Member A, by her own admission, is not a member of a racial minority, she cannot sustain a § 1981 claim. Second, NAEMT regurges its position that Member A has not been prevented from applying for the diversity scholarship. It submits that its "advertising criteria" denies no one—including Member A—the ability to apply for another EMS course, financial aid and other scholarships, or for student membership in NAEMT. In its view, Member A simply chose not to apply for the diversity scholarship.

NAEMT's first argument will succeed or fail depending on the lens of constitutional interpretation appellate judges will ultimately decide to apply to this case. Under "the text, history, and tradition test" that the Court has embraced rigidly in Second Amendment cases, NAEMT will likely succeed. *New York State Rifle & Pistol Ass'n, Inc. v. Bruen*, 597 U.S. 1, 79 (2022) (Kavanaugh, J., concurring).

**\*6** The text, history, and tradition of § 1981 favor NAEMT. The statutory text reveals § 1981 to be a color-conscious law: it expressly says that all persons have the same rights to make contracts as "white persons." Since "only the words on the page constitute the law adopted by Congress and approved by

the President," and judges cannot "add to, remodel, update, or detract from old statutory terms inspired only by extratextual sources and our own imaginations," then NAEMT might be onto something, as the words of § 1981 imply that white persons cannot sue under it. *Bostock v. Clayton Cnty., Ga.*, 590 U.S. 644, 654-55 (2020).

Any fair reading of history confirms as much. "Our country has never been colorblind." *SFFA*, 600 U.S. at 385 (Jackson, J., dissenting). From its very founding—with that odious three-fifths clause—our Nation saw centuries of race-based laws that explicitly sanctioned violence and discrimination against racial minorities.[2] The history further shows that laws like § 1981 were not intended to provide a "preference" for racial minorities.[3] That concept simply did not exist.[4] Instead, they were informed attempts to provide the formerly-enslaved with the same rights and opportunities as their fellow Americans.

[2]    *See* Sandra L. Rierson, *Tracing the Roots of the Thirteenth Amendment*, 91 UMKC L. REV. 57, 71 (2022) ("The Three-Fifths Clause is the most obvious example of the Constitution's formal recognition of the institution of slavery.").

[3]    *See Jones v. Alfred H. Mayer Co.*, 392 U.S. 409, 427 (1968).

[4]    *See* Nancy Leong, *Enjoyed by White Citizens*, 109 GEO L.J. 1421 (2021); see *also* Zamir Ben-Dan, *Deeply Rooted in American History and Tradition: The U.S. Supreme Court's Abysmal Track Record on Racial Justice and Equity*, 15 ALA. C.R. & C.L. L. REV. 45, 55 (2024).

The problem with an appeal to text, history, and tradition, though, is that in 1976, the Supreme Court effectively rewrote § 1981. It held, notwithstanding the text passed by Congress and signed into law by the President, that § 1981 protects "all persons" regardless of race. *McDonald v. Santa Fe Trail Transp. Co.*, 427 U.S. 273, 286 (1976). In line with *McDonald's* command, the Fifth Circuit has affirmed judgment in favor of a white plaintiff who brought his case under § 1981. *See Chaline v. KCOH Inc.*, 693 F.2d 477 (5th Cir. 1982).

This Court is bound by *McDonald*. It applies it faithfully here. There is no requirement that Member A be a member of a specific race to bring her claim. NAEMT's textual argument is, however, preserved for further review.

As for NAEMT's second contention, this Court agrees with the Eleventh Circuit's analysis of a similar argument in *Fearless Fund. See* 103 F.4th at 777. Member A alleges that she was denied the opportunity to compete on equal footing with applicants of color because of her race. If proven to be true—and the applicable standard requires us to presume its truth today—NAEMT's diversity scholarship would pose a race-based barrier to Member A that may violate § 1981.

## IV. Conclusion

The burden at this stage requires the Court to accept Do No Harm's factual allegations as true and draw reasonable factual inferences in its favor. Applying that standard, Do No Harm has met its burden, and NAEMT's motion must be denied.

Within 10 days, the parties shall contact the chambers of the U.S. Magistrate Judge to coordinate a scheduling conference.

**SO ORDERED**, this the 31st day of March, 2025.

### All Citations

Slip Copy, 2025 WL 973614

---

End of Document                    © 2025 Thomson Reuters. No claim to original U.S. Government Works.

2024 WL 3730623

2024 WL 3730623
Only the Westlaw citation is currently available.
United States District Court, M.D.
Tennessee, Nashville Division.

DO NO HARM, a nonprofit corporation
incorporated in the State of Virginia, Plaintiff,
v.
William LEE, in his official capacity as
Governor of the State of Tennessee, Defendant.

No. 3:23-cv-01175
|
Filed August 8, 2024

**Attorneys and Law Firms**

Daniel J. Turklay, Daniel Turklay, Lebanon, TN, Joshua
P. Thompson, Pacific Legal Foundation, Sacramento, CA,
Laura D'Agostino, Pacific Legal Foundation, Arlington, VA,
for Plaintiff.

Reed Neal Smith, Trenton Meriwether, Tennessee Attorney
General's Office, Nashville, TN, for Defendant.

## MEMORANDUM

WILLIAM L. CAMPBELL, JR., CHIEF UNITED STATES
DISTRICT JUDGE

**\*1** Pending before the Court is a motion to dismiss the
amended complaint filed by Defendant William Lee (Doc.
No. 25), to which Plaintiff filed a response (Doc. No. 26),
and Defendant filed a reply (Doc. No. 30). Plaintiff also filed
a notice of supplemental authority (Doc. No. 32), to which
Defendant responded (Doc. No. 33).

For the reasons stated herein, the motion will be **GRANTED**.

## I. BACKGROUND

The Tennessee Board of Podiatric Medical Examiners (the
"Board") was established almost one hundred years ago to
regulate the practice of podiatry in Tennessee. (Am. Compl.,
Doc. No. 23, ¶ 20). The duties of the Board include licensing
qualified podiatrists, investigating allegations of misconduct,
disciplining podiatrists that violate its rules or regulations,

and interpreting the laws, rules, and regulations governing
podiatry in Tennessee. (*Id.*, ¶ 21). The Board is comprised of
six members appointed by the Governor of Tennessee. (*Id.*
¶ 21). Four of those members must be licensed Tennessee
podiatrists who have been regulated by the Board for at least
two years. (*Id.* (citing Tenn. Code Ann. § 63-3-103)). A fifth
member must be a licensed orthotist, prosthetist, or pedorthist.
(*Id.* (citing Tenn. Code Ann. § 63-3-213)). A sixth member
must be a citizen who does not engage in any conduct that
is regulated by the Board. (*Id.* (citing Tenn. Code Ann. §
63-1-124)).

When making appointments to boards, committees, and other
governing or advisory entities of the executive branch of
state government, including the Board of Podiatric Medical
Examiners, the Governor "shall strive to ensure that at least
one (1) such citizen serving on each such board, commission,
committee, or other governing or advisory entity is sixty (60)
years of age or older and that at least one (1) such citizen
serving on each such board, commission, committee, or other
governing or advisory entity is a member of a racial minority."
Tenn. Code Ann. §§ 8-1-111, 63-3-103(b).

Plaintiff Do No Harm is a national nonprofit corporation
headquartered in Glen Allen, Virginia. (Doc. No. 23, ¶ 9). Its
mission is "to protect healthcare from a radical, divisive, and
discriminatory ideology." (*Id.*). Do No Harm states that it has
more than 6,000 members, including one or more individuals
who have been a licensed podiatrist for over two years in
Tennessee, and one or more individuals who are Tennessee
citizens who do not engage in any profession or business
activity subject to regulation by the Board. (*Id.*).

Two of these members are identified in the Amended
Complaint as "Member A" and "Member B." (*Id.*, ¶¶ 10, 11).
Plaintiff states that Member A has been a licensed podiatrist
in Tennessee for over thirty years and is not a member of a racial
minority. (*Id.*, ¶ 10). Member B is a Tennessee citizen who has
resided in Tennessee for over 27 years; he does not engage
in any profession, business, or activity subject to regulation
by the Board; and he is not a member of a racial minority.
(*Id.*, ¶ 11). Plaintiff states that Member A and Member B are
qualified, willing, and able to be appointed to the Board of
Podiatric Medical Examiners. (*Id.*, ¶¶ 10, 11).

**\*2** Plaintiff Do No Harm bring this suit challenging the
constitutionality of Tenn. Code Ann. §§ 8-1-111, 63-3-103(b).
Plaintiff contends the statutory mandate for the Governor to
"strive to ensure" that the Board includes at least one member

**Do No Harm v. Lee, Slip Copy (2024)**

2024 WL 3730623

of a racial minority violates the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution.

Defendant moves to dismiss the amended complaint under Federal Rule of Civil Procedure 12(b)(1) for lack of subject matter jurisdiction. Specifically, Defendant argues Do No Harm Lacks standing because: (1) it fails to identify a particular member the challenged laws have allegedly injured; (2) there is no cognizable injury to any members or to the organization; and (3) the claims are not ripe.

## II. STANDARD OF REVIEW

Rule 12(b)(1) "provides for the dismissal of an action for lack of subject matter jurisdiction." *Cartwright v. Garner*, 751 F.3d 752, 759 (6th Cir. 2014). "If the court determines at any time that it lacks subject-matter jurisdiction, the court must dismiss the action." Fed. R. Civ. P. 12(h)(3). "A Rule 12(b)(1) motion for lack of subject matter jurisdiction can challenge the sufficiency of the pleading itself (facial attack) or the factual existence of subject matter jurisdiction (factual attack)." *Id.* at 759. Where a Rule 12(b)(1) motion challenges subject matter jurisdiction based on the face of the complaint, the plaintiff's burden is "not onerous." *Musson Theatrical Inc. v. Fed. Express Corp.*, 89 F.3d 1244, 1248 (6th Cir. 1996). A court evaluating this sort of facial attack to the assertion of subject matter jurisdiction must consider the allegations of fact in the complaint to be true and evaluate jurisdiction accordingly. *Gentek Bldg. Prods., Inc. v. Sherwin-Williams Co.*, 491 F.3d 320, 330 (6th Cir. 2007).

"When a Rule 12(b)(1) motion attacks the factual basis for jurisdiction, the district court must weigh the evidence." *Am. Telecom Co. v. Republic of Lebanon*, 501 F.3d 534, 537 (6th Cir. 2007). The Court has broad discretion with respect to what evidence to consider in deciding whether subject matter jurisdiction exists, including evidence outside of the pleadings. *Cartwright*, 751 F.3d at 759-60; *see also, Gentek Bldg. Prods., Inc. v. Sherwin-Williams Co.*, 491 F.3d 320, 330 (6th Cir. 2007) (allowing consideration of "affidavits, documents, and even a limited evidentiary hearing"). Under either standard, the plaintiff bears the burden to establish that subject matter jurisdiction exists. *Cartwright*, 751 F.3d at 760.

Here, Defendant raises both facial and factual challenges to subject matter jurisdiction. Defendant challenges standing on the grounds that Plaintiff failed to name members is a facial challenge. Defendant's arguments that Plaintiff lacks a cognizable injury in fact and that the claim is not ripe present factual challenges.

## III. ANALYSIS

### A. Standing

Standing requires a plaintiff to show "(1) an injury in fact, (2) fairly traceable to the challenged conduct of the defendant, (3) that is likely to be redressed by the requested relief." *Fed. Election Comm. v. Cruz*, 596 U.S. 289, 296 (2022). As an organization, Do No Harm has standing to bring a claim when: (1) its members would otherwise have standing to sue in their own right, (2) the interests at stake are germane to the organization's purpose, and (3) neither the claim asserted, nor the relief requested, requires the participation of individual members in the lawsuit." *Students for Fair Admissions, Inc. v. President and Fellows of Harvard Coll.*, 600 U.S. 181, 199 (2023); *Ass'n of Am. Physicians & Surgeons v. USFDA*, 13 F.4th 531, 537 (6th Cir. 2021) (same).

**\*3** Defendant first argues Plaintiff has not established standing to sue on behalf of its members because the Amended Complaint fails to identify (by name) any member who has been injured. (Doc. No. 25-1 at 5-6). Plaintiff provides numerous circuit court opinions that, according to Plaintiff, allow for organizational standing based on members proceeding under pseudonyms. (Doc. No. 26 at 4-7; Doc. No. 32 at 1-2). Defendant relies on other cases, but those standing cases were not decided on the basis of pseudonyms, but instead on other standing and pleading grounds. *See Summers v. Earth Island Inst.*, 555 U.S. 488, 493 (2009) (allegations of generalized harm to members); *Ass'n of Am. Physicians & Surgeons v. United States Food and Drug Admin.*, 13 F.4th 531, 543 (6th Cir. 2021) (alleged injury to members was not caused by defendant); *Protecting Air for Waterville v. Ohio Env't Prot. Agency*, 763 F. App'x 504 (6th Cir. 2019) (failure to demonstrate individual members suffered concrete injury); *Waskul v. Washtenaw Cnty. Cmty. Mental Health*, 900 F.3d 250 (6th Cir. 2018) (no standing to seek injunctive relief for unspecified unnamed members when the specified named members were ineligible for relief); *Mich. Ass'n of Pub. Sch. Acads. v. United States Dep't of Ed.*, No. 1:22-cv-712, 2024 WL 455079, at \* 4 (W.D. Mich. Jan. 10, 2024) (failure to identify which members of the organization were directly injured); *Friends of George's, Inc. v. Mulroy*, No. 2:23-cv-02163, 2023 WL 3790583 (W.D. Tenn. Jun. 2, 2023) (holding the organization had standing to bring claims based on injury to the organization (organizational standing) but not

2024 WL 3730623

standing based on injury to members (association standing) because it failed to identify any member who would suffer injury), *rev'd and remanded*, 2024 WL 3451870 (6th Cir. Jul. 18, 2024) (finding no showing of pre-enforcement injury); *Prairie Rivers Network v. Dynegy Midwest Generation, LLC*, 2 F.4th 1002, 1010 (7th Cir. 2021) (plaintiff identified harm to members "only as a collective").

Defendant asks the Court not to follow as persuasive the recent Tenth Circuit case *Speech First, Inc. v. Shrum*, 92 F.4th 947 (10th Cir. 2024).[1] In that case, the Tenth Circuit held that an organization can base standing on the harms allegedly done to its members, even those proceeding under pseudonyms, absent a showing of reason to disbelieve the facts and declarations relevant to the requirements of standing. *Id.* at 950 (citing *Roe v. Wade*, 410 U.S. 113 (1973); *Doe v. Bolton*, 410 U.S. 179, 187 (1973); *FAIR v. Rumsfeld*, 291 F. Supp. 2d 269, 286 n.6 (D.N.J. 2003), *aff'd on standing issue sub nom.*, *Rumsfeld v. FAIR*, 547 U.S. 47, 52 n.2 (2006)).

[1]  Part of Defendant's argument was that *Speech First v. Schrum* was an unpublished decision, which was true at the time of the briefing. The case has since been published. 92 F.4th 947 (10th Cir. 2024) (filed February 9, 2024).

Defendant relies on *Tennessee Republican Party v. Securities and Exchange Commission*, 863 F.3d 507 (6th Cir. 2017), for the proposition that member of organizations must be named in order for the organization to have standing to sue based on alleged injury to its members. That case, however, did not involve the use of pseudonyms, and the Supreme Court authority cited by the court was addressing purported organizational standing not anchored in an allegation of harm to a specific member, but instead based on generalized harm based on speculation that members may be harmed in the future. *Id.* at 520 (citing *Summers v. Earth Island Inst.*, 555 U.S. 488, 498 (2009)).

Without a showing that the representations concerning Member A and Member B in the Amended Complaint (Doc. No. 23, ¶¶ 10, 11) and the Rasmussen Declaration (Doc. No. 26-1, ¶¶ 6, 7)) are inaccurate, and given the long history of allowing parties to proceed under pseudonyms, the Court finds that Plaintiff has sufficiently identified members who are alleged to have standing in their own right.[2] *See NAACP v. Alabama ex rel. Patterson*, 357 U.S. 449, 458-59 (1958) (anonymous status of association's members posed no standing hurdle); *Rumsfeld*, 547 U.S. at 52 n.2

(finding the plaintiff organization had standing even though its membership list was secret).

[2]  If information later comes to the Court's attention that calls into question whether the two members have standing to sue in their own right, the Court will revisit standing.

**B. Injury in Fact and Ripeness**

  1. The Legal Standard

**\*4**  As discussed above, to satisfy Article III standing, a plaintiff must show, among other things, that it, or, in this case, its members, suffered an "injury in fact," which can be "actual present harm or a significant possibility of future harm." *Sumpter v. Wayne Cty.*, 868 F.3d 473, 490 (6th Cir. 2017); *Thomas More Law Center v. Obama*, 651 F.3d 529, 535 (6th Cir. 2011), *abrogated as to other issues by Nat'l Fed'n of Indep. Bus. v. Sebelius*, 567 U.S. 519 (2012). "In the context of claims for injunctive or declaratory relief, 'a plaintiff must show that he is under threat of suffering 'injury in fact' that is concrete and particularized,' and that 'threat must be actual and imminent, not conjectural or hypothetical[.]' " *Sumpter*, 868 F.3d at 491 (citing *Summers*, 555 U.S. at 493).

The doctrine of ripeness originates from the same Article III limitation as standing. *Doe v. Univ. of Mich.*, 78 F.4th 929, 941 (6th Cir. 2023). In order to establish that a claim is "ripe for judicial resolution," the court considers: (1) whether the claim is " 'fit[ ] ... for judicial decision' in the sense that it arises in a concrete factual context and concerns a dispute that is likely to come to pass?" and (2) "the hardship to the parties of withholding court consideration[.]" *Id.* at 942 (citing *Warshak v. United States*, 532 F.3d 521, 525 (6th Cir. 2008) (en banc)). Similar to the considerations for an injury in fact, "[a] claim is not ripe for adjudication if it rests upon 'contingent future events that may not occur as anticipated, or indeed may not occur at all.' " *Id.* (citing *Texas v. United States*, 523 U.S. 296 (1998)). Sometimes standing and ripeness both "boil down to the same question" – whether the plaintiff suffered an injury in fact. *Id.* ("Ripeness requires that the injury in fact be certainly impending."); *see also, Thomas More Law Center*, 651 F.3d at 537 (noting that reasoning in ripeness decisions applies equally to questions of standing when the Article III question concerns the imminence of the plaintiff's injury). This is such a case.

The Sixth Circuit has explained that the "imminence" of the plaintiff's injury depends not on temporal proximity,

but on the probability that "an event will come to pass." *Thomas More Law Center*, 651 F.3d at 536. Of course, "[t]he uncertainty that the event will come to pass may be based on developments that may occur during a gap in time between the filing of a lawsuit and a threatened future injury." *Id.* (citing *520 S. Mich. Ave. Assocs., Ltd. v. Devine*, 433 F.3d 961, 962 (7th Cir.2006) ("Standing depends on the probability of harm, not its temporal proximity.")). But the significance of the inquiry is the certainty of the injury, not temporal proximity. *Id.* ("[I]t is well settled that a time delay, without more, will not render a claim of statutory invalidity unripe if the application of the statute is otherwise sufficiently probable.") (citing *Riva v. Massachusetts*, 61 F.3d 1003, 1011 (1st Cir. 1995)).

### 2. The Statutes

As an initial matter, determination of whether Member A and Member B have established an injury in fact resulting from the statutes depends on what the statutes require with regard to the Governor's consideration of race in appointments to the Board.[3] The Court beings, as it must with the statutes. The statute specific to the Board of Podiatric Medical Examiners provides that "the governor shall strive to ensure that ... at least one (1) person serving on the board is a member of a racial minority." *See* Tenn. Code Ann. § 63-3-103(b). The general statute, Tenn. Code Ann. § 8-1-111, uses substantially the same language.

[3]    The parties have not developed their argument concerning interpretation of the statutes. Their briefing on this issue consists of one paragraph in Plaintiff's response and one footnote in Defendant's reply. (Doc. No. 26 at 13; Doc. No. 30 at 4 n.4).

 **\*5** Defendant argues that the plain language of the statutes obligates the Governor to consider race of potential Board members to ensure at least one member of the Board is a member of a racial minority, and that once the Board has "at least one" racial minority "there is nothing more to ensure" and the statute has no further effect. (Doc. No. 30 at 4, n.4; *see also*, Doc. Nos. 25-1 and 30 throughout). In Plaintiff's view, the statute requires the Governor to "weigh and consider a candidate's race for every appointment" regardless of the composition of the Board because "at least one" "establishes a baseline, not a limit." (Doc. No. 26 at 13).

Defendant has the better argument. The Court agrees with Plaintiff that "at least one" sets a baseline, not a limit. But, to the extent that "shall strive to ensure" places any affirmative

obligation on the Governor (neither Plaintiff, nor Defendant argue otherwise), that obligation ends when there is "at least one" person serving on the Board who is a member of a racial minority. Any further consideration by the Governor of the racial composition of the Board is purely discretionary.

### 3. Injury in Fact

Defendant argues neither Member A nor Member B can show standing because "no foreseeable openings for the Board are subject to the challenged acts until at least 2027." Defendant asserts that because a racial minority is a current board member whose term will expire in 2027, any appointments between now and then will be unaffected by the relevant statute. (*Id.* at 9-10). Defendants add that even then, the alleged harm may never come to pass for a number of reasons: the members may no longer be ready, willing, and able to serve on the Board; the General Assembly may amend the statutes; or the Governor may appoint other racial minorities to the Board, such that the statutory obligation to "strive to ensure" there is "at least one" racial minority on the Board may never be triggered. (*Id.* at 10-11). Defendant notes that between now and 2027, four Board seats will become available and any alleged harm to Members A and B will come to pass if, and only if, each of those open Board seats are filled by non-minorities. Defendant states that in the past, two racial minorities served on the Board at the same time and could very well do so in the future. (Doc. No. 30 (citing March 11, 2022 Board Minutes).[4,5]

[4]    The March 11, 2022 Board Minutes list as board members Dr. Ramesh Pavuluri and Dr. Bhekumuzi Khumalo. Defendant states that Dr. Pavuluri is Indian American and Dr. Khumalo is black. (*See* Supp. Decl. of Reed Smith, Doc. No. 30-2; Dr. Pavuluri's Application for Gubernatorial Appointment to a Board or Commission dated February 21, 2017, Doc. No. 30-3; Dr. Khumalo's undated application for Governor's Appointment, Doc. No. 30-4).

[5]    The March 11, 2022 Board Minutes are available at *https://www.tn.gov/content/dam/tn/ health/ healthprofboards/03-11-2022-Minutes.pdf*.

As discussed above, the imminence inquiry is more about the certainty that harm will come to pass than time, so the fact that all practitioner seats are currently filled is of no moment when the appointments are for limited terms and there is no question that the Governor will be called upon to appoint new Board

members. But the inquiry does not end there. While the time does not itself defeat standing, "developments that may occur during a gap in time" are relevant to the inquiry as to certainty. *Thomas More Law Center*, 651 F.3d at 536. Here, although it is certain that Board seats will become available, whether the statutes will be triggered based on the composition of the Board is unknowable.

 **\*6**  Plaintiff argues that members may come off the Board at "unpredictable times" – specifically that Dr. Khumalo may not remain on the Board until the end of his term – and contend that Board vacancies are not always timely publicized. (Doc. No. 26 at 12). Defendant responds by pointing to evidence that the term end dates are publicly available. (*See* Doc. No. 30 at 2; Doc. No. 25-1 at 3 (citing Bd. of Pod. Med. Examiners: Bd. Members List, Tenn. Dep't of Health *https://www.tn.gov/health/health-program-areas/ health-professional-boards/podiatric-board/podiatric- board/members.html* (showing term expiration dates)). Defendant argues that possibility of unanticipated openings is nothing but speculation. The Court agrees. The likelihood that a Board seat will become open before the end of a term just as speculative as the possibilities raised by Defendant that Members A and B may no longer be "ready, able, and willing, and able to serve on the Board" or that the legislature will

repeal the law. "[T]hese events are hardly probable and not the kinds of future developments that enter into the imminence inquiry." *Thomas More Law Center*, 651 F.3d at 537-38.

In sum, there is rampant speculation on both sides about whether there will be unscheduled Board openings and what the composition of the Board will be when openings occur. Plaintiff is correct that the possibility that a minority will be appointed between now and 2027 is no more than speculation. But, then again, so is the reverse. Either way, the certainty of injury to Members A and B is speculative. The speculation runs both ways, but the burden to establish standing lies with the Plaintiff. Here, the Plaintiff has not met that burden.

### IV. CONCLUSION

For the reasons stated herein, Defendant's Motion to Dismiss (Doc. No. 25) will be **GRANTED**. An appropriate Order will enter.

### All Citations

Slip Copy, 2024 WL 3730623

---

 © 2025 Thomson Reuters. No claim to original U.S. Government Works.

**WESTLAW**  © 2025 Thomson Reuters. No claim to original U.S. Government Works.  5

2024 WL 98429
Only the Westlaw citation is currently available.
United States District Court, N.D. Illinois, Eastern Division.

Susan GOLDMAN and National
Association of Gun Rights, Plaintiffs,

v.

CITY OF HIGHLAND PARK, ILLINOIS, Defendant.

Case No. 22 C 4774
|
Signed January 9, 2024

**Attorneys and Law Firms**

Barry K. Arrington, Pro Hac Vice, Arrington Law Firm, Wheat Ridge, CO, Jason R. Craddock, Sr., Law Office of Jason R. Craddock, Oak Brook, IL, for Plaintiffs.

David Henry Hoffman, Caroline Anna Wong, Claire Grace Lee, Neil Harris Conrad, Paul J. Rogerson, Pro Hac Vice, Sidley Austin LLP, Chicago, IL, Hart M. Passman, Steven M. Elrod, Elrod Friedman LLP, Chicago, IL, Robert N. Hochman, Gass Turek, Milwaukee, WI, Douglas Neal Letter, Pro Hac Vice, Erin Davis, Pro Hac Vice, Shira Lauren Feldman, Pro Hac Vice, Brady United Against Gun Violence, Washington, DC, for Defendant.

Benjamin Adam Gifford, Pro Hac Vice, Institute for Constitutional Advocacy & Protection, Brooklyn, NY, James Patrick Durkin, Jeffrey E. Stone, McDermott Will & Emery LLP, Chicago, IL, Mary Beth McCord, Pro Hac Vice, Institute for Constitutional Advocacy and Protection, George, Washington, DC, for Amicus United States Conference of Mayors.

Mark W. Bina, Quarles & Brady LLP, Chicago, IL, Aaron R. Marcu, Pro Hac Vice, Covington & Burling, New York, NY, Timothy Howard, Pro Hac Vice, Freshfields Bruckhaus Deringer U.S. LLP, New York, NY, Jennifer Loeb, Pro Hac Vice, Freshfields Bruckhaus Deringer U.S. LLP, Washington, DC, for Amicus Giffords Law Center to Prevent Gun Violence.

Caesar A. Tabet, Jordan E. Wilkow, Tabet DiVito & Rothstein, LLC, Chicago, IL, for Amicus March for Our Lives Foundation.

William James Taylor, Jr., William J. Taylor, Jr., Pro Hac Vice, Everytown Law, New York, NY, David Adam Neiman,

Romanucci & Blandin, LLC, Chicago, IL, for Amicus Everytown for Gun Safety Everytown Law.

**MEMORANDUM OPINION AND ORDER**

Harry D. Leinenweber, Judge

## I. BACKGROUND

**\*1** In 2013, the City of Highland Park, Illinois ("Highland Park" or "the City") amended its City Code to prohibit assault weapons and large-capacity magazines. Soon after its enactment, the Code was challenged as unconstitutional under the Second Amendment. This Court rejected that challenge, and the Seventh Circuit affirmed in *Friedman v. City of Highland Park,* 784 F.3d 406 (7th Cir. 2015), *cert. denied,* 577 U.S. 1039 (2015). But the Supreme Court's recent decision in *New York Rifle Ass'n v. Bruen* has raised questions regarding the ongoing validity of *Friedman* in this Circuit. 597 U.S. 1 (2022). Thus, this case is akin to other post-*Bruen* Second Amendment challenges, both across the nation and in this District. *See Bevis. City of Naperville,* 85 F.4th 1175 (consolidated appeal of four related post-*Bruen* case); *Antonyuk v. Chiumento,* 2023 WL 8518003 (2nd Cir. 2023) (same).

Here, Plaintiff Susan Goldman ("Goldman"), a gun-owning resident of Highland Park, and Plaintiff National Association for Gun Rights ("NAGR"), a non-profit incorporated in Virginia with offices in Virginia, Colorado, and South Carolina, challenge the constitutionality of provisions contained in the City's 2013 amended Code which ban assault weapons and related accessories. Collectively, Goldman and NAGR ask the Court to: (1) declare declaratory judgment pursuant to 28 U.S.C. § 2201 that the challenged provisions, identified below, are facially unconstitutional; and (2) enter preliminary and injunctive relief enjoining Highland Park and its officers from enforcing the Code, as well as damages and other remedies available under U.S.C. §§ 1983 and 1988.

In response, Defendant Highland Park moved to dismiss NAGR from the suit for lack of standing under FRCP 12(b)(1) and moved to deny Goldman's requests for preliminary relief. The Court first considers the merits of Goldman's preliminary injunction, which, as explained below, the Court denies. The Court then turns to NAGR's standing and dismisses NAGR from further proceedings.

## II. Preliminary Injunction

### A. Legal Standard

A preliminary injunction is an "extraordinary remedy." *Bevis,* 85 F.4th 1175, 1188 (citing *Winter v. Nat. Res. Def. Council, Inc.,* 555 U.S. 7, 24 (2008)). To obtain this "drastic" remedy, the plaintiff bears the burden of showing "[1] that he is likely to succeed on the merits, [2] that he is likely to suffer irreparable harm in the absence of preliminary relief, [3] that the balance of equities tips in his favor, and [4] that an injunction is in the public interest." *Id.* (cleaned up). Plaintiffs can carry that burden only with a "clear showing" on each of the four factors, including in constitutional cases. *Troogstad v. City of Chicago,* 576 F.Supp. 3d 578, 583 (N.D. Ill. 2021) (denying preliminary injunction motion involving Due Process challenge), *aff'd sub nom., Lukaszczyk v. Cook Cnty.,* 47 F.4th 587 (7th Cir. 2022); *see also, e.g., Braam v. Carr,* 37 F.4th 1269, 1272 (7th Cir. 2022) (same for Fourth Amendment challenge); *Cassell v. Snyders,* 990 F.3d 539, 544–50 (7th Cir. 2021) (same for First Amendment challenge).

**\*2** Despite extensive briefing and attention brought to this case, which saw the submission of four amici, (see Dkt. Nos. 52, 59, 60, 62), *Bevis* makes the Court's analysis here simple and straightforward. Following *Bevis*'s command, the Court finds that Plaintiffs are unlikely to succeed on the merits.

### B. Analysis

"In a crisp, if not enigmatic, way, [the Second Amendment] says this: A well regulated Militia, being necessary to the security of a free State, the right of the people to keep and bear Arms, shall not be infringed.' " *Bevis,* 85 F.4th at 1188; U.S. CONST. amend. II. This right, however, is not an absolute bar to government regulation. *District of Columbia v. Heller,* 554 U.S. 570, 595 (2008) ("Of course the right was not unlimited, just as the First Amendment's right of free speech ..."). Instead, the Second Amendment pertains to "weapons in common use for self-defense." *Bevis,* 85 F.4th at 1192. In other words, it applies to "*weapons that were not specifically designed for military use and were not employed in a military capacity.*" *Id.* at 1193 (emphasis in original). Bearable arms, then, "extends only to weapons in common use for a lawful purpose. That lawful purpose ... is at its core the right to individual self-defense." *Id.*

When reviewing government regulation, the Court must first decide whether the Second Amendment's plain text covers an individual's conduct. *Id.* (citing *Breun,* 591 U.S. at 24). It is the plaintiffs' burden to demonstrate "that the weapons addressed in pertinent legislation are Arms that ordinary people would keep at home for self-defense purposes," as opposed to exclusive or predominate military use. *Id.* at 1194. If the weapons are indeed ordinarily kept for self-defense, then "the Constitution presumptively protects that conduct." *Id.* The analysis then moves to the second step, which requires a demonstration that the regulation is consistent with the Nation's historical tradition of firearm regulation. *Id.* While the Seventh Circuit has not affirmatively placed the burden of the second step on to the government, it did so in *Bevis*. *Id.* at 1198 ("We will assume (without deciding the question) that this is a step two inquiry, where the state bears the burden of proof.") Again, following the Seventh Circuit's command, this Court will place the burden of this step on the government. In any event, Plaintiffs' pursuit of an injunction must be denied.

#### 1. Protected Arms

Plaintiffs take issue with Chapter 136 of Highland Park's City Code (the "Code"), particularly §§ 136.001 and 136.005, which amended the City's Code to prohibit the manufacture, sale, and possession of assault weapons and large-capacity magazines within City limits. 136.001 of the Code defines "assault weapon," which includes semi-automatic rifles, pistols, and shotguns with certain features, such as semi-automatic rifles with the ability to accept a large-capacity magazine and at least one of the following: (1) a pistol grip without a shoulder stock; (2) a protruding grip for the non-trigger hand; (3) a folding, telescoping, or thumbhole stock; (4) a barrel shroud; or (5) a muzzle brake or compensator. "Large capacity magazines" are defined as ammunition-feeding devices that can accept more than 10 rounds of ammunition. *Id.* The Code also lists specific models of firearms it covers, including, for example, the AR-15, AK-47, Bushmaster XM15, MAC-10 and MAC-11 pistols, and Streetsweeper shotgun. *Id.*

**\*3** Plaintiffs here do not make much of their burden. Their core argument is that the banned weapons, including the magazines, are in common use which, they erroneously claim "is the end of the [Court's] analysis." (Pl. Susan Goldman for Preliminary Inj. at 9; Dkt. No. 7). They otherwise attempt

to distinguish AR-15s and other covered weapons from "machine guns" (*e.g.,* an M16), which are not protected by the Second Amendment, pointing to the fact that machine guns are fully automatic, whereas the covered assault weapons are semiautomatic. *Bevis,* 85 F.4th. at 1190 (citing *Heller,* 554 U.S. at 624-25) ("*Heller* deemed a ban on private possession of machine guns to be obviously valid."). *Bevis* forecloses this argument. In its two-to-one decision rejecting identical arguments furthered in dissent, the Seventh Circuit explained that the "only meaningful distinction" between the two is that "the AR-15 has only semiautomatic capability (unless the user takes advantage of some simple modifications that essentially make it fully automatic), while the M16 operates both ways." Hence:

> Coming directly to the question whether the weapons and feeding devices covered by the challenged legislation enjoy Second Amendment protection, at the first step of the Bruen analysis, we conclude that the answer is no. We come to this conclusion because these assault weapons and high-capacity magazines are much more like machineguns and military-grade weaponry than they are like the many different types of firearms that are used for individual self-defense (or so the legislature was entitled to conclude). Indeed, the AR-15 is almost the same gun as the M16 machinegun.

*Id.* at 1195.

Highland Park's Code directly mirrors the regulations considered in *Bevis,* which also banned pistol grips, detachable stocks, thumbholes, or other items that enhances the concealability of the weapon, as well as semiautomatic rifles with a fixed magazine capacity of greater than 10 rounds. *Compare Bevis,* 85 F.4th at 1183 *with* Highland Park City Code §§ 136.001 and 136.005. There is nothing that distinguishes Highland Park's assault weapon ban, and Plaintiffs have offered no reasons to otherwise distinguish AR-15s from military-grade weapons already outside the scope of Second Amendment protection. Plus, as Plaintiffs' now-moot motion to reassign noted, the Code at issue here was "modeled after the Cook County ordinance" that *Bevis*

already considered. (Memo. In Supp. of Mot. for Rule 40.4 Reassignment at 6; Dkt. No. 79). Hence, Plaintiffs have failed to show that they are likely to succeed on the merits of their Complaints because the Seventh Circuit has already considered and rejected in full identical arguments defended by identical arguments. While there is the possibility that AR-15 *as sold* is an Arm, neither the parties nor the evidence before us addresses these points. *See Bevis,* 85 F.4th at 1196.

### 2. Historical Tradition

While our analysis for the preliminary injunction need not continue, *Bevis* also makes quick work of Plaintiffs' argument that *Bruen* "established that there is no tradition of banning commonly possessed arms, such as the assault weapons and large-capacity magazines banned by Highland Park's Code." (Pl. Susan Goldman for Preliminary Inj. at 27.) Again, they claim that the fact that assault weapons are common (a proposition the Court does not weigh in on) is dispositive. However, this second step is not solely based on numbers. *Bevis,* 85 F.4th at 1198-99 ("For the reasons set forth in more detail in *Friedman,* we decline to base our assessment of the constitutionality of these laws on numbers alone.") Rather, "the relevant question is what are the modern analogues to the weapons people used for individual self-defense in 1791, and perhaps as late as 1868." *Id.* at 1199.

To justify its Code, Highland Park identifies an array of analogues from the relevant historical period. This includes 18th-century laws which banned: (1) the carrying of blunt weapons, like clubs, which were frequently used in fights; (2) firearms that could fire automatically, or "trap guns"; (3) an early 19th-century ban on Bowie knives, which represented a "technological advance" over prior guns; as well as (4) late 19th century weapons, including multi-shot weapons that were banned in several states. (Def.'s Rep. in Opp'n at 36-37 (Ex. 6) Roth Decl.; (Ex. 8) Spitzer Decl.).

**\*4** This 18th- and 19th-century history Highland Park relies on here is precisely the history relied on by the *Bevis* court when it held that the *Bevis* plaintiffs were unlikely to succeed on this step, too. *Bevis,* 85 F.4th at 1201 ("[W]e think that the legislatures involved here did stay within those [traditional] boundaries"). That history included the same Bowie knife regulations, restrictions on clubs, as well as modern machine gun bans, which collectively illustrated that "there is a long tradition, unchanged from the time when the Second Amendment was added to the Constitution,

supporting a distinction between weapons and accessories designed for military or law-enforcement use, and weapons designed for personal use." *Id.* at 1202. Regulations that ban assault weapons, as here, are merely a continuation of a long-established history.

As above, Plaintiffs are not likely to succeed on this step either, as the Seventh Circuit has already considered identical statutes justified by the same history in *Bevis*. And as with *Bevis,* there is "no need to decide whether an alleged Second Amendment violation gives rise to a presumption of irreparable harm, and if so, whether any such presumption is rebuttable or ironclad." *Id.* at 1202-03. The Court denies Plaintiffs' request for relief and now turns to NAGR's standing.

### III. <u>STANDING</u>

#### A. Legal Standard

It is not disputed that NAGR lacks standing to sue in its own right, but organizations like NAGR may still have associational standing to sue on behalf of their members. *White v. Illinois State Police,* 15 F.4th 801 (7th Cir. 2021) (citing *Milwaukee Police Ass'n v. Bd. of Fire & Police Comm'rs of City of Milwaukee,* 708 F.3d 921, 926 (7th Cir. 2013)). To establish associational standing, NAGR must demonstrate that: (1) at least one of its members possesses standing to sue; (2) the interests it seeks to protect are germane to the organization's purpose; and (3) neither the claim asserted, nor the relief requested, requires the participation of individual members. *Prairie Rivers Network v. Dynegy Midwest Generation, LLC,* 2 F.4th 1002, 1008 (7th Cir. 2021). ("Without at least one individual member who can sue in their own right, PRN cannot sue on their behalf."); *Teamsters Loc. Union No. 705 v. Burlington N. Santa Fe, LLC,* 741 F.3d 819 (7th Cir. 2014) (local union suing on behalf of union members). When defendants raise a facial challenge to standing, as here, courts take the allegations in the complaint as true and assess whether they plausibly show plaintiff has standing. *Prairie Rivers Network,* 2 F.4th at 1008.

#### B. Analysis

With much opposition from Highland Park, NAGR moved to amend its Complaint, wherein they tack on additional issues and defendants and "amend the standing allegations to address issues raised by the City in its motion to dismiss." (Pls.' Mot. to Amend at 2; Dkt. No. 42). NAGR subsequently withdrew its amendment, so the Court will focus on Plaintiffs' Complaint as originally filed. (Pls.' Unopposed Withdrawal of Mot. to Amend; Dkt. No. 95). In that Complaint, NAGR claimed that it "has members who reside" in Highland Park and "represents the interest of those who are affected by the City's prohibition of commonly used firearms." (Compl. at 1; Dkt. No. 1). NAGR otherwise fails to provide identifying features of these members: not their names or ages, there are no submitted declarations from members (anonymized in some way or not) or third parties affirming interactions with members that reside in Highland Park, or any other identifying features of these members. Not even co-plaintiff Susan Goldman is a member of NAGR. Instead, NAGR only refers to its Highland Park-based membership as a collective.

Associational standing "requires more specificity." *Prairie Rivers Network,* 2 F.4th at 1005. For instance, the *Prairie Rivers* organization Prairie Rivers Network ("PRN") lacked associational standing because the plaintiff spoke "of its members only as a collective, claiming that [defendant's] alleged discharges have harmed, and will continue to harm, '[t]he individuals' use and enjoyment of" the city in which they resided. *Id.* at 1006. As with NAGR, PRN did not otherwise provide any identifying features of its members. In *White v. Illinois State Police,* despite claiming that 17,000 members and supporters resided in Illinois, the organization's complaint was also insufficiently specific because "it [did] not identify any members." 15 F.4th 801, 807 (7th Cir. 2021).

**\*5** Relying on *Bowsher v. Synar,* NAGR erroneously claims that the Supreme Court has held that, in the context of multi-plaintiff constitutional challenges to legislative and regulatory actions, only one *plaintiff,* as opposed to *member,* is sufficient to confer standing. 478 U.S. 714 (1986). This is not correct. As the Seventh Circuit made clear in *Prairie Rivers,* "standing for at least one individual *member* remains an essential component of associational standing at each stage of litigation." *Prairie Rivers Network,* 2 F.4th at 1011 (emphasis added). This was precisely what made the *Bowser* organization's standing "clear," as "*members* of the Union, one of whom [was] an appellee," had standing. 478 U.S. at 721. (emphasis added).

Cases where courts have found associational standing only make it clearer that NAGR lacks standing here. In *Ezell v.*

*City of Chicago,* the individual plaintiffs were also members of their co-plaintiff organizations. 651 F.3d 684 (7th Cir. 2011) (*see* Appellants' Brief Short App'x, 2010 WL 6636438, at *64). In *Teamsters Loc. Union No. 705 v. Burlington N. Santa Fe, LLC,* a local union had standing where it sued on behalf of its members. 741 F.3d 819 (7th Cir. 2014). In *Luce v. Kelly,* while no members were identified by name, the court concluded that the "organizations' identification of [four] members, by age and county of residence, suffices at the pleadings stage to establish member standing." 2022 WL 204373, at *4 (N.D. Ill., Jan. 24, 2022). The *Luce* organization also submitted a declaration wherein its director claimed to have personal knowledge of members with standing. *Id.,* at *2. And finally, in *Marszalek v. Kelly,* the organization established associational standing where its lawyer attested in declarations to receiving "steady communications" from individuals, identified by their initials and details of their alleged injury, in addition to the lawyer's own personal knowledge of individual members. 2022 WL 225882, at *4 (E.D. Ill., Jan. 26, 2022). At every turn, associational standing has required at least one specific member to have been identified.

None of these identifying features are found here. Because NAGR merely refers to its members in the collective, *Prairie Rivers* controls. Thus, the Court grants Highland Park's Partial Motion to Dismiss NAGR for lack of standing.

## IV. <u>CONCLUSION</u>

For the reasons stated herein, this Court denies Plaintiffs' request for preliminary relief and (Dkt. No. 7) grants Defendant's 12(b)(6) Motion (Dkt. No. 26), dismissing NAGR for lack of standing. All other matters are mooted and dismissed accordingly (Dkt. Nos. 79, 92, 96).

**IT IS SO ORDERED.**

**All Citations**

Slip Copy, 2024 WL 98429

---

**End of Document** © 2025 Thomson Reuters. No claim to original U.S. Government Works.

Case: 1:25-cv-00669 Document #: 80 Filed: 05/15/25 Page 49 of 91 PageID #:707

Second Amendment Foundation, Inc. v. Walker, Not Reported in Fed. Supp. (2019)

2019 WL 13162728

2019 WL 13162728
Only the Westlaw citation is currently available.
United States District Court, C.D. Illinois,
Urbana Division.

SECOND AMENDMENT FOUNDATION,
INC. and Illinois Rifle Association, Plaintiffs,
v.
Beverly J. WALKER, in her official capacity
as Acting Director of the Illinois Department
of Children and Family Services, and Lisa
Madigan, in her official capacity as Attorney
General of the State of Illinois, Defendants.

Case No. 16-cv-2214
|
Signed 04/01/2019

**Attorneys and Law Firms**

David G. Sigale, Law Firm of David G. Sigale, P.C., Glen
Ellyn, IL, for Plaintiffs.

Barbara Lynn Greenspan, Michaelina Gianaris Camp, Office
of the Illinois Attorney General, Chicago, IL, for Defendants.

**ORDER**

COLIN S. BRUCE, U.S. DISTRICT JUDGE

 **\*1** Plaintiffs Illinois State Rifle Association and Second
Amendment Foundation, Inc. filed their Second Amended
Complaint (#33) on October 30, 2018. Defendants Beverly
J. Walker and Lisa Madigan, ("Defendants") in their official
capacities as the Acting Director of the Illinois Department of
Children and Family Services ("Department") and Attorney
General of the State of Illinois, respectively, filed a Motion
to Dismiss (#34) and supporting Memorandum (#35) on
November 20, 2018. Plaintiffs filed their Response (#37) and
supporting exhibits on December 4, 2018. The Defendants
filed their Reply (#39) on December 21, 2018. Defendants'
Motion is ripe for ruling. For the following reasons
Defendants' Motion is GRANTED.

I. BACKGROUND

On July 12, 2016, Kenneth Shults, Colleen Shults, the
Second Amendment Foundation, Inc., and the Illinois State
Rifle Association filed this action against then-director of
the Department George Sheldon, in his official capacity,
alleging that the Department's rule regarding storage of
firearms in foster homes violated their Second and Fourteenth
Amendment rights. Relevant here, the Shultses alleged that
they were licensed foster parents with a foster child placed
in their home, and "would possess loaded and functional
firearms for self-defense and defense of family, but refrain
from doing so because they fear" reprisals due to the
challenged provisions. The organizational Plaintiffs alleged
standing on behalf of themselves and their members. The only
individual members identified were the Shultses.

This court denied Walker's Motion to Dismiss on January 10,
2017, and the case proceeded to discovery.

On August 14, 2018, Plaintiffs filed an Amended Complaint
(#26) against Defendants Walker (who succeeded Director
Sheldon) and Madigan in their official capacities. The
Shultses alleged that they remained licensed foster parents,
but that they no longer had a foster child placed in their
home. As in the initial complaint, the organizational Plaintiffs
asserted standing on their own behalf and on behalf of
their members. Again, the only members identified as foster
parents were the Shultses. Shortly thereafter, the Department
learned that the Shultses had relinquished their Illinois
foster license in January 2018 and had indicated to the
licensing representative at that time that they did not intend
to renew their license for at least two years. Accordingly,
the Department filed an Emergency Motion (#30) alerting the
court to these findings. Plaintiffs then filed a Motion (#31)
to voluntarily dismiss the Shultses from the action, which
was granted by text order on October 17, 2018. In that same
order, the court granted the organizational Plaintiffs leave
to file a second amended complaint. On October 30, 2018,
the current Plaintiffs filed their Second Amended Complaint
(#33) against Walker and Madigan in their official capacities.

That brings the case to the operative pleading. The following
facts are drawn from the Second Amended Complaint, except
as otherwise noted.

 **\*2** The Second Amended Complaint alleges that the
Department's rule related to storage of firearms in foster
homes violates the Second and Fourteenth Amendments.
With respect to standing, Plaintiffs—each a non-profit

membership organization bringing this action on behalf of itself and its members—allege as follows.

The purposes of the Illinois State Rifle Association "include securing the Constitutional right to privately own and possess firearms within Illinois, through education, outreach, and litigation," whereas the purposes of the Second Amendment Foundation "include education, research, publishing and legal action focusing on the Constitutional right privately to own and possess firearms."

Plaintiffs allege they "have members who are licensed foster parents in the State of Illinois." They provide no information or identifiers about specific members within, or attached to, the Second Amended Complaint. According to the Second Amended Complaint these members "would possess and carry loaded and functional concealed handguns in public for self-defense, but refrain from doing so because they fear their foster children being taken away from them by the State, and/or being prohibited from being foster parents in the future" due to the challenged provisions.

Attached to Plaintiffs' Response are several documents. One attachment is a declaration of Darin E. Miller and Jennifer J. Miller ("the Millers"). In their declaration the Millers state that they are married, each holds an Illinois FOID card and concealed carry license, they are licensed foster parents, they have a foster child placed in their home, and they are members of the Illinois State Rifle Association and the Second Amendment Foundation.

Also attached is a declaration of Jed R. Davis and Melissa A. Davis ("the Davises"). In their declaration the Davises aver that they are married, each has an Illinois FOID card, they are licensed foster parents, they have had multiple foster child placements in the past and intend to continue to do so, and they are members of the Illinois State Rifle Association and the Second Amendment Foundation. Jed avers that he holds a concealed carry license.

## II. ANALYSIS

### A. Legal Standards

"Article III restricts the judicial power to actual 'Cases' and 'Controversies,' a limitation understood to confine the federal judiciary ... to redress or prevent actual or imminently threatened injury." *Ezell v. City of Chi.*, 651 F.3d 684, 694-95 (7th Cir. 2011). "Standing is an essential component of Article

III's case-or-controversy requirement." *Apex Dig., Inc. v. Sears, Roebuck & Co.*, 572 F.3d 440, 443 (7th Cir. 2009) (citing *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560 (1992)). "As a jurisdictional requirement, the plaintiff bears the burden of establishing standing." *Id.* (citing *Perry v. Vill. of Arlington Heights*, 186 F.3d 826, 829 (7th Cir. 1999)).

Standing is comprised of three elements. *Spokeo, Inc. v. Robins*, 136 S. Ct. 1540, 1547 (2016). "The plaintiff must have (1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision." *Id.* "To establish injury in fact, a plaintiff must show that he or she suffered 'an invasion of a legally protected interest' that is 'concrete and particularized' and 'actual or imminent, not conjectural or hypothetical.' " *Id.* at 1548 (citing *Lujan*, 504 U.S. at 560). "[P]articularized" injury "must affect the plaintiff in a personal and individual way." *Id.* (internal citation omitted). For an injury to be "concrete," it must be "real" and "not abstract." *Id.*

**\*3** Under Rule 12(b)(1), parties may move to dismiss the complaint for lack of subject matter jurisdiction. Fed. R. Civ. P. 12(b)(1). "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.' " *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).

Because *Lujan* mandates that standing "must be supported in the same way as any other matter on which the plaintiff bears the burden of proof," it follows that the *Twombly–Iqbal* facial plausibility requirement for pleading a claim is incorporated into the standard for pleading subject matter jurisdiction. *Lujan*, 504 U.S. at 561, 112 S. Ct. 2130. Therefore, we join many of our sister circuits and hold that when evaluating a facial challenge to subject matter jurisdiction under Rule 12(b)(1), a court should use *Twombly–Iqbal*'s "plausibility" requirement, which is the same standard used to evaluate facial challenges to claims under Rule 12(b)(6).

*Silha v. ACT, Inc.*, 807 F.3d 169, 174 (7th Cir. 2015). Defendants have raised a facial challenge to Plaintiffs' Second Amended Complaint. Analysis of Plaintiffs' additional factual submissions under the factual challenge standard appears in Section B.2, *infra*.

### B. Whether Plaintiffs Have Standing

Case: 1:25-cv-00669 Document #: 80 Filed: 05/15/25 Page 51 of 91 PageID #:709

Second Amendment Foundation, Inc. v. Walker, Not Reported in Fed. Supp. (2019)

2019 WL 13162728

An organization asserting standing "can do so either on behalf of itself or on behalf its members." *Milwaukee Police Ass'n v. Bd. of Fire & Police Comm'rs of City of Milwaukee,* 708 F.3d 921, 926 (7th Cir. 2013). The court will first discuss whether the Plaintiffs have alleged standing on their own behalf, then will discuss whether they have standing on behalf of their members, i.e., associational standing.

### 1. *Whether the Plaintiffs Have Standing on Their Own Behalf*

To bring an action in its own right, an organization must itself meet the three requirements of standing outlined above. *Id.*

Defendants argue Plaintiffs have failed to allege an adequate injury to confer standing. Plaintiffs counter, in their Response:

> SAF [Second Amendment Foundation] and ISRA [Illinois State Rifle Association] educate, research, and publish about gun control and its consequences. They have to educate their members, and the public, about the government's enforcement of gun laws. When people have questions about the government's firearms policies in Illinois, they turn to SAF and ISRA. The government's enforcement of the challenged provisions thus directly impacts the organizations.

The court finds that Plaintiffs do not allege an adequate injury to confer standing. The Second Amendment Foundation asserts in the Second Amended Complaint that the interests involved in this lawsuit "are germane to [its] organizational purposes" of "education, research, publishing and legal action focusing on the Constitutional right privately to own and possess firearms." The Illinois State Rifle Association, applying the same reasoning, identifies its purposes as "securing the Constitutional right to privately own and possess firearms within Illinois, through education, outreach, and litigation." These interests, which are primarily ideological, do not suffice to establish standing. See 33 Fed. Prac. & Proc. Judicial Review § 8345 (injury alleged

"cannot be merely 'ideological'—i.e., damage to the 'special interest' of an organization does not qualify as an injury for constitutional standing"). As the Seventh Circuit has explained, "[a]n abstract interest in a matter never has been considered a sufficient basis for the maintenance of—or the continuation of—litigation in the federal courts." *Muro v. Target Corp.,* 580 F.3d 485, 491 (7th Cir. 2009); see also *Milwaukee Police Ass'n v. Flynn,* 863 F.3d 636, 639 (7th Cir. 2017) ("[A]n interest in the underlying law does not equal an injury.").

**\*4** Plaintiffs' theory of injury as articulated in their Response – that having to use resources to train and educate their constituents is a financial burden – does no more to support this court finding a concrete injury to Plaintiffs than do the allegations in the Second Amended Complaint. Plaintiffs cite *Havens Realty Corp. v. Coleman,* 455 U.S. 363 (1982), for the proposition that when a group is forced to spend resources, devoting its time and energy to dealing with certain conduct, it has standing to challenge that conduct. [1] Recent Seventh Circuit precedent shows *Havens* provides Plaintiffs no refuge.

> In *Havens,* a non-profit organization dedicated to ensuring open housing brought claims under the Fair Housing Act alleging injury on the basis of having expended significant resources investigating and reporting racially-discriminatory housing practices by a realty company in a suburb of Richmond, Virginia. See *id.* at 369, 102 S. Ct. 1114. The organization specifically contended that the realty company's practice of steering apartments on the basis of race hindered its institutional efforts to assist prospective tenants in realizing equal access to housing. See *id.* at 379, 102 S. Ct. 1114. The Court concluded that these allegations were sufficient to confer standing on the organization, reasoning that "[s]uch concrete and demonstrable injury to the organization's activities—with the consequent drain on the organization's resources—constitutes far more than simply a setback to the organization's abstract social interests." *Id.*

*Keep Chicago Livable v. City of Chi.,* 913 F.3d 618, 624–25 (7th Cir. 2019) (citing *Havens,* 455 U.S. 363). The Seventh Circuit continued:

> The organizational injury alleged by Keep Chicago Livable is much less direct than the one before the Supreme Court in *Havens.* The original and

Case: 1:25-cv-00669 Document #: 80 Filed: 05/15/25 Page 52 of 91 PageID #:710

Second Amendment Foundation, Inc. v. Walker, Not Reported in Fed. Supp. (2019)

2019 WL 13162728

amended complaints sound their contention of injury in no more than Keep Chicago Livable finding it difficult to advocate and educate on home-sharing in Chicago before a court rules on the individual plaintiffs' challenges to the constitutionality of the Ordinance. Nary a word in either complaint tethers any particular requirement of the Ordinance to a specific harm to the organization.

*Keep Chicago Livable*, 913 F.3d at 625. See also *Plotkin v. Ryan*, 239 F.3d 882, 886 (7th Cir. 2001) (denying organizational standing because "ordinary expenditures as part of an organization's purpose do not constitute the necessary injury-in-fact required for standing").

[1] Plaintiffs also cite *Bellwood v. Dwivecli*, 895 F.2d 1521, 1526 (7th Cir. 1990). *Bellwood* followed *Havens*, and the facts and analysis in *Bellwood* are practically identical to *Havens*. The court's application of *Havens* therefore also addresses Plaintiffs' references to *Bellwood*.

The facts before the court here are analogous to those in *Keep Chicago Livable*. Plaintiffs here make no allegation that anything about the challenged statute or regulation makes it more difficult for Plaintiffs to accomplish their organizational purposes. The instant facts are not analogous to those in *Havens*, where the defendant's conduct itself (steering housing applicants to certain locations based on their race) made it more difficult for the plaintiffs to accomplish their goal of providing their clients with equal housing opportunity. The fact that Plaintiffs here disagree with the content of the challenged statute and regulation is not enough to confer standing. See *Sierra Club v. Morton*, 405 U.S. 727, 739 (1972). Plaintiffs have identified no direct harm to their organizations as a result of the challenged firearm storage regulations for foster parents.

**\*5** Plaintiffs direct the court's attention to *Ezell v. City of Chicago*, 651 F.3d 684, 696 (7th Cir. 2011), as emblematic of a case where "The Seventh Circuit correctly held that SAF and ISRA had 'standing to demonstrate their irreparable harm' ". In *Ezell*, individuals, a business, and the SAF and ISRA challenged a City of Chicago ordinance banning firing ranges within the city. The Seventh Circuit held, after first holding

that the individual plaintiffs had standing, that SAF and ISRA met the requirements for *associational* standing. The Seventh Circuit did not analyze whether SAF and ISRA had standing on their *own* behalves. Thus, *Ezell* is inapplicable insofar as Plaintiffs argue that it supports them having standing here, on their own behalves.

For the above reasons, another court has held these same allegations to be "plainly insufficient to give rise to" organizational standing. See *Kachalsky v. Cacace*, 817 F. Supp. 2d 235, 251 (S.D.N.Y. 2011), *aff'd sub nom. Kachalsky v. Cty. of Westchester*, 701 F.3d 81 (2d Cir. 2012). In *Kachalsky*, the court addressed the Second Amendment Foundation's allegations "that it promotes the exercise of the right to keep and bear arms and engages in education, research, publishing and legal action focusing on the Constitutional right to privately own and possess firearms," and held that "such activities, standing alone, are plainly insufficient to give rise to standing." *Id.* [2] (internal marks omitted).

[2] *Kachalsky* went on to address the merits of the case because other plaintiffs, aside from SAF, had established that they had standing, and "[w]here at least one plaintiff has standing, jurisdiction is secure and the court will adjudicate the case whether the additional plaintiffs have standing or not." *Ezell*, 651 F.3d at 696 n.7 (citations omitted).

The same reasoning applies here. Plaintiffs have failed to allege that they have suffered a concrete injury, and therefore have failed to show they have standing in their own right.

### 2. *Whether Plaintiffs Have Associational Standing*

To bring an action on behalf of its members, which is also known as associational standing, an organization must allege that "(1) its members would otherwise have standing to sue in their own right; (2) the interests it seeks to protect are germane to the organization's purpose; and (3) neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit." *Id.* at 928 (internal quotation marks and alterations omitted).

When asked to evaluate a standing-based challenge to subject matter jurisdiction, "the court must first determine whether a factual or facial challenge has been raised." *Silha*, 807 F.3d at 173 (citing *Apex Dig.*, 572 F.3d at 443). [3]

Case: 1:25-cv-00669 Document #: 80 Filed: 05/15/25 Page 53 of 91 PageID #:711

Second Amendment Foundation, Inc. v. Walker, Not Reported in Fed. Supp. (2019)

2019 WL 13162728

A factual challenge contends that "there is *in fact* no subject matter jurisdiction," even if the pleadings are formally sufficient. *Id.* at 444 (emphasis in original) (internal citations and quotation marks omitted). In reviewing a factual challenge, the court may look beyond the pleadings and view any evidence submitted to determine if subject matter jurisdiction exists. *Id.*

In contrast, a facial challenge argues that the plaintiff has not sufficiently "*alleged* a basis of subject matter jurisdiction." *Id.* at 443 (emphasis in original). In reviewing a facial challenge, the court must accept all well-pleaded factual allegations as true and draw all reasonable inferences in favor of the plaintiff. *Id.* at 443–44.

*Silha*, 807 F.3d at 173.

3       The difference between a factual and facial challenge was irrelevant to this court's analysis at Part B.1 above because neither party attempted to put forth anything beyond the four corners of the Second Amended Complaint in briefing that issue.

**\*6** Here, Defendants Motion to Dismiss is properly understood as a facial, rather than factual, challenge to Plaintiffs' standing. Defendants clearly contend that Plaintiffs' Second Amended Complaint lacks sufficient *allegations* to establish standing. See *Silha*, 807 F.3d at 173. "In the context of facial challenges, ... the court does not look beyond the allegations in the complaint, which are taken as true for purposes of the motion. *Apex Dig.*, 572 F.3d at 444.

a. Facial Challenge to the Second Amended Complaint

The first element for associational standing "require[es] an organization suing as representative to include at least one member with standing to present, in his or her own right, the claim (or the type of claim) pleaded by the association." *Disability Rights Wisconsin, Inc. v. Walworth Cty. Bd. of Supervisors*, 522 F.3d 796, 801-02 (7th Cir. 2008).

The member may "remain unnamed by the organization," *id.*, but there must at least be "specific allegations establishing that at least one identified member had suffered or would suffer" concrete, particularized injury in fact from the defendant's actions. *Summers v. Earth Island Inst.*, 555 U.S. 488, 497 (2009) (specific member planning to visit unspecified national forests insufficient to establish injury in

fact related to environmental degradation of certain forest plots); *Quad Cities Waterkeeper v. Ballegeer*, 84 F. Supp. 3d 848, 860-62 (C.D. Ill. 2015) (standing established where specific members declared their intent to return to area alleged to be recreationally and aesthetically degraded by defendants' dumping); *Keep Chicago Liveable*, 913 F.3d at 623-24 (no standing where individual plaintiffs did not clearly or particularly state how challenged ordinance impeded their future plans); *Disability Rights Wisconsin, Inc.*, 522 F.3d at 804 (7th Cir. 2008) ("Because DRW's First Amended Complaint does not identify any Walworth County disabled student with standing to bring suit based on the Board of Supervisors' conduct, DRW does not satisfy the first requirement"); *Kachalsky*, 817 F. Supp. 2d at 251 (Second Amendment Foundation fails to satisfy the first requirement because it "has neither identified particular members who have standing, nor specified how they would have standing to sue in their own right").

Defendants argue that Plaintiffs have failed to allege that any individual member of their organizations would have standing in her own right, and therefore Plaintiffs have failed to plausibly allege associational standing. Plaintiffs counter that because they alleged that there are persons among Plaintiffs' members that are licensed Illinois foster parents, Plaintiffs have alleged standing.

Plaintiffs' conclusory allegations that they "have members who have standing to bring this lawsuit in their own right," and general allegations that they have members "who are foster parents in Illinois [who] would possess and carry loaded and functional concealed handguns in public for self-defense, but refrain from doing so" because they fear reprisals due to the challenged provisions, are insufficient to withstand Defendants' facial challenge to the Second Amended Complaint. The Supreme Court has specifically rejected the blind acceptance of "the organizations' self-descriptions of their membership," even in instances where those assurances are *not* disputed, because "it is well established that the court has an independent obligation to assure that standing exists." *Summers*, 555 U.S. at 499; see also *id.* ("Without individual affidavits, how is the court to assure itself that the Sierra Club, for example, has thousands of members who use and enjoy the Sequoia National Forest?") (internal marks omitted). Instead, "the Court has required plaintiffs claiming an organizational standing to identify members who have suffered the requisite harm." *Id.* Plaintiffs' allegations in the Second Amended Complaint fail to plausibly plead associational standing because they have

Case: 1:25-cv-00669 Document #: 80 Filed: 05/15/25 Page 54 of 91 PageID #:712

Second Amendment Foundation, Inc. v. Walker, Not Reported in Fed. Supp. (2019)

2019 WL 13162728

failed to allege any specific member who would have standing in their own right.

**\*7** Insofar as Plaintiffs argue *Ezell* supports a finding of associational standing, there are not here, as there were in *Ezell*, individual plaintiffs whose standing is "not in serious doubt." *Ezell, 651 F.3d at 696* (individual plaintiffs were firearms owners who wanted to maintain firearm proficiency via target practice at a firing range, and firing ranges were banned by the challenged provision). Here, there are no individual plaintiffs at all, and the Second Amended Complaint points to no individual member who would have standing either, as discussed above.

Defendants also argue that the Second Amended Complaint only alleges that Plaintiffs' members wish to possess and carry firearms *in public*, an action that is not prohibited by any of the challenged provisions. Plaintiffs' Response does not address this argument.

Plaintiffs' generalized allegations in the Second Amended Complaint center on Illinois foster parents who would "possess and carry loaded and functional handguns *in public* for self-defense," (emphasis added). The cited regulations and policies at issue, which regulate storage of firearms *in the home*, do not appear to contain any restriction on "possessing and carrying loaded and functional handguns in public for self-defense," and the allegations make no mention of their membership's desire to possess a loaded and functional firearm *in the home*.

The challenged provisions in the Second Amended Complaint center on the following rule, one part of the Licensing Standards for Foster Family Homes:

> Any and all firearms and ammunition shall be locked up at all times and kept in places inaccessible to children. No firearms possessed in violation of a State or Federal law or a local government ordinance shall be present *in the home* at any time. Loaded guns shall not be kept *in a foster home* unless required by law enforcement officers and in accordance with their law enforcement agency's safety procedures.

Department Rule 402.8(g) (emphasis added). The disjunction between the generally alleged interests of unspecified members to concealed-carry loaded firearms in public, and the wording of the challenged provisions which relate to firearms in the home, further demonstrates the lack of concrete, particularized injury in fact *as a result of the challenged provisions.*

### b. Analysis of Plaintiffs' Additional Evidence

Plaintiffs have asked the court to consider declarations and supplemental discovery responses, disclosed for the first time as attachments to their Response. Defendants object, pointing out correctly that they have raised only a facial challenge to the Second Amended Complaint. Defendants also argue the additional information is untimely under Rule 26(e). Plaintiffs provide no specific support for the court to consider this additional evidence.

Since Plaintiffs provided the supplemental material at issue, the court presumes Plaintiffs have no objection to the court considering it. Defendants have fully briefed the issue, although the court recognizes that Defendants have not waived their objection to the court considering the supplemental information. In the interest of judicial economy, and to assess the viability of allowing Plaintiffs further leave to amend, the court will consider whether the member declarations support a finding that Plaintiffs have associational standing.

Seventh Circuit precedent recognizes the necessity of considering material outside of the complaint when assessing standing in a *factual* challenge. See *Apex Dig., 572 F.3d at 444.* A factual challenge would, in the ordinary case, be brought by a defendant. However, while the evidence at hand has been presented by Plaintiffs, the same principles support this court's decision to review the declarations and determine whether Plaintiffs have, in fact, associational standing to sue.

> **\*8** Because at issue in a factual 12(b)(1) motion is the trial court's jurisdiction—its very power to hear the case—there is substantial authority that the trial court is free to weigh the evidence and satisfy itself as to the existence of its power to hear the case.

Case: 1:25-cv-00669 Document #: 80 Filed: 05/15/25 Page 55 of 91 PageID #:713
Second Amendment Foundation, Inc. v. Walker, Not Reported in Fed. Supp. (2019)
2019 WL 13162728

> In short, no presumptive truthfulness
> attaches to plaintiff's allegations, and
> the existence of disputed material facts
> will not preclude the trial court from
> evaluating for itself the merits of
> jurisdictional claims.

*Apex Dig.*, 572 F.3d at 444 (citing *Mortensen v. First Fed. Sav. & Loan Ass'n*, 549 F.2d 884, 891 (3d Cir. 1977)).

> In other words, the district court's ability to consider evidence beyond the pleadings derives from the importance of limiting federal jurisdiction. Because such "jurisdiction cannot be conferred by consent of the parties, if the facts place the district court on notice that the jurisdictional allegation probably is false, the court is duty-bound to demand proof of its truth." *Kanzelberger v. Kanzelberger*, 782 F.2d 774, 777 (7th Cir. 1986).

*Apex Dig.*, 572 F.3d at 444.

Upon a careful assessment of the member declarations, the court finds that the Second Amended Complaint's generalized allegations of the existence of members with standing are not borne out.

Despite Plaintiffs having ample time and being represented by competent counsel, despite the allegations in the first two complaints stating concrete individualized injury, and despite Plaintiffs *generally* alleging that they had members who had suffered injury, the member declarations now before the court omit any statement that establishes concrete, particularized injury in fact. No declarant states that they *would* possess loaded and functional firearms in opposition to the challenged provisions but *refrain* from doing so because they fear reprisals due to the challenged provisions. No declarant states they own a firearm at all or would own a firearm but for the challenged provisions. No

declarant states any concern whatsoever with the challenged provisions. In short, the declarations do not state that they have been injured by the challenged provisions. Without particularized injury in fact, standing does not exist for any of Plaintiffs' described members. Thus, Plaintiffs' argument for associational standing fails at the first step. *Summers*, 555 U.S. at 497; *Keep Chicago Liveable*, 913 F.3d at 623-24. Plaintiffs are left seeking an advisory opinion "on abstract disputes about the law," which is impermissible. *Milwaukee Police Ass'n*, 708 F.3d at 928.

C. Conclusion

Defendants' Motion to Dismiss (#34) is granted because Plaintiffs have failed to allege they have standing either in their own right or based on an associational standing theory. Because the court has found Plaintiffs lack standing, analysis of the parties' other arguments is unnecessary.

Plaintiffs' have now had three opportunities to plead their claims, over more than two years. In ruling on the instant motion, the court has considered declarations by four of Plaintiffs' members, submitted well after Plaintiffs filed their Second Amended Complaint, in order to carefully assess the issue of standing. And, Plaintiffs make no request for an opportunity to further amend their pleadings. For all these reasons, Plaintiffs' Second Amended Complaint is dismissed with prejudice and this case is terminated.

IT IS THEREFORE ORDERED THAT:

1) Defendants' Motion to Dismiss (#34) is GRANTED with prejudice.

2) This case is terminated.

**All Citations**

Not Reported in Fed. Supp., 2019 WL 13162728

---

**End of Document** © 2025 Thomson Reuters. No claim to original U.S. Government Works.

Case: 1:25-cv-00669 Document #: 80 Filed: 05/15/25 Page 56 of 91 PageID #:714

Students for Fair Admissions, Inc. v. President and Fellows..., Not Reported in Fed....

2023 WL 3126414

2023 WL 3126414
Only the Westlaw citation is currently available.
United States District Court, D. Massachusetts.

STUDENTS FOR FAIR ADMISSIONS, INC., Plaintiff,
v.
PRESIDENT AND FELLOWS OF HARVARD
COLLEGE (HARVARD CORPORATION), Defendant.

Civil Action No. 14-cv-14176-ADB
|
Signed April 27, 2023

**Attorneys and Law Firms**

Adam K. Mortara, Pro Hac Vice, Chicago, IL, J. Scott McBride, Pro Hac Vice, Krista J. Perry, Pro Hac Vice, Bartlit Beck LLP, Chicago, IL, John Michael Connolly, Pro Hac Vice, Thomas R. McCarthy, Pro Hac Vice, William S. Consovoy, Pro Hac Vice, Consovoy McCarthy Park PLLC, Arlington, VA, John M. Hughes, Pro Hac Vice, Katherine L.I. Hacker, Pro Hac Vice, Meg E. Fasulo, Pro Hac Vice, Bartlit Beck LLP, Denver, CO, Paul M. Sanford, Burns & Levinson LLP, Providence, RI, Patrick Strawbridge, Consovoy McCarthy PLLC, Boston, MA, for Plaintiff.

Brittany Amadi, Pro Hac Vice, Danielle Conley, Seth P. Waxman, Pro Hac Vice, Wilmer Cutler Pickering Hale and Dorr LLP, Washington, DC, Debo P. Degbile, Pro Hac Vice, Wilmer Cutler Pickering Hale and Dorr LLP, New York, NY, William F. Lee, Andrew S. Dulberg, Felicia H. Ellsworth, Joseph J. Mueller, Sarah R. Frazier, Wilmer Cutler Pickering Hale and Dorr LLP, Boston, MA, Ara B. Gershengorn, Harvard Office of the General Counsel, Cambridge, MA, for Defendant.

## MEMORANDUM AND ORDER ON REPORTERS COMMITTEE MOTION FOR RECONSIDERATION

BURROUGHS, DISTRICT JUDGE

**\*1** Plaintiff Students for Fair Admissions, Inc. ("SFFA") filed this action against Defendant President and Fellows of Harvard College ("Harvard"), alleging that Harvard's undergraduate admissions process violates Title VI of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000d *et seq.* [ECF No. 1]. The Court held a 15-day bench trial from October 15, 2018 to November 2, 2018. See Students for Fair Admissions, Inc.

v. President & Fellows of Harvard Coll. (Harvard Corp.), 397 F. Supp. 3d 126, 132 (D. Mass. 2019), aff'd sub nom. Students for Fair Admissions, Inc. v. President & Fellows of Harvard Coll., 980 F.3d 157 (1st Cir. 2020), cert. granted, 142 S. Ct. 895 (U.S. Jan. 24, 2022) (No. 20-1199). On September 30, 2019, the Court issued its Findings of Fact and Conclusions of Law and entered judgment for Harvard on all counts. Id. SFFA appealed the Court's judgment, first to the First Circuit, and after the First Circuit affirmed, Students for Fair Admissions, Inc. v. President & Fellows of Harvard Coll., 980 F.3d 157 (1st Cir. 2020), to the Supreme Court. The Supreme Court granted *certiorari* on January 24, 2022 and heard arguments on October 31, 2022, Students for Fair Admissions, Inc. v. President & Fellows of Harvard Coll., 142 S. Ct. 895 (argued Oct. 31, 2022). The Supreme Court has not issued its ruling.

On December 7, 2022, the Reporters Committee for Freedom of the Press ("Reporters Committee") moved to intervene for the limited purpose of unsealing the transcripts of sidebar proceedings during trial ("Motion to Intervene"), [ECF No. 703], which the Court had kept under seal as a matter of course, see [ECF No. 654 (Trial Tr. Day 14) at 184:10–12]. On December 19, 2022, the Court ruled that all but a few limited excerpts of the sidebar transcripts would be unsealed, [1] and finding that it had essentially provided the relief requested, denied the Motion to Intervene ("December 19 Order"). [ECF No. 711]. Currently pending before the Court is the Reporters Committee's Motion for Reconsideration of the December 19 Order ("Motion for Reconsideration"). [ECF No. 713]. For the reasons set forth below, the Reporters Committee's Motion for Reconsideration is GRANTED in part and DENIED in part.

[1]    Of the 15 trial days, the parties agreed that nothing from days 1, 2, 4, 5, 8, 13, or 15 needed to remain sealed. See [ECF Nos. 701–02]. The parties further agreed to keep sealed a portion from day 6. [ECF No. 701 at 1; ECF No. 702 at 2; ECF No. 711]. Harvard asked that additional excerpts from days 3, 7, 9, 10, 11, 12, and 14 remain sealed. [ECF No. 701 at 1]. Following the December 19 order, what remains sealed is the agreed upon excerpt from day 6 and some materials from days 7 and 10. [ECF No. 711]. Additionally, the Court held two sealed status conferences about the sidebar transcripts. The Court unsealed the entire transcript from the December 9 status conference, see [ECF No. 720–21], and kept limited excerpts of the transcript from

Case: 1:25-cv-00669 Document #: 80 Filed: 05/15/25 Page 57 of 91 PageID #:715

Students for Fair Admissions, Inc. v. President and Fellows..., Not Reported in Fed....

2023 WL 3126414

the December 15 status conference under seal, see [ECF No. 726].

## I. BACKGROUND

**\*2** In November 2022, the Court received a letter from a non-party requesting that the Court unseal the sidebar transcripts, [ECF No. 691], [2] and then several more letters from other non-parties, including the Reporters Committee, supporting the request, [ECF Nos. 693, 698–99]. Both parties responded, with Harvard requesting that the full sidebar transcripts remain under seal, [ECF No. 692], and SFFA requesting that more limited portions remain under seal, [ECF No. 694]. The Court held a November 21, 2022 status conference, attended by non-parties, at which the Court directed the parties to, by December 9, 2022, meet and confer to identify for the Court which portions of the sidebar conferences they wished to remain under seal. See [ECF No. 700]. A second status conference was set for December 9, 2022. [Id.]. After meeting and conferring, the parties filed letters on December 5, 2022, explaining that they agreed that one excerpt should remain under seal, but disagreed as to other excerpts, which Harvard asserted should remain under seal and SFFA asserted should not. [ECF Nos. 701–02].

> [2] Upon request from the Supreme Court after *certiorari* was granted, the Court transmitted the full case record to the Supreme Court, with a letter noting that the transmitted record included "sealed or confidential" materials. [ECF No. 690]. As is typical, the Court had previously transmitted an abbreviated record for appeal to the First Circuit in October 2019. See [ECF No. 675].

On December 7, 2022, the Reporters Committee moved for leave to intervene, pursuant to Federal Rule of Civil Procedure 24(b), "for the limited purpose of asserting the rights of the press and public to access sealed judicial records in this matter, including transcripts of the sidebar proceedings held during trial[.]" [ECF No. 703 at 1]. [3] The Motion to Intervene specifically requested that the Court:

> (1) order that the parties file on the public docket the portions of the Sidebar Transcripts that neither party seeks to maintain under seal, with proposed redactions accompanied by justifications detailed enough that the Reporters Committee and other representatives of the press and public may meaningfully respond in writing; (2) provide for a subsequent hearing on the merits at which representatives of the press and public can be heard,

alongside the parties; and (3) thereafter, issue a final, public written ruling—supported by "particularized findings" that are "specific enough to permit a reviewing court to determine whether sealing was appropriate"—identifying those discrete portions of the Sidebar Transcripts, if any, that the Court determines must remain sealed to protect an overriding interest.

[ECF No. 703 at 4 (quoting United States v. Kravetz, 706 F.3d 47, 60 (1st Cir. 2013))]. The Motion to Intervene was opposed by Harvard and unopposed by SFFA. See [id. at 6; ECF No. 726 at 4:2–17].

> [3] In its Motion for Reconsideration, the Reporters Committee describes the purpose of its proposed intervention in even more limited terms: that is, to "oppos[e] restrictions on the public's right to access the sidebar transcripts[.]" [ECF No. 713 at 1].

At the second status conference on December 9, 2022 regarding the parties' positions on redactions, which was sealed, the Court scheduled a second, sealed status conference for December 15, 2022 and a separate, public hearing to occur the same day. [ECF No. 708]; see [ECF No. 717]. At the status conference on the morning of December 15, 2022, the Court informed the parties of its proposed redactions to the sidebar transcripts and gave the parties an opportunity to respond and to put any objections on the record. [ECF No. 726]. At the public hearing that followed, the Court again explained its planned redactions, and allowed non-parties to be heard. During the hearing, the Reporters Committee and another non-party asked the Court to unseal the transcripts of the December 9, 2022 and December 15, 2022 status conferences. See [ECF No. 717].

**\*3** On December 19, 2022, the Court entered an order with its final ruling regarding which of the contested sidebar excerpts would be unsealed and which would remain under seal. [ECF No. 711]. In sum, the Court ruled that the majority of the sidebar transcripts would be unsealed, but that limited excerpts from three trial days would remain under seal. [Id.]. The December 19 Order provided the legal standard the Court applied in reaching its ruling, described the three categories of information being kept under seal, and explained the Court's findings as to why it was keeping each category under seal. [Id.]. The Order also noted that the parties had agreed that the bulk of the sidebar transcripts should be unsealed, but that one excerpt should remain under seal. [Id.]. The Court directed the parties to file on the public docket, within two business days, the sidebar transcripts redacted in accordance with the Order,

Case: 1:25-cv-00669 Document #: 80 Filed: 05/15/25 Page 58 of 91 PageID #:716

Students for Fair Admissions, Inc. v. President and Fellows..., Not Reported in Fed....

2023 WL 3126414

[id.], which the parties did on December 21, 2022, [ECF No. 712].

In the same Order, the Court denied the Reporters Committee's Motion to Intervene as moot without prejudice. [ECF No. 711]. On December 29, 2022, the Reporters Committee filed its Motion for Reconsideration. [ECF No. 713]. SFFA filed a response, stating that it had no position on the Motion for Reconsideration, but re-stating its objection to unsealing identifying information about applicants. [ECF No. 719]. Harvard did not respond to the Motion for Reconsideration.

On January 11, 2023, a non-party renewed the request made at the December 15, 2022 public hearing that the Court unseal the transcripts from the December 9, 2022 and December 15, 2022 sealed status conferences with the parties. [ECF No. 717]. Following consultation with the parties, the transcript for the December 9, 2022 status conference was unsealed on January 13, 2023, see [ECF No. 721], and on January 18, 2023, the transcript from the December 15, 2022 status conference was filed on the public docket with limited redactions, see [ECF No. 726].

## II. DISCUSSION

"A federal district court has the discretion to reconsider interlocutory orders and revise or amend them at any time prior to final judgment." Davis v. Lehane, 89 F. Supp. 2d 142, 147 (D. Mass. 2000); see Fed. R. Civ. P. 54(b); see also Pérez-Ruiz v. Crespo-Guillén, 25 F.3d 40, 42 (1st Cir. 1994) ("Interlocutory orders ... remain open to trial court reconsideration ....").

### A. Intervention

The December 19 Order unsealed the vast majority of the sidebar transcripts. Once the Court unsealed those documents, it denied as moot, but without prejudice, the Reporters Committee's Motion to Intervene for the limited purpose of unsealing court records, [ECF No. 703], on the assumption that the Court had addressed the issues that motivated the motion. The Motion for Reconsideration, however, indicates that the Reporter Committee believes that the relief afforded is incomplete. See [ECF No. 713]. Without reaching the merits of the arguments made by the Reporters Committee in its Motion for Reconsideration, the Court will, in the exercise of its discretion, GRANT permissive intervention to allow the Reporters Committee to participate in the pending appeals concerning sealing. See Fed. R. Civ. P. 24(b)(1)(B) (the court

"may[,]" on a timely motion, "permit anyone to intervene who ... has a claim or defense that shares with the main action a common question of law or fact."); In re Bos. Sci. Corp. ERISA Litig., 254 F.R.D. 24, 33 n.82 (D. Mass. 2008) ("Permissive intervention is 'wholly discretionary,' and a court should consider whether intervention will prejudice the existing parties or delay the action." (quoting In re Sonus Networks, Inc. Sec. Litig., 229 F.R.D. 339, 345 (D. Mass. 2005))).

### B. Unsealing Sidebar Transcripts and Related Materials

As to the merits, prior to the issuance of the December 19 Order, the parties agreed that the bulk of the sidebar transcripts should be unsealed and the Court unsealed all of the agreed upon materials. The parties also agreed, and the Court accepted, that any identifying information about applicants should be remain under seal.

**\*4** Throughout this litigation, the Court has been and continues to be cognizant of the need for transparency, but also that the First Amendment right of public access to certain documents filed in civil litigation is "qualified" and that the common-law right of access to judicial records "is not absolute." Doe v. Mass. Inst. of Tech., 46 F.4th 61, 67 (1st Cir. 2022) (quoting Nixon v. Warner Commc'ns, Inc., 435 U.S. 589, 597–98 (1978)) (further citation omitted). "[P]ublic monitoring of the judicial system [through public access to judicial records] fosters the important values of 'quality, honesty and respect for our legal system.' " Siedle v. Putnam Invs., Inc., 147 F.3d 7, 9–10 (1st Cir. 1998) (quoting FTC v. Standard Fin. Mgmt. Corp., 830 F.2d 404, 410 (1st Cir. 1987)). However, "[i]mportant countervailing interests can, in given instances, overwhelm the usual presumption and defeat access." Id. at 10 (citation omitted). When considering issues of sealing, "a court must carefully balance the competing interests that are at stake in the particular case." Id. (first citing Nixon, 435 U.S. at 599; and then citing In re Globe Newspaper Co., 920 F.2d 88, 96 (1st Cir. 1990)); see also United States v. Vinas, No. 08-cr-00823, 2017 WL 1969665, at *2 (E.D.N.Y. May 11, 2017) (explaining that in the context of a criminal proceeding, "[t]he rights of access afforded by the common law and First Amendment are not absolute, ... and the need for disclosure may be overcome where the party seeking to seal the documents can show that there are 'countervailing factors' (in the common law framework), or that sealing is necessary to preserve 'higher values' (in the First Amendment context)." (first quoting United States v. Amodeo, 71 F.3d 1044, 1050 (2d Cir. 1995); and then

quoting United States v. Alcantara, 396 F.3d 189, 200 (2d Cir. 2005))); Press-Enter. Co. v. Super. Ct. of Cal., Riverside Cnty., 464 U.S. 501, 510 (1984) (holding, as to sealing criminal proceedings, "[t]he presumption of openness may be overcome only by an overriding interest based on findings that closure is essential to preserve higher values and is narrowly tailored to serve that interest."). Here, the portions of the sidebar transcripts that remain under seal reflect the Court's efforts to balance the competing interests at stake. See Siedle, 147 F.3d at 10. The Court articulated its reasons for keeping certain items under seal in the December 19 Order, and expands on that reasoning here.

Currently, the majority of the transcripts of the sidebars and the status conferences addressing the sealing issue have been unsealed. There are three narrow categories of sidebar-related information that remain sealed: (1) inflammatory quotations from a memorandum, on purloined Harvard letterhead, sent to the Harvard Dean of Admissions from a Department of Education Office of Civil Rights (OCR) representative (less than two pages of trial transcript and eight lines of text from the December 15, 2022 status conference), (2) information relating to the death by suicide of a witness' family member (less than six lines of text from both the trial transcript and the December 15 status conference transcript), and (3) information related to an anonymous letter about my own application to Harvard, as well as personal information about my family (again, less than two total pages of trial transcript).

Beginning with the communication between the OCR representative and the Harvard Dean of Admissions, in deciding to keep this information sealed, the Court, in the December 19 Order, found as follows:

- **Trial Day 10, 122:2–11, 122:17–123:1, and 123:20 will remain sealed.** This set of excerpts concerns an email sent to Dean Fitzsimmons from an individual who had worked on the Office for Civil Rights investigation referenced in this case. The email contained a "joke memo," prepared as if it were written by someone who worked in the Harvard admissions office and making it seem like that employee was inappropriately satirizing Asian-American applicants. The parties' discussions about the substance of this document, its relevance, and the propriety of its admission will all be unsealed. Only the direct quotes from the email, which were read into the record, will remain under seal. The material is dated, it implicates the interests of a third party who was never cross-examined at trial, and its relevance to the case is limited only to the Dean's response, which shall be unsealed. Further, the offensive attempt at humor includes inappropriate and inflammatory language that does not need to be repeated or aired. The specific words used are not relevant to the case—the salient information is the recipient's reaction to the email, which will be unsealed. Finally, although not the driving force, the Court also considers in this calculus the potential prejudice to Harvard, who has opposed disclosure, as there is a risk that the views expressed in this email, on Harvard stationary, could be imputed to Harvard by unfamiliar readers. See In re Los Angeles Times Commc'ns LLC, 28 F.4th 292, 297 (D.C. Cir. 2022) (the court should consider the possibility of prejudice to the party opposing disclosure); see also Zapp v. Zhenli Ye Gon, 746 F. Supp. 2d 145, 150 (D.D.C. 2010). Though the fact that this document may be available from other sources cuts against sealing, Los Angeles Times, 28 F.4th at 297, the Court finds that, in sum, the scale tips in favor of keeping these limited excerpts under seal in this proceeding, which is all that is within the control of the Court. In addition to the direct quotes, the name of the Harvard employee that was used in the text by the third-party author shall

Case: 1:25-cv-00669 Document #: 80 Filed: 05/15/25 Page 60 of 91 PageID #:718

Students for Fair Admissions, Inc. v. President and Fellows..., Not Reported in Fed....

2023 WL 3126414

also remain sealed. Accordingly, to protect the privacy and integrity of this uninvolved individual, their name will be redacted from lines **121:23, 123:6, and 125:6 of the Day 10 Transcript**.

**\*5** To further elaborate on this reasoning, the content of the communication was hearsay. The declarant did not testify and was not cross-examined. In the Court's view, it would have been admissible, even in a bench trial, only to illustrate the impact of the communication on the recipient. Here, the recipient's reaction was "I am stunned[,]" [ECF No. 647 at 123:5–6], which the Court concluded was ambiguous, particularly given that it was a response to an inflammatory communication from a regulator. The Court determined that any relevance of this equivocal response was substantially outweighed by the prejudicial content and context of the communication itself.

In addition, the words of the communication were offensive. When determining what should be unsealed, the Court concluded that the impact on the recipient of the email, which was the only relevant aspect of the communication relevant to the issues before the Court, could be understood without repeating offensive rhetoric that did not bear on the resolution of the important legal principles at issue.

Weighing in favor of unsealing was the fact that the statements were made by an OCR employee and available through a FOIA request. The Reporters Committee may disagree with how the Court weighed these factors, but it made its best effort at a reasoned decision (which resulted in almost everything on this topic being unsealed beyond the direct quotes from the communication, which were both offensive and inadmissible hearsay and left nothing under seal that the Court considered in resolving the parties' claims).

Since the Court issued the December 19 Order and the Reporters Committee filed its Motion for Reconsideration, the content of the memorandum written by the OCR employee has been made public in a magazine article. Now that the language is not only available through a FOIA request, but has also appeared in a publication with a broad, national audience, the justification for keeping it sealed has been significantly lessened and the Court will unseal it. See In re L.A. Times Commc'ns LLC, 28 F.4th 292, 297 (D.C. Cir. 2022) ("[W]hen a court is presented with a motion to seal or unseal, it should

weigh (1) the need for public access to the documents at issue; (2) the extent of previous public access to the documents; (3) the fact that someone has objected to disclosure, and the identity of that person; (4) the strength of any property and privacy interests asserted; (5) the possibility of prejudice to those opposing disclosure; and (6) the purposes for which the documents were introduced during the judicial proceedings." (alteration in original) (quoting MetLife v. Fin. Stability Oversight Council, 865 F.3d 661, 665 (D.C. Cir. 2017))). Nevertheless, the Court will continue to keep sealed the name of the now-deceased associate admissions officer whose stationary was used, which was not disclosed in the article. Although there has not been a specific request for the name of this uninvolved third party, to ensure a complete record, the Court finds that the public's right to access the name does not outweigh the privacy interests implicated. See Kravetz, 706 F.3d at 62 (" '[P]rivacy rights of participants and third parties are among those interests which, in appropriate cases, can limit the presumptive right of access to judicial records.' Third-party privacy interests, in particular, have been referred to as 'a venerable common law exception to the presumption of access ....' " (first alteration in original) (citations omitted)). **Trial day 10, 122:2–11, 122:17–123:1, and 123:20** will be unsealed but for the references to the name of the now deceased Harvard admissions officer whose stationary was used **(Trial day 10, 121:23, 123:6, and 125:6).** Similarly, **the two excerpts from the December 15 status conference at 6:24 and 16:15** that quote the communication will also be unsealed, while references to the name of the now-deceased Harvard admissions officer will remain under seal **(December 15 status conference, 17:4, 17:5, 17:8, 17:18, 17:23, and 17:25).**

**\*6** The second category of excerpts that remain under seal, **Trial Day 7, 7:9–11 and 11:4–6, and December 15 status conference, 5:22–24 and 6:2–4,** concerns the Court and counsel's characterizations of a witness' reaction to questions about a relative's death by suicide. In keeping these limited excerpts from the sidebar transcripts under seal, the Court found as follows:

- **Trial Day 7, 7:9-11 and 11:4-6 will remain sealed.** At trial, certain testimony touched on a suicide in a witness's family. Thereafter, during a sidebar concerning this line of questioning, Harvard's counsel, Mr. Lee, and the Court each referenced

Case: 1:25-cv-00669 Document #: 80 Filed: 05/15/25 Page 61 of 91 PageID #:719

Students for Fair Admissions, Inc. v. President and Fellows..., Not Reported in Fed....

2023 WL 3126414

their subjective impressions of the impact of this questioning on the witness. As the Court has already noted, the privacy rights of third parties can limit the presumptive right of access to judicial records, and, in making this determination, a court may consider the sensitivity of the information, the nature and degree of the harm, the reliability of the information, and the interest that the public has in the information. Kravetz, 706 F.3d at 62 (citations omitted). The Court will unseal this sidebar but for those subjective characterizations of the witness's reaction to the questioning, which have no relevance or value to the public, and the unsealing of which would unnecessarily intrude on the witness's privacy.

The Reporters Committee appears to object to the Court's finding that "the privacy rights of third parties" justify keeping this information sealed, because they involve the "Court's characterization of a witness's demeanor" and "members of the public could just as well have witnessed [the examination] for themselves by attending the trial." [ECF No. 713 at 7 n.5 (emphasis omitted)]. Additionally, the Reporters Committee argues that these excerpts have " 'relevance or value to the public' ... in evaluating how the Court managed an emotionally charged line of questioning at trial, as well as one counsel's objection that counsel for the opposing party had behaved inappropriately—the performance of an official function that squarely implicates the public's right to superintend the judiciary." Id. (citation omitted). As noted above, this witness's reaction was to a line of questioning related to an irrelevant and private family matter that had no bearing on the legal issues in dispute. The Court's management of this examination at trial is discernable from the transcript of that examination. The Court's and counsel's subjective characterizations of that testimony are therefore totally irrelevant, and the Court will keep this information sealed.

Finally, the last category of sealed excerpts concerns a sidebar about an anonymous letter that was sent to reporters while the case was being tried. See [ECF No. 711]. The letter accurately stated that I had applied to Harvard and been rejected, which the Court disclosed to the parties early in the litigation. The Court kept the sidebar discussion about this letter sealed as applicant information [4] and based on my family's privacy interests. The letter itself was intentionally mean-spirited, and included personal family information, as well as inaccuracies and unfounded conclusions, many of which pertained to my father, which were difficult to address or understand, given the author's anonymity.

[4]     For present purposes, applicant information includes the names and potentially identifying information for applicants to Harvard as well as the names of individual applicants or potential applicants associated with SFFA. Although the Reporters Committee motion only asks for reconsideration of the court's ruling on trial sidebars, it also references SFFA membership and related applicant information. For clarity, the parties throughout have kept applicant and SFFA membership information confidential. This case was based on associational standing and there were no individual plaintiffs. Consistent with this approach, SFFA relied on statistical data to make its case and called no applicant witnesses and did not present any applications to illustrate individual candidates who it argued should have been admitted over others that were. The identities of SFFA members were provided to Harvard pretrial only for purposes of determining standing. Further, to the Court's knowledge, individual applicants and SFFA members have not consented to having their identities revealed in this litigation. The fact that an organization is litigating an issue does not mean that every member of that organization supports all aspects of lawsuits entered in to by the organization such that total membership should be disclosed. At root, this category, applicant and SFFA member information, involves the rights of third parties – an interest that outweighs any right of access. See United States v. Kravetz, 706 F.3d 47, 62 (1st Cir. 2013) (Third-party privacy interests are "a venerable common law exception to the presumption of access[.]" (citation omitted)); see also In re Bos. Herald, Inc., 321 F.3d 174, 191 (1st Cir. 2003) (declining to find a common law right to disclosure of judicial records, in part because "disclosure sought ... information pertain[ing] not only to [a party], but also to his

Case: 1:25-cv-00669 Document #: 80 Filed: 05/15/25 Page 62 of 91 PageID #:720

Students for Fair Admissions, Inc. v. President and Fellows..., Not Reported in Fed....

2023 WL 3126414

wife and children."). The trial testimony of the student amici and any testimony related to specific applications is public. [5] Of the sealed sidebars, the contents that will now remain under seal includes the following: Trial day 6, 6:21–7:11, 7:21–8:5; Trial day 7, 7:9–11, 11:4–6; and Trial day 10, 121:23, 123:6, 125:6. As to the status conference transcripts concerning the sidebar transcripts, the contents that will remain under seal are: December 15 status conference, 5:22–24 and 6:2–4, and the name referenced in 17:4, 17:5, 17:8, 17:18, 17:23, and 17:25.

**\*7** While the letter appears to have been written to show that I had some bias against Harvard and should therefore be disqualified, the parties reviewed the letter, and concluded, independently, that its contents did not warrant a request for recusal, and therefore did not make such a motion. The fact that neither party moved for recusal distinguishes this case from Arkansas Teacher Retirement System v. State Street Bank & Trust Co., 404 F. Supp. 3d 486 (D. Mass. 2018), cited by the Reporters Committee, see [ECF No. 713 at 3, 6], in which another session of this court unsealed sidebar transcripts in the context of a motion for recusal. In Arkansas Teacher, a party moved for recusal, primarily based on the substance of a conversation the court had with a party held at sidebar during a hearing, which the party alleged constituted an *ex parte* communication that could create the appearance of bias. Ark. Tchr. Ret. Sys., 404 F. Supp. 3d at 494–95. Prior to the recusal motion, the court had sealed the relevant sidebar transcript "because the colloquy did not relate to any pending motion[.]" Id. at 512 n.16. After the recusal motion was filed, the court unsealed the transcript, explaining that the "discussion became central to [the party's] sealed motion for recusal, which relates to respect for the legal system[,]" and therefore implicates "the presumption of a public right to court records[.]" Id. Here, as noted above, no party argued or even suggested that the content of the letter warranted recusal. While disclosure of materials relevant to a court's disposition

of a motion, whether relating to recusal or another issue, may well foster "respect for our legal system," this consideration is absent here.

The members of the press that received the letter reported that I had applied to and been rejected from Harvard, but did not publish the contents of the letter. As a result, the contents of the letter are not public. None of the factors to be considered in determining whether unsealing is appropriate weigh in favor of unsealing the sidebar discussion concerning the letter. See, e.g., In re L.A. Times Commc'ns LLC, 28 F.4th at 297. The Court will unseal the portion of transcript where the parties state their positions on recusal, **Trial Day 6, 6:17 through the beginning of 6:21** and **Trial Day 6, 7:12–20,** but keep the remaining portions of the sidebar related to the letter, **Trial Day 6, 6:21–7:11, 7:21–8:5,** under seal.

### III. CONCLUSION

Accordingly, the Reporters Committee's Motion for Reconsideration, [ECF No. 713], is GRANTED in part and DENIED in part. [5]

5
> Of the sealed sidebars, the contents that will now remain under seal includes the following: Trial day 6, 6:21–7:11, 7:21–8:5; Trial day 7, 7:9–11, 11:4–6; and Trial day 10, 121:23, 123:6, 125:6. As to the status conference transcripts concerning the sidebar transcripts, the contents that will remain under seal are: December 15 status conference, 5:22–24 and 6:2–4, and the name referenced in 17:4, 17:5, 17:8, 17:18, 17:23, and 17:25.

**SO ORDERED.**

### All Citations

Not Reported in Fed. Supp., 2023 WL 3126414

---

**End of Document**

© 2025 Thomson Reuters. No claim to original U.S. Government Works.

2024 WL 3364034
Only the Westlaw citation is currently available.
United States District Court,
N.D. Texas, Fort Worth Division.

AMERICAN ALLIANCE FOR
EQUAL RIGHTS, Plaintiff,
v.
FOUNDERS FIRST COMMUNITY
DEVELOPMENT CORPORATION, Defendant.

Civil Action No. 4:24-cv-00327-O
|
Signed July 10, 2024

**Attorneys and Law Firms**

Steven Christopher Begakis, Cameron Thomas Norris, R. Gabriel Anderson, Thomas R. McCarthy, Pro Hac Vice, Consovoy McCarthy PLLC, Arlington, VA, Adam K. Mortara, Pro Hac Vice, Lawfair LLC, Nashville, TN, for Plaintiff.

Gregg Costa, Gibson Dunn & Crutcher LLP, Houston, TX, Emily Claire Piepenburg, Gibson Dunn & Crutcher LLP, Dallas, TX, Zakiyyah Salim-Williams, Pro Hac Vice, Zoe Klein, Pro Hac Vice, Gibson Dunn & Crutcher LLP, Washignton, DC, for Defendant.

**ORDER**

Reed O'Connor, UNITED STATES DISTRICT JUDGE

**\*1** Before the Court are the Motion to Compel filed by Defendant (ECF No. 32); the Response filed by Plaintiffs (ECF No. 37); and Defendant's Reply (ECF No. 38). After reviewing the motion, response, and reply, the Court finds that the Motion should be **DENIED**. Accordingly, the Court **SUSTAINS** Plaintiff's objections to ROG 1 and ROG 2.

ROG Nos. 1-2: Defendant requests pseudonymous Member A's identity, the name of his business, and related addresses. Specifically, ROG 1 requests the identity of Member A's name and the name of his business, while ROG 2 requests the identification of Member A's home address and business address. ECF No. 32 at 2.

At this stage, before the Rule 26(f) conference and before the resolution of a pending preliminary-injunction motion, the Court finds the association's anonymous member's identity is not relevant. Member A is an associational member of the named plaintiff, not an individually named party to the litigation. That discovery obligation may change as the litigation progresses to summary judgment or trial.

**SO ORDERED** on this **July 10, 2024**.

**All Citations**

Slip Copy, 2024 WL 3364034

---

**End of Document**                    © 2025 Thomson Reuters. No claim to original U.S. Government Works.

Case: 1:25-cv-00669 Document #: 80 Filed: 05/15/25 Page 64 of 91 PageID #:722

South Carolina State Conference of NAACP v. Alexander, Not Reported in Fed. Supp....

2022 WL 453533

2022 WL 453533
Only the Westlaw citation is currently available.
United States District Court, D.
South Carolina, Columbia Division.

The SOUTH CAROLINA STATE CONFERENCE OF
the NAACP, and Taiwan Scott, on behalf of himself
and all other similarly situated persons, Plaintiffs,
v.
Thomas C. ALEXANDER, in his official capacity as
President of the Senate Judiciary Committee; James H.
Lucas, in his official capacity as Speaker of the House of
Representatives; Chris Murphy, in his official capacity
as Chairman of the House of Representatives Judiciary
Committee; Wallace H. Jordan, in his official capacity
as Chairman of the House of Representatives Elections
Law Subcommittee; Howard Knapp, in his official
capacity as interim Executive Director of the South
Carolina State Election Commission; John Wells, Chair,
Joanne Day, Clifford J. Elder, Linda McCall, and Scott
Moseley, in their official capacities as members of the
South Carolina State Election Commission, Defendants.

Civil Action No. 3:21-cv-03302-JMC
|
Signed 02/14/2022

**Attorneys and Law Firms**

Christopher James Bryant, Boroughs Bryant LLC, Columbia,
SC, David Allen Chaney, Jr., ACLU of South Carolina,
Greenville, SC, Adam Pergament, Pro Hac Vice, Gina Marie
Colarusso, Pro Hac Vice, John Arak Freedman, Pro Hac Vice,
John Mark Hindley, Pro Hac Vice, Arnold and Porter Kaye
Scholer LLP, Antonio LaValle Ingram, II, Pro Hac Vice,
NAACP Legal Defense and Educational Fund Inc, Patricia
Yan, Pro Hac Vice, Somil B. Trivedi, Pro Hac Vice, American
Civil Liberties Union Foundation Inc., Washington, DC,
Adriel I. Cepeda Derieux, Pro Hac Vice, American Civil
Liberties Union Foundation, Jeffrey A. Fuisz, Pro Hac Vice,
Paula Rachel Ramer, Pro Hac Vice, Arnold and Porter Kaye
Scholer LLP, John Cusick, Pro Hac Vice, Leah C. Aden, Pro
Hac Vice, Raymond Audain, Pro Hac Vice, Stuart Naifeh,
Pro Hac Vice, NAACP Legal Defense and Educational Fund
Inc, Samantha Osaki, Pro Hac Vice, American Civil Liberties
Union Foundation Inc., New York, NY, Sarah Michelle Gryll,

Pro Hac Vice, Arnold and Porter Kaye Scholer LLP, Chicago,
IL, for Plaintiffs.

La'Jessica Stringfellow, Robert E. Tyson, Jr., Vordman
Carlisle Traywick, Robinson Gray Stepp and Laffitte LLC,
Columbia, SC, John M. Gore, Pro Hac Vice, Stephen J.
Kenny, Pro Hac Vice, Jones Day, Washington, DC, for
Defendants Thomas C. Alexander, Luke A. Rankin.

Andrew Addison Mathias, William W. Wilkins, Konstantine
Peter Diamaduros, Nexsen Pruet, Greenville, SC, Erica
Hope Wells, Hamilton Bohannon Barber, Jennifer Joan
Hollingsworth, Mark Carroll Moore, Michael Antonio
Parente, Nexsen Pruet, Columbia, SC, Rhett Douglas Ricard,
Nexsen Pruet, Charleston, SC, for Defendants James H.
Lucas, Chris Murphy, Wallace H. Jordan.

Jane W. Trinkley, Mary Elizabeth Crum, Burr and Forman
LLP, Michael Reid Burchstead, Collins and Lacy PC, Thomas
Wells Nicholson, SC Department of Probation Parole and
Pardon, Columbia, SC, for Defendants Howard Knapp, John
Wells, JoAnne Day, Clifford J. Elder, Linda McCall, Scott
Moseley.

**ORDER AND OPINION**

Toby J. Heytens, United States Circuit Judge, Richard M.
Gergel, J. Michelle Childs, United States District Judge

**\*1** Before the court are the Motion to Dismiss Plaintiffs'
Amended Complaint by House Defendants James H. Lucas,
Chris Murphy, and Wallace H. Jordan (ECF No. 91) and
House Defendants' Motion to Dismiss Second Amended
Complaint and All Predecessor Complaints With Respect to
the Challenged House Districts (ECF No. 158), which argue
that Plaintiffs lack Article III standing to pursue their racial
gerrymandering claims. House Defendants also contend that
Plaintiffs failed to plausibly plead racial gerrymandering
and that this is, in reality, a non-justiciable partisan
gerrymandering action disguised as a racial gerrymandering
action. Finally, House Defendants seek a stay of certain
discovery deadlines pending a ruling on these motions. (ECF
No. 159). For the following reasons, the court **DENIES** the
Motions.

**I. BACKGROUND**

Case: 1:25-cv-00669 Document #: 80 Filed: 05/15/25 Page 65 of 91 PageID #:723

South Carolina State Conference of NAACP v. Alexander, Not Reported in Fed. Supp....

2022 WL 453533

This lawsuit alleges that the South Carolina legislature unconstitutionally relied on race when composing certain districts for the State House of Representatives. (ECF No. 154 ¶ 2.) Following a recent amendment to the operative complaint, Plaintiffs also challenge the composition of three of South Carolina's congressional districts for the U.S. House of Representatives (Districts 1, 2, and 5) as unconstitutional racial gerrymanders. (*See id.* at 69.)

There are two Plaintiffs. Plaintiff Taiwan Scott is a Black South Carolina voter residing in South Carolina's first congressional district. (*Id.* ¶ 22.) Plaintiff South Carolina State Conference of the National Association for the Advancement of Colored People ("the State Conference") is a nonprofit civil rights organization that "seeks to remove all barriers of racial discrimination through democratic processes," including discrimination in voting rights. (*Id.* ¶ 18.) The State Conference is a subsidiary of the national NAACP. (*Id.* ¶ 17.) It has 77 branches across the state, "including at least one branch in each of South Carolina's 46 counties." (*Id.* ¶ 19.) It has over 13,000 total members, who "include registered voters in the Challenged House and Congressional Districts." (*Id.* ¶¶ 20, 21.)

## II. LEGAL STANDARD

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quotation marks omitted). The "court must accept as true all of the allegations contained in a complaint," but cannot accept mere "[t]hreadbare recitals of the elements of a cause of action." *Id.* The same standard generally applies to both a motion to dismiss for failure to state a claim under Rule 12(b)(6) and a motion to dismiss for lack of standing under Rule 12(b)(1). *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 561 (1992) (standing "must be supported ... with the manner and degree of evidence required at the successive stages of the litigation"). But when a defendant presents a "factual challenge" by producing evidence that contradicts or undermines the complaint's allegations, the court has "discretion to go beyond the allegations of the complaint and in an evidentiary hearing determine if there are facts to support the jurisdictional allegations." *Beck v. McDonald*, 848 F.3d 262, 270 (4th Cir. 2017) (quotation marks omitted).

## III. ANALYSIS

### A. Standing

**\*2** Racial gerrymandering claims apply "district-by-district," not "to a State considered as an undifferentiated 'whole.' " *Alabama Legislative Black Caucus v. Alabama*, 575 U.S. 254, 262 (2015). When "a voter lives in" a particular electoral district that is the subject of an illegal racial gerrymander, that voter experiences "personal" harms, including being "subjected to a racial classification" and "being represented by a legislator who believes his primary obligation is to represent only the members of a particular racial group." *Id.* at 263 (quotation marks and alterations omitted). For that reason, a person has "standing to sue in his or her own right when that [person] resides in [a] district that he alleges was the product of a racial gerrymander." *Alabama Black Caucus*, 575 U.S. at 269 (quotation marks omitted). Because these harms "do not so keenly threaten a voter who lives elsewhere," however, such a "voter normally lacks standing to pursue a racial gerrymandering claim." *Id.* at 263; *accord Gill v. Whitford*, 138 S. Ct. 1916, 1930 (2018) ("[A] plaintiff who alleges that he is the object of a racial gerrymander ... has standing to assert only that his own district has been so gerrymandered.").

Applying these principles, Scott has adequately alleged standing to challenge South Carolina's first congressional district by alleging that he is a Black voter living in that district. (ECF No. 154 ¶ 22.) House Defendants have offered no basis to question that straightforward factual allegation. That is "sufficient" to challenge the district in which Scott resides. *Alabama Black Caucus*, 575 U.S. at 263.

As for the State Conference, "an organization has standing to bring suit on behalf of its members when its members would have standing to sue in their own right, the interests at stake are germane to the organization's purpose, and neither the claim asserted nor the relief requested requires individual members' participation in the lawsuit." *Alabama Black Caucus*, 575 U.S. at 269 (quotation marks and italics omitted). The State Conference therefore has standing if it plausibly alleges (1) it has members who reside in a district that has been racially gerrymandered; (2) combatting racial gerrymandering is germane to its purpose; and (3) there is no need for individual members to participate in the litigation.

Only the first of those factors is seriously at issue here. The second is satisfied because combatting racial gerrymandering

Case: 1:25-cv-00669 Document #: 80 Filed: 05/15/25 Page 66 of 91 PageID #:724

South Carolina State Conference of NAACP v. Alexander, Not Reported in Fed. Supp....

2022 WL 453533

is unquestionably "germane" to the NAACP's purpose. As for the third factor, House Defendants assert that "individualized participation" of voters may be necessary, ECF No. 158 at 9, but they have offered no explanation why evidence regarding individual voters would be necessary to resolve the racial gerrymandering claims here, which turn on the intent and actions of the *legislators*, not of individual voters.

At least at the pleading stage, the State Conference also has plausibly alleged that it has members who are voters residing in each challenged district. (ECF No. 154 ¶¶ 19–21.) That allegation is more than plausible, given the State Conference's unchallenged allegation that it has over 13,000 members in South Carolina, including members in all 46 counties. (*Id.* ¶ 21.) Although the allegations would be even clearer if the complaint specifically alleged that the State Conference has members in "*each*" challenged district, at this early stage the State Conference is entitled to have the language of the complaint read, and reasonable inferences drawn, in its favor. *See Beck*, 848 F.3d at 270; *cf. Alabama Black Caucus*, 575 U.S. at 270 (holding, even after bench trial, that evidence the challenger Caucus had members in "almost every county" and existed specifically to advance minority representation "support[ed] an inference that the organization has members in all of the" relevant "districts"). Further dispelling any doubt raised by the complaint's semantics, the State Conference's opposition to the motion to dismiss plainly states that "its members live in *each* of the Challenged Districts." (ECF No. 124 at 4 (emphasis added).)

**\*3** House Defendants' contrary arguments misunderstand the State Conference's burden at the pleading stage. They insist that, unless the State Conference "can identify at least one of their members" residing "in each and every Challenged House District," the claims "must be summarily and immediately dismissed." (ECF No. 158 at 8.) But, like other elements of a plaintiff's case, standing must simply be "supported ... with the manner and degree of evidence required at the successive stages of the litigation." *Lujan*, 504 U.S. at 561. Absent contrary evidence, a plausible allegation suffices. *See Beck*, 848 F.3d at 270; *accord Hancock County Board of Supervisors v. Ruhr*, 487 Fed. Appx. 189, 198 (5th Cir. 2012) (noting that the court is "aware of no precedent holding that an association must set forth the name of a particular member in its complaint in order to survive a Rule 12(b)(1) motion to dismiss based on a lack of associational standing").

House Defendants claim that they have, in fact, introduced countervailing evidence, namely discovery responses refusing to disclose the names of individual members. (*See* ECF No. 158 at 10–11.) But these responses are not evidence that the State Conference *lacks* the alleged members—they merely suggest the State Conference has reservations about revealing those member names to Defendants. At bottom, this is a discovery dispute about whether the State Conference must disclose its members—one that can and should be handled using the ordinary mechanisms for resolving such disputes.

At trial, of course, the State Conference will have to substantiate its allegations with acceptable proof. *Gill*, 138 S. Ct. at 1932. That proof may well need to include some way of identifying individual members residing in each district—the exact nature of the evidence necessary can be resolved at trial based on whether and how Defendants challenge the evidence the State Conference presents. *See Alabama Black Caucus*, 575 U.S. at 270–271. The court can, if necessary, take steps to ensure that individual voter privacy remains safeguarded. *See, e.g.*, Local Rule 5.03.

House Defendants also suggest that the members in question must not merely *reside* in the district, but must do so "*because of the change in boundaries*" in the most recent maps. (ECF No. 91 at 9 (emphasis added).) There is no basis for such a requirement, which runs counter to both binding precedent and common sense. *Alabama Black Caucus* held it is "sufficient" to establish standing if an "organization has members in all of the" challenged districts, without regard to whether they were newly added to those districts. 575 U.S. at 270. That makes sense given the primary injury in racial gerrymandering cases: being subjected to "racial classification." *Id.* at 263 (quotation marks omitted). An allegation that a district is racially gerrymandered is an allegation that everyone in the district has been subjected to a "racial classification," not just the most recent marginal additions. After all, legislators could not know where to make adjustments without considering the racial composition of the entire district. The State Conference has alleged all it must to survive a motion to dismiss.

**B. Failure to State a Claim** [1]

[1]     Although the motion to dismiss for failure to state a claim was filed before the amendment, the parties agreed to treat the motion as directed to the second

Case: 1:25-cv-00669 Document #: 80 Filed: 05/15/25 Page 67 of 91 PageID #:725

South Carolina State Conference of NAACP v. Alexander, Not Reported in Fed. Supp....

2022 WL 453533

amended complaint to the extent the arguments remained applicable. (ECF No. 111 at 2.)

The Equal Protection Clause "prevents a State, in the absence of sufficient justification, from separating its citizens into different voting districts on the basis of race." *Cooper v. Harris,* 137 S. Ct. 1455, 1463 (2017) (quotation marks omitted). A plaintiff states a claim for discrimination by plausibly alleging that a State " 'subordinated' other factors —compactness, respect for political subdivisions, partisan advantage, what have you—to 'racial considerations.' " *Id.* at 1464. This showing may be made by direct evidence of legislative intent or circumstantial evidence, including a district's shape and demographics. *Id.* Once the plaintiff makes that showing, the burden "shifts to the State to prove that its race-based sorting of voters serves a 'compelling interest' and is 'narrowly tailored' to that end." *Id.*

**\*4** The 86-page operative complaint walks through, district-by-district, circumstantial evidence suggesting that South Carolina's legislature was heavily focused on race when drawing district lines, including irregularly shaped districts that either split up contiguous Black communities (suggesting an intent to "crack" those voters to dilute their voting power) or carefully trace Black communities while excluding non-Black voters (suggesting an intent to "pack" those Black voters into as few districts as possible). The complaint also alleges various procedural irregularities in the process leading up to the adoption of the maps. Taken together, these detailed allegations, though far from conclusive, are sufficient to "plausibly" allege that race predominated the redistricting process in the challenged districts. Of course, the evidence at trial may tell a different story. But House Defendants have

provided no basis for dismissing Plaintiffs' serious allegations at this early stage.

Perhaps foreshadowing one of their defenses, House Defendants also insist that the complaint is not *really* about racial gerrymandering at all, but rather constitutes a veiled effort to raise non-justiciable allegations of partisan gerrymandering. Defendants identify no authority for the proposition that the court can forcibly recharacterize the allegations of a plaintiff's complaint in ruling on a motion to dismiss. If Plaintiffs attempt to prove their claims of racial gerrymandering exclusively with evidence of partisan gerrymandering, that would cause their racial gerrymandering claims to fail on the merits rather than because the complaint, as pleaded, failed to state a claim in the first place. And if Defendants wish to argue the districts they have drawn are a race-neutral partisan gerrymander, they can attempt to do so at trial.

## IV. CONCLUSION

After careful consideration, the court **DENIES** the Motions to Dismiss (ECF Nos. 91 and 158). The court further **DENIES** the Motion to Immediately Stay Court Order on Plaintiffs' Motion to Compel (ECF No. 153) Pursuant To Local Civil Rule 16.00 (ECF No. 159) as moot.

**IT IS SO ORDERED.**

**All Citations**

Not Reported in Fed. Supp., 2022 WL 453533

End of Document                    © 2025 Thomson Reuters. No claim to original U.S. Government Works.

Eason v. Pritzker, Not Reported in Fed. Supp. (2020)

2020 WL 6781794

2020 WL 6781794
Only the Westlaw citation is currently available.
United States District Court, N.D. Illinois, Eastern Division.

Hannibal Dwan EASON, Plaintiff,

v.

J.B. PRITZKER, et al., Defendants.

Case No. 18-cv-2553
|
Signed 11/18/2020

**Attorneys and Law Firms**

Joseph B. Carini, III, Jessica K. Velez, Johnson & Bell, Ltd., Chicago, IL, for Plaintiff.

Amanda Leigh Kozar, Joseph Shaun Moy, Maebetty Kirby, Office of the Illinois Attorney General, Chicago, IL, for Defendants Alan Pasley, Don Mills, Jr., J.B. Pritzker, Walter Nicolson.

Matthew H. Weller, James F. Maruna, Cassiday Schade LLP, Chicago, IL, for Defendant Dr. Page.

Joseph Shaun Moy, Maebetty Kirby, Office of the Illinois Attorney General, Chicago, IL, for Defendant Rob Jeffreys.

**MEMORANDUM OPINION AND ORDER**

Steven C. Seeger, United States District Judge

**\*1** Plaintiff Hannibal Eason is a partially deaf prisoner incarcerated by the Illinois Department of Corrections. He claims that the Governor and a group of Illinois prison administrators violated his statutory and constitutional rights by failing to accommodate his disability. He lacks hearing aids, sign language interpreters, teletypewriters, video phones, and other aids that he needs to navigate prison life.

Defendants moved to dismiss the complaint in part. They basically argue that the complaint is overbroad. It includes individual capacity claims against supervisory defendants who played no role in the alleged violations. Also, the complaint seeks injunctive relief against officials at the Stateville facility, even though Eason is no longer there. Finally, the complaint requests an injunction against the Governor, even though the Governor has no apparent connection to the policies in question.

For the reasons that follow, the Court grants in part and denies in part the motion to dismiss.

**Background**

Plaintiff Hannibal Eason is a hearing-impaired inmate in the custody of the Illinois Department of Corrections. *See* Fourth Am. Cplt., at ¶ 1 (Dckt. No. 82). He is currently incarcerated at Menard Correctional Center, but previously served time at Stateville Correctional Center. *Id.* at ¶ 8. Eason contracted meningitis as a child, leaving him partially deaf in both ears. *Id.* at ¶ 14. He is able to hear using hearing aids. *Id.* He communicates best, however, by using American Sign Language ("ASL"). *Id.*

Eason alleges that his partial deafness has made prison much harder on him, and he blames the prison system for failing to adequately accommodate his disability. His basic complaint is that the prisons have not provided adequate hearing aids, ASL interpreters, or other "auxiliary aids and services." *Id.* at ¶¶ 8–9, 14, 58, 61, 66–69, 75. He also says that the prisons did not give him sufficient access to a teletypewriter or video phone so he could communicate with the outside world. *Id.* at ¶ 9.

The complaint paints in broad brush strokes, without depicting any specific instances when he struggled without access to the aids. But the picture that emerges is that Eason couldn't communicate with others, and they couldn't communicate with him. *Id.* at ¶¶ 3–10. He hasn't been able to stay in touch with loved ones. *Id.* at ¶ 5. He can't talk with counselors or effectively discuss medical care with doctors. *Id.* He can't participate in religious services. *Id.* He can't take advantage of educational opportunities like academic classes or vocational training. *Id.* And so on.

"Plaintiff has been forced to serve his time largely isolated from [and] unable to effectively communicate with other human beings." *Id.* And without consistent access to adequate hearing aids or an ASL interpreter, Eason has been forced to rely on other inmates to navigate prison life, putting him in constant threat of exploitation. *Id.* at ¶ 7.

The communication gap has gotten him into trouble, too. "Plaintiff has been disciplined for not following orders which he could not hear." *Id.* at ¶ 6. The prisons did not use "visual

Case: 1:25-cv-00669 Document #: 80 Filed: 05/15/25 Page 69 of 91 PageID #:727

Eason v. Pritzker, Not Reported in Fed. Supp. (2020)

2020 WL 6781794

notification systems" or other techniques to communicate with Eason so he could comply with guard demands. *Id.* at ¶ 51.

**\*2** And once he was in trouble, the prisons did not enable Eason to defend himself against disciplinary charges. He "could not effectively communicate with hearing officers and investigators in his own defense." *Id.* at ¶ 6. He was left in handcuffs during disciplinary hearings, preventing him from using sign language or even pen and paper to communicate in his defense. *Id.* at ¶ 48.

The same communication breakdown has frustrated his attempts to use the prison grievance process to resolve problems. *Id.* at ¶ 8. The prisons conducted grievance hearings without "needed auxiliary aids and services," so he couldn't effectively communicate his complaints. *Id.*

Instead of granting his requests for accommodation for his hearing disability, Eason says that prison officials at Stateville simply transferred him out of the prison – first to Pontiac Correctional Center and then to Menard. *Id.* Eason says that this was a hardship transfer, sending him to a "higher security prison, with less of an ability to provide Plaintiff ADA accommodations." *Id.* at ¶ 34. But he doesn't elaborate on how things are different – or worse – at Menard.

Eason's allegations focus on his time at Stateville – before his transfer to Pontiac and then to Menard. *Id.* at ¶ 1 ("At all times relevant hereto Plaintiff was incarcerated at Stateville Correction Center in Joliet, Illinois."). But he claims that the same problems continue at Menard. *Id.* at ¶ 60. And he alleges that they are not isolated incidents. He alleges that IDOC prisons suffer a systemic problem of failing to accommodate hearing-impaired inmates, a problem caused by "policies, regular practices, and/or customs of Defendants" that are "ongoing, and continue to this date." *Id.*

Eason advanced six claims in the fourth amended complaint. The first two are statutory claims, and the other four are constitutional claims.

In Counts I & II, Eason claimed that the Americans with Disabilities Act and the Rehabilitation Act required Defendants to accommodate his disability. *Id.* at ¶¶ 56–72. In Counts III to VI, Eason brought claims under section 1983, alleging that Defendants violated his constitutional right to free speech (Count III), his right to be free from cruel

and unusual punishment (Count IV), and his rights to equal protection and due process (Counts V–VI). *Id.* at ¶¶ 73–97.

Eason sued high-ranking officials within Illinois state government. Defendants include current Illinois Governor J.B. Pritzker, current IDOC Director Rob Jeffreys, and former IDOC Director John Baldwin. *Id.* at ¶¶ 15–17. He also named IDOC ADA Coordinator Alan Pasley. *Id.* at ¶ 18. Finally, he named two executives at Stateville: Warden Walter Nicholson and Stateville ADA Facility Coordinator Donald Mills, Jr. (the "Stateville Defendants"). *Id.* at ¶¶ 19–20. There is another defendant (Dr. Page), but he or she did not move to dismiss, so this opinion will refer to the moving defendants as "Defendants."

## Analysis

A motion to dismiss under Rule 12(b)(6) challenges the sufficiency of the complaint, not the merits of the case. *See* Fed. R. Civ. P. 12(b)(6); *Gibson v. City of Chicago*, 910 F.2d 1510, 1520 (7th Cir. 1990). In considering a motion to dismiss, the Court must accept as true all well-pleaded facts in the complaint and draw all reasonable inferences in the plaintiff's favor. *See AnchorBank, FSB v. Hofer*, 649 F.3d 610, 614 (7th Cir. 2011).

**\*3** To survive, the complaint must give the defendant fair notice of the basis for the claim, and it must be facially plausible. *See Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009); *see also Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678.

Defendants did not challenge the sufficiency of the claims head-on. Instead, Defendants attempt to trim the case by reducing the number of defendants and narrowing the requested relief. The question at this point is the number of defendants and the scope of the remedies, not the adequacy of the claims themselves.

Eason advanced some claims against Defendants in their individual capacities, and some claims against Defendants in their official capacities. The lay of the land is as follows.

Eason brought statutory claims under the ADA and the Rehabilitation Act against only two Defendants: Governor

Pritzker and current IDOC Director Jeffreys. [1] He sued them in their official capacities only. *See* Fourth Am. Cplt., at ¶ 15 (Dckt. No. 82) ("Governor Pritzker is sued in his official capacity."); *id.* at ¶ 16 ("Jeffreys is sued in his official capacity."). There are no claims under the ADA and the Rehabilitation Act against any Defendant in an individual capacity.

[1] The fourth amended complaint also named former IDOC Director Baldwin as a defendant to Eason's ADA/Rehabilitation Act claims, *see* Fourth Am. Cplt., at ¶¶ 65–72 (Dckt. No. 82), but Eason dropped those claims in his response to the motion to dismiss because he is no longer the Acting IDOC Director. *See* Pl.'s Resp., at 8 (Dckt. No. 101). The Court therefore dismisses Eason's ADA and Rehabilitation Act claims against Defendant Baldwin.

The constitutional claims are a bit more complicated. Eason advanced constitutional claims against Governor Pritzker and Director Jeffreys in their official capacities (only). Eason sued Director Baldwin in his individual capacity (only). *Id.* at ¶ 17 ("Mr. Baldwin is sued in his individual capacity."). For the remaining Defendants, Eason brought constitutional claims against them in both their individual and their official capacities. *Id.* at ¶¶ 18–21.

Defendants advance a few basic arguments. First, they challenge the individual capacity claims under section 1983 on the grounds that they were not personally involved in the alleged violations. Second, they argue that Eason cannot obtain injunctive relief against the Stateville Defendants because he is no longer there. Third, they argue that Governor Pritzker is an improper party because he had no involvement in running the prisons. Finally, they challenge the belated request for monetary relief on the statutory claims – which appeared for the first time in Eason's response brief – because it does not appear in the complaint itself.

## I. Individual Capacity Claims
The four constitutional claims (Count III to VI) included claims against several of the Defendants in their individual capacities. Specifically, Eason alleged individual capacity claims against (1) former IDOC Director John Baldwin, (2) IDOC ADA Coordinator Alan Pasley, (3) Stateville Warden Walter Nicholson, and (4) Stateville ADA Facility Coordinator Donald Mills, Jr. *Id.* at ¶¶ 17–20. Eason did not bring any individual capacity claims in the first two

counts, meaning the statutory claims under the ADA and the Rehabilitation Act.

**\*4** Defendants basically argue that they had nothing to do with the alleged constitutional deprivations. *See* Mtn. to Dismiss, at 4–8 (Dckt. No. 92). The lack of any alleged involvement, in their view, means that there is no claim.

Officials face no individual liability under section 1983 unless they were personally involved in depriving a plaintiff of his or her constitutional rights. *See Williams v. Shah*, 927 F.3d 476, 482 (7th Cir. 2019) (citations omitted); *Locke v. Haessig*, 788 F.3d 662, 669 (7th Cir. 2015) ("For constitutional violations under § 1983 or *Bivens*, a government official 'is only liable for his or her own misconduct.' ") (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 677 (2009)); *Antonelli v. Sheahan*, 81 F.3d 1422, 1428 (7th Cir. 1996). To recover damages against an official in a supervisory role, a plaintiff "may not rely on a theory of respondeat superior and must instead allege that the defendant, through his or her own conduct, has violated the Constitution." *See Perez v. Fenoglio*, 792 F.3d 768, 781 (7th Cir. 2015) (citation omitted); *see also Burks v. Raemisch*, 555 F.3d 592, 593 (7th Cir. 2009) ("The assumption underlying this choice of defendants – that anyone who knew or should have known of his eye condition, and everyone higher up the bureaucratic chain, must be liable – is a bad one.").

Sitting atop the chain of command is not enough to draw an official within the scope of liability. But a managerial or policy post isn't a firewall against liability, either.

For one thing, an administrator may find out about a constitutional violation so grave that it demands a response. "[A] prison official's knowledge of prison conditions learned from an inmate's communications can, under some circumstances, constitute sufficient knowledge of the conditions" to give rise to a duty to act. *Vance v. Peters*, 97 F.3d 987, 993 (7th Cir. 1996). But the communication must give the official "sufficient notice to alert him or her" to a risk to inmate health or safety. *Id.*; *see also Perez*, 792 F.3d at 782 (requiring "sufficient knowledge" by the prison official). The official must "realize[ ]" that a substantial risk of harm to the prisoner exists, "but disregard[ ] it." *Perez*, 792 F.3d at 781. "Once an official is alerted of such a risk," the refusal to act might give rise to a claim. *See Arnett v. Webster*, 658 F.3d 742, 756 (7th Cir. 2011).

But only a substantial risk of harm is enough to put an administrator on notice. Senior officials cannot "realistically

Case: 1:25-cv-00669 Document #: 80 Filed: 05/15/25 Page 71 of 91 PageID #:729

**Eason v. Pritzker, Not Reported in Fed. Supp. (2020)**

2020 WL 6781794

be expected to be personally involved in resolving a situation pertaining to a particular inmate unless it were of the gravest nature." *See Antonelli*, 81 F.3d at 1428–29; *see also Harrell v. Sheahan*, 937 F. Supp. 754, 758 (N.D. Ill. 1996) ("The plaintiff has not directed us to any evidence indicating that Sheriff Sheahan was personally involved in, or had knowledge of, [alleged violations]. Indeed, we would be surprised to find such evidence, given the role the defendant plays in the administration of the CCDOC."); *Perkins v. Williams*, 2018 WL 453743, at *4 (N.D. Ill. 2018) (explaining that high-level officials "cannot be expected, even with the inference allowed by *Antonelli*" to know about conditions affecting a specific cell or shower).

**\*5** An administrator is, however, presumably knowledgeable about the jail's governing policies and how they affect inmates in general. An administrator "can be expected to know of or participate in creating systemic, as opposed to localized, situations." *See Antonelli*, 81 F.3d at 1429; *see also Smith v. Dart*, 803 F.3d 304, 310 (7th Cir. 2015) ("[T]he personal involvement of senior jail officials, such as [Sheriff] Dart, can be inferred at the motion to dismiss stage, where, as here, the plaintiff alleges 'potentially systemic,' as opposed to 'clearly localized,' constitutional violations.") (quoting *Antonelli*, 81 F.3d at 1428–29; *Sanders v. Sheahan*, 198 F.3d 626, 629 (7th Cir. 1999) (holding that "defendants such as the Sheriff and the Director of the Jail can realistically be expected to know about or participate in creating systemic jail conditions"). A high-ranking officer "can be expected to have personal responsibility" for "systemic violations." *Antonelli*, 81 F.3d at 1429.

A systemic violation means a general prison condition that affects a widespread group of inmates. *See Byron v. Dart*, 825 F. Supp. 2d 958, 963–64 (N.D. Ill. 2011). Examples include restrictions on library access, tampering with the mail system, inadequate recreation or nutrition, vermin infestations, and extreme hot or cold temperatures, among others. *See Antonelli*, 81 F.3d at 1426–27, 1429 (noting that claims such as "opened, delayed, and lost mail," "lack of recreation," vermin-infested living units, and "inadequate food" "allege systemic violations for which the Sheriff and the Director can be expected to have personal responsibility"); *see also Gray v. Hardy*, 826 F.3d 1000, 1008–09 (7th Cir. 2016) (vermin infestation); *Smith*, 803 F.3d at 311 ("(1) inadequate food, (2) the presence of rodents and insects, (3) no mirrors, (4) lack of outdoor recreation, and (5) contaminated water"); *Foust v. Indiana*, 1999 WL 132199, at *2 (7th Cir. 1999) ("prison-wide policies restricting

library access"); *Sanders v. Sheahan*, 198 F.3d 626, 629 (7th Cir. 1999) ("nutritionally deficient food and inadequate hygiene"). [2]

[2]
> *See also Turner v. Cook County Sheriff's Office by & through Dart*, 2020 WL 1166186, at *4–5 (N.D. Ill. 2020) (ineffective or non-existent policies to combat inmate drug overdoses); *Dodson v. Cook County Jail*, 2019 WL 764041, at *4 (N.D. Ill. 2019) (mold, dust, mildew, and contaminated drinking water); *Perkins v. Williams*, 2018 WL 453743, at *4 (N.D. Ill. 2018) (inadequate access to personal hygiene products and cleaning supplies); *Brown v. Bryant*, 2018 WL 2201584, at *3–4 (N.D. Ill. 2018) (inadequate policies to prevent and punish uses of excessive force); *Roman v. Hileman*, 2018 WL 3045622, at *5 (S.D. Ill. 2018) (unsanitary conditions); *Morton v. Dart*, 2017 WL 4785925, at *2–3 (N.D. Ill. 2017) ("extreme temperatures, mold in cells and communal showers"); *Brown v. Dart*, 2017 WL 3219217, at *2–4 (N.D. Ill. 2017) (inadequate shelter, sanitation, clothing, and food); *Lyons v. Vergara*, 2016 WL 4493455, at *4–5, *7 (N.D. Ill. 2016) (unsanitary conditions, absence of cleaning products, and vermin); *Crockwell v. Dart*, 2013 WL 6796788, at *3–4 (N.D. Ill. 2013) (inadequate handicapped facilities for wheelchair-bound detainees); *Potts v. Manos*, 2013 WL 5968930, at *4–5 (N.D. Ill. 2013) (alleged policies of excessive force and inadequate investigation); *Warren ex rel. Warren v. Dart*, 2010 WL 4883923, at *5–6 (N.D. Ill. 2010) (inadequate prison medical system); *Lieberman v. Budz*, 2010 WL 369614, at *7–8 (N.D. Ill. 2010) (inadequate shelter, vermin infestation, and contaminated water in condemned unit); *Barbosa v. McCann*, 2009 WL 2913488, at *1–2, *7 (N.D. Ill. 2009) (unsanitary conditions and inadequate cleaning supplies, vermin infestation, inadequate food, inadequate medical attention, and inadequate library access); *Jones v. Sheahan*, 2001 WL 1230551, at *5–6 (N.D. Ill. 2001) ("inadequate ventilation, excessive noise, inadequate heat, insufficient lighting, and tainted food and water" as well as "denial of reading materials").

**\*6** A few courts in this Circuit have recognized that a failure to make reasonable accommodations for obvious physical

Eason v. Pritzker, Not Reported in Fed. Supp. (2020)

2020 WL 6781794

disabilities also qualifies as a systemic problem, even if it affects only a few disabled prisoners. *See Norfleet v. IDOC*, 2018 WL 1640458, at *4 (S.D. Ill. 2018) (addressing a wheelchair-bound inmate in an overcrowded disability-equipped cell, thereby blocking his access to the toilet); *Despenza v. Sheriff of Cook County*, 2014 WL 1246298, at *2 (N.D. Ill. 2014) (considering a wheelchair-bound detainee in a cell without disability accommodations). For example, in *Crockwell*, Judge Dow noted that the Sheriff was "responsible for overseeing the general conditions of confinement at the jail," and thus was expected to have been "aware of or to have participated in creating the deleterious conditions" that affected wheelchair-bound inmates. *See Crockwell v. Dart*, 2013 WL 6796788, at *3 (N.D. Ill. 2013); *see also Armstrong v. Squadrito*, 152 F.3d 564, 581 (7th Cir. 1998) (explaining that "if the supervisor personally devised a deliberately indifferent policy that caused a constitutional injury, then individual liability might flow from that act").

The IDOC Director and ADA compliance officer are presumed to know about systemic problems with accommodations for prisoners with hearing disabilities. *See Antonelli*, 81 F.3d at 1429. The same is true for the Stateville Warden and ADA compliance officer for hearing-impaired prisoners at that facility. *Id.*

The complaint contains allegations about challenges facing hearing-impaired inmates generally, meaning problems that seem systemic. For example, several paragraphs address challenges that hearing-impaired inmates face at disciplinary hearings. *See* Fourth Am. Cplt. ¶¶ 45–47 (Dckt. No. 82). Other paragraphs describe communication obstacles that deaf inmates frequently encounter, such as an inability to hear prison alarms and instructions from guards. *Id.* at ¶¶ 50–51. Many of the allegations do seem to describe problems specific to Eason. *See, e.g., id.* at ¶¶ 5–10. But at least some of the allegations describe problems that affect hearing-impaired inmates generally.

Defendants hold high-level positions with authority over policies that apply to hearing-impaired inmates. Baldwin and Pasley were in charge of all IDOC prisons across Illinois, with Pasley in charge of ADA compliance. Nicholson was the Stateville Warden, and Mills was in charge of ADA compliance at Stateville. They may not have day-to-day interactions with hearing-impaired prisoners like Eason. But they likely have more power than boots-on-the-ground corrections officers, prison education staff, or doctors to do what Eason wants most – make accommodations for his

hearing disabilities. They are presumed to know about the alleged failures to accommodate a hearing-impaired inmates. *See Antonelli*, 81 F.3d at 1429.

In addition to imputed knowledge, Eason has alleged – albeit in conclusory fashion – that he "submitted numerous written complaints to Defendants requesting that accommodations be made available to him" and that "Defendants have actual knowledge of the unconstitutional conditions to which Plaintiff has been and continues to be subject...." *See* Fourth Am. Cplt. at ¶ 83 (Dckt. No. 82). At this early stage, that allegation is enough to put the administrators on notice of the alleged constitutional violations, particularly given that Eason complained of "systemic" not "localized" problems. *See Antonelli*, 81 F.3d at 1429; *see also Perez*, 792 F.3d at 782 (noting that an official who is not "directly responsible for the constitutional deprivation" may nevertheless be held personally responsible where the prisoner sent "many letters" to the official, who "systematically ignored these requests for redress") (citing *Gentry v. Duckworth*, 65 F.3d 555, 561 (7th Cir. 1995)). The specific details are lacking, but he alleges enough to give notice of his claim.

**\*7** Maybe the facts will look different at the summary judgment stage. But for now, Eason has alleged enough to give notice of his individual capacity claims under section 1983 to Defendants Baldwin, Pasley, Nicholson, and Mills (Counts III–VI). The motion to dismiss those claims is denied.

## II. Official Capacity Claims

Defendants make targeted arguments against the official capacity claims. They argue that Eason can't obtain injunctive relief against the Stateville Defendants because he isn't at Stateville. They also argue that Governor Pritzker is not a proper party when it comes to the request for injunctive relief. They challenge monetary damages, too. The Court agrees.

### A. Injunctive Relief Against Stateville Defendants

The Stateville Defendants argue that any official capacity claims against them for injunctive relief are moot because Eason is not there. Eason is incarcerated at Menard, not Stateville. The idea is simple – officials at one prison can't change what happened at another.

Defendants are correct. "If a prisoner seeking injunctive relief for conditions of confinement at a particular prison is transferred without a realistic possibility of return, then his request for relief becomes moot." *Tolentino v. Baker*, 679 F.

Case: 1:25-cv-00669 Document #: 80 Filed: 05/15/25 Page 73 of 91 PageID #:731

Eason v. Pritzker, Not Reported in Fed. Supp. (2020)

2020 WL 6781794

App'x. 503, 504 (7th Cir. 2017); *see also Maddox v. Love*, 655 F.3d 709, 716 (7th Cir. 2011).

Eason is no longer at Stateville. After transfer, he is now at Menard. *See* Fourth Am. Cplt., at ¶¶ 8, 14 (Dckt. No. 82). He alleges no facts showing a realistic possibility of being transferred back to Stateville. *See Tolentino*, 679 F. App'x. at 504. Therefore, the claims for injunctive relief against the Stateville Defendants (Counts III–VI) are dismissed as moot. *See Maddox*, 655 F.3d at 716.

### B. Injunctive Relief Against Governor Pritzker

Defendants also challenge the request for injunctive relief against Governor Pritzker. The gist of the argument is that the Governor is not a proper party for prospective injunctive relief because he does not have any alleged connection to the violations in question. And without a connection, the Eleventh Amendment stands in the way of prospective injunctive relief against a state official.

The Supreme Court "has consistently held that an unconsenting state is immune from suits brought in federal courts by her own citizens" under the Eleventh Amendment. *Edelman v. Jordan*, 415 U.S. 651, 662–63 (1974). "Sovereign immunity is the privilege of the sovereign not to be sued without its consent.... [A]bsent waiver or valid abrogation, federal courts may not entertain a private person's suit against a State." *Virginia Office for Prot. & Advocacy v. Stewart*, 563 U.S. 247, 253–54 (2011). "[T]he principle of sovereign immunity is a constitutional limitation on the federal judicial power established in Article III...." *Pennhurst State Sch. & Hosp. v. Halderman*, 465 U.S. 89, 98 (1984).

The immunity extends to state officials. "State agencies and officials sued in their official capacities are 'the state' for Eleventh Amendment purposes." *Olison v. Ryan*, 2000 WL 1263597, at *4 (N.D. Ill. 2000). But there are three exceptions. The first is consent – a state may waive immunity and agree to suit in federal court. *See Indiana Prot. and Advocacy Servs. v. Indiana Family and Social Servs. Admin.*, 603 F.3d 365, 371 (7th Cir. 2010). The second is the abrogation of the state's immunity by Congress. *Id.* And the third is a demand for prospective injunctive relief under *Ex parte Young. Id.*

**\*8** In *Ex parte Young*, 209 U.S. 123 (1908), the Supreme Court addressed a request for an injunction to stop a state official from prospectively violating the Constitution. The Supreme Court held that the claim was not barred by the

Eleventh Amendment on the theory that the official's actions were beyond the state's powers. *Id.* at 160. That is, when there is unconstitutional conduct, it is not the state itself doing the act – it is the official acting without any authority. *See Virginia Office for Prot. & Advocacy v. Stewart*, 563 U.S. 247, 255 (2011) ("[The *Ex parte Young* exception] rests on the premise – less delicately called a 'fiction,' – that when a federal court commands a state official to do nothing more than refrain from violating federal law, he is not the State for sovereign-immunity purposes.") (citation omitted); *see also McDonough Assoc., Inc. v. Grunloh*, 722 F.3d 1043, 1050 (7th Cir. 2013) ("*Ex parte Young* employed a chameleon-like legal fiction....").

That theory applies if the defendant is the official who is doing the unconstitutional thing – *e.g.*, enforcing an unconstitutional policy. So there needs to be a connection between the defendant and the conduct to obtain prospective injunctive relief against a state official. "In making an officer of the state a party defendant in a suit to enjoin the enforcement of an act to be unconstitutional, it is plain that such officer must have some connection with the enforcement of the act, or else it is merely making him a party as a representative of the state, and thereby attempting to make the state a party." *Ex parte Young*, 209 U.S. at 157.

Courts require a link between the "official's duties and powers under state law" and the alleged unconstitutional act to ensure that the official is not merely a representative of the state. *See Deida v. City of Milwaukee*, 192 F. Supp. 2d 899, 914 (E.D. Wis. 2002). For example, if a plaintiff objects to enforcement of an unconstitutional statute, he can sue the official charged with enforcing that statute. *See Entm't Software Ass'n v. Blagojevich*, 469 F.3d 641, 644–45 (7th Cir. 2006) (holding that an attorney general with power to enforce statute meets the standard). And the official need not have *exclusive* enforcement powers. Any official with enforcement power – even if shared with others – satisfies the "some connection" standard. *See id.* at 644–45. But not just any state official will do. "[F]or a case to fall within the scope of *Ex Parte Young,* the official being sued must be the party whose prospective actions would violate the federal law invoked." *Crosby v. Blagojevich*, 2008 WL 5111172, at *2 (N.D. Ill. Dec. 4, 2008); *see also Hearne v. Bd. of Educ. of City of Chicago*, 185 F.3d 770, 777 (7th Cir. 1999) (holding that a governor not charged with enforcement did not meet the standard); *Sherman v. Cmty. Consol. Sch. Dist. 21 of Wheeling Twp.*, 980 F.2d 437, 440–41 (7th Cir. 1992) (holding that an attorney general did not have the required connection

Eason v. Pritzker, Not Reported in Fed. Supp. (2020)

2020 WL 6781794

because the statute lacked enforcement penalties, and because the attorney general never threatened enforcement).

Governors do not automatically satisfy the "some connection" standard simply by sitting atop the executive branch. As the Supreme Court explained in *Ex parte Young*, the exception would swallow the rule if governors were fair game simply because of their position:

> If, because [the governor and attorney general] were law officers of the state, a case could be made for the purpose of testing the constitutionality of the statute, by an injunction suit brought against them, then the constitutionality of every act passed by the legislature could be tested by a suit against the governor and the attorney general, based upon the theory that the former, as the executive of the state, was, in a general sense, charged with the execution of all its laws, and the latter, as attorney general, might represent the state in litigation involving the enforcement of its statutes.

**\*9** *Ex parte Young*, 209 U.S. at 157; *see also Illinois League of Advocates for the Developmentally Disabled v. Quinn*, 2013 WL 5548929, at *3–4 (N.D. Ill. 2013) ("A theory of liability predicated on a governor's general obligations as the executive of the State cannot avoid the consequences of the Eleventh Amendment.") (collecting cases); *Mexicana v. Indiana*, 2013 WL 4088690, at *6 (N.D. Ind. 2013); *Marie O. v. Edgar*, 1994 WL 262193, at *4–5 (N.D. Ill. 1994) ("A Governor's generalized duty under Article 5, § 8 of the Illinois Constitution to 'faithfully execute' Illinois law, is insufficient to satisfy the requirement that a state official bear some connection with the enforcement of a challenged statute."); *see also Hearne*, 185 F.3d at 777 ("[T]he governor has no role to play in the enforcement of the challenged statutes, nor does the governor have the power to nullify legislation once it has entered into force.").

To fall within *Ex parte Young*, and thus obtain prospective injunctive relief against a governor, a plaintiff must allege specific involvement by the governor in the unconstitutional policy or practice. *See H.O.P.E., Inc. v. Eden Mgmt. LLC*,

2017 WL 4339824, at *8–9 (N.D. Ill. 2017) (holding that the governor had "some connection" to enforcement of a program where the "governor's office issued notices" concerning a state program); *Love v. Pence*, 47 F. Supp. 3d 805, 808–09 (S.D. Ind. 2014) (holding that the governor had "some connection" to enforcing a state law where the governor "issu[ed] *instructions* to state agencies" on compliance) (emphasis in original); *Bowling v. Pence*, 39 F. Supp. 3d 1025, 1029 (S.D. Ind. 2014) (holding that the governor had "some connection" to enforcement of a state statute concerning the recognition of marriages by same-sex couples where he sent memoranda on the issue).

Eason's complaint does not meet that standard. The complaint does not allege any meaningful connection between Governor Pritzker and the prison policies for disabled inmates. The complaint alleges that Illinois prisons have "policies, regular practices, and/or customs" that fail to accommodate his hearing disability. *See* Fourth Am. Cplt., at ¶ 60 (Dckt. No. 82). But that's about it. The complaint does not include a single sentence alleging that Governor Pritzker did anything, let alone play a role in crafting or enforcing disability policies for prisons.

Only a single paragraph of the complaint mentions the Governor at all. The complaint alleges that Governor Pritzker has "oversight responsibility" over all of the state agencies and employees. *Id.* at ¶ 15. That is true, but it's not enough. If anything, that allegation is telling, and reveals what Eason is trying to achieve – an injunction against the Governor because he's the Governor. Eason seeks prospective injunctive relief against the Governor simply because he is the top official in the executive branch in state government. Under *Ex parte Young*, that's a non-starter.

The lack of a connection between the Governor and the alleged violations would foreclose the claim, even if the Eleventh Amendment did not stand in the way. A complaint must tie the defendant to the conduct, but Eason has failed to latch the two together. *See Hearne*, 185 F.3d at 777 ("Technically, therefore, it is not the Eleventh Amendment that bars the plaintiffs' action for prospective injunctive relief against the governor; it is their inability to show that he bears any legal responsibility for the flaws they perceive in the system.").

The claims for prospective injunctive relief against Governor Pritzker (Counts I & II) are dismissed.

### C. Monetary Relief

**\*10** Defendants also make a targeted challenge to the request for monetary relief on the official capacity claims.

Eason concedes that he is not seeking damages for any official capacity claims under section 1983. *See* Pl.'s Resp., at 10 (Dckt. No. 101). The concession was unavoidable. Section 1983 does not allow suits for damages against state officials in their official capacities.

A suit against a state official in his or her official capacity is a suit against the state, and a state is not a "person" who may be liable for damages under the section 1983 statute. *See* 42 U.S.C. § 1983; *Will v. Michigan Dep't of State Police*, 491 U.S. 58, 64, 71 (1989); *Phillips v. Illinois Dep't of Fin. and Prof'l Regulation*, 718 F. App'x. 433, 434–35 (7th Cir. 2018); *Kolton v. Frerichs*, 869 F.3d 532, 535–36 (7th Cir. 2017). So, based on the text of the statute, Eason cannot recover damages on the official capacity claim under section 1983, even aside from constitutional considerations raised by the Eleventh Amendment. *See Edelman v. Jordan*, 415 U.S. 651, 662–63 (1974) ("[A]n unconsenting State is immune from suits brought in federal courts by her own citizens."); *see also Arizonans for Official English v. Arizona*, 520 U.S. 43, 69 n.24 (1997) ("State officers in their official capacities, like States themselves, are not amenable to suit for damages under Section 1983.").

But Eason contends that he may seek monetary damages for his statutory claims under the ADA and the Rehabilitation Act against Governor Pritzker and IDOC Director Jeffreys. Eason argues that those statutes do not bar the recovery of damages on official capacity claims (unlike section 1983), and Illinois does not enjoy sovereign immunity from suits for damages under the ADA and the Rehabilitation Act. *See* Pl.'s Resp., at 8–9 (Dckt. No. 101); *see also United States v.*

*Georgia*, 546 U.S. 151, 159 (2006) (holding that the ADA abrogated state sovereign immunity for ADA claims that also violate the Fourteenth Amendment, but declining to answer whether the ADA abrogated immunity for claims that do not also violate the constitution); *Jaros v. Illinois Dep't of Corr.*, 684 F.3d 667, 672 n.5 (7th Cir. 2012) ("Illinois has waived its immunity from suits for damages under the Rehabilitation Act as a condition of its receipt of federal funds.").

There is a more basic problem. Eason didn't demand damages on the statutory claims in his fourth amended complaint. Instead, he demanded injunctive relief only. *See* Fourth Am. Cplt., at ¶¶ 64, 72 (Dckt. No. 82) ("As a result of Defendants [sic] past and continuing conduct Plaintiff has been harmed and seeks injunctive relief that alleviates and rectifies the aforementioned violations to prevent similar deprivation from continuing in the future."). Rule 8(a)(3) provides that a complaint "must contain" a "demand for the relief sought." *See* Fed. R. Civ. P. 8(a)(3). Eason cannot obtain a remedy that he did not request.

### Conclusion

Defendants' motion to dismiss is granted in part and denied in part. The motion to dismiss the individual capacity claims is denied. The motion to dismiss the claims for injunctive relief against Nicholson and Mills (*i.e.*, the Stateville Defendants) is granted. The motion to dismiss the claims for injunctive relief against Governor Pritzker is granted. The motion to dismiss the official capacity claims for monetary relief is granted. Count I and II are dismissed against Defendant Baldwin, the former Acting IDOC Director.

### All Citations

Not Reported in Fed. Supp., 2020 WL 6781794

---

National Conference of Personal Managers, Inc. v. Brown, Not Reported in Fed. Supp....

2015 WL 4873541

2015 WL 4873541
Only the Westlaw citation is currently available.
United States District Court, C.D. California.

NATIONAL CONFERENCE OF
PERSONAL MANAGERS, INC., a
Nevada non-for-profit corporation, Plaintiff,
v.
Edmund G. BROWN, Jr., Governor of the State
of California, in his official capacity; Kamala
D. Harris, Attorney General of California, in her
official capacIty; Julie A. Su, California Labor
Commissioner, in her official capacity, Defendants.

Case No. CV 12-09620 DDP (RZx)
|
Signed August 13, 2015

**Attorneys and Law Firms**

Christopher B. Good, Frank William Ferguson, II, Ryan
H. Fowler, Fowler & Good LLP, Sherman Oaks, CA, for
Plaintiff.

Michael Glenn Witmer, CAAG Office of Attorney General of
California, Los Angeles, CA, for Defendants.

**ORDER GRANTING MOTION TO DISMISS
IN ACCORDANCE WITH THE MANDATE
OF NINTH CIRCUIT COURT OF APPEALS**

DEAN D. PREGERSON United States District Judge

*\*1* Presently before the Court is a motion to dismiss
Plaintiff's Complaint brought by Defendants Edmund G.
Brown, Jr., Governor of the State of California, in his official
capacity (the "Governor"); Kamala D. Harris, Attorney
General of California, in her official capacity (the "Attorney
General"); and Julie A. Su, California Labor Commissioner,
in her official capacity (the "Labor Commissioner").
Although the Court previously ruled on the motion, that
order was vacated by the Ninth Circuit and remanded with
instructions to rule on certain jurisdictional and case-or-
controversy questions. (See Dkt. No. 24 (memorandum of the
Ninth Circuit panel vacating previous order and remanding).)
The Court therefore resumes consideration of the motion in
this order.

**I. BACKGROUND**

Plaintiff National Conference of Personal Managers, Inc. is a
national trade association of United States citizens employed
as personal managers who provide representation to "artists"
as defined in Cal. Labor Code § 1700.4(b). (Compl. ¶ 10.) As
explained in Plaintiff's Opposition papers, a personal manager
oversees the work of others working for the artist, such as
the publicist, business manager, transactional attorney, and
various talent agents. [1] (Opp. at 2.)

[1]    The California Supreme Court has explained:
       Agents procure roles; they put artists on the
       screen, on the stage, behind the camera; indeed,
       by law, they only may do so. Managers
       coordinate everything else; they counsel and
       advise, take care of business arrangements, and
       chart the course of an artist's career.
       This division largely exists only in theory. The
       reality is not nearly so neat. The line dividing the
       functions of agents, who must be licensed, and
       of managers, who need not be, is often blurred
       and sometimes crossed.
       Marathon Ent., Inc. v. Blasi, 42 Cal. 4th 974, 980
       (2008).

California's Talent Agencies Act ("TAA") provides that "[n]o
person shall engage in or carry on the occupation of a
talent agency without first procuring a license therefor from
the Labor Commissioner." Cal. Labor Code § 1700.5. A
"[t]alent agency" is defined as "a person or corporation who
engages in the occupation of procuring, offering, promising,
or attempting to procure employment or engagements for an
artist or artists ...." Cal. Labor Code § 1700.4. If a person has
procured employment for an artist without a license, the Labor
Commissioner is empowered to void the contract. (Compl. ¶
38.)

The California Supreme Court case Marathon Ent., Inc v.
Blasi demonstrates how the TAA functions. 42 Cal. 4th 974
(2008). There, Marathon, a personal manager, sued Rosa
Blasi, an actress, for its commission on her earnings from
a television show, alleging that Blasi had reneged on her
oral agreement to pay a commission on her employment
earnings. Id. at 981. Blasi obtained a stay of the action and
filed a petition with the Labor Commissioner, alleging that
Marathon had violated the TAA by procuring employment for
her without a talent agency license. Id. The Commissioner
agreed and voided the contract. Id. Marathon appealed the
Commissioner's ruling to the superior court. Id. at 981-82.

Case: 1:25-cv-00669 Document #: 80 Filed: 05/15/25 Page 77 of 91 PageID #:735

National Conference of Personal Managers, Inc. v. Brown, Not Reported in Fed. Supp....

2015 WL 4873541

After a series of appeals, the California Supreme Court held that the TAA does apply to personal managers and that personal managers may not recover fees for employment procured in violation of the TAA. Id. at 986. It affirmed the court of appeal's decision, which had severed and voided the illegal portion of the contract only. Id. at 982.

**\*2** Plaintiff challenges the constitutionality of the TAA on several grounds. Plaintiff asserts that its members do not have notice of which acts they can or cannot perform for its clients without obtaining a license. It alleges that the TAA is unconstitutionally vague because it does not define "procure employment," that it results in involuntary servitude because Plaintiff is not properly compensated for its labor in violation of the Thirteenth Amendment, that it interferes with interstate commerce because it discriminates against out-of-state personal managers in violation of the Commerce Clause, and that it restricts Plaintiff's commercial speech in violation of the First Amendment.

Defendants moved to dismiss on the grounds that the Governor and Attorney General have sovereign immunity, no case or controversy exists with the Labor Commissioner, Plaintiff lacks standing, and the Complaint fails on the merits. On March 5, 2013, the Court granted Defendants' Motion to Dismiss on the merits after finding that the Plaintiff "likely has standing," that the Labor Commissioner "was likely the appropriate party to sue," and that the Governor and Attorney General "likely have sovereign immunity." (Dkt. No. 17.)

On March 6, 2015, the Ninth Circuit vacated the Court's order and remanded for a determination of the jurisdictional and standing issues. (Dkt. No. 24.)

## II. LEGAL STANDARD

A complaint will survive a motion to dismiss when it contains "sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (quoting Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007)). When considering a Rule 12(b)(6) motion, a court must "accept as true all allegations of material fact and must construe those facts in the light most favorable to the plaintiff." Resnick v. Hayes, 213 F.3d 443, 447 (9th Cir. 2000). Although a complaint need not include "detailed factual allegations," it must offer "more than an unadorned, the-defendant-unlawfully-harmed-me accusation." Iqbal, 556 U.S. at 678. Conclusory allegations or allegations that are no more than a statement of a legal conclusion "are not entitled to the assumption of truth." Id. at 679. In other words, a pleading

that merely offers "labels and conclusions," a "formulaic recitation of the elements," or "naked assertions" will not be sufficient to state a claim upon which relief can be granted. Id. at 678 (citations and internal quotation marks omitted).

"When there are well-pleaded factual allegations, a court should assume their veracity and then determine whether they plausibly give rise to an entitlement of relief." Id. at 679. Plaintiffs must allege "plausible grounds to infer" that their claims rise "above the speculative level." Twombly, 550 U.S. at 555. "Determining whether a complaint states a plausible claim for relief" is a "context-specific task that requires the reviewing court to draw on its judicial experience and common sense." Iqbal, 556 U.S. at 679.

## III. DISCUSSION

### A. Jurisdiction

Defendants argue that the Governor and the Attorney General have sovereign immunity and that no case or controversy exists between Plaintiff and the Labor Commissioner. They also assert that Plaintiff does not have standing to bring the case. The Court finds that the Governor and Attorney General have sovereign immunity. The Court also finds that the Labor Commissioner was the appropriate party to sue for her non-adjudicatory acts and that Plaintiff has standing to bring its claims.

### 1. Governor and Attorney General

Federal courts can adjudicate only those cases that the Constitution and Congress authorize them to adjudicate. Finley v. United States, 490 U.S. 545, 558-59 (1990). Under the Federal Rules of Civil Procedure, the court must dismiss an action if it determines "at any time" that it lacks subject matter jurisdiction. Fed. R. Civ. P. 12(h).

**\*3** With certain exceptions, the Eleventh Amendment has been construed to bar an action brought in federal court by a private person against a state or a state agency. Edelman v. Jordan, 415 U.S. 651, 662-63 (1974); Alabama v. Pugh, 438 U.S. 781, 782 (1978). One such exception permits suits brought against named state officials in which the plaintiff seeks prospective relief. Quern v. Jordan, 440 U.S. 332, 337 (1979).

To sue a state official under this exception, the official "must have some connection with the enforcement of the act, or

Case: 1:25-cv-00669 Document #: 80 Filed: 05/15/25 Page 78 of 91 PageID #:736

National Conference of Personal Managers, Inc. v. Brown, Not Reported in Fed. Supp....

2015 WL 4873541

else is merely making him a party as a representative of the state, and thereby attempting to make the state a party." Ex Parte Young, 209 U.S. 123, 157 (1908). See, e.g., Nat'l Audubon Soc'y, Inc. v. Davis, 307 F.3d 835, 846-47 (9th Cir. 2002)(when seeking to enjoin the enforcement of a statute banning certain animal traps, a suit against the Governor and the Secretary of Resources was barred because there was "no showing that they have the requisite enforcement connection," but a suit against the Director of the California Department of Fish & Game, who had "direct authority over and principal responsibility for enforcing" the statute, was not barred). Cf. Culinary Workers Union, Local 226 v. Del Papa, 200 F.3d 614, 619 (9th Cir. 1999) (finding that the Attorney General's cease and desist letter, which threatened to refer information about violations to prosecutors, established sufficient connection with the enforcement of the statute).

Here, the Governor and Attorney General are not alleged to have any specific connection to the enforcement of the TAA. The Complaint states that the Governor is "responsible for executing the laws of California" and that the Attorney General is "the 'chief law officer of the State,' with a duty to 'see that the laws of the State are uniformly and adequately enforced.' " (Compl. ¶¶ 12-13.) Plaintiff claims that "before the Governor signed the TAA (or any bill) into law, he should have ordered an investigation of the legality and constitutionality of the law." (Opp. at 17.) Because the Attorney General is "obligated to recognize any deficiencies in state law ... and to work to end such wrongful enforcement," she is "either actively or passively allowing an unconstitutional enforcement on the people of California." (Id.) However, these allegations of general enforcement of laws do not establish the "requisite enforcement connection" between the defendants and the TAA. See Nat'l Audubon Soc'y, 307 F.3d at 846-47; see also Long v. Van de Kamp, 961 F.2d 151, 152 (9th Cir. 1992) (per curiam) ("We doubt that the general supervisory powers of the California Attorney General are sufficient to establish the connection with enforcement required by Ex parte Young").

The Court finds that these general duties do not establish a sufficient connection between the Governor or the Attorney General and the enforcement of the TAA to meet the requirements of Ex Parte Young.

**2. Labor Commissioner**

Unlike the Governor and the Attorney General, the Labor Commissioner has particular responsibility in the enforcement of the TAA. She has the authority and duty to issue licenses (§ 1700.3), accept license applications (§ 1700.6), perform investigations in relation to licenses (§ 1700.7), collect the bond for licenses (§ 1700.15), and revoke and suspend licenses (§ 1700.21). She may "adopt, amend, and repeal such rules and regulations as are reasonably necessary" to enforce the TAA (§ 1700.29). She therefore is the proper party to sue under the Ex Parte Young analysis, as she has "some connection with the enforcement of the act." Ex Parte Young, 209 U.S. at 157. Plaintiffs allege that the Labor Commissioner is responsible for applying, enforcing, and interpreting the TAA in a way that violates their rights. (Compl. ¶¶ 1, 14.)

**\*4** Section 1983 creates a civil cause of action for the "deprivation of any rights, privileges, or immunities secured by the Constitution and laws" by any person acting "under color of any statute, ordinance, [or] regulation." 42 U.S.C. § 1983. Injunctive relief shall not be granted "in any action brought against a judicial officer for an act or omission taken in such officer's judicial capacity," unless declaratory relief is unavailable or a declaratory decree was violated. Id. "[A]t least ordinarily, no 'case or controversy' exists between a judge who adjudicates claims under a statute and a litigant who attacks the constitutionality of the statute." Grant v. Johnson, 15 F.3d 146, 148 (9th Cir. 1994) (quoting In re Justices of Supreme Court of Puerto Rico, 695 F.2d 17, 21 (1st Cir. 1982). Thus, "judges adjudicating cases pursuant to state statutes may not be sued under § 1983 in a suit challenging [a] state law." Id.

Defendants argue that the Labor Commissioner "acts in a quasi-judicial capacity" and therefore may not be sued for injunctive relief under section 1983. (MTD at 9.) The Labor Commissioner acts "solely as an adjudicator in disputes involving the TAA, and otherwise exercises no regulatory authority over personal managers." (MTD at 10.) When a controversy arises under the TAA, the matters in dispute shall be referred to the Labor Commissioner, "who shall hear and determine the same, subject to an appeal within 10 days after determination, to the superior court where the same shall be heard de novo." Cal. Labor Code § 1700.44(a). If an appeal is not timely filed, the Commissioner's determination is final and binding. Preston v. Ferrer, 552 U.S. 346, 355 (2008) (citing REO Broad. Consultants v. Martin, 81 Cal. Rptr. 2d 639, 642-643 (Ct. App. 1999)).

Case: 1:25-cv-00669 Document #: 80 Filed: 05/15/25 Page 79 of 91 PageID #:737

National Conference of Personal Managers, Inc. v. Brown, Not Reported in Fed. Supp....

2015 WL 4873541

However, it is not clear that these adjudicatory functions are the sole basis for Plaintiff's suit. Though a decision on a particular controversy is an adjudicatory decision, the Labor Commissioner's role in establishing the parameters of such proceedings and relevant regulations is not adjudicatory, but instead part of her function as an agency executive. Additionally, Plaintiff alleges that the Labor Commissioner is responsible for licensing, for her "wrongful interpretation that the Act restricts any activity relevant to procurement," and for her discrimination against out-of-state participants in the entertainment industry by not allowing licenses for non-Californians. (Compl. ¶¶ 69, 80.)

Although the Complaint is not explicit in its factual allegations pertaining to the Labor Commissioner's non-adjudicatory functions, the Court finds that the Labor Commissioner is the appropriate party to sue in such a case.

### 3. Standing

The federal judiciary can hear cases involving a controversy arising under the Constitution or other laws of the United States. U.S. Const. art. III, § 2, cl. 1. A controversy must be "real and substantial" and "definite and concrete, touching the legal relations of parties having adverse legal interests." Aetna Life Ins. Co. of Hartford, Conn. v. Haworth, 300 U.S. 227, 240-41 (1937). Three requirements must be met to establish Article III standing:

> (1) injury in fact, which means an invasion of a legally protected interest that is (a) concrete and particularized, and (b) actual or imminent, not conjectural or hypothetical; (2) a causal relationship between the injury and the challenged conduct, which means that the injury fairly can be traced to the challenged action of the defendant, and has not resulted from the independent action of some third party not before the court; and (3) a likelihood that the injury will be redressed by a favorable decision, which means that the prospect of obtaining relief from the injury as a

result of a favorable ruling is not too speculative.

**\*5** Bras v. Cal. Pub. Util. Comn'n, 59 F.3d 869, 872 (9th Cir. 1995)(citing Lujan v. Defenders of Wildlife, 504 U.S. 555, 559 (1992)).

To obtain declaratory and injunctive relief, a Plaintiff must "show a very significant possibility of future harm in order to have standing." Bras, 59 F.3d at 873. The "mere existence" of a statute that "may or may not ever be applied to plaintiffs" is insufficient to establish a case or controversy for the purposes of Article III or the Declaratory Judgment Act. W. Mining Council v. Watt, 643 F.2d 618, 627 (9th Cir. 1981).

Defendants argue that the TAA is not generally applied to Plaintiff because the "activities for which a license is required ... are not an inherent part of the functions for which personal managers contract with artists." (MTD at 15.) However, there is no clear dividing line between the roles of talent agencies and managers; the line is "often blurred and sometimes crossed." Blasi, 42 Cal. 4th at 980. "Agents sometimes counsel and advise; managers sometimes procure work. Indeed, the occasional procurement of employment opportunities may be standard operating procedure for many managers and an understood goal when not-yet-established talents ... hire managers to promote their careers." Id. Personal managers "advise, counsel, direct, and coordinate" an artist's career and "advise in both business and personal matters." Id. at 984 (citing Park v. Deftones, 71 Cal. App. 4th 1465, 1469-1470 (1999)). Therefore, to the extent that personal managers engage in conduct that is considered procuring employment, the TAA is appropriately applied to managers. See id. at 986-89.

Defendants argue that Plaintiff has not alleged an actual injury suffered as a result of the Labor Commissioner's conduct. [2] (MTD at 14.) The Complaint generally asserts that Plaintiff's members are "actually and directly impacted by the TAA and the manner in which it has been applied." (Compl. ¶ 10.) Plaintiff alleges that it has been "unfairly singled out without due process and denied its ability to pursue lawful business opportunities to the detriment of Plaintiff and the Artists that it represents." (Compl. ¶ 33.) Plaintiff also makes a conclusory allegation that "Defendants' wrongful enforcement has destroyed careers, ruined, even shortened lives." (Opp. at 10.) Plaintiff has not alleged that any one of its members has actually been engaged in a dispute that

Case: 1:25-cv-00669 Document #: 80 Filed: 05/15/25 Page 80 of 91 PageID #:738

National Conference of Personal Managers, Inc. v. Brown, Not Reported in Fed. Supp....

2015 WL 4873541

has been referred to the Labor Commissioner, and it is not clear if the Labor Commissioner will imminently determine a controversy against Plaintiff's members.

2    Defendants do not address the existence of a case or controversy between Plaintiff and the Governor and Attorney General, concentrating instead on Eleventh Amendment immunity. Because the Court agrees that the Governor and Attorney General were not appropriate parties under Ex Parte Young, Plaintiff's standing will be addressed solely as to the Labor Commissioner.

However, "a real and reasonable apprehension that [a plaintiff] will be subject to liability" creates a case or controversy suitable to seek declaratory relief that a patent is invalid. Societe de Conditionnement en Aluminium v. Hunter Eng'g Co., 655 F.2d 938, 944 (9th Cir. 1981). The defendant's actions must cause the apprehension. Hal Roach Studios, Inc. v. Richard Feiner and Co., 896 F.2d 1542, 1556 (9th Cir. 1989). The showing of apprehension "need not be substantial" if the plaintiff is engaged in an ongoing activity that could be a violation. Id. (citing Societe de Conditionnement, 655 F.2d at 944).

*6  By comparison here, Plaintiff has a "real and reasonable apprehension" that its members will be subject to liability if they do not receive a declaration that the TAA is unconstitutional. (See Compl. ¶ 44.) Prior cases reveal that other unlicensed parties have indeed faced liability because of the Labor Commissioner's actions. See Marathon Ent., Inc. v. Fox & Spillane, LLP, 2011 WL 4357854, at *2 (Cal. Ct. App. September 20, 2011) ("The other two matters were heard by the Labor Commission, and eventually proceeded to trial."); Blasi, 42 Cal.4th at 981 ("the Commissioner voided the parties' contract ab initio and barred [the manager] from recovery"). Plaintiff asserts that, due to the nature of personal managers' professional responsibilities, its members are "threatened by this enforcement on a round-the-clock basis" and are "always at risk" of enforcement to their detriment. (Opp. at 2-3.)

Defendants assert that even if the Labor Commissioner were enjoined from enforcing the TAA, a contract made in violation of the TAA would still be voidable as contrary to public policy, and thus the remedy that Plaintiff seeks would not provide proper redress. (MTD at 14.)

The Court disagrees that declaratory or injunctive relief would not resolve Plaintiff's injury. Without enforcement

of the TAA, there is no cause of action for procuring employment without a talent agency license. Individual contract claims can be brought for breach, unconscionability, or public policy reasons, but that is true with or without enforcement of the TAA. Plaintiff is not seeking to avoid liability for those causes of action. Declaratory and injunctive relief, as Plaintiff seeks (Compl., Prayer ¶¶ 1-5), will provide redress for the injury claimed. (See Compl. ¶¶ 10, 33.)

The Court finds that there is a case or controversy and that Plaintiff has standing to bring suit against the Labor Commissioner. The Court therefore addresses the merits of Plaintiff's claims.

**B. Vagueness**

Plaintiff makes a facial challenge to § 1700.44, alleging that its failure to define the meaning of "procure employment" renders the statute unconstitutionally vague in violation of the Fourteenth Amendment. Plaintiff alleges that " '[p]rocure employment' has never been defined by any court. The uncertainty of knowing when such activity may or not have occurred has left Plaintiff uncertain and highly apprehensive about the permissible parameters of its daily activity." (Compl. ¶ 59.)

A law is not unconstitutionally vague if it provides a "person of ordinary intelligence a reasonable opportunity to know what is prohibited, so that he may act accordingly." Grayned v. City of Rockford, 408 U.S. 104, 108 (1972). "When Congress does not define a term in a statute, we construe that term according to its ordinary, contemporary, common meaning." Human Life of Washington Inc. v. Brumsickle, 624 F.3d 990, 1021 (9th Cir. 2010) (quoting United States v. Kilbride, 584 F.3d 1240, 1257 (9th Cir. 2009)). A statute may be unconstitutional if it "is so standardless that it authorizes or encourages seriously discriminatory enforcement." Holder v. Humanitarian Law Project, 130 S.Ct. 2705, 2718 (2010) (quoting United States v. Williams, 553 U.S. 285, 304 (2008)). Plaintiff has not made any allegations that suggest that the statute is standardless. In its Opposition, Plaintiff claims that "[a]lmost any act undertaken by Plaintiff, even as innocuous as helping choose a headshot, could and has been linked to the ultimate goal of any artist represented by Plaintiff to get a job." (Opp. at 20.) However, this allegation, which does not appear in the Complaint, indicates only that the phrase "procure employment" could be interpreted so as to comprise a broad range of activities, broader than is desirable in the eyes of Plaintiff. This breadth does not render the statute standardless; it may indicate that the activities of

Case: 1:25-cv-00669 Document #: 80 Filed: 05/15/25 Page 81 of 91 PageID #:739

National Conference of Personal Managers, Inc. v. Brown, Not Reported in Fed. Supp....

2015 WL 4873541

personal managers and talent agents have significant overlap with respect to procuring employment for artists.

**\*7** Even if such an allegation were sufficient to be the basis for a claim that the statute is standardless, it is not sufficient to state a claim when California courts have previously interpreted the phrase and determined that its meaning is not vague. "To 'procure' means 'to get possession of: obtain, acquire, to cause to happen or be done; bring about." Wachs v. Curry, 13 Cal. App. 4th 616, 628-29 (1993)(quoting Webster's New Int'l Dict. (3d Ed. 1981) at p. 1809). The TAA uses the word "procure" in this ordinary sense. The California Court of Appeal pointed out that "[t]he term 'procure' in connection with employment is used in numerous California statutes. The fact none of these statutes has ever been challenged is some evidence the term is well understood." Id. (footnote omitted).

The Court finds that the TAA is not unconstitutionally vague.

**C. Thirteenth Amendment**

The Thirteenth Amendment is "an absolute declaration that slavery or involuntary servitude shall not exist in any part of the United States." Jones v. Alfred H. Mayer Co., 392 U.S. 409, 438 (1968) (quoting Civil Rights Cases, 109 U.S. 3, 20 (1883)). The Supreme Court has traditionally found involuntary servitude to exist only where "the victim had no available choice but to work or be subject to legal sanction." United States v. Kozminski, 487 U.S. 931, 943 (1988). See also, e.g., United States v. Reynolds, 235 U.S. 133 (1914) (finding that a criminal surety system imposing criminal sanctions on those who failed to work off a debt constituted involuntary servitude); Clyatt v. United States, 197 U.S. 207, 218 (1905) (finding that the state of peonage, in which the threat of legal sanction coerces a debtor to work off a debt, constitutes involuntary servitude).

To prove compulsion, the plaintiff must show that he had, or believed he had, no choice but to continue his state of servitude. See Kozminski, 487 U.S. at 963 (Brennan, J., concurring) (requiring the plaintiff to show that he or she "actually felt compelled to live in a slavelike condition of servitude"); United States v. Shackney, 333 F.2d 475, 486 (2d Cir. 1964) (requiring the plaintiff to show that he had, or believed he had, "no way to avoid continued service or confinement"); Watson v. Graves, 909 F.2d 1549, 1552 (5th Cir. 1990) (stating that "[w]hen the employee has a choice, even though it is a painful one, there is no involuntary servitude.") Upon demonstrating compulsion, it is for the trier of fact to decide "whether the physical or legal coercion or

threats thereof could plausibly have compelled the victim to serve." United States v. Veerapol, 312 F.3d 1128, 1132 (2002) (quoting Kozminksi, 487 U.S. at 952) (O'Connor, J., majority)).

Here, Plaintiff alleges that the enforcement of the TAA infringes on its right to be free from involuntary servitude except as punishment for a crime. (Compl. ¶¶ 66-74.) Plaintiff alleges that its unlicensed members are subject to involuntary servitude when they are denied a commission due to the voiding of their contracts by the Labor Commissioner. Plaintiff is incorrect. Not being compensated for work performed does not inevitably make that work involuntary servitude. Plaintiff's members have choices. They have the choice to refrain from procuring employment for their clients, to procure employment without a license and risk the voiding of parts of their contracts, or to obtain a license. Because they have a range of options, Plaintiffs have not stated a claim for involuntary servitude in violation of the Thirteenth Amendment.

**D. Commerce Clause**

Plaintiff alleges that the TAA interferes with interstate commerce because it "has no provision for the issuance of a License to an applicant with an out-of-state business address." (Compl. ¶ 76.) Plaintiff's sole factual basis for this allegation is that § 1700.19(b) of the Act states that a license must contain "a designation of the city, street, and number of the premises in which the licensee is authorized to carry on the business of a talent agency." Based on this single factual allegation, Plaintiff draws the inference that "[n]o provision is made in the Act for identification of any State location other than California." (Compl. ¶ 77.)

**\*8** The Court finds that this inference is weak and is not plausible in light of public documents offered by Defendants indicating that an applicant for a license must indicate city, state, and zip code. (See RJN Exh. 1, http://www.dir.ca.gov/dlse/talent_agency_license.html.) Because this evidence makes Plaintiff's inference implausible, and because Plaintiff does not allege that any of its members were refused licenses because they were located outside of California, Plaintiff has not stated a claim for violation of the Commerce Clause.

**E. First Amendment**

Plaintiff alleges that the TAA and its enforcement violate the First Amendment because it "restricts Plaintiff's commercial speech and does not directly advance a substantial state

Case: 1:25-cv-00669 Document #: 80 Filed: 05/15/25 Page 82 of 91 PageID #:740

National Conference of Personal Managers, Inc. v. Brown, Not Reported in Fed. Supp....

2015 WL 4873541

interest and is far more extensive than necessary. The TAA and Defendants' enforcement of the TAA imposes more than an incidental burden on protected expression and imposes a burden based on the content of speech and the identity of the speaker." (Compl. ¶¶ 94-95.) The Court disagrees. The TAA regulates conduct, not speech. It does not limit the speech of a personal manager; it limits the personal manager's ability to enforce contractual obligations when that person engages in the conduct of procuring employment.

The fact that the activity of procuring employment takes place through speech does not mean that the TAA is a regulation of speech. "[I]t has never been deemed an abridgement of freedom of speech or press to make a course of conduct illegal merely because the conduct was in part initiated, evidenced, or carried out by means of language, either spoken, written, or printed." Giboney v. Empire Storage & Ice Co., 336 U.S. 490, 502 (1949). Here, speech is not made illegal. The Court agrees with Defendants that "the TAA licenses the *conduct* of procuring employment for artists, not the expressive means by which employment is procured." (Mot. at 22.)

### F. Contracts Clause

The Contracts Clause of the United States Constitution provides that "[n]o State shall ... pass any ... Law impairing the Obligation of Contracts." Art. I, § 10, cl. 1. The inquiry generally asks three questions: "whether there is a contractual relationship, whether a change in law impairs that contractual relationship, and whether the impairment is substantial."

Gen. Motors Corp. v. Romein, 503 U.S. 181, 186 (1992). The contract must be in existence when the law allegedly impairing it is enacted or altered; a party who enters into a contract after a law is enacted is subject to that law. See, e.g., Veix v. Sixth Ward Bldg. & Loan Ass'n of Newark, 310 U.S. 32, 38 (1940) (when the petitioner "purchased into an enterprise already regulated in the particular to which he now objects, he purchased subject to further legislation upon the same topic.").

Here, Plaintiff does not allege that the law has been altered in any way subsequent to the formation of a particular contract. Because Plaintiff points to no contract in existence when the TAA was enacted or altered, Plaintiff has failed to state a claim for a violation of the Contracts Clause of the Constitution.

### IV. CONCLUSION

The Court finds that, while Plaintiff has standing and has appropriately sued the Labor Commissioner, Plaintiff has failed to state a claim. For these reasons, the motion to dismiss is GRANTED. Because any amendment would be futile, the Court grants the Motion with prejudice.

IT IS SO ORDERED.

**All Citations**

Not Reported in Fed. Supp., 2015 WL 4873541

---

**End of Document**                    © 2025 Thomson Reuters. No claim to original U.S. Government Works.

# IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF NORTH CAROLINA
## CASE NO. 1:14-CV-954

| | |
|---|---|
| **STUDENTS FOR FAIR ADMISSIONS, INC.,** | |
| **Plaintiff,** | **JOINT STIPULATION OF VOLUNTARY DISMISSAL** |
| **v.** | |
| **UNIVERSITY OF NORTH CAROLINA et al.,** | |
| **Defendants.** | |

Pursuant to Rule 41(a)(1)(A)(ii) of the Federal Rules of Civil Procedure, it is hereby stipulated and agreed upon between the parties and their respective counsel as follows:

1.      All claims pursuant to 42 U.S.C § 1981 ("Section 1981") stated in Counts I, II, and III of the Complaint are voluntarily dismissed, without prejudice, in their entirety against all Defendants.

2.      All remaining claims stated in Counts I, II, and III of the Complaint are voluntarily dismissed, without prejudice, against defendants the University of North Carolina Chapel Hill Board of Trustees, W. Lowry Caudill, Alston Gardner, Sallie Shuping-Russell, Jefferson W. Brown, Phillip L. Clay, Haywood D. Cochrane, Donald Williams Curtis, Charles G. Duckett, Peter T. Grauer, Kelly Matthews Hopkins, Steven Lerner, Dwight D. Stone, and Andrew Henry Powell, as members of the Board of

Trustees in their Official Capacity (collectively, the "UNC-Chapel Hill Board of Trustees Defendants").

3.     The parties have agreed to the dismissal of the UNC-Chapel Hill Board of Trustees Defendants on the basis of Defendants' representation that the UNC-Chapel Hill Board of Trustees Defendants do not play an active role in setting or implementing the undergraduate admissions policy of the University of North Carolina-Chapel Hill. Should discovery in the above-captioned action reveal facts to the contrary, the UNC-Chapel Hill Board of Trustees Defendants represent that they will consent to being added as defendants in this litigation. As part of this Joint Stipulation, the UNC-Chapel Hill Board of Trustees Defendants also represent that they will abide by the terms of any final judgment or order in the above-captioned litigation, subject to the usual rights of appeal, entered against any of the remaining Defendants, including any final judgment or order relating to the conduct of the University of North Carolina-Chapel Hill's affairs, including its undergraduate admissions policy.

4.     All claims pursuant to 42 U.S.C § 1983 ("Section 1983") stated in Counts I, II, and III of the Complaint are voluntarily dismissed, without prejudice, against defendants University of North Carolina, the University of North Carolina Board of Governors, and the University of North Carolina-Chapel Hill.

5.     All claims pursuant to 42 U.S.C § 2000d ("Title VI") stated in Counts I, II, and III of the Complaint are voluntarily dismissed, without prejudice, against individual defendants John C. Fennebresque, W. Louis Bissette, Jr., Joan Templeton Perry, Roger

2

Aiken, Hannah D. Gage, Ann B. Goodnight, H. Frank Frainger, Peter Hans,[1] Thomas J. Harrelson, Henry W. Hinton, James L. Holmes, Jr., Rodney E. Hood, W. Marty Kotis III, G. Leroy Lail, Scott Lampe, Steven B. Long, Joan G. MacNeill, Mary Ann Maxwell, W. Edwin McMahan, W.G. Champion Mitchell, Hari H. Math, Anna Spangler Nelson, Alex Parker, R. Doyle Parrish, Therence O. Pickett, David M. Powers, Robert S. Rippy, Harry Leo Smith, Jr., J. Craig Souza, George A. Sywassink, Richard F. Taylor, Raiford Trask III, Phillip D. Walker, Laura I. Wiley, as members of Board of Governors in their Official Capacity, President of the University of North Carolina Thomas W. Ross, Chancellor of the University of North Carolina-Chapel Hill Carol L. Folt, Executive Vice Chancellor and Provost of the University of North Carolina-Chapel Hill James W. Dean, Jr., and Vice Provost, Enrollment and Undergraduate Admissions Stephen M. Farmer.

      6.    Defendants represent that they will Answer the Complaint within two business days of the filing of this Stipulation of Dismissal.

---

[1]Peter Hans, who was named as a defendant in his official capacity in the Complaint, has resigned from the Board of Governors and thus any successor will substitute automatically by operation of Fed. R. Civ. P. 25(d).

Respectfully submitted this 20th day of March, 2015.

<u>/s/ Michael Scudder</u>
Michael Scudder
Skadden, Arps, Slate, Meagher & Flom, LLP
155 North Wacker Drive
Chicago, IL 60606-1720
(312) 407-0877
E: michael.scudder@skadden.com

<u>/s/ Lisa Gilford</u>
Lisa Gilford
Skadden, Arps, Slate, Meagher & Flom, LLP
300 South Grand Ave.
Suite 3400
Los Angeles, CA 90071
(213) 687-5130
E: lisa.gilford@skadden.com

ROY COOPER
Attorney General

<u>/s/ Stephanie Brennan</u>
Stephanie Brennan
Special Deputy Attorney General
NC State Bar No. 35955
E: sbrennan@ncdoj.gov

<u>/s/ Matthew Tulchin</u>
Matthew Tulchin
Assistant Attorney General
NC State Bar No. 43921
E:mtulchin@ncdoj.gov
NC Department of Justice
Post Office Box 629
Raleigh, NC 27602-0629
T: (919) 716-6920

*Attorneys for Defendants*

4

Respectfully submitted this 20th day of March, 2015.

/s/ Thomas R. McCarthy
Consovoy McCarthy PLLC
3033 Wilson Boulevard, Suite 700
Arlington, Virginia 22201
(703) 243-4923
E: tom@consovoymccarthy.com

/s/ William S. Consovoy
Consovoy McCarthy PLLC
3033 Wilson Boulevard, Suite 700
Arlington, Virginia 22201
(703) 243-4923
E: will@consovoymccarthy.com

/s/ J. Michael Connolly
Consovoy McCarthy PLLC
3033 Wilson Boulevard, Suite 700
Arlington, Virginia 22201
(703) 243-4923
E: mike@consovoymccarthy.com

/s/ W. Ellis Boyle
NC State Bar No.: 33826
Ellis Boyle Law PPLC
507 N. Blount St.
Raleigh, North Carolina 27604
(919) 747-8386
E: ellis@ellisboylelaw.com

*Attorneys for Plaintiffs*

5

# IN THE UNITED STATES DISTRICT COURT
# FOR THE WESTERN DISTRICT OF TEXAS
# AUSTIN DIVISION

|  |  |
|---|---|
| SPEECH FIRST, INC., | |
| *Plaintiff*, | |
| | Case No. 1:18-cv-01078-LY |
| v. | |
| GREGORY L. FENVES, *et al.*, | |
| *Defendants*. | |

## JOINT STIPULATION OF DISMISSAL

Pursuant to Federal Rule of Civil Procedure 41(a)(1)(A)(ii), Plaintiff Speech First, Inc., and all Defendants[1] file this Joint Stipulation of Dismissal, and respectfully stipulate the following:

1. Plaintiff filed suit against Defendants on December 13, 2018.

2. On December 27, 2018, Plaintiff and Defendants submitted Joint Stipulations, which included a stipulation that any injunctive or declaratory relief or attorney's fees awarded in this action to Plaintiff against Gregory L. Fenves, in his

---

[1] Defendants are Gregory L. Fenves, in his official capacity as President of The University of Texas at Austin; Soncia Reagins-Lilly, in her official capacity as Vice President for Student Affairs and Dean of Students; Chris Sedore, in his official capacity as Vice President and Chief Information Officer; Leonard N. Moore, in his official capacity as Vice President for Diversity and Community Engagement; Marquita Booker, in her official capacity as Assistant Vice President for Inclusion and Equity; Cam Beasley, in his official capacity as Chief Information Security Officer; Marilyn A. Tyus, in her official capacity as Assistant Vice President University Housing and Dining; Kimberly Burdine, Courtney Chavez, Edna Dominguez, Liz Elsen, Elisa Ramos, Audrey Sorrells, Ryan Sutton, Betty Jeanne Taylore, Tony Vo, Leslie Blair, Stephanie Bullick, Brooke Bulow, Gonzalo Gonzalez, Margaret Luevano, all in their official capacities as members of the Campus Climate Response Team; Jeffery D. Hildebrand, Paul L. Foster, Ernest Aliseda, Sara Martinez Tucker, David J. Beck, Steven Hicks, Keven P. Eltife, Janiece Longoria, James C. "Rad" Weaver, all in their official capacities as members of The University of Texas System Board of Regents; James B. Milliken, in his official capacity as the Chancellor of The University of Texas System.

official capacity as President of The University of Texas at Austin, will apply to and be binding on The University of Texas at Austin.

3.    Plaintiff and Defendants now stipulate that all claims asserted against the following Defendants are dismissed:

(i)  Soncia Reagins-Lilly, in her official capacity as Vice President for Student Affairs and Dean of Students;

(ii)  Chris Sedore, in his official capacity as Vice President and Chief Information Officer;

(iii)  Leonard N. Moore, in his official capacity as Vice President for Diversity and Community Engagement;

(iv)  Marquita Booker, in her official capacity as Assistant Vice President for Inclusion and Equity;

(v)  Cam Beasley, in his official capacity as Chief Information Security Officer;

(vi)  Marilyn A. Tyus, in her official capacity as Assistant Vice President University Housing and Dining;

(vii)  Kimberly Burdine, Courtney Chavez, Edna Dominguez, Liz Elsen, Elisa Ramos, Audrey Sorrells, Ryan Sutton, Betty Jeanne Taylore, Tony Vo, Leslie Blair, Stephanie Bullick, Brooke Bulow, Gonzalo Gonzalez, Margaret Luevano, all in their official capacities as members of the Campus Climate Response Team;

(viii)  Jeffery D. Hildebrand, Paul L. Foster, Ernest Aliseda, Sara Martinez Tucker, David J. Beck, Steven Hicks, Keven P. Eltife, Janiece Longoria, James C. "Rad" Weaver, all in their official capacities as members of The University of Texas System Board of Regents; and

(ix)  James B. Milliken, in his official capacity as the Chancellor of The University of Texas System.

Dated December 28, 2018

Respectfully Submitted,

/s/ William S. Consovoy
William S. Consovoy
Jeffrey M. Harris
J. Michael Connolly
Cameron T. Norris
CONSOVOY MCCARTHY PARK PLLC
3301 Wilson Boulevard, Suite 700
Arlington, VA 22201
[Tel.] (703) 243-9423
cam@consovoymccarthy.com

COUNSEL FOR PLAINTIFF
SPEECH FIRST, INC.

/s/ Charles L. Babcock
Charles L. Babcock
    State Bar No. 01479500
Joel Glover
    State Bar No. 24087593
JACKSON WALKER L.L.P.
1401 McKinney Street, Suite 1900
Houston, Texas 77010
[Tel.] (713) 752-4200
[Fax] (713) 752-4221
cbabcock@jw.com
jglover@jw.com

Sean D. Jordan
    State Bar No. 00790988
Adam W. Aston
    State Bar No. 24045423
JACKSON WALKER L.L.P.
100 Congress Ave., Suite 1100
Austin, Texas 78701
[Tel.] (512) 236-2000
[Fax] (512) 236-2002
sjordan@jw.com
aaston@jw.com

COUNSEL FOR DEFENDANTS

## CERTIFICATE OF SERVICE

This is to certify that on December 28, 2018, a copy of the foregoing was electronically filed with the Clerk of the Court using the ECF system which will send notification of such filing to the following:

William S. Consovoy
Jeffrey M. Harris
J. Michael Connolly
Cameron T. Norris
CONSOVOY MCCARTHY PARK PLLC
3301 Wilson Boulevard, Suite 700
Arlington, VA 22201
*cam@consovoymccarthy.com*

COUNSEL FOR PLAINTIFF SPEECH FIRST, INC.


/s/ Charles L. Babcock
Charles L. Babcock