2022 WL 17253080

2022 WL 17253080
Only the Westlaw citation is currently available.
United States District Court, N.D.
Indiana, Hammond Division.

Jane DOE, Plaintiff,

v.

Lance DUERFAHRD and

Purdue University, Defendants.

CAUSE NO.: 4:18-CV-72-JVB-JEM
|
Signed November 28, 2022

**Attorneys and Law Firms**

C. Anthony Ashford, Ashford Law Group PC, Valparaiso, IN, Amishi P. Sanghvi, Sanghvi Law PC, Valparaiso, IN, for Plaintiff.

Matthew S. Ryan, Cotsirilos Tighe Streicker Poulos & Campbell Ltd., Chicago, IL, Emily Vermylen, U.S. Department of Justice, Chicago, IL, for Defendant Lance Duerfahrd.

William P. Kealey, Matthew M. Humble, Stuart & Branigin LLP, Lafayette, IN, for Defendant Purdue University.

## OPINION AND ORDER

JOSEPH S. VAN BOKKELEN, JUDGE

**\*1** This matter is before the Court on Defendant The Trustees of Purdue University's Motion for Judgment on the Pleadings [DE 192] filed on May 3, 2022, and on Defendant The Trustees of Purdue University's Motion for Summary Judgment [DE 194] filed on May 23, 2022. No response to the motion for judgment on the pleadings was filed. Plaintiff Jane Doe filed a response to the motion for summary judgment on June 30, 2022, and Defendant Purdue University ("Purdue") filed a reply on July 22, 2022. Defendant Lance Duerfahrd has not filed any document related to these motions.

Doe initiated this cause of action on September 20, 2018. She filed an amended complaint on January 4, 2019. A motion to dismiss Doe's fifth claim was granted on August 29, 2019. The remaining claims are (1) a Title IX violation, brought against Purdue, (2) sexual assault, brought against Duerfahrd, (3) sexual battery, brought against Duerfahrd, and (4) intentional infliction of emotional distress, brought against Duerfahrd. Only the Title IX claim against Purdue is at issue in the present motions.

## MOTION FOR JUDGMENT ON THE PLEADINGS

In the motion for judgment on the pleadings, Purdue asks the Court to dismiss any claim for emotional distress damages that Doe is bringing against Purdue. In *Cummings v. Premier Rehab Keller, P.L.L.C.*, 142 S.Ct. 1562 (2022), the Supreme Court determined that emotional distress damages are not recoverable under the Spending Clause statutes of the Rehabilitation Act and the Affordable Care Act. *Id.* at 1569, 1576. Title IX is also a Spending Clause statute. *Id.* at 1569. Purdue asserts that *Cummings* establishes that emotional distress damages are not available under Title IX. Doe has not responded. In light of Purdue's motion and with no argument to the contrary provided, the Court finds that, as Title IX is a Spending Clause statute, the reasoning applied to the Rehabilitation Act and the Affordable Care Act in *Cummings* applies equally to Title IX, and Doe's complaint therefore fails to state a claim for emotional distress damages upon which relief can be granted against Purdue. *See Doe v. Purdue Univ.*, No. 2:17-CV-33, 2022 WL 32 79234, at \*13 (N.D. Ind. Aug. 11, 2022) (dismissing, based on *Cummings*, claim for emotional and psychological damages in a Title IX case). Accordingly, the Court grants judgment on the pleadings in Purdue's favor on the issue of emotional distress damages.

## MOTION FOR SUMMARY JUDGMENT

### A. Summary Judgment Standard

A motion for summary judgment must be granted "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). Rule 56(c) further requires the entry of summary judgment, after adequate time for discovery, against a party "who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

Doe v. Duerfahrd, Not Reported in Fed. Supp. (2022)

2022 WL 17253080

**\*2** The party seeking summary judgment bears the initial responsibility of informing a court of the basis for its motion and identifying the evidence, if any, which it believes demonstrates the absence of a genuine issue of material fact. *Celotex*, 477 U.S. at 323. If the moving party supports its motion for summary judgment with affidavits or other materials, it thereby shifts to the non-moving party the burden of showing that an issue of material fact exists. *Keri v. Bd. of Trust. of Purdue Univ.*, 458 F.3d 620, 628 (7th Cir. 2006).

Rule 56(e) specifies that once a properly supported motion for summary judgment is made, "the adverse party's response, by affidavits or as otherwise provided in this rule, must set forth specific facts to establish that there is a genuine issue for trial." Fed. R. Civ. P. 56(e).

In viewing the facts presented on a motion for summary judgment, a court must construe all facts in a light most favorable to the non-moving party and draw all legitimate inferences and resolve all doubts in favor of that party. *Keri*, 458 F.3d at 628. A court's role is not to evaluate the weight of the evidence, to judge the credibility of witnesses, or to determine the truth of the matter, but instead to determine whether there is a genuine issue of triable fact. *Anderson v. Liberty Lobby*, 477 U.S. 242, 249-50 (1986).

### B. Material Facts [1]

*The Duerfahrd-Doe Incidents*

In the Fall of 2016, Duerfahrd was employed as an Associate Professor at Purdue University. (Purdue's Ex. A at 5, ECF No. 194-4). At that time, Doe was a 21-year-old international undergraduate student. *Id.* Among the classes in which Doe was enrolled that semester were one class taught by Duerfahrd and one class that was taught by Duerfahrd's graduate student. (Jane Doe Dep. 62:9-63:19, ECF No. 194-6).

Doe testified that she met with Duerfahrd off campus on five separate occasions and that she was sexually assaulted by Duerfahrd on the fourth and fifth such occasions. *See id.* 47:11-14 & 48:24-49:5 (first occasion); 66:11-21 & 67:20-22 (second); 68:7-69:20 & 70:2-10 (third); 70:25-71:8 & 81:24-82:16 (fourth); & 157:11-22 (fifth). The fifth occasion occurred in Duerfahrd's office, and Duerfahrd ordered Doe to be there. (Jane Doe Decl. ¶ 46-47, ECF No. 202-1).

At various times, Duerfahrd screamed at Doe, threatened her, and told her to "shut up"; he "exploded with rage" when Doe asked why Duerfahrd was offering Doe wine in a "dark, deserted, unknown off campus location" *Id.* ¶¶ 21, 26-30. On one occasion, Duerfahrd told Doe that she wanted Duerfahrd to rape her. *Id.* ¶ 53. Once, when Doe told Duerfahrd that she was unwell, Duerfahrd responded by asking, "Did the doctor ask you to stop masturbating?" *Id.* ¶ 25.

After these interactions with Duerfahrd, Doe withdrew from classes, and Doe testified that she has been largely unable to resume her studies. *See* (Oliver Dep. 38:13-39:1, ECF No. 194-5) (withdrawal in Fall 2016); Jane Doe Dep. 192:15-195:19 & 289:22:-290:1, ECF No. 194-6) (discussing inability to resume studies).

**\*3** Doe reported Duerfahrd and filed a complaint with the U.S. Department of Education's office for Civil Rights and sent a copy to Purdue's Office of Institutional Equity. (Purdue's Ex. E., ECF No. 194-8). An investigation was initiated, and Duerfahrd resigned. (Purdue's Ex. A, ECF No. 194-4 (investigator's report); Purdue's Ex. O, ECF No. 194-18 (letter of resignation)). Doe does not allege Title IX violations regarding Purdue's post-complaint investigation of Doe's claims against Duerfahrd. (Purdue's Ex. P at 2, ECF No. 194-19).

Doe alleges that she has been harmed by Duerfahrd's actions and Purdue's failure to take action prior to Doe's report. She alleges that she has been diagnosed with Post Traumatic Stress Disorder, panic disorder, and agoraphobia due to Duerfahrd's assaults.

*Purdue's Anti-Harassment Policies and Procedures*

According to Purdue's Anti-Harassment Policies, the term "Harassment" includes sexual harassment, and is defined as "Conduct towards another person or identifiable group of persons that has the purpose or effect of: Creating an intimidating or hostile educational environment, work environment or environment for participation in a University activity." (Rollock Dep. 69:17-70:1, ECF No. 202-4). Purdue's definition of sexual harassment includes

> Any unwelcome sexual advance, request for sexual favors or

**Doe v. Duerfahrd, Not Reported in Fed. Supp. (2022)**

2022 WL 17253080

other written, verbal or physical conduct of a sexual nature when: ... Such conduct has the purpose or effect of unreasonably interfering with an individual's employment or academic performance or creating an intimidating, offensive or hostile environment for that individual's employment, education or participation in a University activity.

(Purdue's Ex. L at 30, ECF No. 194-15). The Purdue Anti-Harassment Policies also provided that:

The University reserves the right to investigate circumstances that may involve Harassment in situations where no complaint, formal or informal, has been filed. In appropriate circumstances, sanctions in accordance with this policy will be implemented.

To determine whether a particular act or course of conduct constitutes Harassment under this policy, the alleged behavior will be evaluated by considering the totality of the particular circumstances, including the nature, frequency, intensity, location, context and duration of the questioned behavior. Although repeated incidents generally create a stronger claim of Harassment, a serious incident, even if isolated, can be sufficient.

(Purdue's Ex. L at 23, ECF No. 194-15). Purdue's Procedures for Resolving Complaints of Discrimination and Harassment provided that:

The University has an obligation to respond to information of which it becomes aware, whether received directly or indirectly. That is, the University's obligation may be triggered by a direct disclosure by those who have experienced potential discrimination or harassment or by gaining indirect knowledge of such information. For this reason, the University may initiate an investigation of circumstances that involve potential discrimination and/or harassment even where no complaint, formal or informal, has

been filed. In those circumstances, the University may elect to investigate and, if warranted, impose disciplinary sanctions pursuant to these or other established University procedures.

(Purdue's Ex. L at 36, ECF No. 194-15).

During the 2015-16 academic year, the Policy included a couple of paragraphs that provided that sanctions for conduct that constitutes harassment, as defined by the policy, would be subject to enhancement when such conduct is motivated by bias based on a person's legally protected status as defined by federal and state law: e.g., race, gender, religion, color, age, national origin or ancestry, genetic information, or disability. (Rollock Dep. 53:11-20, ECF No. 202-4).

**\*4** Purdue's Title IX Coordinators are responsible for overseeing the investigation and resolution of all reports of sexual harassment involving students, staff, and faculty. (Purdue's Ex. L at 26, ECF No. 194-15). The Office of Institutional Equity (OIE) is the unit at Purdue that handles complaints of alleged sexual harassment, including by conducting formal investigations. (Wright Dep. 43:19-44:5, ECF No. 194-21). On the West Lafayette campus, the position of Title IX Coordinator is held by the Director of the Office of Institutional Equity. (Purdue's Ex. L at 12, ECF No. 194-15). All faculty members are mandatory reporters of all incidents of sexual harassment and must report such incidents directly to the Title IX Coordinator. *Id.* at 28.

The Director of OIE is the decisionmaker on the West Lafayette campus for complaints of alleged misconduct involving a faculty or staff member. (Wright Dep. 16:2-6, ECF No. 194-21). A report to West Lafayette campus OIE constitutes a report to a decisionmaker. (Rollock Dep. 84:21-85:25, ECF No. 194-16). A report must reach the Title IX Coordinator before the university knows of and can act on that report. *Id.* 83:3-84:4. A report can reach the Title IX Coordinator via a report made by a mandatory reporter. *Id.* 84:14-20.

*Previous Reports Involving Duerfahrd*

Previous Report Involving R.P.

Case: 1:25-cv-00669 Document #: 90-1 Filed: 05/21/25 Page 4 of 53 PageID #:797

**Doe v. Duerfahrd, Not Reported in Fed. Supp. (2022)**

2022 WL 17253080

In March of 2011, Duerfahrd and a group of students met at a local bar. (R.P. Dep. 17:3-19, 32:16-19, ECF No. 194-22). Sometime thereafter, a subset of this group migrated to a second bar. *Id.* 19:7-14, 20:9 & 26:12-21. At this second location, graduate student R.P. and Duerfahrd danced with each other. *Id.* 29:15-30:3. Duerfahrd's "hand or arm grazed [R.P.'s] chest" while the two were dancing. *Id.* 29:15-19. After this March 2011 encounter, R.P. continued and completed the course that she was taking with Duerfahrd. *Id.* 33:5-7. R.P. testified that this interaction had no effect on the rest of her semester with Duerfahrd. *Id.* 33:24-34:8.

In the context of explaining that she did not feel comfortable taking another class with Duerfahrd, R.P. disclosed the March 2011 dance floor encounter to Professor Maren Linett in January 2012 and requested that Linett keep the report confidential. (Linett Dep. 12:3-13:20, ECF No. 194-23). Subsequently, Linett submitted an anonymous report of misconduct to Purdue's OIE. *Id.* 19:4-11. At this time, Monica Bloom was the Director of the OIE on the West Lafayette campus. (Peterson Dep. 21:21-22, ECF No. 194-20). Ms. Bloom talked to Nancy Peterson (who was Head of the English Department) and Linett. (Linett Dep. 111:11-20, ECF No. 194-23; Peterson Dep. 21:15-22:12, ECF No. 194-20).

No evidence has been identified to show that Purdue was able to or should have been able to substantiate unwanted touching of R.P. by Duerfahrd or to show that drinking and dancing with students in a social setting violates Purdue policy.

Bloom and Peterson spoke to Duerfahrd and advised that he needed to hold himself to a higher standard of conduct, even if university policy did not govern it. (Peterson Dep. 52:20-53:8, ECF No. 194-20; Duerfahrd Dep. 36:23-37:5 & 38:14-39:22, ECF No. 194-24).

#### Previous Report Involving K.H.

On February 8, 2016, while investigating an unrelated matter, OIE received a report that Duerfahrd may have been in a romantic or sexual relationship with student "K.H." (Purdue Ex. V at 1, ECF No. 194-25). On February 11, 2016, OIE followed up by interviewing K.H., who denied the existence of any such relationship. *Id.* at 2. No further evidence has been identified to show that such a relationship existed.

#### Previous Reports Regarding Classroom Behavior in 2015

Purdue student G.G. met with Purdue's Director of Graduate Studies, Director of the English Department, investigators, and the Director of OIE in the fall of 2015 to report what she perceived to be sexual harassment by Duerfahrd. (G.G. Decl. ¶ 5, ECF No. 202-8). [2] G.G. discussed the following matters with those individuals:

**\*5** A. In early fall of 2015, after Duerfahrd had the class watch a film that depicted sexual violence, Duerfahrd asked a female student about the film. The student reported that she was a survivor of sexual assault and was troubled by what she watched, and Duerfahrd responded to the female student that "If that offended you, then subconsciously you wanted to be one of the girls."

B. After that incident, G.G. stayed after class to discuss a film with Duerfahrd. In the film, there was a large flower sitting on a piano. Duerfahrd asked G.G. if she knew what was better than a flower on a piano, and when she responded that she did not, Duerfahrd replied, "Tulips on an organ." He then chuckled and stated, "Sorry, making a crude joke."

C. Duerfahrd showed a pornographic film to the class and read an autobiography by one of the actors. In the book, the male author writes about hitting a "Puerto Rican" so hard that he knocked her unconscious and a cut to her head that was bleeding. The author then wrote about tending to her wound and then engaging in intercourse with her while she was still unconscious. Duerfahrd asked G.G.'s opinion of the book, and she stated that she did not like the book because of the sexual abuse that was discussed. Duerfahrd belittled G.G. in class, telling her that he wanted to talk about the craft, not the content of the book.

D. After that incident, the class was given a midterm exam. One of the questions asked something similar to, "You are watching pornography and you are turned on by the acting and not the sex depicted, and you were going to masturbate, describe how that would be."

E. Duerfahrd made G.G. sit in the front of the class while he showed the class a pornographic film because Duerfahrd stated that he did not feel like G.G. was paying enough attention.

Case: 1:25-cv-00669 Document #: 90-1 Filed: 05/21/25 Page 5 of 53 PageID #:798

Doe v. Duerfahrd, Not Reported in Fed. Supp. (2022)

2022 WL 17253080

F. In one class, Duerfahrd continued to joke about how "pussies are hard to train."

**\*6** *Id.* ¶ 6.

During the meetings with G.G., Purdue employees indicated that they were well-aware of Duerfahrd's harassment of female students, which was an "open secret." [3] *Id.* ¶ 8. G.G. wanted her name to remain confidential until she completed the class to prevent retaliation by Duerfahrd. *Id.* ¶ 7. OIE advised G.G. that they had sufficient information to move forward with action against Duerfahrd and that G.G. did not need to make a formal complaint using her name. *Id.* ¶ 9. G.G. was never advised that any action was taken against Duerfahrd regarding G.G.'s report, and OIE did not request anything further from G.G. after she completed Duerfahrd's class. *Id.* ¶ 10.

Graduate student C.G. met with Jake Amberger, an investigator with OIE, on November 13, 2015. (Purdue's Ex. A, ECF No. 194-4; Wright Dep. 44:14-17, 55:13-16). C.G. reported to Amberger that Duerfahrd asked C.G. to come after class, yelled at her, got close to her, and physically intimidated her by blocking her so she could not leave the room. (Wright Dep. 47:1-10). Duerfahrd told C.G. "You're fucking entitled" and left the room. *Id.* 47:5-10. C.G. further reported to Amberger that Duerfahrd had a midterm exam question regarding watching pornography and masturbating. *Id.* 47:13-22. C.G. withdrew from the class around September 20, 2015. (Wright Dep. 55:13-22, ECF No. 202-2).

On November 18, 2015, student K.D. submitted a written report identifying her concerns regarding Duerfahrd. (Wright Dep. 35:7-36:3, ECF No. 202-2). She met with Amberger and Associate Director of OIE Erin Oliver about those concerns. *Id.* 35:12-36:3. K.D. reported that Duerfahrd constantly made sexual or sexist comments in class that made the women in his class incredibly uncomfortable. *Id.* 22:7-16. K.D. also provided OIE with a recording of a Duerfahrd class. *Id.* 29:10-24. Purdue agrees that K.D.'s report included conduct by Duerfahrd that would potentially violate Purdue's sexual harassment policy. *Id.* 28:25-29:6.

OIE did not receive formal complaints from K.D., G.G., and C.G., and OIE did not initiate an investigation on its own based upon their allegations despite having authority to do so. (Wright Dep. 37:12-17, 65:14-25, ECF No. 202-2). Instead, the OIE director reached out to Duerfahrd's department head

to "explore and address the concerns that were raised." *Id.* 67:7-11.

The head of the English Department testified that she gave Duerfahrd expectations of how he was to behave in the future related to the use of inappropriate sexual terms in his class. (Ratcliffe Dep. 29:23-30:6, ECF No. 205-3). She explained that she thought there was a difference between critical engagement and making students feel uncomfortable in a way that created a hostile environment. *Id.* 30:15-19. The English Department head does not remember Duerfahrd being informed of any consequences he could face if he continued to use inappropriate sexual language in his class. *Id.* 29:23-30:1.

**\*7** It is "not uncommon" at Purdue, when a faculty member's concerning or unacceptable conduct does not rise to the level of a policy violation, for OIE to reach out to the department head and the faculty member, sometimes in conjunction with human resources, and to notify the faculty member of their concerns. (Wright Dep. 37:20-38:14, ECF No. 202-2).

Duerfahrd testified that he did not recall speaking to anyone from Purdue in 2015 regarding any student complaints against him. (Duerfahrd Dep. 49:20-23, ECF No. 202-5). He further stated that, prior to Jane Doe's complaint, no one at Purdue admonished him or cautioned him regarding his interactions with students, other than the R.P. dancing incident and an incident regarding a film Duerfahrd showed in class in 2009. *Id.* 48:19-49:11, 50:2-9.

Previous Report Involving A.S.

Student A.S. met with OIE in September 2016 and reported concerns regarding Duerfahrd. (Wright Dep. 100:8-11, ECF No. 205-5); *see also* (Rep. to Pl.'s Material Facts, ¶ 99, ECF No. 205-1). Amberger's notes from the meeting with A.S. report that A.S. was asked to spit out her gum at Duerfahrd's office hours on September 14th. (Wright Dep. 87:3-22, ECF No. 202-2). The notes continue:

Put out hand, spit in hand, and put in mouth.

See how long been chewing, still flavored throughout, I think. Continued to talk about a film.

As leaving, LD said get different flavor next time.

...

Case: 1:25-cv-00669 Document #: 90-1 Filed: 05/21/25 Page 6 of 53 PageID #:799

Doe v. Duerfahrd, Not Reported in Fed. Supp. (2022)

2022 WL 17253080

Friday, September 16th, asked to come back to office hours after Wednesday meeting ...

Told needed to get out of comfort zone and do things that make her uncomfortable

*Id.* 87:23-88:13. The notes record something about a machine, a strap that was put around A.S. and shook, which A.S. took off and stated she did not want to do anymore. *Id.* 88:14-19 (deponent unable to fully read handwritten notes). A.S. later reported to an individual named Parsons that Duerfahrd had A.S. try out an exercise machine, that A.S. got on for about a minute, felt uncomfortable, and got off. *Id.* 96:1-13.

There was no formal Purdue-initiated investigation following A.S.'s report. *See* (Rep. to Pl.'s Material Facts, ¶ 106, ECF No. 205-1). The department head and a Pam N. [4] spoke with Duerfahrd about unspecified matters, and the notes report that Duerfahrd "said he would never use 'c word' in class or other terms like that" and "he did say like to take students out of their comfort zone." (Purdue Ex. X, ECF No. 205-4; Wright Dep. 96:14-97:3, ECF No. 205-5 (identifying Ex. X)).

**C. Analysis**

Title IX of the Education Amendments of 1972 provides that "[n]o person ... shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance." 20 U.S.C. § 1681(a). Title IX contains an implied cause of action for private victims of discrimination. *Cannon v. Univ. of Chicago*, 441 U.S. 677, 704 (1979). As a Spending Clause statute, Title IX operates "much in the nature of a contract." *Davis v. Monroe County Bd. of Educ.*, 526 U.S. 629, 640 (1999). "In the case of Title IX, the terms are clear: a school district [or university] accepting federal funds promises to not use those funds to discriminate on the basis of sex." *C.S. v. Madison Metro. Sch. Dist.*, 34 F.4th 536, 541 (7th Cir. 2022) (*en banc*) (citing *Gebser v. Lago Vista Indep. Sch. Dist.*, 524 U.S. 274, 286, 292 (1998)). The principles of constructive notice and respondeat superior do not apply; liability only attaches where the educational institution that has accepted federal funds was aware that it was breaking its contractual promise. *Id.*

**\*8** A plaintiff seeking to hold an institution liable under Title IX must prove two elements to succeed:

*First*, "an official of the recipient entity with authority to take corrective action to end the discrimination" must have "*actual knowledge* of discrimination in the recipient's programs." *Second*, the official's "response [to that knowledge] must amount to deliberate indifference to discrimination" reflecting "an official decision by the recipient [entity] not to remedy the violation."

*Id.* (quoting *Gebser*, 524 U.S. at 290) (alterations and emphasis in original). The "actual knowledge" must be of completed or ongoing Title IX violations. *Id.* That is, there is no duty to take corrective action if no Title IX violation has occurred, even if past, non-violative behavior indicates a risk of a future Title IX violation. *Id.* at 541-42.

Once a violation has occurred, then the institution is obligated under Title IX "to act—both to remedy the existing misconduct and to prevent the further foreseeable risks from materializing." *Id.* at 542. The actions taken are not required to "be perfect or even successful." *Id.* at 543. "Owing to Title IX's roots in the Spending Clause, [an institution's] response will suffice to avoid institutional liability so long as it is not so unreasonable, under all the circumstances, as to constitute an 'official decision' to permit discrimination." *Id.* (citing *Gebser*, 524 U.S. at 290).

Doe agrees with Purdue that Purdue responded properly to Doe's complaint against Duerfahrd. However, she asserts that Purdue responded improperly to previous reports of sexual harassment by Duerfahrd. In this context, Doe must prove that Purdue knew of past discrimination by Duerfahrd and has shown itself to be unwilling to act to put an end to it. *See id.* at 544.

*1. Notice of Title IX Violations*

As a legal matter, Purdue had no duty to act "until it [had] actual knowledge of facts which, in the totality of the circumstances, indicate that sex-based discrimination [had] occurred or [was] occurring under its watch." *C.S.*, 34 F.4th at 544. Accordingly, the Court must determine if Purdue had the requisite knowledge.

a. Fall 2015

Doe asserts that Purdue had knowledge of multiple reports alleging Duerfahrd's sexual harassment of students and that

Doe v. Duerfahrd, Not Reported in Fed. Supp. (2022)

2022 WL 17253080

Purdue did nothing to stop the harassment. Specifically, Doe identifies the reports by G.G., C.G., and K.D.

G.G. reported that Duerfahrd showed a film depicting sexual violence and then told a student who disclosed that she was sexual assault survivor "[i]f that offended you, then subconsciously you wanted to be one of the girls." Later, outside of class, Duerfahrd asked G.G. if she knew what was better than a flower on a piano and told her that it was "Tulips on an organ." Duerfahrd then apologized, saying he was "making a crude joke." On a midterm examination, Duerfahrd asked students to describe masturbating to pornography while being "turned on by the acting and not the sex depicted." (G.G. Decl. ¶ 6, ECF No. 202-8).

G.G. declares that she met with OIE staff, the English Department head, and the English Department's director of graduate studies. G.G. further declares that these Purdue employees "made clear that they were well-aware of Prof. Duerfahrd's harassment of female students, representing that it was an 'open secret.' " (G.G. Decl. ¶ 8, ECF No. 202-8).

 **\*9** Another student, C.G., reported that Duerfahrd asked C.G. to come after class, yelled at her, got close to her, and physically intimidated her by blocking her so she could not leave the room. Duerfahrd told C.G. "You're fucking entitled" and left the room. (Wright Dep. 47:5-10). C.G. further reported to Amberger that Duerfahrd had a midterm exam question regarding watching pornography and masturbating. Ultimately, C.G. chose to withdraw from the class.

K.D., a third student, reported that Duerfahrd constantly made sexual or sexist comments in class that made the women in his class incredibly uncomfortable. K.D. also provided OIE with a recording of a Duerfahrd class. Purdue agrees that K.D.'s report included conduct by Duerfahrd that would potentially violate Purdue's sexual harassment policy.

Purdue dismisses G.G's, C.G.'s, and K.D.'s reports as student opinions on "course content, pedagogy, and alleged use of colorful language in the company of adults." (Rep. at 10, ECF No. 205).

When viewed in the light most favorable to Doe, however, the students reported behavior that extends beyond matters of academic freedom, curriculum choices, censorship, and off-color comments and enters the realm of harassment. There is evidence that Duerfahrd (1) told a sexual assault survivor that her discomfort watching a depiction of sexual violence

meant that she wished to be subjected to sexual violence, (2) directed a crude, sexual joke to a female student outside of class, (3) on a midterm examination asked students to write descriptions of themselves masturbating, (4) yelled at and physically intimidated a female student outside of class, (5) "constantly" made sexual or sexist comments during class that made female students uncomfortable.

Additionally, Purdue agreed that the report by K.D. included conduct that potentially violated Purdue's sexual harassment policy, and Purdue employees made clear that they were "well-aware" of the "open secret" that was Duerfahrd's harassment of female students.

There is a genuine question of fact regarding whether Purdue had actual knowledge of past discrimination by Duerfahrd during the fall semester of 2015.

b. Fall 2016

Doe also points to the 2016 report by A.S. that, when the evidence is viewed in the light most favorable to Doe, indicates that Duerfahrd told A.S. during office hours to spit her chewing gum into his hand, which Duerfahrd then placed in his own mouth and began chewing, commented on, and directed her to bring a different flavor "next time." He also had A.S. get on a shaking exercise machine that caused A.S. to feel uncomfortable. This shows a continuation of the pattern of Duerfahrd eschewing a professional manner of relating to female students outside of class and choosing a more intimate and familiar manner.

*2. Purdue's Response to the Reported Harassment*
Once the actual knowledge requirement is met, "Title IX requires [the educational entity] to 'take action to end the harassment or to limit further harassment.' " *C.S.*, 34 F.4th at 547. However, under Title IX, Purdue "will not be held liable unless its response to harassment is clearly unreasonable in light of the circumstances." *Johnson v. Northeast Sch. Corp.*, 972 F.3d 905, 911-12 (7th Cir. 2020) (citations and quotation marks omitted). "The response does not have to be perfect or even successful ... so long as it is not so unreasonable, under all the circumstances, as to constitute an official decision to permit discrimination." *C.S.*, 34 F.4th at 543 (citing *Gebser*, 524 U.S. at 290).

Case: 1:25-cv-00669 Document #: 90-1 Filed: 05/21/25 Page 8 of 53 PageID #:801

Doe v. Duerfahrd, Not Reported in Fed. Supp. (2022)

2022 WL 17253080

### a. Fall 2015

**\*10** OIE did not initiate an investigation based upon the reports made in the fall of 2015. Instead, the OIE director reached out to Duerfahrd's department head to "explore and address the concerns that were raised." (Wright Dep. 67:7-11, ECF No. 202-2). According to testimony given on behalf of Purdue, the English Department head gave Duerfahrd expectations of how he was to behave in the future related to the use of inappropriate sexual terms in his class. (Ratcliffe Dep. 29:23-30:6, ECF No. 205-3). She explained that she thought there was a difference between critical engagement and making students feel uncomfortable in a way that created a hostile environment. *Id.* 30:15-19. The English Department head does not remember Duerfahrd being informed of any consequences if he continued to use inappropriate sexual language in his class. *Id.* 29:23-30:1.

However, Duerfahrd testified that he did not recall speaking to anyone from Purdue in 2015 regarding any student complaints against him. (Duerfahrd Dep. 49:20-23, ECF No. 202-5). He further stated that, prior to Jane Doe's complaint, no one at Purdue admonished him or cautioned him regarding his interactions with students, other than the R.P. dancing incident and an incident regarding a film Duerfahrd showed in class in 2009. *Id.* 48:19-49:11, 50:2-9.

Given the conflicting evidence regarding how Purdue responded to the prior reports, there is a genuine issue of material fact, so Doe withstands summary judgment on the issue of whether Purdue was deliberately indifferent to discrimination.

### b. Fall 2016

There was no formal Purdue-initiated investigation following A.S.'s report in 2016. *See* (Rep. to Pl.'s Material Facts, ¶ 106, ECF No. 205-1). Notes recorded by Amberger regarding the situation state that the department head and Pam Nesbitt spoke with Duerfahrd about unspecified matters, and the notes report that Duerfahrd "said he would never use 'c word' in class or other terms like that" and "he did say like to take students out of their comfort zone." (Purdue Ex. X, ECF No. 205-4; Wright Dep. 96:14-97:3, ECF No. 205-5 (identifying Ex. X)).

However, once again there is a genuine issue of fact. Duerfahrd testified that, after the dancing incident with R.P, no one at Purdue admonished or cautioned him about his interactions with his students. Accordingly, questions of fact preclude a finding at this stage that Purdue's actions were not "clearly unreasonable."

### 3. Foreseeability of Risk to Jane Doe

Purdue's final argument is that any past misconduct by Duerfahrd was insufficient to alert Purdue to the possibility that Duerfahrd would become sexually involved with a student. In *Gebser*, as Purdue identifies, a single complaint that a teacher had used inappropriate comments during class was "plainly insufficient to alert the principal to the possibility that [the teacher] was involved in a sexual relationship with a student." 524 U.S. at 291.

*Gebser* is not directly on point here. Though Doe does allege that she was an unwilling recipient of Duerfahrd's sexual actions, there were more complaints against Duerfahrd than there were against the teacher in *Gebser*. Furthermore, Doe alleges milder forms of sexual harassment in addition to the sexual assaults. The Court cannot only consider whether the most egregious misconduct was foreseeable. Purdue can be liable under Title IX for lesser—but still violative— misconduct.

Doe has presented evidence that connects Duerfahrd's past behavior to instances of misconduct perpetrated against her. Similar to the midterm examination question—reported at least twice to Purdue—that asked students to describe their own masturbation, Duerfahrd asked Doe: "Did the doctor ask you to stop masturbating?" (Doe Decl. ¶ 25, ECF No. 201-1). Duerfahrd told Doe that she wanted to be raped; Purdue knew that he had previously told a sexual violence survivor that discomfort with depictions of sexual violence meant that the survivor wished to have more sexual violence inflicted on her. Duerfahrd exhibited intimidating behavior in a private setting toward Doe as he had toward C.G. Duerfahrd used his office hours as an opportunity to misconduct himself with Doe, as he had with A.S. (chewing her gum and having A.S. get on an exercise machine that made her uncomfortable). The Court need not reach the closer question of whether Duerfahrd's sexual acts on Doe were foreseeable because, at the very least, a reasonable jury could find that his milder (but still harassing) behaviors were.

**\*11** In light of Duerfahrd's continuation of behaviors for which there is evidence that Purdue took no action to curb

Case: 1:25-cv-00669 Document #: 90-1 Filed: 05/21/25 Page 9 of 53 PageID #:802

**Doe v. Duerfahrd, Not Reported in Fed. Supp. (2022)**

2022 WL 17253080

(despite there being an "open secret" that Duerfahrd harassed his female students) and the reality that "[p]ast misconduct may foreshadow even worse future misconduct," *C.S., 34 F.4th at 542*, the Court finds that a reasonable juror could determine that Doe was subjected to sexual harassment in violation of Title IX because Purdue did not act to prevent the further foreseeable risks from materializing after having actual knowledge of Duerfahrd's prior misconduct. Purdue's motion for summary judgment fails.

**CONCLUSION**

Based on the foregoing, the Court hereby **GRANTS** Defendant The Trustees of Purdue University's Motion for Judgment on the Pleadings [DE 192] and **DISMISSES** all claims for emotional damages brought by Plaintiff Jane Doe against Defendant Purdue University. The Court **DENIES** Defendant The Trustees of Purdue University's Motion for Summary Judgment [DE 194].

SO ORDERED on November 28, 2022.

**All Citations**

Not Reported in Fed. Supp., 2022 WL 17253080

---

**Footnotes**

1   Pursuant to Northern District of Indiana Local Rule 56-1(f), Purdue's request to strike portions of the record is embedded in its reply brief. To the extent objected-to portions of Doe's evidence are being used in deciding the summary judgment motion, the Court addresses Purdue's objections below in footnotes 2 and 3. Regarding objected- to statements or pieces of evidence that are not being used to decide this matter, the request to strike is denied as moot.

2   Purdue objects to the declaration and asks the Court to strike it on the basis that the "G.G." of the affidavit may not be the same "G.G." who complained about Duerfahrd. In Purdue's view, this means that the declaration fails to meet the personal knowledge requirement of Federal Rule of Evidence 602. This objection is overruled, and the Court will not strike the document.

   The declarant states that she made the reports at issue in the sworn declaration. As only one individual with initials G.G. has been identified as reporting Duerfahrd to Purdue, there is no reason to suspect any genuine confusion over G.G.'s identity, nor is there any reason to doubt the declarant's statement that she has personal knowledge of the matters addressed in the declaration. "Title 28 U.S.C. § 1746 (declarations) does not prohibit the use of nicknames, aliases, or pseudonyms." *Springer v. I.R.S.*, Nos. S97–0091, S–97–0092, & S–97–0093, 1997 WL 732526 (E.D. Cal. Sept. 12, 1997). A declarant should be "a readily identifiable person who can be subjected to the penalties for perjury." *Id.* The Court has no doubt that this is the case here.

   Purdue notes that it has used initials to identify students to comply with its obligations under the Family Educational Rights and Privacy Act (FERPA) and notes that, in contrast, Doe has no obligations to comply with FERPA. It would be of little benefit to G.G., however, if Purdue were to uphold its FERPA obligations only to have Purdue force Doe to disclose G.G.'s identity. *Cf. United States v. West*, No. 08 CR 669, 2010 WL 3951941, at *4 (N.D. Ill. 2010) ("Pseudonyms can be used when a witness's safety must be maintained"); *United States v. Pound*, No. CIV-07-427, 2010 WL 2803918, at *1 (E.D. Okla. Feb. 2, 2010) (approving use of pseudonym by a declarant).

3   Purdue asserts that the unnamed speaker's statements are hearsay. However, regardless of which of Purdue's employees identified previously as having met with G.G. made this statement, the Court concludes that the statements were on a matter within the scope of the employment relationship during the existence

**Doe v. Duerfahrd, Not Reported in Fed. Supp. (2022)**

2022 WL 17253080

of the relationship. Thus, under Federal Rule of Evidence 801(d)(2)(D), the statements are not hearsay. The Court denies the request to strike this portion of G.G.'s declaration.

4    Purdue asserts, without objection from Doe, that this is Human Resources Director Pam Nesbitt.

---

End of Document

© 2025 Thomson Reuters. No claim to original U.S. Government Works.

Doe v. Los Angeles Unified School District, Not Reported in Fed. Supp. (2017)

2017 WL 797152

2017 WL 797152
Only the Westlaw citation is currently available.
United States District Court, C.D. California.

Jane DOE

v.

LOS ANGELES UNIFIED SCHOOL DISTRICT et al.

2:16-cv-00305-CAS (JEMx)
|
Filed 02/27/2017

**Attorneys and Law Firms**

Attorneys Present for Plaintiffs: Robert Hennig, Samuel Brown.

Attorneys Present for Defendants: Lucien Schmit, III, Drew Antablin.

**Proceedings:** CARNINE'S MOTION FOR SUMMARY JUDGMENT (Dkt. 76, Filed December 28, 2016)

LOS ANGELES UNIFIED SCHOOL DISTRICT'S, PAUL REVERE MIDDLE SCHOOL'S, CHRISTOPHER PERDIGAO'S, AND THOMAS IANNUCCI'S MOTION FOR SUMMARY JUDGMENT (Dkt. 78, Filed December 29, 2016)

CHRISTINA A. SNYDER, District Judge

**I. INTRODUCTION**

*1 On January 14, 2016, plaintiff Jane Doe, a minor, by and through her parental Guardian Ad Litem, John Doe (collectively, "plaintiff"), filed the instant action against defendants: the Los Angeles Unified School District ("LAUSD"); Paul Revere Middle School and Magnet Center ("Paul Revere"); Steven Carnine ("Carnine"), a former teacher at Paul Revere; Thomas Iannucci ("Iannucci"), the assistant principal of Paul Revere; Christopher Perdigao ("Perdigao"), the principal of Paul Revere; and Michelle King ("King"), the superintendent of LAUSD (collectively, "defendants"). Dkt. 1. On March 17, 2016, all of the defendants, with the exception of Carnine, filed a motion to dismiss portions of plaintiff's complaint. Dkt. 38. On May 16, 2016, the Court granted in part and denied in part defendants' motion. Dkt. 47.

On June 14, 2016, plaintiff filed the operative First Amended Complaint ("FAC"). [1] Dkt. 50. In the FAC, plaintiff asserts claims against Paul Revere and LAUSD for: (1) Violation of Title VI of the Civil Rights Act, 42 U.S.C. § 2000d—Hostile Racial Educational Enviromnent; (2) Violation of Title VI of the Civil Rights Act, 42 U.S.C. § 2000d—Intentional Discrimination on the Basis of Race; and (3) Violation of Title VI of the Civil Rights Act, 42 U.S.C. § 2000d—Intentional Discrimination on the Basis of Race by Failure to Provide Adequate Sensitivity Training. Plaintiff also asserts two claims against the individual defendants, Carnine, Perdigao, and Iannucci: (4) Violation of 42 U.S.C. § 1983—Freedom of Speech; and (5) Violation of 42 U.S.C. § 1983—Equal Protection. In brief, plaintiff alleges that Carnine, a teacher at plaintiff's former middle school, Paul Revere, made racially offensive comments to her during class. Plaintiff alleges that the remaining defendants failed to take adequate steps to protect plaintiff from the hostile educational enviromnent that erupted after she complained about Carnine's statements.

On August 8, 2016, the Court granted defendants' motion to dismiss plaintiff's third claim for relief. Dkt. 65.

On December 28, 2016, Carnine filed a motion for summary judgment with respect to the two claims against him. Dkt. 76. On December 29, 2016, LAUSD, Paul Revere, Iannucci, and Perdigao filed a motion for summary judgment on all of plaintiff's claims. [2] Dkt. 78. On January 26, 2017, plaintiff filed an opposition to each motions. Dkts. 83-84. On February 9, 2017, Carnine filed a reply, dkt. 86, as did the LAUSD defendants, dkt. 87. The defendants also filed objections to certain evidence offered by plaintiff in support of her claims. Dkts. 86-4 (Carnine's Objections); 88 (LAUSD Defendants' Objections).

*2 Having carefully considered the parties' arguments, the Court finds and concludes as follows.

**II. BACKGROUND**

Except where otherwise noted, the following background is undisputed.

Plaintiff is an African American student who was formerly enrolled at Paul Revere Middle School. The events giving rise to plaintiff's claims for relief took place during the second semester of Jane Doe's eighth grade year at Paul Revere.

Case: 1:25-cv-00669 Document #: 90-1 Filed: 05/21/25 Page 12 of 53 PageID #:805

Doe v. Los Angeles Unified School District, Not Reported in Fed. Supp. (2017)

2017 WL 797152

### A. Carnine's History Class

At the beginning of the semester in January 2015, Doe was transferred into an Honors History class taught by Carnine. [3] When she first reported to Carnine's class, Doe brought a transfer slip, which she handed to Carnine explaining that she had been promoted into Honors History and was enrolled in his course. Doe claims that, when she first walked into Carnine's class on January 12th, Carnine's mood soured. Doe Decl. ¶ 14. She claims that Carnine had been smiling during a conversation with a Caucasian student, but stopped smiling when he saw her. Id. ¶¶ 13-14. Doe claims that Carnine stared at her silently for five seconds in a way that made her feel inferior before saying "Who are you? Why are you in my class?" Id. ¶ 14. According to Doe, when Doe presented Carnine with her transfer note, Carnine stared at her for several more seconds and said only "you can sit over there," signaling to an open seat at the front corner of the classroom, adjacent to Carnine's desk. Id.

It is undisputed that Carnine identified plaintiff as an African American student; however, the parties dispute the demographic makeup of Carnine's history class. Carnine contends that plaintiff was one of four or five students that he believed to be of African American descent out of the approximately 37 students in his class. Carnine Decl. ¶ 24. Plaintiff claims that the class was primarily made up of Caucasian students, but that a few students were of Persian descent. Doe Decl. ¶ 12. Plaintiff claims that, other than the Persian students, there was only one other student of color, a student of French African descent. Id.

On the first Friday of the semester, January 16th, the Friday before the Martin Luther King holiday, Carnine led a discussion about stereotypes. Carnine distributed a questionnaire to the class wherein he asked students to write down examples of stereotypes. Carnine then asked if anyone would like to volunteer to read examples of stereotypes they had written. Carnine recalls several stereotypes being discussed during the class. During his deposition, Carnine testified that a student said "[a]ll Jewish people are rich," and another said "blacks are good at sports." Carnine Depo. 84:9-19. Carnine recalls discussing a stereotype that Hispanic and African American students are "poor and don't perform well," id. 85:23-24, but does not recall all of the stereotypes discussed. Doe recalls a student saying that African Americans are sometimes stereotyped as being athletic and not being smart. In response, plaintiff remembers Carnine saying "yes, that is a good example ... most black

people are not smart; they're just good athletes." Doe Depo. 67:2-4. According to plaintiff, Carnine never said he did not believe in the foregoing stereotypes. Doe Decl. ¶ 22.

**\*3** At some point during the discussion, Carnine mentioned Michael Brown. [4] According to Doe, Carnine said that his own view of the situation in Ferguson, Missouri, was that "Michael Brown was a thug who got what he deserved." Doe Decl. ¶ 21; Doe Depo. 67:20-68:6. Doe recalls Carnine continuing, "I know that if I see two black people walking behind me at night. I'm immediately going to get scared and think they're either going to hurt me or rob me." Doe Depo. 68:4-6. Carnine recalls telling the class that "if Dr. Martin Luther King was living today, he would be involved in issues like the Sanford [sic] or Staten Island or Ferguson," [5] but does not recall specifically what he explained. Carnine Depo 97:3-6. Doe was very upset by Carnine's comments and relayed them to her parents that evening. Doe claims that she was worried and scared about returning to Carnine's class.

Plaintiff was sick from January 20th to January 23rd. Plaintiff returned to school on January 26th and learned that Carnine's class was scheduled to take an exam on January 28th. On January 28th plaintiff's mother was able to get a note to Carnine asking for an extension. Plaintiff claims that when she came to class on January 28th Carnine stepped in between her and her seat and said in a loud voice, "why are you in my class?" [6] Doe Decl. ¶ 29. Doe explained that she had been transferred by her former teacher, to which Carnine replied, "Why? Who was your teacher again?" Id. Doe claims that when she answered, Carnine let out an audible sigh and threw the note from her parents directly at her. Id. Carnine had written on the note that Doe could take the exam on February 2nd. After Doe took her seat, she claims Carnine said to the class, "Sorry class, but you will not be getting your test back on time because there are some students who feel like they need more time," at which point Carnine allegedly stared at Doe for several seconds. Id. ¶ 30. [7]

On January 29th, Doe attended Carnine's class again. The parties dispute what exactly was said during the January 29th class, its tone, and the context in which it occurred. Doe testified during her deposition that the students were doing "book work" during the class period, in which they would silently work in their textbooks. Doe Decl. ¶ 33. According to plaintiff, near the beginning of class:

[Carnine] said that 'If you want to know why Abraham Lincoln was hated as a president'—he then leaned into me

2017 WL 797152

and he said that 'He was an N-I-G-G-E-R lover,' and he
said, 'Isn't that right, [Jane Doe]?' And he looked at me,
and he said that to me.

Doe Depo. 75:1-9. Doe further testified that:

> [a]fter that it was—it was dead
> silence ... I just wanted to leave the
> classroom, but I was—I didn't want to
> get in trouble, and I was just really,
> really scared ... Because he was just
> really close to me and leaned into me ...
> he was really close. I could smell his
> breath, and then I was really nervous.

Id. 78:3-8. Carnine testified during his deposition that he said:

> **\*4** Excuse the vernacular of that time,
> because it's an—you know, it's a word
> that shouldn't be used, you know, in
> —except I'm using it to bring out the
> anger, the viciousness that the South
> felt at the defeat of the Civil War.

Carnine Depo. 109:21-25. Carnine claims he said "there was
much hatred of Lincoln and that much of that hatred stemmed
from the fact that he was viewed by many as a (spelling it out)
'n-i-g-g-e-r lover.' " Carnine Decl. ¶ 29. Carnine claims that
he did not direct any comment at plaintiff when he spelled the
word and that he did not stare at plaintiff. Id. ¶ 30.

### B. The School's Investigation and Response to Complaints About Carnine

While Doe was at school on January 29th, her father called
Perdigao to report Carnine's behavior from the previous
classes. Neither party offers evidence of when the call
occurred relative to Doe' class with Carnine that day plaintiff's
father recalls that when he spoke with Perdigao about the
stereotypes class, "Perdigao laughed it off and said Mr.
Carnine was 'old school' and that we should take a meeting
with Mr. Carnine to express our concerns." John Doe Decl.
¶ 21.

The evening of January 29th, plaintiff told her parents and
godmother about what had happened in her most recent
history class. plaintiff's father called the school a second
time on that same day and scheduled a meeting for the next
morning. On January 30th, plaintiff, her parents, and her
godmother all met with the vice principal, Iannucci; plaintiff's
academic counselor, Joy Kobashi; and Derek Hubbard,
an African American staff member at the school. During
the meeting, Iannucci told plaintiff's family that he would
investigate the concerns they had presented. Paul Revere staff
agreed to transfer plaintiff to a new Honors History class.
Plaintiff did not return to famine's class.

To investigate plaintiff's complaints, Iannucci randomly
selected seven students from Carnine's class, interviewed
them, and obtained written statements from them. According
to Iannucci, the students corroborated many of the facts
relayed by plaintiff about the January 29th class and
the January 16th class. [8] Iannucci planned to meet with
Carnine about plaintiff's complaint and Iannucci's subsequent
investigation. In early February 2015, before Iannucci met
with Carnine, a student with an Individualized Education Plan
("IEP") in one of Carnine's other classes complained that
Carnine made a derogatory statement about IEPs and students
who had them. Iannucci investigated both complaints, in
tandem. Throughout his investigation, Iannucci consulted
with District Operations and Staff Relations personnel within
the LAUSD administrative offices—specifically Brenda
Olortegui, Staff Relations Director at the Educational Service
Center, West ("ESC-West").

**\*5** On February 12th, Iannucci met with Carnine to
discuss the complaints. Iannucci later gave Carnine a written
conference memorandum summarizing their discussion. On
or about February 20th, Olortegui prepared and presented
a Worksheet for Potential Discipline Discussion to her
supervisor and peers in Staff Relations. The consensus of the
Staff Relations meeting was to recommend issuing a Notice
of Unsatisfactory Act ("NOUA") to Carnine and suspend him
for between five and eight days. Staff Relations presented its
recommendation to Perdigao and Iannucci, who decided to
suspend Carnine for eight days.

On March 18th, plaintiff filed a complaint in Los Angeles
County Superior Court, see Case No. BC576028 ("the State
Case"), against defendants alleging a Civil Rights Claim
based upon California's Unruh Civil Rights Act, see Cal. Civ.
Code §§ 52 et seq. [9]

Case: 1:25-cv-00669 Document #: 90-1 Filed: 05/21/25 Page 14 of 53 PageID #:807

Doe v. Los Angeles Unified School District, Not Reported in Fed. Supp. (2017)

2017 WL 797152

On March 19th, Perdigao sent a letter to Carnine notifying him that a meeting would be held to discuss Perdigao's "tentative intention to issue" an NOUA and "possible suspension." LAUSD Ex. 204. The meeting with Carnine was scheduled to occur on March 24th.

The State Case garnered immediate press attention. LAUSD staff determined that Carnine should be removed from his classroom and reassigned. Accordingly, on Friday, March 20th, Carnine was reassigned from his classroom to the LAUSD ESC-West office. On the same day, Perdigao sent a revised letter to Carnine notifying him that Perdigao's tentative recommendation was for dismissal and suspension without pay. Over the weekend between March 20th and March 23rd, LAUSD administrators reconsidered their position and determined that the original recommendation of suspension had been correct. Olortegui Decl. ¶ 10. On Monday, March 23rd, protests occurred on school grounds at Paul Revere, discussed in more detail below.

The disciplinary meeting with Carnine occurred on March 25th, at which time Paul Revere administrators served Carnine with the NOUA and a Notice of Suspension for eight days. On March 26th, Carnine appealed his suspension pursuant to the United Teachers Los Angeles Collective Bargaining Agreement and was returned to his classroom.

After Carnine sent notice of his appeal to Olortegui, it was Olortegui's responsibility to schedule an appeal meeting and move the process forward if LAUSD intended to pursue disciplinary action. Olortegui did not schedule an appeal hearing. LAUSD took no further steps to pursue disciplinary action against Carnine. Carnine was neither suspended nor terminated. Carnine's appeal of the suspension was, for practical purposes, the last act in relation to Carnine's discipline and terminated the proceedings. Carnine has since retired from teaching.

### C. The Response to the State Case

In plaintiff's declaration she states that, after January 29th, she did not receive any updates about the process and progress relating to any potential disciplinary action against Carnine. She continued to see him in the school hallways. Doe Decl. ¶ 47. Plaintiff was distressed by her experiences in Carnine's class and suffered from insomnia as well as crying spells. By March 18th, plaintiff and plaintiff's family had heard nothing about possible disciplinary action against Carnine and filed the State Case.

On March 19th, the day after plaintiff filed the State Case, there were news trucks in front of the school and a crowd of parents when plaintiff was dropped off. According to plaintiff, news broke online that she had filed the State Case. Id. ¶ 51. Plaintiff claims that fellow students began to ask her questions about it. Id. Plaintiff further claims, "I was also told by students that I was 'going to pay for this.'" Id. On March 20th, Carnine was removed from his classroom and temporarily reassigned to ESC-West.

*6 Over the weekend, March 21st and 22nd, news of the State Case spread as well as news of Carnine's reassignment. By the end of the weekend, a "Save Carnine" movement had developed among, primarily, parents and plaintiff's peers. On Sunday, March 22nd, Perdigao became aware that there was a group of people planning to organize in defense of Carnine and against the State Case.

The parties agree that, on March 23rd, there were protests on Paul Revere school grounds relating to plaintiff's State Case. Before school started on March 23rd, a group of at least 50 to 100 people, many of them parents, gathered in front of Paul Revere with signs. When plaintiff arrived at school, cars were honking and people were yelling "Bring Him Back" and "Save Carnine." Doe Decl. ¶ 54. There was also at least one news truck in front of the school.

Plaintiff recalls making her way through the protesters to get to her first class. Plaintiff claims that no administrator or teacher spoke to her or checked on her, but that her peers were asking her lots of questions focused on the State Case. Doe Decl. ¶ 58. The parties contest what transpired over the course of the remainder of the school day on March 23rd. After first period, plaintiff walked through the hallway, where she claims she heard students chanting "down with the black girl" and using profanity. Id. ¶ 59. After plaintiff's second period class she had a 15-minute nutrition break. While she was walking to her locker she "noticed more and more people holding up signs that not only read ... 'We want Carnine,' but now I was seeing people with signs and t-shirts reading 'Down with black girl' and '[Jane Doe] is a B.'" [10] Id. ¶ 61. Plaintiff claims that students were taping paper to their shirts with derogatory messages about her. Plaintiff began crying and went with a friend to cry in the bathroom. Plaintiff claims she "hid" in the bathroom for the remainder of the nutrition period. Id. Thereafter, plaintiff walked across the school grounds to physical education class. While crossing campus, she claims that she observed "more and more kids now chanting and wearing t-shirts saying 'Down with black

Case: 1:25-cv-00669 Document #: 90-1 Filed: 05/21/25 Page 15 of 53 PageID #:808

Doe v. Los Angeles Unified School District, Not Reported in Fed. Supp. (2017)

2017 WL 797152

girl' and '[Jane Doe] is a B.' ... On the way, I passed at least 5 teachers and staff who witnessed this behavior but who did nothing to stop it." Id. ¶ 63. On her way to her fourth period class, plaintiff noticed that the number of students chanting continued to grow and that the chanting became more aggressive. Id. ¶ 65. When she arrived at her fourth period class, there was a group of students inside, some of whom had "Down with the black girl" signs and began chanting "We want Carnine." Id. According to plaintiff, the students in her classroom quieted down and hid their signs when the teacher entered the room. Id.

After fourth period, plaintiff had lunch. At the beginning of lunch, there was no chanting or protesting. Plaintiff claims that, "[a]s lunch progressed, there was a huge rally of angry students chanting, 'We want Canine,' [sic] 'Jane is a B.' and 'Down with the black girl.' Mr. Perdigao and Mr. Iannucci were both there. They saw and heard everything but did not interject or stop them. They never checked on me." Id. ¶ 66. Plaintiff finished her lunch in the bathroom. Id. After fifth period, plaintiff was called to the office, where her family picked her up. Id. ¶ 68. Plaintiff could hear hundreds of students chanting as she walked to her car.

**\*7** The parties agree that at an undetermined time during the school day on March 23rd, there was a student walkout and demonstration of approximately 500 students. A large group of students did not go to class and participated in a sit-in in the quad. Iannucci Decl. ¶ 14; Perdigao ¶ 11. The large group of students congregated in the quad initially. Iannucci announced that students participating in the demonstration would be given detention. Perdigao claims, "the crowd was noisy and disruptive, we tried to get these students to go back to class, but it became apparent that would not work, so we moved these students into the school auditorium." Perdigao Decl. ¶ 11. Once in the auditorium, school administrators distributed index cards to students to write questions. Administrators answered questions and told students that "their support for Mr. Carnine could not extend to disrespectful or intimidating words or acts directed to any student." Id. After the discussion in the auditorium, most students returned to their classes. A small number remained for a sit-in in the quad. None of the participating students were punished in any way. Students who missed class were marked as absent for extracurricular activities rather than being marked as truant.

The parties dispute the tenor of the protests, what Paul Revere administrators knew or should have known about the protests, and how Paul Revere responded to the protests. [11]

Numerous school staff and teachers have submitted declarations stating that they did not see signs or shirts referring to plaintiff in disparaging language and that they did not hear disparaging chants on March 23rd. See Moreno Decl. ¶¶ 4-10 (plaintiff's homeroom teacher) [12]; Cronin Decl. ¶ 4 (plaintiff's first period teacher) [13]; Edmiston Decl. ¶¶ 4-14 (plaintiff's second period teacher); Foxson Decl. ¶¶ 4-14 (one of plaintiff's third period teachers); Walker Decl. ¶¶ 4-14 (one of plaintiff's third period teachers); Banner Decl. ¶¶ 4-14 (fourth period teacher); Mabashov Decl. ¶¶ 4-14 (fifth period teacher); Fulling Decl. ¶¶ 4-14 (sixth period teacher). Iannucci states in his declaration that he spent "most of the day" monitoring the protests outside and neither saw nor heard any derogatory messages targeting plaintiff. Iannucci Decl. ¶¶ 15;18.

The parties dispute whether or not a Paul Revere counselor "shadowed" plaintiff during the school day of March 23rd. During her deposition, Kobashi testified that she "shadowed" plaintiff on March 24th. [14] Kobashi later clarified that she does not recall the exact date. Kobashi Depo. 146:1-147:15. The LAUSD defendants argue that it could only have been March 23rd, because it is undisputed that plaintiff was absent from school March 24th to 27th. Kobashi does not recall speaking to plaintiff and does not recall observing anything out of the ordinary while she shadowed plaintiff except that plaintiff left school early. Id. 134:12-138:7.

**\*8** Plaintiff returned to school on April 7th, after spring break. Paul Revere assigned Edwina Harding to "shadow" plaintiff from the beginning of April until the end of the school year. Plaintiff claims that Harding never spoke to her and, on one occasion, when a student began asking about the State Case, Harding was "nowhere to be found." Doe Decl. ¶ 77. From April 7th, to the end of the school year, no students wore clothing or had signs disparaging plaintiff. Plaintiffs' teachers claim that they did not hear any students make disparaging comments about plaintiff from April 7th, to the end of the school year. Plaintiff claims that other students avoided her for the rest of the year. Plaintiff graduated from Paul Revere at the end of the 2015 school year.

### III. LEGAL STANDARDS

Case: 1:25-cv-00669 Document #: 90-1 Filed: 05/21/25 Page 16 of 53 PageID #:809

Doe v. Los Angeles Unified School District, Not Reported in Fed. Supp. (2017)

2017 WL 797152

Summary judgment is appropriate where "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The moving party bears the initial burden of identifying relevant portions of the record that demonstrate the absence of a fact or facts necessary for one or more essential elements of each claim upon which the moving party seeks judgment. See Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986).

If the moving party meets its initial burden, the opposing party must then set out specific facts showing a genuine issue for trial in order to defeat the motion. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 250 (1986); see also Fed. R. Civ. P. 56(c), (e). The nonmoving party must not simply rely on the pleadings and must do more than make "conclusory allegations [in] an affidavit." Lujan v. Nat'l Wildlife Fed'n, 497 U.S. 871, 888 (1990); see also Celotex, 477 U.S. at 324. Summary judgment must be granted for the moving party if the nonmoving party "fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." Id. at 322; see also Abromson v. Am. Pac. Corp., 114 F.3d 898, 902 (9th Cir. 1997).

In light of the facts presented by the nonmoving party, along with any undisputed facts, the Court must decide whether the moving party is entitled to judgment as a matter of law. See T.W. Elec. Serv., Inc. v. Pac. Elec. Contractors Ass'n, 809 F.2d 626, 631 & n.3 (9th Cir. 1987). When deciding a motion for summary judgment, "the inferences to be drawn from the underlying facts ... must be viewed in the light most favorable to the party opposing the motion." Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986) (citation omitted); Valley Nat'l Bank of Ariz. v. A.E. Rouse & Co., 121 F.3d 1332, 1335 (9th Cir. 1997). Summary judgment for the moving party is proper when a rational trier of fact would not be able to find for the nonmoving party on the claims at issue. See Matsushita, 475 U.S. at 587.

## IV. DISCUSSION

### A. Evidentiary Objections

Carnine and the LAUSD defendants make several similar objections to evidence offered by plaintiff purportedly demonstrating a material issue of disputed fact. Because they affect the Court's analysis, the Court will address two at the outset.

#### 1. Anonymous Declarations

In support of her opposition to each motion, plaintiff offers three anonymous declarations from purported friends of plaintiff. See Dkt. 83-3 (cited by plaintiff as "Student No. 1 Decl."); 83-4 ("Student No. 2 Decl."); & 83-5 ("Student No. 3 Decl."). The names and signatures of each declarant appear to have been blacked out, such that neither the Court nor defendants can identify the person offering the declaration. Although plaintiff has been permitted to proceed anonymously in this action, see dkt. 30, the Court can discern no basis for the admission and consideration of anonymous witness declarations.

*9 In rare circumstances, witnesses may testify anonymously; however, "[a]bsent extraordinary circumstances, witnesses do not testify anonymously under our system of laws." Diamond Pleasanton Enter., Inc. v. City of Pleasanton, No. 12-CV-00254-WHO, 2015 WL 74946, at *1 (N.D. Cal. Jan. 5, 2015). Plaintiff has not sought a protective order to keep juvenile witness names under seal, nor has plaintiff filed any document identifying the signators to these supporting declarations. 28 U.S.C. § 1746 requires that unsworn declarations be signed by the declarant under penalty of perjury. Without any record whatsoever of a witness's identity or their signature, a declarant cannot be held to their statements under "penalty of perjury." Indeed, the Court cannot discern whether the declarations are actually signed by any witness because the signature block is redacted. Both Carnine and the LAUSD defendants object to consideration of any portion of the foregoing anonymous declarations. Those objections are sustained. The Court declines to consider the anonymous declarations offered in support of plaintiff's opposition.

#### 2. Plaintiff's Supporting Declaration

Carnine and LAUSD also object to Doe's declaration in support of her opposition. According to defendants, Doe's declaration is a "sham declaration," upon which plaintiff cannot rely to demonstrate a material issue of disputed fact.

> [The] sham affidavit rule prevents a party who has been examined at length on deposition from raising an issue of fact simply by submitting

Case: 1:25-cv-00669 Document #: 90-1 Filed: 05/21/25 Page 17 of 53 PageID #:810

Doe v. Los Angeles Unified School District, Not Reported in Fed. Supp. (2017)

2017 WL 797152

an affidavit contradicting his own prior testimony.... But the sham affidavit rule should be applied with caution because it is in tension with the principle that the court is not to make credibility determinations when granting or denying summary judgment.

Yeager v. Bowlin, 693 F.3d 1076, 1080 (9th Cir. 2012) (quotations and citations omitted).

The parties direct the Court to numerous instances in which plaintiff's declaration allegedly contradicts her deposition testimony. Having closely reviewed plaintiff's deposition and her declaration the Court declines to make a finding that plaintiff's declaration is a sham. See Id. (district court must make a factual finding that a factual contradiction is both "clear and unambiguous" and a sham). Most of defendants' objections relate to purported omissions from Doe's deposition testimony rather than unambiguous contradictions. Statements may be deemed a sham if the declarant first testified that they did not remember certain facts but later stated them in a declaration; however, "newly-remembered facts, or new facts ... should not ordinarily lead to the striking of a declaration as a sham." Id. at 1081. Other statements to which defendants object in plaintiff's declaration are directed at plaintiff's own feelings and observations, about which plaintiff does not appear to have been asked during her deposition. For example, defendants argue that paragraph 44 of plaintiff's declaration contradicts her deposition testimony. In paragraph 44 of her declaration, plaintiff discusses her feelings during the January 30th meeting with Paul Revere staff: "I was still feeling very shook up and many of the emotions I had experienced the previous day in Mr. Carnine's class were still affecting me. I was afraid to talk." However, during her deposition, plaintiff was not asked about, nor did she testify to, her own feelings during the meeting. See Doe Depo. 109:11-109:24 (asking "What is your best recollection as to the general substance of the conversation? ... what was said generally at this meeting? ... What did you say during this meeting?"). Paragraph 44 of plaintiff's declaration does not contradict her deposition testimony, let alone warrant a finding that the declaration is a sham. Defendants' other objections similarly fail to demonstrate a material, unambiguous contradiction. In light of the foregoing, the Court does not find that Doe's declaration in opposition to the instant motions is a sham. [15]

**B. Plaintiff's Claims for Violations of Title VI of the Civil Rights Act**

*10 Plaintiff alleges two claims for violations of Title VI of the Civil Rights Act. plaintiff's first claim is that Paul Revere students subjected her to a racially hostile educational environment from March 2015 to the end of the school year which was facilitated by defendants in retaliation for plaintiff's complaints of racial harassment. FAC ¶ 145. plaintiff's second claim is that defendants intentionally denied her the benefits of public education on the basis of her race by exposing her to famine's class and failing to take remedial action. Id. ¶ 153. plaintiff's second claim further alleges a "separate theory of liability for intentional denial of the benefit of public education" insofar as defendants intentionally retaliated against plaintiff for making complaints and bringing a lawsuit alleging racial discrimination. Id. ¶ 157.

In pertinent part, Title VI of the Civil Right Act provides that no person:

shall, on the ground of race, color, or national origin, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance.

42 U.S.C. § 2000d.

**1. Plaintiff's Claim Based Upon a Racially Hostile Educational Environment.**

Since 1994, the Department of Education has interpreted Title VI as requiring recipients of federal funds to appropriately ensure that they do not subject student to a racially hostile educational environment. Department of Education regulations provide that:

A violation of title VI may also be found if a recipient has created or is responsible for a racially hostile environment —i.e., harassing conduct (e.g., physical, verbal, graphic, or written) that is sufficiently severe, pervasive or persistent

Case: 1:25-cv-00669 Document #: 90-1 Filed: 05/21/25 Page 18 of 53 PageID #:811

Doe v. Los Angeles Unified School District, Not Reported in Fed. Supp. (2017)

2017 WL 797152

so as to interfere with or limit the ability of an individual to participate in or benefit from the services, activities or privileges provided by a recipient. A recipient has subjected an individual to different treatment on the basis of race if it has effectively caused, encouraged, accepted, tolerated or failed to correct a racially hostile environment of which it has actual or constructive notice ...

Under this analysis, an alleged harasser need not be an agent or employee of the recipient, because this theory of liability under title VI is premised on a recipient's general duty to provide a nondiscriminatory educational environment.

59 Fed. Reg. at 11448. To prove a violation of Title VI's prohibition on racially hostile environments, a party must show: (1) the existence of a racially hostile environment, (2) of which a recipient of federal funds had notice and (3) failed to adequately redress. Monteiro v. Tempe Union High Sch. Dist., 158 F.3d 1022, 1033 (9th Cir. 1998) (citing 59 Fed. Reg. at 11448 for the foregoing elements and acknowledging that the Department of Education regulations are entitled to a high degree of deference regarding the meaning of Title VI's language). Since Monteiro, the Supreme Court has clarified that plaintiff must demonstrate defendant had *actual notice* of the hostile environment and that a school administrator's response to peer-on-peer harassment will be adequate if it is not "clearly unreasonable." Davis Next Friend LaShonda D. v. Monroe Cty. Bd. of Educ., 526 U.S. 629, 649 (1999) (evaluating a hostile environment claim based upon gender discrimination pursuant to Title IX); see also, Cannon v. Univ. of Chicago, 441 U.S. 677, 694–96, (1979) (Title IX is interpreted and applied in the same way as Title VI).

LAUSD and Paul Revere argue that they are entitled to summary judgment with respect to plaintiff's first claim for relief because there is insufficient evidence of circumstances constituting a racially hostile environment. The existence of a racially hostile environment is a question of fact that depends upon the severity, pervasiveness, and persistence of racial harassment. 59 Fed. Reg. 11448. To determine whether a racially hostile environment exists, a trier of fact must evaluate the totality of the circumstances, including the "identity, number, and relationships of the persons involved;" the alleged victim's age and race; and the educational context. Id. Ultimately, the question is whether racial harassment was "sufficiently severe that it would interfere with the educational program of a reasonable person of the same age and race as the victim." Monteiro, 158 F.3d at 1033. Further;

**\*11** an incident that might not be considered extremely harmful to an older student might nevertheless be found severe and harmful to a younger student. For example, verbal harassment of a young child by fellow students that is tolerated or condoned in any way by adult authority figures is likely to have a far greater impact than similar behavior would have on an adult.

59 Fed. Reg. 11448. In early 2015, plaintiff was thirteen years old.

Defendants argue that the harassment plaintiff claims to have experienced on March 23rd, does not rise to the level of a hostile environment. Defendants characterize Doe's experience as a "single event." Mot. at 16. Defendants rely Davis, in which the Supreme Court stated that it is unlikely Congress intended to impose liability for "a single instance of one-on-one peer harassment." Davis, 526 U.S. at 653. The Davis Court concluded that the harassment at issue must be "serious enough to have the systemic effect of denying the victim equal access to an educational program or activity." Id.

Here, plaintiff claims she experienced more than a single instance of one-on-one peer harassment. Plaintiff offers evidence that Paul Revere tolerated racially harassing protests aimed at plaintiff for much of the school day and by as many as 500 middle school students. Plaintiff claims that she was, in effect, forced out of school for approximately a week because she did not feel safe among her peers and Paul Revere staff. LAUSD and Paul Revere offer evidence in stark contrast to plaintiff's testimony and declaration; however, the Court cannot say, as a matter of law, that the March 23rd protests were not sufficiently severe to interfere with the 8th grade education of a thirteen-year-old African American girl. There are numerous disputed facts regarding Paul Revere students' behavior on March 23rd—it is unclear what students yelled, what students wore, what students' signs said, and when any harassment occurred. Additionally, the Department of Education has determined that "[i]n some cases, a racially hostile environment requiring appropriate responsive action may result from a single incident that is sufficiently severe." 59 Fed. Reg. 11448. Accordingly, the seriousness of the racial

Doe v. Los Angeles Unified School District, Not Reported in Fed. Supp. (2017)

2017 WL 797152

harassment does not provide a basis for granting summary judgment here.

In the alternative, LAUSD and Paul Revere contend that, if a racially hostile environment existed, their response was adequate based upon what they knew. LAUSD and Paul Revere are only liable for students' harassment of plaintiff insofar as plaintiff demonstrates deliberate indifference to said harassment. See Davis, 526 U.S. at 642; Monteiro, 158 F.3d at 1034. School administrators are not required to completely purge schools of peer harassment to avoid liability and "courts should refrain from second-guessing the disciplinary decisions made by school administrators." Id. at 648. A recipient of federal funds is only required to "respond to known peer harassment in a manner that is not clearly unreasonable in light of the known circumstances." Id. "In an appropriate case, there is no reason why courts ... could not identify a response as not 'clearly unreasonable' as a matter of law." Id. at 649.

In this case, the parties dispute what LAUSD and Paul Revere staff knew and when. Plaintiff claims that she saw numerous Paul Revere staff observe harassment throughout the morning of March 23rd. Plaintiff further claims that Perdigao and Iannucci were present during the lunch protest. Although Paul Revere staff acknowledge observing student protests about Carnine, staff deny having observed any of the racial harassment at issue. For purposes of the instant motions, the Court cannot resolve said factual disputes or weigh the witnesses' credibility. Nor can the Court determine that the response was not clearly unreasonable as a matter of law. If Paul Revere staff stood by while a large group of students with the phrase "Down with the Black Girl" on their shirts and signs chanted "[Jane Doe] is a bitch" or "down with the black girl," in the school cafeteria, halls, and quad, then defendants' response may have been deliberately indifferent to racial harassment. It is undisputed that no students involved in the protest were punished for missing class and disrupting the school day, let alone yelling racially charged attacks at plaintiff (if any occurred). Accordingly, this is not the "appropriate case" where the response was "not 'clearly unreasonable' as a matter of law." Id.

**\*12** Lastly, LAUSD and Paul Revere argue that no harm occurred from the events of March 23rd. However, plaintiff, a thirteen-year-old girl, missed approximately a week of school, claims she felt isolated from her peers, and claims she felt her middle school's staff had lent support to a racially-motivated attack. "It does not take an educational

psychologist to conclude that ... being shamed and humiliated on the basis of one's race, and having the school authorities ignore or reject one's complaints would adversely affect a Black child's ability to obtain the same benefit from schooling as her white counterparts." Monteiro, 158 F.3d at 1034. "This is especially so when we also consider ... the victim's age." Id. There is at least a material issue of disputed fact as to whether plaintiff was injured by defendants' alleged deliberate indifference.

LAUSD's and Paul Revere's motion for summary judgment with respect to plaintiff's first claim is **DENIED**.

### 2. Plaintiff's Claims Based Upon Intentional Discrimination

The contours of plaintiff's second claim against LAUSD and Paul Revere warrant some initial discussion. Contrary to plaintiff's contention, LAUSD and Paul Revere can only be liable for their response to Carnine's conduct, not the conduct itself. Plaintiff alleges that "LAUSD and Paul Revere intentionally denied her the benefits of public education on the basis of her race *by exposing her* to Carnine's lessons plans [sic] intended to create racial hostility in the classroom." FAC ¶ 153 (emphasis added). Plaintiff adds that Carnine was an agent of LAUSD. Id. ¶ 156, In light of the foregoing, plaintiff appears to seek to hold the school and LAUSD liable pursuant to a theory of *respondeat superior*. Such a theory of liability is foreclosed by controlling precedent.

The Supreme Court has expressly rejected school or school district liability for intentional discrimination by a teacher where it is premised upon the teacher's agency relationship with a school and school district. See Gebser v. Lago Vista Indep. Sch. Dist., 524 U.S. 274, 285 (1998) (applying respondeat superior principles to intentional discrimination claims would "frustrate the purposes" of Title IX). Similarly, the Court held in Gebser that a claim could not proceed where it is premised upon a school's constructive notice of discrimination by a teacher. Id.

> [I]n cases like this one that do not involve official policy of the recipient entity, we hold that a damages remedy will not lie ... unless an official who at a minimum has authority to address the alleged discrimination

Doe v. Los Angeles Unified School District, Not Reported in Fed. Supp. (2017)

2017 WL 797152

and to institute corrective measures on the recipient's behalf has actual knowledge of discrimination in the recipient's programs and fails adequately to respond.

Id. at 290. The party bringing a discrimination claim against a school must demonstrate that the school was deliberately indifferent to discrimination by its teachers. Id. "The premise, in other words, is an official decision by the recipient not to remedy the violation ... Under a lower standard, there would be a risk that the recipient would be liable in damages not for its own official decision but instead for its employees' independent actions." Id. at 290-91.

It is undisputed that Paul Revere administrators were unaware of concerns regarding plaintiff's experience in Carnine's class until January 29th, plaintiff's last day in Carnine's class. As discussed in more detail below, there are material issues of disputed fact regarding whether Carnine's conduct was discriminatory. Paul Revere and LAUSD may only be found liable for Carnine's alleged conduct if they were deliberately indifferent to discrimination.

Similarly, Paul Revere and LAUSD may be liable for racial harassment by plaintiff's peers if they were deliberately indifferent to their students' harassing conduct. In this respect, plaintiff's second claim overlaps, in part, with plaintiff's first claim in which she alleges a racially hostile educational environment. However, with respect to plaintiff's second claim, plaintiff alleges that LAUSD and Paul Revere tolerated peer harassment because they sought to intentionally retaliate against her based on her race and because of the State Case. FAC ¶ 157.

 **13** Plaintiff alleges that LAUSD and Paul Revere intentionally discriminated against her by failing to take appropriate remedial action against Carnine for alleged discrimination and by failing to appropriately control racially charged peer harassment. Plaintiff alleges that the latter is "a separate theory of liability." Id. Defendants, in turn, argue that their remedial response to Carnine's conduct was adequate and, separately, that their remedial response to peer harassment was adequate. However, plaintiff's second claim for relief is premised upon LAUSD's and Paul Revere's alleged deliberate indifference to interrelated acts of discrimination by teachers and students alike. Plaintiff claims, for instance, that defendants permitted peer harassment

because plaintiff had complained about discrimination by Carnine. FAC ¶ 157. Accordingly, each step in defendants' remedial efforts should not be viewed in isolation.

With the foregoing understanding of plaintiff's second claim for relief, the Court will now proceed to evaluate whether defendants are entitled to summary judgment. Defendants argue that throughout plaintiff's last semester of 8th grade, LAUSD and Paul Revere responded to discriminatory conduct or allegations thereof in ways that were "not clearly unreasonable." Mot. at 20 (describing the response to Carnine's alleged conduct); & 21 (describing the response to alleged peer harassment). However, the undisputed facts do not entitle LAUSD and Paul Revere to summary judgment. Material issues of disputed fact persist regarding whether defendants were deliberately indifferent to racial discrimination against plaintiff. The Court cannot say defendants' remedial measures were not clearly unreasonable, as a matter of law.

As an initial matter, what Carnine said and did in class is disputed and defendants present little evidence of what exactly plaintiff told them had occurred and when. Accordingly, the Court cannot evaluate the administrator's "actual knowledge" of Carnine's behavior at that time. On January 30th, plaintiff was transferred out of Carnine's class. However, Carnine continued to teach throughout all of February while the school investigated the allegations and a separate incident. Iannucci met with Carnine about the allegations; however, neither Paul Revere nor LAUSD took disciplinary action until *after* plaintiff filed the State Case on March 18th. The "consensus recommendation" of LAUSD administrators, as of February 20th, was to suspend Carnine for five to eight days. Dkt. 83-1 No. 36. However, no one took further steps to impose said discipline until March 19th—the day after the State Case was filed. Id. No. 37. With the exception of Carnine's temporary, administrative reassignment to ESC-West, the motivation for which is unclear from the present record, defendants' disciplinary steps had no formal effect upon Carnine because LAUSD officials did not pursue action against him after he sought to appeal.

Defendants contend that "the appeal process after the suspension was not completed, but the reason for that was the overall volume of cases handled by LAUSD Staff Relations and not any doing of Mr. Perdigao, Mr. Iannucci or Mr. Carnine. This was not clearly unreasonable." Mot. at 20. However, plaintiff's second claim is against Paul Revere and LAUSD, not any individual administrators or teachers. To the

Case: 1:25-cv-00669 Document #: 90-1 Filed: 05/21/25 Page 21 of 53 PageID #:814

Doe v. Los Angeles Unified School District, Not Reported in Fed. Supp. (2017)

2017 WL 797152

extent that LAUSD and Paul Revere contend that the volume of disciplinary cases involving teachers excuses their failure to press disciplinary action against Carnine, the Court cannot draw such an inference on a motion for summary judgment. Instead, the Court must draw all reasonable inferences in favor of the party resisting the motion. Matsushita, 475 U.S. at 587. One such inference, in light of the sequence of events, is that defendants initially pursued disciplinary action against Carnine because of media attention resulting from the State Case and then abandoned the effort when public attention subsided. Furthermore, it is unclear to what extent Carnine was being disciplined for his alleged statements about students with IEPs as opposed to the comments at issue here.

**\*14** The parties offer starkly conflicting accounts of what occurred on March 23rd. Plaintiff offers evidence that the principal and vice principal of Paul Revere had actual knowledge that hundreds of students chanted "Down with the Black Girl" at plaintiff while holding signs and wearing shirts bearing the same message. It is undisputed that no students were disciplined for participation in the March 23rd protests. In light of the foregoing, especially when viewed alongside the delayed and abandoned effort to discipline Carnine, the evidence demonstrates a material issue of disputed fact regarding whether LAUSD and Paul Revere were deliberately indifferent to racial discrimination and intentionally permitted a racially hostile educational environment because of plaintiff's race and complaints.

Defendants' motion for summary judgment with respect to plaintiff's second claim is **DENIED**.

### C. Plaintiff's Constitutional Claims

Iannucci, Perdigao, and Carnine also seek summary judgment with respect to plaintiff's § 1983 claims for violation of plaintiff's First Amendment right to Freedom of Speech and plaintiff's Fourteenth Amendment Right to Equal Protection.

### 1. Plaintiff's First Amendment Claim

Plaintiff's fourth claim is that she suffered retaliation for engaging in protected speech. To establish such a claim, plaintiff must establish:

> (1) [s]he was engaged in a constitutionally protected activity, (2) the defendant's actions would chill a person of ordinary firmness from continuing to engage in the protected activity and (3) the protected activity was a substantial or motivating factor in the defendant's conduct.

O'Brien v. Welty, 818 F.3d 920, 932 (9th Cir. 2016) (quoting Pinard v. Clatskanie Sch. Dist. 6J, 467 F.3d 755, 770 (9th Cir. 2006)).

#### a. Against Carnine

It is undisputed that Carnine took no action in retaliation for plaintiff's filing the State Case, dkt. 84-2 no. 15, that Carnine exercised no control over the March 23rd protests, id. no. 9, and that Carnine did not speak to anyone about retaliating in response to the State Case, id. no. 10-11; 14. Accordingly, plaintiff's First Amendment retaliation claim against Carnine is limited to her claim that Carnine retaliated against her on January 29th, during her last day in his class.

Plaintiff has a constitutional right to speak with her parents and have them speak freely on her behalf. Cain v. Tigard-Tualatin Sch. Dist. 23J, 262 F. Supp. 2d 1120, 1127 (D. Or. 2003). Relatedly, it is well-established that a student has a protected right, subject to certain exceptions that are not relevant here, to raise complaints about teachers to school and district officials. See e.g. Pinard v. Clatskanie Sch. Dist. 6J, 467 F.3d 755, 771 (9th Cir. 2006) (student complaints to district that basketball coach was "verbally abusive and highly intimidating" are protected by the First Amendment).

Plaintiff offers evidence suggesting that on January 29th, Carnine stopped a silent session of class, leaned in close to plaintiff, said to the class that Abraham Lincoln was hated for being an "n-i-g-g-e-r lover," then looked at plaintiff and said "isn't that right [Jane Doe]?" Doe Depo. 75:1-9. Plaintiff argues that Carnine did so in retaliation for her complaints about Carnine's prior classes.

It is undisputed that plaintiff complained to her father about Carnine's January 16th class before January 29th. On January

Case: 1:25-cv-00669 Document #: 90-1 Filed: 05/21/25 Page 22 of 53 PageID #:815

Doe v. Los Angeles Unified School District, Not Reported in Fed. Supp. (2017)

2017 WL 797152

29th, during school, plaintiff's father called Perdigao on the telephone and relayed plaintiff's complaints about Carnine's prior classes. Neither party offers evidence of when plaintiff's father first spoke with Perdigao on January 29th. Perdigao does not recall whether he spoke immediately with Carnine about the complaint or whether he spoke with Carnine at all on January 29th about plaintiff's first complaint. See Perdigao Depo. 130:6-9 ("I don't know if I addressed him that day. I don't know. Don't remember"); 196:2-25 ("I don't know if we had the meeting with Mr. Carnine prior to the second complaint. They were right on top of each other").

**\*15** Carnine argues that there is no evidence showing that, as of plaintiff's class on January 29th, Carnine had knowledge of plaintiff's initial complaints. Therefore, Carnine contends that he could not have intended to retaliate for said complaints. Carnine cites his own declaration for the proposition that he was unaware of any complaints until after the January 29 class. See Carnine Decl. ¶ 22. In response, plaintiff contends that the timing of Carnine's conduct and the conduct itself are circumstantial evidence of retaliation. Plaintiff argues that Carnine's conduct followed soon after her father's call to the school—circumstantial evidence that Carnine heard about the call. Further, plaintiff contends that the class had not yet had a lesson on the Civil War and Abraham Lincoln, Doe Decl. ¶ 33, such that Carnine's comments may have been out of place. In light of the foregoing, there is a material issue of disputed fact regarding whether Carnine was aware of plaintiff's complaint at the time of his January 29th class and singled out plaintiff for retaliation. plaintiff's father's phone call to Perdigao, which the parties appear to agree occurred prior to Carnine's class, coupled with Carnine's behavior at the commencement of class would be sufficient evidence for a jury to conclude that Carnine *was* aware of plaintiff's complaint, notwithstanding his own testimony to the contrary.

Next, Carnine argues that a First Amendment retaliation claim cannot rely solely upon retaliatory verbal insults. Carnine relies upon a line of cases which have held that a correctional officers' verbal insults aimed at inmates are insufficient to establish a freestanding violation of an inmate's Due Process rights. See e.g., Oltarzewski v. Ruggiero, 830 F.2d 136, 139 (9th Cir. 1987) (quoting Collins v. Cundy, 603 F.2d 825, 827 (10th Cir. 1979)). However, these cases shed little light on the appropriate standard to apply to a teacher's insults in an Eighth grade classroom where a student brings a First Amendment retaliation claim.

The reasoning of Valandingham v. Boiorquez, 866 F.2d 1135 (9th Cir. 1989), is somewhat instructive. In Valandingham, an inmate alleged that he had engaged in protected speech (petitioning a court for redress of grievances) and that, as a result, prison officials called him a "snitch" in front of other inmates. Id. at 1138. The court held that his allegations were sufficient to state a claim for First Amendment retaliation and that the district court erred in granting summary judgment in favor of the prison officials. Id. at 1139. The court reasoned that there was a material issue of disputed fact as to whether calling the inmate a "snitch" would cause him "harm" (and therefore chill protected speech). Id. The court made no mention of the fact that the officers' retaliation was, in effect, only a verbal insult because, in prison, such a label may carry serious practical consequences. Id.

Plainly, Valandingham's facts are easily distinguished. However, if true, the retaliation plaintiff claims may have foreseeable practical consequences for an eighth-grade girl who is a racial minority in her classroom and school. Carnine's comments may have caused plaintiff immediate psychological harm and may have opened her up to racially charged harassment from peers—which plaintiff claims followed. Plaintiff presents evidence, albeit disputed, suggesting Carnine made the statements in retaliation for protected speech. Drawing all reasonable inferences from the evidence in favor of plaintiff, there is a disputed issue of material fact regarding whether Carnine's conduct "would chill a person of ordinary firmness from continuing to engage in the protected [speech]." O'Brien v. Welty, 818 F.3d at 932. Accordingly, the Court declines to grant Carnine summary judgment on the basis that his alleged retaliation was *only* verbal.

Lastly, Carnine argues he is entitled to qualified immunity. Carnine argues that it was (and is) not clearly established that a teacher may not tell his students Lincoln was hated for being a "n-i-g-g-e-r lover." Mot. at 21-22. Carnine cites Monteiro, 158 F.3d at 1032, for the proposition that the other students in plaintiff's class have a first amendment right to receive offensive ideas and for the uncontroversial proposition that teachers play an important role as guides to students. Carnine further argues that he has a First Amendment right to present even offensive ideas to his history class. Mot. at 21 (citing Monteiro, 158 F.3d at 1030 n. 13 (acknowledging that teachers do not shed their First Amendment rights when they enter school grounds)).

Case: 1:25-cv-00669 Document #: 90-1 Filed: 05/21/25 Page 23 of 53 PageID #:816
Doe v. Los Angeles Unified School District, Not Reported in Fed. Supp. (2017)
2017 WL 797152

**\*16** On the present record, Carnine is not entitled to summary judgment because of qualified immunity. Qualified immunity is a defense to suit where an official's conduct "does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." Pearson v. Callahan, 555 U.S. 223, 231 (2009).

Carnine appears to argue that he could not possibly have violated a clearly established statutory or constitutional right where he exercised, in his view, his right to free speech. However, Carnine offers no authority for his contention that a reasonable teacher would perceive their first amendment rights as protecting against suit for First Amendment retaliation or racial discrimination. In Monteiro, the plaintiff sought to prevent certain books from being taught on the ground that their contents created a racially hostile environment. However, in refusing to ban certain books, the Monteiro court acknowledged:

> We do not, of course, suggest that racist actions on the part of teachers implementing a curriculum could not comprise discriminatory conduct ... Nor do we preclude the prosecution of actions alleging that schools have pursued policies that serve to promote racist attitudes among their students, or have sought to indoctrinate their young charges with racist concepts ... It is simply not the role of courts to serve as literary censors or to make judgments as to whether reading particular books does students more harm than good.

Monteiro, 158 F.3d at 1032.

Although defendant characterizes his conduct as merely a lesson about a dark period of American history and the bigoted views held by others, there are material issues of disputed fact as to whether Carnine's conduct was merely an ill-considered teaching-method or intentional retaliation for a student's protected speech. In this case, the Court is not called upon to determine whether Carnine's statements did more harm than good as a lesson on bigotry. The Court is called upon to determine whether Carnine may have violated plaintiff's clearly established rights.

Carnine does not dispute, nor could he, that as of January 29th plaintiff had a clearly established First Amendment right to bring complaints about her teachers to the Principal's attention. See Pinard, 467 F.3d 755. Accordingly, in determining whether Carnine is entitled to qualified immunity, the Court must determine whether the "facts viewed in the light most favorable to the injured party show that [Carnine] violated a constitutional right." See Ford v. City of Yakima, 706 F.3d 1188, 1192 (9th Cir. 2013) (citing Saucier v. Katz 533 U.S. 194, 201 (2001)).

The context in which Carnine brought up the racist epithet and the extent to which he focused attention upon plaintiff specifically are in dispute. As is Carnine's motive for commencing the January 29th class in the way he did. Viewed in the light most favorable to plaintiff, the evidence suggests Carnine's conduct was in retaliation for plaintiff's protected speech. Accordingly, Carnine is not entitled to qualified immunity.

Carnine's motion for summary judgment as to plaintiff's fourth claim is **DENIED**.

### b. Against Iannucci and Perdigao

Plaintiff's First Amendment retaliation claim against Iannucci and Perdigao, in contrast to that against Carnine, is based primarily upon their alleged acquiescence to large-scale, racially charged protests aimed at plaintiff in response to the State Case. Iannucci and Perdigao argue that they are entitled to summary judgment for two reasons: (1) they took no actions against plaintiff that would chill protected speech and (2) nothing they did was motivated by retaliation. According to defendants, "[p]resumably plaintiff's claim against Mr. Perdigao is that he allowed a demonstration to occur in the hope that it would result in harming Plaintiff, but she has no evidence to back that up." Mot. at 21. Similarly, defendants argue that Iannucci, "was not responsible for deciding how to deal with protests or demonstrations on March 23rd [and] did not witness the harassment that plaintiff says occurred." Id. at 22.

**\*17** On the contrary, plaintiff offers her own testimony that she saw, at a minimum, Perdigao and Iannucci in the cafeteria on March 23rd, listening and observing while a large group of students chanted "Down with the Black Girl" and "[Jane Doe] is a bitch." See Doe Depo. 94:15-19 ("Iannucci, he was watching all the students, and he was hearing them chant the

Case: 1:25-cv-00669 Document #: 90-1 Filed: 05/21/25 Page 24 of 53 PageID #:817

Doe v. Los Angeles Unified School District, Not Reported in Fed. Supp. (2017)

2017 WL 797152

things that they said and watching those protests go on and people with the shirts on and saying these things, and he just stood there and didn't do anything"); Doe Decl. ¶ 66 ("After fourth period, I had lunch ... there was a huge rally of angry students chanting ... 'Jane is a B,' 'Down with the Black Girl.' Mr. Perdigao and Mr. Iannucci were both there. They saw and heard everything but did not interject or stop them"). It is undisputed that none of the students who missed class to participate in the March 23rd protests faced any disciplinary action from Perdigao or Iannucci.

Defendants' argument that they took no affirmative steps to retaliate against plaintiff for filing the State Case is belied by their enormous control and authority over discipline at Paul Revere as principal and assistant principal. A school administrator's inaction may constitute a deprivation of plaintiff's constitutional rights, where the administrator is deliberately indifferent to peer harassment. See Flores v. Morgan Hill Unified Sch. Dist., 324 F.3d 1130, 1135 (9th Cir. 2003) (using the "clearly unreasonable" standard to evaluate whether acquiescence to peer harassment could constitute a constitutional violation). Where teachers, in retaliation for protected speech, permit a large crowd of students to chant racially charged insults at a peer without consequence, there can be little doubt that the teachers' conduct may chill protected speech. Defendants dispute whether students actually chanted racially charged insults, let alone in front of Iannucci and Perdigao; however, plaintiff's testimony demonstrates a material issue of disputed fact.

Similarly, whether defendants' indifference to the harassment allegedly suffered by plaintiff was motivated by plaintiff's protected speech presents a material issue of disputed fact. "As with proof of motive in other contexts, this element of a First Amendment retaliation suit may be met with either direct or circumstantial evidence and involves questions of fact that normally should be left for trial." Ulrich v. City & Cnty. of San Francisco, 308 F.3d 968, 979-80 (9th Cir. 2002). Motive may be proven circumstantially, based on the "(1) proximity in time between the protected speech and the alleged retaliation; (2) the [defendants'] expressed opposition to the speech; and (3) other evidence that the reasons proffered ... were false and pretextual." Id. at 980. Additionally, "[d]epartures from the normal procedural sequence also might afford evidence that improper purposes are playing a role." Village of Arlington Heights v. Metro Hous. Dev. Corp., 429 U.S. 252, 267 (1977).

In this case, plaintiff's protected speech—the complaint in the State Case—was premised upon Carnine's conduct in January

2015 and the school's lack of remedial efforts. Iannucci led the investigation into Carnine's conduct and Perdigao was the principal of Paul Revere. The State Case implicated allegedly poor conduct by both of them. The student-protests followed closely on the heels of plaintiff's filing the State Case and was in direct response to the State Case and media coverage of plaintiff's complaint. If plaintiff's testimony is credited, Iannucci and Perdigao stood by while hundreds of students chanted insults and threats against plaintiff because of the State Case. Thereafter, neither Perdigao nor Iannucci sought disciplinary action against any students despite their alleged chants, shirts, signs, and having missed classes. Despite defendants' testimony to the contrary, the foregoing is sufficient circumstantial evidence to demonstrate a material issue of disputed fact as to whether Iannucci and Perdigao were deliberately indifferent to the student protests because of plaintiff's protected speech.

*18 In light of the foregoing, Iannucci's and Perdigao's motion for summary judgment regarding plaintiff's fourth claim is **DENIED**.

### 2. Plaintiff's Equal Protection Claims

The Equal Protection Clause of the Fourteenth Amendment provides that "[n]o state shall ... deny to any person within its jurisdiction the equal protection of the laws." U.S. Const., amend. XIV, § 1. "To establish a § 1983 equal protection violation, the plaintiff[ ] must show that the defendants, acting under color of state law, discriminated against [her] as [a] member[ ] of an identifiable class and that the discrimination was intentional" or resulted from deliberate indifference. Flores, 324 F.3d at 1134. "In the specific context of a school administrator's failure to ... discipline harassment at school, a defendant acts with deliberate indifference when he or she responds to known harassment in a manner that is clearly unreasonable." Walsh v. Tehachapi Unified Sch. Dist., 827 F. Supp. 2d 1107, 1116 (E.D. Cal. 2011). Furthermore, the Supreme Court has held that retaliation for complaints of discrimination is itself intentional discrimination. See Jackson v. Bd. of Educ., 544 U.S. 167, 173-74 (2005) (holding retaliation for complaint of gender discrimination "is discrimination on the basis of sex because it is an intentional response to the nature of the complaint: an allegation of sex discrimination.")

Case: 1:25-cv-00669 Document #: 90-1 Filed: 05/21/25 Page 25 of 53 PageID #:818

Doe v. Los Angeles Unified School District, Not Reported in Fed. Supp. (2017)

2017 WL 797152

### a. Against Carnine

Plaintiff's fifth claim for relief against Carnine is based upon her treatment in famine's classroom.

Carnine first argues, as he does with respect to plaintiff's First Amendment claim, that verbal harassment or abuse is not sufficient to state a claim for constitutional deprivation, famine argues that the Court should not consider his verbal statements because they cannot support a constitutional claim and that plaintiff fails to present evidence of other conduct supporting a constitutional claim. Carnine contends that plaintiff's:

> Fifth Cause of Action [does not] survive[ ] without that claimed verbal harassment. What else would Plaintiff claim constituted racial discrimination? A 'mean' look? A 'stare'? Standing too close to her desk in a classroom full of students?

Reply at 14.

The Court rejects Carnine's argument that a teacher's verbal harassment of black students cannot support an Equal Protection claim. See Lovell v. Comsewogue Sch. Dist., 214 F. Supp. 2d 319, 323 (E.D.N.Y. 2002) ("several courts have held that harassment is a basis for an equal protection claim under Section 1983"). Unlike the inmate litigation upon which Carnine principally relies, plaintiff does not allege that Carnine's language *alone* is a violation of substantive due process or that she has a freestanding right to be free of verbal abuse. Deliberate indifference to racial name-calling among students may support a claim of race discrimination in violation of the Constitution. See Gant ex rel. Gant v. Wallingford Bd. of Educ., 195 F.3d 134, 141 (2d Cir. 1999) (indifference to even "a few instances of student-on-student racial name-calling" would present a "significant question" on summary judgment). Undoubtedly, the same conduct, racial name-calling, may support a constitutional claim where it is allegedly done by the teacher rather than the students. "A sense of inferiority affects the motivation of a child to learn" and may deprive African American students of the educational benefits they would otherwise receive. Brown v. Bd. of Ed. of Topeka. Shawnee Cty., Kan., 347 U.S. 483,

494, (1954), supplemented sub nom. Brown v. Bd. of Educ. of Topeka, Kan., 349 U.S. 294 (1955). Similarly, a student who faces racial, public denigration by the teacher in the classroom may reasonably be left with a sense of inferiority relative to her classmates. Doe claims as much. See Doe Decl. ¶¶ 34-36. Such denigration may deprive a student of equal access to educational opportunities. Accordingly, the Court declines to preclude, as a matter of law, an equal protection claim based upon a teacher's alleged verbal harassment of an eighth grader.

**\*19** Carnine also contends that plaintiff has failed to present evidence of intent to discriminate. Carnine cites his own declaration and the undisputed fact that he has never received a complaint from a parent or student that he discriminated against a student of African-American ancestry as an evidentiary basis for summary judgment. However, there is a material issue of disputed fact.

Plaintiff contends that she personally observed Carnine treating her differently than the other members of her, principally white, class. She contends that he was rude to her, threw a note at her, repeatedly asked why she was in his class, looked distinctively at her when he said that Michael Brown got what he deserved, publicly blamed her for any delays after she asked for more time before an exam, and singled her out while saying "if you want to know why Abraham Lincoln was disliked, it was because he was a 'N-I-G-G-E-R lover.' " According to Doe's testimony, Carnine then leaned in very close to her and said, "Isn't that right [Jane]?" Doe Depo. 75:1-9. At this stage, plaintiff need only present circumstantial evidence that Carnine intentionally discriminated against her based upon her race such that there is a material issue of disputed fact. The foregoing is sufficient circumstantial evidence of Carnine's intent.

Lastly, Carnine again asserts his entitlement to qualified immunity. Carnine's focus is upon whether he has a right to use a racial epithet as part of a class about racism in the South. However, as already discussed, the question of qualified immunity is whether an official's conduct violated "clearly established statutory or constitutional rights of which a reasonable person would have known." Pearson v. Callahan, 555 U.S. 223, 231 (2009). A student's right not to face racial discrimination in public education is clearly-established, as is a student's right not to face racial harassment at school. See Flores v. Morgan Hill Unified Sch. Dist., 324 F.3d 1130, 1135 (9th Cir. 2003) (school administrators have an equal protection obligation to prevent and respond to harassment at school); DiStiso v. Cook, 691 F.3d 226, 240 (2d Cir.

Case: 1:25-cv-00669 Document #: 90-1 Filed: 05/21/25 Page 26 of 53 PageID #:819

Doe v. Los Angeles Unified School District, Not Reported in Fed. Supp. (2017)

2017 WL 797152

2012) (student's right to be free of racial harassment has been "clearly-established" since Gant, 195 F.3d 134). As already discussed, viewing the evidence in the light most favorable to plaintiff, Carnine is not entitled to qualified immunity.

Carnine's motion for summary judgment with respect to plaintiff's fifth claim is **DENIED**.

### b. Against Iannucci and Perdigao

In response to plaintiff's fifth claim, Iannucci and Perdigao reiterate many of the same arguments already discussed at length above. They contend, for instance, that plaintiff cannot demonstrate deliberate indifference to peer harassment or that their remedial efforts were clearly unreasonable. The Court rejects the foregoing argument for the reasons already discussed. [16]

**\*20** Iannucci and Perdigao also contend that there is no evidence of racially discriminatory intent. However, the Court has already concluded there are material issues of disputed fact as to whether or not Iannucci and Perdigao retaliated against plaintiff for filing the State Case. Relatedly, therefore, there is a material issue of disputed fact as to whether Iannucci and Perdigao retaliated against plaintiff for complaining about discrimination. It is undisputed that the State Case alleged racial discrimination. If defendants retaliated against plaintiff for the State Case, then that retaliation could support a claim for violation of plaintiff's right to equal protection. See Jackson, 544 U.S. at 173-74 (retaliation is "a form of 'discrimination' because the complainant is subjected to differential treatment"). Furthermore, plaintiff presents evidence that she was singled out because of her race. If

Iannucci and Perdigao truly observed what plaintiff contends they observed, and did nothing to discipline students or put a swift end to the pervasive harassment, then there is, at least, a material issue of disputed fact as to whether they were deliberately indifferent to racial discrimination against plaintiff.

Iannucci and Perdigao's motion for summary judgment as to plaintiff's fifth claim is **DENIED**.

The Court is mindful that most of the remaining material issues of disputed fact arise from conflicts between plaintiff's testimony and the testimony and declarations of all of her teachers and Paul Revere staff. However, the Court "may not weigh credibility in summary judgment proceedings." Hernandez v. Polanco Enterprises, Inc., 19 F. Supp. 3d 918, 935 (N.D. Cal. 2013); see SEC v. Koracorp Indus., Inc., 575 F.2d 692, 699 (9th Cir. 1978) ("The courts have long recognized that summary judgment is singularly inappropriate where credibility is at issue"). If plaintiff's testimony is credited, she may prove all of her claims. Accordingly, this matter is inappropriate for disposition on a motion for summary judgment.

### V. CONCLUSION

Defendants' motions for summary judgment are hereby **DENIED**.

IT IS SO ORDERED.

### All Citations

Not Reported in Fed. Supp., 2017 WL 797152

---

### Footnotes

1    The FAC no longer lists King as a defendant.

2    Carnine no longer works for LAUSD and has separate counsel in this action. To the extent that the Court treat's Carnine's motion separately from the motion brought collectively by the other defendants, the Court refers to all of the defendants except Carnine as the "LAUSD defendants."

3    Unless otherwise noted, all dates described herein occurred during 2015.

Doe v. Los Angeles Unified School District, Not Reported in Fed. Supp. (2017)

2017 WL 797152

4    Referring to the unarmed African American man shot and killed by a police officer in Ferguson, Missouri in August 2014.

5    It appears that Carnine was referring to the deaths of Trayvon Martin, in Sanford, Florida; Eric Garner, in Staten Island, New York; and Michael Brown, in Ferguson, Missouri.

6    It was Doe's seventh day attending Carnine's class.

7    It is unclear the extent to which this incident is disputed. Carnine's motion and evidentiary submissions do not dispute plaintiff's account. In the LAUSD defendants' Statement of Uncontroverted Facts, they claim that Carnine does not recall making any announcement impliedly blaming plaintiff for any delay. Dkt. 79-1 (citing Carnine Depo. 199:2-24). However, LAUSD has not offered the deposition transcript page upon which it relies. Although it does not appear to affect the Court's ruling, the Court will not consider LAUSD's unsupported contention.

8    Carnine has offered the students' written statements into evidence as part of a request for judicial notice. See Dkt. 76-3. It appears that the students' statements, along with a declaration by Iannucci, were filed in a separate case in state court. Carnine seeks judicial notice of the substance of the documents filed in Los Angeles County Superior Court Case No. BC576028. However, there does not appear to be a basis for taking judicial notice of the substance of the documents and considering them for their truth. The truth of the statements cannot "accurately and readily determined from sources whose accuracy cannot reasonably be questioned." Fed. R. Evid. 201. Additionally, they appear to be inadmissible hearsay offered for its truth— the students' recollection of events in Carnine's class. Accordingly, Carnine's request for judicial notice of the students' statements is denied and the Court declines to consider them.

9    plaintiff's complaint in state court was voluntarily dismissed on November 9, 2015.

10   Plaintiff claims that students were chanting that she was "a 'B-word'." Doe Decl. ¶ 59. It is unclear if students' signs said "is a B" or "is a bitch."

11   Plaintiff also argues that there was a "District policy explicitly prohibiting student led protests during instructional periods," which defendants did not enforce. Dkt. 83-1, Contested Issue No. 149. However, having closely reviewed the citations and evidence offered by plaintiff, plaintiff's factual contention appears to be unsupported by the present record. Plaintiff claims that the existence of an explicit policy is supported by the following evidence: LAUSD's Response to RFA No. 22; Exhibit 117; Perdigao Depo. 145:24-147:6 (describing Exhibit 117); Hubbard Depo. 63:23-65:27; 65:8-14; and Coe Depo. 201:14-202:11. However, plaintiff has not offered an LAUSD response to request for admission number 22. See Dkt. 83-19 Ex. 231 (LAUSD responses to other requests for admission). Nor does Exhibit 117 or the cited depositions excerpts describe any District policy prohibiting student protests on school grounds.

12   The Moreno declaration appears to be incomplete. Both the electronic and paper copies filed with the Court are missing at least one page and paragraphs eleven through sixteen.

13   The Cronin declaration appears to be incomplete. Both the electronic and paper copies filed with the Court are missing at least one page and paragraphs five through 16.

14   The parties do not describe what is meant by the term "shadowed" in this context.

15   The LAUSD defendants also argue that the sham affidavit rule "is especially apt in this case, because Plaintiff made earlier wholesale changes to her deposition testimony without any plausible explanation for them." Reply at 3. It appears that plaintiff testified to events transpiring on certain dates (for instance that students chanted "Down with the Black Girl" during the week of April 13th through April 17th) only to

correct the dates when she had an opportunity to review her deposition for inaccuracies. See Doe Depo. at 40:21-41:5 (Acknowledging that the protests and chants occurred "During the week of March 23-27th"). Plaintiff acknowledges that it is undisputed that the student chants occurred only in March 2015. See Dkt. 83-1 No. 58 ("Undisputed that the events she claims occurred happened during the week of March 23–27, 2015. Undisputed that Plaintiff exercised her right to make changes to her transcript to reflect the proper date of the events"). plaintiff's corrections to her deposition testimony do not appear to contradict plaintiff's declaration. Therefore, they do not support a finding that plaintiff's declaration is a sham.

16    During oral argument, the LAUSD defendants pressed the argument in their moving papers that "harsh or abusive language is not enough to establish" a violation of the Equal Protection Clause. Reply at 20 (citing Fennell v. Marion Indep. Sch. Dist., 804 F.3d 398, 415 (5th Cir. 2015)). The LAUSD defendants rely upon Fennell for their contention that *merely verbal* harassment cannot violate a student's right to equal protection. However, Fennell is unpersuasive authority here because it is easily distinguished and did not purport to establish a rule regarding verbal harassment. In Fennell, the Fifth Circuit was faced with a single statement by a school's athletic director. During a conversation with a student about the school's hair-color policy, the athletic director had said, "I know how much you people spend on your ethnic hair styles." Id. at 404. The Fifth Circuit held that such a comment could not, standing alone, constitute an equal protection violation unless it somehow deprived "the victim of established rights" or was coupled with "harassment." Id. at 415. The lone comment had not stopped plaintiff from equally participating in athletics or in school and the hair-color policy had been consistently applied to students of all races. Id.

In contrast, here, plaintiff's equal protection claim is not premised upon a single racially insensitive statement by an administrator that was of no consequence to her education or other established rights. Plaintiff offers evidence of racially charged harassment. Although the boundary between a racially insensitive comment and verbal "harassment" is somewhat indistinct, it is sufficient to note that Carnine's multiple statements and the alleged chants by plaintiff's peers are of a different kind than the athletic director's comment in Fennel. Viewed in the light most favorable to plaintiff, the evidence in this case presents a very different situation than was present in Fennell. Furthermore, in contrast to the statement in Fennell, the verbal harassment in this case is intertwined with plaintiff's right to equal access to the classroom and plaintiff's established right to attend a school where administrators are not deliberately indifferent to a racially hostile enviromnent.

**End of Document**                                    © 2025 Thomson Reuters. No claim to original U.S. Government Works.

Case: 1:25-cv-00669 Document #: 90-1 Filed: 05/21/25 Page 29 of 53 PageID #:822

KeyView Labs, Inc. v. Barger, Not Reported in Fed. Supp. (2020)

2020 WL 8224618

2020 WL 8224618
Only the Westlaw citation is currently available.
United States District Court, M.D. Florida,
Tampa Division.

KEYVIEW LABS, INC. d/b/a Procera Health, Plaintiff,
v.
Benjamin BARGER, ICGOLD4ME, LLC, and Gold
for Life, LLC d/b/a FocusGold, LLC, Defendants.

Case No. 8:20-cv-2131-T-36AEP
|
Filed 12/22/2020

**Attorneys and Law Firms**

Ryan M. Guerin, S. Gordon Hill, Hill Ward Henderson, PA, Tampa, FL, for Plaintiff.

Brandon Paul Faulkner, Daniel Buchholz, Jason H. Baruch, Holland & Knight, LLP, Tampa, FL, Eduardo R. Latour, Latour & Associates, PA, Tarpon Springs, FL, for Defendants.

## REPORT AND RECOMMENDATION

ANTHONY E. PORCELLI, United States Magistrate Judge

**\*1** Plaintiff KeyView Labs, Inc. d/b/a Procera Health's ("KeyView") brought this action against Defendants Benjamin Barger ("Barger"), ICGOLD4ME, LLC ("ICGOLD4ME"), and Gold for Life, LLC d/ b/a FocusGold, LLC ("Gold for Life") (collectively, "Defendants"), alleging that Defendants engaged in false advertising and unfair competition under the Lanham Act (Count I), misleading advertising under Florida law (Count II), deceptive and unfair trade practices under the Florida Deceptive and Unfair Trade Practice Act ("FDUTPA") (Count III), and misappropriation of trade secrets under the Florida Uniform Trade Secrets Act ("FUTSA") (Counts IV and V). (Doc. 1). Currently before the court are KeyView's Motion for Preliminary Injunction (Doc. 7) and Defendants' response in opposition thereto. (Doc. 17). With leave, the parties also submitted supplemental briefing and supporting evidence. (Docs. 21, 24, 30-33, 41, 44). The undersigned conducted hearings on the motion on October 14 and November 24, 2020, at which both parties presented oral argument. After consideration, and for the reasons that follow,

it is recommended that Plaintiff's Motion for Preliminary Injunction (Doc. 7) be denied.

### I. Background

KeyView is a nutritional supplement company that manufactures and sells brain health products. (*See* Doc. 1, ¶¶12-15). KeyView sells these products under the "Procera Health" brand. (*Id.*, ¶13). A "selling point[ ]" for KeyView's products is that they contain "natural ingredients." (*Id.*, ¶ 15). Procera, however, uses an ingredient called Vinpocetine, which is apparently synthetically produced. (*See* Doc. 17-1, ¶57 & Ex. 4; Doc. 21-2, ¶10). KeyView avers it developed its products by working with Dr. Keith Wesnes, a neuroscientist who passed away in April 2020, and his company, Wesnes Cognition, for over ten years. (Doc. 1, ¶¶16, 72).

Between 2014 and December 2017, Barger served as KeyView's Vice President of Direct Sales & Marketing. (Doc. 17-1, ¶17). Barger had many roles and duties during his tenure at KeyView. Barger assisted with marketing campaigns. (*Id.*, ¶47; Doc. 33-1, ¶¶4-5). Barger also set up telephone numbers at KeyView for returning customers and KeyView's customer service department. (Doc. 33-1, ¶¶8-9). Additionally, Barger worked with Dr. Wesnes and Wesnes Cognition on various matters. (Doc. 25-1, Comp. Ex. 1; Doc. 30-1, ¶¶ 6-9).

One of Barger's principal tasks was developing database algorithms and capabilities for KeyView's customer database. (*See* Doc. 7, ¶¶19-22). Barger also recruited the help of his father – a computer engineer – to assist with optimizing KeyView's customer database. (Doc. 1, ¶48; Doc. 17-2, ¶¶3, 6). Although KeyView disputes this, during his tenure with KeyView, Barger asserts he did not sign a confidentiality agreement and that KeyView did not mark its customer database as confidential. (Doc. 1, ¶¶44-45; Doc. 7, ¶¶16-21; Doc. 17-1, ¶¶20-21, 38). KeyView never requested Barger's father to sign a confidentiality agreement either. (Doc. 17-2, ¶¶4-5). Further, nothing in the record indicates that KeyView and Barger entered into non-competition or non-solicitation agreements.

**\*2** Nevertheless, KeyView alleges it "has invested substantial amounts of time, money, and manpower to develop its customer database consisting of all customers who have bought KeyView's products[.]" (Doc. 1, ¶17). KeyView avers its customer database is the "largest database of brain health buyers" and took roughly ten years to develop. (*Id.*, ¶¶18-19). KeyView alleges its customer database contains the "names and ages, detailed contact information, detailed

Case: 1:25-cv-00669 Document #: 90-1 Filed: 05/21/25 Page 30 of 53 PageID #:823

KeyView Labs, Inc. v. Barger, Not Reported in Fed. Supp. (2020)
2020 WL 8224618

order history, detailed history of returns, product preferences, detailed buying habits and order patterns, including lifetime purchase history, for all KeyView customers." (*Id.*, ¶21) (emphasis in original). KeyView also asserts that its customer database "includes detailed 'behavioral data' tailored to each customer, including tips on sales techniques, optimal times and days of the week to place calls, and exact products ordered." (*Id.*, ¶22). As a result, KeyView concludes that its customer database constitutes "confidential, proprietary, and trade secret information." (*Id.*, ¶23).

Defendants, however, dispute KeyView's characterization of its customer database. As noted by Barger, prospective customer and sales information, including some of KeyView's customer information, is commercially and publicly available for purchase from third-party aggregators and data brokers, which Barger asserts is a relatively common practice in the direct-response marketing industry. (*See* Doc. 17-1, ¶¶32-39). Indeed, during Barger's employment, KeyView directly shared customer information with at least one third-party data broker, Macromark, Inc. ("Macromark"), if not more. (*See* Doc. 17-1, ¶¶32-37; Doc. 17-2; Doc. 21-2, ¶4; Doc. 25-1, Ex. 2; Doc. 30-1, ¶¶18-21; Doc. 33-1, ¶¶21-36 & Ex. 6-10). Barger asserted that, during his employment, KeyView additionally shared its customer information with third-party data brokers i-Behavior cooperative and Epsilon Abacus & the Abacus Alliance ("Abacus"). (Doc. 30-1, ¶¶18-21). Scott Eibel ("Eibel"), KeyView's CEO, acknowledged that, as part of and to facilitate Macromark's work for KeyView, KeyView necessarily shared some of its customer information with Macromark, although he asserted that Macromark did not sell or provide access to KeyView's list of active customers to Defendants and that Macromark's prospect lists feature only the prospects' names and addresses not phone numbers. (Doc. 21-2, ¶4(c) & (d); Doc. 32-2, ¶¶7-8). Eibel indicated that KeyView did not have a *direct* relationship with i-Behavior cooperative or Abacus, did not purchase leads *directly* from either entity, and did not send any of its customer data *directly* to either entity, but he admits that Macromark worked with the two entities for work performed on KeyView's behalf and sent KeyView's customer information, including information for some active customers, to those entities to facilitate such work. (Doc. 32-2, ¶¶5, 10-13; *see* Doc. 32-3, ¶¶5-10). Steven Carrara ("Carrara"), an employee of Macromark, stated that the information provided to Macromark and then subsequently to i-Behavior consisted of approximately 75,000 direct mail customer records and that Macromark possessed some telephone numbers of KeyView prospects and customers (Doc. 44-1, ¶¶6-9). Beyond that, KeyView also

received prospective customer information from data brokers. (*See* Doc. 17-1, ¶¶35-40; Doc. 21-2, ¶4(d)(iii); Doc. 30-1, ¶¶15-22; Doc. 32-2, ¶¶7-13; Doc. 32-3, ¶¶2-3; Doc. 33-1, ¶¶22-34 & Ex. 6-10). [1]

**\*3** Barger resigned from KeyView in December 2017. (Doc. 1, ¶49). Pursuant to an employee manual that expressly disclaims any contractual obligation, Barger was directed to return all of KeyView's property upon his resignation. (*Id.*, ¶50; *see* Doc. 7-1; Doc. 7-2). According to KeyView, however, Barger improperly retained a copy of its customer database. (Doc. 1, ¶51). Barger emphatically denies retaining or utilizing KeyView's customer database following his resignation in 2017. (Doc. 17-1, ¶¶30-31, 40; Doc. 30-1, ¶13; Doc. 33-1, ¶11). According to Barger, the only documents he retained were some Microsoft Outlook files, which included email information and attachments from Macromark. (Doc. 17-1, ¶¶ 40-42). Those attachments included names of prospect lists that were in the possession of Macromark, a third party. (*Id.*). KeyView permitted Barger to access and store these Outlook files on his personal computer during his employment, and KeyView did not restrict Barger's retention of his historical email accounts. (*Id.*).

Following his resignation from KeyView, Barger worked as the Chief Operating Officer of NES Health, LLC ("NES Health"). (*Id.*, ¶27). Harry Massey ("Massey"), the owner of NES Health, declares that Barger showed him a copy of KeyView's customer database. (*See* Doc. 7-5, ¶¶4-5). Barger disputes this. According to Barger, Massey is mistaken, and Barger actually showed Massey a copy of NES Health's customer database, as an example of Barger's experience with optimizing databases, rather than KeyView's customer database. (*See* Doc. 17-1, ¶¶63-69).

After leaving NES Health, Barger formed Gold for Life in November 2019, but it did not start operating until January 2020. (*Id.*, ¶29). Gold for Life manufactures, sells, and distributes various brain health supplements, such as "Focus Gold," and sports nutrition products. (*Id.*). Gold for Life purchased and utilizes prospect lists available from third-party sources. (*Id.*, ¶44). Gold for Life contacts prospective customers from its purchased lists through direct mail campaigns, telephone marketing efforts, web sales, word of mouth, and referrals. (*See id.*, ¶¶ 32-39, 44).

In March 2020, KeyView learned that Gold for Life had contacted some of KeyView's customers. (Doc. 1, ¶52). Gold for Life continued to contact some of KeyView's customers

KeyView Labs, Inc. v. Barger, Not Reported in Fed. Supp. (2020)

2020 WL 8224618

through August 2020. (*Id.*, ¶¶53-54). During this time, KeyView alleges that it was unaware of Barger's involvement with Gold for Life. (*See id.*, ¶¶53, 57). In late August 2020, however, KeyView alleges that Gold for Life began "making a concerted effort to contact KeyView customers and making significant false, disparaging, and misleading claims about KeyView and its products." (*Id.*, ¶55). KeyView also avers that these phone calls to its customers evidence that Defendants in fact possess a copy of KeyView's customer database.

Many of KeyView's allegations stem from a call by one of Gold for Life's sales representatives, William Steinmetz ("Steinmetz"), to one of KeyView's sales representatives, Diana Schneider ("Schneider"), on August 28, 2020. (*See id.*, ¶¶57-63, 68-77). Schneider declares that the 1-800-Number that Steinmetz called is a "test" number and specifically designated to Schneider. (Doc. 7-4, ¶¶7-15). This 1-800-Number was included in KeyView's customer database during Barger's employment, and, therefore, KeyView avers this demonstrates that Defendants possess its customer database. (Doc. 1, ¶58). Schneider also declares that Steinmetz made false and misleading statements, including: "Procera is being sued due to 'false information' " and "Focus Gold's product was superior because Focus Gold uses 'all natural' ingredients." (Doc. 7-4, ¶11; *see* Doc. 1, ¶60). Additionally, Schneider declares that Steinmetz stated Gold for Life "was currently working with Dr. Wesnes and his team to help develop or tests its product." (Doc. 7-4, ¶12).

Defendants dispute several facts surrounding the context and content of this call. According to Defendants, the 1-800-Number was neither a "test" number nor a number specifically designated to Schneider. (*See* Doc. 17-1, ¶¶47-55). Rather, Barger declares that the 1-800-Number was included in a report provided by Macromark that Barger imported with his Outlook files. (*Id.*). Additionally, Barger declares that the 1-800-Number was saved to his contacts list because it was associated with a marketing campaign during his employment at KeyView. (*Id.*, ¶47). Barger further declares, with supporting documents, that the 1-800-Number was publicly disseminated to thousands of potential customers on direct mailers from KeyView. (*Id.*, ¶¶50-54 & Ex. 3). For his part, Steinmetz declares that he never discussed on the call whether Procera's ingredients are "natural" or that Gold for Life was working with Dr. Wesnes. (Doc. 17-3, ¶¶6-10). Instead, Steinmetz declares he merely noted Barger previously worked with Dr. Wesnes. (*Id.*, ¶9).

**\*4** In addition to the call to the 1-800-Number, KeyView avers that there have been other phone calls demonstrating that Defendants possess the customer database and made false statements. Mark Thomson ("Thomson"), an account manager at KeyView, states he had several conversations with undisclosed KeyView customers regarding Gold for Life contacting them. (Doc. 7-6, ¶¶7-9). According to Thomson, these undisclosed customers informed him that unspecified sales agents for Gold for Life stated: "KeyView has been sued multiple times for making false claims about its product and is currently being sued for making false claims;" Procera's "products are inferior and do not feature natural ingredients;" and Procera "sold its customer database and customer contact information to Focus Gold." (*Id.*, ¶ 7). Thomson does not provide any detail regarding who made or heard these statements and when exactly these statements were made or heard.

In fact, the only customer offered by KeyView is an undisclosed "Customer Jane Doe # 1." ("Jane Doe") (*See* Doc. 7-7). [2] According to Jane Doe, an unspecified sales agent stated that her "information was in Focus Gold's 'database' and said something to the effect of 'sometimes companies share or sell customer information to other companies,' which [she] understood as suggesting that Procera Health shared or sold [her] private information and work phone number to Focus Gold." (Doc. 7-7, ¶5). Defendants deny that these statements were ever made. Defendants also claim it is not possible to fairly challenge the statements of a purported witness whose identity is concealed. Finally, Barger declares that Gold for Life's sales scripts do not include any information about KeyView or KeyView's products, including Procera. (Doc. 17-1, ¶45).

On September 10, 2020, KeyView brought this action against Defendants for false and misleading advertising, unfair competition, deceptive and unfair trade practices, and misappropriation of trade secrets. (Doc. 1). Thereafter, KeyView filed its Motion for Preliminary Injunction, which it supported by affidavits and declarations from Schneider, Massey, Thomson, and Jane Doe. (Doc. 7). Subsequently, Defendants submitted their response in opposition with declarations from Barger, Barger's father, and Steinmetz. (Doc. 17). The undersigned conducted a hearing on the motion on October 14, 2020. During the hearing, the undersigned and the parties raised several issues relating to the motion. As a result, the undersigned allowed substantial supplemental briefing and evidence to assist with resolving the motion. (*See* Docs. 21, 24, 25, 30-33, 44).

2020 WL 8224618

Namely, KeyView submitted a declaration from Helen Brooker ("Brooker"), an employee of Wesnes Cognition; a declaration from Carrara; and declarations from Eibel. (*See* Docs. 21, 32). Brooker's declaration states that Barger did not work directly with Dr. Wesnes or Wesnes Cognition during his employment with KeyView. (Doc. 21-1). Carrara's declaration indicates that KeyView provided only some of its customer information to Macromark. (*See* Doc. 32-3). Eibel's declaration focus on KeyView's sharing of its customer database with third-party data brokers. (*See* Doc. 21-2; Doc. 32-2). In response, Defendants submitted two more declarations from Barger, which substantially rebutted the statements made in Brooker, Carrara, and Eibel's declarations with corroborating documentary evidence. (*See* Doc. 30-1; Doc. 33-1).

KeyView also submitted a second declaration from Schneider. (*See* Doc. 32-1). Schneider's second declaration focuses on alleged phone calls to another phone number that belongs to KeyView, (925) 255-2462 (the "925-Number"). According to Schneider, an unspecified Gold for Life sales agent called the 925-Number "several times" and asked to speak with an individual named "Peter." (*Id.*, ¶¶5-8). KeyView argues that this alleged use of the name "Peter" indicates the 925-Number was obtained from KeyView's customer database because the database incorrectly matches the 925-Number with an individual named "Peter Dicaro." Barger's third declaration, however, refutes many of the statements in Schneider's second declaration. (*See* Doc. 33-1). Specifically, Barger declares, with supporting documents, that he in fact set up the 925-Number for returning customers and KeyView's customer service department, which resulted in the number being saved in Barger's contacts list. (*Id.*, ¶¶8-9). Barger also declares, again with supporting documents, that there was only a single call to the 925-Number – which occurred at the same time that Steinmetz and Schneider had spoken on August 28, 2020 – and the request for "Peter" could not have happened. (*See id.*, ¶¶13-19 & Ex. 4-5).

**\*5** On November 24, 2020, the undersigned conducted another hearing on the motion, addressing some preliminary findings and conclusions. (Doc. 43). After consideration, the undersigned denied Defendants' motion to dismiss (Doc. 42) and permitted KeyView to submit supplemental authority in support of its motion (Doc. 41). Accordingly, in response to Barger's third declaration, KeyView submitted evidence of another connected phone call to the 925-Number on August 24, 2020 from Defendants, wherein the conversation

requesting "Peter" *may* have happened, and information regarding the exchange of information between KeyView and Macromark, including that Macromark possessed some phone numbers of KeyView customers and prospects as a KeyView vendor (Doc. 44).

## II. Legal Standard

The decision to grant or deny a preliminary injunction falls within the discretion of the district court. *Int'l Cosmetics Exch., Inc. v. Gapardis Health & Beauty, Inc.,* 303 F.3d 1242, 1246 (11th Cir. 2002) (citation omitted); *Carillon Importers, Ltd. v. Frank Pesce Int'l Grp. Ltd.,* 112 F.3d 1125, 1126 (11th Cir. 1997) (citation omitted). "The purpose of a preliminary injunction is merely to preserve the relative positions of the parties until a trial on the merits can be held." *Univ. of Tex. v. Camenisch,* 451 U.S. 390, 395 (1981). In determining whether a preliminary injunction should issue, the court considers whether the moving party demonstrates (1) a substantial likelihood of success on the merits; (2) irreparable harm to the moving party unless the injunction issues; (3) that the threatened harm to the moving party outweighs the potential harm the proposed injunction may cause the opposing party if the injunction issues; and (4) if issued, the injunction would not disserve or be adverse to the public interest. *Siegel v. LePore,* 234 F.3d 1163, 1176 (11th Cir. 2000) (citations omitted). Since a preliminary injunction is an extraordinary and drastic remedy, a court should not issue a preliminary injunction unless the moving party clearly establishes the burden of persuasion as to each of the four prerequisites. *Four Seasons Hotels and Resorts, B.V. v. Consorcio Barr, S.A.,* 320 F.3d 1205, 1210 (11th Cir. 2003) (citations omitted).

## III. Discussion

### A. Substantial Likelihood of Success

The first and primary factor to consider is whether KeyView can demonstrate a substantial likelihood of success on the merits of its claims. As noted, KeyView brings claims against Defendants for false advertising and unfair competition under the Lanham Act (Count I), misleading advertising (Count II), deceptive and unfair trade practices under the FDUTPA (Count III), and misappropriation of trade secrets under the FUTSA (Counts IV and V). By the instant motion, KeyView seeks an injunction relating to Counts I, III, IV, and V but not as to Count II (Doc. 7). Accordingly, KeyView must demonstrate that it maintains a substantial likelihood of

Case: 1:25-cv-00669 Document #: 90-1 Filed: 05/21/25 Page 33 of 53 PageID #:826

KeyView Labs, Inc. v. Barger, Not Reported in Fed. Supp. (2020)
2020 WL 8224618

success on its claims under the Lanham Act, the FDUTPA, and the FUTSA.


### i. FUTSA Claims

To establish a claim for misappropriation of trade secrets, the plaintiff must establish that "(1) the plaintiff possessed secret information and took reasonable steps to protect its secrecy and (2) the secret it possessed was misappropriated, either by one who knew or had reason to know that the secret was improperly obtained or by one who used improper means to obtain it." *Del Monte Fresh Produce Co. v. Dole Food Co., Inc.*, 136 F. Supp. 2d 1271, 1291 (S.D. Fla. 2001) (citing Fla. Stat. § 688.02). On this record, KeyView failed to establish a substantial likelihood of success on the merits of its FUTSA claims for two reasons. Primarily, the record consists of conflicting evidence regarding whether Defendants possess KeyView's customer database. KeyView contends Defendants possess the customer database; Defendants contend they do not possess it. The sworn proof submitted by KeyView is in direct contradiction with the sworn proof submitted by Defendants. For example, Massey declares that Barger showed him a copy of KeyView's customer database. (*See* Doc. 7-5, ¶¶4-5). By contrast, Barger declares that Massey is mistaken, and Barger actually showed Massey a copy of NES Health's customer database as an example of Barger's experience with optimizing databases. (*See* Doc. 17-1, ¶¶63-69). Additionally, while Schneider declares the 1-800-Number was a closely held, non-public phone number (Doc. 7-4, ¶¶7-8), Barger declares, with supporting evidence, that the 1-800-Number was widely distributed for marketing purposes and was saved in his personal contacts list. (*See* Doc. 17-1, ¶¶46-62 & Ex. 3; Doc. 33-1, ¶¶13-19 & Ex. 1). Barger also declares, with supporting evidence, that the 925-Number was saved independently in his personal contacts list. (*See* Doc. 33-1, ¶¶3-12 & Ex. 2).

 **\*6** The only evidence submitted by KeyView of Defendants' contacting an external, non-KeyView phone number is Jane Doe's declaration. (*See* Doc. 7-7). This declaration, however, is insufficient to satisfy KeyView's burden of establishing a likelihood of success on the merits of its FUTSA claims. Specifically, Jane Doe's declaration does not reveal either the identity of the customer or the phone number allegedly called by Defendants. (*See id.*). Defendants therefore cannot even attempt to contradict or explain the assertions made in Jane Doe's declaration. "In almost every setting where important

decisions turn on questions of fact, due process requires an opportunity to confront and cross-examine adverse witnesses." *Goldberg v. Kelly*, 397 U.S. 254, 269 (1970). Defendants' ability to contradict this declaration is especially important because Defendants have already contradicted KeyView's evidence regarding the 1-800-Number and the 925-Number. As a result, KeyView cannot rely on Jane Doe's declaration to meet its high burden to obtain a preliminary injunction. *See Doe v. L.A. Unified Sch. Dist.*, No. 2:16-cv-00305-CAS (JEMx), 2017 WL 797152, at \*8-9 (C.D. Cal. Feb. 27, 2017) (sustaining objection to use of anonymous declarations and noting that "[w]ithout any record whatsoever of a witness's identity or their signature, a declarant cannot be held to their statements under 'penalty of perjury' "); *Ajisefinni v. KPMG LLP*, 17 F. Supp. 3d 28, 43 (D.D.C. 2014) (noting requirement to "set forth specific facts" in Rule 56 for opposing summary judgment is "not satisfied by an affiant whose identity is not disclosed"); *Or. Socialist Workers 1974 Campaign Comm. v. Paulus*, 432 F. Supp. 1255, 1259 (D. Or. 1977) (finding that anonymous affidavits were inappropriate because, although affiants may run risk of harassment and fear, "our system of justice does not contemplate the judicial resolution of disputes based on secret testimony").

Significantly, KeyView failed to offer typical evidence of trade secret misappropriation, such as electronic records or other internal documentation suggesting removal of customer information and files. Instead, KeyView exclusively relies upon circumstantial evidence to support its theory that Defendants possess the customer database, which, as noted above, has been heavily contradicted. *See Pals Grp., Inc. v. Quiskeya Trading Corp.*, No. 16-23905-CIV, 2017 WL 532299, at \*4 (S.D. Fla. Feb. 9, 2017) (finding suspicion without "actual *evidence*" of trade secret misappropriation is insufficient for a preliminary injunction); *see also Langford v. Rotech Oxygen & Med. Equip., Inc.*, 541 So.2d 1267, 1268 (Fla. Dist. Ct. App. 1989) (quashing injunction on trade secrets claim because "there was no evidence that [plaintiff] took any customer information lists from [defendant]"). Indeed, Barger repeatedly and vehemently denies, in sworn statements, that he does not and has never possessed KeyView's database. (*See* Doc. 17-1; Doc. 25-1; Doc. 30-1; Doc. 33-1).

Without sufficient proof that Defendants even possess KeyView's customer database, the undersigned cannot determine whether Defendants misappropriated KeyView's customer database. Indeed, "misappropriation," as defined by the FUTSA, requires proof that the trade secret was

Case: 1:25-cv-00669 Document #: 90-1 Filed: 05/21/25 Page 34 of 53 PageID #:827

KeyView Labs, Inc. v. Barger, Not Reported in Fed. Supp. (2020)

2020 WL 8224618

obtained through "improper means." *See* Fla. Stat. § 688.002(2). In turn, "improper means" is defined to include "theft, bribery, misrepresentation, breach or inducement of a breach of a duty to maintain secrecy, or espionage through electronic or other means." Fla. Stat. § 688.002(1). Here, KeyView provided no evidence of non-competition or non-solicitation agreements between KeyView and Barger, meaning there is nothing preventing Defendants from contacting KeyView's customers. Barger declares Gold for Life utilized only prospect lists available from third-party sources, and KeyView also admitted it obtained prospective customer information through a prospect list at least once. (*See* Doc. 17-1, ¶¶30-44; Doc. 21-2, ¶4(d)(iii)). Gold for Life's utilization of the same methods as KeyView to obtain prospective customer information would not constitute "misappropriation" as defined by the FUTSA. *See Templeton v. Creative Loafing Tampa, Inc.*, 552 So.2d 288, 290 (Fla. Dist. Ct. App. 1989) (explaining an employer may not preclude its former employee from "utilizing contacts and expertise gained during his former employment ... or even customer lists he himself developed"). KeyView cannot obtain a preliminary injunction on its FUTSA claims without sufficient proof of a misappropriation. *See ActivEngage, Inc. v. Smith*, No. 6:19-cv-1638-Orl-37LRH, 2019 WL 5722049, at *5 (M.D. Fla. Nov. 5, 2019) (denying preliminary injunction on FUTSA claims because the plaintiff failed to put forth sufficient evidence of alleged misappropriation).

**\*7** Second, KeyView failed to establish a substantial likelihood of success in demonstrating its customer database constitutes a trade secret. KeyView "bears the burden of demonstrating both that the specific information it seeks to protect is secret and that it has taken reasonable steps to protect this secrecy." *Del Monte Fresh Produce*, 136 F. Supp. 2d at 1291. Under Florida law, a "trade secret" includes information, including a compilation, that: "(a) derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable by proper means by, other persons who can obtain economic value from its disclosure or use; and (b) is the subject of efforts that are reasonable under the circumstances to maintain secrecy." Fla. Stat. § 688.002(4). Information generally known or readily accessible to third parties cannot qualify for trade secret protection. *See Am. Red Cross v. Palm Beach Blood Bank, Inc.*, 143 F.3d 1407, 1410 (11th Cir. 1998) (applying Florida law). "Under Florida law, customer lists are generally considered trade secrets provided: (1) the list was acquired or compiled through the industry of the owner of the list and is not just a compilation of information

commonly available to the public; and (2) the owner shows that it has taken reasonable efforts to maintain the secrecy of the information." *Digital Assurance Certification, LLC v. Pendolino*, No. 6:17-cv-72-Orl-31TBS, 2017 WL 320830, at *2 (M.D. Fla. Jan. 23, 2017).

As noted, KeyView shared customer information – which includes customers' names, phone numbers, and residential addresses – with third parties, including third-party data brokers. (*See* Doc. 17-1, ¶¶35-40; Doc. 17-2; Doc. 21-2, ¶4; Doc. 30-1, ¶¶15-22; Doc. 32-2, ¶¶7-13; Doc. 32-3, ¶¶2-10; Doc. 33-1, ¶¶22-34 & Ex. 6-10; Doc. 44-1; Doc. 44-2). KeyView failed to provide any evidence that it entered into any confidentiality agreements with these third-party data brokers or Barger's father, and the evidence is in conflict with respect to whether KeyView entered into a confidentiality agreement with Barger. (Doc. 1, ¶¶44-45; Doc. 7, ¶¶16-21; Doc. 17-1, ¶¶20-21, 38). *See Temurian v. Piccolo*, No. 18-cv-62737-BLOOM/Valle, 2019 WL 1763022, at *11 (S.D. Fla. Apr. 22, 2019) (concluding that plaintiffs failed to allege reasonable steps because plaintiffs conceded to giving defendants access to allege trade secrets without a confidentiality agreement). Conflicts in the evidence also exist as to whether KeyView marked or failed to mark its customer database as confidential. (Doc. 7, ¶¶16-21; Doc. 17-1, ¶38). *See Yellowfin Yachts, Inc. v. Barker Boatworks, LLC*, 898 F.3d 1279, 1300 (11th Cir. 2018) (affirming that customer information was not trade secret because, in part, plaintiff allowed defendant to access information on personal devices and did not have a confidentiality agreement or mark information as confidential). In fact, while KeyView asserts that the information is shared in a limited capacity with third-party vendors, KeyView's Terms of Service permit sharing of information with third parties beyond KeyView's control. *See Terms of Service*, Procera Health, https://procerahealth.com/policies/terms-of-service (last visited Dec. 21, 2020) ("In arranging to have marketing and promotional information of third-party companies that we think might be of interest to you, we may disclose your personal information, including information such as your shipping address, billing information, telephone number, and credit card information to nonaffiliated third parties not controlled by KeyView Labs.").

KeyView's sharing of its customer information with third-party data brokers evidences that KeyView failed to take reasonable efforts to maintain the secrecy of its customer database. Although the motion, which is verified by Eibel, originally asserted KeyView's customer information

2020 WL 8224618

is confidential, not publicly available, password protected, and accessible by only a few KeyView employees (Doc. 7, ¶¶9, 13, 16), Eibel later admitted that KeyView shared some customer information with Macromark, a third party. (*See* Doc. 21-2, ¶4; Doc. 32-2, ¶8; Doc. 44-2; *see also* Doc. 32-3, ¶5). Eibel attempts to downplay and explain away the information that was shared with third-party data brokers in his second and third declarations. (Doc. 32-2; Doc. 44-2). The emails submitted with Barger's third declaration, however, significantly contradict the statements in Eibel's second declaration. (*See* Doc. 33-1, Ex. 6, 7). These emails indicate that KeyView shared with Macromark the information for at least 340,000 KeyView customers. (*See id.*). Eibel contends that the listed individuals were mostly customers who ordered Procera AVH pursuant to direct mailers sent by Macromark and Procera AVH customers who were difficult to reach through telephone contact or who had otherwise not ordered KeyView's products in more than one year, *i.e.* inactive customers. (Doc. 44-2, ¶¶7-13). Regardless, 340,000 customers constitute a large majority of the names in KeyView's customer database. (*See* Doc. 1, ¶20 ("KeyView's Database currently consists of over 500,000 customers, of which 100,000 customers are currently active ....."). Likewise, KeyView received customer information from third parties, including third-party data brokers. (*See* Doc. 17-1, ¶¶35-40; Doc. 17-2; Doc. 21-2, ¶4; Doc. 30-1, ¶¶15-22; Doc. 32-2, ¶¶7-13; Doc. 32-3, ¶¶2-10; Doc. 33-1, ¶¶22-34 & Ex. 6-10; Doc. 44-1; Doc. 44-2). Questions therefore exist as to whether KeyView's customer list included information originated from publicly available data. *See Templeton*, 552 So.2d at 289-90; *Harry G. Blackstone, D.O., P.A. v. Dade City Osteopathic Clinic*, 511 So.2d 1050, 1051-52 (Fla. Dist. Ct. App. 1987).

**\*8** In sum, the record contains conflicting evidence regarding whether Defendants possess KeyView's customer database and whether KeyView's customer database constitutes a trade secret under Florida law. These factual disputes prevent KeyView from establishing a substantial likelihood of success on the merits of its FUTSA claims. [3] *See B&G Equip. Co., Inc. v. Airofog USA, LLC*, No. 8:19-cv-403-T-36AEP, 2019 WL 2537792, at \*5 (M.D. Fla. June 20, 2019) (adopting report and recommendation denying preliminary injunction because parties' conflicting declarations prevented moving party from establishing substantial likelihood of success on merits); *Ill. Tool Works Inc. v. BG Prods., Inc.*, No. 8:17-cv-420-T-30AAS, 2017 WL 3017214, at \*10 (M.D. Fla. June 22, 2017) (denying preliminary injunction because parties' conflicting declarations prevented moving

party from establishing substantial likelihood of success on merits), *report and recommendation adopted*, No. 8:17-cv-420-T-30AAS, 2017 WL 2986240 (M.D. Fla. July 13, 2017).

### ii. Lanham Act and FDUTPA Claims

KeyView's claims under the Lanham Act and the FDUTPA involve similar elements. In fact, the success of the FDUTPA claim is tied to the Lanham Act claim for false advertising. *Sovereign Military Hospitaller Order v. Fla. Priory of the Knights Hospitallers*, 702 F.3d 1279, 1296 (11th Cir. 2012) (citation omitted); *Diamond Resorts Int'l, Inc. v Aaronson*, 371 F. Supp. 3d 1088, 1115 (M.D. Fla. 2019) (citations omitted). To establish a likelihood of success on the merits of a false advertising claim under the Lanham Act, "the movant must demonstrate the following: (1) 'the ads of the opposing party were false or misleading, (2) the ads deceived, or had the capacity to deceive, consumers, (3) the deception had a material effect on purchasing decisions, (4) the misrepresented product or service affects interstate commerce, and (5) the movant has been—or is likely to be—injured as a result of the false advertising.' " *N. Am. Med. Corp. v. Axiom Worldwide, Inc.*, 522 F.3d 1211, 1224 (11th Cir. 2008) (quoting *Johnson & Johnson Vision Care, Inc. v. 1-800 Contacts, Inc.*, 299 F.3d 1242, 1247 (11th Cir. 2002)).

To recap, in the Complaint, KeyView alleged that Focus Gold's salespeople made the following false statements, among others, to KeyView customers:

- "Procera sold your customer information to us";

- "Procera is a bad company";

- Procera has been sued multiple times for false and misleading claims;

- Procera's products do not really contain natural ingredients; and

- Focus Gold has worked very closely with Dr. Keith Wesnes in developing its product and has an ongoing relationship with Dr. Wesnes's company, Wesnes Cognition.

(Doc. 1, ¶70). The instant motion, verified by Eibel, indicates that the following statements were made to Defendants' salespeople during Defendants' sales calls:

Case: 1:25-cv-00669 Document #: 90-1 Filed: 05/21/25 Page 36 of 53 PageID #:829

KeyView Labs, Inc. v. Barger, Not Reported in Fed. Supp. (2020)

2020 WL 8224618

- "Procera sold your customer information to us";

- "Procera shared your information with us";

- "Procera is a bad company";

- Procera has been sued multiple times for false and misleading claims;

- Procera is currently being sued for false and misleading claims;

- Procera's products do not really contain natural ingredients; and

   **\*9** • Focus Gold has worked very closely with Dr. Keith Wesnes in developing its product and has an ongoing relationship with Dr. Wesnes's company, Wesnes Cognition.

(Doc. 7, ¶38). Subsequently, in her affidavit submitted in conjunction with the motion, Schneider asserts that a Focus Gold salesperson told her the following during a phone call:

- Like Prevagen, Procera is being sued due to "false information' "

- Focus Gold's product was superior because Focus Gold uses "all natural" ingredients; and

- Focus Gold was currently working with Dr. Wesnes and his team to help develop or test its product.

(Doc. 7-4, ¶¶11-12). Schneider also asserts that she received calls from customers who told her that they had been contacted by a company selling a memory product named "Focus Gold" and that, before and after the call she personally received, she received calls from KeyView customers reporting false and damaging information they heard from Focus Gold sales calls made to them, including that KeyView "is currently being sued" (Doc. 7-4, ¶¶14, 16). According to Schneider, KeyView customers also contacted her because they were upset that Focus Gold contacted them on private numbers and expressed concern that KeyView sold their contact information to Focus Gold (Doc. 7-4, ¶17). Per Schneider, several KeyView customers informed her that they would no longer buy from KeyView because of the statements made to them by Focus Gold salespeople (Doc. 7-4, ¶18).

Additionally, in his affidavit, Thomson asserts that multiple KeyView customers complained about Focus Gold salespersons making the following statements:

- Key View has been sued multiple times for making false claims about its products and is currently being sued for making false claims;

- Procera Health's products are inferior and do not feature natural ingredients; and

- Procera Health sold its customer database and customer contact information to Focus Gold

(Doc. 7-6, ¶7). According to Thomson, several KeyView customers told him that they were upset by the negative statements made about Procera Health by Focus Gold sales agents and would no longer buy Procera Health products (Doc. 7-6, ¶9). Further, in her declaration, Jane Doe indicated that a Focus Gold sales agent stated that her information was in Focus Gold's "database" and "something to the effect of 'sometimes companies share or sell customer information to other companies,' " which Jane Doe understood as suggesting that KeyView shared or sold her private information and work number to Focus Gold (Doc. 7-7, ¶5). Jane Doe indicated that she was upset by the idea that KeyView might have shared her private information and work phone number with anyone, so she contacted KeyView to ask about whether such sharing had occurred, and a KeyView agent denied sharing or selling her private information or work number (Doc. 7-7, ¶7).

### a. Whether Statements Were Made

As a threshold matter, a conflict exists in the evidence regarding whether some of the allegedly false or misleading statements were ever made. Among other things, Schneider declares that Steinmetz stated Focus Gold is "superior" because it uses "all natural" ingredients and that Focus Gold was currently working with Dr. Wesnes. (*See* Doc. 7-4, ¶¶11-12). Steinmetz, by contrast, denies that these statements were ever made. (*See* Doc. 17-3, ¶¶7,9; Doc. 17-1, ¶¶56-60). Schneider's affidavit and Steinmetz's declaration are in direct contradiction. Neither party has submitted sufficient corroborating evidence to allow the undersigned to determine whose recital of the statements is accurate.

 **\*10** Similarly, a conflict in the evidence exists regarding whether Defendants made the statements, "Procera sold your customer information to us" and "Procera shared your information with us." Defendants submitted evidence suggesting these statements were not made. For example, Barger and Steinmetz declare that Gold for Life's sales scripts

2020 WL 8224618

do not include information about KeyView or its products, including Procera. (Doc. 17-1, ¶45; Doc. 17-3, ¶3). Barger further declares that he never instructed Gold for Life's sale agents to comment on KeyView's products. (Doc. 17-1, ¶8). Moreover, Steinmetz denies ever discussing customer information or databases during his call with Schneider. (*See* Doc. 17-3, ¶8). Additionally, as fully explained above, there is a conflict in the evidence regarding whether Defendants even possess KeyView's customer database. Defendants aver that they do not possess or utilize KeyView's customer database but instead purchased and utilized prospect lists available from third-party sources. (Doc. 17-1, ¶¶43-44).

Furthermore, KeyView failed to submit sufficient evidence to establish that Defendants made the statements regarding Procera selling or sharing customer information. KeyView relies on Jane Doe's declaration and Thomson's affidavit to establish that these statements were made. (*See* Doc. 7, ¶38; Doc. 7-6, ¶7; Doc. 7-7, ¶5). Thomson's affidavit states unspecified, unidentified customers informed him that unspecified "Focus Gold sales agents" stated "Procera Health sold its customer database and customer contact information to Focus Gold." (Doc. 7-6, ¶7(c)). Although at the preliminary injunction stage, a district court may rely on affidavits and hearsay materials which would not be admissible for a permanent injunction," the evidence must be " 'appropriate given the character and objectives of the injunctive proceeding.' " *Levi Strauss & Co. v. Sunrise Inter. Trading Inc.*, 51 F.3d 982, 985 (11th Cir. 1995) (quoting *Asseo v. Pan Am. Grain Co.*, 805 F.2d 23, 26 (1st Cir. 1986)). KeyView fails to identify specific times or dates when such statements were made or the names of customers who reported that such statements were made. Thomson's secondhand recitals of non-detailed events are insufficient to satisfy KeyView's burden of establishing that these comments were in fact made.

The only customer offered by KeyView is Jane Doe (Doc. 7-7, ¶5). As explained above, however, the undersigned finds Jane Doe's declaration to be of limited probative value. Even considering Jane Doe's declaration, Jane Doe does not establish that these statements were made or that they were false. Jane Doe merely declares an unspecified sales agent stated that her "information was in Focus Gold's 'database' and said something to the effect of 'sometimes companies share or sell customer information to other companies,' which I understood as suggesting that Procera Health shared or sold my private information and work phone number to Focus Gold." (Doc. 7-7, ¶5). In other words, KeyView relies

on what Jane Doe believed the sales agent meant, but not what the sales agent actually said. And, as noted above, there is evidence demonstrating that companies – including KeyView – in fact "share or sell customer information to other companies."

### b. Whether Statements Are Non-Actionable Opinion

The statements regarding the superiority or inferiority of products and whether "Procera is a bad company" are either not actionable or unsupported by the record evidence. Generally, statements of opinion are not actionable. *See Warren Tech., Inc. v. UL LLC*, 962 F.3d 1324, 1328 (11th Cir. 2020) (noting statements of opinion are not actionable under the Lanham Act, the FDUTPA, or Florida common law); *see also Osmose, Inc. v. Viance, LLC*, 612 F.3d 1298, 1311 (11th Cir. 2010) ("Statements of opinion are generally not actionable."). Though generally not actionable, the Eleventh Circuit has suggested that a statement framed as an opinion will be treated as one of fact if the statement fairly implies a factual basis. *Duty Free Americas, Inc. v. Estee Lauder Co., Inc.*, 797 F.3d 1248, 1277 (11th Cir. 2015) (citations omitted). In this instance, Gold for Life's alleged comments that Focus Gold is a "superior" product or that KeyView's products are "inferior" constitute non-actionable statements of opinion. *See Osmose*, 612 F.3d at 1311; *Pizza Hut, Inc. v. Papa John's Int'l, Inc.*, 227 F.3d 489, 496 (5th Cir. 2000) ("Bald assertions of superiority or general statements of opinion cannot form the basis of Lanham Act liability."); *Intertape Polymer Corp. v. Inspired Tech., Inc.*, 725 F. Supp. 2d 1319, 1333 (M.D. Fla. 2010) (indicating that "statements amounting to an opinion or 'puffery' are generally not actionable" under the Lanham Act); *BellSouth Advert. & Pub. Corp. v. Lambert Pub.*, 45 F. Supp. 2d 1316, 1320 (S.D. Ala. 1999) ("Vague or highly subjective claims of product superiority generally will fall within the category of non-actionable puffery."). Additionally, although KeyView contends that Gold for Life asserted that "Procera is a bad company," this allegation is not stated in any of KeyView's affidavits. (*See* Doc. 7, ¶38(c)). In any case, without more, this statement is, at most, a non-actionable opinion.

### c. Whether Statements Are False or Misleading

**\*11** In addition to the conflicting evidence regarding whether the above statements were made and whether the statements are actionable, KeyView failed to establish

Case: 1:25-cv-00669 Document #: 90-1 Filed: 05/21/25 Page 38 of 53 PageID #:831

KeyView Labs, Inc. v. Barger, Not Reported in Fed. Supp. (2020)

2020 WL 8224618

a substantial likelihood that those statements and others relied upon by KeyView are false or misleading. Under the Lanham Act, an advertisement is false or misleading "if the challenged advertisement is literally false, or if the challenged advertisement is literally true, but misleading." *1-800 Contacts*, 299 F.3d at 1247. Determining which category the ad falls into is relevant, as once a court deems the ad to be literally false, the movant need not present evidence of consumer deception, but, if the court finds an ad to be true but misleading, the movant—even at the preliminary injunction stage—must present some evidence of deception. *Id.*

To establish that the advertisement was false or misleading, a plaintiff must "show that the statements at issue were either (1) commercial claims that are literally false as a factual matter or (2) claims that may be literally true or ambiguous but which implicitly convey a false impression, are misleading in context, or likely to deceive consumers." *Hickson Corp. v. N. Crossarm Co., Inc.*, 357 F.3d 1256, 1261 (11th Cir. 2004) (internal quotation marks and citation omitted). If a plaintiff attempts to establish that the advertisement is literally true but misleading, the plaintiff must demonstrate that consumers were actually deceived. *1-800 Contacts*, 299 F.3d at 1247. Namely, the plaintiff must " 'present evidence of deception' in the form of consumer surveys, market research, expert testimony, or other evidence." *Hickson Corp.*, 357 F.3d at 1261 (quoting *1-800 Contacts*, 299 F.3d at 1247). Regardless of which type of falsehood is alleged, determining whether an advertisement is false or misleading requires courts to "analyze the message conveyed in full context" and "view the face of the statement in its entirety." *1-800 Contacts*, 299 F.3d at 1248 (internal quotation marks and citation omitted).

Here, there is evidence demonstrating that not all of Procera's ingredients are natural, as Procera uses an ingredient called Vinpocetine, which is apparently synthetically produced. (*See* Doc. 17-1, ¶57 & Ex. 4). Indeed, Eibel acknowledged that Vinpocetine is not 100% natural, even though he asserts that it comprises only one ingredient in one of KeyView's products. (Doc. 21-2, ¶10). Given that, any statements regarding whether KeyView's products are "natural" are not false or misleading, and, therefore, KeyView cannot establish a substantial likelihood of success based on those statements.

Similarly, the statements regarding whether Barger worked with Dr. Wesnes are not false or misleading. The evidence shows that Barger in fact previously worked with Dr. Wesnes

and his company for multiple years, and these assertions are supported by numerous emails. (*See* Doc. 17-1, ¶59; Doc. 25-1, ¶¶6-11 & Comp. Ex. 1; Doc. 30-1, ¶¶6-11). Furthermore, there are significant factual issues and disputes with the alleged statements concerning Dr. Wesnes and his company. Specifically, there is a significant distinction between KeyView's allegations in the Complaint and the statements in the parties' sworn proof. In the Complaint, KeyView alleges that Gold for Life stated it "*has worked* very closely" with Dr. Wesnes and his company for over ten years in developing Focus Gold. (Doc. 1, ¶¶62, 70(e), 83(e) (emphasis added)). KeyView also alleges Gold for Life stated it "*has an ongoing relationship* with Dr. Wesnes's company, Wesnes Cognition." (*Id.*, ¶¶70(e), 83(e) (emphasis added)). By contrast, Schneider declares that Steinmetz stated Gold for Life "*was currently working* with Dr. Wesnes and his team to help develop or tests its products." (Doc. 7-4, ¶12 (emphasis added)). Schneider's statements that Gold for Life is "currently working with Dr. Wesnes" is inconsistent with the Complaint's allegations that Gold for Life stated it "*has worked* very closely" with Dr. Wesnes. Further compounding the confusion, Steinmetz declares he "never stated that Gold for Life *had performed* ten years of clinical research with Dr. Keith Wesnes [or] that Gold for Life *is working* with Dr. Wesnes." (Doc. 17-3, ¶9 (emphasis added)). Steinmetz declares that he merely stated that Barger "*previously worked* with Dr. Wesnes," which appears to be true. (Doc. 17-3, ¶9 (emphasis added); Doc. 25-1, ¶¶6-11 & Comp. Ex. 1; Doc. 30-1, ¶¶6-11).

**\*12** The distinction between the allegations in the Complaint and the statements in the sworn proof is material because Gold for Life cannot *currently* work with Dr. Wesnes, who passed away in April 2020. By contrast, Barger could have previously worked with Dr. Wesnes and his company. These conflicting allegations and declarations prevent KeyView from establishing a substantial likelihood of success on the merits based on the statements concerning Dr. Wesnes and his company.

Finally, as to the statements regarding KeyView being sued multiple times or currently being sued for making false and misleading claims or due to "false information," such statements are false. As Defendants contend, KeyView has been subject to civil lawsuits and civil enforcement proceedings, including an action brought by the Federal Trade Commission ("FTC") and an action brought for violations of California's Health & Safety Code, which resulted in substantial restrictions regarding the sale of its products in

Case: 1:25-cv-00669 Document #: 90-1 Filed: 05/21/25 Page 39 of 53 PageID #:832

KeyView Labs, Inc. v. Barger, Not Reported in Fed. Supp. (2020)

2020 WL 8224618

California. (*See* Doc. 17, at 6; Doc. 17-1 at ¶¶22-26, 41-42, 60 & Ex. 2; Doc. 17-3, ¶10; Doc. 17-4); *FTC v. KeyView Labs, Inc.*, Case No. 8:15-cv-01047-CJC-DFM (C.D. Cal. filed on July 1, 2015) (FTC permanent injunction and final judgment entered on July 9, 2015); *Jamara v. KeyView Labs, Inc.*, Case No. 2:18-cv-03040-TLN-CKD (E.D. Cal. filed Nov. 26, 2018) (TCPA Action voluntarily dismissed in January 2019); *Pannell v. KeyView Labs, Inc.*, Case No. 5:18-cv-02508-SL (N.D. Ohio filed Oct. 30, 2018) (TCPA Class Action with an agreed stipulation and order of dismissal entered on June 3, 2019). Though the FTC enforcement action required various submissions for a period of 10 years and released KeyView employees from confidentiality or other agreements that might limit their cooperation with the FTC, that action concluded in July 2015 and mainly involved KeyView's predecessor. (*See* Doc. 17-1, Ex. 2, at 15-17; Doc. 21-2, ¶¶6-8). During the relevant time period, from around March 2020 to the present, KeyView has not been the subject of a lawsuit for false or misleading claims or due to false information, as the last two lawsuits against KeyView involved claims under the Telephone Consumer Protection Act, both of which reached resolution in 2019. (Doc. 21-2, ¶9); *see Jamara*, Case No. 2:18-cv-03040-TLN-CKD (E.D. Cal. filed Nov. 26, 2018); *see Pannell v*, Case No. 5:18-cv-02508-SL (N.D. Ohio filed Oct. 30, 2018).

Steinmetz and Barger admit that Steinmetz discussed lawsuits involving Procera during the call with Schneider but contend that the discussion only occurred following questions from Schneider regarding whether Procera had been involved in any lawsuits (Doc. 17-1, ¶60; Doc. 17-3, ¶10). Outside of the statements during the call with Schneider, which Defendants admit occurred, the record does not sufficiently demonstrate that Defendants made the statements to any customers or that such statements had a material effect on any customer's purchasing decisions. *See Axiom Worldwide, 522 F.3d at 1224.* KeyView relies primarily upon the affidavit of Thomson, in which he indicates that several KeyView customers told him that Focus Gold salespeople stated that Key View has been sued multiple times for making false claims about its products and is currently being sued for making false claims, those customers were upset by the negative statements made about Procera Health by Focus Gold sales agents, and those customers would no longer buy Procera Health products (Doc. 7-6, ¶¶7, 9).

**\*13** Notably absent from the record is any affidavit from an actual customer indicating that they were told about litigation involving KeyView. Where a court deems an advertisement to be literally false, the plaintiff need not present evidence of consumer deception, but, even where a court finds a statement literally false, the plaintiff must establish materiality. *1-800 Contacts, 299 F.3d at 1247, 1250* (citation omitted). To establish materiality, KeyView must demonstrate that Defendants' deception is likely to influence the purchasing decision. *Osmose, 612 F.3d at 1319* (citation omitted). There is simply no evidence in the record regarding any influence such statements had or would have on a customer's purchasing decision nor any documented lost sales as a result of such statements. Indeed, Jane Doe, the only customer providing an affidavit, expressed concern solely regarding whether KeyView shared or sold her private information and work number to Focus Gold (Doc. 7-7, ¶5). Accordingly, although the statements are false regarding KeyView being sued due to false information or currently being sued or having been sued multiple times for making false claims about its products, no evidence of record supports a finding that the statements had or would have a material effect on any customer's purchasing decisions. Given that, KeyView cannot demonstrate a likelihood of success on the merits of its claims under the Lanham Act or the FDUTPA.

In sum, there is conflicting evidence regarding whether some of the allegedly false and misleading statements were in fact made, whether they are actionable, whether they are false or misleading, and whether they are material. Like the FUTSA claims, these factual disputes prevent KeyView from establishing a substantial likelihood of success on the merits of its claims under the Lanham Act and the FDUTPA. *See Airofog USA, LLC, 2019 WL 2537792, at \*5.* As explained above, numerous factual disputes remain, despite conducting multiple hearings and allowing numerous rounds of briefing. These factual disputes prevent KeyView from establishing a substantial likelihood of success on the merits, and, as a result, KeyView failed to establish the first element required for issuance of a preliminary injunction.[4]

### B. Irreparable Harm

As a prerequisite to the entry of a preliminary injunction, the party seeking a preliminary injunction must also establish it will suffer irreparable harm unless the injunction issues. *See Siegel, 234 F.3d at 1176.* Even if KeyView could establish a substantial likelihood of success on the merits, the absence of a substantial likelihood of irreparable harm to Plaintiffs, standing alone, precludes entry of a preliminary injunction. *Id.* ("Significantly, even if Plaintiffs establish a likelihood of

2020 WL 8224618

success on the merits, the absence of a substantial likelihood of irreparable injury would, standing alone, make preliminary injunctive relief improper."). Indeed, irreparable harm is "the sine qua non of injunctive relief." *Id.* (citations and quotation marks omitted).

In the context of a preliminary injunction, the asserted irreparable harm must be actual and imminent rather than remote or speculative. *Id.*; *see also Stewart Agency, Inc. v. Arrigo Enter., Inc.*, 266 So.3d 207, 214 (Fla. Dist. Ct. App. 2019) (citation omitted) (indicating that, for a claimant to be aggrieved under the FDUTPA, the injury claimed to have been suffered cannot be merely speculative). Harm is "irreparable" only where it cannot be undone through monetary remedies. *Cunningham v. Adams*, 808 F.2d 815, 821 (11th Cir. 1987). Here, KeyView fails to demonstrate that it will suffer any harm if an injunction is not issued, much less that such harm is irreparable. Interestingly, outside of Jane Doe, KeyView fails to point to a single customer or sale lost or diverted to Defendants or any damage to its reputation or brand caused by Defendants' statements. Notably, in his declaration, Eibel indicated that he could identify at least 24 customers who contacted KeyView to complain about Defendants' contacting them (Doc. 21-2, ¶4(d)(i) & (iii)), yet not a single affidavit or declaration appears from one of those customers. Rather, KeyView relies upon the statements from Jane Doe, which lack probative value, and upon secondhand statements from Schneider and Thomson regarding purported disgruntled KeyView customers, who were either concerned or upset about statements from Defendants or indicated that they would no longer buy KeyView's products as a result of statements from Defendants. (Doc. 7-4, ¶¶17-18; Doc. 7-6, ¶9; Doc. 7-7). As noted, although at the preliminary injunction stage, a district court may rely on affidavits and hearsay materials which would not be admissible for a permanent injunction, the evidence must be appropriate given the character and objectives of the injunctive proceeding. *Levi Strauss & Co.*, 51 F.3d at 985 (internal quotation and citation omitted). KeyView's attenuated evidence simply does not warrant a finding that irreparable harm will occur absent issuance of an injunction. [5] Based on the foregoing, KeyView failed to demonstrate that it will suffer irreparable harm, and, thus, this prong of the analysis also does not support entry of a preliminary injunction.

## C. Balance of Harm

**\*14** A party seeking a preliminary injunction must further demonstrate that the threatened harm to it outweighs the harm a preliminary injunction may cause to the opposing party. *Siegel*, 234 F.3d at 1176. As the Eleventh Circuit cautions, courts should exercise great care before the entire case has been fully and fairly heard to assure that the power of the court to require or deter action does not result in unwarranted harm to the defendant or the public. *Ala. v. U.S. Army Corps of Eng'r*, 424 F.3d 1117, 1128 (11th Cir. 2005). Comparing the harm suffered by the parties in this instance, the balance of harm tips in favor of Defendants. In a conclusory fashion, KeyView asserts that the "balance of hardships tips decisively in KeyView's favor" as "Defendants cannot legitimately claim that they will suffer harm if an injunction is entered because such injunction would merely prohibit them from using misappropriated trade secrets, from unlawfully disparaging KeyView, and from engaging in unfair competition." (Doc. 7, at 20). Given the foregoing, however, such a finding is not warranted. KeyView failed to demonstrate that it maintains a substantial likelihood of success regarding whether Defendants misappropriated trade secrets, unlawfully disparaged KeyView, or engaged in unfair competition. Notwithstanding, KeyView requests extensive injunctive relief against Defendants (Doc. 7, at 23-25), essentially preventing Defendants from contacting potential customers and engaging in fair competition with KeyView. Granting the requested injunctive relief would effectively prohibit Defendants from engaging in lawful, competitive activities based upon evidence that is, at best, questionable or, at the very least, in conflict. As such, the balance of harm weighs against entry of a preliminary injunction. For that reason, a preliminary injunction should not issue.

## D. Public Interest

Finally, Plaintiffs must demonstrate that the preliminary injunction would not disserve or be adverse to the public interest. *Siegel*, 234 F.3d at 1176. The goals of preventing customer confusion or deception would not be served because questions remain as to whether Defendants possess or utilize KeyView's customer database and whether the alleged false and misleading statements were made, whether they are actionable, and whether they are, in fact, false or misleading or materially affect customer decisions. Further, as KeyView did not enter into a non-competition or non-solicitation agreement with Barger, entry of a preliminary injunction would not serve the public interest in enforcement of contracts. Nor would the public interest be served by

Case: 1:25-cv-00669 Document #: 90-1 Filed: 05/21/25 Page 41 of 53 PageID #:834

KeyView Labs, Inc. v. Barger, Not Reported in Fed. Supp. (2020)

2020 WL 8224618

stifling competition. Rather, restricting Defendants' ability to lawfully solicit customers and compete with KeyView would prove adverse to the public interest in free and fair competition. Accordingly, the public interest considerations weigh against entry of a preliminary injunction.

### IV. Conclusion

For the foregoing reasons, it is hereby

RECOMMENDED:

1. Plaintiff's Motion for Preliminary Injunction (Doc. 7) be denied.

IT IS SO REPORTED in Tampa, Florida, this 22nd day of December, 2020.

### NOTICE TO PARTIES

A party has fourteen days from the date they are served a copy of this report to file written objections to this report's proposed findings and recommendations or to seek an extension of the fourteen-day deadline to file written objections. 28 U.S.C. § 636(b)(1)(C). A party's failure to file written objections waives that party's right to challenge on appeal any unobjected-to factual finding or legal conclusion the district judge adopts from the Report and Recommendation. See 11th Cir. R. 3-1; 28 U.S.C. § 636(b)(1).

### All Citations

Not Reported in Fed. Supp., 2020 WL 8224618

---

### Footnotes

1    Additionally, though not determinative, KeyView acknowledges on its website that it shares customer information with third parties. *See Terms of Service*, Procera Health, https://procerahealth.com/policies/terms-of-service (last visited Dec. 21, 2020). According to Eibel, however, the information disclosed to such third parties remains confidential to the third-party vendor, and the third-party vendors are "subject to confidentiality and other restrictions on their permissible use [of] KeyView's customer information – i.e., such information is to be used exclusively in their work for KeyView. The vendors do not sell, rent, or otherwise share KeyView's data with other third[ ]parties." (Doc. 21-2, ¶5(a) & (c)).

2    The Declaration of Jane Doe (Doc. 7-7) was permitted into evidence at the hearing on October 14, but, as stated during the November 24 hearing and as addressed below, the undersigned gives little weight to this evidence because it was provided anonymously, which hindered Defendants' ability to refute the allegations raised therein.

3    The motion also seeks to "[r]emove the content from Defendants' focusgold.com website that uses pictures and names formerly used by KeyView." (Doc. 7, at 25). While KeyView alleges in its complaint and motion that "Defendants' website, focusgold.com, uses the same photographs and names for its supposed 'customer' testimonials as KeyView's marketing materials," (Doc. 1, ¶76), KeyView failed to offer evidence to support this allegation. Regardless, Defendants' sworn proof refutes such allegation. (*See* Doc. 17-1, ¶45).

4    Typically, where a movant fails to establish a substantial likelihood of success on the merits, the court need not address the other elements required for a preliminary injunction. *See Warren Pub., Inc. v. Microdos Data Corp.*, 115 F.3d 1509, 1516 (11th Cir. 1997) ("Because we conclude that Warren failed to establish a substantial likelihood of success on the merits, we need not address the additional elements required for a preliminary injunction."). Since this is a report and recommendation, however, the undersigned will address the other three factors in turn.

2020 WL 8224618

5   On this record, the only potentially actionable statements are the ones discussing KeyView being sued for false or misleading statements or due to false information. The fact that those statements are false does not create a presumption of irreparable harm. "Proof of falsity is generally only sufficient to sustain a finding of irreparable injury when the false statement is made in the context of comparative advertising between the plaintiff's and defendant's products." *Axiom Worldwide,* 522 F.3d at 1227 (citation omitted). As the statements regarding purported litigation involving KeyView does not involve any comparative advertising between KeyView's and Defendants' products, the presumption of irreparable harm does not arise.

---

**End of Document**                              © 2025 Thomson Reuters. No claim to original U.S. Government Works.

---

2005 WL 1838427
Only the Westlaw citation is currently available.
United States District Court,
N.D. Illinois, Eastern Division.

George Clifford KNIGHTS, Plaintiff,
v.
Dewayne E. WILLIAMS, Correctional Officer,
Sergeant Dunmars, Correctional Sergeant, D
Johnson, Correctional Lieutenant (K3-K9),
Edmund Victor Butkiewicz, Paralegal, Defendants.

No. 02 C 5017.
|
July 28, 2005.

**Attorneys and Law Firms**

George Clifford Knights, Joliet, IL, pro se.

Ronald Anthony Rascia , Illinois Attorney General's Office, IDOC Chief of Legal Services, Chicago, IL, for Defendants.

*MEMORANDUM OPINION AND ORDER*

FILIP, J.

**\*1** Plaintiff, George Knights ("Knights" or "Plaintiff"), is incarcerated at the Stateville Correctional Center in Joliet, Illinois, as a result of his 1970 conviction by jury for his role in the execution-style murder of two ambushed Chicago Police Officers. Plaintiff is suing Defendants DeWayne Williams ("Williams"), Sergeant Joel Dunmars ("Dunmars"), Lieutenant Darryl Johnson ("Johnson"), and Edmund Butkiewicz ("Butkiewicz") (collectively "Defendants"), who are all employees of the Illinois Department of Corrections. Plaintiff alleges that Defendants unconstitutionally denied him access to the courts. (D.E. 1 (Compl.).) The case is before the Court on Defendants' renewed motion for summary judgment ("Summary Judgment Motion") (D.E.48) and Plaintiff's motion to strike three affidavits submitted in conjunction with Defendants' motion for summary judgment ("Motion to Strike") (D.E.53). For the reasons stated below, the Motion to Strike is denied, and the Summary Judgment Motion is granted.

I. Background

A. Local Rule 56.1

The relevant facts are taken from the parties' filings under Local Rule 56.1 ("L.R.56.1"). As is the practice in this district, the Court only considers those facts or additional facts that are presented in conformity with L.R. 56.1.

The Seventh Circuit has "consistently and repeatedly upheld a district court's discretion to require strict compliance" with L.R. 56.1. *See Bordelon v. Chicago Sch. Reform Bd. Of Trs.,* 233 F.3d 524, 527 (7th Cir.2000); *accord Cichon v. Exelon Generation Co., LLC,* 401 F.3d 803, 809 (7th Cir.2005). The Seventh Circuit and district courts have not been wedded to enforcement of the local rule as a matter of mere formalism. Rather, precedent acknowledges that it is a "reasonable judgment" that "consistent, 'bright-line' enforcement is essential'-not only in promoting compliance with the local rule, but also "to ensuring that [the] long-run aggregate benefits in efficiency" that L.R. 56.1 is intended to produce are realized for the system of justice in the Northern District of Illinois. *Midwest Imports v. Coval,* 71 F.3d 1311, 1316 (7th Cir.1995); *accord, e.g., Kozola v. Bd. of Ed. of City of Chicago,* 385 F.3d 1104, 1109 (7th Cir.2004) (collecting cases). In addition, the process established in L.R. 56.1 (and its predecessor, L.R. 12(M) and (N)), helps focus and narrow the factual disputes so the court is not attempting to guess at what fairly can be argued and inferred from an often massive factual record; that dynamic helps to ensure that the summary judgment process best promotes fair results for all. In addition, the Court notes that while it is generally solicitous of *pro se* plaintiffs confronting the procedural requirements of summary judgment adjudication, precedent teaches that a *pro se* litigant is not exempt from meaningfully complying with L.R. 56.1 or provided blanket immunity from the requirements of that Rule. *See, e.g., Greer v. Bd. of Educ. of the City of Chicago,* 267 F.3d 723, 727 (7th Cir.2001); *Stevens v. Navistar Int'l Transp. Corp.,* 244 F.Supp.2d 906, 910 (N.D.Ill.2002) (St.Eve, J.) (collecting cases); *see also Members v. Paige,* 140 F.3d 699, 702 (7th Cir.1998) (stating that procedural rules "apply to uncounseled litigants and must be enforced"); *Midwest Imports,* 71 F.3d at 1317 ("Rule 12(N) [a predecessor to L.R. 56.1] is straightforward and clear.").

**\*2** In this case, Defendants provided Knights with the "Notice to Pro Se Litigants Opposing Summary Judgment" as required by L.R. 56.2, and the Court specifically admonished Knights that he would be expected to comply with L.R. 56.1. (*See* D.E. 50 (L.R. 56.2 notice); D.E. 44 ("Plaintiff is cautioned that in any future summary judgment briefing he will be required to comply with Local Rule 56.1.").) Despite

2005 WL 1838427

these notices, Knights has substantially failed to comply with the requirements of L.R. 56.1 in his summary judgment filings. Thus, while cognizant of Knights's status as a *pro se* prisoner litigant, the Court will not consider facts or denials not properly put before the Court-whether by Knights or Defendants.[1]

Defendants filed a statement of facts pursuant to L.R. 56.1(a)(3) in conjunction with their motion. (D.E.53.) Rather than, as the rule instructs, filing a response to Defendants' statement of facts (*see* L.R. 56.1(b)(3)(A)), and a separate statement of additional facts (*see* L.R. 56.1(b)(3)(B)), Knights has included additional facts within his responses.[2] (*See* D.E. 61 (Pl.'s Reply to Def.'s L.R. 56.1(a)(3)(B) Filing) ("Plaintiff's Response" or "Pl. Resp.").) The Seventh Circuit has consistently affirmed that this practice is improper under the rule and that statements contained in responses that go beyond what is necessary to justify a denial will not be considered. *See Cichon,* 401 F.3d at 809 (collecting cases); *Midwest Imports,* 71 F.3d at 1316-17. Defendants, to their credit, attempted to identify the additional statements contained in Knights's response and responded to those statements. In doing so, however, Defendants have often responded to statements that constituted justifications for denial (as opposed to additional statements of fact) (*see, e.g.,* Pl. Resp. ¶ 11; Def. Reply ¶ 11), which effectively created "replies" that also are not allowed under the rule. *See Schulz v. Varian Med. Sys., Inc.,* 315 F.Supp.2d 923, 925 n. 1 (N.D.Ill.2004); *accord Kozlowski v. Fry,* 238 F.Supp.2d 996, 1000 n. 2 (N.D.Ill.2002) (citing *White v. Sundstrand Corp.,* No. 98 C 50070, 2000 WL 713739, at *2 (N.D.Ill. May 23, 2000), *aff'd,* 256 F.3d 580 (7th Cir.2001)). L.R. 56.1 was designed precisely to avoid this sort of procedural morass-both because the situation makes it difficult to identify the universe of actual, material, factual disputes, and also because the time required to decipher the parties' improper filings creates undue burdens on limited judicial resources that delay the courts' efforts to render decisions for other litigants. *Accord Midwest Imports,* 71 F.3d at 1316-17. Sorting the wheat from the chaff would take-and has taken-this Court needless hours that could have been devoted to other cases. *See Smith v. Lanz,* 321 F.3d 680, 683 (7th Cir.2003); *Bordelon,* 223 F.3d at 528-29 (affirming district court's decision to strike entire response to movant's statement of facts rather than searching for individual, proper statements; holding that "the purpose of [the predecessor rule of L.R. 56.1]-to require the parties to identify the disputed issues in a concise format-would be defeated if the court were required to wade through improper denials and legal argument in

search of a genuinely disputed fact"); *Midwest Imports,* 71 F.3d at 1316-17. Thus, the Court disregards the additional statements of fact contained in the following paragraphs of Plaintiff's Response: ¶¶ 8, 11, 15, 23, 28, 31, and 32, as well as Defendants' responses to what it deemed were additional statements of fact.

**\*3** Additionally, much of the evidence Knights uses to support his denials is improper. When denying a movant's factual allegations, "a general denial is insufficient." *Malec v. Sanford,* 191 F.R.D. 581, 584 (N.D.Ill.2000). Instead, "the nonmovant must cite specific evidentiary materials justifying the denial." *Id.; see also id.* (failure to adhere to L.R. 56.1 requirements, including citation to specific evidentiary materials justifying denial, is equivalent to admission). In deciding a summary judgment motion, a court may consider, along with deposition testimony and other material discussed in Federal Rule of Civil Procedure 56(c) and 56(e), "any material that would be admissible or usable at trial, including properly authenticated and admissible documents or exhibits." *Smith v. City of Chicago,* 242 F.3d 737, 741 (7th Cir.2001) (internal quotations omitted). In particular, the Court notes that Plaintiff's Exhibit C, a purported affidavit by inmate Marvin Williams, fails to conform to the requirement that the affidavit be made under penalty of perjury. *See* 28 U.S.C. § 1746;[3] *Pfeil v. Rogers,* 757 F.2d 850, 859 (7th Cir.1985). While Mr. Williams signed the document, he left blank the signature block under the statement that he understood that he was subject to the penalty of perjury pursuant to 28 U.S.C. § 1746. (*See* Pl. Resp., Ex. C.) The Seventh Circuit teaches that a court is not to be "unnecessarily hyper-technical and overly harsh on a party who unintentionally fails to make certain that all technical, non-substantive requirements of execution [of an affidavit] are satisfied," *Pfeil,* 757 F.2d at 859, but compliance with 28 U.S.C. § 1746 is mandatory and fundamental, not a "non-substantive" requirement. *Id.* (teaching that "affidavits are admissible in summary judgment proceedings if they are made under penalties of perjury" and also that "unsworn documents purporting to be affidavits may be rejected") (citing 28 U.S.C. § 1746). The Court also notes that the purported affidavit is quite suspicious, in that the signer executed the document but specifically abjured from signing the portion of the document on the same page that would subject him to penalties for perjury for any false statement(s). In any event, the document is improper and will not be considered.

Knights also relies on several unsworn grievance forms that contain narratives of facts written by Knights. (*See* Pl. Resp., Ex. A, F, and M.) To the extent that the narratives are being offered for the truth of the matters asserted (*see, e.g.,* Pl. Resp. ¶ 8 (Knights's statement as to why he was placed in segregation)), these grievances constitute inadmissible hearsay. *See, e.g., Eisenstadt v. Centel Corp.,* 113 F.3d 738, 742 (7th Cir.1997) ("[H]earsay is inadmissible in summary judgment proceedings to the same extent that it is inadmissible in a trial ... except that affidavits and depositions, which (especially affidavits) are not generally admissible at trial, are admissible in summary judgment proceedings to establish the truth of what is attested or deposed...."). Where Plaintiff's denial of a properly supported statement of fact is insufficient for lack of record support, the Court deems that statement admitted. *See* L.R. 56.1(a), (b)(3)(B); *accord Malec,* 191 F.R.D. at 584 (failure to adhere to L.R. 56.1 requirements, including citation to specific evidentiary materials justifying denial, is equivalent to admission). Thus, the Court deems admitted the following statements from Defendants' L.R. 56.1(a)(3)(B) statement of facts ("Defendants' Statement of Facts" or "Def. SF"): ¶¶ 8, 11, 12, 13, 15, 17-24, 27-32, 36 (first sentence), 40a,[4] and 41.

**\*4** Where Defendants failed to provide support for a statement that was not otherwise admitted by Knights, the Court disregards that statement. *See, e.g., Malec,* 191 F.R.D. at 583 ("Factual allegations not properly supported by citation to the record are nullities."). Thus, the Court declines to consider paragraphs 10 and 25 in Defendants' Statement of Facts. Additionally, the Court disregards the second sentence of paragraph 36, which is an improper legal conclusion. *See, e.g., Malec,* 191 F.R.D. at 583 ("[A] movant's 56.1(a) statement should contain only factual allegations. It is inappropriate to allege legal conclusions.").

B. Motion to Strike

In conjunction with their Summary Judgment Motion, Defendants filed affidavits submitted by Williams, Johnson, and Dunmars. (*See* D.E. 48, Ex. A, B and C.) Plaintiff argues in his Motion to Strike that the signatures on the affidavits are forgeries, offering comparisons between the affidavits and other documents Knights believes represent the signatures of the correctional officers.

The Court declines to strike the affidavits on the basis of Knights's comparisons. Knights offers no evidence beyond his personal speculation that the signatures are not authentic.

He compares the two signatures of Dunmars and Johnson, and states, "I found that they were written by the same hand." (D.E. 53 at 2.) Knights also looks at two signatures purportedly written by Williams and stated, "I found that they were written by two different people not of the same hand." (*Id.*) With all respect to Knights, who provides no indication he has received training or has otherwise obtained expertise on the subject of handwriting analysis, this is simply not evidence of forgery-particularly in the face of (as explained further below) sworn testimony from the notary who notarized the respective documents in which the notary responds and swears that they were executed as represented.

In this regard, the Court notes that treatises on handwriting analysis teach that "no one ever writes one's name exactly the same way twice," Doris M. Williamson & Antionette E. Meenach, *Cross-Check System for Forgery and Questioned Document Examination* 1 (1981), and that any number of extenuating circumstances-such as, by way of example, an individual having alternative styles, carelessness, or mere fatigue-can lead to fundamental differences in a single person's writing, *see, e.g.,* Roy A. Huber & A.M. Headrick, *Handwriting Identification: Facts and Fundamentals* 51-55 (1999). The self-serving speculation of a litigant who claims no expertise in the area of handwriting analysis is insufficient for the Court to disregard the sworn testimony of the notary, Daly Colwell, who witnessed and notarized the signatures of the three correctional officers.[5] (*See* D.E. 41, Ex. A.) Mr. Knights offers no evidence, and the Court finds no reason, to reject Ms. Colwell's testimony that the documents were signed by the Defendant-affiants as represented. The Motion to Strike is respectfully denied.

C. Facts[6]

1. Actions of Defendants

**\*5** Knights is an inmate currently incarcerated by the Illinois Department of Corrections at Stateville Correctional Center ("Stateville"). (Def.'s L.R. 56.1(a)(3)(A) St. of Facts ¶ 1.) Dewayne Williams and Joel Dunmars were at all times relevant to this case correctional officers at Stateville, and Darryl Johnson was a correctional lieutenant. (*Id.* ¶¶ 2-4.) Ed Butkiewicz was at all times relevant to this case a paralegal at Stateville. (*Id.* ¶ 5.)

On January 12, 2002, Knights was placed in segregation.[7] (Def. SF ¶ 7.) The prison's property rules for inmates in segregation are more restrictive than for inmates in the general

2005 WL 1838427

population, so most of Knights's personal items had to go
to the Personal Property department. (*Id.* ¶ 8.) Plaintiff was
taken back to his cell to pack his property before he was
escorted to segregation. (*Id.* ¶ 9.) Plaintiff and his property
boxes were taken to a holding cell (which Knights refers to
as the "bullpen"), where Officer Williams packed Knights's
"essential items" into his segregation bag. (*Id.* ¶ 11.) These
are items, such as shower and hygiene items, that an inmate
might need until he is able to have the rest of his allowable
property sent to him in segregation. (*Id.*) This packing was
done in Knights's presence. (*Id.* ¶ 12.)

According to testimony offered by the Defendant correctional
officers, inmates are able to take some legal documents with
them as essential items, but only an amount which fits in the
segregation bag (size not described). [8] (Def. SF ¶ 13.) On the
day he was transferred to segregation, Knights demanded to
take all his legal materials with him, even though they did
not fit into his segregation bag. (*Id.* ¶ 14.) Defendant Johnson
denied his request and escorted Knights to segregation
without any of Knights's legal materials. [9] (*Id.* ¶ 15, 16.)
Defendant Williams delivered Knights's remaining property
to Personal Property. (*Id.* ¶ 17.) Personal Property delivered
Plaintiff's two legal property boxes to Plaintiff on January
13, 2002. (*Id.* ¶ 18.) Defendants Dunmars and Johnson never
came into contact with Plaintiff's legal materials. (*Id.* ¶ 19.)
Defendants Williams, Dunmars, and Johnson did not take
or confiscate any of Plaintiff's legal property, nor did they
order anyone else to do so. (*Id.* ¶ 20.) Knights never asked
these three defendants for assistance in locating his legal
documents. (*Id.* ¶ 21.)

Plaintiff asked Defendant Butkiewicz, the paralegal, for
assistance in locating his legal documents. (Def. SF ¶ 23.)
Butkiewicz arranged to have delivered to Plaintiff the boxes
of excess legal documents that Knights had in storage with
his name on them. (*Id.* ¶ 24.) In early 2002, Stateville
Correctional Center's administration closed the satellite law
library in its segregation unit. (*Id.* ¶ 39a.) Butkiewicz was not
involved in the decision to close the satellite law library. (*Id.* ¶
40a.) After the satellite law library was closed, legal services
were provided to segregation inmates through paralegals and
law clerks. (*Id.* ¶ 41.)

2. Underlying Cases

**\*6** In his Complaint, Knights referenced three cases: "01-
MR-762 Habeas Corpus, 3-01-0725 Civil Appeal, and 01-
MR-810 Suit for Injunctive or Declaratory Relief," (Compl.¶

13), and included exhibits which show that 01-MR-762 was
dismissed on Knights's own motion and that the Illinois
Appellate Court dismissed 3-01-0725 (Compl., Ex. E, G, H,
M). Knights offers no evidence on summary judgment that
is properly before the Court as to the underlying grounds
for these claims. Defendants, however, have submitted on
summary judgment the Complaint for Injunctive Relief in 01-
MR-810 (Def.SF, Ex. F); the Complaint for Habeas Corpus
Relief in 01-MR-762 (*id.,* Ex. H); and the Complaint for
Mandamus Relief in 01-MR-746 (*id.,* Ex. L), of which case
3-01-0725 was the appeal (*id.* ¶ 26). These cases are described
in detail below.

## II. Summary Judgment Standard
Summary judgment is proper where "the pleadings,
depositions, answers to interrogatories, and admissions on
file, together with the affidavits, if any, show that there is no
genuine issue as to any material fact and that the moving party
is entitled to a judgment as a matter of law." *Fed.R.Civ.P.
56(c)*. In determining whether there is a genuine issue of fact,
the court "must construe the facts and draw all reasonable
inferences in the light most favorable to the nonmoving
party." *Foley v. City of Lafayette,* 359 F.3d 925, 928 (7th
Cir.2004). To avoid summary judgment, the opposing party
must go beyond the pleadings and "set forth specific facts
showing that there is a genuine issue for trial." *Anderson v.
Liberty Lobby, Inc.,* 477 U.S. 242, 250, 106 S.Ct. 2505, 91
L.Ed.2d 202 (1986). Summary judgment is proper against
"a party who fails to make a showing sufficient to establish
the existence of an element essential to that party's case, and
on which that party will bear the burden of proof at trial."
*Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548,
91 L.Ed.2d 265 (1986).

## III. Analysis
Plaintiff contends that Defendants violated his First, Sixth,
Eighth and Fourteenth Amendment right to access to the
courts and, consequently, violated 42 U.S.C. § 1983. [10]
To prevail on a claim under § 1983, Knights must prove
that Defendants deprived him of a right guaranteed by the
Constitution or laws of the United States, and did so while
acting under color of state law. *Ross v. Town of Austin,*
343 F.3d 915, 917 (7th Cir.2003). There is no dispute that
Defendants acted under color of law (Def. SF ¶ 6), so
the Court considers whether Knights was deprived of his
constitutional right of access to the courts.

A prisoner's right of access to the courts includes both the right not to be obstructed by state actors in his attempts to present his claims to the courts, a right prisoners share with free persons, and the more limited right to receive the assistance necessary to enable him to present claims relating to the lawfulness or conditions of his confinement. *See generally Snyder v. Nolen,* 380 F.3d 279, 290-91 (7th Cir.2004) (per curiam). Knights alleges violations of both, claiming that Williams, Dunmars and Johnson took or destroyed his paperwork, while Butkiewicz denied him assistance.

### A. Lack of Evidence of Interference

**\*7** Given the Court's evidentiary rulings above, summary judgment is proper on the ground that Knights has failed to put any evidence properly before the Court from which a jury could find that any of the Defendants interfered with Knights's right to access the courts. Knights adduced no evidence that Defendant Butkiewicz intentionally failed to offer him any legal assistance. Nor is there any evidence before the Court that the other three Defendants deliberately lost or confiscated his legal materials. *See, e.g., Snyder,* 380 F.3d at 291 n. 11 ("[W]e have made clear that an allegation of simple negligence will not support a claim that an official has denied an individual of access to the courts.") (citations omitted); *see also Hossman v. Spradlin,* 812 F.2d 1019, 1022-23 (7th Cir.1987) (teaching that the Due Process clause is "not implicated by a negligent act of a state official, nor by an intentional deprivation by a prison employee where the state has provided a meaningful post-deprivation remedy for the loss") (citations omitted). Indeed, despite an admonition from the Court in an Order on an earlier-filed motion for summary judgment (*see* D.E. 44), Knights has failed to produce evidence (or even argue) what legal materials he was missing without which he was unable to prosecute his case. *See Hossman,* 812 F.2d at 1022 (holding that to survive summary judgment, plaintiff "should have stated with specificity exactly what materials he was deprived of and how such deprivation resulted in his being denied meaningful access to the courts to which he is entitled.... The mere assertion by plaintiff ... that legal papers, transcripts and law books were intentionally kept from him fails, without more, to demonstrate a constitutionally significant deprivation of meaningful access to the courts.") (footnotes omitted); *Davis v. Bierman,* No. 01 C 6658, 2004 WL 161523, at \*10 (N.D.Ill. Jan.21, 2004) (Coar, J.) (holding plaintiff could not show prejudice in denial of access case where he "set forth no real argument or evidence concerning *how* the confiscation of the letter allegedly affected his

attorney's ability to cross-examine or impeach [the witness] at the [ ] hearing") (emphasis in original). Plaintiff merely states that his "legal materials" were confiscated, and that he was denied access to a library containing "legal materials" and to "legal services" generally. (*See e.g.,* Pl. Resp. Br. at 2, 5, 7, 9-12.) These vague allegations are insufficient to survive summary judgment.

Additionally, in order for Knights to succeed on his § 1983 claim, he must show that each of the Defendants personally participated in or caused the unconstitutional actions. *See, e.g., Alejo v. Heller,* 328 F.3d 930, 936 (7th Cir.2003) (citing *Duncan v. Duckworth,* 644 F.2d 653, 655 (7th Cir.1981)); *Palmer v. Marion County,* 327 F.3d 588, 594 (7th Cir.2003) ("[Section] 1983 lawsuits against individuals require personal involvement in the alleged constitutional deprivation to support a viable claim."). The undisputed evidence before the Court shows only that Defendants Johnson and Williams were involved in transporting Knights to segregation and in getting his personal property together at that time. (Def. SF ¶¶ 14, 15, 17.) Knights has not refuted the evidence that Defendants Johnson and Dunmars never came into contact with Knights's legal materials. (*See* Def. SF ¶ 19.) Even if his legal materials were lost, Knights has put forward no proper evidence on summary judgment indicating that Williams, Johnson, or Dunmars were responsible for that loss. On this record, no reasonable jury could find that Defendants intentionally interfered with Knights's access to the courts by obstructing his efforts to file a lawsuit or by failing to provide him assistance.

### B. Failure to Demonstrate Actual Injury

**\*8** Even assuming that Plaintiff had properly adduced evidence to support his allegations that Defendants intentionally interfered with his access to the courts, Knights's claim would fail for the independent reason that he has failed to demonstrate any actual injury. *See Lewis v. Casey,* 518 U.S. 343, 349-51, 116 S.Ct. 2174, 135 L.Ed.2d 606 (1996). The Supreme Court teaches that the right of access to the courts "is ancillary to the underlying claim, without which a plaintiff cannot have suffered injury by being shut out of court." *Christopher v. Harbury,* 536 U.S. 403, 415, 122 S.Ct. 2179, 153 L.Ed.2d 413 (2002). Thus, to succeed on a denial of access case, the "plaintiff must identify a 'nonfrivolous,' 'arguable' underlying claim." *Id.* (quoting *Lewis,* 518 U.S. at 353 and n. 3). In this regard, precedent teaches that "[t]o prove a violation [of the constitutional right of access to the courts] a plaintiff must demonstrate that state action hindered his or her efforts to pursue a non-frivolous legal claim and

that consequently the plaintiff suffered some actual concrete injury." *May v. Sheahan,* 226 F.3d 876, 883 (7th Cir.2004) (citing *Lewis,* 518 U.S. at 350-54).

In its earlier summary judgment Order, the Court noted Knights's failure to provide sufficient information regarding the substance of two of the three of the cases he mentions in his Complaint (indeed, the substance as to the third case-the complaint-was provided by Defendants). (*See* D.E. 44.) The Court denied Defendants' earlier summary judgment motion without prejudice to allow Knights an additional opportunity to provide proof, if any exists, that Defendants prevented him from pursuing nonfrivolous claims. (*Id.*) Knights has not provided a single piece of evidence-or even an argument-in his response to the instant Summary Judgment Motion to prove the non-frivolousness or arguable merit of his underlying claims. [11] Rather, Knights argues that he has an absolute right to legal services. (*See* Pl. Resp. Br. at 2, 4-5, 13.) Precedent instructs, however, that Knights's argument is misplaced unless he can put forth some evidence that Defendants' alleged actions impeded his ability to pursue "a non-frivolous legal claim and that consequently the plaintiff suffered some actual concrete injury." *May,* 226 F.3d at 883.

In *Lewis v. Casey,* the Supreme Court held that "prison law libraries and legal assistance programs are not ends in themselves, but only the means for ensuring 'a reasonably adequate opportunity to present claimed violations of fundamental constitutional rights to the courts.' " *Lewis,* 518 U.S. at 351 (quoting *Bounds v. Smith,* 439 U.S. 817, 825 (1977)). Knights's deficiencies on summary judgment are similar to those in *Tarpley v. Allen County, Indiana,* 312 F.3d 895 (7th Cir.2002). In that case, the Seventh Circuit affirmed the district court's grant of summary judgment for the defendants where the plaintiff provided "no detail" about either of the underlying cases he claims he was prevented from pursuing. *Id.* at 899. The court held that plaintiff's "long list of deficiencies" was insufficient; "without evidence that the defendants prevented him from pursuing a nonfrivolous legal action, he cannot show that his constitutional right was violated." *Id.* (citing *Lewis,* 518 U.S. at 350-54, and *Nance v. Vieregge,* 147 F.3d 589, 591 (7th Cir.1998)). Similarly, Knights has listed a number of alleged actions taken, or not taken, by Defendants that prevented him from pursuing his three lawsuits. But he has adduced no evidence as to whether these three lawsuits were nonfrivolous, and summary judgment is independently proper for this reason.

*9 In the alternative, Defendants, in addition to identifying Plaintiff's failure to adduce any evidence that the underlying claims were non-frivolous, have argued that Knights's underlying claims are frivolous. At the behest of the Court, Defendants have filed materials regarding Knights's underlying claims sufficient for the Court to review them for arguable merit. The Court reviewed those materials and finds that summary judgment is proper for the independent reason that Knights's underlying claims are frivolous.

1. Case No. 01 MR 762

Case 01-MR-762 is a Complaint for Habeas Corpus Relief filed November 5, 2001, in the Circuit Court of Will County in which Knights challenges his denial of parole. (Def. SF ¶ 34; *id.,* Ex. H (Habeas Compl.).) On March 2, 2002, the defendants filed a motion to dismiss. (*Id.* ¶ 36.) On March 16, 2002, Knights apparently asked the court for a six-month extension of time to file a response to the motion to dismiss (*see* Pl. Resp. ¶ 37; *id.,* Ex. V (motion for extension of time)), but it is unclear from the record whether this request was granted. On May 6, 2002, Knights filed a motion for leave to withdraw his habeas case, which was granted on May 10. (Def. SF ¶¶ 37, 38.)

By way of background regarding the habeas proceeding, Knights was convicted in 1970 by a jury for the execution-style murders of two Chicago police officers, and he received concurrent sentences of 100-199 years for each. (Habeas Compl. at 1; D.E. 48, Ex. J.) In his Habeas Complaint, Knights asserted that he should be released for three reasons. First, Knights noted that Illinois law directed the judge sentencing him to impose a sentence "proportionate to the seriousness of the offense," 730 ILCS 5/1-1-2(a) (formerly Ill.Rev.Stat., Ch. 38, § 1001-1-2), and that a second statutory provision directs the Prisoner Review Board (the "Board") to deny parole to a prisoner if "his release at that time would deprecate the seriousness of his offense," 730 ILCS 5/3-3-5(c)(2) (formerly Ill.Rev.Stat., Ch. 38, § 1003-3-5). For the state to consider the seriousness of his offense twice, Knights argued, amounted to double jeopardy in violation of the United States and Illinois Constitutions because denial of parole imposes an additional penalty for the same crime. (*See* Habeas Compl. at 4.) In other words, Knights complained that in addition to being imprisoned, he had been forced to suffer the additional punishment of not being released early on parole. Second, Knights argued that because Illinois law does not provide objective standards for release on parole, the decision to grant or deny parole is arbitrary and violative of the Constitution. (*Id.* at 5.) Third, Knights argued that the Board's decisions

impermissibly lengthen his original sentence because they take into account that Knights's victims were police officers. (*Id* . at 7.) According to Knights, because the fact that his victims were police officers was not charged in his indictment or proven beyond a reasonable doubt, the Board's consideration of this fact violates the rule of *Apprendi v. New Jersey,* 530 U.S. 466, 120 S.Ct. 2348, 147 L.Ed.2d 435 (2000). (*Id.*)

**\*10** This claim for habeas relief is frivolous in the sense that it is "groundless in light of legal principles and decisions," *United States v. Eggen,* 984 F.2d 848, 850 (7th Cir.1993), because well-settled Illinois law holds that a prisoner is not entitled to habeas relief for denial of parole where he has not served his maximum sentence. In *People v. Spivey,* 10 Ill.2d 586, 141 N.E.2d 321 (Ill.1957), the Illinois Supreme Court held,

> Parole is a matter of grace and not of legal right. A convict cannot invoke it at his own will and has no right to demand that he be discharged before the expiration of the maximum term of his sentence.... Neither prisoner had the legal right to release prior to the expiration of his full term of life imprisonment. The court could not legally discharge them prior thereto upon the mere showing that they had not been admitted to parole, or because the court might feel that the denial of parole was unreasonable, or that the period of years served was sufficient to justify the ends of justice. A court has no jurisdiction in a habeas corpus proceeding to enter an order for a prisoner's release because of equitable considerations and no right to exercise clemency through its own processes.

*Id.* at 325-26 (internal citations omitted). The Illinois Supreme Court has repeatedly affirmed *Spivey's* teaching that parole is not a right which can be reviewed by the courts except under specific, limited circumstances, none of which are applicable here. *See, e.g., Hanrahan v. Williams,* 174 Ill.2d 268, 220 Ill.Dec. 339, 673 N.E.2d 251, 255 (Ill.1996) (citing numerous cases, including *Spivey, supra* ).

Illinois specifically limits the authority of its courts to grant discharges in habeas corpus proceedings. The Illinois Supreme Court instructs that "[t]he remedy of habeas corpus is available in a limited number of situations including obtaining the release of a prisoner incarcerated by a trial court without subject matter jurisdiction or personal jurisdiction over the defendant or where a post-conviction occurrence entitles a prisoner to release." *Hughes v. Kiley,* 67 Ill.2d 261, 10 Ill.Dec. 247, 367 N.E.2d 700, 702 (Ill.1977). Review of claims that are non-jurisdictional in nature, or do not involve an assertion that the petitioner is entitled of right because of a post-conviction occurrence to immediate release, "is not available by means of habeas corpus even though a denial of constitutional rights is involved." *Id.* (collecting numerous cases); *accord, e.g., Barney v. Prisoner Review Bd.,* 184 Ill.2d 428, 235 Ill.Dec. 1, 704 N.E.2d 350, 351 (Ill.1998). Of particular importance for Knights's demand for early parole, Illinois law explicitly states that a prisoner is *not* entitled to discharge where he is in custody "by virtue of a final judgment of any circuit court, or of any proceeding for the enforcement of such judgment, unless the time during which such party may be legally detained has expired." 735 ILCS 5/10-123(2) (section of Illinois habeas corpus statute entitled "When prisoner not entitled to discharge"); *accord Barney,* 235 Ill.Dec. 1, 704 N.E.2d at 351; *Jones v. Brantley,* 45 Ill.2d 335, 259 N.E.2d 33, 34 (Ill.1970) ("An indeterminate sentence is for the full term fixed by law for the crime, and inasmuch as parole is a matter of grace and executive clemency rather than legal right, a prisoner cannot invoke it at his will and has no right to demand that he be discharged before the expiration of the maximum term of his sentence.") (internal quotation marks and multiple citations omitted); *People v. Burbank,* 108 Ill.App.3d 697, 64 Ill.Dec. 303, 439 N.E.2d 554, 556 (Ill.App.Ct.1982) ("[W]here the legality of the original imprisonment is not challenged, the inquiry is ordinarily limited to determining whether the maximum term for which the defendant was sentenced has expired or has lawfully terminated.") (citing *Spivey, supra* ). Given that Knights's sentence of 100-199 years has not expired, nor is he alleging, in any event, that the trial court had no jurisdiction over him or that a post-conviction occurrence entitles him to relief as of right, Knights's claim for habeas relief in Will County is legally groundless and therefore frivolous. [12] *Accord, e.g., Barney,* 64 Ill.Dec. 303, 439 N.E.2d at 557 ("For a court to order a *habeas corpus* discharge before the petitioner's sentence is completed on the basis of an erroneous or inequitable denial of parole, would exceed its authority under the [Illinois] Habeas Corpus Act and constitute an act

2005 WL 1838427

of clemency, a function vested in the executive, not judicial, branch.") (citing *Spivey, supra* ).

2. Civil Appeal No. 3-01-0725

**\*11** In case 00-MR-746, Plaintiff sought mandamus relief in the Circuit Court of Will County to compel the Department of Corrections to provide him a copy of the summary report concerning a "Program Unit Hearing," which was allegedly conducted after Knights received a disciplinary report for allegedly violating a direct order. (Def. SF ¶ 27; *id.,* Ex. L.) When Plaintiff requested a copy of the summary report, he was told by a prison administrator that he would not get a summary because the "ticket" (presumably the disciplinary report) had been expunged. (*Id.* ¶ 27.) The trial court granted defendant's motion to dismiss on August 23, 2001, on the grounds that there was no clear right to the relief requested, as is required under Illinois law. (*Id.* ¶ 29; *id.,* Ex. O (order of Circuit Court of Will County, Illinois, dismissing case because "the court finds that there is no clear right to the relief requested").) On January 11, 2002, the Third Appellate District ordered Plaintiff's appellate brief stricken because he had failed to cite to the record, as required by the court's rules, and ordered him to file a brief by February 1, 2002, that complied with the rules. (*Id.* ¶ 30.) Plaintiff did not file a corrected brief, nor did he request more time to file one. (*Id.* ¶ ¶ 31, 32.) Plaintiff's appeal in 3-01-0725 was dismissed on February 14, 2002. (*Id.* ¶ 33.)

An action for mandamus is the appropriate proceeding to compel IDOC to follow its own rules. *Turner-El v. West,* 349 Ill.App.3d 475, 285 Ill.Dec. 241, 811 N.E.2d 728, 733 (Ill.App.Ct.2004). A plaintiff seeking mandamus must demonstrate "that he has a clear right to the relief requested, there is a clear duty on the part of the defendant to act, and clear authority exists in the defendant to comply with an order granting *mandamus* relief." *Id.* (citing *Baldacchino v. Thompson,* 289 Ill.App.3d 104, 224 Ill.Dec. 621, 682 N.E.2d 182, 186 (Ill.App.Ct.1997)). Knights asserted that Illinois Department of Corrections administrative rules gave him a clear right to the summary, citing 20 Ill. Admin. Code § 504.80(o):

> A copy of the disciplinary report and Adjustment Committee summary shall be forwarded to the Chief Administrative Officer for review and approval and a copy shall be filed in the committed person's master record file. The committed person shall be given a copy of the Adjustment Committee summary.

Any hearing would have taken place before the Stateville Program Unit, rather than the Adjustment Committee, because Knights was charged with only a minor violation. *See id.* § 504.50(d)(3). Nevertheless, section 504.100(k) appears to at least suggest that Program Unit hearing summaries are treated in the same manner as Adjustment Committee summaries. *Id.* § 504.100(k). This presupposes, of course, that a hearing summary existed. The Defendant maintained (and Plaintiff does not dispute) that the ticket had been "expunged," and a ticket can be expunged at the investigative stage, short of any hearing. *See id.* § 504.50(c)(4); *id.* § 504.50(d)(1). Even if a hearing was held, the Program Unit Hearing Officer also can expunge the ticket. *See id.* § 504.80(k). In addition, nothing in that subsection mandates that a summary report must be generated on an expunged ticket, and other portions at least suggest by negative implication that a statement of reasons or summary of reasoning is needed when, for example, the prisoner is found to have committed the offense, when exonerating evidence is presented and disregarded, or when disciplinary action is recommended, none of which took place here. *See id.* § 504.80(1)(2), (3). Mandamus under Illinois law is an extraordinary remedy, and requires a showing of, *inter alia,* a clear right to the relief requested and a concomitant clear duty on the defendant to act. The ambiguities identified above, and Knights's failure to cite a single case requiring provision of any assumedly generated summaries for expunged tickets, all cut against the viability of any appeal of the Illinois Circuit Court's denial of mandamus relief.

**\*12** In addition, by being deprived of his right to appeal the denial of mandamus, Knights lost no more than the possibility of obtaining a copy of a paper, which, if it existed at all, had no effect on his institutional record. Knights does not state what value a copy of this paper would have had to him, or to anyone else, for that matter. The Court can think of none.

As precedent makes clear, a plaintiff in a denial of access case "must demonstrate that state action hindered his or her efforts to pursue a non-frivolous legal claim and that consequently the plaintiff suffered some actual concrete injury." *May v. Sheahan,* 226 F.3d 876, 883 (7th Cir.2004) (citing *Lewis,* 518 U.S. at 350-54). Knights does not even suggest any injury

suffered by his failure to receive a summary of an episode that will have no effect on his institutional record. As a result, his claim fails for this independent deficiency, in addition to the others identified above.

### 3. Case No. 01-MR-810

Case 01-MR-810 is a complaint titled "Suit for Injunctive Relief" seeking to compel the Illinois Prisoner Review Board to comply with Knights's Freedom of Information Act request for a copy of the "Rules of the Parole And Pardon Board." (Def. SF ¶ 39; *id.,* Ex. F.) Defense counsel sent Knights a copy of the requested rules after the case was filed, and the case was dismissed on July 25, 2002. (*Id.* ¶ 40.) Given that Knights obtained the relief he sought in this case, and that he has provided no evidence that would suggest he ever appealed-or intended to appeal-the dismissal, the Court finds that, even if Defendants somehow interfered with his prosecution of this case, Knights suffered no actionable harm.

Thus, because Knights has failed to demonstrate that Defendants prevented him from pursuing a nonfrivolous legal action, he cannot show that his constitutional right to access of the courts was violated. See *Tarpley,* 312 F.3d at 899.

### IV. Conclusion

For the reasons stated above, the Court denies Plaintiff's Motion to Strike and grants Defendants' Summary Judgment Motion.

So ordered.

**All Citations**

Not Reported in F.Supp.2d, 2005 WL 1838427

---

## Footnotes

1   The Court notes that, for the reasons explained below, summary judgment for Defendants would be proper even if the Court were to consider Knights's improper filings.

2   The Court notes that Knights submitted a signed declaration with his summary judgment response. (*See* D.E. 61.) While this declaration may have been used by Knights to support his denials or additional statements of fact under L.R. 56.1, it is not a substitute for them. *See* L.R. 56.1(b)(3)(B) (non-movant's response to L.R. 56.1(a)(3) statement may include "a statement, consisting of short numbered paragraphs, of any additional facts that require the denial of summary judgment, including *references to the affidavits, parts of the record, and other supporting materials relied upon"* ) (emphasis added); L.R. 56.2 (Notice to Pro Se Litigants) ("If you choose to do so, you may offer the Court a list of facts that you believe are in dispute and require a trial to decide. Your list of disputed facts should be *supported by your documents or declarations."* ) (emphasis added).

3   28 U.S.C. § 1746 provides as follows:

   Wherever, under any law of the United States or under any rule, regulation, order, or requirement made pursuant to law, any matter is required or permitted to be supported, evidenced, established, or proved by the sworn declaration, verification, certificate, statement, oath, or affidavit, in writing of the person making the same (other than a deposition, or an oath of office, or an oath required to be taken before a specified official other than a notary public), such matter may, with like force and effect, be supported, evidenced, established, or proved by the unsworn declaration, certificate, verification, or statement, in writing of such person which is subscribed by him, as true under penalty of perjury, and dated, in substantially the following form:

   * * *

WESTLAW   © 2025 Thomson Reuters. No claim to original U.S. Government Works.   9

(2) If executed within the United States, its territories, possessions, or commonwealths: "I declare (or certify, verify, or state) under penalty of perjury that the foregoing is true and correct. Executed on (date).

(Signature)."

4    Defendants misnumbered their statement of facts after paragraph 40, such that the numbers 39 and 40 were repeated. The Court uses the designations 39a and 40a to refer to the second set of paragraphs with those numbers.

5    The Court rejects Knights's suggestion that the issue would be cleared up by having Dunmars, Johnson, and Williams submit photos of their driver's licenses. Doing so would merely require the Court to engage in the same kind of handwriting comparison eschewed above. Again, Knights offers nothing other than his untrained and unsworn speculations; Defendants offer sworn testimony of the relevant notary verifying the signatures in question.

6    Where the parties disagree over relevant facts, the Court sets forth the competing versions. In addition, the Court resolves genuine factual ambiguities in Plaintiff's favor. *Foley v. City of Lafayette,* 359 F.3d 925, 928 (7th Cir.2004).

7    Defendants offer evidence that Knights was placed in segregation after he tested positive for drugs. (Def. SF ¶ 7.) Knights attempts to dispute the reason for being placed in segregation, and offers that he was sent there for filing a grievance against Defendant Williams. (Pl.Resp.¶ 7.) Knights's evidence supporting this attempted denial is a grievance form filled out by Knights, which constitutes inadmissible hearsay. *See* discussion, *supra.* In any event, why Knights was placed in segregation is not material to his denial of access claim.

8    Plaintiff attempts to create a dispute as to whether this is the prison rule by offering what appears to be the personal property rules for the segregation unit which state that a prisoner in segregation may have his legal materials "as needed." (Pl. Resp. ¶ 13 (citing Ex. B).) Even if it is true that there is no limit on the amount of materials an inmate may have in segregation, this does not create a dispute as to whether the amount is more limited on the initial transfer of the inmate. Thus, the Court deems this statement admitted.

9    There is at least a dispute of fact as to whether Knights had any of his essential materials, including any legal materials, with him when he was escorted to segregation. (*See* Def. SF ¶ 16; Pl. Resp. ¶ 16.) While the Court disregards the unsworn "affidavit" of Marvin Williams for the reasons described, *supra,* it does not disregard Defendants' admission in their Answer that "Defendant Johnson then escorted plaintiff and inmate Williams to the Segregation unit without any of his legal materials or other property." (D.E. 13 (Answer) ¶ 18).) Even if the admission is not binding, the factual dispute must be resolved in Knights's favor on summary judgment. This dispute, however, is not material to the outcome of the case.

10   The Court notes that there are two issues mentioned in Plaintiff's summary judgment filings that are not part of the case before the Court. First, in his response brief, Knights at least arguably contends that the intentional taking of property, here his legal materials, by a state agent "violates the Due Process Clause of the 14th Amendment and is actionable under Section 1983." (D.E. 61 (Pl.'s Mem. of Law in Opp. to Def.'s Renewed Mot. for Summ. J. ("Pl.Resp.Br.") at 2-3.) Plaintiff did not allege in his Complaint any deprivation of property that created an injury apart from his claim for lack of access to the courts. Plaintiff also does not move to amend his Complaint to add any such allegation. To the extent that Plaintiff would seek to amend his Complaint to add such a claim for unconstitutional deprivation of property outside his denial of access claim, the Court almost surely would deny that request to amend. The request would be made at the eleventh hour, after discovery and summary judgment briefing had been completed and after the case was almost three years old. (The case had previously been briefed for summary judgment, but the Court denied the Defendants'

2005 WL 1838427

motions without prejudice to ensure that Plaintiff had been given a full chance to present evidence that the underlying cases were not frivolous. (*See* D.E. 44.) That additional opportunity for Plaintiff produced a second round of summary judgment briefing.) Moreover, the Defendants have not had any opportunity to respond to that theory or to take discovery on it. *Accord Sanders v. Venture Stores, Inc.,* 56 F.3d 771, 774-75 (7th Cir.1995) (collecting cases and noting that the Seventh Circuit has consistently affirmed denials of leave to amend made after defendant filed successful motion for summary judgment); *Cont'l Bank, NA v. Meyer,* 10 F.3d 1293, 1298 (7th Cir.1993) (affirming district court's denial of leave to amend where amendment would have prejudiced defendant by necessitating additional discovery); *see also Perrian v. O'Grady,* 958 F.2d 192, 195 (7th Cir.1992) (holding that the burden on the judicial system from amendments made at the eleventh hour can justify a denial of a motion to amend even if there is no hardship to the opposing party). Additionally, Knights has offered no reason for his failure to include such a claim at an earlier stage in the litigation. *See Sanders,* 56 F.3d at 775 (reasons for denying leave to amend at late stage "hold[ ] particularly true where a plaintiff has provided no explanation as to why amendment did not take place sooner"). Second, Plaintiff seeks leave of the Court to amend his complaint to include an Eighth Amendment claim, but he does not offer any evidence (or even argument) that would support such a claim. (*See* Pl. Resp. Br. at 14.) For the same reasons described above-namely, prejudice to Defendants and to the Court from seeking leave to amend at this late date, as well as grounds of futility-the Court denies the request.

11   In its previous Order, the Court also instructed Knights to promptly inform the Court if he "feels he is unable to obtain the court documents necessary to properly describe his underlying claims." (D.E.44.) *See also* Fed.R.Civ.P. 56(f). Knights has not informed the Court of any unavailability of documents or testimony necessary to support his response to Defendants' Summary Judgment Motion.

12   Knights alludes to a section in the Illinois habeas corpus statute that teaches that a litigant's having sought the wrong remedy is not fatal if the plaintiff nonetheless has a winning claim. However, Knights has offered nothing to suggest that his claim-which fundamentally founders on the fact that he is seeking a declaration of his legal right to a matter that is viewed as an prerogative of executive grace-would be no less defective if framed, for example, as a mandamus claim or as a request for injunctive relief.

---

End of Document

© 2025 Thomson Reuters. No claim to original U.S. Government Works.