**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | |
|---|---|
| AMERICAN ALLIANCE FOR EQUAL RIGHTS, *Plaintiff*, and | |
| | Case No. 1:25-cv-669 |
| UNITED STATES OF AMERICA, *Plaintiff-Intervenor*, v. | Judge Coleman |
| STATE OF ILLINOIS; JB PRITZKER, in his official capacity as Governor of the State of Illinois; JAMES BENNETT, in his official capacity as Director of the Illinois Department of Human Rights; KWAME RAOUL, in his official capacity as Attorney General of the State of Illinois; and ALEXI GIANNOULIAS, in his official capacity as Secretary of State of the State of Illinois. *Defendants*. | |

**NOTICE OF SUPPLEMENTAL AUTHORITY IN SUPPORT OF
OPPOSITION TO MOTION TO DISMISS AMENDED COMPLAINT (Doc.80)**

Illinois challenges the Alliance's standing on the ground that SB 2930 might not require the Alliance's members to make disclosures. *See* MTD (Doc.69) at 8-12. In response, the Alliance argues that its members are directly regulated by the law, that they would make the disclosures, and that the whole point of SB 2930 is to force nonprofits to make these disclosures. *See* MTD-Opp. (Doc.80) at 3-5. The Supreme Court's recent decision in *Diamond Alternative Energy v. EPA* supports the Alliance in two main ways. 2025 WL 1716141 (U.S. June 20, 2025) (Exhibit A).

**1.** *Diamond* reiterates that regulated entities almost always have standing to challenge laws that directly regulate them. There is usually "little question" of standing in this context. *Id*. at *7-8. Direct regulation imposes cost, MTD-Opp.3-4, which is "'of course an injury,'" *Diamond*, 2025 WL 1716141, at *8. So too here. *See* Am-Compl. (Doc.59) ¶23, ¶36.

1

**2.** Illinois cannot avoid that conclusion by claiming that SB 2930 will cause no disclosures from nonprofits. California made a similar argument in *Diamond*, claiming that its electric-car mandates wouldn't "have any impact" on fuel producers because the public "would not" respond to those regulations in the way that the producers alleged. 2025 WL 1716141 at *3-5, *7. But the Supreme Court disagreed, noting that "courts can appropriately be skeptical" when the government initially touts a law's "consequences" but then claims that "there are no [such] consequences" after someone sues. *Id*. at *12. In that situation, it's fair to "assume" that a law will "likely" have the "consequences" that its supporters initially predicted. *Id*. at *10-12.

Here, too, the supporters of SB 2930 claimed that it would "encourage" nonprofits to diversify their officers and directors—an argument that makes sense only if nonprofits make, and the public sees, the demographic disclosures. Am-Compl.¶¶20-22. Those demographic disclosures are "[t]he whole point" of SB 2930. *Diamond*, 2025 WL 1716141 at *10. Though Illinois has now "changed its tune about the continuing impact of" its law, *Diamond* instructs courts to reject that kind of convenient, post-lawsuit argument. *Id.* at *5. That kind of argument would be "odd" for this Court to credit. *Id.* at *10. "After all, if invalidating [SB 2930] would change nothing …, why [is Illinois] enforcing and defending [it]?" *Id.* Illinois is "presumably defending the [law because [it] think[s] that the [law]" will "make a difference" in terms of the information that nonprofits disclose. *Id.* Under *Diamond*, Illinois "may not target" an industry and "then evade the resulting lawsuits by claiming that the targets of its regulation should be locked out of court as unaffected bystanders." *Id.* at *14.

Dated: July 1, 2025

Respectfully submitted,

*/s/ Cameron T. Norris*
Thomas R. McCarthy*
Cameron T. Norris*
Matt Pociask**
R. Gabriel Anderson*
CONSOVOY MCCARTHY PLLC
1600 Wilson Blvd., Ste. 700
Arlington, VA 22209
(703) 243-9423
tom@consovoymccarthy.com
cam@consovoymccarthy.com
matt@consovoymccarthy.com
gabe@consovoymccarthy.com

*Admitted *pro hac vice*
**Admitted to the Northern District of Illinois

*Counsel for Plaintiff*

## CERTIFICATE OF SERVICE

On July 1, 2025, I e-filed this document with the Court, which automatically emailed everyone requiring notice.

*/s/ Cameron T. Norris*
Counsel for Plaintiff

Case: 1:25-cv-00669 Document #: 96 Filed: 07/01/25 Page 4 of 36 PageID #:984

Diamond Alternative Energy, LLC v. Environmental Protection Agency, 606 U.S. ---- (2025)
--- S.Ct. ----, 2025 WL 1716141

--- S.Ct. ----
Only the Westlaw citation
is currently available.
Supreme Court of the United States.

DIAMOND ALTERNATIVE
ENERGY, LLC, et al., Petitioners
v.
ENVIRONMENTAL
PROTECTION AGENCY, et al.

No. 24-7
|
Argued April 23, 2025
|
Decided June 20, 2025

**Synopsis**
**Background:** Producers of gasoline and other
liquid fuels sued the Environmental Protection
Agency (EPA), alleging it violated the Clean
Air Act (CAA) when it approved California
regulations that sought to limit greenhouse-
gas emissions by requiring automakers to
manufacture more electric vehicles and fewer
gasoline-powered vehicles. California and
other States that had adopted California's
regulations, as well as five automakers that
invested heavily in electric vehicles, intervened
to defend EPA's approval of California's
regulations. The United States Court of
Appeals for the District of Columbia Circuit, 98
F.4th 288, held that the fuel producers lacked
Article III standing. Certiorari was granted.

**Holdings:** The Supreme Court, Justice
Kavanaugh, held that:

monetary costs to producers from decrease in
fuel purchases were an injury in fact for Article
III standing purposes;

causation element of Article III standing was
satisfied;

setting aside EPA's approval of California's
regulations would likely redress at least some
of producers' monetary injuries; and

to demonstrate standing, producers did not
have to introduce affidavits either from
expert economists or from directly regulated
automakers explaining how they would
respond to court order invalidating California's
regulations.

Reversed and remanded.

Chief Justice Roberts, and Justices Thomas,
Alito, Kagan, Gorsuch, and Barrett, joined.

Justice Sotomayor filed a dissenting opinion.

Justice Jackson filed a dissenting opinion.

**Procedural Posture(s):** Petition for Writ of
Certiorari; Review of Administrative Decision.

*Syllabus* [*]

**\*1** Under the Clean Air Act, the
Environmental Protection Agency (EPA)
approved California regulations that require
automakers to manufacture more electric
vehicles and fewer gasoline-powered vehicles
with a goal of decreasing emissions from liquid
fuels. The regulations require automakers

Diamond Alternative Energy, LLC v. Environmental Protection Agency, 606 U.S. ---- (2025)
--- S.Ct. ----, 2025 WL 1716141

to limit average greenhouse-gas emissions across their vehicle fleets and manufacture a certain percentage of electric vehicles. Several producers of fuels such as gasoline and ethanol sued EPA in the D. C. Circuit, arguing that EPA lacked authority to approve the California regulations because they target *global* climate change rather than *local* California air quality problems as required by the Clean Air Act. They submitted standing declarations explaining that California's regulations depress demand for liquid fuel by requiring vehicles that use less or no liquid fuel, causing the fuel producers monetary injury. California's own estimates indicated the regulations would cause substantial reductions in demand for gasoline exceeding $1 billion beginning in 2020 and increasing to over $10 billion in 2030.

EPA did not challenge the fuel producers' standing in the D. C. Circuit. California, as well as other States adopting California's regulations, intervened to defend EPA's approval. California argued that the fuel producers lacked standing because automobile manufacturers would not change course if EPA's decision were vacated given the "surging consumer demand" for electric vehicles. The D. C. Circuit held that the fuel producers lacked Article III standing, finding they failed to establish that automakers would likely respond to invalidation of the regulations by producing fewer electric vehicles and more gasoline-powered vehicles.

*Held*: The fuel producers have Article III standing to challenge EPA's approval of the California regulations. Pp. —— – ——.

(a) Article III limits federal court jurisdiction to "Cases" and "Controversies," requiring plaintiffs to demonstrate standing by showing three elements: injury in fact, causation, and redressability. Injury in fact requires a " 'concrete,' " "particularized" injury that is "actual or imminent." *FDA v. Alliance for Hippocratic Medicine*, 602 U.S. 367, 381, 144 S.Ct. 1540, 219 L.Ed.2d 121. Causation requires showing "the injury was likely caused by the defendant." *TransUnion LLC v. Ramirez*, 594 U.S. 413, 423, 141 S.Ct. 2190, 210 L.Ed.2d 568. Redressability requires demonstrating that judicial relief would likely redress the injury. *Ibid.* When a plaintiff is not the direct object of government regulation, causation and redressability often depend on how third parties not before the court will predictably respond to the regulation or judicial relief. Pp. —— – ——.

(b) The fuel producers' injury in fact and causation are straightforward and undisputed. The fuel producers make money by selling fuel, so decreased purchases of gasoline and other liquid fuels resulting from California's regulations constitute monetary injury. EPA's approval authorized California and 17 other States to enforce regulations requiring lower emissions and vehicle electrification, thereby reducing liquid fuel purchases. The regulations likely cause the fuel producers' monetary injuries because reducing gasoline and diesel fuel consumption is the whole point of the regulations.

**\*2** The fuel producers also satisfy redressability. Even minimal additional revenue would satisfy this requirement, and invalidating the regulations would likely result

in more revenue from additional fuel sales based on commonsense economic principles and record evidence. Pp. —— – ——.

(1) The fuel producers might be considered direct objects of the California regulations because the regulations explicitly seek to restrict gasoline and other liquid fuel use in automobiles. When the government prohibits or impedes one company from using another company's product or service, both companies might be deemed objects of the regulation. See, *e.g.*, *Pierce v. Society of Sisters*, 268 U.S. 510, 535–536, 45 S.Ct. 571, 69 L.Ed. 1070; *Columbia Broadcasting System, Inc. v. United States*, 316 U.S. 407, 422, 62 S.Ct. 1194, 86 L.Ed. 1563. The Court need not resolve this question because the record evidence in this case establishes the fuel producers' standing in any event. Pp. —— – ——.

(2) This case presents the "familiar" circumstance where government regulation of one business "may be likely" to cause injuries to other linked businesses. *Alliance for Hippocratic Medicine*, 602 U.S., at 384, 144 S.Ct. 1540. California's regulations force automakers to manufacture more electric vehicles and fewer gasoline-powered vehicles, likely causing downstream economic injuries to fuel producers. Invalidating these regulations would likely mean more gasoline-powered automobiles and more fuel sales.

EPA and California argue this case is unusual because the vehicle market has developed such that automakers would not manufacture more gasoline-powered cars even if regulations were invalidated. This argument is undermined by their own actions—if invalidating the

regulations would change nothing, why are they enforcing and defending them? The whole point of the regulations is to increase electric vehicles beyond what consumers would otherwise demand and manufacturers would otherwise produce.

Record evidence confirms that invalidating the regulations would likely redress the fuel producers' monetary injury. First, the fuel producers' declarations quote California's own estimates of substantial reductions in gasoline demand and note California's recognition that fuel providers would be "most adversely affected." App. 137. Second, California stated in 2021 that the regulations are "critical" for future emissions reductions and submitted expert declarations in 2022 stating that without the regulations, fewer electric vehicles would be sold and more gasoline-fueled vehicles would be sold. *Id.*, at 66, 115. Third, EPA affirmed that California "needs" its standards and credited California's estimates that the regulations would continue reducing emissions through at least 2037. 87 Fed. Reg. 14334; 89 Fed. Reg. 82558. Fourth, five automakers who invested heavily in electric vehicles intervened to defend the regulations and predicted that without California's regulations, other automakers would seek a competitive advantage by selling fewer electric vehicles and more gasoline-powered vehicles. Pp. —— – ——.

(3) EPA and California argue the fuel producers needed more evidence, such as affidavits from expert economists or directly regulated automakers. This Court has not demanded such evidence to show how third parties would likely respond to government regulations. Plaintiffs

--- S.Ct. ----, 2025 WL 1716141

must simply "show a predictable chain of events" that would likely result from judicial relief. *Alliance for Hippocratic Medicine*, 602 U.S., at 385, 144 S.Ct. 1540. Requiring affidavits from regulated third parties would make standing dependent on whether the plaintiff and third parties share litigation interests and whether third parties are willing to publicly oppose the government regulator. Such a heightened requirement would close the courthouse doors to many traditional challenges to agency action. Pp. —— – ——.

 **\*3** (4) This case does not involve the rare instance where a market has likely permanently changed such that invalidating a challenged regulation would have no effect on that market. Such instances are rare for two reasons. First, governments do not usually continue enforcing and defending regulations that have no continuing effect. Second, the effect of regulations like these depend on interrelated economic forces that change over time, so courts should be wary of claims that invalidating important regulations would have zero impact on dynamic, heavily regulated markets. The evidence that some automakers are in compliance with California's mandates suggests regulatory effect, not absence of effect, and does not demonstrate how all automakers would respond to invalidation. Pp. —— – ——.

98 F.4th 288, reversed and remanded.

KAVANAUGH, J., delivered the opinion of the Court, in which ROBERTS, C. J., and THOMAS, ALITO, KAGAN, GORSUCH, and BARRETT, JJ., joined. SOTOMAYOR, J., and JACKSON, J., filed dissenting opinions.

**Attorneys and Law Firms**

Jeffrey B. Wall, Washington, DC, for Petitioners.

Edwin S. Kneedler, Deputy Solicitor General, for Federal Respondents

Joshua A. Klein, Deputy Solicitor General, for State Respondents.

Carter G. Phillips, Sidley Austin LLP, Washington, DC, for Petitioners.

Eric D. McArthur, Sidley Austin LLP, Washington, DC, Michael Buschbacher, Jared M. Kelson, Boyden Gray PLLC, Washington, DC, Jeffrey B. Wall, Counsel of Record, Morgan L. Ratner, Julia J. Mroz, Sullivan & Cromwell LLP, Washington, DC, Leslie B. Arffa, Sullivan & Cromwell LLP, New York, NY, Brittany M. Pemberton, Bracewell LLP, Washington, DC, for Petitioner Diamond Alternative Energy, LLC and Valero Renewable Fuels Company, LLC.

Richard S. Moskowitz, American Fuel & Petrochemical Manufacturers, Washington, DC, for American Fuel & Petrochemical Manufacturers.

Matthew W. Morrison, Shelby L. Dyl, Pillsbury Winthrop Shaw Pittman LLP, Washington, DC, for Diamond Alternative Energy, LLC, Iowa Soybean Association, The Minnesota Soybean Growers Association, and South Dakota Soybean Association.

Rob Bonta, Attorney General of California, Tracy Winsor, Senior Assistant Attorney

General, Theodore McCombs, Caitlan McLoon, Elaine Meckenstock, Jonathan Wiener, Deputy Attorneys General, Michael J. Mongan, Solicitor General, Joshua A. Klein, Counsel of Record, Teresa A. Reed Dippo, Deputy Solicitors General, Haley L. Amster, Associate Deputy Solicitor General, State of California Department of Justice, Oakland, CA, Philip J. Weiser, Attorney General of Colorado, William Tong, Attorney General of Connecticut, Kathleen Jennings, Attorney General of Delaware, Brian L. Schwalb, Attorney General of the District of Columbia, Anne E. Lopez, Attorney General of Hawaii, Kwame Raoul, Attorney General of Illinois, Aaron M. Frey, Attorney General of Maine, Anthony G. Brown, Attorney General of Maryland, Andrea Joy Campbell, Attorney General of Massachusetts, Keith Ellison, Attorney General of Minnesota, Aaron D. Ford, Attorney General of Nevada, Matthew J. Platkin, Attorney General of New Jersey, Raúl Torrez, Attorney General of New Mexico, Letitia James, Attorney General of New York, Jeff Jackson, Attorney General of North Carolina, Dan Rayfield, Attorney General of Oregon, Peter F. Neronha, Attorney General of Rhode Island, Charity R. Clark, Attorney General of Vermont, Nicholas W. Brown, Attorney General of Washington, Hydee Feldstein Soto, City Attorney of Los Angeles, Michael J. Bostrom, Senior Assistant City Attorney, Muriel Goode-Trufant, Corporation Counsel of the City of New York, for State Respondents.

James Payne, Acting General Counsel, Kyle Durch, Attorney, Environmental Protection Agency, Washington, DC, Sarah M. Harris, Acting Solicitor General, Counsel of Record, Adam R.F. Gustafson, Acting Assistant Attorney General, Malcolm L. Stewart, Deputy Solicitor General, Matthew Guarnieri, Assistant to the Solicitor General, Eric G. Hostetler, Sue Chen, Attorneys, Department of Justice, Washington, DC, for Federal Respondents.

## Opinion

Justice KAVANAUGH delivered the opinion of the Court.

Pursuant to the Clean Air Act, the U. S. Environmental Protection Agency approved California regulations requiring automakers to alter their fleets of new vehicles. Under those California regulations, automakers must manufacture more electric vehicles and fewer gasoline-powered vehicles. The goal is to decrease emissions from the use of gasoline and other liquid fuels. Producers of gasoline and other liquid fuels sued EPA, arguing that EPA's approval of the California regulations violated the Clean Air Act.

The sole issue before this Court is whether the fuel producers have standing to maintain their suit.

The fuel producers assert that the California regulations reduce the manufacture and sale of cars powered by gasoline and other liquid fuels, thereby causing a decrease in sales of those fuels by the fuel producers. So fuel producers take in less revenue than they would in a free market. Invalidating the regulations, they say, would remove a regulatory impediment to their ability to fully compete in the market. And without California's regulations in effect, manufacturers would likely make more cars powered by gasoline and other liquid fuels,

thereby increasing purchases of those fuels and redressing the fuel producers' injury.

EPA and California dispute redressability. They suggest that, even if the regulations are invalidated, car manufacturers nonetheless would not manufacture more gasoline-powered cars. They posit that the California regulations no longer have any impact because, in a free market, consumer demand for and manufacturers' supply of electric vehicles would still supposedly exceed what the California regulations mandate.

Based on this Court's precedents and the evidence in the record, we hold that the fuel producers have standing. We therefore reverse the contrary judgment of the U. S. Court of Appeals for the D. C. Circuit and remand for that court to consider the merits of the fuel producers' legal claims.

I

A

As relevant here, the Clean Air Act requires the Environmental Protection Agency, or EPA, to periodically "prescribe ... standards" that limit emissions of certain air pollutants from new motor vehicles. 42 U.S.C. § 7521(a)(1). To promote uniformity in vehicle emissions regulations, the Act also preempts state standards "relating to the control of emissions from new motor vehicles." § 7543(a).

But the Act's preemption provision exempts California. Under certain circumstances,

California may adopt emissions standards for new motor vehicles that are more stringent than EPA's. California may do so when it concludes that more stringent standards are needed to meet "compelling and extraordinary conditions." § 7543(b)(1)(B). Other States may also adopt California's stricter limits on emissions from new motor vehicles, but may not adopt or enforce state standards that differ from California's. § 7507.

**\*4** The upshot of this system is that EPA sets nationwide emissions standards for new motor vehicles; California in limited circumstances may set more stringent emissions standards for vehicles sold in the State; and other States may either follow EPA's standards or adopt California's but may not set their own.

Over the years, California has often requested and received EPA approval for stricter emissions standards to combat local California air-quality problems like smog. See, *e.g.*, 38 Fed. Reg. 10319 (1973).

Beginning in 2005, California also attempted to use its unique preemption exception as one means to address global climate change. As relevant here, the State asked EPA for approval of regulations that limit greenhouse-gas emissions and force electrification of the new vehicle fleet sold in the State. See 73 Fed. Reg. 12157 (2008).

In 2008, under the George W. Bush administration, EPA denied California's first such request. EPA explained that the Clean Air Act permits California to enact standards to address local and regional pollution where the causal factors are tied to California. But

EPA reasoned that the authority granted to California did not extend to efforts to combat global climate change. See *id.*, at 12156–12157, 12168.

Since then, as Presidential administrations have come and gone, EPA has repeatedly altered its legal position on whether the Clean Air Act authorizes California regulations targeting greenhouse-gas emissions from new motor vehicles.

This case involves California's 2012 request for EPA approval of new California regulations. As relevant here, those regulations generally require automakers (i) to limit average greenhouse-gas emissions across their fleets of new motor vehicles sold in the State and (ii) to manufacture a certain percentage of electric vehicles as part of their vehicle fleets. Cal. Code Regs., tit. 13, §§ 1961.3, 1962.2 (2022). The greenhouse-gas emissions limits remain in force indefinitely into the future, and the specific requirements for electric vehicles in new vehicle fleets run through model year 2025. See *ibid.* (EPA has separately approved a new California electric-vehicle mandate that applies through model year 2035 and beyond; that separate set of regulations is not at issue in this suit.[1])

Under President Obama, EPA reversed its legal position and, in 2013, allowed the California regulations to take effect. 78 Fed. Reg. 2112 (2013). Then in 2019, under President Trump, EPA flipped back and rescinded approval of the California regulations. 84 Fed. Reg. 51328 (2019). In 2022, under President Biden, EPA again reversed course and reinstated approval of California's regulations. 87 Fed. Reg. 14333

(2022). That is where things stand as of now, although President Trump has directed EPA to again reconsider its approval of California's standards. Exec. Order No. 14154, 90 Fed. Reg. 8353–8354 (2025).

To date, acting pursuant to the Clean Air Act, 17 States and the District of Columbia have copied California's greenhouse-gas emissions standards for new motor vehicles, the electric-vehicle mandate, or both. Together with California, those jurisdictions account for about 40 percent of America's market for new cars and light-duty trucks.

B

**\*5** In 2022, after EPA reinstated approval of California's 2012 regulations, several fuel producers sued EPA in the D. C. Circuit. The fuel producers primarily argued that EPA lacked authority under the Clean Air Act to approve the California regulations. They reasoned that the regulations did not target a *local* California air-quality problem—as they say is required by the Clean Air Act—but instead were designed to address *global* climate change.

The fuel producers manufacture and sell automobile fuels such as gasoline, diesel, and ethanol. For example, American Fuel & Petrochemical Manufacturers is a national trade association that represents many American fuel companies that produce and sell gasoline and other liquid fuels for automobiles. Diamond Alternative Energy sells renewable diesel, an alternative to traditional

Diamond Alternative Energy, LLC v. Environmental Protection Agency, 606 U.S. ---- (2025)
--- S.Ct. ----, 2025 WL 1716141

petroleum-derived diesel. Valero Renewable Fuels Company manufactures and sells ethanol.

To establish Article III standing for their D. C. Circuit challenge, the fuel producers submitted 14 declarations and devoted two pages of their opening brief to standing. In one declaration, for example, an analyst for American Fuel & Petrochemical Manufacturers explained that "the demand for gasoline and diesel fuel will be depressed" by California's regulations (also adopted by 17 other States) because they "require the sale of vehicles that use less gasoline and diesel fuel" or "use no liquid fuel at all." App. 172–174. As support, the declaration quoted California's own estimate that "its regulations would cause 'substantial reductions in demand for gasoline exceeding $1 billion beginning in 2020 and increasing to over $10 billion in 2030.' " *Id*., at 173. Various fuel producers further stated that those "injuries would be substantially ameliorated if EPA's decision" to reinstate the waiver "were set aside." *Id*., at 137, 181.

Notably, in the D. C. Circuit, EPA did not argue that the fuel producers lacked Article III standing. EPA's silence on standing was telling—the proverbial dog that did not bark—because EPA routinely challenges a party's standing when the agency believes that injury in fact, causation, or redressability is questionable. So EPA's failure to do so here tends to suggest that EPA believed the fuel producers had standing.

California, along with other States that chose to adopt California's regulations, intervened in the D. C. Circuit to defend EPA's approval of those regulations. To support

its motion to intervene, California submitted declarations emphasizing the importance of the regulations—now and in the future—to meeting California's emissions-control goals. For example, a California official responsible for Clean Air Act compliance stated that, without the regulations, "it is reasonable to expect that there would be fewer" electric vehicles "produced and sold ... , and thus additional gasoline-fueled vehicles produced and sold during these model years." *Id*., at 110. All of that "would increase criteria pollutant emissions," as California's own "modeling has confirmed." *Ibid.* Another California official explained that invalidating the fleet-wide emissions standards and electric-vehicle mandate "would result in higher greenhouse gas and criteria pollutant emissions" from the "additional gasoline-fueled cars" that would be produced and sold. *Id*., at 115.

After the D. C. Circuit granted California's motion to intervene, however, California completely changed its tune about the continuing impact of the regulations. In its merits briefing in that court, California suddenly argued that the fuel producers lacked Article III standing because they had not "established any probability" that automobile "manufacturers would change course if EPA's decision were vacated." Brief for State and Local Government Respondent-Intervenors in No. 22–1081 (CADC), p. 15. Specifically, California suggested that because of supposed "surging consumer demand" for electric vehicles, invalidating the fleet-wide emissions standards and electric-vehicle mandate would not cause vehicle manufacturers to make more gasoline-powered vehicles. *Id*., at 14. Therefore, California argued that judicial

Diamond Alternative Energy, LLC v. Environmental Protection Agency, 606 U.S. ---- (2025)
--- S.Ct. ----, 2025 WL 1716141

invalidation of the California regulations was not likely to redress the fuel producers' injuries.

**\*6** The D. C. Circuit agreed with California and held that the fuel producers lacked Article III standing. *Ohio v. EPA*, 98 F.4th 288, 300 (D.C. Cir. 2024). The court explained that redressability depended on how third-party automakers would act in the absence of California's fleet-wide emissions standards and electric-vehicle mandate. According to the D. C. Circuit, the fuel producers failed to "cite any record evidence" or "file additional affidavits or other evidence" demonstrating that automakers would respond to invalidation of the regulations by producing fewer electric vehicles and more gasoline-powered vehicles. *Id.*, at 303 (quotation marks and alteration omitted).[2]

This Court granted certiorari limited to the question of whether the fuel producers have Article III standing. 604 U. S. —— (2024).

## II

Article III of the Constitution confines the jurisdiction of federal courts to "Cases" and "Controversies." § 2, cl. 1. For a lawsuit to constitute a case within the meaning of Article III, the plaintiff must have standing to sue. To demonstrate standing, plaintiffs must answer a basic question—" 'What's it to you?' " *FDA v. Alliance for Hippocratic Medicine*, 602 U.S. 367, 379, 144 S.Ct. 1540, 219 L.Ed.2d 121 (2024) (quoting A. Scalia, The Doctrine of Standing as an Essential Element of the Separation of Powers, 17 Suffolk U. L. Rev. 881, 882 (1983)). In other words, plaintiffs

must show that they possess "a 'personal stake' in the dispute" and are not mere bystanders. 602 U.S., at 379, 144 S.Ct. 1540 (quoting *TransUnion LLC v. Ramirez*, 594 U.S. 413, 423, 141 S.Ct. 2190, 210 L.Ed.2d 568 (2021)).

"By limiting who can sue, the standing requirement implements 'the Framers' concept of the proper—and properly limited—role of the courts in a democratic society.' " 602 U.S., at 380, 144 S.Ct. 1540 (quoting J. Roberts, Article III Limits on Statutory Standing, 42 Duke L. J. 1219, 1220 (1993)). Standing doctrine also " 'tends to assure that the legal questions presented to the court will be resolved, not in the rarified atmosphere of a debating society, but in a concrete factual context conducive to a realistic appreciation of the consequences of judicial action.' " 602 U.S., at 379, 144 S.Ct. 1540 (quoting *Valley Forge Christian College v. Americans United for Separation of Church and State, Inc.*, 454 U.S. 464, 472, 102 S.Ct. 752, 70 L.Ed.2d 700 (1982)).

This Court's "cases have established that the irreducible constitutional minimum of standing contains three elements": injury in fact, causation, and redressability. *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560, 112 S.Ct. 2130, 119 L.Ed.2d 351 (1992).

The first requirement, injury in fact, requires the plaintiff to demonstrate an injury that is "concrete," "particularized," and "actual or imminent, not speculative." *Alliance for Hippocratic Medicine*, 602 U.S., at 381, 144 S.Ct. 1540 (quotation marks omitted). "Monetary costs are of course an injury."

Case: 1:25-cv-00669 Document #: 96 Filed: 07/01/25 Page 13 of 36 PageID #:993

Diamond Alternative Energy, LLC v. Environmental Protection Agency, 606 U.S. ---- (2025)
--- S.Ct. ----, 2025 WL 1716141

*United States v. Texas*, 599 U.S. 670, 676, 143 S.Ct. 1964, 216 L.Ed.2d 624 (2023).

The second and third requirements, causation and redressability, are usually "flip sides of the same coin." *Alliance for Hippocratic Medicine*, 602 U.S., at 380, 144 S.Ct. 1540 (quotation marks omitted). Causation requires the plaintiff to show "that the injury was likely caused by the defendant," and redressability requires the plaintiff to demonstrate "that the injury would likely be redressed by judicial relief." *TransUnion*, 594 U.S., at 423, 141 S.Ct. 2190. "If a defendant's action causes an injury, enjoining the action or awarding damages for the action will typically redress that injury." *Alliance for Hippocratic Medicine*, 602 U.S., at 381, 144 S.Ct. 1540. To be sure, redressability "can still pose an independent bar in some cases," but "the two key questions in most standing disputes are injury in fact and causation." *Id.*, at 381, and n. 1, 144 S.Ct. 1540. The additional redressability requirement generally serves to ensure that there is a sufficient "relationship between 'the judicial relief requested' and the 'injury' suffered." *California v. Texas*, 593 U.S. 659, 671, 141 S.Ct. 2104, 210 L.Ed.2d 230 (2021) (quoting *Allen v. Wright*, 468 U.S. 737, 753, n. 19, 104 S.Ct. 3315, 82 L.Ed.2d 556 (1984)); see *Haaland v. Brackeen*, 599 U.S. 255, 292–293, 143 S.Ct. 1609, 216 L.Ed.2d 254 (2023).

**\*7** Importantly, if a plaintiff is "an object of the action (or forgone action) at issue," then "there is ordinarily little question that the action or inaction has caused him injury, and that a judgment preventing or requiring the action will redress it." *Lujan*, 504 U.S., at 561–562, 112 S.Ct. 2130.

When the plaintiff is not the object of a government regulation, however, causation and redressability often depend on how regulated third parties not before the court will act in response to the government regulation or judicial relief. See *Alliance for Hippocratic Medicine*, 602 U.S., at 383, 144 S.Ct. 1540. Courts must distinguish the "predictable" from the "speculative" effects of government action or judicial relief on third parties. *Ibid.*; see also *Department of Commerce v. New York*, 588 U.S. 752, 768, 139 S.Ct. 2551, 204 L.Ed.2d 978 (2019). With respect to causation (and redressability), a court must conclude that " 'third parties will likely react' " to the government regulation (or judicial relief) " 'in predictable ways' " that will likely cause (or redress) the plaintiff's injury. *Alliance for Hippocratic Medicine*, 602 U.S., at 383, 144 S.Ct. 1540 (quoting *California*, 593 U.S., at 675, 141 S.Ct. 2104).

Here, the fuel producers say that they suffered injury in fact caused by the California regulations. They point out that the entire purpose of California's fleet-wide emissions standards and electric-vehicle mandate is to reduce the use of gasoline and other liquid fuels in motor vehicles as compared to what otherwise would occur in a free market. The regulations cause automakers to, among other things, produce fewer gasoline-powered vehicles. That in turn causes fewer gasoline sales, leading to a monetary injury in fact for producers of gasoline and other liquid fuels.

As to redressability, the fuel producers say that invalidating the California regulations would likely redress their injury because it would

Diamond Alternative Energy, LLC v. Environmental Protection Agency, 606 U.S. ---- (2025)
--- S.Ct. ----, 2025 WL 1716141

remove a regulatory impediment to the sale and use of their products. They further contend that, absent the regulations, automakers would likely produce fewer electric vehicles and more gasoline-powered vehicles. Production of those vehicles would predictably lead to more purchases of gasoline and other liquid fuels sold by the fuel producers. In short, they argue that when the government tells automakers to make more cars that use less gasoline, there should be little question that the gasoline producers have standing to sue.

In this Court, neither EPA nor California meaningfully disputes injury in fact or causation. But they argue that the fuel producers did not establish redressability. According to EPA and California, even if the California regulations are invalidated, the fuel producers have not shown that vehicle manufacturers would reduce the percentage of their fleets that consist of electric vehicles (or otherwise stated, increase the percentage that consists of gasoline-powered vehicles). EPA and California suggest that the automobile market has changed—apparently permanently in their view—and strong consumer demand for (and manufacturers' supply of) electric vehicles means that automakers are unlikely to manufacture or sell any additional gasoline-powered cars even if the California regulations are invalidated.

### III

We hold that the fuel producers have standing to sue.

**\*8** To begin, the injury in fact and causation elements of the fuel producers' standing, which no party disputes, are straightforward.

As for injury in fact, the fuel producers make money by selling fuel. Therefore, the decrease in purchases of gasoline and other liquid fuels resulting from the California regulations hurts their bottom line. Those monetary costs "are of course an injury." *United States v. Texas*, 599 U.S. 670, 676, 143 S.Ct. 1964, 216 L.Ed.2d 624 (2023).

As for causation, EPA's approval authorized California (and ultimately 17 other States) to enforce regulations that require lower fleet-wide greenhouse-gas emissions and the electrification of automakers' vehicle fleets, thereby reducing purchases of liquid fuels such as gasoline. The regulations likely cause fuel producers' monetary injuries because the regulations likely cause a decrease in purchases of gasoline and other liquid fuels for automobiles. Indeed, that is the whole point of the regulations.

As for redressability, invalidating the California regulations would likely redress at least some of the fuel producers' monetary injuries.[3] Even "one dollar" of additional revenue for the fuel producers would satisfy the redressability component of Article III standing. *Uzuegbunam v. Preczewski*, 592 U.S. 279, 292, 141 S.Ct. 792, 209 L.Ed.2d 94 (2021). And as we will explain, it is "likely" that invalidating the California regulations would result in more revenue for the fuel producers from additional sales of gasoline and other liquid fuels. *FDA v. Alliance for*

Diamond Alternative Energy, LLC v. Environmental Protection Agency, 606 U.S. ---- (2025)
--- S.Ct. ----, 2025 WL 1716141

*Hippocratic Medicine*, 602 U.S. 367, 380, 144 S.Ct. 1540, 219 L.Ed.2d 121 (2024).


### A

When a plaintiff is the "object" of a government regulation, there should "ordinarily" be "little question" that the regulation causes injury to the plaintiff and that invalidating the regulation would redress the plaintiff's injuries. *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 561, 112 S.Ct. 2130, 119 L.Ed.2d 351 (1992).

The fuel producers here might be considered an object of the California regulations because the regulations explicitly seek to restrict the use of gasoline and other liquid fuels in automobiles. When the government prohibits or impedes Company A from using Company B's product, then both Company A and Company B might be deemed objects of the government action at issue. For example, if the government bans hot dog sales in stadiums, then hot dog manufacturers, not just stadiums, might be considered objects of the regulation. If the government prohibits aluminum bats in Little League, then aluminum bat manufacturers, not only Little League, might be objects of the regulation. If the government bans bookstores from selling certain publishers' books, then those publishers, not just bookstores, might be objects of the regulation. See *Bennett v. Spear*, 520 U.S. 154, 169, 117 S.Ct. 1154, 137 L.Ed.2d 281 (1997); *Energy Future Coalition v. EPA*, 793 F.3d 141, 144–145 (CADC 2015).

 **\*9** This Court has applied principles of that kind in various contexts. For example, when a State prohibited parents from sending their children to private schools, affected schools had standing to sue, even though parents were the directly regulated parties. See *Pierce v. Society of Sisters*, 268 U.S. 510, 535–536, 45 S.Ct. 571, 69 L.Ed. 1070 (1925). And when the Federal Communications Commission announced that it would deny a license to any broadcasting station that conducted certain business with broadcasting networks, a broadcasting network (CBS) had standing to sue even though broadcasting stations were the directly regulated parties. See *Columbia Broadcasting System, Inc. v. United States*, 316 U.S. 407, 422, 62 S.Ct. 1194, 86 L.Ed. 1563 (1942).

According to the fuel producers, when a regulation targets the provider of a product or service by limiting another entity's use of that product or service, the targeted provider ordinarily has standing—without the need for much additional analysis. See *Bennett*, 520 U.S., at 169, 117 S.Ct. 1154. So too here, according to the fuel producers. As they see it, the government is targeting the use of gasoline and other liquid fuels by regulating at the assembly line rather than the gas pump. Either way, they say that the California regulations pose a legal barrier to the fuel producers' sale of their products and deny them the opportunity to compete in the marketplace without government interference. And the fuel producers assert that removing a coercive government standard that restricts the use of their products would allow them to compete more fully in the marketplace and thus provide redress for purposes of Article III. See *ibid.*; *Energy Future Coalition*, 793 F.3d at 144–145.

Diamond Alternative Energy, LLC v. Environmental Protection Agency, 606 U.S. ---- (2025)
--- S.Ct. ----, 2025 WL 1716141

That argument is not without force and, at a minimum, highlights how the government might seek to indirectly target a product or service "through a conduit" in addition to regulating it directly. Brief for Petitioners 43. But we ultimately need not further consider that argument in this case because, regardless, the fuel producers have readily demonstrated their standing.

## B

This case presents what the Court has described as the "familiar" circumstance where government regulation of a business "may be likely" to cause injuries to other linked businesses. *Alliance for Hippocratic Medicine*, 602 U.S., at 384, 144 S.Ct. 1540. As the Court has explained, "when the government regulates (or under-regulates) a business, the regulation (or lack thereof) may cause downstream or upstream economic injuries to others in the chain, such as certain manufacturers, retailers, suppliers, competitors, or customers." *Ibid.*

In cases of that kind, this Court's analysis of causation and redressability has recognized commonsense economic realities. When third party behavior is predictable, commonsense inferences may be drawn. Importantly, EPA agrees that "commonsense economic principles" can be useful when evaluating Article III standing. Brief for Federal Respondents 39.

In this case, those commonsense economic principles support the fuel producers' standing. The California regulations force automakers to manufacture more electric vehicles and

fewer gasoline-powered vehicles. See *Bennett*, 520 U.S., at 169, 117 S.Ct. 1154.[4] The standards force automakers to produce a fleet of vehicles that, as a whole, uses significantly less gasoline and other liquid fuels. California's regulation of automakers' vehicle fleets in turn will likely "cause downstream or upstream economic injuries to others in the chain," such as producers of gasoline and other liquid fuels. *Alliance for Hippocratic Medicine*, 602 U.S., at 384, 144 S.Ct. 1540.

**\*10** By the same token, the fuel producers persuasively contend that invalidating California's regulations would likely mean more gasoline-powered automobiles, which would in turn likely mean more sales of gasoline and other liquid fuels by the fuel producers. See *Bennett*, 520 U.S., at 170–171, 117 S.Ct. 1154. Because the fuel producers have suffered classic monetary injury caused by a government regulatory action, it would be surprising and unusual if invalidating the regulations did not redress the fuel producers' injuries. See *Alliance for Hippocratic Medicine*, 602 U.S., at 381, 144 S.Ct. 1540 ("If a defendant's action causes an injury, enjoining the action ... will typically redress that injury"). After all, the fact that a regulation was designed to produce a particular effect on the market ordinarily means that the likely result of vacating that regulation would be to reduce that effect on the market. Cf. *Lujan*, 504 U.S., at 561–562, 112 S.Ct. 2130.

EPA and California push back on that reasoning, asserting that this case is unusual and does not fit the typical pattern. They suggest that the new vehicle market has developed in a way that even if the California

Diamond Alternative Energy, LLC v. Environmental Protection Agency, 606 U.S. ---- (2025)
--- S.Ct. ----, 2025 WL 1716141

regulations are invalidated, automakers would not likely manufacture or sell more gasoline-powered cars than they do now.

To begin with, that is an odd argument for EPA and California to advance. After all, if invalidating the regulations would change nothing in the market, why are EPA and California enforcing and defending the regulations? The whole point of the regulations is to increase the number of electric vehicles in the new automobile market beyond what consumers would otherwise demand and what automakers would otherwise manufacture and sell. And EPA and California are presumably defending the regulations because they think that the regulations still make a difference in the market.

In all events, record evidence confirms what common sense tells us: Invalidating the regulations likely (not certainly, but likely) would make a difference for fuel producers because automakers would likely manufacture more vehicles that run on gasoline and other liquid fuels.

*First*, the fuel producers' standing declarations explain that California's regulations have historically harmed the fuel producers by causing a decrease in purchases of fuel. The declarations further quote California's estimate that its standards would produce " 'substantial reductions in demand for gasoline exceeding $1 billion beginning in 2020 *and increasing to over $10 billion in 2030*.' " App. 173 (emphasis added). The fuel producers' declarations emphasize, moreover, that California itself asserted that the State's standards would reduce emissions partly

through " 'reductions in fuel production.' " *Id*., at 148. The declarations also note that California recognized that the "oil and gas industry" and "fuel providers" would likely be "most adversely affected" by the regulations due to "the resulting substantial reductions in demand for gasoline." *Id*., at 137 (quotation marks omitted).

*Second*, the record reveals that California itself stated in 2021, when asking EPA to reinstate the regulations, that the regulations are "critical not just for immediate emissions reductions" but also for "greater emission reductions *in the future*." *Id*., at 66 (emphasis added). And after the fuel producers sued EPA in 2022, California moved to intervene and attached expert declarations stating that California's standards are likely to decrease fuel use. Specifically, California's experts opined that absent California's regulations, "fewer" electric vehicles "are likely to be sold than would otherwise have been ... and thus additional gasoline-fueled vehicles would be sold." *Id*., at 115; see also *id*., at 110. California itself therefore acknowledged that its regulations were still having an impact and that invalidating the regulations would likely affect the automobile market and increase demand for gasoline and other liquid fuels.

**\*11** *Third*, EPA too has stated that the California regulations are likely to reduce consumption of fuel. When approving California's regulations, EPA repeatedly affirmed that California "needs" its standards "to address compelling and extraordinary air quality conditions in the state." 87 Fed. Reg. 14334; see *id*., at 14353. And in proposing to amend California's state implementation

Diamond Alternative Energy, LLC v. Environmental Protection Agency, 606 U.S. ---- (2025)
--- S.Ct. ----, 2025 WL 1716141

plan under the Clean Air Act more than two years after this suit was filed, EPA credited California's estimates that the regulations would continue reducing greenhouse-gas emissions in California *through at least 2037*. 89 Fed. Reg. 82558 (2024).

*Fourth*, five automakers who have invested heavily in electric vehicles—and thus have an interest in the government continuing to support and favor that market—intervened on the side of EPA and California in the Court of Appeals. Their motion to intervene predicted that, absent California's regulations, other automakers would seek a competitive advantage over them by selling fewer electric vehicles and more gasoline-powered vehicles. See Motion To Intervene of Ford Motor Co. et al. in No. 22–1081 (CADC), pp. 4, 11–12, 14. As with California's motion to intervene, the automakers' assessment that the regulations make a difference—and that invalidating them would make a difference—indicates that the regulations are still likely having a real-world impact on the automobile market.

In short, the commonsense economic inferences about the operation of the automobile market—combined with the statements of the fuel producers, California, EPA, and the vehicle manufacturers—make it sufficiently "predictable" that invalidating California's regulations would likely redress the fuel producers' injury. *Alliance for Hippocratic Medicine*, 602 U.S., at 383, 144 S.Ct. 1540.

Article III's redressability requirement serves to align injuries and remedies. The primary goals of that requirement are to ensure that plaintiffs do not sue the wrong parties and that courts do not issue advisory opinions. The redressability requirement should not be misused, however, to prevent the targets of government regulations from challenging regulations that threaten their businesses. EPA and California cite no case where Article III's redressability requirement has been applied to prevent challenges to a regulation setting a permanent ceiling on the sale or use of a business's products. Here, the fuel producers have established their standing to challenge EPA's approval of the California regulations. [5]

C

EPA and California further argue, however, that the fuel producers had to introduce still more evidence—for example, affidavits either from expert economists or from directly regulated automakers explaining how they would respond to a court order invalidating California's regulations. See Brief for Federal Respondents 17–18, 43–44; Brief for State Respondents 13.

We disagree. This Court has not demanded that plaintiffs introduce evidence from expert economists or from directly regulated third parties to show how third parties would likely respond to a government regulation or invalidation thereof. Rather, to show redressability, the plaintiff must simply "show a predictable chain of events" that would likely result from judicial relief and redress the plaintiff's injury. *Alliance for Hippocratic Medicine*, 602 U.S., at 385, 144 S.Ct. 1540. In *Department of Commerce v. New York*, to take just one example, this Court considered a

--- S.Ct. ----, 2025 WL 1716141

challenge by several States and other plaintiffs to the Government's decision to reinstate a citizenship question on the census. 588 U.S. 752, 758–759, 139 S.Ct. 2551, 204 L.Ed.2d 978 (2019). The States argued that reinstating the question would likely cause noncitizens to respond to the census at lower rates, thereby causing noncitizen residents of the States to be undercounted, and in turn leading to reduced representation and other harms for those States. *Id.*, at 766–767, 139 S.Ct. 2551. The Court did not require the States to produce affidavits or testimony from noncitizens explaining that they would not respond to the census in light of the citizenship question.

 **\*12** Requiring the plaintiff to produce affidavits from regulated parties would be especially problematic in cases of this kind. It would render the plaintiff's ability to obtain judicial review dependent on the happenstance of whether the plaintiff and the relevant regulated parties are aligned and share litigation interests—and whether the regulated party is willing to publicly oppose (and possibly antagonize) the government regulator by supporting the plaintiff's suit. Such a rule would create incentives for gamesmanship and could make it difficult or impossible to establish standing in cases where the standing analysis should be straightforward. A heightened "proof of redressability" requirement of that kind would ultimately close the courthouse doors to many traditional challenges to agency action. Cf. *id.*, at 768, 139 S.Ct. 2551. Such a rule has little to commend it, and we decline to adopt it.

D

In ruling against EPA and California, we recognize that there may conceivably be some atypical instances where a market has permanently and dramatically changed such that invalidating a challenged regulation would have no effect on the market in question, thereby defeating redressability. [6] But that is likely to be a fairly rare and unusual scenario, for a couple of reasons.

*First*, we can assume that governments do not usually continue to enforce and defend regulations that have no continuing effect in the relevant market. EPA and California continue to enforce these regulations, and for three years, EPA and California have tenaciously defended them in court. So it is difficult to put much stock in their suggestion that invalidating the regulations (in California and 17 other States) would have *zero* effect on the new vehicle market in America both now and in the future. Simply put, EPA's and California's own actions—their statements, their enforcement decisions, their litigation positions—undermine the central premise of their redressability argument. When as here a government seeks to justify its regulatory actions by, on the one hand, touting the consequences for fuel usage and emissions while, on the other, maintaining that those same regulations are unreviewable because there are no consequences, courts can appropriately be skeptical. Judges "are 'not required to exhibit a naiveté from which ordinary citizens are free.' " *Department of Commerce*, 588 U.S., at 785, 139 S.Ct. 2551 (quoting *United States v.*

Diamond Alternative Energy, LLC v. Environmental Protection Agency, 606 U.S. ---- (2025)
--- S.Ct. ----, 2025 WL 1716141

*Stanchich*, 550 F.2d 1294, 1300 (CA2 1977) (Friendly, J.)).

*Second*, EPA and California's view of redressability fails to account for dynamic markets and the effects of interrelated economic forces and regulatory programs that change over time. Supply and demand may depend on, among other things, the strength of the overall economy, regulatory emissions standards, international developments, government subsidies to particular industries, and tax incentives, among many other factors. Predicting developments in complex markets can be a difficult and uncertain endeavor, particularly when various governments' regulatory, spending, and tax policies are at play. [7]

**\*13** To deny standing based on a theory that invalidating an important regulation would actually have zero impact on a dynamic and heavily regulated market requires a degree of economic and political clairvoyance that is difficult for a court to maintain. That is particularly so when the government regulation itself may be skewing the market at issue. So courts should exercise caution before denying standing because of a claimed lack of redressability rooted in questionable economic speculation.

In advancing their argument, EPA and California also point out that some automakers are now in compliance with California's regulatory mandates. But that is not surprising. Compliance with government regulation usually suggests regulatory effect, not the absence of effect. Nor is such compliance especially probative of how *all* automakers

are acting or would respond to a court order invalidating California's regulations—including in the 17 other States that have adopted those regulations. In the D. C. Circuit, California pointed to evidence that seven automakers had announced future plans to sell more electric vehicles than California's regulations required. Brief for State and Local Government Respondent-Intervenors in No. 22–1081, at 14. But California offered no evidence that the cited press releases from seven automakers represented commitments definite enough to withstand potential future market fluctuations and regulatory changes. Nor did California offer evidence that the statements of those seven automakers represented the likely behavior of the *entire* automaking industry, including potential new market entrants. Recall that the automakers' own motion to intervene in the Court of Appeals suggested otherwise—that if the regulations were invalidated, other automakers would seek a competitive advantage by manufacturing *more* gasoline-powered cars.

In sum, this case does not present the unusual scenario where invalidating a challenged government restriction on businesses in a competitive market is not likely to have any effect. Here, it may not be certain, but it is at least "predictable" that invalidating the California regulations would likely result in the fuel producers ultimately selling more gasoline and other liquid fuels. See *Alliance for Hippocratic Medicine*, 602 U.S., at 383, 144 S.Ct. 1540.

E

Two of our colleagues have filed dissenting opinions. They primarily object to the Court's decision to grant certiorari in this case. But having granted certiorari, we proceed to decide the question presented for our review.

Justice SOTOMAYOR suggests that the D. C. Circuit's erroneous standing analysis was attributable to its misunderstanding about the duration of California's fleet-wide emissions standards. See *post*, at —— (dissenting opinion). So in her view, the Court need only correct that factual misunderstanding and remand the case to the D. C. Circuit. See *post*, at ——. But the D. C. Circuit's standing analysis did not rest entirely on that misunderstanding. And neither EPA nor California asked for such a remand—even though they acknowledged the D. C. Circuit's misunderstanding. Moreover, because this litigation has gone on for three years, we see no good reason to waste the parties' time and resources by remanding for further analysis of the standing issue in the Court of Appeals when the parties have comprehensively briefed it and we can readily resolve it now.

Justice JACKSON separately argues that the Court does not apply standing doctrine "evenhandedly." *Post*, at —— (dissenting opinion). A review of standing cases over the last few years disproves that suggestion. See, *e.g.*, *Alliance for Hippocratic Medicine*, 602 U.S., at 374, 144 S.Ct. 1540; *United States v. Texas*, 599 U.S., at 674, 143 S.Ct. 1964; *Haaland v. Brackeen*, 599 U.S. 255, 291–292, 143 S.Ct. 1609, 216 L.Ed.2d 254 (2023); *Reed v. Goertz*, 598 U.S. 230, 234, 143 S.Ct. 955, 215 L.Ed.2d 218 (2023); *TransUnion LLC v. Ramirez*, 594 U.S. 413, 417–418, 141 S.Ct.

2190, 210 L.Ed.2d 568 (2021); *California v. Texas*, 593 U.S. 659, 666, 141 S.Ct. 2104, 210 L.Ed.2d 230 (2021); *Uzuegbunam*, 592 U.S., at 282–283, 141 S.Ct. 792; *Thole v. U. S. Bank N. A.*, 590 U.S. 538, 541–542, 140 S.Ct. 1615, 207 L.Ed.2d 85 (2020); *Department of Commerce*, 588 U.S., at 766–768, 139 S.Ct. 2551. In this case, as we have explained, this Court's recent standing precedents support the conclusion that the fuel producers have standing.

\* \* \*

**\*14** This case concerns only standing, not the merits. EPA and California may or may not prevail on the merits in defending EPA's approval of the California regulations. But the justiciability of the fuel producers' challenge to EPA's approval of the California regulations is evident. Courts should not "make standing law more complicated than it needs to be." *Thole v. U. S. Bank N. A.*, 590 U.S. 538, 547, 140 S.Ct. 1615, 207 L.Ed.2d 85 (2020). The government generally may not target a business or industry through stringent and allegedly unlawful regulation, and then evade the resulting lawsuits by claiming that the targets of its regulation should be locked out of court as unaffected bystanders. In light of this Court's precedents and the evidence before the Court of Appeals, the fuel producers established Article III standing to challenge EPA's approval of the California regulations. We reverse the judgment of the Court of Appeals and remand the case for further proceedings consistent with this opinion.

*It is so ordered.*

Diamond Alternative Energy, LLC v. Environmental Protection Agency, 606 U.S. ---- (2025)
--- S.Ct. ----, 2025 WL 1716141

Justice SOTOMAYOR, dissenting.

In May 2022, several businesses in the fuel industry challenged the Environmental Protection Agency's effective reinstatement of two California vehicle-emissions rules. The rules in question aimed to reduce greenhouse gas emissions by requiring vehicle manufacturers to produce more fuel-efficient cars. Before the D. C. Circuit, petitioners argued, relying in part on statements from California regulators and the EPA, that this shift toward fuel efficiency would reduce demand for the fossil fuels they produce, thereby causing a financial injury. Petitioners did not meaningfully address redressability, likely because they assumed it would follow naturally from the evidence about injury and causation. With no dispute over those elements, the case appeared ready to proceed to the merits.

Then, a factual complication arose. California, which had intervened to defend its regulations before the D. C. Circuit, explained that by the time this suit was filed, car manufacturers could no longer change their manufacturing schedule for cars with model years up to 2025. See Brief for Petitioners 13–14, 41; Brief for State Respondents 10–11. Evidence in the record overwhelmingly supported that contention. See *Ohio v. EPA*, 98 F.4th 288, 302–303 (CADC 2024) (*per curiam*) (recounting statements to that effect from Ford, Tesla, Toyota, Chrysler, Hyundai, and Mitsubishi). As the car manufacturers explained to the court, production plans are set years in advance and cannot be changed on short notice. *Ibid.*

Due in part to petitioners' own briefing, the D. C. Circuit thought that neither of California's regulations would apply beyond model year 2025. See Brief for Private Petitioners in No. 22–1081 (CADC), p. 9 ("The program covers vehicles from model years 2015 through 2025 ..."). So, when the court considered redressability, it asked only whether vacatur of the rules "would be substantially likely to result in any change to automobile manufacturers' vehicle fleets by Model Year 2025." 98 F.4th at 302. On that question, the evidence did not support petitioners, who bore the burden of proof to establish redressability. *Ibid.*; see *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 562, 112 S.Ct. 2130, 119 L.Ed.2d 351 (1992). Thus, the D. C. Circuit dismissed the petition for lack of standing. 98 F.4th at 306.

Before this Court, the EPA conceded that the D. C. Circuit had been partly mistaken about the facts. Whereas that court thought both of California's rules expired with model year 2025, in fact only one of the two does. See Brief for Federal Respondents in Opposition 5. That concession undercut the core factual premise on which the D. C. Circuit's standing analysis depended. See 98 F.4th at 302–303. It called instead for a new assessment of redressability: Would manufacturers change their plans for any future, post-2025 model years if the court vacated the fuel-efficiency rule? California now says that, by the time petitioners sued, demand for electric vehicles had expanded so dramatically that manufacturers would not return to producing more environmentally unfriendly vehicles even if the rules were vacated. Petitioners say otherwise. Yet the D. C. Circuit never opined on this purely factual

question, and it is hard to see why this Court should do so in its stead.

**\*15** Having granted certiorari, the Court relegates to a footnote the actual basis for the D. C. Circuit's decision. See *ante*, at ——, n. 2. A version of that footnote should have been the Court's entire opinion in this case. For reasons unknown, the majority instead conjures up a "heightened 'proof of redressability' requirement" that the D. C. Circuit did not adopt and that no party advanced, and then laboriously "decline[s] to adopt" that requirement. See *ante,* at ——. I see no need to expound on the law of standing in a case where the sole dispute is a factual one not addressed below.[*] Indeed, as Justice JACKSON explains, this case is unlikely to present a live controversy for much longer regardless of petitioners' standing, as the administration is likely to withdraw the challenged rules. See *post*, at —— (dissenting opinion). I would simply have vacated the case and remanded it to the D. C. Circuit to reconsider its redressability analysis, keeping in mind the now corrected timeline for the challenged vehicle-emissions programs.

Justice JACKSON, dissenting.
Standing is a constitutional doctrine meant to promote judicial restraint. By design, it " 'prevent[s] the judicial process from being used to usurp the powers of the political branches' " and "helps safeguard the Judiciary's proper—and properly limited—role in our constitutional system." *United States v. Texas*, 599 U.S. 670, 675–676, 143 S.Ct. 1964, 216 L.Ed.2d 624 (2023). But standing doctrine cannot serve that important purpose if the

Judiciary fails to apply it evenhandedly. When courts adjust standing requirements to let certain litigants challenge the actions of the political branches but preclude suits by others with similar injuries, standing doctrine cannot perform its constraining function. Over time, such selectivity begets judicial overreach and erodes public trust in the impartiality of judicial decisionmaking.

Today's ruling runs the risk of setting us down that path. The Court shelves its usual case-selection standards to revive a fuel-industry lawsuit that all agree will soon be moot (and is largely moot already). And it rests its decision on a theory of standing that the Court has refused to apply in cases brought by less powerful plaintiffs. This case gives fodder to the unfortunate perception that moneyed interests enjoy an easier road to relief in this Court than ordinary citizens. Because the Court had ample opportunity to avoid that result, I respectfully dissent.

I

In 2022, petrochemical companies and other fuel-industry groups filed this lawsuit challenging a Government action under the Clean Air Act.

President Lyndon B. Johnson signed the Clean Air Act into law in 1963 to "protect and enhance the quality of the Nation's air resources so as to promote the public health and welfare and the productive capacity of its population." As added, 77 Stat. 392, 42 U.S.C. § 7401(b)(1). One of the ways the Act sought to achieve that goal was by requiring all "new

motor vehicles or new motor vehicle engines" sold in the United States to comply with certain emissions standards established by the Environmental Protection Agency (EPA). §§ 7521(a)(1), 7522(a)(1).

**\*16** To ensure that automakers would not have to comply with a competing patchwork of emissions standards set by various States, the Act pre-empts state efforts to regulate vehicle emissions. Under the statute's pre-emption provision, "[n]o State ... shall adopt or attempt to enforce any standard relating to the control of emissions from new motor vehicles." § 7543(a).

But, notably, that provision contains an exception for the State of California, which was the only State whose efforts to regulate auto emissions predated the Clean Air Act. Recognizing that "California's unique problems and pioneering efforts justified a waiver of the preemption section," S. Rep. No. 403, 90th Cong., 1st Sess., 33 (1967), Congress allowed California to adopt more stringent emissions standards than the Federal Government. § 208, 81 Stat. 501. Thus, under the current statute, California can obtain a preemption waiver that allows it to adopt emissions standards that are, "in the aggregate, at least as protective of public health and welfare as applicable Federal standards." § 7543(b)(1). The statute specifically directs EPA to grant such a waiver unless the agency finds that California's standards are "arbitrary and capricious," not necessary to "meet compelling and extraordinary conditions," or incompatible with specific statutory requirements. *Ibid.* Consistent with that directive, EPA has granted dozens of pre-emption waivers for California

emissions programs over the past several decades. [1]

This case concerns one of those waivers: a 2013 waiver that EPA granted for a California emissions program targeting greenhouse gases. 78 Fed. Reg. 2112 (2013). California's program had two main components. *Id.*, at 2114. First, it required automakers to ensure that a certain percentage of their vehicle fleets for model years 2017 to 2025 was composed of electric vehicles. *Ibid.* Second, it imposed fleet-wide limits on average greenhouse gas emissions; those fleet-wide emissions limits would gradually increase in stringency through model year 2025, at which point the limits would remain at 2025 levels permanently. *Ibid.* Nobody challenged the waiver in court, and California's program went into effect without incident.

In the years that followed, automakers upped their production of electric and low-emissions vehicles significantly, investing billions of dollars in new manufacturing facilities and other infrastructure. Consumer demand for those vehicles surged, too. So much so that, by 2018, automakers were selling well over 200,000 fully electric vehicles per year—a more-than-tenfold increase from the 18,000 vehicles sold in 2011, the year before California sought the waiver from EPA.

In 2019, however, EPA changed course and rescinded the waiver. 84 Fed. Reg. 51310. The agency concluded that California's emissions standards were not necessary " 'to meet compelling and extraordinary conditions,' " and were also pre-empted by a different federal law. *Id.*, at 51328.

Diamond Alternative Energy, LLC v. Environmental Protection Agency, 606 U.S. ---- (2025)
--- S.Ct. ----, 2025 WL 1716141

Three years later, EPA reversed its position again. In 2022, the agency reinstated the waiver, asserting that its 2019 decision to rescind the waiver rested on an incorrect understanding of federal law. 87 Fed. Reg. 14332–14333.

**\*17** That 2022 waiver-reinstatement decision precipitated this lawsuit. Members of the fuel industry sought review of that decision in the D. C. Circuit, arguing that it contravened the Clean Air Act and exceeded EPA's statutory authority. Although EPA's reinstatement of the waiver did not regulate the fuel industry directly, petitioners claimed that the revival of California's emissions standards would injure them by suppressing the sale of gas-powered vehicles and thus quelling consumer demand for their fuel products.

The D. C. Circuit rejected that argument. *Ohio v. EPA*, 98 F.4th 288, 294 (D.C. Cir. 2024) (*per curiam*). The panel unanimously held that petitioners lacked standing because they had failed to show that a court order invalidating the waiver would actually redress their asserted injury—namely, diminished demand for fuel. The court reasoned that petitioners' "injuries would be redressed only if automobile manufacturers responded to vacatur of the waiver by producing and selling fewer non-conventional vehicles or by altering the prices of their vehicles such that fewer nonconventional vehicles—and more conventional vehicles—were sold." *Id.*, at 302. But petitioners had "fail[ed] to point to any evidence affirmatively demonstrating that vacatur of the waiver would be substantially likely to result in any change to automobile

manufacturers' vehicle fleets by Model Year 2025," when the court believed California's program would terminate. *Ibid.*[2] To the contrary, the court concluded, the "only evidence points in the opposite direction." *Ibid.*

Among other evidence, the court cited an expert declaration submitted by California, which had intervened to defend the waiver. The declaration documented how electric-vehicle sales in California had already surpassed state-mandated levels as a result of rising consumer demand and automakers' long-term planning choices, "suggesting that vacatur of the [electric] vehicle mandate would not redress [p]etitioners' injuries." *Id.*, at 305. The court also pointed to a brief from the auto industry echoing the same point and explaining that " 'both internal sustainability goals and external market forces' are prompting manufacturers to transition toward electric vehicles, irrespective of California's regulations." *Id.*, at 303, n. 8. Based on petitioners' failure to submit any countervailing evidence, the court found "no basis to conclude that [p]etitioners' claims are redressable." *Id.*, at 305.

Seven months after the D. C. Circuit issued its decision, President Trump was elected to a second term in office. We granted certiorari the following month. 604 U. S. ——, 145 S.Ct. 980, 220 L.Ed.2d 288 (2024). One month later, the Government asked us to hold this case in abeyance while the new administration "reassess[ed] the basis for and soundness of " the waiver at issue. Motion of Federal Respondents To Hold Briefing Schedule in Abeyance 3. We declined to do so and instead set this case for argument.

Diamond Alternative Energy, LLC v. Environmental Protection Agency, 606 U.S. ---- (2025)

--- S.Ct. ----, 2025 WL 1716141

## II

## A

Article III of the Constitution restricts the jurisdiction of federal courts to actual "Cases" or "Controversies." That case-or-controversy requirement limits our power as judges: It means that we can only resolve concrete legal disputes—those with real stakes for real people —and we must turn away litigants who ask us to decide purely hypothetical questions. Standing doctrine furthers the end of ensuring that each case has real stakes by requiring anyone who files a federal lawsuit to establish, as a threshold matter, that they have suffered a genuine injury that can actually be redressed by a court. As the majority aptly puts it, the doctrine forces every plaintiff to "answer a basic question—' "What's it to you? " ' " *Ante*, at ——.

 **\*18** The fuel industry's answer to that question here should give us all pause. In their petition for certiorari, the industry members asserted that California's emissions standards harmed them by suppressing the sale of gas-powered cars and thereby driving down demand for fuel. But they later made clear that any such harm would be exceedingly short lived: EPA is presently reviewing California's pre-emption waiver, and as petitioners' counsel told us at oral argument, the agency is likely to withdraw that waiver imminently, which will put an end to California's emissions program for good. Tr. of Oral Arg. 69. In fact, petitioners' counsel was so confident of that outcome that he told us he would bet his "bottom dollar" on it. *Ibid.*

His confidence is not overstated. President Trump rescinded this exact same waiver the last time he was in office. And EPA has told us that it is actively reconsidering its decision to grant the waiver. Because a withdrawal of the waiver would moot this case, an obvious question arises: Why would this Court rush to opine on whether the fuel industry's legal challenge raises an Article III "case" or "controversy" when all involved—including petitioners themselves—believe that any such "case" or "controversy" will soon vanish?

The Court had plenty of other options. For one thing, it could have denied certiorari, recognizing that one of the core components of California's emissions program —the electric-vehicle mandate—is about to sunset. Regardless of what EPA does here, that mandate will terminate in just a few months, when model year 2025 ends. Automakers are already accepting preorders on model-year-2026 vehicles, and, by Thanksgiving, their entire fleets for model year 2026 will be available. This means that even if the electric-vehicle mandate is currently harming the fuel industry—a dubious proposition in itself, see Part III–A, *infra*—that harm will cease before petitioners brief the actual merits of their challenge, let alone before any court rules on it.

Alternatively, this Court could have deferred its decision in this case until after EPA concludes its reassessment of the waiver, as the Government asked us to do. The Government rarely proposes that we withhold judgment after certiorari is granted, and it did so here before any party had filed its brief. In the rare cases where the Government does ask us

to defer, we often grant those requests—and we sometimes decide to put cases on hold independently.[3] But, for some reason, in this case, we rejected the Government's request and proceeded to render a decision anyway.

A third option, once we granted certiorari, would have been to simply vacate the judgment and remand the case to the D. C. Circuit. The D. C. Circuit's opinion appeared to rest, at least in part, on the erroneous factual assumption that California's entire emissions program—and not just its electric-vehicle mandate—would sunset with model year 2025. As the majority observes, "[i]t may be that some of the D. C. Circuit's standing analysis stemmed from a misunderstanding about when the California fleet-wide emissions standards expire." *Ante*, at ——, n. 2.[4] Once EPA clarified the regulatory timeline in its certiorari brief, it would have been reasonable for this Court to give the D. C. Circuit an opportunity to reconsider its analysis on a corrected record. Cf. *Lawrence v. Chater*, 516 U.S. 163, 166–167, 116 S.Ct. 604, 133 L.Ed.2d 545 (1996) (*per curiam*) ("We have GVR'd [*i.e.*, granted, vacated, and remanded] in light of a wide range of developments, including ... changed factual circumstances"). That approach might have even allowed for a quicker resolution of this matter by obviating the need for a seven-month detour to this Court. But the Court granted plenary review instead.

 **\*19** Our insistence on resolving the standing question in this case strains our usual case-selection standards, which are highly selective. We typically grant review in just a few dozen cases each year—a tiny fraction of the thousands of petitions we receive.[5] That is because, as we have often explained, ours "is

not a court of error correction." S. Breyer, Reflections on the Role of Appellate Courts: A View From the Supreme Court, 8 J. App. Prac. & Process 91, 92 (2006). Rather, we grant review in cases "only for compelling reasons." Supreme Court Rule 10. This case—concerning a record-specific disagreement about standing to sue in a dispute that will soon be moot anyway—hardly cries out for our involvement.

To be sure, if the lower courts were divided on some legal question in this case, then maybe certiorari would be justified. They are not. Similarly, if the lower courts had been clamoring for us to clarify how best to evaluate Article III redressability when plaintiffs assert injuries based on third parties' responses to regulation, then maybe our intervention would have been sensible. They have not. Indeed, we recently spoke to the redressability issue—just last Term, we decided a case addressing our redressability standard at length. See *FDA v. Alliance for Hippocratic Medicine*, 602 U.S. 367, 144 S.Ct. 1540, 219 L.Ed.2d 121 (2024); *ante*, at —— – —— (citing *Alliance for Hippocratic Medicine* nearly 20 times).

At most, then, the Court's ruling today amounts to little more than error correction in the context of a dispute that all agree will be over soon in any event.

B

This is not to suggest that no one will benefit from the Court's decision to dabble in error correction in this case. Our ruling will no doubt aid future attempts by the fuel industry to attack

Diamond Alternative Energy, LLC v. Environmental Protection Agency, 606 U.S. ---- (2025)
--- S.Ct. ----, 2025 WL 1716141

the Clean Air Act. But Article III requires a live case or controversy, not merely the potential that a favorable judgment will help the plaintiff in some future lawsuit.

Also, I worry that the fuel industry's gain comes at a reputational cost for this Court, which is already viewed by many as being overly sympathetic to corporate interests. See, *e.g.*, A. Liptak, Corporations Find a Friend in the Supreme Court, N. Y. Times, May 4, 2013.[6] Some knowledgeable researchers have suggested that this reputation is unfounded.[7] But, at this point, that unfortunate perception seems pervasive.[8] And even the mere "appearance" of favoritism, founded or not, can "undermin[e] confidence in the integrity of the judiciary." *Williams-Yulee v. Florida Bar*, 575 U.S. 433, 454, 135 S.Ct. 1656, 191 L.Ed.2d 570 (2015); cf. *Republican Party of Pa. v. Degraffenreid*, 592 U. S. ——, ——, 141 S.Ct. 732, 737, 209 L.Ed.2d 164 (2021) (THOMAS, J., dissenting from denial of certiorari) (arguing that state efforts to prevent voter fraud are important even "where allegations [of fraud] are incorrect," because " '[c]onfidence in the integrity of our electoral process is essential to the functioning of our participatory democracy' ").

 **\*20** It may be difficult for the public to know exactly what to make of the Court's decision to address the fleeting legal issue presented here. For its part, the Court does not explain why it is so eager to resolve this highly factbound, soon-to-be-moot dispute. See *ante*, at —— – ——. For some, this silence will only harden their sense that the Court softens its certiorari standards when evaluating petitions from moneyed interests, looking past the

jurisdictional defects or other vehicle problems that would typically doom petitions from other parties. This Court's simultaneous aversion to hearing cases involving the potential vindication of the rights of less powerful litigants—workers, criminal defendants, and the condemned, among others[9]—will further fortify that impression.

In my view, we should have either denied certiorari outright or held this matter in abeyance pending EPA's reconsideration of its waiver grant. Barring that, we should have simply vacated and remanded for the D. C. Circuit to reconsider its ruling on a clarified factual record.

### III

But that's not all. The Court's substantive Article III standing analysis, though not entirely implausible, also invites questions about inconsistent decisionmaking and whether this Court is holding business litigants to the same standards as everyone else. The majority has made nothing short of a herculean effort to justify the conclusion that redressability exists on this record. See *ante*, at —— – ——. Its demonstrated concern for ensuring that the fuel industry's ability to sue is recognized on these facts highlights a potential gap in the manner in which the Court treats the claims of plaintiffs pursuing profits versus those seeking to advance other objectives.

### A

It is "a bedrock principle that a federal court cannot redress 'injury that results from the independent action of some third party not before the court.' " *Murthy v. Missouri*, 603 U.S. 43, 57, 144 S.Ct. 1972, 219 L.Ed.2d 604 (2024). Accordingly, "we have 'been reluctant to endorse standing theories that require guesswork as to how independent decisionmakers will exercise their judgment.' " *Ibid.*

It is indisputable that petitioners' theory of standing requires guesswork as to how independent decisionmakers (specifically, automakers and consumers) would respond to a court order invalidating the pre-emption waiver for California's emissions standards. The only way that such an order could possibly benefit the fuel industry would be if it ultimately spurred the production, purchase, and usage of more gas-powered cars. The majority holds, however, that our usual skepticism about standing theories that turn on independent third-party conduct is not warranted because, in its view, petitioners' theory of redressability rests on "commonsense economic principles." *Ante*, at ——.

I have no quarrel with relying on common sense as a general matter. But we should acknowledge that what counts as a "commonsense" inference to the Justices on this Court may not be viewed as such by others. And, if anything, the actual evidence presented in this case suggests that the majority's "[c]ommon sense is not so common." J. Bartlett, Familiar Quotations 299 (18th ed. 2012) (quoting Voltaire, Dictionnaire Philosophique (1764)).

The central problem petitioners face is one of timing. Had they challenged California's emissions program at its inception, then commonsense intuitions might have sufficed to establish redressability; indeed, "the whole point" of California's program was to reduce fuel consumption, as the majority notes. *Ante*, at ——. But petitioners did *not* challenge the program at its inception. Instead, they challenged it nearly a decade after California obtained its pre-emption waiver. By that point, consumer demand for electric and low-emissions vehicles had grown many times over, and automakers had invested billions to transform their production and marketing strategies. As California's expert attested, by the time petitioners filed suit, automakers were "already selling *more* qualifying vehicles in California than the State's standards require." App. 202.

**\*21** Furthermore, several major automakers —including Ford, Volvo, Honda, BMW, and Volkswagen—explicitly told the court below that they "have no plans to abandon their extensive and growing financial commitments to electric vehicles" because their "long-term, world-wide, industry-transformative planning ... is already well underway." Brief for Industry Respondent-Intervenors in No. 22–1081 (CADC), pp. 12–13. Meanwhile, consumers are now "willing to pay price premiums for [qualifying vehicles], sometimes thousands of dollars above the manufacturer's suggested retail price." App. 192. And demand for electric vehicles continues to grow, "both in California and nationwide." *Id.*, at 202.

Against the weight of that evidence, the majority's "commonsense" intuitions about

Diamond Alternative Energy, LLC v. Environmental Protection Agency, 606 U.S. ---- (2025)
--- S.Ct. ----, 2025 WL 1716141

automaker and consumer behavior are much less certain. Maybe some automakers would actually produce more gas-powered cars if a court were to invalidate California's emissions program now. Or maybe not. Maybe any such uptick in production would cause consumers to buy more gas-powered cars moving forward. Or maybe not.

The only thing we know for sure is that the onus of establishing what is likely to happen is on petitioners (the fuel industry), as the party invoking the jurisdiction of a federal court. It is the fuel producers who must present evidence supporting their theory that invalidation of the waiver by a court will benefit them—intuition alone will not suffice. When redressability " 'depends on the unfettered choices made by independent actors not before the courts,' " it "becomes the burden of the plaintiff to adduce *facts* showing that those choices have been or will be made in such manner as to ... permit redressability." *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 562, 112 S.Ct. 2130, 119 L.Ed.2d 351 (1992) (emphasis added).

Petitioners have made little effort to meet that burden. None of the declarations they submitted below say anything substantive about redressability. None purport to address, much less refute, any of the data or analyses California's expert or the automaker intervenors have provided. Indeed, all of the language that the majority quotes from petitioners' declarations derives from statements originally made in 2011 and 2012 —*a full decade before* petitioners filed this lawsuit. See *ante*, at —— – ——. Although petitioners shrewdly attempt to bolster their submissions by citing assertions from

California's intervention motion, almost all of those assertions concern the nearly defunct electric-vehicle component of California's program—not the fleet-wide emissions limits —suggesting that any redressability is likely to expire within months. [10]

It is perhaps due to the "paucity of evidence in the record regarding the redressability of [petitioners'] injuries," 98 F.4th at 303, that petitioners' primary contention is that they *do not need to submit any evidence at all* to establish redressability. Brief for Petitioners 18 ("[W]hen a third-party response is predictable, no more is needed than a dose of common sense"). Indeed, petitioners' opening brief devotes just two pages to the argument that the actual record in this case supports redressability. See *id*., at 37–38 (arguing, in the alternative, that the Court should reverse "[e]ven if petitioners were legally required to produce record evidence to support redressability").

Petitioners' obvious disinterest in developing or relying on the evidentiary record in this litigation is the reason why the majority has had to perform yeoman's work in cobbling together a plausible factual basis for redressability. See, *e.g.*, *ante*, at —— – —— (scouring the regulatory history and scant record for redressability-related evidence). Whatever one thinks about the majority's labored redressability analysis, the effort it expends on this endeavor is striking—especially when compared to the Court's approach to Article III standing in cases involving civil rights.

--- S.Ct. ----, 2025 WL 1716141

B

**\*22**  The Court's remarkably lenient approach to standing in this case contrasts starkly with the stern stance it has taken in cases concerning the rights of ordinary citizens. See, *e.g.*, *Whitmore v. Arkansas*, 495 U.S. 149, 155–156, 110 S.Ct. 1717, 109 L.Ed.2d 135 (1990) ("A federal court is powerless to create its own jurisdiction by embellishing otherwise deficient allegations of standing"). Here, the Court's "commonsense" inferences readily align with the fuel industry's assertions of economic injury, even in the face of conflicting evidence. But for less wealthy individual plaintiffs, establishing redressability to the Court's satisfaction is often harder to come by.

Take our decision in *Warth v. Seldin*, 422 U.S. 490, 95 S.Ct. 2197, 45 L.Ed.2d 343 (1975). There, the Court held that a group of low-income plaintiffs in upstate New York lacked standing to challenge a zoning ordinance that effectively barred the construction of affordable housing in the town where they wished to move. *Id.*, at 493, 95 S.Ct. 2197. The plaintiffs had alleged that the ordinance—which prohibited the construction of multifamily housing virtually anywhere in town—excluded them from the town, causing injury, by depressing the supply of affordable housing options. *Id.*, at 504–507, 95 S.Ct. 2197. The Court rejected the claim for lack of redressability. *Ibid.*

Under the Court's reasoning, the plaintiffs' "desire to live in [the town] depended on the efforts and willingness of third parties to build low- and moderate-cost housing," and "their inability to reside in [the town was] the consequence of the economics of the area housing market, rather than of [the defendants'] assertedly illegal acts." *Id.*, at 505–506, 95 S.Ct. 2197. Critically, the Court stated that it was not enough for the plaintiffs to show generally that the zoning ordinance suppressed the overall supply of affordable housing. Rather, we explained, the plaintiffs needed to show that the invalidation of the ordinance by court order would lead to the availability of *specific* units that met their individual needs and fell within their individual budgets. *Id.*, at 506, 95 S.Ct. 2197. "[C]ommonsense economic principles," *ante*, at ———say, about the general impact of increased housing supply on housing prices—did not rescue the plaintiffs.

Our decision in *Allen v. Wright*, 468 U.S. 737, 104 S.Ct. 3315, 82 L.Ed.2d 556 (1984), was more of the same. There, we held that a group of Black parents lacked standing to challenge the Internal Revenue Service's (IRS) policies concerning tax exemptions for private schools. *Id.*, at 739–740, 104 S.Ct. 3315. The parents had alleged that the IRS's failure to deny tax-exempt status to racially exclusionary private schools in their communities was hindering desegregation efforts in the districts their children attended. *Id.*, at 752–753, 104 S.Ct. 3315. This Court held that, although the parents had stated a cognizable injury, they had not shown that denying tax-exempt status to the exclusionary private schools would redress that injury. *Id.*, at 758–759, 104 S.Ct. 3315.

Notably, in *Allen*, the Court specifically observed that the plaintiffs' redressability

theory hinged on speculation about, among other things, how private-school parents and administrators would respond to the loss of their tax exemptions and whether that response would actually affect the racial makeup of local public schools. *Id.*, at 758, 104 S.Ct. 3315. Justice Brennan noted in dissent that "[c]ommon sense alone would recognize that the elimination of tax-exempt status for racially discriminatory private schools would serve to lessen the impact that those institutions have in defeating efforts to desegregate the public schools." *Id.*, at 774, 104 S.Ct. 3315. But "[c]ommon sense alone" was not enough for those plaintiffs, either.

 **\*23** For a more recent example, look at *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 133 S.Ct. 1138, 185 L.Ed.2d 264 (2013). In that case, the Court held that a group of human-rights, media, labor, and legal organizations lacked standing to challenge certain electronic-surveillance practices under the Foreign Intelligence Surveillance Act. *Id.*, at 402, 406, 133 S.Ct. 1138. Among the reasons we provided for this holding was that any surveillance activities the Government pursued would ultimately have to be approved by the Foreign Intelligence Surveillance Court (FISC), and the plaintiffs could "only speculate as to whether that court will authorize such surveillance." *Id.*, at 413, 133 S.Ct. 1138. We could have easily drawn a commonsense inference that the FISC was likely to approve at least *some* of the surveillance activities of concern to the plaintiffs, given that (per the Government's own statistics) the FISC approved over 99% of the surveillance-authorization requests it received. *Id.*, at 430, 133 S.Ct. 1138 (Breyer, J., dissenting) (citing

records showing that the court approved 1,674 out of 1,676 applications in 2011). But instead we "decline[d] to abandon our usual reluctance to endorse standing theories that rest on speculation about the decisions of independent actors." *Id.*, at 414, 133 S.Ct. 1138.

I could go on. My point here is not that any of these particular standing decisions was wrongly decided. Instead, I am simply observing that the Court seems inconsistent in its willingness to premise redressability on commonsense inferences about third-party behavior. That inconsistency, which we reinforce with today's holding, tends to redound to the benefit of particular litigants. But nothing in Article III's text or history justifies relying on "commonsense" inferences in one standing context and not another. The Constitution does not distinguish between plaintiffs whose claims are backed by the Chamber of Commerce and those who seek to vindicate their rights to fair housing, desegregated schools, or privacy. But if someone reviewing our case law harbored doubts about that proposition, today's decision will do little to dissuade them.

* * *

It is easy to deprecate the single phrase inscribed atop the entrance to our courthouse by conceptualizing it as a mere platitude. But "Equal Justice Under Law" remains this Court's guiding light nearly a century after those words were first engraved there. Striving to embody that particular ideal is what distinguishes our work as judges from that of the well-heeled lawyers and lobbyists who walk into similarly ornate buildings every day to promote the interests of their clients. It may sometimes

be difficult to tell one marble façade from another—especially when some of them share a common architect. [11] But those of us who are privileged to work inside the Court must not lose sight of this institution's unique mission and responsibility: to rule without fear or favor. If the Court privileges the interests of one class of litigants over others, even unintentionally, it can damage Americans' faith in an impartial Judiciary and undermine the long-term credibility of its judgments.

Time will tell if today's decision portends a broader shift in the Court's view of Article III standing for *all* litigants. If it does not, and if the Court is not fastidious in maintaining consistency across its certiorari decisions and substantive rulings, its decisions will come to represent, like so many marble façades, another mere facsimile of justice.

**All Citations**

606 U.S. ----, --- S.Ct. ----, 2025 WL 1716141

---

## Footnotes

\*      The syllabus constitutes no part of the opinion of the Court but has been prepared by the Reporter of Decisions for the convenience of the reader. See *United States v. Detroit Timber & Lumber Co.*, 200 U.S. 321, 337, 26 S.Ct. 282, 50 L.Ed. 499.

1      Acting under the Congressional Review Act, Congress recently passed and the President signed legislation to block that separate set of California regulations. See H. J. Res. No. 88, 119th Cong., 1st Sess. (2025).

2      The D. C. Circuit opined that the California regulations expire after model year 2025, making it unlikely that automakers would "change course" even if the court "were to vacate the waiver." 98 F.4th at 302. In its briefing before this Court, EPA acknowledged that the D. C. Circuit was factually incorrect on that point—California in fact may keep its fleet-wide emissions standards in place indefinitely into the future. Brief for Federal Respondents in Opposition 12–13; see Cal. Code Regs., tit. 13, § 1961.3(a). It may be that some of the D. C. Circuit's standing analysis stemmed from a misunderstanding about when the California fleet-wide emissions standards expire.

3      In this opinion, we use the term "invalidated" as shorthand to describe the result from setting aside EPA's approval of the California regulations. Under D. C. Circuit precedent, setting aside EPA's approval would mean that California may not enforce its greenhouse-gas emissions limits and electric-vehicle mandate for new vehicle fleets.

Diamond Alternative Energy, LLC v. Environmental Protection Agency, 606 U.S. ---- (2025)
--- S.Ct. ----, 2025 WL 1716141

4   Recall that the California regulations at issue impose a direct electric-vehicle mandate along with fleet-wide limits on average greenhouse-gas emissions from new motor vehicles. Automakers may comply with the fleet-wide emissions limits by producing more electric vehicles, more low-emission vehicles, or both. See Cal. Code Regs., tit. 13, §§ 1961.3(a)(1), (a)(4). For the sake of simplicity, we refer to the production of additional electric vehicles, recognizing that some manufacturers may also (or alternatively) manufacture additional low-emission vehicles to comply with California's fleet-wide emissions limits.

5   We need not decide whether every piece of record evidence described above is necessary to establish standing here. The totality of record evidence, along with commonsense inferences about market realities, readily suffices to demonstrate standing.

6   Or a regulation may have expired, making the legal challenge moot. But that scenario is covered by mootness doctrine, not redressability.

7   Even if it appears that a market may have temporarily rendered a regulation irrelevant, the market may shift again. This market may be an example. Even supposing that California's regulations as of 2022 were momentarily having no continuing effect on the automobile market due to surging consumer demand for electric vehicles, the demand for electric vehicles may have slowed or at least not matched what might have been anticipated. See, *e.g.*, I. Penn, Electric Vehicles Died a Century Ago. Could That Happen Again? N. Y. Times, May 27, 2025, section B, p. 1; R. Felton, EV Sales Streak Grinds to a Sudden Halt, Wall Street Journal, May 8, 2025; Carmakers Scale Down Electrification Plans as EV Demand Slows, Reuters, Sept. 12, 2024; C. Otts, GM Delays Electric Vehicle Buildout in New Sign of Weakening Demand, Wall Street Journal, July 24, 2024; J. Ewing, Carmakers Downshift on E.V. Spending as Sales Growth Slows, N. Y. Times, Nov. 10, 2023, section B, p. 1.

*   The majority suggests it can disregard the actual basis for the D. C. Circuit's decision because (in the majority's view) that court "did not rest" its analysis "entirely" on its factual error. *Ante*, at ——. Having granted certiorari in this case to conduct the factbound standing analysis in the first instance, the majority now asserts a remand would "waste ... time and resources" because "the parties have comprehensively briefed" the issue. *Ibid*. What the parties briefed, however, is whether petitioners bore any evidentiary burden to establish standing at all. See Brief for Petitioners 24–37 (arguing that, because California's rules are a "regulatory hurdle" to the sale of petitioners' product, no evidence of redressability was required). To be sure, the fuel producer petitioners argued in a single paragraph that they should prevail "[e]ven if [they] were legally required to produce record evidence to support redressability."

Case: 1:25-cv-00669 Document #: 96 Filed: 07/01/25 Page 35 of 36 PageID #:1015

Diamond Alternative Energy, LLC v. Environmental Protection Agency, 606 U.S. ---- (2025)
--- S.Ct. ----, 2025 WL 1716141

*Id.*, at —— – ——. "But our usual practice is to leave matters of that sort for remand." *E.M.D. Sales, Inc. v. Carrera*, 604 U.S. 45, 54, 145 S.Ct. 34, 220 L.Ed.2d 309 (2025) (KAVANAUGH, J., for the Court).

1 See EPA, Vehicle Emissions California Waivers and Authorizations, https://www.epa.gov/state-and-local-transportation/vehicle-emissions-california-waivers-and-authorizations.

2 As noted above, the electric-vehicle-mandate component of California's program sunsets with model year 2025, but the other component of the program—the fleet-wide limits on average greenhouse-gas emissions—remains in effect indefinitely.

3 We have opted to defer decision with respect to other closely watched cases in recent months. See, *e.g.*, *Bessent v. Dellinger*, 604 U. S. ——, 145 S.Ct. 515, 221 L.Ed.2d 226 (2025) (holding emergency application in abeyance pending expiration of a temporary restraining order).

4 The D. C. Circuit's mistake in this regard could have stemmed from the fact that, until recently, petitioners themselves seem to have shared that understanding. See Pet. for Cert. 26 (arguing that "the Court can decide this case before it becomes moot" because "it will presumably render a decision before model year 2025 ends").

5 This Term, for instance, the Court has docketed nearly 4,000 new cases but will issue fewer than 60 signed opinions.

6 See also L. Epstein & M. Gulati, A Century of Business in the Supreme Court, 1920–2020, 107 Minn. L. Rev. Headnotes 49, 57 (2022) (concluding, based on an analysis of all decisions involving business litigants between 1920 and 2020, that the current Court is "significantly more likely to favor business than ... any Court era in the last 100 years" and "is the first Court in the last 100 years that rules in favor of business more often than not"); A. Feldman, Empirical SCOTUS: The Big Business Court, SCOTUSblog, Aug. 8, 2018, https://www.scotusblog.com/2018/08/empirical-scotus-the-big-business-court/ (analyzing data from the 2015 through 2017 Terms, and concluding that the Court "increased its pro-business momentum"); L. Epstein, W. Landes, & R. Posner, When It Comes to Business, the Right and Left Sides of the Court Agree, 54 Wash. U. J. L. & Pol'y 33, 43–50 (2017) (concluding, based on an analysis of all decisions involving business litigants between 1946 and 2015, that the "Court's tendency to favor business in unanimous decisions has increased, not decreased, over time").

7 See, *e.g.*, J. Adler, Is the Business of the Court (Still) Business? 713 Annals Am. Acad. Pol. & Soc. Sci. 221, 222 (2025) (citing scholars that have "criticized the 'probusiness' characterization of the Roberts court as a simplistic,

Diamond Alternative Energy, LLC v. Environmental Protection Agency, 606 U.S. ---- (2025)
--- S.Ct. ----, 2025 WL 1716141

insufficiently nuanced, and unhelpful way to characterize or understand the court's jurisprudence").

8    *E.g.*, E. Pollman, The Supreme Court and the Pro-Business Paradox, 135 Harv. L. Rev. 220, 223 (2021) ("Corporations have often pushed for rights and challenged external rules and regulations that create responsibility, and as the Supreme Court in recent years has appeared to take a friendly stance toward their claims, it has developed a 'pro-business' reputation"); F. Salmon, The Most Pro-Business Supreme Court Ever, Axios (Aug. 4, 2022); J. Surowiecki, Courting Business, The New Yorker (Feb. 28, 2016); B. Goad, Business Racks Up Wins With Roberts Court, The Hill (May 5, 2014); A. Liptak, Justices Offer Receptive Ear to Business Interests, N. Y. Times, Dec. 19, 2010.

9    *E.g.*, *Nicholson* v. *W.L. York, Inc.*, 605 U. S. —— (2025) (JACKSON, J., dissenting from denial of certiorari); *Shockley v. Vandergriff*, 604 U. S. ——, 145 S.Ct. 894, 221 L.Ed.2d 578 (2025) (SOTOMAYOR, J., dissenting from denial of certiorari).

10    This, of course, underscores the illogic of this Court's decision to issue a ruling in this case at all. See Part II–A, *supra*.

11    See U. S. Commission on Fine Arts, Cass Gilbert, https://www.cfa.gov/about-cfa/who-we-are/cass-gilbert (noting that Cass Gilbert, who designed the Supreme Court building, also designed the Chamber of Commerce's headquarters in Washington, D. C., and the New York Life building in Manhattan, among other major commercial offices).

---

**End of Document**                    © 2025 Thomson Reuters. No claim to original U.S. Government Works.